IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT PIERCE

_____

LINDA LAROCQUE,                )
                               )
            Plaintiff,         )
                               )
v.                             ) No. 3:25-cv-05380-MJP
                               )
THE KROGER CO., A FOREIGN )
CORPORATION DOING BUSINESS)
IN WASHINGTON STATE; AND   )
FRED MEYER STORES, INC.,    )
A FOREIGN CORPORATION      )
DOING BUSINESS IN          )
WASHINGTON STATE, A/K/A     )
TACOMA-STEVENS FRED MEYER,)
GATEKEEPER SYSTEMS, INC., )
A FOREIGN CORPORATION      )
DOING BUSINESS IN          )
WASHINGTON STATE,          )
                               )
            Defendants.   )
_____

DEPOSITION OF LINDA LAROCQUE
_____

10:00 a.m.
September 12, 2025

ESQUIRE
File #J13317722

Reported By:  Judy Robinson, CCR #2171



Q.    How many times had you gone to a grocery store post surgery before the car incident.

A.    To any store?

Q.    Any store with a shopping cart?  Grocery store, Walmart, anything like that?

A.    I would say once a week.

Q.    Your husband mentioned to us yesterday that you started driving at some point in time.  Do you know when you started driving post surgery?

A.    After the first surgery, three weeks.

Q.    So moving kind of to the day of the accident, in that general timeframe, were you still experiencing any pain or swelling in your left knee?

A.    Just some mild pain at that time.

Q.    Okay.  And your husband answered some of these questions for us yesterday, but I'd like to ask you. How many times have you shopped at this Fred Meyer's before?

A.    In years or a lot of times?

Q.    It -- was his testimony accurate?  He said something like a couple times a week for 20 or so years?

A.    It was frequent, I would say at least once or twice for me, because my doctor's office is just down the road.

Q.    Okay.  How many times when you would go shop



800.211.DEPO (3376)
EsquireSolutions.com

at this Fred Meyer's did you use a shopping cart for stability like you had talked about earlier?

A.    Every time.

Q.    So I did this with your husband yesterday and I would like to ask you as well.  I'm going to pull up a map of the parking lot or a map of the store and the parking lot, and when you first arrived at the Safeway, where did you park?

A.    It wasn't at Safeway.

Q.    I'm sorry.  Fred Meyer's, Fred Meyer's.

A.    On the grocery side where the disability spots are.

Q.    So here is where your husband said; is that accurate or is it a different location based on your memory?

A.    It was in that area or just the one at that spot right at the very corner of the sidewalk.

Q.    When you say the spot at the very corner, here (indicating) or a different location?

A.    Different location, across the way.

Q.    To the right?

A.    Right there.  There's a disability spot right there. (indicating).

Q.    Okay.  So your testimony is you parked either this island of parking or this corner spot (indicating)?



about the ATM is kind of in this area here; right?

A.    Correct.

Q.    So when you parked, can you describe to me how you maneuvered to the ATM?  Did you need any assistance?

A.    I got out the van and I had my cane and Steve and I walked together, so she knew I went in the store.

Q.    Okay.  So you go to the ATM deposit the cash and then go to the entrance?

A.    Correct.

MR. URBAN:  Okay.  I think that should be good for this, so I will stop sharing and we'll mark this as Exhibit 2.

(Exhibit No. 2 was marked.)

MR. WILKE:  Skyler, can we take a bathroom break in the next 10 to 15, whatever works for you?

MR. URBAN:  I think now's an okay time if that works for you.

MR. WILKE:  Yeah.  Take five or ten, either one works for us.

MR. URBAN:  Let's do ten.  I will refill my coffee.  We'll do --

MR. WILKE:  Sounds good.  I'll see you at 11:33?

MR. URBAN:  Sounds good.

(Off the record.)



BY MR. URBAN:

Q.   All right.  Ms. Larocque.  Let me take a look at my notes here and see where we are.

Okay.  So you mentioned you two came back to the store and decided to get magnesium supplements; is that correct?

