IN THE UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT PIERCE

LINDA LAROCQUE,                  )
                                 )
              Plaintiff,         )
                                 )
         vs.                     )   No. 3:25-cv-05380-MJP
                                 )
THE KROGER CO., A FOREIGN        )
CORPORATION DOING BUSINESS       )
IN WASHINGTON STATE; AND,        )
FRED MEYER STORES, INC., A       )
FOREIGN CORPORATION DOING        )
BUSINESS IN WASHINGTON           )
STATE, A/K/A TACOMA-STEVENS      )
FRED MEYER, GATEKEEPER           )
SYSTEMS, INC., A FOREIGN         )
CORPORATION DOING BUSINESS       )
IN WASHINGTON STATE,             )
                                 )
              Defendant.         )
_____  )

VIDEOCONFERENCE DEPOSITION OF STEVEN LAROCQUE

Taken in behalf of the Defendants

*   *   *

September 11, 2025



800.211.DEPO (3376)
EsquireSolutions.com

right now your cane or her cane?

A.    This is my cane.

Q.    Okay.

A.    She has her own.

Q.    So how were you assisting her?  Were you -- I guess, were you using your cane on that date?

A.    I was using the cane and like a gentleman I had my arm out --

Q.    Okay.

A.    -- and my wife had ahold of my arm.

Q.    And then she had your arm and her cane?

A.    Yep.

Q.    Okay.  And you guys walked to the carts?

A.    To the carts, I pulled the cart out, handed it to her, and then that's when we went into the store.

Q.    What did she do with her cane?

A.    Put it in the cart.

Q.    And how often do you guys shop at this Fred Meyer?

A.    We used to shop there all the time but ever since that incident we've only shopped there once or twice, and that was just me.

Q.    So when you say all the time, once a week?  Twice a week?



A.    I used to do maybe three to four times a week.

Q.    How often was your wife with you for those trips?

A.    Maybe two to three times.

Q.    And is that two to three times per week in the last -- so, like, is there a -- so in the year prior to the incident, was it two to three times a week?

A.    Yes.

Q.    And what about the year before that?

A.    Isn't that -- doesn't that prior and before mean the same thing?

Q.    So, yeah, I'm just trying to get a sense of, like, how many years you were shopping at this Fred Meyer.  Sorry.  That's a confusing question.

A.    Oh, okay.  Well, about as long as we've lived in that address.

Q.    Okay.  So I think you said you've lived there for about 25 years?

A.    Yeah.

Q.    Okay.  And so how much magnesium were you guys getting?

A.    We usually get two bottles, like, eight-ounce size.



is Larocque.

Q.   Oh, thank you.  No, I appreciate that. Larocque.

A.   Could you please repeat that question?

Q.   Absolutely.

So I believe that you said that Ms. Larocque --

A.   Thank you.

Q.   The cart stopped, Ms. Larocque said "Ow," and then you ran into the back of her?

A.   Yeah.

Q.   Okay.  How fast were you guys walking?

A.   Not that fast.

Q.   I'm trying to think of how -- if you're walking at a brisk pace -- or -- let's see.  Were you guys walking the same speed?

A.   Yeah, or I would have been right on top of her.

Q.   Okay.  And you were also walking with a cane?

A.   Yes.

Q.   So it's fair to say you guys were moving slowly?

A.   Yes.

Q.   How much space was there between you and



came over to unlock the cart and made a joke?

A.    Yeah.  He was --

Q.    Did they -- okay.  Go ahead.

A.    Go ahead.  I'm sorry.

Q.    Did he say anything else?

A.    No.  Basically, that's all he -- he was saying was that "This happens a lot and this was, like, the fourth time today."

Q.    And do you remember what that guy was wearing?

A.    Whatever they wear for their uniform, that -- you know, and it says Fred Meyer's and, like, a -- the cart with those vests or those --

Q.    Like a reflective vest?

A.    Yeah.  Yeah.

Q.    Okay.  Have you seen that gentleman there before?

A.    No.

Q.    So I believe you said you shopped there approximately two to three times a week, correct?

A.    Yes.

Q.    Did you -- did you know that the carts had a warning system on them?

A.    Nope.

Q.    How often did you use a cart when you



shopped at Fred Meyer?

A.   Every time.

Q.   How often did you enter through those sliding glass doors where the -- where the warning sign was affixed?

A.   Well --

Q.   I mean, is that the entrance you typically go through?

A.   Yes.

Q.   And you'd never -- you'd never seen the warning sign on the sliding glass doors?

A.   Nope.

Q.   Had you ever seen carts stopped in the Fred Meyer parking lot or, I guess, carts that were abandoned or weren't moved or anything?

A.   I don't -- I don't understand.

Q.   That was a bad question.  Let me think.

I guess, do you shop at other shopping centers in Tacoma besides Fred Meyer?

A.   Yes.

Q.   Okay.  Are you aware that there's systems like the -- like the cart system at that Fred Meyer that exists?

MR. WILKE:  Object to form.

You can answer.



THE WITNESS:  I'm sorry.  Could you repeat that?

BY MS. LUKES:  (Continuing)

Q.   Sure.

Are you -- are you aware that -- so the -- the cart was equipped with an antitheft mechanism, correct?

A.   We've -- yeah.  We found that out after the fact, yeah.

Q.   Okay.  Have -- did -- are you aware of other -- of other stores in Tacoma that have carts with antitheft mechanisms installed?

A.   Yes.

MR. WILKE:  Object to form.

THE WITNESS:  Yes.

BY MS. LUKES:  (Continuing)

Q.   Okay.  Did you know about those mechanisms prior to this incident?

A.   For -- for Fred Meyer or -- or other stores?

Q.   For -- for other locations -- for other stores in Tacoma?

A.   Yes.  I -- no.  The other ones -- I'm sorry.  I'm getting off track here.  Ever since the accident happened to my wife, every time we go to a



grocery store we check everything.

Q.    So what other stores have you noticed have these systems?

A.    WinCo.

Q.    Any others?

A.    No.

Q.    Okay.  And you didn't -- you were not aware that WinCo had that system prior to this incident?

A.    No, we did not know or see them until after this incident.

Q.    Okay.  So at that -- did you -- did you attend most of Ms. Larocque's doctor's appointments with her?

MR. WILKE:  Object to form.

Go ahead.

THE WITNESS:  Yes and no.  That's a hard question to answer.  It's not direct.

BY MS. LUKES:  (Continuing)

Q.    I guess, did you attend -- in regards to her knee surgery prior to this incident, did you attend appointments with her?

A.    Yes.

Q.    Okay.  And post knee surgery did you attend those follow-up appointments with her?

A.    Yes.

ESQUIRE
DEPOSITION SOLUTIONS

STATE OF OREGON        )
                       )  ss.
COUNTY OF CLACKAMAS    )

         I, Amy A. Dalton, Certified Court Reporter and Notary Public, do hereby certify that STEVEN LAROCQUE personally appeared before me at the time and place mentioned in the caption herein; that the witness was by me first duly sworn under oath and examined upon oral interrogatories propounded by counsel; that said examination, together with the testimony of said witness, was taken down by me in stenotype and thereafter reduced to typewriting; and, that the foregoing transcript, pages 1 to 85, both inclusive, contains a full, true and correct record of all such testimony adduced and oral proceedings had and of the whole thereof.

         Witness my hand at Oregon City, Oregon, this 24th day of September, 2025.



_____
Amy A. Dalton
Certified Court Reporter
CCR No. 3353
Notary Commission No. 1049787
My commission expires 7-17-28

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Exhibit B - Page 9 of 9