EXHIBIT 3

Page 1

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT TACOMA

_____

LINDA LAROCQUE,                    )

                         )

          Plaintiff,      )

vs.                      )

                         )

THE KROGER CO., a foreign    )    Case No.

corporation doing business in  )  2:25-cv-05380

Washington state; and, FRED   )

MEYER STORES, INC., a foreign  )

corporation doing business in  )

Washington state, a/k/a       )

TACOMA-STEVENS FRED MEYER,    )

GATEKEEPER SYSTEMS, INC., a   )

foreign corporation doing     )

business in Washington state,  )

                         )

         Defendants.

_____

REMOTE VIDEOTAPED 30(B)(6) DEPOSITION UPON ORAL

EXAMINATION OF GATEKEEPER SYSTEMS, INC. DESIGNEE

RYAN HARTER

_____

1:00 p.m.
April 14, 2026
Remote via Zoom

CARRIE L. PUMNEA, RPR, CCR #2130
CARRIE REPORTING, LLC
16212 Bothell-Everett Highway, Suite F-328
Mill Creek, Washington  98012
206.940.9200
carriereportingllc@outlook.com

                    A P P E A R A N C E S


FOR THE PLAINTIFF:

        ROBERT C. WILKE
        Gordon Thomas Honeywell LLP
        1201 Pacific Avenue, Suite 2200
        Tacoma, Washington  98402
        253.620.6500
        rwilke@gth-law.com


FOR DEFENDANTS THE KROGER COMPANY and FRED MEYER
STORES:

        HANNA LUKES
        Chock Barhoum LLP
        121 Southwest Morrison Street, Suite 500
        Portland, Oregon  97204
        503.223.3000
        hanna.lukes@chockbarhoum.com


FOR DEFENDANTS GATEKEEPER SYSTEMS, INC.:

        SKYLER P. URBAN
        Floyd, Pflueger, Kearns, Nedderman & Gress, P.S.
        3101 Western Avenue, Suite 400
        Seattle, Washington  98121
        206.441.4455
        surban@nwtrialattorneys.com


ALSO PRESENT:

        Andrew Mac Tavish, Videographer

Page 5

plaintiff Linda LaRocque.

MR. URBAN:  Skyler Urban on behalf of defendant Gatekeeper Systems.

MS. LUKES:  Hanna Lukes on behalf of defendants Fred Meyer and Kroger.

THE VIDEOGRAPHER:  Thank you.

I will now ask the court reporter to please administer the oath.

RYAN HARTER,

sworn as a witness by the Certified Court Reporter,

testified as follows:


EXAMINATION

BY MR. WILKE:

Q.  All right.  Good afternoon, Mr. Harter.

A.  Good afternoon.

Q.  Good after- -- the first question is an easy one.  Can you please state and spell your name for the record.

A.  Yes.  My name is Ryan Harter, R-y-a-n, last name H-a-r-t-e-r.

Q.  Do you mind if I call you Ryan?

A.  Of course.

a YouTube channel that is --

A.   Yeah.  Looks that way.

(Crosstalk.)

THE COURT REPORTER:  Sorry, Ryan, can you just hold on?  It cuts out on Zoom.  Thank you.

Q.   Who -- what's the name of the person that does the -- who would be in charge of the YouTube stuff for Gatekeeper?

MR. URBAN:  Hold on, Ryan.  I'm going to object to the degree any of this goes beyond the scope of the topics identified.

Ryan, to the degree you can answer, go ahead.

A.   Okay.  So our vice president of marketing would be in charge of that.

Q.   And what is that person's name?

A.   Tracine Marroquin, M-a-r-r-o-q-u-i-n.

Q.   And how do you spell the first name, their first name?

A.   T-r-a-c-i-n-e.

Q.   Tracine Marroquin, okay.

A.   So she's head of our marketing.

Q.   And you may not know, but I'm entitled to your best answer.  To your understanding, is Gatekeeper putting out factual information in the YouTube videos posts?

Page 23

MR. URBAN:  Objection.  Beyond the scope.
Answer if you can, Ryan.

A.  Yeah, it's factual.

Q.  Are you familiar with the language of warning signs at the Tacoma-Stevens Fred Meyer store that are related to the Purchek system?

A.  Yes, I am.

Q.  Okay.  And I'm asking about the language, not the physical signs themselves.

Who drafted the language in those warning signs?

A.  I do not know that answer as far as --

(Crosstalk.)

Q.  Did Gate- --

A.  Sorry.

Q.  No, no, no.  I cut you off.  Go ahead.

A.  I was going to say, I do not know the answer as far as who the individual is who drafted those.

Q.  That's a good point.

I don't mean the individual.  Do you know if it was Fred Meyer, or was it Gatekeeper that drafted it?

