# EXHIBIT 4

Page 1

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT TACOMA

_____

LINDA LAROCQUE,                    )
                                   )
            Plaintiff,             )
                                   )
    vs.                            )   No. 3:25-cv-05380
                                   )
THE KROGER CO., a foreign          )
corporation doing business in      )
Washington state; FRED MEYER       )
STORES, INC., a foreign            )
corporation doing business in      )
Washington state, a/k/a            )
TACOMA- STEVENS FRED MEYER;        )
and GATEKEEPER SYSTEMS, INC.,      )
a foreign corporation doing        )
business in Washington state,      )
                                   )
            Defendants.            )

_____


REMOTE VIDEOTAPED DEPOSITION UPON ORAL EXAMINATION OF

BRENTON WHEELER

_____


2:00 p.m.
March 26, 2026
Witness Location:  Federal Way, Washington



Karmen Knudson, RPR, CRR, CCR 1935
Carrie Reporting, LLC
16212 Bothell-Everett Highway, Suite F-328
Mill Creek, Washington
CarrieReportingLLC@outlook.com

A P P E A R A N C E S


FOR THE PLAINTIFF:

         ROBERT C. WILKE
         CHRISTINA WELCH
         GORDON THOMAS HONEYWELL
         1201 Pacific Avenue
         Suite 2200
         Tacoma, WA 98402
         rwilke@gth-law.com
         cwelch@gth-law.com


FOR DEFENDANTS THE KROGER COMPANY AND FRED MEYER
     STORES:

         SARAH TUTHILL-KVETON
         CHOCK BARHOUM LLP
         121 SW Morrison Street
         Suite 500
         Portland, OR 97204
         sarah@chockbarhoum.com


FOR DEFENDANT GATEKEEPER SYSTEMS:

         SKYLER P. URBAN
         FLOYD PFLUEGER KEARNS, NEDDERMAN &
            GRESS, P.S.
         3101 Western Avenue
         Suite 400
         Seattle, WA 98121
         surban@nwtrialattorneys.com

plaintiff Linda Larocque.

THE VIDEOGRAPHER:  Thank you, Counsel.  Today's court reporter is Karmen Knudson of Carrie Reporting.

Would she please swear the witness.

Brenton Wheeler,
sworn as a witness by the Certified Court Reporter, testified as follows:

THE VIDEOGRAPHER:  You may proceed.

MR. WILKE:  Great.  Thank you.

EXAMINATION

BY MR. WILKE:

Q.   Good afternoon, Mr. Wheeler.

A.   Hello.

Q.   Could you please state and spell your name for the record.

A.   Yes.  It's Brenton Wheeler.  B-r-e-n-t-o-n, last name W-h-e-e-l-e-r.

Q.   Great.  And you got a nametag.  That makes it easy for us to spell as well.

A.   Oh.

Q.   Is it okay if I call you Brenton?

A.   Yeah, that's totally fine.  A lot of people

or their staff present for either of those meetings?

A.   No.

Q.   Did you review any documents to prepare for today's deposition?

A.   No.  Just the summons, I guess it would be called, the piece of paper that was given to me to be here by, I think, your office.

Q.   Got it.  The deposition subpoena?

A.   Yes.

Q.   Okay.  Didn't review anything else, though?

A.   No.

Q.   We used to take these depositions in person, and more and more often they're just taken over Zoom, but they're much more casual even when they were in person than in court.  But do you understand that you're under oath today, and even though we're not in court, the same requirements for you to provide truthful testimony exist?

Does that make sense?

A.   Yes.

Q.   Brenton, what is your current job title?

A.   Lead assistant store leader.

Q.   And when were you -- how long have you been in that particular position?

A.   About two and a half years, almost.

Q. And is that the -- at the 19th Street location in Tacoma?
A. Part of it was there.
Q. Are you still at the 19th Street location?
A. No.
Q. Okay. What location are you at now?
A. Federal Way.
Q. And before Federal Way, you were at the Tacoma location?
A. Tacoma Stevens. Correct.
Q. Tacoma Stevens location. Okay.
So approximately what time frame were you at the Tacoma Stevens location?
A. I believe it was October of 2023 through a week ago.
Q. Oh, okay. So this is a recent change?
A. Yes. Third day here.
Q. What was the reason for the change in location?
A. The person I'm replacing got a promotion to a different position.
Q. Hopefully the commute is better for you.
So at both the Federal Way and Tacoma Stevens locations, you were the lead assistant store leader?
A. Correct.

Q. Okay. Can you describe, in your own words, what the lead assistant store leader -- what your responsibilities generally are?

