# EXHIBIT 5

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT TACOMA

_____

LINDA LAROCQUE,                   )

                          )

         Plaintiff,       )

                          )

   vs.                 )   No. 3:25-cv-05380

                          )

THE KROGER CO., a foreign   )

corporation doing business in )

Washington state; FRED MEYER  )

STORES, INC., a foreign     )

corporation doing business in )

Washington state, a/k/a     )

TACOMA-STEVENS FRED MEYER;   )

GATEKEEPER SYSTEMS, INC.,    )

a foreign corporation doing  )

business in Washington state, )

                          )

        Defendants.      )

_____

REMOTE VIDEOTAPED 30(B)(6) DEPOSITION

UPON ORAL EXAMINATION OF

FRED MEYER STORES, INC. AND THE KROGER CO.

CHAD PETERSON

_____

9:00 a.m.

April 2, 2026

Witness Location:  Tacoma, Washington

Karmen Knudson, RPR, CRR, CCR 1935

Carrie Reporting, LLC

16212 Bothell-Everett Highway, Suite F-328

Mill Creek, Washington

CarrieReportingLLC@outlook.com

A P P E A R A N C E S


FOR THE PLAINTIFF:

    ROBERT C. WILKE
    CHRISTINA WELCH
    GORDON THOMAS HONEYWELL
    1201 Pacific Avenue
    Suite 2200
    Tacoma, WA 98402
    rwilke@gth-law.com
    cwelch@gth-law.com


FOR DEFENDANTS THE KROGER COMPANY AND FRED MEYER
    STORES:

    SARAH TUTHILL-KVETON
    CHOCK BARHOUM LLP
    121 SW Morrison Street
    Suite 500
    Portland, OR 97204
    sarah@chockbarhoum.com


FOR DEFENDANT GATEKEEPER SYSTEMS:

    SKYLER P. URBAN
    FLOYD PFLUEGER KEARNS, NEDDERMAN &
      GRESS, P.S.
    3101 Western Avenue
    Suite 400
    Seattle, WA 98121
    surban@nwtrialattorneys.com


ALSO PRESENT:    ERIC JENSEN, VIDEOGRAPHER

THE VIDEOGRAPHER:  Thank you, Counsel.

Today's court reporter is Karmen Knudson of Carrie Reporting.

Would she please swear the witness.

Chad Peterson,

sworn as a witness by the Certified Court Reporter,

testified as follows:

THE VIDEOGRAPHER:  You may proceed.

MR. WILKE:  Great.

EXAMINATION

BY MR. WILKE:

Q     Good morning, Mr. Peterson.

A.    Good morning.

Q.    Could you please state your name and spell your last name for the record.

A.    Yes.  Chad Peterson, P-e-t-e-r-s-o-n.

Q.    Great.  You're doing a great job answering my questions so far.  Have you had your deposition taken before, either as a designee or in your individual capacity?

A.    I have.

Q.    Okay.  How many times have you been deposed before, approximately?

"Hey, heads-up, I'd like to take a break in the next five or ten minutes" and I can make sure that happens.

I take it you're here today because you are the representative designated to testify on behalf of The Kroger Company and Fred Meyer Stores, Incorporated.

Is that correct?

A.    Yes.

Q.    Okay.  And just for the sake of brevity -- we'll try not to make things too long today -- when I refer to "Fred Meyer" or "you" or "Fred Meyer defendants" in the 30(b) -- in this deposition, will you understand that I mean both The Kroger Company and Fred Meyer Stores, Incorporated?

A.    Yes.

Q.    Okay.  Cool.  That will -- that will save me some breath from having to say both every time.  So that's good.

What is your role at Fred Meyer?

A.    I am the store manager of the Tacoma Stevens Fred Meyer.

Q.    Since we're on the topic, let's talk about your work history.  How long have you been the store manager at the Tacoma Stevens Fred Meyer?

A.    Going on five years in October.

Q.    How long have you been employed by Fred Meyer

A.    It was the tail end, because I do remember the mask was still in place when I first started here.

Q.    Okay.  The 2021, that sounds -- that tracks for me.

Was it after the remodel?  There was some remodel --

A.    Yes.

Q.    -- in process.

A.    Post-remodel.

Q.    Post-remodel.

Were you at the Tacoma Stevens store when they installed the antitheft shopping cart locking mechanism?

A.    No.

Q.    So that system existed prior to your arrival at the store -- at the Tacoma Stevens store?

A.    Yes.

Q.    Who was the manager before you at Tacoma Stevens?

A.    Jason Smith.

Q.    Is Mr. Smith still a Fred Meyer/Kroger employee?

A.    Yes.

Q.    And where is he at, what's his role?

A.    He's a store manager at the Lacey, Washington

Q. And who was the person in that role before Mr. Peterson?

A. Rebecca Leeper, L-e-e-p-e-r.

Q. And how long was Ms. Leeper in the role?

A. One year.

Q. Okay. Thank you for going through that somewhat tedious history. I appreciate it. We'll talk more about different positions and roles, but I want to shift gears.

Who did you speak to in order to prepare for today's deposition? And I don't want to know any conversations with counsel. That's going to be attorney-client privileged, so don't share any of those conversations, but I would like to know who you spoke with -- with whom you spoke.

A. Sarah.

Q. Okay. Other than your attorney, did you speak with anyone else in order to prepare for today's deposition?

A. During the call, there was another person that was talking to Sarah but they weren't talking directly to me, but that's --

Q. Got it.

Don't tell me anything about that. Was that someone from Sarah's office?

A.    I believe so.

Q.    Okay.  Yeah.  Did you speak to any Fred Meyer other managers in order to --

A.    No.

Q.    -- prepare --

A.    No.

Q.    And I'm going to go through -- I understand your answer would be "no," but let me get the question on the record.

Did you speak with any of your employees in order to prepare for today's deposition?

A.    No.

Q.    Did you speak with Mr. Smittling to prepare for today's deposition?

A.    No.

Q.    Did you speak with Angela Padilla in order to prepare for today's deposition?

A.    No.

Q.    So just Sarah?

A.    Yes.

Q.    Okay.  Got it.

What did you review, documents, if any, to prepare for today's deposition?

A.    I was shown some documents, like how many incidents have been reported on carts.

Q.   So like incident reports?

A.   Not necessarily reports.  Just kind of a -- and I didn't read it in detail, but it basically showed that I believe there's around 75 reported incidents with carts, with the locking of the carts.

Q.   So you didn't review any incident reports?

A.   No.

Q.   Are you familiar at all with any individual incident that's in the incident reports?

A.   That they showed?  I didn't -- no, I didn't read anything specifically.

Q.   So I'm having a hard time just understanding what you reviewed.  Was it a summary or a list?  What --

A.   It was a sum -- it was a summary.

MS. TUTHILL-KVETON:  I'll just instruct you --

Q.   (By Mr. Wilke)  Do you know who --

MS. TUTHILL-KVETON:  Wait.  I'll just instruct you, if they're communications from us, if we're -- if we're -- if we're emailing you, please don't talk about that.

If they're documents that you reviewed that were exchanged in this case, go ahead and tell Mr. Wilke about those.  All right, Chad?

THE WITNESS:  Okay.

Q (By Mr. Wilke) Yeah. So what document did you review regarding -- related to the incident reports?

A. I didn't read any in detail, so I couldn't tell you what the name of it was or -- I just remember looking at the number of --

Q. Okay. So was it -- was it in an email or are we talking about like a PDF or an Excel spreadsheet? What can you tell me about the document you reviewed?

A. It wasn't an email. It was -- we were just going over what -- what -- how many incidents would go -- would happen with the cart.

Q. So did you review anything that's a written material? I'm not talking about the conversations you had with your counsel. I'm talking about materials you read.

A. No. I was not --

(Crosstalk)

A. I was not emailed anything.

Q. Okay. So what documents did you review in order to prepare for today's deposition?

A. Nothing, really, besides, like I said, when we were talking, which I can't talk about, obviously, but --

(Crosstalk)

Q. Yeah, don't tell me about the conversation.

A.    There's nothing else past that.

Q.    Okay.  So you didn't review anything, any documents, to prepare for today's deposition?

A.    No.

Q.    All right.  I dropped in the chat -- I'm going to -- I think Sarah arrived after that, so let me drop it in the chat again so everyone has that.  Just a second, please.  It's just the deposition notice.

MS. TUTHILL-KVETON:  I have it.  You don't need to drop it.  Thank you, though.

MR. WILKE:  Yeah, for sure.

(Exhibit No. 1 introduced.)

Q    (By Mr. Wilke)  All right.  I'm going to share my screen.

All right.  Hopefully you're seeing what says here Second Amended Notice of Videotaped Combined 30(b)(6) Deposition of Fred Meyer Stores, Inc., and The Kroger Company

Have you seen this before, Mr. Peterson?

A.    No, it doesn't look familiar.

Q.    So these are the designated topics that are set forth in the deposition notice.  I want to go through and make sure that you're prepared to testify as to each of these topics.  Okay?

A.    Okay.

Q.    Topic 1 is:   The installation of the antitheft shopping cart mechanism at the Fred Meyer store located at 4505 South 19th Street.

Before I ask you generally about your ability to identify as to this topic, that address, is that the Tacoma Stevens Fred Meyer store?

A.    Let me zoom in here.

Q.    And I can zoom in for you.

MS. TUTHILL-KVETON:   Can you --

(Crosstalk)

MR. WILKE:   Absolutely.

Q    (By Mr. Wilke)   It's 4505 South 19th.   Is that the location of the Tacoma Stevens Fred Meyer?

A.    Correct.

Q.    Okay.   Are you prepared to talk about topic 1?

A.    Correct.

Q.    Okay.   Number 2 is:   The maintenance of the antitheft shopping cart mechanism at the premises, which is the Tacoma Stevens store.

Are you prepared to talk about topic number 2?

A.    Yes.

Q.    Are you at the store right now as we are taking this deposition?

A.    Yes.

Q.    Oh.  Is that your office?

A.    Yes.

Q.    Okay.  Is there anyone else in there with you?

A.    No.

Q.    Okay.  Topic 3:  The maintenance of all premises shopping carts with the antitheft shopping cart mechanism.  The temporal scope of this topic is January 1, 2020 to the present.

Let's limit it to just that time frame.  Are you prepared to talk about topic number 3?

A.    I can speak to my period of time here.

Q.    Well, this is --

(Crosstalk)

A.    I wasn't here in 2020.

Q.    So the designee has an obligation to prepare for the designated topic.

Are you saying you're not prepared to talk about the topic number 3 in its temporal entirety?

A.    I -- is this related to basically what happened with the system prior to my arrival here?

Q.    So you have an obligation, the Fred Meyer Stores, to prepare a designee to testify as to these topics.  And so this was the notice that was circulated

to Fred Meyer, and you were obviously designated the designee to testify. And so I'm trying to make a record confirming whether or not you, as the designee, are prepared to testify as to all the topics we set forth in the notice.

A. Yeah, I'm prepared to testify to my knowledge of what has happened with the system since I've been here.

Q. But anything before --

MS. TUTHILL-KVETON: Can we please take a quick break?

MR. WILKE: No, Counsel. No.

MS. TUTHILL-KVETON: Well, what? You haven't asked a question.

MR. WILKE: Counsel, I'm going through the topics. No, we're not taking a break.

(Crosstalk)

MR. WILKE: We've been going for 25 minutes.

(Crosstalk)

MR. WILKE: I know you want to coach your witness --

MS. TUTHILL-KVETON: I get to take a break. Okay?

MR. WILKE: No, we're not -- this is -- no, we're not taking a break.

MS. TUTHILL-KVETON:  Mr. Peterson, will you please mute and turn off your camera?

MR. WILKE:  Counsel, this is completely inappropriate.  You're trying to --

MS. TUTHILL-KVETON:  I get to ask for a break.

MR. WILKE:  Counsel, you're trying to coach your witness.

(Crosstalk)

MS. TUTHILL-KVETON:  I get to talk --

(Crosstalk)

MR. WILKE:  Counsel, this is entirely -- go ahead and make your record, Counsel, and then I can respond.  We're talking over each other.

MS. TUTHILL-KVETON:  Sure.

I get to ask for a break at any point whenever I would like to ask a break, as long as a question is not pending.  And I can talk to my client whenever I want, just as if we were in person taking a break.  So that's what I'm going to do.

MR. WILKE:  That's not true.

MS. TUTHILL-KVETON:  Mr. Peterson --

MR. WILKE:  There's a pending question, Counsel, and I'm -- these are a pending series of questions on the topics.

MS. TUTHILL-KVETON:  Okay, great.  Well, I get to take a break and talk to my client.  So --

(Crosstalk)

MR. WILKE:  Are you refusing -- are you telling your client -- are you telling the designee to not answer my questions?

MS. TUTHILL-KVETON:  You haven't asked a question.  I've asked to take a break.

MR. WILKE:  There is.

Can the reporter, please --

(Crosstalk)

MS. TUTHILL-KVETON:  No, you have not.

MR. WILKE:  The reporter --

(Crosstalk)

MS. TUTHILL-KVETON:  I asked to take a break before you asked your next question.

MR. WILKE:  You're not going to -- I'm not -- no.

MS. TUTHILL-KVETON:  I'm not going to do this either.  I'm going to take a break.

(Crosstalk)

MR. WILKE:  Court reporter, can you please read back my question.

MS. TUTHILL-KVETON:  No.  You don't have a question pending.

MR. WILKE:  Can you please -- Counsel --

MS. TUTHILL-KVETON:  You don't --

(Crosstalk)

MS. TUTHILL-KVETON:   -- have a question pending.  So I'm going to stop.  Why don't you go ahead --

MR. WILKE:  Reporter --

(Crosstalk)

MR. WILKE:  Reporter, can you please read back the question.

(Crosstalk)

THE COURT REPORTER:  Sorry.  I really can't take this down.

MR. WILKE:  I just want to make it clear for the record that counsel is insisting that she be able to consult with her client in the midst of us going through the 30(b)(6) topics, and I'm asking the reporter to please read back the last pending question.

(Crosstalk)

MR. WILKE:  And for the record, the -- for the record, the witness --

(Crosstalk)

MR. WILKE:   -- the witness has turned off his camera and muted at the instruction of counsel.

MS. TUTHILL-KVETON:  Yeah.  And I'm not

instructing him not to answer the question.  I'm asking for a break, which I'm entitled to do.  So I'm going to take a break.  I will be back at --

(Crosstalk)

MR. WILKE:  There's a pending question.  This is inappropriate, Counsel.

MS. TUTHILL-KVETON:  I will be back at 9:35.  Thank you.

MR. WILKE:  No, the --

THE VIDEOGRAPHER:  We are still on the record.  We will remain on the record since there is no agreement of counsel to go off the record.

MR. WILKE:  So I'm going to go ahead and make my record.

In the midst of going through the 30(b)(6) topics and seemingly that the designee was unprepared to talk about the 30(b)(6) topics, Counsel insisted that we go off the record so she can consult with her client.  I told her there was a pending question and we had a pending series of questions.

She instructed the witness to turn off his microphone, turn off his camera.  Both of those are turned off.  Counsel has also turned off her camera and microphone and said that she will return at 9:35 despite the pending series of questions and the pending

question.

So we'll go ahead and go off the record and wait for counsel to appear.

THE VIDEOGRAPHER: We are going off the record at 9:26.

(Recess 9:26 a.m. to 9:31 a.m.)

