# EXHIBIT 2



**Applied Cognitive Sciences**

February 25, 2026

Robert Wilke
Gordon Thomas Honeywell
1201 Pacific Avenue
Suite 2100
Tacoma, Washington 98402

**Re: Larocque vs. The Kroger Co., et al.**

Dear Mr. Wilke:

As requested, I reviewed the discovery material and performed an inspection of the Fred Meyer facility in the above referenced matter. Based on this information, along, with my education, training, and experience in Safety and Human Factors Engineering, the following report summarizes my findings and conclusions to date. I reserve the right to, and intend to, update my conclusions upon receipt and review of new discovery material that becomes available. My curriculum vitae highlights my training, experience, and expertise as it pertains to Human Factors Engineering and Safety and Risk Management. I have a B.S. in Technology – Manufacturing option and an M.S. in Human Factors & Ergonomics; I have 16 years of experience in Safety and Risk Management, with my emphasis being in Human Factors Engineering for the past 11 years. In addition, I have provided consulting services to private industry and businesses in the fields of Safety and Risk Management and Human Factors Engineering. Also, as noted in my CV, I am a Certified Human Factors Professional, a Certified Safety Professional, and a Certified XL Tribometrist.

**Material Reviewed**
1. Plaintiff's Responses to Defendants The Kroger Co. and Fred Meyer Stores, Inc.'s First Set of Interrogatories and Requests for Production, with First Supplemental Responses
2. Plaintiff's Responses to Gatekeeper Systems, Inc.'s First Set of Interrogatories and Requests for Production
3. The Kroger Co.'s Responses to First Requests for Admission Propounded by Plaintiff Linda LaRocque
4. The Kroger Co. Response to Plaintiff's First Request for Interrogatories and First Request for Production, with Amended Responses (DEF Kroger 00001-122)
5. The Kroger Co.'s Response to Second Request for Admissions to Defendant the Kroger Co.
6. The Kroger Co. and Fred Meyer Stores Inc.'s Responses to Third Requests for Admission Propounded by Plaintiff Linda LaRocque
7. The Kroger Co.'s Response to Plaintiff's Second Request for Interrogatories, with Amended Responses

8. The Kroger Co.'s Second and Third Amended Response to Plaintiff's First Request for Interrogatories and First Request for Production
9. The Kroger Co.'s Response to Third Interrogatories Propounded by Plaintiff Linda LaRocque
10. The Kroger Co's Response to Plaintiff's Fourth Request for Interrogatories and Third Request for Production
11. The Kroger Co's Response to Second Request for Production Propounded by Plaintiff Linda LaRocque
12. Fred Meyer Stores, Inc.'s Responses to First, Second, and Third Requests for Admission Propounded by Plaintiff Linda LaRocque
13. Fred Meyer Stores Response to Plaintiff's First Request for Interrogatories and First Request for Production, with Amended Responses
14. Fred Meyer Stores, Inc.'s Response to Plaintiff's Second Request for Interrogatories and Request for Production of Documents, with Supplemental Responses
15. Fred Meyer Stores, Inc.'s Response to Plaintiff's Third Request for Production
16. Plaintiff's First Set of Requests for Admission to Gatekeeper Systems, Inc. – and Responses Thereto
17. Plaintiff's First Set of Interrogatories and Requests for Production to Defendant Gatekeeper Systems, Inc. – and Responses Thereto, with First and Second Supplemental Responses
18. Deposition of Linda LaRocque
19. Deposition of Steven LaRocque

**Description of Incident**

On May 6, 2023, the LaRocques arrived at Fred Meyer to purchase merchandise prior to Mr. LaRocque's upcoming medical appointment. After parking the vehicle, they walked into the foyer, obtained a shopping cart, and proceeded into the facility; Ms. LaRocque testified that she was using the shopping cart for stability, as she was still recovering from surgery. After searching for the merchandise they were looking for, they could not find it, so they proceeded back toward the front to the exit door. Ms. LaRocque described that she had her purse and coat in the child seating area of the cart, and that she had both hands on the cart while she was pushing it. After pushing the cart in front of the register area, Ms. LaRocque pushed it back through the door where she entered. However, as she was pushing the shopping cart, the cart suddenly and unexpectedly stopped, which resulted in Ms. LaRocque's knee contacting the cart. Notably, Mr. LaRocque testified that he was walking behind Ms. LaRocque, such that he walked into her after the cart stopped.