A.   Correct.

Q.   Okay.  And your husband retrieved the cart for you?

A.   Yes.

Q.   Do you recall if it was a full-sized cart or one of those mini carts?

A.   Full-sized cart.

Q.   While he was retrieving the cart, where did you stand?

A.   Close by.  We were in the foyer area.  He was getting the cart right there.

Q.   And you weren't intending to purchase any other grocery just the supplement for him?

A.   Just the supplement.

Q.   So what was the purpose of the cart?

A.   For balance.

Q.   Is it fair to say you were still in a recovery period from your surgery?

A.   Yes.



Q.   Can you explain to me how you used the cart for balance?

A.   I mainly put my purse and my coat in the top part where you put the little kids, and then I put both hands on the cart and I stand up straight, push it to keep my balance.

Q.   Outside of your two hands, were -- was any part of your body touching the cart?

A.   No.

Q.   Did you ever lean or put your body weight on the cart for support?

A.   No.

Q.   Okay.  Tell me what happened after you went to the store?

A.   We went into the store and went to the right produces, kind of walked down, got back in.  Like I said, it was all remodeled.  So we -- I hadn't been there in a long time.  So we went, you know, finally found the aisle and we could not find the merchandise we needed, so I'm like, "Let's just go to Walmart."

That's what he wanted to do.  And so we just went out, like, through the area, like, in the front with, like, the restroom and the banking lot and things. We just walked past all the registers and went out the door, the first door.



Q.    Okay.

A.    Or something.  He just takes it and I'm looking down at him and he's waving it under -- on the wheel on the left -- right side of the cart to deactivate.  And so by now, more people are there because it's really busy.  And I'm just like, "Come on, let's go, Steve."

And Steve was upset with the guy.  Steve thought it was like no big deal and I'm like -- so suddenly the cart moves and I pushed it out of the way, and I'm like, "I'm out of here.  I'm out of here."

So I left.  He was mad.  Steve was mad at this guy, because he thought it was kind of like a joke.  And He goes, "My wife just had knee surgery.  This isn't funny."  And so I was so upset.  By then I was crying and I walked over -- back over by myself to the BECU machine, okay?

And I waited there thinking Steve was next to me.  He wasn't.  He was still back there with the guy. And there was another.  I was carrying on about, you know, just another reason not to shop at Fred Meyer's, because it was getting so bad with the violence and the criminals and that whole area by Cheney Stadium and everything.

So I was becoming very uncomfortable to shop



800.211.DEPO (3376)
EsquireSolutions.com

at that store.  And the security wasn't really, you know, what I thought it should be.  So I apologized to the gentleman and I stand at the machine and waited for Steve.  And I'm like, "Come on, just tell him to tell his manager this happened."

Steve goes, "What?"  And I said, "Just tell him to tell his manager this happened.  I want to go." You know, so I was just besides myself by then.  So he came and we got in the car and we left.  Left to go to Walmart.  Come to find out that it was taken off the market.

Q.   Okay.  Okay.

A.   So that's what happened.

Q.   Understood.  When the employee came over -- let me backtrack.  After the cart stopped, did you inspect the cart at all?  Where did you look on the cart?

A.   I was standing and I looked down to see if I had, like, run -- excuse me, went over something, you know, like a rock got stuck in the door or something like that stopped it like that and it didn't.  And I'm like -- and it was like the track in the -- like, part of the wheel was on that side of the track, and the other part was on this side of the track to me.

So it just -- it wouldn't move.  And so I



could see it, Steve couldn't because he was behind me, but that's where it was and that's where it stopped and it would not budge.  I tried moving it, he tried moving it, we didn't understand why it was locked up like that. And then that's when the guy came over and told us this stuff.

Q.   Before speaking to the employee, did you notice any of the wheel were different than the others?

A.   No.

Q.   Okay.  Did you look, again, before the employee came over, did you specifically look for any signs or something on the cart, any warnings?