A.  Gatekeeper.

Q.  Okay.  And so there's two sets of signs at the Tacoma-Stevens store.  There's the ones on the shopping

cart, and there's the adhesives on the doors.

Did Gatekeeper manufacture both of those signs?

A.   Yes, we did.

Q.   When a store purchases a Gatekeeper product like Purchek, does it have a choice of what the signs say, or does Gatekeeper simply provide those signs?

A.   Gatekeeper provides the signs.

Q.   And, to your knowledge, has the language changed at all, let's say, in the last ten years?

A.   Not to my knowledge.

Q.   Do you have any knowledge of them changing at all from when you started working at Gatekeeper to the present?

A.   No.  Maybe just the addition of different languages.

Q.   Yeah, I'm curious about that.  Do you have any knowledge of what the different language or the language changes were?

A.   It depends on the regions.  We are global.  So we cover all the languages that are dominant within the regions.

Q.   Oh, you're talking about the language --

A.   Yeah, yeah.

(Crosstalk.)

Q.  -- not the --

(Crosstalk.)

Q.  -- text?

A.  Yeah.  Not the verbiage text.  The language, yeah.

Sorry for over talking you.

Q.  No, no, no, no.  You're good.  That makes sense to me.

So the verbiage stays the same.  As far as English-speaking worlds, that verbiage has remained the same?

A.  Yes.

Q.  Okay.  And can the store decide how the system operates?

What I'm trying to understand is:  Can the store decided carts -- decide carts only lock at the store perimeter, meaning the parking lot, versus locking at the doors if a purchase isn't made?

A.  Yes, because that's going to be two different systems.

Q.  Okay.  And I see that we received responses to requests for admission today that seem to clarify that.

Just for the record, can you explain to the jury what those two systems are, what they're called?

A.  Yes.  So we have our cart containment, which

Page 26

is going to be our exterior perimeter system, and its sole purpose is to lock any carts at the perimeter line, at the property line, which is designated by the customer to prevent that cart or that asset from leaving the property.

Then the indoor systems are --

(Crosstalk.)

Q. Cart --

A. I'm sorry. Go ahead.

Q. No, no. That's called the cart containment system?

A. Yes.

Q. Gotcha. Okay. And the other one?

A. The other one is called Purchek, and that's going to be our interior system, and it's designed to prevent pushout theft.

So if a cart does not go through a transaction point, point of sale, it will lock up at the door.

Q. Got it. And I know that there -- it looks like there's some add-on services that a Gatekeeper client can purchase.

There's a video monitoring service that Gatekeeper offers with Purchek; correct?

A. Correct.

Q. What is that called?

A.   Video Classification.   Or theft intelligence we call it too.   So it's a -- we install a camera that only records an event that takes place.   So it's a 20-second video showing the approach, the actual lock event, and then their response.   And then that video is classified as theft, put together as a case, and then provided to the customer.

Q.   Oh.   So you're collecting statistics on cart lockups?

A.   Not --

MR. URBAN:   Hold on, Ryan.

Objection.   It seems like this is out of the scope of the identified topics.   We're talking about a different system.

Ryan, go ahead and answer with what you can.

A.   Yeah.   We're not quite in the analytics or data.   We're actually just recording the physical lock event so we can videotape and classify that theft attempt and flag it to the customer.

Q.   So tell me what classification is if it's not an analytic.

A.   It's classifying what that -- what that event is, whether it's an empty cart, a pushout, suspicious. It 's not -- it's hard to classify them all.   Some we will mark as suspicious and leave it to the AP team and

the customer to put those final dots together.

But we just -- we do the general classification.  So we only provide crucial information to the customer.

Q.   And what percentage of the total -- what do you call it when a cart locks up?  There's a term for it; correct?

A.   We call it an event.

Q.   You call it an event?

Can it also be referred to as an activation?

A.   Yes, it can be.

Q.   Okay.  Do you know what percentage of activations are empty carts?

MR. URBAN:  Objection.  Beyond the scope.  Go ahead, Ryan.

A.   No, I don't.

Q.   Do you know if it's over half?

MR. URBAN:  Same objection.

A.   It's not.  I don't know the exact number, but it's not over half.

Q.   How do you know that it's not over half?

MR. URBAN:  Same objection.

A.   Because it's -- I would have to look at the store specifically to answer that accurately, which I wasn't prepared to do, so I didn't do that.

topic you think that falls under?

MR. WILKE: I think it would be under 1, the anti-theft shopping cart mechanism, because that's the services. And I know you'll probably object to it, and that's fine, we can fight whether it's admissible or not, but, you know, I don't want to have to reopen this dep.