A. To follow the store leader in all expectations in their time off so the store runs the exact same way the store leader would like it to run in their absence, and to be a partner for them to tackle any type of operational or merchandising expectations the company has given us or the store leader has set themselves.

Q. So if the store leader is gone, you -- in their absence, you essentially fill in for the store leader. Is that right?

A. Correct.

Q. Okay. And when the store leader is there, you assist the store leader?

A. Correct.

Q. Okay. Do you oversee employees?

A. I have no direct reports.

Q. Got it. Okay.

Do you have direct reports when the store leader is absent?

A. No.

Q. And so your direct report is the store leader?

A.    Correct.

Q.    Who was the store leader when you were at the Tacoma Stevens location?

A.    Chad Peterson.

Q.    Is that P-e-t-e-r-s-o-n or s-e-n?

A.    S-o-n, I believe.

Q.    And was Chad Peterson the store leader the entire time you were at Tacoma Stevens?

A.    Yes.

Q.    Is Chad Peterson still the store leader at Tacoma Stevens?

A.    Yes.

Q.    And you said you've been the lead assistant store leader for about two and a half years.  How long in total have you worked for Kroger or Fred Meyer?

A.    Going on 22 years.

Q.    What was your position before you were the lead assistant store leader?

A.    I was the fresh assistant store leader.

Q.    Fresh assistant, is that refrigerated and produce?

A.    The fresh assistant oversees all the fresh departments.  So everything that's -- yeah, that's under refrigeration or perishable.

Q.    Perishable items.  Okay.  That makes sense.

Meyer/Kroger?

A.    16 years old.

Q.    Okay.  So you've been with them most of your adult working life?

A.    The whole thing.

Q.    The whole thing.

Did you ever have -- did any of your responsibilities include interactions or dealing with the shopping cart locking mechanism?

A.    In which title?

Q.    Any title.

A.    Only if a customer needed assistance unlocking a cart.

Q.    Can you describe what you mean by that?

A.    If -- if a -- if a customer, an honest-paying customer, needed assistance with a cart that served in its purpose but, for whatever reason, needed to be unlocked, then I -- if I happened to be around, there were times that I would unlock a cart.

Q.    How many times have you unlocked a cart where the person wasn't stealing?

A.    Rare.  But I'm not always at the door.  I'm usually -- I'm frequently anywhere but at the entrances.

Q.    Okay.  So those lockups where someone is not stealing, they typically occurred near the door?

Brenton Wheeler - March 26, 2026

A.    Yes.

Q.    And you --

(Crosstalk)

A.    Everyone that I --

Q.    I'm sorry.  Go ahead.

A.    Everyone that I personally experienced, yes.

Q.    How many have you experienced?  Could you -- is it more than one?

A.    Oh, I don't know.  A handful.  I don't keep track of how many.

Q.    Is it more than one?

A.    Sure.

Q.    Is it more than six?

A.    I don't know.

Q.    And you said that you're rarely by the front door.  Is there someone else by the front door that would be the employee that would deal with a customer whose cart has locked that was not stealing?

A.    That depends on each location.  It varies whether they have security at the door, this company that we contract or -- or if they don't need it.

If they don't need it, then usually the parcel clerks that are retrieving the carts would be the one that would be asked.

Q.    You said security would sometimes be the

person that would deal with that?

A. Yes, security, specifically the outside-sourced third-party company that Fred Meyer or Kroger uses. We don't have security inside the store that's managed by Fred Meyer, that's Fred Meyer employees.

Q. Fred Meyer hires security guards from a third party; correct?

A. Correct.

Q. Okay.

A. Contracts a party, and then that third party has their staff. So it's -- we're not hiring individuals specifically for security from that company. We hire -- or pay that company and they staff -- it's -- it can be whatever security guard, any number of them. They just make sure somebody's there.

Q. When you worked at Tacoma Stevens, did you ever see the same security guard or was it different security guards every day?

A. They tried to keep things somewhat consistent so that the security guards had a good relationship with the customer base, so that the customers are seeing the same face frequently. But we operate for, you know, seven days a week, most of the day, so those shifts would vary, and sick calls and all that stuff.

Q. Can you remember the name of any security

last five years, have those all been full-time positions?

A. Yes.

Q. Do you know when the antitheft shopping cart mechanisms were installed at the Tacoma Stevens Fred Meyer?

A. I do not have a specific date.

Q. Were they there before you started working --

A. Yes.

Q. -- at Tacoma Stevens?

Sorry. We talked over each other. We're doing it to each other. That's fine.

They were there before you got there?