THE VIDEOGRAPHER: We're back on the record. The time is 9:31. You may continue.

Q (By Mr. Wilke) Okay. Mr. Peterson --

MS. TUTHILL-KVETON: Before we start, I would like -- before we start, I would like to ask Mr. Wilke, if I say something after my client has answered a question, before -- I would like for you to allow me to state what I'm going to say before you dive into the next question. If I have something to say -- you know, I know you talk fast and there's no gaps, and there's nothing wrong with that, but in this context, I do need you to allow me to either make my objection or state what you're going to say before diving into something else, because that's -- it creates a cleaner record and that's what I'm entitled to.

Q (By Mr. Wilke) Okay. Mr. Peterson, we were talking about number 3 before your attorney instructed you to turn off the camera and take a break. So let me read topic number 3 and I'll ask the question again.

Topic 3 says: The maintenance of all premises shopping carts with the antitheft shopping cart mechanism. The temporal scope of this topic is January 1, 2020 to the present.

Are you prepared to talk about this topic?

A. Yes.

Q. And what did you do to prepare for this topic, since you weren't at the store in 2020?

A. I haven't done much preparation.

Q. Other than talk to your counsel, did you do anything to prepare for today's deposition?

MS. TUTHILL-KVETON: Asked and answered.

Q (By Mr. Wilke) You can answer --

(Crosstalk)

MS. TUTHILL-KVETON: (Inaudible).

Q (By Mr. Wilke) -- Mr. Peterson.

A. No.

Q. Topic number 4 is: The placement, location, content and maintenance of all warning signs related to the antitheft shopping cart mechanism, from the time of placement of warning signs to the date of the incident at issue in the lawsuit.

Are you prepared to talk about this topic?

A. Yes.

Q. Do you know when the warning signs were

Page 34

placed?  What year?

A.    No.

Q.    Okay.  So you can't speak to -- you don't have any knowledge about the placement?

A.    I know where they're placed, but I don't know when they were placed there.

Q.    Do you know who placed them?

A.    I do not.

Q.    So you are not in fact prepared to talk about this topic in its entirety?

A.    I can only speak to what our normal procedures would be as far as this was -- anything else we do, if we roll out a program, we're going to put the signage up before we roll out the program.  So I can speak to that.

Q.    But not at this specific store?

A.    I was not here when the signs were installed.

Q.    And you didn't speak with anyone who was?

A.    No.

Q.    Topic number 5 is:  The number of shopping carts at the premises with the antitheft shopping cart mechanism and the number of shopping carts without the antitheft shopping cart mechanism at the time of the incident at issue in this lawsuit.

Are you prepared to talk about topic number

5?

A.    Yes.

Q.    Topic number 6 is:  Your knowledge of all incidents occurring between January 1, 2020 to the present at the premises in which the antitheft shopping cart mechanism locked and caused injury to a Fred Meyer customer or employee.

Are you prepared to talk about this topic?

A.    Yes.

Q.    And I believe you testified earlier, you haven't actually seen any of the incident reports that were generated during this time period for the State of Washington.  Is that correct?

A.    I wasn't -- so I had been a part of a deposition for one before this, but I didn't -- nothing was shared with me.  Just -- just was questioned.

Q.    I understand you were in a different case --

A.    Yeah.

Q.    -- or deposed in a different case.  My question is a little bit different, so it's important you understand my question before you answer.

My question is:  I wanted to confirm, you haven't reviewed any of the incidents -- incident reports that Fred Meyer Stores generated and produced in this lawsuit for the time period of January 1, 2020 to

Page 36

present in Washington state; is that correct?

A.   Not that I remember, but we do fill out incident packets quite frequently.  So nothing that -- that I can remember.

Q.   Okay.  But you didn't review any incidents specifically for this deposition, is what I'm getting at.  Is that correct?

A.   Not that I remember.

Q.   So topic number 7 is:  Your knowledge of all incidents occurring between January 1, 2020 to the present at any Fred Meyer and/or Kroger store in Washington state in which the antitheft shopping cart mechanism locked and caused injury to a Fred Meyer and/or Kroger customer or employee.

So this is similar to number 6 but it's all the Washington state ones.  Again, you haven't reviewed any of the incident reports produced in this case in order to prepare for today's deposition; correct?

A.   Correct.

Q.   Number 8, topic 8, is:  The number of locking wheels on the shopping cart at the premises that has the antitheft shopping cart mechanism called.

Are you prepared to talk about topic 8?

A.   Yes.

Q.   Topic 9 is:  How the antitheft shopping cart

mechanism generally functions when it locks.

Are you prepared to talk about topic number 9?

A.    Yes.

Q.    Topic 10 is:  Your knowledge of what causes the antitheft shopping cart mechanism to lock, including, but not limited to, routes customers take on the premises, meaning the Tacoma Stevens store, that may cause the mechanism to lock or the time it takes to exit the checkout stand before the mechanism will lock.

Are you prepared to talk about topic number 10?

A.    Yes.

Q.    Topic 11 is:  Your knowledge of how store shopping carts at the premises are used by customers and what circumstances may cause the antitheft shopping cart mechanism to lock.

Are you prepared to talk about topic 11?

A.    Yes.

Q.    Topic 12 is:  All maintenance and/or service performed in service of the antitheft shopping cart mechanism from January 1, 2020 to the date of the incident at issue in this lawsuit at the premises.

A.    Yes.

Q.    Are you -- you've got to wait until I ask my

question.

Are you prepared to talk about topic 12?

A. Yes.

Q. Okay. And so this talks about maintenance under service of the carts before your time at the Tacoma Stevens store. So what did you do to prepare to talk about maintenance or service performed for the time period before you arrived at the Tacoma Stevens store?

A. What did I do -- what was that?

Q. What did you do in order to obtain knowledge about maintenance and service that occurred at the Tacoma Stevens store before your arrival in --

A. I --

Q. -- 2021?

A. I've done no preparation.

Q. Topic 13 is: Circumstances that would cause Fred Meyer and/or Kroger to service the antitheft shopping cart mechanism.

Are you prepared to talk about topic 13?

A. Yes.

Q. Topic 14 is: Your knowledge and Fred Meyer's knowledge of the incident involving Ms. LaRocque at issue in this lawsuit.

Are you prepared to talk about this topic?

A. Yes.

Q.    And what did you do to prepare to talk about this topic?

A.    Just talking to my attorney.

Q.    Did you talk to the security guard on duty on the day that Ms. LaRocque was injured at the Fred Meyer Tacoma Stevens location?

A.    I have no knowledge of that.

Q.    Did you review any documents related to the incident involving Ms. LaRocque at the Tacoma Stevens location?

A.    Not that I remember.

Q.    Topic 15, there's a typo.  It should say "the identity."  The identity of the Fred Meyer security guard working at the time of the incident at issue in this lawsuit, their knowledge of the incident and their actions, if any, in response to the incident.

Are you prepared to talk about this topic?

A.    Yes.

Q.    Who was the Fred Meyer security guard working on the time -- working at the time of the incident at issue in this lawsuit?

(Crosstalk)

A.    I have no --

MS. TUTHILL-KVETON:  Let me object, Mr. Peterson.

I'm going to object to the form of the question.

Go ahead, Mr. Peterson.

A.    I do not know.

Q    (By Mr. Wilke)  Okay.  Do you know what their knowledge is of the incident?  The security --

(Crosstalk)

A.    I would not know.

Q.    You are not, in fact, prepared to talk about topic 15; is that correct?

A.    I -- I can only -- I am -- do I know -- I guess maybe I didn't hear the question correctly.

Q.    So, yeah, okay.  That's fair.  Let's go back --

A.    Yeah.

Q.    -- over topic 15.  So listen carefully.  And you can read along.

A.    Okay.

Q.    The identity of the Fred Meyer security guard or guards working at the time of the incident at issue in this lawsuit, their knowledge -- meaning the security guard's knowledge -- of the incident and their actions, if any, in response to the incident.

I'll ask you again, are you prepared to talk about this topic?

A.     Thank you.   No.

Q.     Number 16 is:   The role of Fred Meyer security guards and their location at the store on the date of the incident at the premises.

A.     I can speak to what they're -- they're tasked to do, but I can't -- I couldn't tell you where they're at specifically, because they do move.

Q.     Did you do anything to prepare by -- such as speaking to any security guard prior to this deposition?

A.     No.

Q.     So you don't, in fact, have any knowledge regarding the location of the security guard or guards on the date of the incident; correct?

A.     I know where they could be but not specifically.

Q.     Topic --

A.     Or should be.

Q.     Topic 17 is:   The identity -- again, there's a typo -- of the Fred Meyer manager or managers working at the time of the incident at issue in this lawsuit, their knowledge of the incident and their action, if any, in response to the incident.

Are you prepared to talk about topic 17?

A.     Yes.

Q.     Did you speak with any of the managers that

were working on the date of the incident in order to prepare for today's deposition?

A.    No.

Q.    So how do you -- how did you prepare to learn the store manager's knowledge of the incident, if any?

A.    I wasn't -- I didn't do any prepare -- preparation to find out if they knew anything.  I haven't talked to them.

Q.    Okay.  Topic 18 is:  Why video surveillance footage was not maintained showing the incident at issue in this lawsuit.

Are you prepared to talk about this topic?

A.    Yes.

Q.    What did you do to prepare for this topic?

A.    Nothing.

Q.    So how do you have knowledge of why video surveillance was not maintained?  Do you have personal knowledge?

A.    I don't have personal knowledge.

Q.    So it was incorrect to say that you are prepared to talk about this topic; correct?

MS. TUTHILL-KVETON:  Object to the form of the question.  That's not what he said.  He said he's prepared to talk about it.  If he doesn't know what it is, if there's no knowledge of it, then that's what the

corporate answer is.

Q (By Mr. Wilke) You can answer my question, Mr. Peterson.

A. I'm prepared to talk about what we -- how we record incidents, but I don't -- I don't have knowledge as to why -- you're saying this incident is not recorded. I don't -- I couldn't tell you why.

Q. So it's correct to say that you are not prepared to talk about topic 18, which is why video surveillance footage was not maintained showing the incident at issue in this lawsuit. Correct?

A. Correct.

Q. Number 19 is: Your knowledge of the tool used to unlock the antitheft shopping cart mechanism at the premises. Again, "premises" means the Tacoma Stevens store.

Are you prepared to talk about topic 19?

A. Yes.

Q. Has that tool been the same since you arrived at the Tacoma Stevens or are there -- is there a different tool that was -- that was ever used?

A. Same tool.

Q. Topic 20 is: Employees who were responsible for completing an incident report and/or accident report at the time of the incident at issue in this lawsuit.

Are you prepared to talk about topic 20?

A.    Yes.

Q.    Okay.   Did you talk to any employees who were working on the date of the incident in order to prepare for today's deposition?

A.    No.

Q.    Do you know what employees were -- would be responsible for completing an incident report or accident report on the day of the incident at issue in this lawsuit?

A.    I do.

Q.    Who are those employees?

A.    It would be myself, Savannah Stone, or Mark Boeller.

Q.    Who is Savannah Stone?

A.    Savannah Stone was my other lead ASL time, lead assistant store leader.

Q.    Did you talk to her in order to prepare for today's deposition?

A.    No.

Q.    And you said -- was it Mark Vole?

A.    Mark Boeller.

Q.    Boeller.   Okay.   Do you mind spelling his last name, please.

A.    B-o-e-l-l-e-r.

Q.    Okay.   And what is his -- was his role at the time of the incident?

A.    Center store assistant store leader.

Q.    Did you talk to Mr. Boeller in order to prepare for today's deposition?

A.    No.

Q.    Do you know whether either of them have any knowledge about the incident at issue in this lawsuit?

A.    I do not.

Q.    Topic 21 is:   Policies and procedures in place at the time of the incident regarding when a customer is injured by the antitheft shopping cart mechanism at any Washington Fred Meyer and/or Kroger store.

Are you prepared to talk about these policies and procedures?

A.    Yes.

Q.    Did you review any of the policies and procedures in order to prepare for today's deposition?

A.    No.

Q.    Topic 22 is:   Your knowledge of any cost-benefit analysis of the cost of litigation for customers injured by the antitheft shopping cart mechanism in comparison to the cost savings from preventing theft of items and/or theft of shopping carts.   And this is

limited to January 1, 2020 to the present.

Are you prepared to talk about topic 2020 -- or excuse me -- topic 22?

A. Yes.

Q. And what did you do to prepare to talk about this topic?

A. Nothing.

Q. And what are you basing your knowledge of, of the cost-benefit analysis?

A. Working for this company for --

MS. TUTHILL-KVETON: I'm going to object to the form. The question assumes something that may or may not be accurate.

Go ahead, Mr. Peterson.

A. Working for this company, that's -- that's never a prior- -- people -- you know, profit is not a priority over people.

Q. (By Mr. Wilke) Okay. Did you review any documents related to cost-benefit of preventing theft versus injured customers?

A. No.

Q. Topic 23 is: Fred Meyer and Kroger's response to interrogatories and request for production in this lawsuit and the factual basis for its responses to interrogatories.

Are you prepared to talk about topic 23?

A.   Yes.

Q.   Okay.   What did you do to prepare for this topic?

A.   Nothing.

Q.   Have you seen any of Fred Meyer or Kroger's responses to written discovery in this lawsuit?

A.   No.

Q.   You did not review those in order to prepare for today's deposition?

A.   No.

MR. WILKE:  All right.  I'm just going to, for the record, indicate that we're going to leave this deposition open, given --

(Crosstalk)

MR. WILKE:  Let me make my record.  You haven't even let me finish.

MS. TUTHILL-KVETON:  Sure.  Yeah.  Go ahead, please.

MR. WILKE:  We're going to keep this deposition open, just given the designee's testimony about his ability to testify about these topics.

MS. TUTHILL-KVETON:  I will go ahead and make my objection.

You haven't actually asked him any questions

Q.   Or 31 years in October; right?

A.   31 years March 9th, this past March 9th.

Q.   Oh, okay.  Congratulations.  So it just happened.

A.   Thank you.

Q.   Did you -- are you familiar with the Tacoma Stevens warning signs both on the cart and the doors that are related to the antitheft shopping cart locking mechanism?

A.   Yes.

Q.   Are you familiar with the language in those warning signs?

A.   No.  I don't remember what it says verbatim. I know there's -- there's like a caution and it showed the picture of the cart.

Q.   And the picture of the cart and caution, are you talking about the sign affixed to a cart or the sign affixed to the door, or both?

A.   The door.  The door and the -- the door has a decal on the inner doors.

Q.   Do you know what else it says or what it contains other than an image of a shopping cart --

A.   I --

Q.   -- the one on the door?

A.   I don't verbatim.

Q.    Do you know if the language is the same in the warning sign -- warning signs for the door and the cart?

A.    I do not.

Q.    Do you know who made those?

A.    I do not.

Q.    So you don't know whether it was Gatekeeper or Fred Meyer?

A.    I do not.

Q.    Do you know when -- when they were installed at the Tacoma Stevens location?

A.    It would be prior to launch.

Q.    When was the launch?

A.    I don't -- I wasn't here.

Q.    So you don't know?

A.    No.

Q.    Are you assuming that it was prior to launch or do you have knowledge that it was prior to launch that the warning signs were either --

A.    I --

Q.    -- affixed to the door or the cart?

A.    I am assuming just based on how we -- our practices are in the company.

Q.    Were you involved -- you were working at Fred Meyer -- well, scratch that.

Do you know -- so you don't know when they were installed.  Do you know when Fred Meyer -- well, let me re-ask that.