During her deposition, Ms. LaRocque testified that an employee came over after the cart stopped and alerted her that it occurs multiple times each day. She stated that the employee further explained that if the cart wheel is not deactivated when you purchase items and/or go through the register area, then the cart will stop at the door. Notably, Ms. LaRocque also described that the cart was "empty", as there were no signs, tags, or the like on it. Both Mr. and Ms. LaRocque testified that prior to this incident, they were not aware that the shopping carts had the wheel locking system installed on them.

**Safety Analysis**
*Struck-by/Contact Injuries*
It is well understood in the Safety industry that being struck by objects puts people at risk of being injured. The Occupational Safety and Health Administration (OSHA) notes that "Struck-by objects" are a leading cause of construction related deaths. Notably, the National Safety Council (NSC) documented that in 2022 alone, there were 738 workers who died due to this type of incident. Additionally, in 2021-2022, there were over 780,000 incidents involving "Days Away from Work, Job Restriction, or Transfer"(DART), and over 450,000 incidents involving "Days away from work" (DAFW). Obviously, this is not to suggest that Ms. LaRocque was a "construction worker" and/or that Fred Meyer was a "construction site." Instead, my inclusion of this is to illustrate that people being struck by objects is a notorious hazard, so it is important to have a plan in place to identify risks associated with people being struck by objects to decrease the risk of someone being injured.

The potential to be injured by being struck-by and/or contacted by shopping carts in a retail environment is also well-known. For example, Kim, et al. (2015)[1] analyzed incidents that occurred inside retail stores in 2012. The researchers broke incidents into different categories, including "contact accidents" which were defined as an incident "in which the patient was injured as a result of unintentionally coming into contact with an object or person (e.g., hit by, ran into, pinched by, or caught in an object)". Notably, the researchers estimated that in 2012, there were 21,731 "contact accidents" accounting for over 25% of all store-related injuries that occurred inside retail stores. Of all contact accidents, the object involved was a shopping cart in over 31% of incidents. The researchers also looked at injuries associated with different objects/conditions and noted that for fractures, carts were referenced in 23.4% of the incidents. Notably, the researchers found that internal organ injuries were most often associated with carts, which represented 56.9% of the internal organ injuries. The bottom line from this discussion is that the risk of harm posed by being struck-by and/or coming into contact with a shopping cart in a retail setting is well known, which underscores the importance of implementing measures to reduce the risk of such incidents occurring.

*Risk of Harm Posed by Shopping Cart Abruptly Stopping*
As noted above, years prior to this incident, there was published research about the potential to be injured by coming into contact with a shopping cart. In this case, the sudden and unexpected nature of the shopping cart wheels stopping (and as a result, the cart suddenly decelerating and/or stopping) poses a risk of harm to pedestrians that puts them at risk of injury due to contact with the cart and/or from a perturbation to their balance and a resultant fall. For example, shopping carts are commonly used in retail facilities, and we have a general expectation that they will have rolling wheels that allow us to push them around freely, place items into them, and maneuver around displays, people, and the like. While pushing a shopping cart, it is relatively common for pedestrians to grasp the handlebar with both hands and slightly lean forward while pushing it. It is also common for pedestrians to have their elbows bent, which results in the handlebar being closer to their torsos as they traverse through the facility (rather than having their arms extended straight ahead). In fact, some pedestrians may even lean forward and/or place their torso/chest against the handlebar as they walk forward. The bottom line is that while pushing a shopping cart

---

[1] Kim, R., Crump, C., Harley, E., Nauhaus, G., & Yigit-Elliot, S. (2015). Store-related injuries to children and adults. Proceedings of the Human Factors and Ergonomics Society 59thAnnual Meeting, 1457-1461.

through a retail facility, pedestrians will naturally have the expectation that, absent any obstructions in their pathway (i.e., like a display, a curb, or the like), a shopping cart will roll forward when they are pushing it forward.