A.   Yeah.  We were kind of like, "What's going on?"  And, you know, there was nothing.  It was just like an empty cart.  There was nothing, no tags, no nothing.

Q.   So earlier when you were kind of explaining as you were standing by the ATM making a reference, you know, kind of joking about -- saying, you know, another reason not to shop at this Fred Meyer's, you mentioned the crime and violence.  What -- I'm unfamiliar with kind of the area.

A.   Oh it's --

Q.   What crime or violence are you referencing?

A.   There's a lot of homelessness in that area,



because there's a walkway that can go just off to -- you can go out the door and go to the right.  There's a huge pathway that can go all the way down, and like that something is called, I think it's snake trail.

Anyway, there's a walkway that you can take and they were -- all the homeless people were coming in there, you know, taking over.  Coming in the store, you know, they are harassing people in the parking lot.

And it just became an issue of not going there, but we had to go there because it was that or 38th Street, 38th Street's even worse because they're sitting right on the floor next to the ATM machine.  So that's one of the reasons I said not another reason to come here.

Q.   Had you seen the homeless that were kind of taking over the store, take shopping carts before or had you seen them strewn about?

A.   They were everywhere.  They were out in the parking lots, they were over across the street at the metro place, they were by the Cheney Stadium, grass area.  They're all over the place.

Q.   What was the inside of the store where -- was that just an issue in the parking lot or were there issues inside the store too that you witnessed?

A.   That I can't recall.



that one, but fair to say that you were using it; correct?

A.    Correct.

Q.    Were you leaning your weight on the shopping cart?

MR. WILKE:  Asked and answered.

BY MS. LUKES:

Q.    I apologize.  I generally don't remember.  I promise I'm not trying to trick you.  I just -- I'm trying to remember if you were holding your weight on the cart?

A.    No.

Q.    Okay.

A.    I was holding the cart and pushing it, that's it.  Just try to stay -- because leaning is not going to do me any good for my knee.

Q.    Okay.

A.    I have to straight up and down.  So...

Q.    Okay.  So it's sort of like a -- almost like a tactile cue to sort of help you keep your balance?

A.    Correct.

Q.    Okay.  Were you pushing the shopping cart with your arm extended in front of you?

A.    Yes.

Q.    Okay.

A.   Correct.

Q.   The back part?  Okay.  And you hit the back plastic part that's angled away?

A.   Yeah, the one that's on --

MR. WILKE:  Object to form.  Did you say that plastic part?

BY MS. LUKES:

Q.   Whatever shopping cart material is on the back.

A.   The back.

Q.   Yes.  Okay.  And then that's the part that you hit though?

A.   Yes.

Q.   Okay.

A.   You know, where you sit below the handles, down below right where my knee -- because I lifted my knee, walked right into it and that was it.  I'll just leave.

Q.   Do you think if we had a shopping cart that you could, like, sort of recreate what happened?  I'm just having a hard time picturing it.

MR. WILKE:  I'll object to form here.  Today you're -- she's answering questions under oath.  We're not doing a physical examination.  That would be CR35.

MS. LUKES:  Well, I can ask her if that's



C E R T I F I C A T E


STATE OF WASHINGTON )
                    )SS.
COUNTY OF KING      )


    I, Judith A. Robinson, Certified Court Reporter and an officer of the Court under my commission as a Notary Public, in and for the State of Washington, do hereby certify that the foregoing deposition was transcribed under my direction; that the transcript of the deposition is a full, true and correct transcript to the best of my ability; that I am neither attorney for, nor a relative or employee of any of the parties to the action or any attorney or Counsel employed by the parties hereto, nor financially interested in its outcome.

    IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal this 21st day of September, 2025.

_____

                    Judith A. Robinson, Notary Public
                    in and for the State of Washington
                    residing at Seattle.
                    My Commission expires November 4, 2028.
                    CCR License #2171



ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Exhibit A - Page 13 of 13