MR. URBAN: He'll answer to the degree he can.

Let me just put my objection on record that I think that's beyond the scope of any of the topics, but even specifically Topic 1. But we can handle that later.

MR. WILKE: Yeah. And we can go over the discovery responses. We asked for all the services, all the communications related to services, and I didn't see a work order or anything for Video Classification. So I think the easiest way is just to find out today. And whether that's admissible or not, we can fight over that later.

MR. URBAN: Fair enough.

Q. (By Mr. Wilke) So we were talking about activations, and we were talking about -- I want to know generally, not just this Fred Meyer store, what your knowledge is of generally what the percentage of

empty-cart activations are.

A. Really not something I can give you. It's going to be very, very general.

Q. That's okay. Just the best --

(Crosstalk.)

Q. -- you can answer.

A. But it's a very, very small percentage. I would say empty carts... And, again, it's based on store as well, because store operations, some store operations generate a lot of empty carts by how they move them around, because an empty cart typically will lock because it's not going through a pay point.

Q. Right. And Gatekeeper has the technology not to activate the Purchek locking system if it's an empty cart; correct?

A. We do have that technology, yeah.

Q. Okay. And so tell me how -- is there a name for that technology? Is it called, like, empty cart something?

A. It's called SmartExit.

Q. So tell me how SmartExit works.

A. It's an overhead sensor that looks down at the cart as it passes through. It can do a visual recognition based off certain machine learning and recognize if the cart is full or empty. If the cart is

empty, it changes the status of a lock loop into what we called surveillance. It will physically lock that cart.

Q. And you said -- a moment ago you said, "Well, empty carts a lot of times will activate the system because they didn't go through the register."

Can you explain what you mean?

A. So, by design of the system, it's to detect if a cart went through a purchase or not. So if you have a cart that carries a path that doesn't take it through a point of sale or a place where a purchase can take place, it will lock, by design, at the door, because it's ultimately alerting a pushout event.

Q. What are some circumstances in which a shopper might have an empty cart and is not stealing and tries to exit the store?

A. Then that cart will lock, because it can't determine.

Q. Sorry. Go ahead.

A. That's it.

Q. Okay. All right. I didn't want to interrupt you again.

No, my question is little bit different, and I probably phrased it not great.

What are the circumstances in which a customer

might go through the store and exit with an empty cart?

MR. URBAN: Object to form. You can go ahead and answer after my objections, Ryan.

THE WITNESS: Okay.

A. There's a number of human behavioral scenarios that can cause that. You can forget something in your cart and turn around and go back out the store. You can just be killing time and using the cart to push against then going back outside. There's a number of reasons why people enter and leave without purchasing anything.

Q. But certainly reasons that are unrelated to intent to steal something; correct?

MR. URBAN: Object to form.

A. Yeah. Again, human behavior. But someone going with a cart and not going through a pay point and exiting, it's the same pattern as a pushout. So the system sees it as that.

Q. Got it. So, like, if somebody came with in a cart with the intent to purchase something and that product was no longer available, would that be a scenario that would result in an empty-cart scenario or empty-cart activation?

A. Yes.

Q. Have you seen that happen before in your

experience working at Gatekeeper?

A.   Yes.

Q.   Do you know if any Kroger store has purchased the SmartExit system?

A.   There's a couple in trial, but none have been actively on purchase and put in production.

Q.   What does that mean?  What do you mean, "in trial"?

A.   Kind of a proof of concept, a POC, with the customer.

Q.   Does Gatekeeper have any SmartExit systems installed for any client that isn't a test or trial?

A.   Yes, we do.

Q.   Okay.  But Kroger has only done a trial use of the SmartExit system; is that correct?

A.   Correct.

Q.   Okay.  Do you know what state Kroger is trying the SmartExit?

A.   Not without research.

Q.   Okay.  Do you know -- and just to the best of your ability, do you know if any of them are in Washington state?

A.   Not to my knowledge.  I don't believe any are under the Fred Meyer banner.

Q.   Okay.  Is SmartExit, that product, is it

Page 36

coupled with the video -- what's that called?  I forgot the name already.

A.    Video Classification.

Q.    Video Classification.

MR. URBAN:  Objection.  Beyond the scope.

A.    It's -- it's an ad hoc.  So each Purchek system can operate on itself, and then we have additions that can be purchased, like Video Classification and SmartExit.

Q.    Does the SmartExit use the same camera as the Video Classification product, or is it a separate camera?

A.    It's a separate camera.

Q.    Got it.  Okay.  That makes sense.

Who installed the Purchek system at the Tacoma-Stevens Fred Meyer?