A. Yes.

Q. Okay. Do you have any knowledge of who installed the antitheft shopping cart locking mechanisms?

A. No.

Q. Did you receive any training about the mechanism?

A. No official training.

Q. Did you receive unofficial training?

A. Just the description of how the system works.

Q. Can you tell me about that description, what you remember about it?

A. The system is designed to prevent theft.

Q. Is that all you were told?

A. Keep carts on the property.

There's a -- like a geofence that's around the store so that shopping carts will lock up if someone's trying to take them off our property.

Q. And by off property, do you mean outside the parking lot or outside the store doors?

A. Outside of our property lines. The line follows the property lines to the edge of the parking lot, far out. Yeah.

Q. Were you told anything else about what would cause a shopping cart with a mechanism installed to lock?

A. Its only primary function that was ever told to me is if a cart has not gone through a register and a payment made, it's designed to shop at the doors and stay there until it's unlocked.

Q. Who gave you this unofficial training?

A. I don't remember which store was the first store that I worked at.

Probably the Auburn location back in 2018. It's a pretty rough store, so they had it.

Q. What do you mean, "rough store"?

A. Just high theft.

Q.   So that would be a scenario where somebody wasn't stealing.  Do you know what caused the cart to lock in any one of those scenarios?

A.   No purchase is made.

Q.   And so a person came into the store with a cart, didn't purchase anything, didn't try to steal anything, tried to leave, and then it locked?  Is that fair?

A.   Accurate, yeah.

Q.   Were any of the customers in those scenarios we're just talking about, were they surprised that the cart locked?

MS. TUTHILL-KVETON:  Object to the form of the question.  This requires speculation.

Go ahead and answer.

A.   Surprised in a -- in a -- a way like other than, what, confused?

I don't know that they'd be surprised. Mostly confused.  It's not a shocking thing that happens.  It's not a big event.  It just stops moving. So there's more confusion than anything, not shock.

Q   (By Mr. Wilke)  How did you know they were confused?

A.   If somebody goes and says, "Hi, I was going through -- I was trying to exit the store and the cart

is just not moving anymore," that would show, you know, the confusion to me.

They don't know the -- and that's a long time ago too. Most -- the vast majority of people that shop in the Pacific Northwest are familiar with these types of systems now, as they've been used for years and years and years and years. So...

Q. Are you aware of any customers in all your time at Fred Meyer that were injured by the shopping cart locking?

A. Not injured in a -- in an official way. Not reported to me.

Q. Have you seen any of the incident reports that Fred Meyer produced in response to discovery in this case?

A. No.

Q. Would it surprise you that there are a number of customers that were -- that claimed injuries in incident reports at Fred Meyer locations in Washington state?

A. That would surprise --

MS. TUTHILL-KVETON: I'm going to -- just let me object real quick.

I'm going to object to the form of the question, as it calls for speculation, and the context

of the question.

But go ahead, Brenton --

MR. URBAN: I'm going to join that objection.

A. It --

Q (By Mr. Wilke) You can answer, Brenton.

A. It would surprise me if there were multiple people that have been injured by this system. It would -- it would shock me, to use a word that you used.

Q. Why would it shock or surprise you?

A. Because the system -- when a cart locks up, it's not a -- it's -- I mean, it just stops moving. It's not like -- it doesn't bite you, doesn't jump at you, doesn't explode. It just simply won't go forward anymore.

And the stop is not an immediate, super, abrupt stop. It has a -- from the best of my knowledge, a braking -- braking mechanism that you can hear start to activate and slows the wheel to a stop. So...

Q. What are you basing your knowledge on the braking mechanism, that you can hear this start to activate?

A. Well, one can assume that there's a brake if the wheel is no longer moving.

Q. So this is an assumption? This isn't something you were trained on or observed?

A.	No.	I don't know what else would keep a wheel from moving other than a brake, as far as --

Q.	You said that --

(Crosstalk)

A.	-- to my knowledge.

Q.	You testified that it was not abrupt when it started to activate, so I'm asking you what the basis for that --

A.	Oh.

Q.	-- statement is.

A.	I've heard them.

So when associates use a shopping cart for stocking or putting cardboard or whatever in and they no longer need to use it, they didn't go through a register, so the cart will lock up at the door.  It requires the key to be used to disactivate, or whatever word you want to use, release whatever brake is holding that wheel, and then they can put the cart back into the lobby for customers to use.

And when that happens, you can -- it's happened to me.  You start to hear it.  It makes like a clicking sound that I now know, just through my experience, is the beginning of the brake or whatever system is in that wheel to make the wheel not move anymore, and within a very short amount of time, the

cart does not move forward anymore unless you use an obnoxious amount of force.

Q.   And so this is -- you're talking about when employees are taking a cart and moving it to a different location; correct?