Who placed the stickers on the door?

A.    I do not know.

Q.    Do you know if the stickers on the door have ever been replaced?

A.    Not to my knowledge.

Q.    Do you know who placed the warning signs on the carts?

A.    I do not.

Q.    Do you know whether the warning signs on the door tell customers what may cause the antitheft shopping cart locking mechanism to lock?

A.    I do not.

Q.    Do you know if the warning signs on the shopping carts themselves tell Fred Meyer customers when the shopping cart may lock?

A.    I do not.

Q.    Do you know why Fred Meyer has warning signs related to the antitheft shopping cart mechanism?

A.    I do not.  I would just be assuming.

Q.    I'm entitled to your best answer.  What's your best answer on why Fred Meyer has the shopping cart --

A.    I assume it wants --

(Crosstalk)

Q.    -- locking --

A.    I assume they want them to know if there's going to be an inconvenience in their -- at the end of their shopping experience with the cart stopping.

Q.    And what are you basing that assumption on?

A.    Because if the cart does -- a customer does have a cart lock up, they would be, you know -- their time is their most valuable asset, so they're -- they can be, you know, unhappy about that.

Q.    Do you know whether the warning signs exist to warn customers that -- avoid potential harm to the customer?

A.    I don't know without reading it.

Q.    Do you know whether -- do you have any knowledge whether the warning signs that Fred Meyer has at the Tacoma Stevens store prevented any harm to customers?

MS. TUTHILL-KVETON:  Object to the form of the question.

Go ahead and answer, Mr. Peterson.

A.    Have they done -- what?  Can you please repeat it one more time?  Sorry.

Q    (By Mr. Wilke)  Yeah.  Well, let me ask it a

different way.

Are the warning signs that are on the carts -- on some of the carts and on the doors, are they designed in order to prevent customers from being injured?

A. I don't think so.

Q. And why do you say that?

A. I -- just being in the store for all this time, like, I don't see people being injured by them. I mean, we have roughly 4,000 transactions a day and I don't see, you know, people reporting injuries.

Q. Well, what's the other lawsuit that you testified in?

A. In -- I don't remember that person's name either.

Q. Okay. Did it involve a shopping cart?

A. Yes.

Q. And that person claimed they were injured by a shopping cart?

A. Yes.

Q. So your testimony that you don't think the warning signs are designed to prevent customers from being injured is just based on your experience as a store manager and whether you've personally observed customers being injured?

A.    Yeah.

Q.    Do you have any knowledge of whether the warning signs tell customers that the cart will lock if they don't go through the checkout?

A.    I do not without reading it.

Q.    Let's talk about the warning signs on the door.  What -- where are they located?  Let's start by telling me -- telling the jury what doors they're located on.

A.    I do know that they're on the inner door.  So there's the -- the lobbies have two sets of doors.  It's on the inner set of doors.

Q.    And so the jury can understand, when you walk into Fred Meyer -- there's two entrances; right?

A.    Correct.

Q.    Okay.  And so there's an outer door, and are those automatic doors that open if someone's coming in or out?

A.    Yes.

Q.    And then when you go through the lobby, there's the inner door; correct?

A.    Correct.

Q.    Okay.  And so on both sets of doors, the warning signs are affixed to those inner doors?

A.    Correct.

Q.    Do you know where they're located on the inner door?

A.    It's -- I don't know if it's the left or right, but it's right when you -- it's right on the door that opens.  So it's right in the -- right next to the metal frame where the door opens.

Q.    Okay.  So if those doors are open, the stickers are near that metal part of the door that's slid to the far side; is that correct?

A.    I'd have to look at it.  I have never looked at it like that.

Q.    Well, one of the topics today is -- we identified was the placement of the warning signs. That's why I'm asking you.  This is my opportunity to find out Fred Meyer's knowledge of that.

So you don't have any knowledge, specific knowledge --

A.    I never --

Q.    Sorry.  Let me finish my question so the record is clear.  Sorry.

You don't have any specific knowledge of where the warning sign is located on the door and how that -- how that placement may look when the doors are open.  Is that correct?

MS. TUTHILL-KVETON:  I'm going to object to

the form of the question. It's a compound question. And also mischaracterizes the testimony.

Go ahead, Mr. Peterson.

A. Yes, I've never -- I do not know -- I've never looked at -- looked -- knowingly tried to look for the door -- the sticker placement once the doors are open, if there's any --

(Crosstalk)

A. -- anything blocking its view.

Q. Is it possible something's blocking the view?

MS. TUTHILL-KVETON: Object to the form of the question. Speculation.

Go ahead.

A. I would note that -- I don't remember by heart the way that everything lines up when you're out there.

Q (By Mr. Wilke) You don't have any knowledge one way or the other whether they're blocked --

A. Yeah.

Q. -- or not?

A. I don't.

Q. Did you -- as the store manager, did you receive any training about the antitheft locking mechanism?

A. I just reviewed when I got here. They

you, let me know.

(Crosstalk)

A.    Absolutely.

(Crosstalk)

Q.    Good recall.

THE COURT REPORTER:  Can we --

Q.    (By Mr. Wilke)  And we're talking --

THE COURT REPORTER:  Can we maybe like one --

MR. WILKE:  I was just going to get to that.

THE COURT REPORTER:  -- at a time?

MR. WILKE:  Yeah.  I was just going to get to that.  So...

Q    (By Mr. Wilke)  So we're talking over each other, Chad, a little bit.  It's natural in conversation to do it.  It shows you're a good listener, but it's hard for the court reporter to capture when there's simultaneous talking.  So do your best just to pause and let me finish my questions.  I'm trying to make a clean record.  And I'll do the same thing.  I think I've been talking over you.  I'll pause, make sure you're done answering before moving on to the next one.

But it's natural.  This happens.  But for the court reporter's sake, we should try not to do that.

Okay.  So other than the informal training you had from Katherine, did you receive -- you

personally receive any training -- other training from Fred Meyer or Kroger related to the antitheft shopping mech- -- shopping cart locking mechanism?

A.    No.

Q.    Do you know if employee -- Fred Meyer employees are trained about the shopping cart antitheft locking mechanism?

A.    The same informal training.

Q.    And so that's the APM's job?

A.    Correct.

Q.    Does the APM train the employees or is that done sometimes by some other management person?

A.    APM.

Q.    And what does the APM tell employees about the mechanism?

A.    They show us basically when the -- when the cart enters the store, the procedure of how it can -- once it travels through a register, the sensor sees the cashier, disarms the wheel, the cart goes out.  And when the cart goes out after going through a register, it -- from what I remember, rearms after that, so then that way when it comes back in, it would do the same job.

Q.    Okay.  So the employees are told, hey, the shopping cart will lock if you don't go through the register?

Page 60

A. Correct. Correct.

Q. Any other training other than what we just talked about?

A. No.

Q. So we talked a little bit about if you don't go through the register and pay, the cart will lock. Correct?

A. Correct.

Well, there's -- there's only one other caveat to that.

Q. Okay.

A. The cashier does have to be in front of the checkstand when the person passes through there also. There is a sensor that reads that there's a person at the register.

Q. Got it.

What about self-checkout?

A. Self-checkout is just pre- -- it's just pre- -- if they're there -- if they pull up and they're there for -- I couldn't tell you the distance of time. I'm sure it's short. Then the cart is free, you go outside.

Q. What if a customer lingers after checking out, like -- there's a Starbucks located somewhere close to the exit. Correct?

A.    Correct.

Q.    What if a customer stops and orders a complicated drink and it takes some time?  Is there a time period after which they checked out, they've gone through the pathway, they stop and get a drink, will that cause the shopping cart to lock in some instances?

A.    That wasn't conveyed to me that way.  I was told that it has to exit.  And that's when start -- that's when the process starts back over, if you will.

Q.    There's no time period?

A.    I was never told about a time period.

Q.    Mr. Wheeler testified last week that he is -- he testified that potentially like if somebody checked out and then that cart was unlocked and then they left it there and then they exited the store, after a period of time, that cart would lock because thieves could come and take it if it's already been unlocked.  There's like a time period.

Do you have any knowledge about whether that is the case or not?

A.    I do not have any knowledge of that.

Q.    Okay.  And then which wheels is the locking mechanism affixed to?

A.    There's one in the front and one in the -- in the rear.

Q.   Do you know -- if the cart's in front of you in the -- and so the bar is in front of you, and then this -- we'll call it the driver's side and the passenger's side.  Do you know which wheels are -- which front and back wheels have the locking mechanism?

A.   I do not.  I know they're opposite each other, usually.

Q.   Does the Fred Meyer store, the Tacoma Stevens store, have video cameras?

A.   We do.

Q.   When there's an incident causing claimed injuries to a customer, is there a policy in place to preserve surveillance footage?

A.   When it's reported, we will look for a video. Sometimes that's not possible.  We don't have cameras in every corner.  But when it is there, they burn it and you send it to Sedgwick, our insurance company, and we save copies of it in the store.

Q.   Does that only happen if there's an incident report created?

A.   Correct.

Q.   Do you know whether -- was it Gatekeeper that -- do you have knowledge of whether Gatekeeper was the one who installed the smart wheel locking mechanism on the carts?

A. I do not know.

Q. Do you know if they were installed on every push cart?

A. That is our general policy.

Q. Do you have any specific knowledge related to the Tacoma Stevens store, whether they were installed on every cart?

A. It -- that would be tough to say because we had many carts taken from us. So we've had carts replaced from other stores. We don't verify that they have Gatekeeper on them when they show up.

Q. I'm talking about a specific period of time when it was first installed. Do you have any knowledge of whether, when it was first installed, if they were installed on every cart?

A. I would imagine so. But it's just my assumption.

Q. That's just --

(Crosstalk)

A. I can't see them put -- I can't see them putting in the system and not doing -- paying for the full -- full gamut be done.

Q. But you don't have any specific knowledge?

A. No.

Q. If a cart was locked up, is it ever corralled

at the entrance?

A.   If a cart -- if a cart will not unlock at the doorway?  Yes.  They isolate it and then we take those out back.

Q.   Is that the cart graveyard, I think Mr. Wheeler called it?

A.   Yeah.  It's the nickname they gave it.

Q.   And so I think we talked a little it about it.  Is it a remote that unlocks the carts if they've locked up?

A.   Correct.

Q.   And who has -- who keeps the unlock remotes?

A.   It will be right near the -- right near the doorway.  So it's there, accessible for either the cashier or, in this case, sometimes the guards.

Q.   Got it.  Okay.

Where specifically is it located?

A.   It's different on both doors.

Q.   Okay.

A.   So one's -- one's hanging from a pole in the food entry and one's right at the self-checkout counter at the home entry.

Q.   So there's two remotes?

A.   Yes.

Q.   Is there a third kept in the manager's office

or anything like that?

A.    The APMs should have extras also.

Q.    Got it.  The APM is the keeper of the remotes?

A.    Correct.

Q.    That makes sense.

And you said if you can't get them to unlock. Do you know what causes them to be unable to unlock?

A.    I do not.

Q.    If you can't get them to unlock, do you have to carry them out to the cart graveyard?

A.    Personally what I've done is I'll just kick it up on one wheel and roll it out back.

Q.    Have thieves ever figured out that you can kick it up on one wheel?

A.    The thieves will basically act as if it was your car and take the wheels off.  They'll just strip the cart down.

Q.    How do they do that inside the store?

A.    It just takes a wrench.  Anybody -- it's not a special lug or anything.

Q.    So they just need time and not being caught?

A.    Correct.

Q.    What else -- what else is a reason to put a cart in the cart graveyard?

A.    That's typically -- that's typically it, is just the wheels.

Q.    Is there anything else you can think of that would require a cart to be serviced and sent to the cart graveyard?

A.    Possibly hit by a car in the parking lot.

Q.    Are carts ever hit by cars in the parking lot?

A.    Yes, that has happened.

Q.    Are carts damaged by that?

A.    They can be damaged by it, yes.

Q.    Do you have any knowledge of carts that are missing a warning on the cart, for whatever reason, and that they are then -- sorry.  Let me rephrase that.

Do you have any knowledge of when a cart is missing a warning sign, for whatever reason, that that warning sign is replaced?

A.    I do not.

Q.    So you don't know one way or another whether that happens?

A.    I do not.

Q.    Do you know when Fred Meyer first learned that Ms. LaRocque claimed she was injured at a Fred Meyer store?

A.    I do not.

Q     Do you know whether an incident report was taken on the day she was injured?

A.     I do not.

Q.     Did you do anything to prepare for today by seeing if that was the case or not?

A.     I do not.  I didn't look into this case at all.  Just...

Q.     What training is given to employees regarding taking incident reports?

A.     That's -- that's formal training.  We do have that.  Any new leader gets that formal training.

Q.     And --

MS. TUTHILL-KVETON:  Wait.  This is -- wait. Before you ask your next question, this is a good time to take a break.  So I'm going to take a break.

MR. WILKE:  Counsel, we've only been 40 minutes now.  I have a pending series of questions. We'll take a break in just a few minutes.

I understand you want to coach your --

(Crosstalk)

MR. WILKE:  Let me finish, please.

I understand you want to coach your witness. I understand this testimony is not good for you. Believe me, I understand that.  But let me finish my pending series of questions.  You keep interrupting my

deposition --

MS. TUTHILL-KVETON:  I am a lawyer --

(Crosstalk)

MR. WILKE:  -- just because you want to coach your witness.

MS. TUTHILL-KVETON:  I am a lawyer who represents a client.  My client is here to testify today.  I get to advise my client.  It's not coaching.  I get to talk to my client during the course of the deposition.

And let's -- let's be honest.  When a client comes prepared, then your job is also easier.  And so that's why I'm here.  I get to talk to my client.

So I would like to take a break --

MR. WILKE:  I have a pending question.  We'll take a break in five minutes.

MS. TUTHILL-KVETON:  But you haven't asked a pending question.  I asked to take a --

MR. WILKE:  I said pending series --

MS. TUTHILL-KVETON:  I asked to take a break before you asked the question.

MR. WILKE:  Okay.  We'll take a break in five minutes.

(Crosstalk)

MS. TUTHILL-KVETON:  That's proper procedure.

No.  I don't -- you don't get --

MR. WILKE:  This is twice you've --

(Crosstalk)

MS. TUTHILL-KVETON:  I know.  I get to -- you asked -- so how about this.  You asked [sic] Mr. Peterson that he gets to take a break at any point in time after you've asked the question.  You instructed him in that at the beginning.

(Crosstalk)

MR. WILKE:  I said pending series, pending --

(Crosstalk)

MR. WILKE:  That's not what I said.  So just for the record.

MS. TUTHILL-KVETON:  This is what you said.  Don't interrupt me either.

So, Mr. Peterson, would you like to take a break?

THE WITNESS:  Yes.

MS. TUTHILL-KVETON:  There.

MR. WILKE:  Okay.  We'll take a break after I finish this next -- after we finish this next question.

MS. TUTHILL-KVETON:  No.  It's not like that.  It's because -- whenever I ask to take a break, you say that you have multiple -- a multitude of questions, when I've taken it at the appropriate time.

MR. WILKE: We'll let the courts --

(Crosstalk)

MR. WILKE: -- sort this out.