The factors above are important from a safety perspective, given that the presence of the locking mechanism on the subject shopping carts puts pedestrians at risk of the cart abruptly and unexpectedly stopping, thereby putting them at risk of "running into" the shopping cart and/or a perturbation to their balance and resultant fall. That is, when a shopping cart abruptly and unexpectedly stops while a pedestrian is pushing it forward, there is a mismatch between the forward momentum of the shopping cart and the pedestrian. In other words, if the cart wheel(s) unexpectedly lock, then the cart will be at risk of quickly decelerating and/or stopping, despite the pedestrian still moving forward toward the cart. In light of this, the pedestrian is at risk of essentially striking and/or "running into" the stopped shopping cart, especially since they will have limited time to perceive the abrupt and unexpected stop of the cart and implement action to avoid striking it.

That is, given a pedestrian will predictably be pushing the shopping cart in front of them with their elbows bent, the shopping cart will potentially be within inches of the pedestrian when it abruptly stops. Assuming a distance of two feet from the handlebar to their torso when the cart abrupt stops, the pedestrian would have approximately half a second to perceive the abruptly stop of the cart and stop their forward momentum (assuming a typical walking speed of 4 feet per second). Obviously, this is not to say that every pedestrian will be walking with their torso exactly two feet from the handlebars (some may have more distance, and some may have less distance), nor that every pedestrian walks at 4 feet per second. Rather, my inclusion is simply to illustrate that if the shopping cart wheels unexpectedly lock and stop the cart, pedestrians are put at serious risk of striking the cart (with their torso, lower limbs, or the like) and/or losing their balance and falling.

The point to be made from this discussion is that if a shopping cart wheel(s) were to unexpectedly lock and stop the cart, just as Ms. Larocque described occurred, pedestrians would be put at risk of harm due to striking the cart and/or losing their balance and falling. As discussed in detail below, the evidence I have reviewed indicates that the Defendants were aware of the potential for the shopping cart wheels to unexpectedly stop even when people were not "shoplifting" (and the risk of harm associated with them doing so), but the chosen safety plan to reduce the risk of an incident occurring was unreliable and contrary to basic Safety and Human Factors Engineering principles.

*Summary*
In summary, the sudden and abrupt locking of the subject cart wheel(s) created a hazard that put patrons like Ms. LaRocque at risk of harm due to striking and/or coming into the shopping cart. As discussed in more detail below, the Defendants knew and/or should have known that the overall locking system posed a risk of harm to patrons, but the safety measures implemented to attempt to reduce the risk of harm it posed were unreliable.

**Unreliable Safety Measures**
*Hierarchical Process for Mitigating Hazards Used in Safety and Human Factors Engineering*
The fields of Human Factors Engineering and Safety use a hierarchical process to determine the mitigation strategy to employ when eliminating and reducing the risk of harm posed by a walkway hazard. This hierarchical approach to safety is endorsed by entities such as the Centers for Disease Control and Prevention (CDC), the National Safety Council (NSC), the Occupational Safety and Health Administration (OSHA), and the National Institute for Occupational Safety and Health (NIOSH). The first and most effective tier is to Eliminate or Design-Out the hazard (i.e., Safety by Design), and if that is not possible/feasible, then the implementation of Engineering Controls or Guarding should be considered. In the event that the hazard cannot be eliminated or guarded, then administrative controls and/or warnings can be implemented to attempt to minimize the risk of people being exposed to the hazard.

It should be noted that reliance on administrative controls and/or warnings is known to be unreliable (which is why it is lower on the hierarchy), as such methodologies rely more on the human component and are "active" in nature rather than "passive." Safety literature emphasizes the importance of only resorting to active safety alone when it is not possible to implement passive safety (i.e., such as eliminating a hazard or restricting access to it) because it is well understood that active safety measures are unreliable in nature.[2] As such, it is critically important for an entity that resorts to measures like warnings to implement them consistent with state-of-the-art methodologies. However, even then, they can still be unreliable and ineffective, given that people may not detect them, the hazard still exists, and so forth.