A.    The Purchek system was installed by Tim Wright, who was a Gatekeeper employee.  Then the wheels were installed by West Coast Casters, which is a third party.

Q.    Okay.  And so West Coast Casters, did Gatekeeper subcontract with them, or did Fred Meyer contract with West Coast Casters?

A.    They contracted with Gatekeeper.  So they're our third party for this installation.

shopping carts from all the major manufacturer brands that are out there.  And for Kroger, we can cover 100 percent of their carts.

Q.  Got it.  Okay.  And then who -- was Gatekeeper involved in the actual placement of warning signs on the doors to the Tacoma-Stevens Fred Meyer?

A.  We ask for them to put in the line of sight, but it's -- typically the placement is dictated by the store manager on duty who signs off on the paperwork.

Q.  Got it.

(Crosstalk.)

Q.  Got it.

A.  He will reserve that --

Q.  So Gate-

(Crosstalk.)

Q.  So is it fair to say that Gatekeeper recommends putting the signs on the door somewhere where customers will see them, but it's up to Fred Meyer to actually place them?

A.  Yes.  Well, we place them, but we use their -- off their guidance.  So we'll ask them where they want them, because we want to make sure it's going to -- we'll lance them where it's not going to be removed or replaced by something else.  So we ask for their guidance on placement where they want it.  So it's more

likely to be kept in that place.

Q. Got it. Okay. So do you know whether at this particular store, the Tacoma-Stevens Fred Meyer store, whether a Gatekeeper employee physically placed the warning signs on the door/doors?

A. Most likely, but I can't speak a hundred percent because I wasn't there.

Q. Okay.

A. And it doesn't specifically say that in the paperwork.

Q. In the work order?

A. Yeah.

Q. I saw it identifies -- like they call them clings?

A. Yeah. It identified that he installed the clings and then also the wall signs.

Q. When you say "he," are you referring to Tim?

A. Yes, I am.

Q. Okay. So does that -- is it your understanding that the work order confirms that Tim installed them or just that they were delivered? Do you know?

A. My interpretation is he installed them.

Q. Have you seen some of the photos of the placement of the warning signs at the Tacoma-Stevens

A.   From the pictures I saw, yes, you can.

Q.   Give me one second here.

A.   And to go back on the video question.

Q.   Yeah.

A.   I don't have to look it up, because that just refreshed my memory.  I apologize.  I look at a lot of videos in a lot of stores every day.

I did watch video on this store after talking to Skyler, because I was looking at the sign placement in the videos.  So we do currently have Video Classification for this location.

Q.   Do you know if those are -- sorry.  Go ahead.

A.   No, go ahead.

Q.   So you said currently.  Do you know how long Video Classification has been in place?

A.   That I'll have to look up.

Q.   Okay.

A.   It was most like- -- it doesn't look like it was on the work order, so I don't think it was since day one installed.  It might have been added in.

Q.   Do you know if it was in place on the date that Linda LaRocque was injured at the Fred Meyer?

A.   Not without looking up.

Q.   Okay.  All right.  That's something we would ask you to find out, if there was Video Classification

Page 43

and if there's video of that particular incident.

Let me ask you this, then: Does Gatekeeper maintain copies for a certain period of time of the video recordings of the activations?

A. So depending on the customer, but with Kroger our retention policy is one year on video, unless it's a confirmed pushout that was confirmed by both sides, then it's retained until deleted. But all other videos are purged after one year.

Q. So you only maintain them -- is it fair to say you only maintain them longer than one year if it's a confirmed theft?

A. Yes.

Q. Okay. I'm going to mark this Exhibit 2. I just want to pull up the photo from this. This is the expert report from Mr. Dixon.

(Exhibit No. 2 introduced.)

Q. So here we can see the warning sticker.

Have you seen it from this perspective with the doors open?

A. Yes.

Q. Okay. And does this look partially obscured to you?

MR. URBAN: Object to form.

Q. You can answer.

It's a break-fix only.

Q.  Okay.  Break-fix of what?

A.  Anything.  So break-fix meaning if something needs service, Kroger would reach out to us, and then we would schedule a service.

Q.  Would a work order be generated if that occurred?

A.  Yes.  Kroger or Fred Meyer would generate a work order to us, then we would quote, schedule, and commence the service based off of that.

Q.  How many times did Gatekeeper service anything on a break-fix at the Tacoma-Stevens Fred Meyer location?

A.  From the records I saw, I didn't see any service records.

Q.  If Fred Meyer wanted -- well, let me ask you this:  Fred Meyer testified at its 30(b)(6) and one of its store managers testified that carts are sometimes damaged in its parking lot.

Is that something that you've seen happen before with clients?

MR. URBAN:  Object to form to the extent it misstates prior testimony.