A.   Yes.  If they were using a cart inside the building to have, you know, product or cardboard in it and they no longer need the cart, instead of just leaving it inside, obviously it would be returned to the lobby for customer use, but since it's been inside the store, it requires the system to -- to do its thing and then unlock the wheel and then you can go and push it into the -- into the lobby for customer use.

Q.   Got it.

So the employee doing that would be aware that it's going to lock up; correct?

A.   I would sure hope so.  Unless it was their first day.

Q.   Okay.  Why do you say if it was their first day?

A.   I don't think that there, to the best of my knowledge, is any like official first-day training about if you use a cart, we have this whole system called Gatekeeper and, you know, the whole song and dance.  I think that that isn't formal training that I know of.

It might be if you have a good instructor or a good leader that's very detailed, might go over that on a first day, but --

Q. They might be surprised on the first day by that locking?

MS. TUTHILL-KVETON: Object to the form of the question.

Go ahead and answer.

Q (By Mr. Wilke) You can answer.

A. Confused, again, more than surprised. It's not a very surprising thing. It just doesn't make sense if you don't know what it's doing.

Q. Right. So meaning that they wouldn't anticipate it?

A. Sure. Unless they've read the signs at the door that explain the system or the warning placards on the carts themselves. If they've read those, great, they would know that it could unexpectedly stop and they might have that knowledge.

Q. Are you familiar with the signs and the language on the signs?

A. Somewhat. I don't have it memorized, but I know that it -- it explains that wheels can unexpectedly stop.

Q. Does it say that if you don't go through the

register, that the wheels will lock?

A.   I don't know.

Q.   You don't know whether it says that or not?

A.   I do not know.  I don't have it memorized, no.

Q.   Well, you've been at the store for a long time.  I assume you've seen these signs before.  So I'm trying to find out your knowledge of whether you know whether the signs warn that it will lock if you don't go through the register and pay, or if it's just a warning, like you said, that they can lock unexpectedly.

Do you understand the difference between those two things?

MS. TUTHILL-KVETON:  I'm going to object to the form of the question, as it's compound and asking four questions at once, and it's already been -- part of the question at least has been asked and answered.

But go ahead, Brenton.

Q    (By Mr. Wilke)  So, Brenton, do you understand the difference between a warning that says carts can unexpectedly lock and a warning that says if you don't go through the register and pay, the cart will lock?

A.   Yeah.  I think that the -- the first one would blanket more, it would cover more, versus being

extremely detailed in a warning, which, in my personal experience in people that I've observed, the more detailed the warning is, the less they tend to pay attention to it.  So --

Q.    You don't --

A.    -- we don't have --

Q.    Sorry.  Go ahead.

A.    I was just going to say, you know, we don't -- we don't have stop signs at four-way stops that say, you know, stop, there are cars coming from multiple directions, maybe behind you, if you don't press the brake, you're going to go into traffic and get hit by another car.  Like, it just says stop.  So...

Q.    Well, it sounds like you think the first warning is a better warning.  Is that right?

A.    I don't have an opinion on that at all, as I'm not paid to -- to analyze what warnings are effective or not or how they should be worded.

Q.    Well, I'm just --

A.    That's a whole different --

(Crosstalk)

Q.    I'm just going off what you told me.  You said that it's more blanket and customers can get confused if it's more detail.

Is that what you just testified to?

A.    I think that a more summarized warning is -- is probably the better way to go if there's any chance that people are not going to pay attention to the warnings that you're trying to give.

Q.    Understood.

Do you know one way or the other if the warning signs specifically state that if you don't go through the register --

A.    I do not know --

(Crosstalk)

A.    I do not know one way or the other.  I have not paid that much of attention to commit to memory.

Q.    Got it.

Do you know which wheel the mechanism is affixed to on the shopping cart?

A.    I believe usually it is the -- two wheels, if my memory is correct.  I think we have a wheel opposite of each other, one on the front and one on the back.

Q.    Two wheels?

A.    Yes.  But one might be one -- I don't know. But one might be the one that keeps a cart from going off the company property all together and one may be the one that stops at the door.  They could be different wheels.  I do not know.  I don't have a --

Q.    Got it.

We talked about the mechanism being triggered if you don't go through the checkout and pay.  Are there any other scenarios that trigger it?

For example, there's a Starbucks on the way out of the store, correct, after you get past the registers at Tacoma Stevens?

A.    There is a Starbucks, correct.

Q.    Okay.  If someone with a shopping cart who has paid and gone through the register, if they stop at Starbucks for too long, will that trigger a lock upon exit?