MS. TUTHILL-KVETON: I don't know that there's going to be a time where I do ask for a break and that you won't say that you don't -- that it's not an appropriate time for you.

And so if you believe that you're correct, you know, once we get back on the record, you can send me whatever authority that you believe you have that you get to ask whatever questions until you're done to take a break. And if you send me that authority that says you get to ask whatever questions you want and that when counsel asks for a break after a question has been answered, that I'm not entitled to one, I would be happy to take a look at that.

But I believe that I'm doing this properly. And so I would like to take a break. And the more we argue about it, the longer the break is going to take.

So let's come back at no later than 10:20.

MR. WILKE: Okay. And I'm just going to make my record that this is the second time counsel has impeded my deposition so she can coach the witness. We'll be raising this issue with the court.

Okay. We'll come back at 10:20.

MS. TUTHILL-KVETON: I'm going to -- I'm just going to say, I'm a lawyer and the things that we do are advising clients. And I get to advise my clients. That is what I get to do.

And the fact that I talked to my client during the deposition if we were in person would not be any different than it would be if we're doing this remote.

So we'll go ahead and come back at no later than 10:20.

THE VIDEOGRAPHER: Okay. We're going off the record. The time is 10:13.

(Recess 10:13 a.m. to 10:19 a.m.)

THE VIDEOGRAPHER: We're back on the record. The time is 10:19.

You may continue.

Q    (By Mr. Wilke) Okay. We took a quick break. Mr. Peterson, did you talk to anyone on the break?

A.    Yes.

Q.    Okay. And I don't want to know any content of conversations you had with counsel. Did you talk to your counsel on break?

A.    Yes.

Q.    We were talking about training given to employees regarding incident reports. Do you remember

that topic we were talking about?

A. Not the question specifically but, yes, I remember you were asking -- you were beginning to talk about training.

Q. Okay. And you said that there is formal training given to managers. Is that correct?

A. Correct.

Q. Okay. And how were employees trained, if at all?

A. Employees are trained to contact a manager.

Q. So if a customer is injured, employees are instructed to notify the store manager; is that correct?

A. That is correct.

Q. Okay. In every instance in which an employee -- in which a customer claims that they're injured?

A. Customer or employee.

Q. Customer or employee.

What about the security guard working at the front station? If he or she learns that a customer is injured, is that security guard supposed to notify a store manager?

A. They would contact a manager or APM, an APM would contact us.

They have radios where they're in

Page 73

communication with the asset protection at all times.

Q.	Got it.

So my question's a little bit different.  Is a security guard instructed to notify an APM or store manager if they observe a customer that's injured?

A.	Yes.

MS. TUTHILL-KVETON:  Object to the form of the question.  And so -- before you answer.

Q	(By Mr. Wilke)  And who instructs the security guards to notify the store manager or APM to notify -- the store manager or APM if a customer is injured?

A.	This would be their supervisors, ODS.

Q.	What does ODS stand for?

A.	Off Duty Services.

Q.	And earlier you said you didn't know the security guard or guards that were working on the date of the incident at issue in this lawsuit.  Correct?

A.	Correct.

Q.	Do you know if Fred Meyer did anything to identify the actual shopping cart that Ms. LaRocque claims injured her?

A.	I do not.

Q.	Did you do anything to talk to anyone about that before today's deposition?

A.    Did I talk to anybody about Ms. LaRocque?

Q.    No.  I'm sorry.  Did you talk to anyone about the specific shopping cart and whether it was preserved or not?

A.    No, I did not.

Q.    So Fred Meyer does not know what specific shopping cart Ms. LaRocque claims injured her; correct?

A.    I wasn't aware of her case before this, so I am not -- I guess -- I don't know.  I wouldn't be able to tell you that.

Q.    So you don't know?

A.    I don't know.

Q.    Do you know whether that specific cart had a warning sign or not?

A.    I do not.  It's our general practice that we do have those signs on the carts, so I would assume.

Q.    But you don't have any knowledge one way or the other whether that specific cart did or did not have a warning sign; correct?

A.    Just assumptions that it does.

Q.    Right.

So I understand you have an assumption.  So listen to my question.

You don't have any specific knowledge whether the specific cart that Ms. LaRocque claims injured her

Page 75

had a warning sign or not; correct?

A.   Correct.

MS. TUTHILL-KVETON:  I'm going to object to the form as asked and answered.  He said "I would assume."  That was his answer.

MR. WILKE:  Did you capture his response, Karmen?

THE COURT REPORTER:  He said "correct."

MR. WILKE:  Okay.  Thank you.

Q   (By Mr. Wilke)  Do you have any knowledge of whether the security guard working on the date Ms. LaRocque was injured notified a store manager or not?

A.   I do not.  I mean, if there is a record, if she reported it, we'd have an incident report.  So I'd have to look at the incident reports.

Q.   But as you sit here today, you don't know one way or the other?

A.   It was never presented to me at the time if she did.

Q.   Do you know or do you not know?

A.   I would assume she -- you -- can you just ask -- I don't want to mess you up.  What was --

Q.   Sure.

So do you have any knowledge of whether the

security guard working on the date Ms. LaRocque was injured notified any manager that Ms. LaRocque was injured or not?

A.    I was not notified by security of an injury that day.

Q.    Do you know whether you were working that day?

A.    Yeah.

Q.    And how do you know that?

A.    I was told by -- the counsel asked when --

Q.    Wait, wait, wait.

(Crosstalk)

A.    Yep.

Q.    Don't say anything --

(Crosstalk)

A.    No.  I just know I was working that day.

Q.    Okay.  Do you have any knowledge whether a security guard notified anyone or not on the date that Ms. LaRocque was injured, that she was injured?

A.    I -- if there's a report, then yes.  If not, then I would say no.

Q.    Do you know whether there's a report or not?

A.    I do not know.

Q.    So you don't know whether or not -- you don't know whether a security guard notified anyone or not?

A.     I don't know if it was reported or not, because if -- or if there is or not, it's -- is there a report?  I guess, is there a --

Q.     Listen to my question, Mr. Peterson.

A.     Okay.

Q.     My question is:  Do you have knowledge sitting here today, do you know whether a security guard notified anyone, any Fred Meyer employee, that Ms. LaRocque was injured?

A.     I do not.

Q.     Is there a sort of schedule or regular schedule -- well, let me -- I'm trying to ask, does Fred Meyer have regular inspection of the carts?

A.     Yes.

Q.     How does that work?  Is there a schedule?  Tell me how --

A.     I believe it's biannually, they come out. There's a company that comes out and they process through every single cart.  They usually spend one or two days here.

Q.     Okay.  What company is that?

A.     I believe that company is PICS.

Q.     And can you spell that for the court reporter, please?

A.     I believe it's P-I-C-S.

Q.    It's not P-I-X?

A.    It might be P-I-X.  I don't know.

Q.    That's okay.

A.    I'm just guessing.

Q.    Do you know whether they pull carts that are missing warning signs or not?

A.    I do not know.

Q.    Do customers ever come into the store and, for whatever reason, not purchase anything?

A.    I'm sure that happens.

Q.    Does Fred Meyer have any policy on which customers are allowed to use a shopping cart or not?

A.    No.

Q.    Any customer can use a shopping cart?

A.    Correct.

Q.    Give me one second, Mr. Peterson.

MR. WILKE:  I'll mark this as Exhibit 2.

(Exhibit No. 2 introduced.)

Q    (By Mr. Wilke)  And I can zoom in here, Mr. Peterson.

A.    Sure.

Q.    You're on your phone, so I imagine this is somewhat small.

A.    Yes.

Q.    So this is an incident report

Bates-labeled -- the last three digits are 115, produced by Fred Meyer defendants in discovery.

Do you recognize, just generally, this type of document that says "Incident Report" at the top?

A. I do.

Q. Okay. And so is this the form that Fred Meyer uses to fill out when a customer is injured?

A. Let me zoom in on it a little bit here.

Yes.

Q. Okay. Have you filled these -- one of these out before?

A. Oh, yes. Many times.

Q. Okay. So this is dated January 27th, 2021. The customer ID, her name is Candis Hoptooit; which is a great last name. It has a description, it has her employer. It tells you the manager on duty at the time. It tells you the store location. This one was in Yakima.

And then it says: Went through entrance -- if we go down to page 2, describe the incident: Went through entrance B, Purcheck wheels locked and hurt her right and left hands - right hand bent back and sprained right wrist.

Then below, it says "Provide Brief Description in ten words or less": Purcheck alarm

locked and bent backward and fingers.

Have you seen this particular incident today -- before today?

A. No.

Q. And then it has some other information. So witnesses -- let me go back up to the top here where it has a description.

Is this something that the store manager or APM person filling out the incident report, is this -- is this something they fill in or the customer fills in?

A. This particular one would be the manager.

Q. Okay. And is that typically what happens, is the store manager, or whatever employee is filling this out, is the one that fills out the form?

A. Yes.

Q. Meaning you don't --

(Crosstalk)

Q. Sorry. Go ahead.

A. Yes. Yes.

Q. Okay. Meaning you don't hand it to the customer to fill out. Correct?

A. There used to be, and I believe it still is, a portion that's the customer's portion. The customer does fill out their own statement, if they're willing to do so.

Q.    Okay.  But this particular part of the form is filled out by the store employee?

A.    Correct.

Q.    Got it.  Okay.

And then so here it says "Describe what happened," and then it has a narrative that says:  I made my purchase and hastened to exit, adjusting my purse, bags, holding onto the cart to return it through the doors, and the cart locked up in the doorway, throwing me over the handle and bending my hands/wrists in an unnatural motion/position.  The cashier, Christine, assisted me immediately and I departed for home.  No broken bones.

Is that the part that's filled out by the customer?

A.    Can you go back -- usually it -- yeah, I was going to say it's the customer statement at the top, if that's the -- if that's the --

(Crosstalk)

Q.    Yeah, it does.

A.    Yep.  Yep.

Q.    Yep, okay.  Okay.

Do you know if anything -- was there -- anything was done after this incident report was completed?  Any actions taken?

A.   This would be sent in to Sedgwick.   That is our policy.

Q.   Okay.

A.   This would all be -- we call them in and then we send it all electronically.

Q.   But do you have any knowledge specifically about this incident, what happened following this incident?

A.   What was the name?

Q.   Christine Hoptooit -- or I'm sorry.   Candis Hoptooit --

A.   It doesn't --

Q.   -- at the Yakima store.

A.   It doesn't strike -- strike any...

Q.   So you don't have any knowledge about this particular incident and what occurred --

A.   No.

Q.   -- after?

A.   No.

MR. WILKE:  I'll mark this as Exhibit 3.

(Exhibit No. 3 introduced.)

Q     (By Mr. Wilke)  Okay.  Now I'm going to Zoom if a little bit so you're able to see it.

This incident report was dated September 5th, 2024.  This is in the Vancouver, Washington Fred Meyer.

The manager on duty is Dana Eckman.

Do you know Dana?

A.     No.

Q.     You haven't spoken with her?

A.     No.

Q.     Okay.  It says name of the parent/guardian was Angelina Corona.  This person lives in Bellevue.

The manager, Dana Eckman, was the employee initially notified.  And it says:  Customer's cart locked up, causing customer to fly with cart.

And then it says provide detailed description as witnessed or as conveyed by the customer, which is in circles.

But it says:  I checked out with a cashier, who told me to get a cart.  I did.  It locked up on the way out the door.  I did not know it would do this.  It jarred my hands, neck, hurting my neck and up my -- and I can't read that.  I'm in a lot of pain.  Very frustrated to experience this without warning.

Have you seen this incident report before today's deposition?

A.     No.

Q.     Do you know if any actions were taken following this incident report?

A.     No.

Q.    Do you have any knowledge as to why the cart in that particular incident locked up?

A.    No.

MR. WILKE:  All right.  We'll mark this Exhibit 4.

(Exhibit No. 4 introduced.)

Q     (By Mr. Wilke)  This is an incident report dated October 15th, 2024.  Manager on duty is Scott Velter.  This is the Vancouver, Washington store.

Do you know Mr. Velter?

A.    No.

Q.    Have you ever spoken with him before?

A.    No.

Q.    Okay.  And so this customer is Marcia [sic] Birian, age 32.

We go down to the description, it says: Exiting store, wheels locked up, cart hit up, landed on customer's left knee.  Said knee -- says knee was -- says was a -- something -- guard at door described as bald guy.

It says the injury, knee pain.

Let me see here.

Stated there was no other customer/witnesses with her aside from potentially -- something -- guard at door.

Page 85

Let me scroll down a bit.

While exiting Fred Meyer's, an incident occurred that resulted in an injury to my knee. As I was pushing the cart, the wheels unexpectedly stopped. The sudden halt caused my knee to collide. Shopping cart went up and landed down on my knee. As a result of the impact, I've been experiencing significant knee pain.

Describe any injuries. It says: Throbbing pain left knee. Not -- something -- to stand long on left leg. And then it says notified the store manager.

Have you seen this incident report before today?

A. No.

Q. Do you know what actions, if any, Fred Meyer took in response to this incident report?

A. No.

MS. TUTHILL-KVETON: Object to the question as vague.

Go ahead.

Q (By Mr. Wilke) Can you repeat your answer, Mr. Peterson?

A. I said "no."

MR. WILKE: I'll mark this as Exhibit 5 as soon as it uploads.

Page 86

It's still uploading.

(Exhibit No. 5 introduced.)

Q    (By Mr. Wilke)  Okay.  It's gone through.

This -- Exhibit 5 is Bates-labeled 143.  This is an incident report dated September 2nd, 2024.  This is at the Ellensburg Fred Meyer.  The customer's name is Andy.

There's a -- on page 2, it says:  Cart locked on customer, causing injuries.

And it looks like there's a letter here that's accompanied with the incident report dated December 2nd, 2024.

It says:  Dear Lee, last week on November -- on Monday, November 25th, we met and discussed in detail the incident my wife experienced regarding the dangerous security cart protocols.  As you recall, she was a victim of an auto engagement of the security cart while exiting the north door on an evening on November 23rd.  Coincidentally, my eldest daughter experienced an energy -- injury from a similar cart malfunction on Thanksgiving Day only five days later.  This marks the second incident of Kroger's unsupervised security carts causing injury to be inflicted upon two members of my family within less than one week.

Here are the details of the second incident:

After purchasing grocery items at 12:56 p.m. on Thursday, November 28th, my daughter bought a coffee and perused some clothing items for a few minutes before exiting the store through the north door. As she left, the cart she was pushing suddenly locked up with no prior warning. This abrupt and unannounced action caused my daughter's leg to strike the cart, which caused a laceration and bruise. A photo of her injury and a copy of her receipt are attached.

I now must strongly urge you to pursue a resolution to this ongoing and dangerously reckless "security" practice. Any delay in a resolution places your customers at risk of sustaining injuries and places Kroger at risk of litigation. As a reminder, here are the details of the two possible resolutions we discussed on November 25th.

So number one, it says: Fix the security cart software. Currently the carts abruptly halt (a/k/a auto-engage) randomly and incorrectly each day. Tighten up the code and/or the variables in the system so the carts activate only when either a law or store policy has been violated. There should be no less than one false positive for every thousand accurate engagements.

MS. TUTHILL-KVETON: I think we lost -- just one second. I think we lost Mr. Peterson.

THE WITNESS:  Yeah, I just -- yeah.  My thing's acting up all of a sudden.  I'm trying to get it back.

MR. WILKE:  I can see the camera.