*Principles for Warnings*
As discussed above, Safety Professionals and Human Factors Engineers utilize a hierarchical approach for mitigating hazards, and the use of warnings to attempt to alter user behavior is lower on the hierarchy of controls because warnings are known to be ineffective (i.e., the hazard still exists, people may not perceive warnings, and the like). In light of this, it is important that an entity relying on warnings implement them consistent with the basic principles of warning. That is, research has shown that there is a variety of principles to follow to increase the likelihood that warnings create the requisite behavior to minimize the risk of a user being exposed to and/or injured by a hazard. For example, a safety message must attract the user's attention, motivate the user to read and process the information, and have sufficient credibility.[3] Even if a safety message/warning is noticed, that does not mean that the user is likely to read it, much less read all of its contents, particularly if it is burdensome to do so and/or if the user feels they already possess the knowledge to use the product safely. That is, we live in an information rich society; it is not possible to read and process all of the information we encounter in everyday life. Humans are selective information processors such that we selectively attend to and process a subset of the information that is available to us at any given moment in time; a long wordy warning is not likely to be read.

---

[2] Lee, J. D., Wickens, C. D., Liu, Y., & Boyle, L. N. (2017). *Designing for people: an introduction to human factors engineering* (3rd ed.). Charleston, SC: CreateSpace.
[3] Ayers, T.J, et al. (1989). What is a warning and when will it work? *Proceeding of the Human Factors Society 33rd Annual Meeting.*

Even if the user's attention can be captured by a safety message in a warning and/or instructions, and they can be persuaded to read it, that still is not sufficient to create the requisite behavior. The content of the message is an important factor in determining its likely ability to create the desired behavior. To be effective, a warning must clearly convey to the user several basic components, including the nature of the hazard, the consequences of exposure, and how to avoid it. Finally, it should also be pointed out that warnings should be explicit, clear, and concise, and located proximate in time and location to where behavior needs to be changed. In short, warnings are known to be unreliable, so it is important that basic principles for warnings are followed if an entity chooses to rely on warnings (which are an active safety measure) in lieu of passive measures (i.e., elimination of the hazard, guarding of the hazard, and the like).

Site Inspection Observations of Warnings
During my site visit, I had the opportunity to inspect the general area of this incident, along with a number of different shopping carts, including two different sizes of carts (smaller/compact and the normal/typical size). During my site visit, I observed that there were generally two types of warnings in use in the general area, including warning placards on most of the carts, along with a sign placed on the sliding glass door. Figures 1 and 2 show two different shopping carts that had the warning placard inside them. I observed that some of the carts had the placard at the front of the cart, such that they faced the handlebar area. I also observed that some of the carts had the placard on the "sidewall" of the cart, such that it would be at an oblique angle to a shopper pushing the shopping cart from the handle bar area. The signage states "!WARNING! Shopping Carts may stop unexpectedly at exit doors, and carts will stop if taken beyond the perimeter of the parking lot." Notice in Figure 1 that there is a piece of tape covering a portion of the warning.



**Warning Placard**

**Figure 1. Placard on Front of Cart**



**Figure 2. Placard on Sidewall**

Figure 3 below is a photograph I took showing a view looking toward the interior of Fred Meyer when standing in the foyer area where the shopping carts are located. Notice that there is a variety of stimuli competing for one's attention, including various signage posed on standalone displays, the wall, and even the glass. While the glass doors in the center of the photograph appear to be automatic sliding doors, they remained open during my entire site visit. Notably, I observed that when in the open position, the signage about the locking shopping cart wheels was partially obscured, as marked in Figure 3. Figure 4 shows an up-close view of the sign from the foyer area.