Go ahead, Ryan.

A.  I was actually going to ask you to rephrase

that one too.

Q.   Are carts ever damaged in grocery store parking lots?

A.   Oh, yeah.   They are.

Q.   Okay.   And let's say one of the -- or do carts ever get vandalized by customers or other people in the area?

A.   Yes.

Q.   Okay.   If one of the warning signs was gone from the shopping cart for whatever reason, how would Kroger go about getting a replacement warning sign to be placed on that cart?

A.   They're either through the work order channel and have us come do it directly or their maintenance department sometimes does the service as well and they would order parts from us.

Q.   Okay.   Would you have a record of their maintenance department ordering a replacement warning sign?

A.   Possibly.   I would have to -- I would have to check with my sales team and look.   It would depend --

(Crosstalk.)

Q.   Would you have -- sorry.

A.   Sorry.   I was going to say it would depend how the order came in, if it came directly for that store

or if it came in just for Fred Meyer in general.  It might not be directly associated to that location.

Q.   But an order would come in, nonetheless?

A.   Yes.

Q.   You charge to replace the warning signs? They're not just to replace for free?

A.   Yes.  It's a service.

Q.   Okay.  In preparing for today's dep -- deposition, do you know whether Tacoma-Stevens ever received replacement warning signs for the shopping carts?

A.   Not to my knowledge.  Not that I saw.

Q.   Do you have any knowledge if Fred Meyer ever replaced a missing or damaged warning sign on a shopping cart?

A.   Yes, they have.

Q.   Okay.  And how do you -- what knowledge do you have about that?

A.   Service orders.

Q.   And is that for just Fred Meyer generally?

A.   Just Fred Meyer general.

Q.   Okay.

A.   I've seen them -- I have seen them firsthand.

Q.   But what about -- I guess, yeah, my question is just about the Tacoma-Stevens.

Do you have any knowledge of whether the Tacoma-Stevens store ever replaced a damaged or missing warning sign on a shopping cart?

A. I have no knowledge of that, no.

Q. And there doesn't appear to be any record to substantiate that they did; correct?

A. Correct.

Q. When there's an activation, is there any sort of audible sound that's triggered, like an alarm?

A. Yes, there is. There's also a strobe.

Q. Is that an option to turn on or off?

A. No, it's not.

Q. Do you know if the Tacoma-Stevens location if there's an activation, if there's an alarm?

A. There is.

Q. What does the alarm sound like, to the best of the ability you can describe it?

MR. URBAN: Object to form.

Try your best, Ryan.

Q. Yeah, is it a blaring sound?

A. I'm not going to mimic it, but it's just a cadence chirp.

Q. How loud is it? Is it as loud as a fire alarm?

MR. URBAN: Object to form.

their feet?

A. Usually between eight and ten feet above the finished floor.

Q. And you said there's a strobe as well?

A. Yes.

Q. Okay. Do you know if the Tacoma-Stevens has a strobe?

A. Yes, it does.

Q. Okay. And where is that strobe light located?

A. It's built into the same. It's all one packaged unit, the horn and strobe.

Q. Does the cart itself emit any sound upon activation?

A. No, it doesn't.

Q. And are you able to tell me -- I'm looking for an approximate time of how -- when the cart activation occurs to when it locks up, is it instantaneous? Does it take a couple seconds?

MR. URBAN: Object to form.

A. It can take a couple seconds. It is a -- it is a motor and a gear that's driven. So once it hears that command, it has to activate and go through the cycle before it locks.

Q. And once it's activated, the cart can no longer move forward?

MR. URBAN:  Object to form.

A.  Correct.

Q.  And which wheel is the mechanism affixed to?

A.  Can you rephrase that?

Q.  Well -- yeah, yeah, yeah.  My understanding of the Purchek system is there's a Purchek wheel on the front set of wheels and then one on the back; is that right?

A.  Yes, it is.  So we have two options:  a paired wheel and a single wheel.

Fred Meyer does utilize the paired wheel, so there's going to be two wheels on the cart.

Q.  And does that -- when it says paired wheel, is it the same side?  Like if you're looking at the cart and this is the driver's side, can you point to me of the four wheels which ones would have the system?

A.  So we're going to -- we have our primary, which is the one that locks off the signal received. Then the secondary, which is tethered to the primary, then it activates off the primary's command.  Primary is always on the left-hand side of the cart.  So it depends on if it's a primary front or a primary rear, but it's always going to be primary left, secondary right, and always going to be counter from each other. So primary front left and secondary right.

Q. It doesn't matter which one, as long as they're opposite one another?

A. Yes. Correct.

Q. Okay. Cool. And so the primary activates first?

A. Correct.

Q. And does that explain your description as it can take a couple seconds, because it takes a couple seconds for the secondary to activate?