A.    I imagine there is a reset amount of time -- I don't know what the amount of time is.  I don't have that much detailed knowledge of the system.  But I'm sure -- not "sure."  I think that if a cart goes through a register and receives the signal that a payment has been made but then doesn't exit the building after some amount of time, I would assume it would reset itself so that it can't be then used for theft, meaning if somebody's watching a customer, the customer pays, goes out, if that -- if that wheel didn't reset, then a thief could just use that cart to then go steal and exit the store.

So my assumption would be that there is some type of system in place so that after a certain amount

of time, the cart would reset.  So theoretically if you went to Starbucks and were there for 20 minutes, the cart may reset itself.

Q.    You don't know the amount of time --

A.    No.

Q.    -- it takes to --

A.    I do not.

Q.    And you probably don't remember this.  You and I met at the site visit in January at Tacoma Stevens.  You were present for that when they --

A.    Yeah.  I --

(Crosstalk)

A.    Yeah.  I remembered to open the doors for you guys so you could take pictures.  Correct.

Q.    Yeah, no, I appreciate that.  That was early in the morning.

Do you remember a conversation, you were present, and I think one of your coworkers mentioned that they had observed customers paying at a register, stopping at Starbucks, and then the cart locking if they spent too much time at Starbucks?

Do you remember that conversation?

A.    I don't remember the conversation vividly.  I remember talking about how unfortunate the area is for grocery retailers to operate.  And we had some sentiment

of the decline of Washington state or the West Coast in general causing grocery retailers to have to resort to systems like this, which is just a bummer.

I remember that conversation, but...

Q.    Why do you think it's a bummer?

A.    I just think it would be nice if -- if everybody followed the rules and behaved accordingly. And if we didn't have theft, we could offer better prices to our consumers.  We could operate stores.  Some stores have ceased to operate primarily due to the climate in which they operate.

I think we talked about that as well while you were there.  May have touched on that.

Q.    Do you remember saying that it happens often that customers' carts lock up even though they aren't trying to steal any merchandise?

A.    I don't remember specifics of that conversation, no.

Q.    In going back to the employee we were talking about who shared that the cart can lock if they stay at Starbucks, are you aware of any time -- any single time that that's happened?

A.    Nobody has pointed it out to me specifically that they were at Starbucks and then went to leave and the cart locked up.

A.     Yeah, I don't know.  They don't pay me to -- to manage Gatekeeper.  They pay me to manage Fred Meyer.

Q     (By Mr. Wilke)  Who is in charge, just generally, of maintaining the antitheft locking cart -- shopping cart locking mechanism at Fred Meyer?

A.     Who makes the mechanisms?

Q.     No.  I'm sorry.  Who maintains it.  Like if there's an issue with a cart, who's in charge at Fred Meyer to get that sorted out?

A.     A specific cart or the system itself?

Q.     Specific cart.

A.     A specific cart?

If there's a specific cart that, for some reason like -- unfortunately, working in this weather, the wheels are not perfect, and eventually over time wheels will not ever -- like they won't come unlocked, so they've activated whatever mechanism it is and it will not unlock, there's no -- there's nothing we can do, we take it to a secure location behind our store.

They can vary in location, but at Tacoma Stevens, it is a gated and locked -- we call it like the graveyard.  And that's where a cart would go in that situation until a professional company who works with Gatekeeper comes to replace that wheel.

Q.     Who is the company that works with

Gatekeeper?  Do you know their name?

A.    The company that we use frequently -- there's two different ones.  There's PICS and West Coast Carts.

(Crosstalk)

A.    I believe PICS is P-I-C-S, I think.

Q.    Do you work with them together at the same time or is there like one that was contracted with Fred Meyer and then you switched?

A.    I believe --

Q.    Do you understand that?

A.    Yeah.

I believe PICS does our routine or annual, semiannual maintenance, whatever the -- whatever the regimen is.  And West Coast Carts is the company that I have seen come out when we need service in and above our routine, like, maintenance from PICS.

Q.    Can you tell me the difference between like an example of routine maintenance and something above routine maintenance, what that means?

A.    Yeah.  So as we have carts that need service, we bring them to the back.  And depending on the store and the environment, the climate, whatever goes into it, a store might have more carts that need repair or just timing.

So if PICS came and it's the semiannual

I've ever seen or heard.  They don't, like, take apart wheels to try to repair whatever's in the mechanism. They just replace it with a brand-new Gatekeeper wheel.

And then they will also do maintenance on any of the non-Gatekeeper wheels that have hair in them, or whatever it could be.

Q.    You said non-Gatekeeper wheels.  Do some of the shopping carts not have the antitheft locking mechanism at the Tacoma Stevens location?

A.    Well, there's two wheels on every cart, at least two wheels, that are just normal wheels.  They're not all four Gatekeeper wheels on every cart.  So each cart has some Gatekeeper wheels and some normal operating just wheels.