THE WITNESS:  Yeah.

MR. WILKE:  Looks like you're still live, and I can hear you.

THE WITNESS:  Yeah, good, good, good.

MS. TUTHILL-KVETON:  It's not facing you, though.  It's --

(Crosstalk)

THE WITNESS:  Oh, okay.  Gotcha.

MR. WILKE:  There we go.

THE WITNESS:  How about now?

(Crosstalk)

MR. WILKE:  All right.  Good.  All right.

MS. TUTHILL-KVETON:  It looked like -- it looked like it said the audio was reconnecting.  So maybe we can figure out what the last thing you heard was.

Q    (By Mr. Wilke)  What's the last thing you heard, Mr. Peterson?

A.    You had gotten through, I believe -- let me look at your paragraph here.

Q.    Yeah.  Let me scroll in so you can see it.

Page 89

A.    It was -- I believe you were just starting the second paragraph.

Q.    The pull the plug?

A.    The "Here are the details" --

Q.    Okay.

A.    -- "of the second" --

Q.    Okay.  All right.  We can go back over that.

Here are the details of the second incident: After purchasing grocery items at 12:56 p.m. on Thursday, November 28th, my daughter bought a coffee and perused some clothing items for a few minutes before exiting the store through the north door.  As she left, the cart she was pushing suddenly locked up with no prior warning.  This abrupt and unannounced action caused my daughter's leg to strike the cart, which caused a laceration and bruise.  A photo of her injury and a copy of her receipt are attached.

I now must strongly urge you to pursue a resolution to this ongoing and dangerously reckless "security" practice.  Any delay in a resolution places your customers at risk of sustaining injuries and places Kroger at risk of litigation.

As a reminder, here are the details of two of the possible resolutions we discussed on November 25th.

1) Fix the security cart software.  Currently

the carts abruptly halt, (a/k/a auto-engage) randomly and incorrectly each day.  Tighten up the code, enter the variables in the system so the carts activate only when either a law or store policy has been violated. There should be less than one false positive for every thousand accurate engagements; e.g., less than .10 percent defaults.

2) Pull the plug on the existing dangerous security cart system.  Not one criminal has been apprehended in Ellensburg via the use of these security carts; however, many customers have been injured and are complaining.  This is the best option for Kroger given the acceleration of reported incidents and injuries.

I won't read the rest.  It concludes on the last paragraph.  It says:  Knowingly and willfully allowing the current security cart system to continue to injure your own law-abiding customers is not only flagrantly reckless, it is morally and legally wrong. Please resolve this matter as soon as possible.  Andrew Cleman, Shield & Sword, Citizen's Advocates.

And it says cc:  Julieann Cleman, victim 1, Allison Cleman, victim No. 2.

Then there's a copy of the store receipt showing that they made a purchase.  And this is presumably a photograph that was rendered unviewable

despite how it was copies.

Have you seen this incident report and the attached letter before today?

A. No.

Q. Do you know -- have any knowledge of whether Fred Meyer took any actions related to the security cart system following this incident report?

A. No.

MS. TUTHILL-KVETON: Object to the question as vague.

Go ahead and answer if you can.

Q (By Mr. Wilke) Did you say "no"? Mr. Peterson?

A. No. Said "no."

MR. WILKE: I'll mark this Exhibit 6. Just give me a second. It's uploading.

(Exhibit No. 6 introduced.)

Q (By Mr. Wilke) Okay. It's been uploaded. I'll just share my screen. One second here.

This exhibit is Bates-labeled 120. It's dated 3/10/21. Customer name is Esther Flores.

Is this information supposed to be filled out, Mr. Peterson, the manager on duty and the store address here in section A?

A. Hold on. I'm having problems hearing again.

Q.    Okay.

A.    What the heck?

Okay.   Can you repeat that?

Q.    Yeah.

So we're looking at an incident report, section A.   The store ID that has the store address and the manager on duty, is this supposed to be filled out?

A.    Yes.   This is supposed to be filled out.

Q.    Okay.   We have the customer is Esther Flores. She lives in Selah, Washington.   She works for Memorial Hospital.   The date of the incident was March 7th, 2021.

It says -- provide details of the incident "as conveyed by the customer" is circled here.   Walking to exit building and cart locked up.   She ran into cart.

And then on the injury section, it says neck sore, wrist hurt.   And then it's signed by the employee.

Have you seen this incident report before?

A.    No.

Q.    Okay.   And then on the customer statement, it says:   I was exiting towards the doors and the security device locked the cart wheels and I ran into my cart.

And then it says "Describe any Injuries." And she writes:   Immediately my wrist had pain.   Shortly after getting into my vehicle, I noticed a pinching feeling in my right shoulder and neck area.

And then reported the incident was Tina. She unlocked the cart. Called Mohamed after arriving at home.

Do you have any knowledge one way or the other of whether Fred Meyer took any action with regard to the shopping cart locking mechanism in response to this particular incident?

(Crosstalk)

MS. TUTHILL-KVETON: Object to form as vague.

Go ahead.

A. Well, this one, just like the others, is -- they're running into the carts. It's -- I don't see them needing to do anything.

Q (By Mr. Wilke) So that wasn't my question.

Do you any knowledge one way or the other whether Fred Meyer took any action with regard to the shopping cart mechanism in relation to this specific incident?

A. No.

MR. WILKE: All right. We'll mark that Exhibit 7.

(Exhibit No. 7 introduced.)

Q (By Mr. Wilke) This is an incident report Bates-labeled 157. This is dated July 20th, 2025. This incident report at the Burlington Northern location.

Bill Pelan was the manager on duty.

Have you spoken with Bill Pelan before?

A.    No.

Q.    And this injured customer was Kim Paulson. She was 59 years old from Mountlake Terrace.

If we go to the incident report, it says "Provide Brief Description."  Cart locked up at doors.

And then the more detailed description underneath, it says:  Exiting store after going through checkstand and the cart locked up, causing her pain and numbness.

Have you seen this incident report before?

A.    No.

Q.    Okay.  If we go to the incident report, it says:  Kim P. is currently in physical therapy for a neck injury.  She has an appointment Tuesday, 7/2/2025 with her physical therapist, which was previously scheduled.

And then further down, it says:  Kim Paulson stated she was in a car accident four months ago and is in physical therapy for the injury.

Do you have any knowledge whether Fred Meyer took any action in relation to the shopping cart locking mechanism in response to this specific incident?

A.    Did it say why the cart locked up?

MS. TUTHILL-KVETON:  Wait.  One second.  One second, Chad.  I need to make an objection as to vague.

And I'd also like to make an objection that all of these questions are outside the scope of the corporate deposition notice.

But you can keep going.

Q     (By Mr. Wilke)  Go ahead, Mr. Peterson.  You can answer my question.  Do you have any -- do you want me to repeat the question or --

A.     I couldn't see --

Q.     -- did you hear it?

A.     I couldn't see what the -- what the customer's claiming happened with their exit.

Q.     Said:  Exiting store after going through checkstand and the cart locked up.

A.     Okay.

Q.     Do you want me to repeat the question?

A.     No, sir.

Q.     Okay.  Do you have any knowledge?

A.     No.

MR. WILKE:  And just for the record, topic number 6 in the 30(b)(6) says:  Your knowledge of all incidents occurring between January 1, 2020 to the present at any Fred Meyer and/or Kroger store in Washington state in which the antitheft shopping cart

mechanism locked and caused injury to a Fred Meyer and/or Kroger customer or employee.

(Crosstalk)

MS. TUTHILL-KVETON: My objection still stand -- my objection still stands.

MR. WILKE: Sure.

MS. TUTHILL-KVETON: The questions that you're asking --

MR. WILKE: Sure.

MS. TUTHILL-KVETON: -- apart from the incident report are outside the scope.

Go ahead.

MR. WILKE: All right. We'll mark this Exhibit 8.

(Exhibit No. 8 introduced.)

Q (By Mr. Wilke) Just a second here.

Okay. This is Bates-labeled 161. This is an incident report from this year, February 14th, 2026.

It looks like Lacey is crossed out. I'm not sure why.

Do you have any knowledge of this incident report, why it has a Lacey location that's crossed out?

A. No.

Q. Do you know Christine -- Christiana Johnson, the manager?

A. I might know them. I don't know for sure.

I know a Christiana. I don't know her last name, though.

Q. Do you know which store she works at?

A. I believe she works out at Bremerton, so not -- not Lacey.

Q. Let's scroll down where there's a little bit more information here.

It says on page 4, which is Bates-labeled 164: As I was exiting Fred Meyer's, the shopping cart locked and injured my right shin.

And then the next page says the injury was to the right shin, bruising to right shin. Julia front, self-checkout. And then it's signed.

Have you seen this incident report before?

A. No.

Q. Do you have any knowledge of whether Fred Meyer took any actions with relation to the antitheft shopping cart locking lock in response to this particular incident?

A. No.

Q. All right. Let's do -- give me one second here.

MR. WILKE: I'll mark this Exhibit 9. I'm waiting for it to upload.

(Exhibit No. 9 introduced.)

Q    (By Mr. Wilke)  Okay.  Exhibit 9 is a -- has the customer statement first on page 172.  This is dated July -- I'm sorry -- December 21st, '25.  Customer's name is Barbara Adams.  And this is at the -- looks like the Issaquah store.

It says:  Cart wheels locked up as she was walking out of the home entrance, caused a jerking motion with her neck.  Currently have a neck injury, a fusion.  Went to doctor and had an MRI due to extreme pain.

Have you seen this incident report before?

A.    No.

Q.    Do you have any knowledge of whether the shopping cart was functioning as intended in this incident?

A.    I would imagine it would still be working correctly.

Q.    And how do you know that?

A.    Because we take care of our carts.

Q.    Okay.  But you don't have any specific knowledge about this incident; correct?

A.    Correct.

Q.    You haven't spoken with anyone about this incident; correct?

A.     Correct.

Q.     And then on page 175, it says:  Customer claims that the cart wheels locked up while exiting building at the home entrance.  Customer hurt neck when cart wheels locked up at home entrance.  Customer claims that the cart wheels locked up as she was exiting the building at the home entrance.  Customer claims that she had previous neck surgery and it aggravated her neck. Home entrance no hazards.  Cart wheels locked up due to Purcheck system.

Do you have any knowledge of whether Fred Meyer took any actions following this particular incident with relation to the --

MS. TUTHILL-KVETON:  (Inaudible).

Q     (By Mr. Wilke)  -- antitheft shopping cart locking mechanism?

MS. TUTHILL-KVETON:  Object to the form and outside the scope of the -- as vague and outside the scope of the notice.

Go ahead, Mr. Peterson.

A.     No.

Q     (By Mr. Wilke)  Do you know whether Fred Meyer investigated whether the cart functioned correctly in this case?

A.     The manager would.

Q.   How do you know that?

A.   That's procedure.

Q.   So is that your assumption?

A.   Yes, assumption.

MS. TUTHILL-KVETON:  Object to --

Q    (By Mr. Wilke)  Do you --

MS. TUTHILL-KVETON:  Object to the form of the question.  He says it's procedure.

Q    (By Mr. Wilke)  Do you have any specific knowledge of what the manager did in response to this incident?

A.   No.

Q.   Never talked to the manager at this store?

A.   No.

Q.   And you didn't talk with anyone at Fred Meyer corporate about this incident either; correct?

A.   No.

MR. WILKE:  I'll mark this Exhibit 10 as soon as it comes up.

(Exhibit No. 10 introduced.)

MS. TUTHILL-KVETON:  I'll just remind you, Mr. Wilke, we do have to stop at 2:00.  So --

MR. WILKE:  Understood.

Q    (By Mr. Wilke)  All right.  Exhibit 10 is an incident report Bates-labeled 185.  This was at the Fred

Meyer in Lynnwood. It looks like Cheryl Tutt was the manager.

Do you know who Cheryl Tutt is, Mr. Peterson?

A. No.

Q. Have you ever spoken with Ms. Tutt?

A. No.

Q. And then Amy Craig, do you know this customer?

A. No.

Q. If we go to page 2, which is 186, customer stated that after checking out through checkstand 3 or 4, she exited the building through north entrance. Bruise on abdomen. Bleeding disorder. Then it's signed by Cheryl.

And then we go to the customer statement, it says: Walking after paying for food and exiting the building. Upon exiting, my grocery cart suddenly locked and the momentum of my body didn't slamming the cart into my stomach. My stomach is starting to bruise.

The next page it says: Upper abdomen under breast is bruising and pain. Pain is constant and abdomen is tender to the touch.

Have you seen this incident report before?

A. No.

Q. Do you have any knowledge on whether the

shopping cart locking mechanism was functioning as intended when this injury occurred?

A.    I would imagine so.

Q.    And what are you basing that knowledge on?

A.    The systems -- I have yet to see our system fail here.

Q.    Okay.  Did you speak with anyone that has any knowledge related to this particular incident?

A.    No.

Q.    Do you have any knowledge of whether Fred Meyer took any action with relation to the shopping cart locking mechanism in response to this particular incident?

MS. TUTHILL-KVETON:  Object again as vague and outside the scope of the deposition notice.

Go ahead and answer, Mr. Peterson.

A.    No.

MR. WILKE:  I'll mark this Exhibit 11.

(Exhibit No. 11 introduced.)

Q     (By Mr. Wilke)  All right.  This is Bates-labeled 201.  This is an incident report dated June 2nd, 2025.  This is the Puyallup store.

Is that the location that you used to work at?

A.    I worked there a long time ago.  1997.

(Crosstalk)

Q. This is the other side; this isn't the South Hill location?

A. Correct.

Q. Okay. Do you know this manager, Kristine --

(Crosstalk)

Q. I'm sorry. Kristen Nickolson?

A. Yes.

Q. Okay. Did you speak with her about this particular incident at any time?

A. No.

Q. Customer's name is Anna Holts. Do you know that customer?

A. No.

Q. Looks like she's from Tacoma.

Says on the second page: Customer was walking out of the exit door in apparel when cart locked up on her, bouncing backwards and hitting her shin.

And then when we go here -- doesn't look like there's a witness statement.

The customer statement says: The cart stopped suddenly and jumped backed, hitting me in the shin and then would not move.

Have you seen this incident report before?

A. No.

Q.    Do you have any knowledge one way or the other whether the cart was functioning as intended in this particular incident?

A.    I would imagine so.

I've never seen a cart bounce backwards either.

Q.    Do you have any knowledge about this -- whether there was any sort of investigation by Fred Meyer on whether the cart was acting as intended?

A.    The managers would have followed up.

Q.    And how do you know that?  Have you spoken with the manager?

A.    No.  This is procedure.

Q.    Okay.  You don't have any specific knowledge about any actions that were taken by Fred Meyer, if any, in response to this particular incident; correct?

A.    No.

MS. TUTHILL-KVETON:  I'm going to object to the form as vague, because he already testified about following up and procedures, but -- and this is also outside the scope of the deposition notice.

Q    (By Mr. Wilke)  So my question is a little bit different, Mr. Peterson.  I said "is it correct" and you said "no."  So I just want to make sure the record's clear.

Do you have any knowledge one way or the other of what actions, if any, Fred Meyer took in response to this particular incident?

MS. TUTHILL-KVETON: Are you asking him -- let me clarify. Are you asking him, Mr. Wilke, as an individual or the corporate designee? Because he is here for a corporate designee.

MR. WILKE: Correct, as the designee.