**Figure 3. Warning Signage on Glass Door Obstructed**



**Figure 4. Up-Close View of Partially Obstructed Signage**

Figure 5 shows a view looking toward the same doors and signage from inside the facility; the photograph was taken when walking towards the glass doors from the register area. Here again, notice that there is a variety of environmental stimuli competing for one's attention as they approach the doors (the ATM, signage, merchandise displayed for purchase, and the like). I observed that there was a security guard who stood in the general area, and I also observed that, depending on one's angle of approach, the signage on the glass door regarding the locking shopping cart wheels was obstructed, as seen in Figure 6. Figure 7 shows an up-close view of the signage, which notes that the shopping cart wheels "may lock unexpectedly if removed from the store" and that they "will lock if taken beyond the parking lot."



**Figure 5. Signage Placed on Glass Door**



**Figure 6. Signage Blocked**



**Figure 7. Signage Warning of Unexpected Wheel Locking**

During her deposition, Ms. LaRocque testified that there was no signage on the shopping cart that she was utilizing at the time of her incident. Consistent with Ms. LaRocque's testimony, I observed a number of shopping carts that were devoid of the warning signage. For example, Figure 8 below shows a "small" cart that is devoid of the warning signage regarding the shopping cart wheels locking. Figure 9 shows a "normal" size cart that is also devoid of the warning signage. Again, these are just a few examples of the numerous carts that I observed were devoid of the warning signage regarding the shopping cart wheels unexpectedly locking.



**Figure 8. Small Cart Devoid of Warning About Locking Wheels**



**Figure 9. Normal Cart Devoid of Warning About Locking Wheels**

*Knowledge and Appreciation of Potential for Wheels to Stop/Lock*

As noted above, the warning placards and signage illustrate an appreciation of the potential for the cartwheels to unexpectedly stop, thereby creating a condition that poses a risk of harm to pedestrians. However, I also reviewed additional evidence indicating that Defendants Fred Meyer and Gatekeeper were aware of prior instances of the cart wheels unexpectedly stopping/locking. For example, Ms. LaRocque testified that the employee came over and described that the wheels locking happened multiple times each day. Consistent with this, Mr. LaRocque testified that the employee described that it had already occurred multiple times prior to Ms. LaRocque's incident. Notably, I was provided a document showing that there was another injury incident involving a locked shopping cart on September 5, 2020. In fact, even after Ms. LaRocque's injury, incidents involving locking shopping cart wheels continued to occur at the subject Fred Meyer. For example:

1. August 19, 2023: Customer was exiting store when the shopping cart wheels locked and she jammed her wrist. There are signs on the doors entering the store that carts "may" lock up.

2. August 21, 2023: Cart locked up and shin hit bottom of cart, resulting in knot and bruising.

3. December 23, 2023: Cart locked up, causing customer to fall and suffer a variety of injuries.

4. November 7, 2024: Customer pushed cart out of door and the cart locked up, which caused the child to fall out of the cart.

I was also provided a document produced by Defendant Gatekeeper that illustrates that Gatekeeper was aware of several claims at a Fred Meyer facility in Washington State prior to Ms. LaRocque's incident. For example, the document showed that there were two claims in 2021 at a Fred Meyer in Washington State. In fact, the document also showed that there were a number of claims after Ms. LaRocque's incident as well.

*Unreliable Nature of Warning Signage*

While I observed that there were various warnings about the wheels that "may" unexpectedly stop, it is critical to point out that there are a number of inconsistencies with basic warning principles associated with the warnings that were utilized to attempt to alert pedestrians of the hazards associated with the wheels locking. Salient examples include:

1. Potential for Obstruction:
   As a basic principle for warnings, it is critical that they are received by the user; in other words, if a warning is not received by a user (such as from it being blocked from view), then it will not be capable of informing them of the basic components (i.e., the hazard, the consequences, and how to avoid it). In this case, both types of warning signage (i.e., the placards on the cart and the sign on the glass) would be at an increased risk of never even being received by a user due to being obstructed/partially obstructed in a stimulus-rich environment that has a variety of stimuli competing for their attention.