A. Correct.

Q. Okay. So the primary activates as soon as it gets that signal?

A. Correct.

Q. Okay. One thing I was hoping you could shed some light on is, if the cart goes -- like, everything goes through the register, there's a transaction, cart doesn't lock.

Is there a timer in place? Like if somebody checks out and they just are lazy, they don't return the cart, it just sits there, but it's been deactivated. Is there a period of time in which that will reset so that you can't just come in and grab the deactivated cart?

A. I was waiting to see if there was an objection.

Page 53

Yes, there is. It's a -- there is a timer on that.

Q. Do you know what that time period is?

A. One hour.

Q. Okay. Is that something that can be modified by the store?

A. It can be modified, but not by the store.

Q. They would have to request it?

A. Yes.

Q. Okay. Do you know if Tacoma-Stevens Fred Meyer modified the one-hour timeout?

A. Not to my knowledge.

Q. Is there a way to modify the stopping time once the activation occurs?

A. No, there's not.

Q. Okay. Tell me what other options there are, if any, that we haven't discussed as far as, like, the store can select to have this option.

We talked about different products, right, the one that can lock on the perimeter, cart check or whatever that is, and then the Purchek system.

I want to talk about the Purchek system. What options does the store have that it can tweak?

MR. URBAN: Object to form.

A. Not -- they don't -- there's nothing the store

talked about in the Purchek ecosystem outside of the SmartExit cameras and the Purchek system itself.

Q.  And you said -- I get it that the store can't make any tweaks or modifications on their own.  I was just getting at what options they can come to you and say, "Hey, we want this tweaked.  We want you to change this."

Is there anything we haven't discussed as far as options that they can request Gatekeeper makes that are feasible?

A.  No.  Other than the time limits, there's not much that we can change on it.

Q.  Okay.  When does -- one sec.  So empty-cart activations, the smart check, when did -- do you know when Gatekeeper -- I'm sorry, when Gatekeeper first offered that product, what year?

MR. URBAN:  Object to form to the extent it's beyond the scope.

A.  It was pretty recently.  So it wasn't at the time of this installation.

Q.  Do you know why Gatekeeper decided to offer that product, what the motivating factor was, if you know?

MR. URBAN:  Same objection.

A.  To stop empty carts from locking.

Q. Did Gatekeeper perform any training for Fred Meyer employees on the Purchek system?

A. Yes, we did.

Q. And who is trained? Is it managers?

A. Yes. The manager on duty and anybody else designated by the manager on duty, sometimes front-end key holders, AP personnel, loss prevention, et cetera. It's part of the final stages of installation, because we do a training to explain how to operate the system, the functionality, and then we also do a go-live when we turn on the system with the store manager, and then repeat that training.

Q. Okay. Are the SmartWheels -- do you know at the Tacoma-Stevens location specifically if SmartWheels were installed on every cart?

A. From the paperwork, yes, there was.

MR. WILKE: We've been going for about an hour. Let's go ahead and take a break. Let's go off the record.

THE VIDEOGRAPHER: Thank you. We're off record at 2:02.

(A break was taken.)

THE VIDEOGRAPHER: On record. 2:13.

Q. (By Mr. Wilke) All right. We took a break. Ryan, were you able to find out when the Video

Classification was installed at the Tacoma-Stevens Fred Meyer?

A. Yeah. It's, like, February 14th, 2019.

Q. Was that -- I could look it up. How soon after the installation of the Purchek system was that?

A. The Purchek installation was 2017.

Q. Okay. Is that October 2017, you think? It doesn't matter. Strike that question. I can look it up.

Okay. So it -- Fred Meyer -- Tacoma-Stevens Fred Meyer had the Purchek system for some period of -- amount of time, and then they had the Video Classification installed?

A. Yes.

Q. Okay. And then we were talking about the two-wheel system. What did you call it when there's two wheels instead of just one?

A. Paired. Paired wheels.

Q. Paired. Paired wheels.

With the paired wheels, does the cart stop more abruptly compared to the one wheel?

A. It doesn't stop more abruptly, but it has a -- it can't be moved after that because it has more friction points. But by having the primary/secondary, it actually gives a more slowed, controlled stop,

because the one wheel locks and then the other one locks up momentarily afterwards. So they don't lock at the same time. There's a delay between.

Q. Is Gatekeeper aware of people striking their bodies when a cart activates?

MR. URBAN: Object to form.

A. Only from claims like this.

Q. Okay. I mean, I was just watching videos on Gatekeeper's YouTube of pushouts, and I'm just wondering if Gatekeeper has any knowledge of watching pushouts or thieves where when the cart stops they strike their body against the cart after it activates.