Q.    Good point.  Thank you for clarifying that.

So every cart that you're aware of at the Tacoma Stevens location has Gatekeeper system installed on the wheels?

A.    Most of them.  I would say for sure most of them do.

A few months ago, due to a lack of carts for the -- for the store to operate effectively, we did receive a transfer of shopping carts from another location.  And upon their arrival, I don't know if they were from a Gatekeeper location already equipped with

them or if they were not. But if they were not, then they would just roll out the door as -- as normal.

Q. Got it.

And you said that was a few months ago?

A. Yeah. We received some carts just a few months ago. I don't know --

Q. Do you --

A. -- the exact date, but it wasn't that long ago.

Q. Got it.

And you don't know whether they had Gatekeeper -- the Gatekeeper device installed or not?

A. I don't, no.

Q. Okay. Before the shipment of carts from another store, as far as you know, did all of the carts have the Gatekeeper mechanism involved?

A. The vast, vast, vast majority of them, yes.

If one squeaked through somehow, I don't know how that would be, but I can't honestly tell you that 100 percent of the carts do. I feel like that would not be a fair thing for me to assume, because it would be an assumption. I have not inspected every single cart that is in each location.

Q. But you assume the vast, vast majority, you said, would -- did have the mechanism installed?

A.    Yes.   That would defeat the purpose.   If we had carts that you can easily identify, as a thief, that the cart does not have the Gatekeeper wheels, they would just then use those carts.   It's very obvious which cart has Gatekeeper and which ones don't.

Q.    What happens when there's somebody actually stealing and it locks up?  What is -- what's the procedure?

A.    We have an asset protection team, which is our store employee.  That's their title:  asset protection.  We have specialists and managers.

If they had been following that person and getting all of their elements, as we call them -- I don't know exactly what each individual element is, but it's -- they have to -- our asset protection team has to have all these specific elements before they can try to make what we call an apprehension, even though we don't physically touch anybody regardless of whether we know them to be stealing or not.  We're completely hands off.

So if they were tailing a thief and they had their elements and the thief locks up at the door -- it's kind of -- it's kind of funny to watch, since we're hands off.  They ask the thief to come back inside and to go with them, sit down and talk about the situation.

That happens very, very infrequently, as one

Q.   Okay.  Do you know, at the Tacoma Stevens location, have any of the warning signs on the door ever been replaced?

A.   I do not know.

Q.   Do you know if any of the warning signs on the shopping carts at the Tacoma Stevens location have ever been replaced?

A.   They're supposed to be.  I don't -- I don't keep track of that, but...

Q.   Why do you say "they're supposed to be"?

A.   Just to keep the cart current, just to keep it to what they -- what the company wants.

Q.   Who does the replacement?  Is it PICS or this other company?  You'll have to tell me -- remind me of their name.

A.   West Coast Cart.

I don't know who specifically does those -- those warning signs, if it's the cart company or if Gatekeeper comes and does it.  I don't know who does it.

Q.   Do you know who at Fred Meyer looks at the carts and determines whether a sign needs to be replaced or added?

A.   I do not.

Q.   Have you ever seen a shopping cart with a damaged warning sign?

A.    In all my years, I'm sure at some point I've seen a cart that has a damaged sign.

Q.    Have you ever seen a shopping cart that was missing a sign?

A.    But that also had the wheels?

Q.    Correct.

A.    Definitely behind the store, in our graveyard or whatever you want to call it.

Q.    So is it fair to say the policy -- Fred Meyer policy, if you notice that a shopping cart is missing the sign, whether it's somebody tore it off or it broke off, whatever, it's missing the sign, is to move it to the graveyard to have it serviced?

A.    I do not know of any policy that specifically states that or if it's more of a best practice, as we call it, kind of a routine that store leadership implements at their locations.

Q.    Have you ever seen the graveyard personally? Is that something that, your role, that you've gone back there?

A.    Yes.

Q.    Okay.  Have you ever seen a cart in the graveyard that was missing a sign?

A.    Not that I can specifically point to and say definitively yes.  There's a possibility.

shopping cart says, what the language says?

MS. TUTHILL-KVETON:  Objection.  Asked and answered.

MR. URBAN:  Join.

MS. TUTHILL-KVETON:  Go ahead.  Go ahead, Brenton.

A.    I believe the same as -- as what's on the doors is on the cart, or at least an extremely similar version.

Q     (By Mr. Wilke)  Do you know what it says, any of the language?

MS. TUTHILL-KVETON:  Objection.  Asked and answered.

Go ahead.