MS. TUTHILL-KVETON: So those two things are different.

MR. WILKE: And when I say "you," I'm referring to him.

Q. (By Mr. Wilke) So Mr. -- let me ask it again, Mr. Peterson.

Do you have any knowledge, as the designee, of whether this -- what actions, if any, Fred Meyer took in response to this particular incident with regard to the antitheft shopping cart locking mechanism?

A. I mean, the procedure is the manager would follow up with the cart [sic] if someone's claiming the cart hurt them.

Q. So did you -- in preparation for today's deposition, did you find out what was done, if anything, in response to this particular incident?

A. I did not call Kristen.

Q.    So as you sit here today, you don't have any knowledge of any actions, if any, that Fred Meyer took in response to this specific incident with regard to the shopping cart locking mechanism?

MS. TUTHILL-KVETON:  Objection.  Asked and answered as the corporate deponent.

Q    (By Mr. Wilke)  You can answer, Mr. Peterson.

A.    I -- I'm now confused as to what was said. Sorry.

Q.    Do you have any knowledge one way or the other of any actions that Fred Meyer took in response to this specific incident related to the shopping cart mechanism?

MS. TUTHILL-KVETON:  And I'm going to object again as vague as to whether or not you're asking him, as the corporate deponent, for policies and procedures or whether or not he had personal knowledge as to these things.

(Crosstalk)

Q    (By Mr. Wilke)  You can answer, Mr. Peterson.

A.    Yeah.  And obviously -- so basically I -- I've never sat on this part as far as being like the corporate respondent.

Is that what it's called?

So Fred Meyer's -- if I am Fred Meyer's, yes,

Fred Meyer's would have taken action, because a Fred Meyer manager is a representative of Fred Meyer.

Q. Okay. So tell me --

(Crosstalk)

Q. So tell me what -- what action --

(Crosstalk)

A. Yeah, okay.

(Crosstalk)

MS. TUTHILL-KVETON: Counsel, please don't --

(Crosstalk)

THE COURT REPORTER: Wait. Wait, wait, wait, wait, wait.

I really need this to slow down.

(Crosstalk)

Q. (By Mr. Wilke) Okay. Go ahead. I'm sorry, Mr. Peterson.

THE COURT REPORTER: It's getting really messy.

Q (By Mr. Wilke) Go ahead, Mr. Peterson. I interrupted you. I apologize.

A. No, no. It's all right.

Is there a certain part you didn't hear when I was talking?

Q. I guess my question is: What action did the manager take -- as you sit here today as the designee,

tell me what actions you're aware of the manager took in response to this incident.

A. The procedure is that the -- if any item is involved in an injury, we review the safety of that -- that piece. So it could be if it's a knife, if it's a saw, if it's a cart, the manager who responds to that incident will inspect the -- everything involved to ensure safety.

So it could even be a pothole in the street. We would inspect that, we would make sure that we note it, we put in for repair, take pictures.

Q. And I understand that's general policy. So my question's a little bit different.

Tell me what you are aware of, as the corporate designee, what actions the manager took in response to this specific incident.

MS. TUTHILL-KVETON: I'm going to -- I'm going to -- I'm going to -- I'm going to object to that, because he's either a corporate designee and he is talking about policies and procedures or you're asking him, as an individual person, what he knows to be true. And I don't believe that it's appropriate. So --

(Crosstalk)

MR. WILKE: Just please make your objection -- you can make your objection, Counsel. I'll

let you make your objection --

(Crosstalk)

MR. WILKE:  -- on the record.  Then I'm going to move on.

MS. TUTHILL-KVETON:  Okay.  Well, then I will definitely move to strike all of these answers if it's not clear whether or not he's speaking from his --

MR. WILKE:  Counsel --

MS. TUTHILL-KVETON:  -- personal experience -- I'm making a record.

MR. WILKE:  Okay.

MS. TUTHILL-KVETON:  -- or as the corporate designee.  So you're asking questions that confuse the -- both.  And I will, in the future, move to strike them.

So why don't you go ahead and ask your question again.  We'll see --

(Crosstalk)

MR. WILKE:  I did.  I --

(Crosstalk)

THE COURT REPORTER:  I really -- guys, I really need one person at a time.  This is...

MR. WILKE:  Karmen, can you please read back my last question to the witness.

THE COURT REPORTER:  Let's see.

But I really do need --

MR. WILKE: Yeah.

(The reporter read back.)

MS. TUTHILL-KVETON: Okay. And I'm going to add to that: Asked and answered as the corporate designee.

Go ahead, Mr. Peterson.

A. The manager would inspect the cart, would inspect the system, to make sure it's working properly.

Q. (By Mr. Wilke) So tell me how you know, how you have knowledge that the cart -- the manager inspected the cart.

A. That's the procedure.

Q. Okay. So you don't have specific knowledge. You're just basing it on a procedure. Correct?

A. I, myself, my -- personally? I do not.

Q. Okay. So as the corporate designee, you have an obligation to prepare for topics, and that involves reviewing documents, speaking with people. And so this is your -- this is Fred Meyer's opportunity, for as the corporate entity, you are the face of the corporate entity today.

So it's my opportunity to ask Fred Meyer these questions, and you have an obligation to prepare for these topics. So I'm asking -- I just want to make

it clear for the record, it sounds like you, as a designee, have not done anything to find out what was done in regard to this specific incident.

MS. TUTHILL-KVETON:  Object to the form --

A.    I did not talk to --

MS. TUTHILL-KVETON:  Hold on.

I'm going to object to the form of the question.  He hasn't said he hasn't done anything or doesn't have knowledge, but if --

Q.    (By Mr. Wilke)  Can you --

MS. TUTHILL-KVETON:  But go ahead -- but go ahead.

And it's, you know, a vague question.  But go ahead.

Q     (By Mr. Wilke)  Go ahead, Mr. Peterson.

A.    I have not personally talked to Kristen Nickolson.

Q.    So you don't have any specific knowledge of what was done or not in regards to this specific incident?

A.    Just from procedures, what she -- what she would have been mandated to do.

Q.    Understood.

MR. WILKE:  I'll mark this Exhibit 12.

(Exhibit No. 12 introduced.)

THE VIDEOGRAPHER:  Let me just interject here real quick, Mr. Wilke.

MR. WILKE:  Sure.

THE VIDEOGRAPHER:  Mr. Peterson, if there's a way for you to prop your phone so you're not holding it with your hand.

THE WITNESS:  Oh, yeah.  I'm sorry.  Is it shaking a lot?

THE VIDEOGRAPHER:  Yeah.

THE WITNESS:  Okay, I gotcha.  Sorry.

THE VIDEOGRAPHER:  Appreciate it.

Q     (By Mr. Wilke)  Okay.  Exhibit 12 has been Bates-labeled 218.  This is an incident report at the Vancouver store.  The manager on duty is Jesus Ortega.

Do you know Mr. Ortega, Mr. Peterson?

A.     No.

Q.     Have you ever spoken with him before?

A.     No.

Q.     And the customer's name is William Leady.  Do you know that customer?

A.     No.

Q.     This says:  Customer's cart locked up when crossing the doors and he hurt his knee -- or hit his knee against the cart.  Says the left knee was hurt.

And then we go to the last page, it says:

Customer stated this has happened many times before, except this time he was hurt.

Have you seen this incident report before today's deposition?

A. No.

Q. Did you do anything to find out any additional information about this specific incident before today's deposition?

A. No.

Q. Do you have any knowledge of whether Fred Meyer took any actions regarding the shopping cart locking mechanism in response to this specific incident?

MS. TUTHILL-KVETON: Object to the form as vague.

A. If I'm speaking -- if I'm speaking as Fred Meyer, the manager would have followed up on the system.

Q (By Mr. Wilke) How do you know for certain the manager followed up?

A. We follow policy and procedures.

Q. Did you speak with the manager before today's deposition?

A. Personally I did not speak to that manager.

Q. Okay. So you have no specific knowledge. You're just basing it on what the procedure is. Is that fair?

A.    That is fair.

MR. WILKE:   I'll mark this Exhibit 13.

(Exhibit No. 13 introduced.)

Q     (By Mr. Wilke)   It's still uploading.

Okay.   This is another incident report Bates-labeled 221.   The date of this incident is December 27th, 2024.   This is at Spokane Valley store.   The manager on duty is Nicholas Strandberg.

Do you know Mr. Strandberg, Mr. Peterson?

A.    That name sounds familiar, but I'm not sure.

Q.    Did you speak with him in order to prepare for today's deposition?

A.    No.

Q.    And then the customer's name is Suzanne Litwan.   Do you know that customer?

A.    No.

Q.    It says:   When exiting the building, the shopping cart locked up due to no merchandise being purchased through a register.   The cart locking up caused customer affecting her right shoulder and neck.

And then down here, it says urgent care on December 28, 2024.

And then at the very last page, it says: Would like a better system for theft.

Have you seen this incident report before

today?

A.    No.

Q.    And you didn't talk to the manager at the store to find out what actions were taken following this incident; correct?

A.    I did not personally talk to them.

Q.    In order to prepare for the deposition as a designee, you did not talk to the manager; correct?

A.    Correct.

MR. WILKE:  Karmen, I need to interrupt.  Is this 13?

THE COURT REPORTER:  I think it's 14.

MR. WILKE:  Thank you.

(Exhibit No. 14 introduced.)

Q    (By Mr. Wilke)  Okay.  Exhibit 14 is an incident report Bates-labeled 228.  This is a Fred Meyer location in Covington.  The manager is Sandra Voeller.

Do you know Sandra?

A.    Yes.

Q.    And how do you know Sandra?

A.    We worked together many years ago.

Q.    Okay.  Did you talk to her in preparation for today's deposition as the designee?

A.    No.

Q.    And then this customer's name is Maximo

Cortez. Do you know this customer?

A. No.

Q. It says: Customer describing that -- described to me that her son was bleeding, and I notified the MOD.

Is that the manager on duty?

A. Yes.

Q. And then in the incident report, it says: as we were leaving the store, the cart locked up and my son slammed his face into the handle, causing him to bleed.

And then there's a customer statement. It says: As we were leaving the store, the cart locked up causing my son, Maximo, to slam his face into the cart handles. His nose is bleeding and split. We went into the Starbucks to clean him up.

And then the injuries, it says: Bloody, split nose, crying from pain, needed to clean blood up.

And it says they reported the incident to two attendants at the self-checkout area.

Have you seen this incident report before today?

A. No.

Q. And did you talk to the store manager, as the designee, to find out what actions were taken following

this incident?

A.    I did not talk to them.

Q.    Did you talk to anyone at corporate about this particular incident?

A.    No.

MR. WILKE:   So this will be Exhibit 15.

Actually, I think this is a duplicate.  Give me one second.  We may have to strike that exhibit number.

So ignore that, Counsel.  I apologize.  I dragged the wrong one.

Just a second here.

This will be 15.  It's coming through.

(Exhibit No. 15 introduced.)

Q    (By Mr. Wilke)  This is Bates-labeled 270. This is an incident report.  This is dated May 9th, 2024.  This is at the Seattle location on Northwest 45th.  It's David Barger.

Do you know Mr. Barger, the manager?

A.    No.

Q.    Have you spoken with him before?

A.    No.

Q.    Travis Bevan is the customer.  Do you know that customer?

A.    No.

Q. All right. Some of this handwriting, it's difficult to read.

Says: Customer leaving store through food -- something. Cart wheel locked. Customer tripped over cart and fell into door. Customer called and stated they had wanted to report and -- blank -- the incident -- and document the incident. The customer has not filled out any forms as of May 9th, 2024.

And it says: Customer stated he just had surgery. Did not specify where but stated his back and wrist may be a concern.

And then here's the customer -- the incident statement. It says: Around 7:45/7:50 a.m., I saw the subject walk through the grocery exit. The alarms went off, which indicated his cart would lock. I grabbed the cart key to unlock it, by the time I reached the -- and it continues on the next page.

And then it -- I don't see where that continues, but if we go to the next page, it says: Travis was pushing small grocery cart out through food entry. Cart wheel locked up. Travis tripped over cart and crashed into door.

Okay. Here's the full -- the fuller statement: At around 7:45 to 7:50 a.m., I saw the customer walk through the grocery exit. The alarms went

off, which indicated his cart would lock up.  I grabbed the cart key to unlock it, but by the time I reached the first set of doors, he had reached the second set because he was walking rather quickly.  When the cart locked, the momentum made him topple over the cart and fall and he hit the doors as he went down.  The cart flipped over and the groceries fell out.  I went up to him as he was getting up and put his items back in the cart.  He then mentioned he just had surgery.  He paused for a brief moment, then took his groceries out of the cart and walked to his car.  I locked the cart and put it away.

Did you talk to the Fred Meyer manager to prepare for today's deposition related to this particular incident?

A.    No.

Q.    Did you talk to Fred Meyer corporate about this particular incident in order to prepare for today's deposition?

A.    No.

Q.    And I take it you didn't talk to anyone about any actions that Fred Meyer took or not in relation to the shopping cart locking mechanism in relation to this incident.  Correct?

A.    I just know what actions --

MS. TUTHILL-KVETON:  Object to the form --

(Crosstalk)

A.      -- he should take.

MS. TUTHILL-KVETON:  I'm going to just -- let me state an objection for the record, so Karmen doesn't hate us all.

But I'm making an objection as to personal knowledge versus policies and procedures as a corporate deponent, and that the question is vague and outside the scope of the notice.

MR. WILKE:  Counsel, I asked whether he spoke to anyone.  I'm not sure how that's vague, but I'll --

MS. TUTHILL-KVETON:  And it's also --

MR. WILKE:  -- repeat my question.

MS. TUTHILL-KVETON:  Okay.  It's also not reasonably calculated to lead to the discovery of admissible evidence, or outside the scope of permissible discovery in this case, like this entire line of questioning, for the record.

Go ahead.

Q      (By Mr. Wilke)  Did you understand my question, Mr. Peterson, or would you like me to repeat it?

A.      If you could repeat it, that would be great. Sure.

Q.    Sure.

So is it fair to say you didn't talk to anyone about any steps Fred Meyer took or not in relation to this particular incident?

A.    I did not talk to anyone.

Q.    And you didn't review anything about this particular incident as well; is that fair to say?

A.    Yes.

THE VIDEOGRAPHER:  We have some audio in the background.

MR. WILKE:  Yeah.

THE VIDEOGRAPHER:  I'm not sure where that's coming from.

MR. WILKE:  Mr. Peterson, is your door closed in the office is it just --

(Crosstalk)

THE WITNESS:  My door is closed.

There is a PA system.  Is it bothering -- is it coming through?

MR. WILKE:  Something's coming through.

THE VIDEOGRAPHER:  Yeah, we're hearing something.

THE WITNESS:  There's an ad going over the PA.  Hopefully that ends here in a second.

Can you hear it now?

THE VIDEOGRAPHER: No.

THE WITNESS: Okay. Good. Yeah, there's -- unfortunately, there's ads every once in a while in the PA system. I'm sorry.

MR. WILKE: Karmen, are we on 16?

(Exhibit No. 16 introduced.)

MR. WILKE: Okay. It will be 16. It's just coming through.

Q. (By Mr. Wilke) All right. Can you see the incident report on your screen, Mr. Peterson?

A. Yes. Yes.

Q. I'll blow it up -- okay. Thank you.

So this is Bates-labeled 293. This is an incident report dated July 22nd, 2024, and this was a Lynnwood location. It's Paul Braun.