For example, shopping carts are specifically intended to be used for transporting merchandise throughout the store. In light of this, it is expected that patrons will obtain merchandise and place it into the shopping cart, which puts the placard at risk of being blocked from the shopper's view (if there is even a placard mounted on the cart); they may also place a child in the provided seat, which creates a partial visual obstruction. Hence, if the placard is blocked from one's view, then there is a decreased risk of the patron receiving the message it contains.

Alternatively, the signage placed on the glass door is placed in a location where it is expected that it will be partially obstructed from one's view when coming into the store, as well as when going out of the store. For example, as a pedestrian approaches the sign from the foyer area, there is a risk of the door being in the open position, where the sign is partially obstructed by the metal frame of the adjacent door. Even if the door is "closed" and the sign is not obstructed by the frame, it is at risk of being blocked from view by other patrons attempting to enter, and it is also expected that the door will then move to an open position as one approaches it, thereby reverting back to a partially obscured condition. In other words, by the time a pedestrian enters the facility and begins shopping, it is predictable that they will not have even received the message on the sign, especially since the foyer has a variety of stimuli competing for one's attention, which decreases the likelihood of someone perceiving and reading the sign even if it is not blocked from view.

After going through the register area and approaching the exit doors where the sign is located (on the interior of the facility), there is also a variety of environmental stimuli that will naturally compete for one's attention, including other shoppers, merchandise just purchased and/or displayed for purchase, a receipt, and the like. In fact, there are a number of items/objects that would predictably block one's view of the sign as they approach it from the register area, including other people, signage, the ATM, and the like. Furthermore, depending on one's angle of approach, the sign itself may be blocked from view, as shown in Figure 6 above. The bottom line from the foregoing is that the predictable nature of the warning signage to be blocked/partially blocked from one's view increases the potential for a patron to not even receive the warning message prior to being exposed to a risk of harm from the shopping cart unexpectedly stopping/locking.

2. <u>Ambiguous and Contradictory Messages:</u>
In addition to the potential for the warning signage to be blocked/partially blocked, it is important to point out that the actual message of the warning placards and signage is misleading, ambiguous, and contradictory in nature. For example, the signage on the glass doors states that the shopping cart wheels **may** lock unexpectedly "if removed from the store", whereas the placards inside the carts stated that they **may** stop unexpectedly "at exit doors." In other words, the signage and placards provide conflicting information regarding the location of where the wheel **may** lock (i.e., at the exit doors or only if they are removed from the store). That is, "if removed from the store" suggests the wheels will lock only if the cart is removed from the building itself, whereas "at exit doors" suggests that the wheels will lock at the threshold itself. In addition, it is unclear whether the exit doors refer to the interior foyer doors, the exterior set of doors, or both, which creates

ambiguity. Notably, people routinely take their shopping cart outside of the facility (such as to go to their vehicle to unload it). A warning stating that the wheels may lock if removed from the store and/or at the exit doors conflicts with our everyday experience and expectations, which can compromise the credibility of the warning and the uncertainty of when the wheels will actually lock versus when they "may" lock (if at all).

Additionally, both the placards and signage repeatedly describe that the wheels "may" lock/stop unexpectedly. While this illustrates and appreciation and awareness that the carts were at risk of unexpectedly stopping (which poses a risk of harm to patrons, as discussed above), the wording that the carts "may" stop/lock unexpectedly is ambiguous and does not clearly communicate to the user when the cart is actually going to stop/lock. In other words, even if a patron knows that the carts "may" unexpectedly lock, they are still at risk of contacting the cart (as discussed above) since it may happen **unexpectedly**, such that they do not have time to prepare for and/or avoid striking the cart. Furthermore, the ambiguous language of the wheels "may" lock/stop increases the risk of a patron being uncertain on various information, such as where the wheels **will** lock, if the cart is actually equipped with the locking wheels and/or if the system is active, the nature of the stop (will it be abrupt versus gradual), and the like.