MR. URBAN: Object to form.

A. No. Personally, I watch thousands of videos a month, and I've never noticed or seen anybody hit their body on the cart.

Q. We talked about the Video Classification system. And so as part of that classification system you said it will identify whether it was a pushout, an empty cart, and what was the other -- was there another category?

A. Yeah. There's employee, vendor, empty, merchandise, confirmed, suspicious, possible, and ORC for organized retail crime.

Q. And so Gatekeeper maintains this information

on classifications of activations?

A. Yes.

Q. So Gatekeeper would be able to tell of the total classifications it has what percentage were empty cart, for example?

A. Yes.

Q. And Gatekeeper does not maintain the video longer than a year unless it's a pushout theft?

A. Correct.

Q. Okay. And then how long does it keep the pushout theft videos?

A. I don't think we have a timeline on those. I think we keep the confirmed pushouts until deleted.

Q. If someone claims injuries, does Gatekeeper keep the video for the Video Classification?

A. Not that I'm aware of.

Q. And then Gatekeeper, we asked them to produce incident reports. Actually, we will save that. We'll just go over some of the discovery responses to make it easier. Give me a second here.

I'll mark this Exhibit 3. Give me just a second.

(Exhibit No. 3 introduced.)

Q. All right. And I'll zoom in on this, Ryan, so you can see it. I can -- I'm starting to get old. I

Page 60

can't read it.

So this is Request for Production Number 5. We asked for incident reports. It was originally more broad than that, but we agreed to narrow it with -- after consulting with your counsel.

And so what I wanted to ask about is, there's an April 6th, 2026 supplemental response. It identifies Bates labels, which are just numbering, of accident reports that were provided by Travelers Insurance for about 20 incidents.

It says, "By way of further response, Gatekeeper states that it does not receive or maintain these reports in the ordinary course of business. These reports are generated at the store level, and transmitted directly to Travelers by the store or the store's insurer."

So is it your understanding that Gatekeeper doesn't maintain any sort of database of alleged injuries that occur that are related to the Purchek system?

MR. URBAN: Object to form.

Q. You can answer.

A. Yeah, I was making sure you guys were done. Yeah, that's my understanding.

Q. You've never seen a database of alleged

Page 61

injuries --

A. I have --

Q. Sorry. I have to finish the question. I was pausing there. We took a break, and I'm already slowing down.

You haven't seen a database of alleged injuries that were related to the Purchek system that Gatekeeper maintains?

A. No.

Q. Give me a second here.

Sorry. I'm going through discovery. I am trying to -- you'll be happy to hear we aren't going through all of it. I am making sure we can skip through some of this stuff.

All right. This was produced by Gatekeeper in discovery. We'll mark this Exhibit 4.

(Exhibit No. 4 introduced.)

Q. And so does this look like a representation of the warning sign that Gatekeeper provides that is affixed to shopping carts that have the SmartWheel system installed?

A. Yes. That's it.

Q. Okay. And I take it these are, like, the mounting brackets?

A. Yes.

Page 62

Q. The ones I'm pointing to, the circular disk and the screws, and --

A. Yeah. They go --

Q. -- that's how they go onto the cart?

A. Correct. It's goes on the outside, and that's what sandwiches it in between the wire frame and the cart so it stays in place.

Q. Okay. So if one of these was damaged or came off, if there was a purchase order by the store or by Fred Meyer generally, does it ship with -- does the replacement packet ship with the mounting bracket, screws, and the sign?

A. Yes. That's the M-8033B kit. It comes with everything pictured there. So three sets of screws for different size carts and different orientations.

Q. Okay. And you don't -- you didn't see it in preparing for today's deposition that Tacoma-Stevens Fred Meyers specifically have ordered the M-8033B following installation?

A. No, I did not see any.

Q. We will mark this 5.

(Exhibit No. 5 introduced.)

Q. I will pull it up here in a second.

Have you seen this before? This is the Purchek Pushout Theft Solution Troubleshooting Guide.

that whole door opening.

Q. Okay. And then this strobe alarm, is that the unit we're talking about that emits a chirp and it also strobes?

A. Correct.

Q. Okay. All right. And then the keypad, that's how you can turn it on or off?

A. Correct.

Q. Okay. And so if it's off, the whole system is off?

A. It's in what we call surveillance mode. It's off, but it's not going to lock carts, but we still get that activation event silently in the background.

Q. Got it. Okay. And then antennas is beaming the signal to the cart to lock?

A. No. There's actually a physical wire embedded in the ground loop, and that's how we lock the cart. The antennas act as the mouth and the ears of the system, and that's what communicates to the wheel once it locks.