A.    I do not.

The only thing that rings a bell is cart may stop suddenly or abruptly, or something like that.  Or may just stop.

It just gives a notice that it can happen for whatever reason, to the best of my knowledge.  I don't know the terminology or the exact verbiage.

Q     (By Mr. Wilke)  Do you -- and I'm testing your memory a little bit here, Brenton.

As you sit here today, do you have knowledge of where on the doors the warning signs related to the

shopping carts are located?

A.    At Tacoma Stevens?

Q.    That's a very good follow-up question.  Yes, at Tacoma Stevens.

A.    I do not have specific memory.  I just know that they are on -- on the door.

Q.    Do you have any knowledge --

(Crosstalk)

A.    To the best of my knowledge.

Q.    That's all we can ask for.

To the best of your knowledge, do you know if the signs are obscured when the doors are open?

A.    I do not know.

Q.    You said that the mechanism, at least at the Tacoma Stevens, was there before you got there.  But you've been working at Fred Meyer for over 20 years. so you worked at Fred Meyer when Fred Meyer first instituted the shopping cart locking mechanism; correct?

A.    I do not know.  It was never -- it wasn't implemented for the first time at any like, hey, we're having some new system that we're going to implement.

So it may have been implemented during my career, it may not have.  I just know that I've worked at stores with them.

Q.    Got it.

When's the first time that you became aware that Fred Meyer -- any Fred Meyer store you worked at had this mechanism?

A.    I think that my oldest memory of it is Auburn, but it could have been -- it could have been before that.  But Auburn was a high theft -- it was -- that system was very needed at that store, so I definitely remember it there.

Q.    What year was that, do you remember, approximately?

A.    Pre-COVID.  So maybe 2018, 2019.

Q.    Okay.  From what you remember in 2018/2019 with that system and the system, let's say, in 2023, were there any changes that Fred Meyer made to how the system operated or has it been the same?

A.    Not to my knowledge.

Q.    Not to your knowledge any -- no changes, in other words?

A.    I don't know of any changes.

I do think that the systems are the same but independent.  Whether you want to keep it just locking at the door or going off the property, I'm not exactly sure, but they -- yeah.

We have two different names for it, so...

Q.    What do you mean, "two different names for

Q.    Let's talk about when a customer is injured at Fred Meyer and it results in an incident report. Walk me through, who decides whether -- let's start with:  Who decides whether an incident report is created or not?

A.    If a customer brings an incident to any member of store leadership, then they -- they call it in to Sedgwick to start a claim.

If it's something very small, customer just wanted to let us know what happened, it's a report only just so that we can document it happened, get a claim number to attach to it.

If it's more severe, medical attention, whatever it could be, then obviously we -- same process. We call Sedgwick, but it's not just to report it only. It's -- yeah.

Q.    Okay.  In both those circumstances, is the same form used or are you using a different form?

A.    Same form.

Q.    Okay.  All right.  And so who decides whether it goes -- it's sent to Sedgwick or it just stays in-house?

A.    It goes to Sedgwick 100 percent of the time if store leadership -- and that's -- this is -- obviously this is what they're supposed to do.  I'm not

speaking for everybody's performance.

But you are to call Sedgwick immediately, gather all the information you possibly can at the time of the incident, report that up to them, get a claim number, scan in that packet and store the packet at the store, the paper -- like the physical packet.

Q. And you said -- and what's in the packet?

A. A description of the incident, date and time, where it happened, description of the person. Just all the -- all the details that they want. It's -- there's a lot.

Q. And it's in a form; right? So it tells --

A. Yes.

Q. -- you what to fill out?

Okay. And you said you can't speak to other -- this is what they're supposed to do, you can't speak for compliance of other people.

Were you thinking about some other Fred Meyer employee that wasn't doing that correctly?

A. No. I'm just speaking from --

MS. TUTHILL-KVETON: Object to the form.

THE WITNESS: Oh, sorry.

A. No, I just --

MS. TUTHILL-KVETON: Object to the form of the question.

Go ahead.

Q      (By Mr. Wilke)   Go ahead, Brenton.

A.      I'm just speaking -- I cannot speak for other people in their performance, whether they execute or not.   I can speak for myself and what I do.

But, yeah, that's -- I also -- it would be irresponsible of me to try and claim that I know how every leader in Fred Meyer operates in this -- I know what the expectation is and what we are to do.   I'm not in every store.   I don't know every incident.   I can't speak to anything other than what I know we're supposed to do and what I do.

Q.      Does the leadership at any particular store ever review these incident reports and discuss what changes, if any, should be made to the store operations?

A.      Yes.   The safety team reviews any and all incidents that are reported to store leadership and do root cause analysis, what can be done differently, you know, was it -- was there anything that we -- yeah, that we can do differently to prevent a similar incident from happening in the future.