Do you know Mr. Braun?

A. No.

Q. Have you ever spoken with him before?

A. No.

Q. And the customer's name is Julie Balatico. Does that -- do you know that customer?

A. No.

Q. I'll go to the second page. It says: Cart stopped abruptly and customer ran into it.

Provide detailed description below. It says:

Cart was -- excuse me.  Customer was pushing a cart out the apparel exit and the wheel locked up and stopped the cart.  Customer ran into the cart.

And then on the injuries, it says right shoulder blade, right chest muscle or ribs.

There's a witness here.  I'm still scrolling down?

On the customer statement -- I'll do my best to read -- it says:  I used a shopping cart in the store but didn't find the item I was looking for so was leaving the store.  When the cart stopped -- when the cart -- the cart antitheft mechanism stopped the cart and the door -- hit the door, opening it, jammed and suddenly stopped, like ramming into a brick wall.  My shoulder and muscles in my chest hurt and it hurts to take deep breaths.

And then in injuries, it says:  My shoulder blade -- can't read that word -- and muscles in my chest hurt on my right side and it hurts to take a deep breath.  My right ribs hurt.

And she reported it to Kara, grocery manager, and greeter at the door.

There's further information on the last page. It says:  The alarm at the door stopped the customer cart.  I asked the customer if she purchased any

products.  She said no.  She wanted to know why did wheels lock.  I told her since she didn't purchase anything and didn't go through the checkstand, the wheels would lock at the exit.  She left the cart.  I did offer to unlock the cart but she took off.

Have you seen this incident report before today?

A.    No.

Q.    Did you talk with anyone prior to today's deposition to find out any information about this particular incident?

A.    No.

Q.    Did you talk to anyone to prepare as the designee to find out what steps, if any, Fred Meyer took in response to this particular incident?

MS. TUTHILL-KVETON:  Object to the form of the question to the extent it calls for attorney-client-privileged information, outside the scope of the deposition notice, and also not reasonably calculated to lead to the discovery of admissible evidence.

Go ahead.

A.    Did I talk to anybody -- what was that, again?

Q.    (By Mr. Wilke)  Did you talk to anyone other than your counsel in order to find out information about

whether Fred Meyer took any actions in response to this particular incident?

A.    I didn't talk to anyone.

MR. WILKE:  I believe this is Exhibit 17.

MS. TUTHILL-KVETON:  I have a question.  How many of these are we going to do?  Because there's about 75 reports we produced.  Are we doing to do all 75?

MR. WILKE:  No, but we still have time.  I know that your witness has to be done by 2:00.  I'm not sure that -- we conclude the deposition based on what time you told me we had to end.

MS. TUTHILL-KVETON:  Okay.  I will need probably about 20 to 25 minutes minimum at the end as well.

MR. WILKE:  Understood.

THE COURT REPORTER:  You asked what number we were on.

MR. WILKE:  Yes.

THE COURT REPORTER:  17.

(Exhibit No. 17 introduced.)

THE COURT REPORTER:  And I have a hard stop at 1:30, just so you know.  I told the reporting agency.

MS. TUTHILL-KVETON:  Okay.

MR. WILKE:  Yeah.  I'm not sure that was told to us.

THE COURT REPORTER: Do we want to go off the record?

MR. WILKE: No. We don't have time. I need to get through this.

Q. (By Mr. Wilke) Okay. Let's do -- this is 17. As an incident report Bates-labeled 302.

Mr. Peterson, do you know Kyle Reddick, the manager at the Tacoma store?

A. Yeah.

Q Okay. All right. Were you working at the Tacoma store in August 2023?

A. Yeah.

Q. What was your position in August 2023?

A. It would be the store manager then too.

Q. And what was Kyle Reddick's position in August 2023?

A. He was the HR assistant store leader.

Q. Got it. So is that position below yours?

A. Correct. He's a direct report.

Q. He's a direct report. Got it. We went through that. Thank you.

And Christine Still, do you know this customer?

A. No.

(Interruption.)

THE WITNESS: Sorry, guys.

Q. (By Mr. Wilke) Did you speak with Mr. Reddick in order to prepare for today's deposition, to discuss this incident?

A. No.

Q. Have you ever seen this incident report before today?

A. Let me see what you got here, see if I remember this at all.

Not that I remember.

Q. So on page --

(Crosstalk)

Q. Sorry.

On Page 303, it says: Customer was exiting the store and the security wheels locked up. Customer jammed left wrist.

And then it says: Customer stated that she was on disability for the left wrist injury. Signs on doors entering the stores -- entering store that carts may lock up. Kyle Reddick.

And I'm not sure there's much information on the subsequent report.

Did you talk -- you said you didn't talk to Kyle. Other than your counsel, did you talk to any Fred Meyer or Kroger manager or employee about this

particular incident?

A. No.

Q. Did you talk to any Fred Meyer manager or customer to talk about Fred Meyer's response, if any, in relation to this incident with regard to the wheel locking device?

A. I didn't talk to anybody about that, no.

Q. All right, 323. This will be 18.

(Exhibit No. 18 introduced.)

Q (By Mr. Wilke) All right. This should be Exhibit 18. This is a customer -- this is an incident report that starts with a customer statement on page 323 Bates-labeled. This is the Burlington store. Esai Ibarra is the contact information for the client -- or for the customer. And this is July 25th, 2023.

Do you know this customer, Mr. Peterson?

A. No.

Q. And it says: Approaching metal detector and cart locked up, grocery exit. See above. Customer hit right shin lower on bar at back of cart. Was completely unexpected. Smaller bascarts do not have warning about potential for wheel lockup.

And it says hurt and throbbing lower shin. Talked to Birdie who suggested report.

Do you know who Birdie is?

A.    No.

Q.    And here's a -- somebody's drawing of the incident.  And I can't tell from the signature who the manager is.

Typically, should the manager's name be included on the incident report?

A.    Yeah.  There's -- I believe there's a line that says person -- MOD on duty or person reporting, their name gets filled out.  You print it on that document somewhere.

Q.    Can you tell the manager from this document?  And I can scroll through it if that's helpful.

A.    I'm looking right now.  Let me see here.

So this is the customer statement, so we wouldn't have filled it out here.  It would be on the -- it would be on the -- the ones we fill out.

Q.    Okay.

A.    Evidence report.  That's -- so that's not it.  It would be on a -- it would be on a statement that the manager writes down.

Q.    So on the --

(Crosstalk)

Q.    Sorry.  I didn't mean to cut you off.

A.    That's okay.

It's on the -- basically where we take the

customer's statement, we write it down before they write theirs down.

Q. Okay.

A. I don't see that document in what you're showing me.

Q. Right. And I don't think we received it.

So at the very last page, though, it says "Name and EUID of Employee Completing This Report," and there's a number BR97697.

Is that a Fred Meyer employee number?

A. Yeah. It is pretty much a -- it's an identifier.

Q. Okay. Before this deposition, did you look that number up to see who the manager was?

A. No.

Q. Did you speak with anyone at Fred Meyer to determine whether -- in this incident report where the customer reported that there was no warning sign on the push cart, did you talk to anyone at Fred Meyer about that claim?

A. I did not speak to anyone about that claim.

Q. Did you speak to anyone about this particular incident?

A. I did not.

MR. WILKE: This is 19.

Page 131

(Exhibit No. 19 introduced.)

Q       (By Mr. Wilke)   All right.   This is an incident report dated March 19th, 2021.   This is the Pacific Avenue location and then Dylan Richardson.

Do you know Mr. Richardson?

A.      No.

Q.      Does that name sound familiar as a Tacoma manager?

A.      No.   That store -- they shut that store down last year, but I do not know them.

Q.      Got it.   Okay.

And the customer's name is Valerie Powell.

A.      Also not familiar.

Q.      Okay.   It says:   Cart locked up, impacting left arm by elbow.   As I was exiting garden side door, my cart locked up, impacting my left tendon/elbow, causing pain shooting into my index finger, then locked up again two feet later.   No warning or signage.

And it says there's a doctor, Dr. Smith, at Community Healthcare.   Cart locking up also caused jerking, also whiplash, to my three-year-old son who was properly secured in child seat of basket.

And then Sam Wickline is the employee that filled that out.   Do you know who Sam Wickline is?

A.      No.

Q.    Did you speak with Sam to discuss this incident before today's deposition?

A.    No.

Q.    Did you speak with anyone at Fred Meyer to determine -- to -- about this particular incident?

A.    No.

MS. TUTHILL-KVETON:  I'll just object as outside the scope of discovery and the corporate deposition notice.

Q    (By Mr. Wilke)  So this incident report indicates that there was no warning sign or signage. Did you speak with anyone at Fred Meyer to determine whether that was true or not?

A.    I can't imagine that to be true.

Q.    Okay.  So my question's a little bit different.

MR. WILKE:  I'm going to move to strike the nonresponsive portion of the testimony.

Q.    (By Mr. Wilke)  My question was:  Did you speak with anyone before today's deposition to determine whether that was true or not, other than your attorney?

(Crosstalk)

MS. TUTHILL-KVETON:  And I'm going to go ahead and object, if you're asking him as a personal individual or what the policies and procedures are of

Fred Meyer.

So that -- because my understanding is he's here today as a corporate designee. Certainly you can ask him questions outside the scope of that, but go ahead -- go ahead.

A. Did I personally talk -- talk to anyone about that?

Q (By Mr. Wilke) Yes.

A. No.

Q. Okay. And my question was as the designee in order to prepare for today's deposition. As the designee, did you talk to anyone about anything related -- did you talk to any Fred Meyer employees about anything related to that incident?

A. No.

Q. So you have no knowledge as the designee of whether the statement in the incident report that there was no warning sign was true or not?

MS. TUTHILL-KVETON: I'm going to object on that. And he already asked and answered, as the designee, the policies and procedures.

But go ahead.

A. It's my belief that there would be signage in place.

Q (By Mr. Wilke) And what are you basing that

on?

A. It's -- we -- when the system gets -- like every store I've seen that has this that I've worked at always has the signage in place.

Q. Okay. So my question is a little bit different. I understand you're basing it on your experience, but as the designee, did you do anything -- because this store is not your store, right, and it's closed?

A. Correct.

Q. Okay. And so did you speak with anyone at that store, in preparation for today's deposition as the designee, to determine whether that was true or not, whether the sign was missing --

MS. TUTHILL-KVETON: I'm going to --

Q. (By Mr. Wilke) -- or not?

MS. TUTHILL-KVETON: I'm going to object to the question as compound and confusing. He is here as the designee. As the designee, he gets to take in his experience of working for the company for 31 years.

So I think he's -- if you -- you know, if he can answer it, fine, but I think it would be helpful if you asked him specifically if he's talking to people versus if he's here to testify on his training and experience as the corporate designee.

MR. WILKE: My question was clear.

Q (By Mr. Wilke) Do you need me to repeat it, Mr. Peterson?

A. Sure.

Q. So in preparing to testify today as the designee, my question is very specific. Did you talk to anyone from that particular store in Tacoma regarding that particular incident that we just looked at?

A. I did not.

Q. Did you look at any of the carts from that particular store?

A. I did not.

Q. And you never worked at that particular store?

A. I have in the past.

Q. What years did you work at that store?

A. That's where I started. So '94 to '96. And I think again in '08 to '09 or '10.

Q. Is it fair to say you worked at that store before there was an antitheft shopping cart locking mechanism installed in the carts?

A. Yes.

MR. WILKE: And I'm so sorry, Karmen. This is -- what number exhibit are we on? I'm going the make a note.

Page 136

THE COURT REPORTER: Looks like 20.

MR. WILKE: Thank you. I'm going to make a note so I don't have to ask you again. I apologize.

(Exhibit No. 20 introduced.)

Q (By Mr. Wilke) This is Exhibit 20. This is an incident report dated June 21st, 2023. This is at the Vancouver location, Vancouver, Washington. Amber Drake is the manager.

Do you know that manager, Mr. Peterson?

A. No.

Q. And there's also Shelley Robinson, it looks like a different manager besides Amber. Do you know Ms. Robinson?

A. No.

Q. Have you spoken with either of them?

A. No.

Q. Okay. And the customer name is Samantha Swart. Do you know that customer?

A. No.

Q. Says: Customer was returning cart. Wheels locked up and fell over cart.

And then the conveyed by customer description is: Customer was returning cart to the entryway and the front wheels locked up. Customer and cart fell forward onto the ground.

It says under injury:  Cracked, bruised lip on the right side observed in labor and delivery and bruised knees.

Sounds like the customer was pregnant.

Then we see on the last page, it confirms customer eight months pregnant.  Then it's signed by Amber, the store manager.

Have you seen this incident report before?

A.    No.

Q.    In order to prepare for today's deposition, did you speak with anyone else at Fred Meyer with regard to this specific incident?

A.    No.

Q.    Did you review --

MS. TUTHILL-KVETON:  I'm going to say --

Q.    (By Mr. Wilke)  -- any documents --

MS. TUTHILL-KVETON:  Hold on.

I'm just going to say for the record, this is all outside the scope of the deposition.  If there was specifics that you wanted from each of these incident reports for him to further investigate rather than the fact that they were simply produced by my client, we have no objections to the contents therein, then that needed to be designated in the corporate deposition notice.

(Exhibit No. 21 introduced.)

MR. WILKE: The ads are reaching a larger audience than they normally do today.

(Crosstalk)

MS. TUTHILL-KVETON: Chat? Did you drop this in the chat?

MR. WILKE: I did, yes. 480.

Did you guys receive that?

MS. TUTHILL-KVETON: Just one second.

MR. URBAN: 480?

MR. WILKE: Yes.

MR. URBAN: Yeah.

MR. WILKE: Okay. Good.

MS. TUTHILL-KVETON: Okay. Go ahead. I got it.

MR. WILKE: Yeah, I'm trying to share. Is it sharing my screen?

There we go. I think we're up and running now.

Q. (By Mr. Wilke) So this is Fred Meyer Bates-labeled 480. Incident report dated 5/5/23. This is Renton Center Way in Renton. It doesn't have the manager on duty at the top.

The name of the customer is Juliana Proctor. Do you know Ms. Proctor, Mr. Peterson?

A.    No.

Q.    Okay.    It does have the name of an employee initially notified, Jamae Kennedy, and it has an employee ID.

Do you know who Jamae is?

A.    No.

Q.    Ms. Kennedy is?

A.    No.

Q.    It says:    Customer finished shopping and went to Starbucks exit out of the store using their outside entrance.    Cart locked up at the pedestals in the entranceway in the store.    Left shoulder in pain and cannot lift arm.    Will make an appointment at Kaiser Permanente on Rainier.

And it's signed by Jamae Kennedy with her employee number.

Have you seen this incident report before today?

A.    No.

Q.    In order to prepare for today's deposition, did you speak with any Fred Meyer managers or employees about this particular incident?

A.    No.

Q.    We have over 70 incident reports that were produced.    Did you review any incident reports for

today's deposition?

A.    No.

Q.    Okay.  I'll try to speed this up.

Have you spoken -- did you speak with any Fred Meyer manager or employee about any incident reports in order to prepare for today's deposition?

A.    No.

Q.    One of the topics was Fred Meyer's discovery responses.

Did you -- and I think you said at the beginning -- I just want to confirm -- did you review any of the written responses to discovery which are questions -- written questions that are called interrogatories?

A.    No.

MR. WILKE:  We'll mark this Exhibit 22.