The bottom line from the foregoing is that the warning system in place shows an appreciation that the cart wheels are at risk of unexpectedly locking, which poses a risk of harm to pedestrians. However, the warning system in place is an unreliable safety strategy, given that patrons may not even receive the warnings (such as if they are missing from the shopping cart, blocked from view, and the like). In fact, even if a pedestrian does receive the message contained within the warnings, they will still be put at risk of contacting the cart if the wheels unexpectedly stop, given that the cart is at risk of unexpectedly stopping at a time and place that is unknown and not clearly defined to the user, along with the unknown nature of the wheels locking (i.e., abrupt vs. gradual) and the lack of information provided to the user regarding what needs to be done in the event of the wheels locking to avoid contacting/striking the cart. Notwithstanding, the LaRocques both testified that they had not observed the warning signage on the glass doors, and they both affirmatively testified that the subject cart did not have a warning placard attached to it.

*Summary*
In summary, the information I have reviewed illustrates that the Defendants were both aware of the potential for the wheels to unexpectedly lock, thereby putting patrons at risk of striking/contacting the cart and/or being knocked off balance. Despite this, the chosen safety strategy (i.e., warning signage) was unreliable (for all reasons discussed above), especially since the LaRocques both testified that the shopping cart they were using did not even have the placard in place. In other words, the Defendants were aware of the risk of harm posed by the wheels unexpectedly stopping/locking, but they failed to implement safety measures to eliminate/reduce the risk and/or reliably warn patrons like Ms. LaRocque about the risk.

**Ms. LaRocque's Behavior**
From a Safety and Human Factors Engineering perspective, Ms. LaRocque's overall behavior was predictable at the time of this incident. For example:

1. For all reasons discussed above, Ms. LaRocque was exposed to a risk of harm due to the shopping cart wheel(s) unexpectedly locking up as she was pushing the cart.

2. Ms. LaRocque described that she had no prior knowledge that the shopping carts were at risk of unexpectedly locking up and stopping. In fact, she described that she had not perceived the various warnings that were utilized to attempt to alert users of the risk of the wheels locking, which was predictable for all reasons discussed above. Here again, the testimony illustrates that the subject shopping cart did not even have the warning placard on it, which is consistent with my observations at the site, wherein I observed a number of carts devoid of the warning placard.

3. Given typical behavior at a grocery store, it should be expected that, at times, patrons will exit the facility with their shopping cart and take it into the parking lot and/or their vehicle (such as when loading groceries into their vehicle, obtaining something from their vehicle that they are taking back into the store, and the like). In other words, there is no reason to criticize Ms. LaRocque for taking the shopping cart through and/or past the exit doors, especially since I have seen no evidence she would somehow know that the locking function of the wheels had not been deactivated.

4. I have seen nothing indicating that Ms. LaRocque was in a rush/hurry, nor that she was engaged in horseplay at the time of her incident.

5. There is nothing indicating that she was impaired by alcohol or recreational drugs.

**Conclusions**
I have formed the following conclusions, which are expressed to a reasonable degree of Safety and Human Factors Engineering certainty:

1. Prior to Ms. LaRocque's incident, the Defendants knew and/or should have known that the shopping cart wheels were at risk of locking up and/or unexpectedly stopping, even if someone was not "shoplifting."

2. The cart wheels unexpectedly locking and/or stopping the forward motion of the shopping cart poses a risk of harm to pedestrians due to putting them at risk of striking/contacting the shopping cart and/or a loss of balance.

3. The overall warning system that was utilized to attempt to alert pedestrians of the risk of the shopping cart wheels locking and/or the shopping cart unexpectedly stopping was unreliable and inconsistent with basic principles for warnings.

4. Despite relying on warnings placards placed on the shopping carts, the shopping cart that Ms. LaRocque was using at the time of this incident was devoid of the warning placard.

5. From a Safety and Human Factors Engineering perspective, Ms. LaRocque's overall behavior was predictable.

Please let me know if I can be of any further assistance.

Sincerely,

Levi Dixon, M.S., CXLT, CSP, CHFP
Senior Engineer