Q. Got it. Okay. And so the NanoKey or the CartKey, do both of these items unlock the carts if they've locked?

A. Yes.

Q. Do you have any knowledge of all the cart

activations and any period of time at the Tacoma-Stevens store what percentage are actual pushouts versus some other activation unrelated to theft?

MR. URBAN: Object to form.

A. I do not, but it is something that can be accessed.

Q. So there would be a way to determine on, like, a specific period of time the total activations and what percentage of those were pushout or theft attempts versus some other activation?

MR. URBAN: Object to form.

A. Yes.

MR. URBAN: Sorry, Ryan. I was a bit delayed there. Go ahead.

THE WITNESS: I'm sorry.

A. Yeah, there is a report we could run.

Q. What would that report be called?

A. Wheel Event.

Q. Wheel Event?

A. Yeah. It's a -- we have a Wheel Event and a Video Classification Report that we could run.

Q. Video Classification Report.

Would you have the data for a Wheel Event Report for 2023?

A.  We should, yes.

Q.  Would you have a Video Classification Report for 2023?

A.  Yes.  We retain the data from it; we just don't retain the video.

Q.  Just not the actual video.

I won't spend too much time on this.  I think we went over it.  This is -- one, two, three, four, five, six.  I'm just pulling up the work orders that were produced in discovery.

(Exhibit No. 6 introduced.)

Q.  Okay.  This is a total of three pages.  We have the installation work order.  This is dated October 2017.

Is this the paperwork for when the Purchek system was installed by Tim?

A.  Yes.  Tim and Kevin.

Q.  We see their names down here under the text name.  Kevin is the apprentice?

A.  Yes.

Q.  Okay.  All right.  And so it says hang six window clings and six wall signs and deliver four CartKeys and ten NanoKeys.

When we were talking about what you could glean, whether Gatekeeper is the one that installed the

window clings, this is what you're basing it on?

A. So the typed out is what's written by our coordinators in the office. The handwritten chicken scratch on the bottom is going to be from our field technician.

Q. Got it. So, yeah, that's a good point. Because it actually says two window clings, four wall signs; correct?

A. Correct.

Q. Okay. What -- help me understand what this means: Also check for any incoming permission lockups.

Is that just a tech? I don't know what that means.

A. We monitor installs after installed with that data we get in. And so if we see any abnormal things, we send the technician back to double-check things. That's mostly what happened here.

Q. Just to make sure the system is working?

A. Yeah. Before we turn it on.

Q. Got it. And so if you -- if a client like Fred Meyer, if an individual store wants service, is there, like, a field service ticket that's completed and submitted?

A. If the store wants service?

Q. Yeah.

Page 68

A. If the store wants service, they have a service app they go through. I believe Kroger -- again, I'm not in the service department -- they use KroGo. So they'll go in there and issue a work order, and then we have our own account in KroGo, and it comes straight to us as one of their vendors.

Q. Yeah.

A. And then from that, we -- that's where we access our PO, and then we coordinate and schedule from there.

Q. Got it. And you checked before today's dep to see if any of those -- any type of work order came in at the Tacoma-Stevens store?

A. Yes. I didn't see anything.

Q. Okay. Cool. When did Gatekeeper learn that Ms. LaRocque was injured at the Tacoma-Stevens Fred Meyer, generally? Was it after she filed a lawsuit? Was it when Gatekeeper saw the Video Classification? That's what I'm trying to get at.

A. It would have been when -- after it was filed and the insurance company notified us.

Q. Okay. And Fred Meyer tendered the claim to Gatekeeper, correct, for indemnification? Do you have any understanding of that?

A. A little bit from my understanding, yes.

A.  Not that I'm aware of, not for Gatekeeper.

Q.  Okay.  I had a question about Topic 11, which is Gatekeeper's knowledge of what should be done when warning signs fall off or are no longer present on shopping carts.

Does Gatekeeper tell its customers that those warning signs need to be replaced if they're damaged or missing?

A.  Yeah.  During the install when we're talking about service and the troubleshooting, I believe it's covered.  I would have to look at the guide again.  But, yeah, it's general knowledge that when it's damaged, it needs to be serviced.

Q.  Okay.  And do you know if Tacoma-Stevens managers were told that upon installation?

A.  Not being there, I couldn't tell you a hundred percent, but they should have been as far --

Q.  Okay.  Policy --

A.  -- as the SOP.

Q.  Gatekeeper's policy is to tell its customers that, "Hey, if these signs are damaged or go missing, they need to be replaced"?

A.  Yeah.

MR. WILKE:  I don't have any further questions.  I really appreciate your time, Ryan.