Q.      What is the safety team?   Is that somebody in corporate or is that somebody at each store location?

A.      There's a safety division in corporate and a safety team at every location.

Q. Got it.

Who's at the -- who is on the safety team at Tacoma Stevens?

A. I don't know who is now, but there were a few different members. They cycle in and out. It's not -- it's a voluntary thing, so they can choose to do it. They can't be forced to be a member of the safety team. So --

(Crosstalk)

Q. Sorry. Go ahead.

A. It can just -- people can come and go. They can come to a couple safety meetings and say I don't -- I have no interest in representing my department and I don't want to do this, or they can be an amazing safety team member and be on a team for years.

It depends on the store, the people. It's all -- it's just variable.

Q. Have you served on the safety team?

A. Yes.

Q. Okay. What years did you serve on the safety team at Tacoma Stevens?

A. The entire time I was there.

Q. Okay. Who else served with you? What are their names?

A. I can think of one name in particular that

was always there.  Andrea Dillon.  She was an apparel associate and she's the -- probably the most constant I have had on any safety team I've been a part of.

Q.    Can you spell her last name?

A.    D-i-l-l-o-n.

Q.    Did you ever discuss anything related to shopping carts in any of the safety team meetings?

A.    Not that I recall.

Q.    Do you know who Kyle Reddick is?

A.    Yes.

Q.    Who is Kyle Reddick?

A.    He is -- I don't know what his position is now or if he's even with the company anymore, but he used to be the HR when I first got to the Tacoma Stevens Fred Meyer.

Q.    Would he fill out incident reports?

A.    If he was the leader that was -- excuse my crude language, but smelt-it-dealt-it style, whoever it is reported to.  That way, it doesn't get passed off and missed.  Who it's reported to is who calls it in.

Q.    Do you know if the third-party security guard ever reported anything related to creating an incident report?

A.    Nobody, in my experience --

(Crosstalk)

MS. TUTHILL-KVETON: (Inaudible) form.

A. -- has reported --

MS. TUTHILL-KVETON: I'm going to object to the form -- object to the question as vague.

Go ahead.

A. Yeah, no security guard, no third-party security guard has ever, in my experience, came to me and said, "We need to fill out" -- I don't think they would know what our process is, what the name is. That's not their duties or responsibilities. Half the time, they don't even want to be there.

Q (By Mr. Wilke) Okay.

MR. WILKE: Let's go off the record.

THE VIDEOGRAPHER: We're going off the record. The time is 3:19.

(Recess 3:19 p.m. to 3:26 p.m.)

THE VIDEOGRAPHER: We're back on the record. The time is 3:26. You may continue.

MR. WILKE: Great. Thank you.

Q (By Mr. Wilke) Brenton, we are just about done.

We were talking about incident reports and you said that the safety team would sometimes meet and discuss them and whether any changes need to be made. Can you think of any examples of where changes were made

in response to the review of incident reports?

A.  Are you referring to internal or like workers' comp or general liability claims?

Q.  Oh, I guess I meant more an incident report is going to be something where a customer is injured and --

(Crosstalk)

Q.  -- and -- yeah, so a customer is injured and -- I'm just making up an example; I don't know if this is true or not -- and you reviewed incident reports and say, "Oh, we should move -- people are bumping their head on the sign.  We should move the sign."

This is just a made-up example.  I know it's not real.

I'm trying to understand of, you know, any examples that you might have of the team reviewing incident reports and making any change of a store in response to that review.

A.  Off the top of my head, I can't think of anything specific where it's like this incident happened and, as a result, we need to do this.

Primarily we talk about conditions; you know, if somebody slips on the floor, hey, was there anything we could have -- you know, we could have done better on our side?

And it doesn't ever necessarily lead to anything.  It's just -- it's just open discourse to get people to think about the claim.  And obviously Fred Meyer would -- would try to have a safe environment in which to shop and work in.  So there's emphasis on, you know, root cause analysis and stuff like that.

Q.    Okay.

MR. WILKE:  Brenton, I really appreciate your cooperation today and your time.  Thank you.  I don't have any other further questions.

MS.  TUTHILL-KVETON:  A couple follow-up questions.


EXAMINATION

BY MS. TUTHILL-KVETON:

Q.    All right.  Brenton, in your experience, the shopping carts that have the Gatekeeper system have the sign on them?

A.    Yes.

Q.    In your experience, if they don't have the Gatekeeper system, is there no sign?

A.    There would be no sign if the cart did not have the Gatekeeper system.

Q.    Okay.  And if you're low on carts, you kind of talked how you would get shipments from other