(Exhibit No. 22 introduced.)

Q    (By Mr. Wilke)  So this is -- I'm going to come back to page 4.

This is defendants' first -- Fred Meyer's responses to the first interrogatories and requests for production that were served by my client, Ms. LaRocque.

Have you seen --

MS. TUTHILL-KVETON:  It's really hard to see, Rob.

MR. WILKE: I'm sorry. I didn't hear you, Sarah.

You want me to zoom in? Is that better?

MS. TUTHILL-KVETON: Yeah.

MR. WILKE: Okay.

Q (By Mr. Wilke) Have you seen this document before, Mr. Peterson?

A. I believe this is looking familiar, yes.

Q. Okay. What did you review in this document before?

A. It pretty much goes over what the case is about, if I'm correct. Correct?

Q. No. These are discovery responses. So these ask questions.

So, for example -- we'll go to the one at issue here.

A. Okay.

Q. Well, let's take this one as an example. It says --

A. Sure.

Q. -- Interrogatory 6: Identify the seller, manufacturer, and installer of the wheel locking mechanism.

And the written answer by Fred Meyer Stores is Gatekeeper Systems, Incorporated.

Does that refresh your recollection of whether you reviewed this specific document?

A.   Gosh.   I don't think I read it word for word, if I did.

Q.   So one of the topics was the factual basis for Fred Meyer's responses to interrogatories.   So I want to look at Interrogatory No. 8.

Well, I'll read it, and then I may have some questions for you.   Okay?

A.   Okay.

Q.   So you can just follow along.

Interrogatory 8:   Are you contending that Ms. LaRocque was at fault and/or partially at fault for the shopping cart striking her knee on May 6, 2023?   If yes, set forth the factual basis for your assertion Ms. LaRocque is at fault or partially at fault.

Answer.   There's an objection.   And it says: Subject to and without waiving said objection, yes.   See defendant's answer to plaintiff's complaint.   If the incident occurred as alleged by plaintiff, if at all, plaintiff, per her complaint, attempted to leave the store with an empty shopping cart after bypassing the checkout stands, meaning plaintiff's actions caused her alleged injuries.

Did you understand that?

A.    I believe so.

Q.    Okay.  So I want to -- help me explain Fred Meyer's position.  You're the designee.

Are customers -- is it Fred Meyer's position that a customer has done something wrong if they enter the store with a shopping cart, don't purchase anything, and then attempt to leave?

MS. TUTHILL-KVETON:  Wait.  I'm going to -- just give me a second.

Rob, if you recall in your objection that was taken of your client, you object adamantly to her providing any testimony as to why Fred Meyer's was liable in that case, and you couched it in attorney-client-privileged information, outside of the scope of what she would know.

I think we are getting into that testimony, or we could depose your client again, but I think that, you know, the apples to apples, this is the same type of questioning, and that goes into the legal defense of the claim.

I think generally if you want to talk about what -- I mean, you're kind of getting into more of like a fact -- fact witness.

If you want to talk about policies and procedures, then I think that's what the corporate

designee has to say.

MR. WILKE: Are you instructing your client not to answer?

MS. TUTHILL-KVETON: I don't know what your question was, because your question was sort of like tell me about this. You know?

So I -- I don't know if you're asking for attorney-client-privileged information. I just don't want that to be disclosed. So maybe --

(Crosstalk)

MR. WILKE: I'm not asking -- sure. I'm not asking for attorney-client communications. I'm asking the corporate --

MS. TUTHILL-KVETON: So you're --

MR. WILKE: Let me ask my question. Okay?

MS. TUTHILL-KVETON: Sure.

Q     (By Mr. Wilke) So, Mr. Peterson, as the corporate designee, is it Fred Meyer's position that the customers are not supposed to enter the store with a shopping cart and not purchase anything and then leave the store?

A.     Well, to be specific -- I mean, specifically with a cart, if -- from what I've witnessed, if you get hurt on a cart, it's due to inattention.

Q.     So my question is a little bit different.

Right?  Because Ms. LaRocque -- did you review any of her deposition testimony in order to prepare for today's deposition?

A.    No.

Q.    Okay.  So I'll represent to you Ms. LaRocque testified she went into the store looking for a particular magnesium supplement that Fred Meyer didn't carry, and so she entered the store and then left the store without purchasing anything.

Do you understand that?

A.    Okay.

(Crosstalk)

Q.    Does that make sense?

A.    Yes.

Q.    Okay.  Cool.

And as you know, the mechanism will lock if you don't go through the checkout stand.  Correct?

Is that your understanding as well?

A.    Yes.

Q.    And so I'm just wondering, does Fred Meyer have any sort of policy that customers are not supposed to enter and exit the store without purchasing anything?

A.    No.

Q.    So that's perfectly fine for a customer to do; correct?

A.    Yes.

Q.    Okay.  I'll pull this back up.

Interrogatory No. 10, can you see that, Mr. Peterson?

I have it highlighted on the screen.  I know it's small, so I'll read it for you.

And I'll go ahead and read it for the record.

A.    Sure.

Q.    It says Interrogatory No. 10:  Are you contending that a nonparty is at fault?  If yes, identify each nonparty with specificity and explain how their fault caused or contributed to Ms. LaRocque's injuries or damages.

And the answer says:  Yes.  See defendant's answer to complaint alleging Gatekeeper Systems is a nonparty at fault.

I don't want to know any conversations you had with your attorney, and I'm not asking you any sort of legal question.  I just want to know the factual basis for Fred Meyer alleging that Gatekeeper is at fault.

MS. TUTHILL-KVETON:  If you wouldn't know based on anything outside of the conversations with me, then don't answer.

If you know because you have read the

complaint and have personal knowledge (inaudible) as the corporate deponent, please answer.

A.    Yeah, I don't have any knowledge.

Q    (By Mr. Wilke)   Do you know the names of any of the security guards that worked at Fred Meyer in the last six months?

A.    Yes.

MS. TUTHILL-KVETON:   Object to the form of the question as far as whether or not they were security guards.

Go ahead -- for Fred Meyer's.

Go ahead.

A.    Yeah.   The ODS?   I know an ODS guy, Mike. Mm-hmm.

The others -- I mean, we -- we -- the company does cycle through them, so I don't know a lot of the names.

And they typically will interact with APS and APMs more than myself.

Q    (By Mr. Wilke)   Got it

What's Mike's last name?

A.    Gosh.   We don't get that -- we don't even get that deep.

Q.    Is it Michael Griffin?

A.    I -- I -- I don't think I ever got his last

is hard for me to remember.

It could have been the Katherine person I talked about or the Karina.

Those are the only three that have been here since I've -- since I've been here. So...

Q. Did you talk to Mike -- Artemis Michael Griffin before today's deposition to prepare to testify as the designee?

A. No.

Q. Did you talk to any employee that was working on the day that Ms. LaRocque was injured in order to prepare for today's testimony as the designee?

A. No.

Q. Did you talk the any other manager that was working on the date of the injury, of Ms. LaRocque's injury, to prepare to testify as the designee?

A. No.

Q. Do you have any knowledge as the designee generally how much money Fred Meyer Washington -- Fred Meyer Stores save in the state of Washington -- how much they save by preventing theft with the antitheft locking mechanism?

A. I do not.

Q. Do you know how much Fred Meyer pays to resolve litigation or threat litigation from injuries

arising out of the shopping cart locking mechanism in Washington state?

A.      I do not.

MS. TUTHILL-KVETON:  I'm just going to object to the question as (inaudible).

THE COURT REPORTER:  Sarah, I can't hear you at all.

MS. TUTHILL-KVETON:  Just making an objection that the question was compound.

Q       (By Mr. Wilke)  Have you heard of the Lubken case?

A.      That sounds familiar.

Q.      Jean Lubken?  Does that sound familiar?

A.      I'd have to hear more about the incident, maybe.  The name doesn't...

Q.      So she's brought a lawsuit against Fred Meyer and Gatekeeper for an incident arising out of the same Tacoma Stevens store related to the shopping cart mechanism.

A.      Yeah, she might -- yeah, she might be the one that I was just deposed on not too long ago.

Q.      Okay.  Is it Andrew that deposed you, or Andy?

A.      Maybe?  I'm not great with names.  I meet a lot of people in this business, unfortunately, so...

record.  The time is 12:05.

(Recess 12:05 p.m. to 12:12 p.m.)

THE VIDEOGRAPHER:  We're back on the record. The time is 12:12.

You may continue.

MR. WILKE:  Great.  Okay.

Q  (By Mr. Wilke)  Just a few more follow-up questions, Mr. Peterson.

We talked a little bit about the signs on the door, and you said that there's the -- it's a sign on the foyer door, which is the second door if you're coming in through the entrance.  Is that right?

A.  Yes.

Q.  Do you know if -- is it on both sides of the door or is it only on the side facing the entrance?

A.  To my memory, it's both -- it's a -- it's a decal that's on -- it's a dual-sided decal, to my memory, so when you stick it on one side, it's got -- the writing is on both sides.

Q.  Okay.  Did you check that out before today's deposition?

A.  No.

Q.  And you talked about PICS maintaining the carts.  We couldn't figure out if it was P-I-X or P-I-C-S.

A.    No.

Q.    And then you said you didn't review anything regarding my client, Linda LaRocque's, incident.  Is that true, you didn't review any documents -- well, let me rephrase it in a different way.

In order to prepare as a designee for today's deposition, did you review any document or communication related to Linda LaRocque's incident at the Fred Meyer store that's at issue in this lawsuit?

A.    The only thing I knew about Linda LaRocque's issue was through counsel, through -- through the lawyer.

Q.    Okay.  Do you know whether Fred Meyer investigated -- following its notice of Ms. LaRocque's incident, do you know whether Fred Meyer determined whether there was a warning sign or not on the shopping cart that specifically Ms. LaRocque claims injured her?

A.    To my knowledge, it wasn't reported, so there was no way to get the cart to investigate the cart.

Q.    Okay.  And what are you basing that knowledge on?

A.    A conversation I had.

Q.    Oh, wait, wait, wait, wait, wait.  Yeah, don't tell me any conversation you had with counsel.  Sorry.

A.    Yeah.

Q.    Okay.  Did you talk to -- so at some point, Fred Meyer knew about Ms. LaRocque's injury, at least when we filed and served the lawsuit.

So I'm trying to find out, from the point of time that Fred Meyer knew about Ms. LaRocque's injury, did it -- did Fred Meyer take any steps to investigate whether that specific shopping cart had a warning sign or not?

A.    I don't think Fred Meyer's knew until the lawsuit.

Q.    So --

A.    So there was no way to find out the cart. There was -- I don't think there's a way to find out the cart -- which cart it was.

Q.    Understood.

So there's no way to find out because it doesn't know which cart it was?

A.    Yeah, without -- without it being reported, there's nothing we can -- we can determine that.

Q.    Did Fred Meyer take any steps to find out the security guard at the entrance?

Ms. LaRocque testified that he's the one that unlocked the cart and that she told that she was injured.  Do you know if Fred Meyer took any steps to

investigate what the security guard knew or didn't know regarding Ms. LaRocque's injury?

MS. TUTHILL-KVETON: I'm going to object to the question to the extent it asks for information that was gained from attorney-client communications. There's --

Q. (By Mr. Wilke) I'm not asking for any information or conversations you had with counsel. My question is whether Fred Meyer took any steps to speak with the security guard about Ms. LaRocque's incident.

MS. TUTHILL-KVETON: I'm just going to add in that it's outside the scope of the deposition notice.

Go ahead.

A. I do not know.

MR. WILKE: Okay. I don't have any questions at this point. Your counsel and counsel for Gatekeeper may have questions. It may prompt some more with me.

I'm going to turn it over just with the caveat that, as I said earlier, we keep this deposition open.

Thank you, Mr. Peterson.

THE WITNESS: Thank you.


EXAMINATION

BY MR. TUTHILL-KVETON:

have some follow-up, but thank you, Mr. Peterson.

THE WITNESS:  Thank you.


FURTHER EXAMINATION

BY MR. WILKE:

Q.    I do have just a couple follow-ups, Mr. Peterson.  We'll get done in plenty of time here.

MR. WILKE:  So we'll mark this Exhibit 24 as soon as it goes through.

(Exhibit No. 24 introduced.)

Q    (By Mr. Wilke)  So this is just another incident report.  This one is Bates-labeled 115.  I want to go to the second page, 116.

Is this similar to the incident report form that you're familiar with, Mr. Peterson?

A.    Yeah, that looks right.

Q.    Okay.  And so on the second page, it says "Provide Detailed Description of the Incident."  And then at the bottom, it says "(as witnessed by you) OR (as conveyed by customer) (Circle one)."

Would you agree that this section can be either filled out by the store employee who witnessed it or it could be conveyed by the customer?  Is that fair?

A.    I think it's got to be done by -- the employee has to fill it out.  It's not for the customer

to fill out, that form.

The other form, the customer statement form, is that one.

Q.    So tell me what your understanding of this line here that says "(as witnessed by you) OR (as conveyed by customer) (Circle one)."

A.    I think what that is, is -- so we have a lot of incidents where the person doesn't want to fill out paperwork but we want to log it ourselves because we want to just, you know, obviously put a place saver there just in case they come back and they do have an issue, so we can try and get video and things like that.

So we would write, you know, obviously what we know with that -- because we've had people hospitalized for having a seizure in the store and all I have is a description of them and the time.  And so I would just fill this out as far as what I know.  So I'd write they're having a seizure, but they didn't tell me they're having a seizure, if that makes sense.

Q.    It's your witness to them having a seizure?

A.    Yeah, what I -- what I assumed was a seizure.

Q.    Got it.

A.    So yeah, yeah, yeah.

(Crosstalk)

A.    But sometimes in the most fortunate

situation, the customer is there and they're telling you what -- the statement, usually that's pretty close to what they write because you're basically asking them the question before they write it down.

Q. So you would agree there's a difference between the narrative that's witnessed by you, the person filling this out, the store employee, versus conveyed by the customer. Correct?

A. Correct.

Q. Okay. And so it's important to circle these so you know whether it's an employee who witnessed it and they're relaying what they witnessed or it's something that a customer is conveying to them. Correct?

A. Yes.

Q. Okay. You mentioned the supervisor -- there's a supervisor you can contact if the security guard is a no show. Is there a name that you have associated with a supervisor?

A. That name's changed a few times. Their company is cycled through people. But Mike Hafner was one of them at one point. I don't know if he still holds that position.

Q. And then Mr. Urban was talking to you about how warning signs on carts are replaced if they're

Page 175

missing or damaged.

And so I know you're the designee.  How many times at the Tacoma Stevens location specifically in the last year has there been a request to replace a missing or damaged warning sign on a cart?

A.    I don't believe we have.

Q.    In the last year at Fred Meyer in Washington state, do you know how many times a missing or damaged warning sign has been replaced in the last year for all of Washington state?

A.    I do not.

Q.    Who manufacturers that shopping cart warning sign?

A.    I do not know.

MR. WILKE:  Those are all the questions I have.  Thank you.

THE WITNESS:  Thank you.

(Crosstalk)

MR. WILKE:  Ready to conclude?

MR. URBAN:  I think that's it.

THE VIDEOGRAPHER:  Okay.  This concludes today's 30(b)(6) testimony of defendant Fred Meyer.  The time is now 12:35.  We are off the record.

(Signature reserved.)

(Deposition concluded at 12:37 p.m.)