EXHIBIT 1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| LINDA LAROCQUE, | NO. 3:25-cv-05380 |
| Plaintiff, | PLAINTIFF LINDA LAROCQUE'S RULE 26 EXPERT DISCLOSURE |
| v. | |
| THE KROGER CO., a foreign corporation doing business in Washington state; and, FRED MEYER STORES, INC., a foreign corporation doing business in Washington state, a/k/a TACOMA-STEVENS FRED MEYER; GATEKEEPER SYSTEMS, INC., a foreign corporation doing business in Washington state | |
| Defendants. | |

Pursuant to Federal Rule of Civil Procedure 26(a)(2), Plaintiff Linda LaRocque, by and through her counsel, hereby designates the following expert witnesses who may testify at trial of the above-captioned case:

Law Office
GORDON THOMAS HONEYWELL LLP
1201 PACIFIC AVENUE, SUITE 2200
TACOMA, WASHINGTON 98401-1157
(253) 620-6500 - FACSIMILE (253) 620-6565

1. Cloie B. Johnson, M.Ed., A.B.V.E.-D., C.C.M.
   10132 NE 185th St.
   Bothell, WA 98011
   (425) 486-4040, Ext. 5222

Ms. Johnson is a Vocational Rehabilitation Counselor and Case Manager with OSC Vocational Systems, Inc. Ms. Johnson is expected to testify as to the reasonable and necessary lifecare planning issues faced by Ms. LaRocque, including but not limited to her current, past and future medical treatment, therapeutic needs, modification and accommodation needs, as well as the cost of such needs and the reasonableness of related medical expenses.

Ms. Johnson's CV is attached as **Exhibit A.** Ms. Johnson's report is attached as **Exhibit B** and her supplemental report is attached as **Exhibit C.**

2. Bruce A. Rolfe, M.D.
   Orthopedic Forensic Advisors, LLC
   11900 NE 1st Street, Suite 300
   Bellevue WA 98005
   (425) 417 7069

Dr. Rolfe is an orthopedic surgeon. Dr. Rolfe is expected to testify as to Ms. LaRocque's injuries, impairments, and disabilities resulting from the injuries caused by the shopping cart injury that is the subject of this lawsuit. Dr. Rolfe will also provide an opinion as to the necessity of past and/or future medical treatment should Defendants deny that any of the related past and/or future medical treatment was necessary. Dr. Rolfe will also offer an opinion on the future medical treatment that is necessitated by the incident that is the subject of this lawsuit.

Dr. Rolfe's CV is attached as **Exhibit D**. Dr. Rolfe's report is attached as **Exhibit E**.

Law Office
GORDON THOMAS HONEYWELL LLP
1201 PACIFIC AVENUE, SUITE 2200
TACOMA, WASHINGTON  98401-1157
(253) 620-6500  -  FACSIMILE (253) 620-6565

3.    Levi Dixon, M.S., CXLT, CSP, CHFP
10501 South Lambs Lane
Mica, WA 99023
(509) 624-3714

Mr. Dixon is a Certified Human Factors Professional, a Certified Safety Professional, and a Certified XL Tribometrist. Mr. Dixon is expected to testify as to human factors and safety issues relevant to the claims and defenses in this lawsuit, as identified more fully in his attached report.

Mr. Dixon's CV is attached as **Exhibit F**. Mr. Dixon's report is attached as **Exhibit G**.

Pursuant to Rule 26(e), Plaintiff Linda LaRocque reserves the right to supplement this disclosure to the extent necessary and in the event additional information is obtained during the pendency of this action, in which discovery is not yet complete.

Plaintiff also reserves the right to amend or supplement her expert's *curriculum vitae*, testimony list, and schedule of billing rates, to the extent that more current information is available and to the extent necessary as expert discovery develops.

Plaintiff reserves the right to substitute a new expert in the event that an expert becomes unavailable for trial.

Plaintiff reserves the right to offer expert testimony disclosed by other defendants, whether or not they remain parties at the time of trial.

DATED this 2nd day of March 2026.

GORDON THOMAS HONEYWELL LLP

By _____
Robert C. Wilke, WSBA No. 49937
rwilke@gth-law.com
Ian M. Leifer, WSBA No. 56670
ileifer@gth-law.com
Attorneys for Plaintiff

PLTF'S EXPERT DISCLOSURE - 3
(3:25-cv-05380)
[4917-1150-5554]

EXHIBIT A

# CLOIE B. JOHNSON, M.Ed., A.B.V.E.-D., C.C.M.

10132 NE 185th St.
Bothell, WA  98011
425-486-4040 ext. 5222
cloie@osc-voc.com

**Education**

M.Ed, Guidance and Counseling, Whitworth College,
Spokane, Washington, 1996
B.S., Liberal Studies, (Psychology, Sociology and Counseling)
University of the State of New York, Troy, New York, 1992

**Certifications**

Registered Vocational Rehabilitation Counselor, Washington
State Department of Labor and Industries #8764 1993
Certified Vocational Rehabilitation Counselor, Oregon
Workers' Compensation Division #AC 0486 2006
Certified Case Manager M-027632 1998
Vocational Expert for the Social Security Administration's
Office of Hearings and Appeals, Seattle, WA 2002
Diplomate – American Board of Vocational Experts 2002
Contracted Counselor with Veteran's Administration 2002

## Professional Affiliations, Awards and Involvement

Professionals in Workers' Compensation, Seattle, WA Present Member and Past President and Board Member (2001-2003)

Washington Self Insurer's Association – Member and Past Board of Directors Vocational Representative 2013 - 2017

International Association of Rehabilitation Professionals (IARP) International Academy of Life Care Planning (IALCP) Past Chair (2008 - 2010)

IALCP Standards of Practice for Life Care Planning; Advisory Group 3rd Edition (2013 – 2014) and 4th Edition (2021 – 2022)

Rehabilitation Professional Journal, Past Managing Editor (2007-2011) Current Editorial Board Member

Journal of Life Care Planning (JLCP) – Current Editorial Board Member

The Earnings Analyst – Current Editorial Board Member

Collegium of Pecuniary Damages Experts (CPDE)

American Rehabilitation Economics Association (AREA)

American Academy of Economic and Financial Experts (AAEFE)

Lifetime Achievement Award – October 2016
Presented by the International Symposium of Life Care Planning, (Foundation for Life Care Planning Research (FLCPR), International Commission on Health Care Certification (ICHCC), IARP, IALCP, and The Care Planner Network)

**Professional Experience**

Vocational Rehabilitation Counselor/Case Manager
OSC Vocational Systems, Inc.                                    1/2002 – Present

- Perform vocational assessments of disabled veterans, injured worker's and their occupations after sustaining an industrial injury or occupational disease.
- Provide vocational services to individuals in need of retraining or placement to obtain and perform gainful employment on a continuous basis.
- Perform case management services and coordinate Care Plans for individuals with a catastrophic injury or long term health care needs.
- Perform economic damage calculations regarding loss of earning capacity, wageloss and life care planning, including reduction to present value.
- Perform assessments, file reviews, reporting and expert witness testimony in injury, state and federal civil, workers' compensation and social security cases regarding ability to work, wage loss, life care planning and lost earning capacity.

Field Case Manager/Vocational Rehabilitation Counselor/Case Manager
Intracorp                                    9/1993 – 1/2002

- Perform vocational assessments of disabled veterans, injured worker's and their occupations after sustaining an industrial injury or occupational disease.
- Provide vocational services to individuals in need of retraining or placement to obtain and perform gainful employment on a continuous basis.
- Perform case management services and coordinate Care Plans for individuals with a catastrophic injury or long term health care needs.
- Perform economic damage calculations regarding loss of earning capacity, wageloss and life care planning.
- Perform assessments, file reviews, reporting and expert witness testimony in injury, state and federal civil, workers' compensation and social security cases regarding ability to work, wage loss, and lost earning capacity.
- Provided review, assessment, reporting and expert witness testimony in various state and federal worker's compensation files to include Washington, Oregon Alaska, California, Texas, Florida, Iowa, Nebraska, North Dakota, Idaho, Longshore Harbor Workers Act, OWCP and United States Air Force.
- Prepared and provided educational training to colleagues and other professionals regarding vocational services.
- Performed vocational assessments of injured workers and their occupations after sustaining an industrial injury or occupational disease.
- Provided vocational services to individuals in need of retraining to obtain and perform gainful employment on a continuous basis.
- Performed file reviews, interviews and assessment in order to provide opinions regarding individuals ability to work.

Behavioral Science Specialist
United States Army, SC, TX, OK, Panama, AR, WA                 1987 – 1995

- Active Duty 5 years; Reserve Duty 3 years.

**Professional Experience** (cont.)

Behavioral Science Specialist

      United States Army, SC, TX, OK, Panama, AR, WA          1987 – 1995

- Non-Commissioned Officer in Charge of the following clinics:
Community Mental Health Services, Psychological Testing Services, Alcohol and Drug Abuse Prevention and Control Program, and Social Work Services
- Provided discharge planning services and family advocacy assessments for soldiers and dependents leaving the hospital after treatment
- Provided crisis intervention, supportive and guidance counseling to active duty, retired military and their dependents.
- Performed and assisted in the personality, neuro-psychological and intelligence testing of soldiers and their families.
- Provided alcohol and drug assessment, training and counseling services to the 1st Battalion 508th Airborne infantry, a 600-man battalion stationed at Fort Kobbe, Panama.
- Performed file reviews, interviews and assessment in order to provide opinions regarding individuals fitness for duty and ability to serve in the United States Armed Forces.
- Prepared and provided educational training to colleagues and other professionals regarding behavioral science specialist activities.
- Interviewed clients with problems, such as personal and family adjustments, finances, employment, food, clothing, housing, and physical and mental impairments to determine nature and degree of problem.
- Reviewed service plans and performs follow-up to determine quantity and quality of service provided client and status of client's case.
- Performed on-call services to the emergency room for crisis intervention, assessments and triage for psychiatric and domestic cases.
- Served on the Family Advocacy Case Management Team
- Developed and implemented a Standard Trainee Rapid Adjustment Counseling (STRAC) Program for newly enlisted soldiers in an effort to reduce loss and adjustment disorders of young soldiers newly transitioned to the military.
- Provided training to unit Alcohol and Drug Coordinators for routine assessment, monitoring and referral of soldiers with substance abuse problems.
- Served a combat tour during Operation Just Cause
- Performed Critical Incident Stress Debriefings after traumatic events and was part of the Gorgas Army Hospital Psychiatric Emergency Response Team (PERT) responding to fatalities and crises throughout the military bases in Panama.

**Publications and Presentations:**

      Johnson, C., (2002) Contributor in Dillman, E., Field, T., Horner, S., Slesnick, T., and Weed, R., **Approaches to Estimating Lost Earnings: Strategies for the Rehabilitation Consultant,** Elliott and Fitzpatrick, Inc., Athens, GA

      Johnson, C., and Parker, J., **Introduction to Workers' Compensation in Washington,** Lorman Education Services, Eau Claire, WI, (2002), Presenter, 9/19/02

**Publications and Presentations:** (cont.)

Johnson, C., and Parker, J., **Advanced Workers' Compensation in Washington,** Lorman Education Services, Eau Claire, WI, Presenter, 12/12/02

Johnson, C., **Vocational Reform,** Professionals In Workers Compensation, Presenter, 1/16/03

Johnson, C., and Parker, J., **Advanced Workers' Compensation in Washington,** Lorman Education Services, Eau Claire, WI, Presenter, 2/18/03

Johnson, C., (2003), Book Review, The Transitional Classification of Jobs, *Journal of Life Care Planning*, Vol. 2, No. 4, 215-218, Elliott and Fitzpatrick, Inc., Athens, GA

Johnson, C., and Bennett, N., **Five Most Common Injuries in Workers' Compensation Update in Washington,** Lorman Education Services, Eau Claire, WI, Presenter, 4/27/04

Johnson, C., **Top 10 Tips from a Vocational Expert,** Washington State Trial Lawyers, Workers Compensation Conference, Presenter, 5/14/04

Johnson, C., Choppa, A., Field, T., Fountaine, J., Grimes, J., Jayne, K., and Shafer, K., (2004), **The Efficacy of Professional Clinical Judgment: Developing Expert Testimony in Cases Involving Vocational Rehabilitation and Care Planning Issues**, *Journal of Life Care Planning*, Vol. 3, No. 3, 131-150, Elliott and Fitzpatrick, Inc., Athens, GA

Johnson, C., Bennett, N., Choppa, A., Cohen, M., Fountaine, J., Glass, S., Lohse, K., Parker, J., Penberthy, A., and Silberberg E., **Life Care Planning in Washington,** Lorman Education Services, Eau Claire, WI, Presenter, 10/14/04

Johnson, C., Blackwell, T., Kelsey, M., and Neulicht, A., (2005), **Vocational Expert, Revised and Updated**, Elliott and Fitzpatrick, Inc., Athens, GA:

Johnson, C., and Fountaine, J., **Successful Handling of Wrongful Death Cases,** Lorman Education Services, Eau Claire, WI, Presenter, 3/21/05

Johnson, C., Farnsworth, K., Field, J., Field, T., Griffin, S., Jayne, K., Kelsay, E., Kelsay, M., Neulicht, A., Van de Bittner, E., and Van de Bittner, S., (2005) Contributor and Editor, **Quick Desk Reference (QDR) Forensic Rehabilitation Consultants**, Elliott and Fitzpatrick, Inc., Athens, GA:

Johnson, C., Choppa, A. and Field, T., (2006), **The Daubert Challenge; From Referral to Trial**, Elliott and Fitzpatrick, Inc., Athens, GA:

Johnson, C., Field, T., Schmidt, R., and Van de Bittner, G, (2006), **Methods and Protocols; Meeting the Criteria of General Acceptance and Peer Review Under Daubert and Kumho**, Elliott and Fitzpatrick, Inc., Athens, GA:

Johnson, C., **Vocational Plans: Positives and Pitfalls,** Professionals In Workers Compensation, Presenter, 1/19/06

**Publications and Presentations:** (cont.)

Johnson, C., **Vocational Experts and Issues: From Referral to Testimony,** Washington Self Insured Association Spring Conference, Presenter, 3/17/06

Johnson, C., **Private Sector Rehabilitation, Life Care Planning Seminar,** Guest Lecturer, Texas Tech University, 4/10 – 14/06

Johnson, C., and Bennett, N., **Workers' Compensation Update in Washington,** Lorman Education Services, Eau Claire, WI, Presenter, 10/12/06

Johnson, C. and Weed, R., (2006), **Life Care Planning in Light of Daubert and Kuhn**, Elliott and Fitzpatrick, Inc., Athens, GA:

Johnson, C., **Admissible Testimony Series Pre-Conference Seminar,** International Association of Rehabilitation Professionals – Forensic Conference, Scottsdale, AZ Presenter, 11/2/06

Johnson, C., **Private Sector Rehabilitation, Life Care Planning Seminar,** Guest Lecturer, Texas Tech University, 4/9 – 13/07

Johnson, C., **Traumatic Brain Injuries: Meeting Real Life Needs: Vocational Assessments, Rehabilitation and Life Care Plans**, Washington State Trial Lawyers, Workers Compensation Conference, Presenter, 6/15/07

Johnson, C., Choppa, A., Field, T., Fountaine, J., and Jayne, K., (2007), **Rule of Evidence vs. Professional Certifications: The Real Basis for Establishing Admissible Testimony by Rehabilitation Counselors and Case Managers**, *Rehabilitation Professional Journal*, Vol. 15, No. 3, 7 – 16, Elliott and Fitzpatrick, Inc., Athens, GA

Johnson, C., Fountaine, J., Gibson, G., Jayne, K., Parker, J., and Vega, E., **Preconference – Earning Capacity Data, Methodology, and Thinking Outside the Box,** International Association of Rehabilitation Professionals – Forensic Conference, Presenter, 11/1/07

Johnson, C., Bensch, E., and Hollar, P., **Workers' Compensation Update,** Lorman Education Services, Tacoma, WA, Presenter, 11/28/07

Johnson, C., **Self Insured Vocational Update,** Puget Sound Workers' Compensation Trust, Renton, WA, Presenter, 12/6/07

Johnson, C., (2008) Contributor in Field , J. and Field, T. (Eds.), **CDMS Study Guide, 5th Edition**, Elliott and Fitzpatrick, Inc., Athens, GA

Johnson, C., **Private Sector Rehabilitation, Life Care Planning Seminar,** Guest Lecturer, Minnesota State University, Spring 2008

Johnson, C., and Bennett, N., **Workers' Compensation Update in Washington,** Lorman Education Services, Eau Claire, WI, Presenter, 2/27/08

**Publications and Presentations:** (cont.)

Johnson, C., Becker, T, and Bennett, N., **Applications of work physiology science to capacity test prediction of full-time work – 8 hour work day and the Utilization of the FCE for Vocational Case Management and/or Forensic Case Management by the Vocational Expert,** International Association of Rehabilitation Professionals Annual Conference, Los Angeles, CA, Presenter, 5/17/08

Johnson, C. and Choppa, A., (2008), **Response to Estimating Earning Capacity: Venues, Factors and Methods,** Timothy F. Field, Ph.D., *Earning Capacity Journal*, Vol. 1, No. 1, Elliott and Fitzpatrick, Inc., Athens, GA

Johnson, C., Choppa, A., Deutsch, P., Field, T., Fountaine, J., and Gamboa, A., **Worklife Expectancy and Life Expectancy Data, Methodology, and Thinking Outside the Box – Effects on Earning Capacity Assessments and Life Care Plans,** International Association of Rehabilitation Professionals – Forensic Pre-Conference, Presenter, 10/30/08

Johnson, C., Becker, T, and Bennett, N., **Rehabilitation Educators Guide for Work Task and Activity of Daily Living Using the Science of Full Time Work,** National Rehabilitation Educators Conference – Spring Conference, San Antonio, TX, Presenter, 2/20/09

Johnson, C., **Life Care Planning Issues Associated with the Traumatic Brain Injury Victim**, Washington State Association for Justice, Seattle, WA, Presenter, 3/20/09

Johnson, C., **Private Sector Rehabilitation, Life Care Planning Seminar,** Guest Lecturer, Minnesota State University, Presenter, Spring 2009

Johnson, C., Bensch, E., and Hollar, P., **Workers' Compensation Update,** Lorman Education Services, Seattle, WA, Presenter, 4/24/09

Johnson, C., Choppa, A., Field, T., Fountaine, J., Jayne, K., and Smith, A., (2009), **Bereavement and Mortality: A Methodology for Assessing Capacity and Functioning Following the Loss of a Spouse**, *Journal of Life Care Planning*, Vol. 7, No. 4, 163-179. Elliott and Fitzpatrick, Inc., Athens, GA

Johnson, C., **Medical and Other Records for Paralegals, How to Get the Most From Them,** Institute for Paralegal Education, Webinar Presenter, 8/25/09

Johnson, C., and Preston, K., **Life Care Planning Summits: An Analysis of Results and Relevancy for the Future,** International Symposium of Life Care Planning, Chicago, IL, Presenter, 9/26/09

Johnson, C., Deutsch, P, Riddick-Grisham, S. Bonfiglio, R., and Pomeranz, J., **Building Foundations in Life Care Planning, (Standards of Practice in Life Care Planning and Cases Where LCP Opinions Have Been Challenged)**, International Symposium of Life Care Planning, Chicago, IL, Presenter, 9/24-25/09

**Publications and Presentations:** (cont.)

Johnson, C., Fountaine, J., Jayne, K., and Neulicht, A., **Preconference Thinking Outside the Box – Anatomy of a Case and Special Considerations, Part 3 of 3,** International Association of Rehabilitation Professionals Forensic Conference, Presenter, 10/29/09

Johnson, C., Berens, D., Pomeranz, J., and Preston, K., **Life Care Planning Summit 2010**, Georgia State University**,** Atlanta, GA, Co-Chair and Presenter, 4/17 and 18/10

Johnson, C., Berens, D., Pomeranz, J., and Preston, K., (2010), **Life Care Planning Summit 2010 Proceedings,,** *Journal of Life Care Planning*, Vol. 9, No.2, 3 - 14. Elliott and Fitzpatrick, Inc. Athens, GA:

Johnson, C., Bennett, N., Fisher, M., Fountaine, J., and Parker, J., (2010), **Past Medical Bill Review: Who is Best Qualified to Determine the Reasonableness of Costs?,** Trial News

Johnson, C., Choppa, A., and Field, T., **Clinical Judgment,** International Association of Rehabilitation Professionals Webinar, Presenter, 10/13/10

Johnson, C., Lacerte, M., and Weed, R., **Canadian Life Care Planning Summit 2011**, Toronto, Ontario, Co-Chair and Presenter, 6/3 and 4/11

Johnson, C., Bennett, N., Fisher, M., Fountaine, J., and Parker, J., **Determining the Reasonableness of Past Medical Bills**, American Rehabilitation Economics Association (AREA) Annual Conference, Seattle, WA, Presenter, 6/9/11

Johnson, C., Choppa, A., Field, T., and Jayne, K.; **Clinical Judgment**, American Rehabilitation Economics Association (AREA) Annual Conference 2011, Seattle, WA, Presenter, 6/11/11

Johnson, C., Lacerte, M, and Weed, R., (2011), **Canadian Life Care Planning Summit 2011 Proceedings**, *Journal of Life Care Planning*, Vol. 10, No.3, 87-106. Elliott and Fitzpatrick, Inc., Athens, GA

Johnson, C., (2012), **Guest Editor**, *Journal of Life Care Planning*, Vol. 11, No. 1, Elliott and Fitzpatrick, Inc., Athens, GA

Johnson, C., Weed, R., Grisham, S., and Yuhas, S., (2012), **What Every Life Care Planner Should Know About the 2012 Summit.** *Journal of Life Care Planning*, Vol. 11, No. 1, 113-130. Elliott and Fitzpatrick, Inc., Athens, GA

Johnson, C., **2012 Life Care Planning Summit,** Dallas, TX, Chair and Presenter, 5/5 - 6/12

Johnson, C., (2012), **The 2012 Life Care Planning Summit: Third Time is a Charm.**, *Journal of Life Care Planning*, Vol. 11, No.2, 3-8. Elliott and Fitzpatrick, Inc., Athens, GA:

Johnson, C. and Preston, K., (2012), **Consensus and Majority Statements derived from Life Care Planning Summits held in 2000, 2002, 2004, 2006, 2008, 2010 and 2012**, *Journal of Life Care Planning*, Vol. 11, No. 2, 9-14, Elliott and Fitzpatrick, Inc., Athens, GA

**Publications and Presentations:** (cont.)

Johnson, C., **Life Care Planning Process and Practice,** Association Internationale de Dommage Corporel Pre-Congress Workshop: Life Care Planning: State of Art., Montreal, Canada, Presenter, 9/9/12

Johnson, C. and Choppa, A., **Case Studies and Discussion: Amputation and Spinal Cord Injury,** Association Internationale de Dommage Corporel Pre-Congress Workshop: Life care Planning: State of Art., Montreal, Canada, Presenter, 9/9/12

Johnson, C. and Choppa, A., **Fundamentals and Practice of Life Care Planning,** Washington Chapter International Association of Rehabilitation Professionals, Fall Conference, Tacoma, WA, Presenter, 9/21/12

Johnson, C., Choppa, A., and Neulicht, A., (2013) **Foundations for Forensic Vocational Rehabilitation -** *Chapter 11* **Case Conceptualization: Achieving Opinion Validity through the Lens of Clinical Judgment,** Springer Publishing Company, New York, NY.

Johnson, C., and Sommers, L., **Best Practices in ADA, FMLA and Workers' Compensation,** Lorman Education Services, Eau Claire, WI, Presenter, 7/17/13

Johnson, C. and Lacerte, M., Co-Editors, (2013) **Special Issue on Life Care Planning,** *Physical Medicine and Rehabilitation Clinics of North America***,** Vol 24, No. 3, 403-572, Elsevier, Philadelphia, PA

Johnson, C. and Weed, R., (2013) **The Life Care Planning Process,** *Physical Medicine and Rehabilitation Clinics of North America* - August 2013 (Vol. 24, Issue 3, Pages 403-417, DOI: 10.1016/j.pmr.2013.03.008)

Johnson, C. and Katz, R., (2013) **Life Care Planning for the Child with Cerebral Palsy,** *Physical Medicine and Rehabilitation Clinics of North America* - August 2013 (Vol. 24, Issue 3, Pages 491-505, DOI: 10.1016/j.pmr.2013.03.003)

Johnson, C., Choppa, A., and Meier, R., (2013) **Life Care Planning for Persons with Amputations,** *Physical Medicine and Rehabilitation Clinics of North America* - August 2013 (Vol. 24, Issue 3, Pages 467-489, DOI: 10.1016/j.pmr.2013.03.004)

Johnson, C., and Sommers, L., **Workers' Compensation Update,** Lorman Education Services, Eau Claire, WI, Presenter, 12/13/13

Johnson, C., and Cary, J., **Workers' Compensation Update in Washington,** Lorman Education Services, Eau Claire, WI, Presenter, 12/12/14

Johnson, C., Lacerte, M., and Fountaine, J., (2015) **Certification Standards for Professionals Coordinating Life Care Plans for Individuals Who Have Acquired Brain Injury,** *NeuroRehabilitation Journal*, Vol. 36, No. 3, 235-241.

<u>**Publications and Presentations:**</u> (cont.)

Johnson, C., Cary, J., Choppa, N., and Gamez, J., **Labor Market Survey/Research: A New Approach to LMS Focused on the Injured Worker and Grounded in Objective and Reliable Data,** Seattle, WA, Washington State Association for Justice Section Meeting, Presenter, 7/09/2015

Johnson, C., and Gamez, J., (2015) **What is the Life Care Planning Summit; and Why Should You Attend the 2015 Summit?**, *Journal of Life Care Planning*, Vol. 13, No. 1., 19-22, Elliott and Fitzpatrick, Inc., Athens, GA

Johnson, C., Field, T., Choppa A., and Fountaine, J., (2015) **The Collateral Source Rule and the Affordable Care Act: Implications for Life Care Planning and Economic Damages,** *Journal of Life Care Planning*, Vol. 13, No. 3, 3-16. Elliott and Fitzpatrick, Inc., Athens, GA

Johnson, C., **2015 Life Care Planning Summit,** Pre-conference - International Symposium on Life Care Planning, Scottsdale, AZ, 9/18/15.

Johnson, C., Field, T. and Choppa A. **The Collateral Source Rule and the Affordable Care Act: Implications for Life Care Planning and Economic Damages,** International Symposium on Life Care Planning, Scottsdale, AZ, 9/19/15.

Johnson, C., (2015) **2015 Life Care Planning Summit: Moving Forward and Looking Ahead,** *Journal of Life Care Planning*, Vol. 13, No. 4, 27-33. Elliott and Fitzpatrick, Inc., Athens, GA

Johnson, C. (2015) **Consensus and Majority Statements Derived from Life Care Planning Summits Held in 2000, 2002, 2004, 2006, 2008, 2010, 2012 and 2015,** *Journal of Life Care Planning*, Vol. 13, No. 4, 35-38. Elliott and Fitzpatrick, Inc., Athens, GA

Johnson, C., Field, T., and Choppa, A. (2015) **Prologue - The Collateral Source Rule and the Affordable Care Act: Implications for Life Care Planning and Economic Damages,** *Journal of Life Care Planning*, Vol. 13, No. 4, 47-50. Elliott and Fitzpatrick, Inc., Athens, GA:

Johnson, C. and Choppa, N., **Medical Issues in Workers' Compensation, Vocational and Legal Perspectives**. National Business Institute. Workers' Compensation from A to Z, 109-119, November 18, 2015

Johnson, C. and Choppa, N., (2016) **Use of the FCE in Estimation of Client Care of Services,** *Rehabilitation Professional Journal*, Vol. 24, No. 1, 31-36, Elliott and Fitzpatrick, Inc., Athens, GA

Johnson, C., Field, T. and Choppa, A., **Collateral Sources and Life Care Planning: Issues Related to the Life Care Planner's Role in the Emerging ACA Climate**, American Board of Vocational Experts Annual Conference, Vancouver, BC, Presenter, 4/8/16.

Johnson, C. and Donley, J., **Revised Labor Market Survey Research (LMS/R),** CC/ AGO University, Tumwater, WA 5/25/16

Johnson, C., **Life Care Planning Standards of Practice,** Canadian Society of Medical Examiners, Toronto, ON. Presenter 6/3/16

**Publications and Presentations:** (cont.)

Johnson, C., Cary, J. Choppa, N., and Gamez, J., **Building a Supportable Labor Market**, Tumwater, WA, WA State Department of Labor and Industries Fall Conference Presenter 10/05/16

Johnson, C., Cary, J., Choppa, N., and Gamez, J., **Code of Ethics Review, CRC and CDMS**, DoubleTree SeaTaC., WA IAM Corporation to Re-employment and Safety Training (CREST) Conference Presenter, 12/5/16

Johnson, C., (2017). Contributor in Field, J. and Field, T. (Eds.), **Forensic Casebook: Vocational and Economic Reports**. Elliott and Fitzpatrick, Inc., Athens, GA

Johnson, C. and Gamez, J., (2015) **Why Should You Attend the 2017 Life Care Planning Summit?**, *Journal of Life Care Planning*, Vol. 15, No. 1., pp.41-43, Elliott and Fitzpatrick, Inc., Athens, GA

Johnson, C. and Cary, J., (2016) **Response to: Appropriate Use of Vocational Opinions to Rebut a Scheduled Rating in California Workers' Compensation Claims for Permanent Partial Disability After *Dahl* and After Senate Bill 863**. *Journal of Forensic Vocational Analysis,* 17(1), pp 39 – 43, Elliott and Fitzpatrick, Inc., Athens, GA

Johnson, C., Albee, T. and Gamez, J., (2017), **Life Care Planning Summit Proceedings**, *Journal of Life Care Planning,* 15(3), 19 – 29,

Johnson, C., Gamez, J., and Stajduhar, L., (2017), **A Comparison of Life Care Planning Standards of Practice,** *Journal of Life Care Planning*, 15(3), 37-44. Elliott and Fitzpatrick, Inc., Athens, GA

Johnson, C., and Choppa, A., **Life Care Planning Process and Practice Case Studies and Discussion: Amputation and Spinal Cord Injury,** Guest Lecturer, University of Washington Law School, Seattle, WA, 11/28/17

Johnson, C., Guest Editor (2018) **Special Issue on Life Care Planning Summits,** *Journal of Life Care Planning,* 16(4), Elliott and Fitzpatrick, Inc., Athens, GA

Johnson, C., Pomeranz, J. and Stetten, 2018 **Life Care Planning Consensus and Majority Statements, 2000-2018: Are They Still Relevant and Reliable? A Delphi Study**, *Journal of Life Care Planning,* 16(4), 5-15, Elliott and Fitzpatrick, Inc., Athens, GA

Johnson, C., Pomeranz, J. and Stetten, 2018 **Consensus and Majority Statements derived from Life Care Planning Summits held in 2000, 2002, 2004, 2006, 2008, 2010, 2012, 2015 and 2017 and updated via Delphi study in 2018**, , *Journal of Life Care Planning,* 16(4), 15- 19, Elliott and Fitzpatrick, Inc., Athens, GA

Johnson, C., (2019) **A Historical Review of Life Care Planning Summits since 2000** *Journal of Life Care Planning,* 17(3), 37-51, Elliott and Fitzpatrick, Inc., Athens, GA

**Publications and Presentations:** (cont.)

Johnson, C., and Choppa, N., (2020). **Life Care Planning; Coordination of Care; A Tool of Case Management**. *Washington Chapter - International Association of Rehabilitation Professionals Winter Newsletter.* January 2020, 7-10.

Johnson, C., Choppa, N., and Cary J., **Accommodating Anxiety, Workplace Stress and PTSD Under the ADA.** Lorman Education Services Webinar, Presenter, 12/1/20.

Johnson, C., Cary, J., Choppa, N. Layton, K., McBroom Weiss, M., and Taylor, D., (2021). **Considerations for Vocational Assessments in the Era of COVID-19**. *Rehabilitation Professional,* 29 (2), 57-70, Elliott and Fitzpatrick, Inc., Athens, GA

Johnson, C., Cary, J., Choppa A., Choppa, N., and Fountaine, J., **A Walk-Through from Referral to Testimony; Methodology & Admissibility,** International Association of Rehabilitation Professionals 2021 Virtual Conference – Pre-Conference, Presenter, 11/11/21.

Johnson, C., Cary, J., Choppa, N. Layton, K., McBroom Weiss, M., and Taylor, D., (2021). **Considerations for Vocational Assessments in the Era of COVID-19**. *Rehabilitation Professional*, 29, (1), 57-70. *[Selected for reprint in the The Rehabilitation Professional & Journal of Life Care Planning: A Year in Review (2021) Vol.1, No. 1, (9-22)]*

Johnson, C. and Woodard, L., (2022). **Life Care Planning Cost Techniques: History, Methodology, and Literature Review**, International Association of Rehabilitation Professionals, IALCP 2022 Life Care Planning Summit, Dallas, TX, Presenter, 5/13/22

Johnson, C. and Woodard, L., (2022). **Life Care Planning Cost Techniques: History, Methodology, and Literature Review**, *Journal of Life Care Planning,* 20 (2), 37-55, Elliott and Fitzpatrick, Inc., Athens, GA

Johnson, C., Cary, J. and Robert, E., (2022). **A Comparison of the Definition of a Life Care Plan: The Impact on Life Care Planners**, *Journal of Life Care Planning,* 20 (3), 25-43, Elliott and Fitzpatrick, Inc., Athens, GA

Johnson, C., Layton, K., McBroom Weiss, M., and Taylor, D., (2022). **Admissibility: Federal Rules of Evidence 702 Revisited,** *Rehabilitation Professional,* 30 (3), 13-22, Elliott and Fitzpatrick, Inc., Athens, GA

Johnson, C., (2022). **A Comparison of Codes of Ethics of Life Care Planners, International Symposium of Life Care Planners,** Fort Worth, TX, Presented 10/20/22
**Publications and Presentations:** (cont.)

Johnson, C., Cary, J. and Robert, E., (2022). **A Comparison of the Definition of a Life Care Plan: The Impact on Life Care Planners**, *The Rehabilitation Professional & Journal of Life Care Planning: A Year in Review* Vol. 2, No 1, 88-107, Elliott and Fitzpatrick, Inc., Athens, GA

**Publications and Presentations:** (cont.)

Johnson, C., Choppa, A., and Girards, J., (2022). **Presenting Life Care Planning Testimony, International Symposium of Life Care Planners,** Fort Worth, TX, Presented 10/20/22

Johnson, C., Cary, J., Choppa A., Choppa, N., and Fountaine, J., (2022), **A Walk-Through from Referral to Testimony; Methodology & Admissibility,** *Journal of Life Care Planning,* (at Press) Elliott and Fitzpatrick, Inc., Athens, GA

# EXHIBIT B



**VOCATIONAL SYSTEMS, INC.**

November 22, 2025

Robert Wilke, Attorney at Law
PO Box 1157
1201 Pacific Ave., Ste. 2100
Tacoma, WA 98401-1157

Re:     Linda Larocque
DOB:  02/09/1958
DOI: 05/06/2023

Dear Mr. Wilke:

Thank you for referring Linda Larocque for a review of past medical bills for the reasonableness of the costs.

I have reviewed medical treatment records, billings and correspondence from Multicare Allenmore Hospital, Anchor Physical Therapy, Multicare Orthopedics and Sports, Multicare Lakewood Clinic, Multicare Allemore Building C, Multicare Tacoma General, Multicare Pulse Heart Institute, Multicare Gig Harbor Medical, and Multicare TG Retail/Specialty Pharmacy

It is not my intent to restate these records in their entirety for purposes of this report.

In performing this work I have followed accepted methodologies and standards of practice. As a Vocational Rehabilitation Counselor and Case Manager, I have looked to the medical community to define the necessity of the medical/rehabilitation treatment and services, equipment and other items. I have then ascertained the reasonableness of the costs associated. My opinions are based upon my knowledge, training and experience combined with my clinical judgment.

Part of my job duties and clinic practice as a Rehabilitation Counselor/Case Manager and Life Care Planner involves the knowledge and assessment of the reasonable value and charges for various medical and life care goods and services. This requires that I keep current on the charges for such goods and services in this region. I use my knowledge and experience when approving or recommending various medical goods and equipment for governmental agencies and private clients. I am also hired to provide my expertise on the reasonable value of medical goods, services and bills in the forensic arena, and have been qualified and accepted as an expert on this subject area by multiple courts.

☐ Main Office (Bothell) • 10132 NE 185ᵗʰ St
Bothell, WA 98011 • (425) 486-4040
Fax: (425) 486-8701
☐ Mount Vernon Office • 205 Stewart Rd Ste 108-7
Mount Vernon, WA 98273 • (360) 424-6239
Fax: (360) 738-9524
☐ Olympia Office • 924 7ᵗʰ Ave SE Suite B
Olympia, WA 98501 • (360) 352-5078
Fax: (253) 779-5486
☐ Wenatchee Office • 200 Palouse St Ste 201-4
Wenatchee, WA 98801 • (509) 665-8382
Fax: (509) 325-7666

☐ Edmonds Office • 7500 212ᵗʰ St SW Suite 216
Edmonds, WA 98026 • (425) 672-9600
Fax: (360) 738-9524
☐ Burien Office • 601 SW 152ⁿᵈ St
Burien, WA 98166• (206) 243-1300
Fax: (206) 243-0366
☐ Kingston Office • 26127 Calvary Lane Suite 300
Kingston, WA 98346 • (360) 633-4252
Fax: (360) 352-5417
☐ Moses Lake Office • 2130 Basin St SW Suite A
Ephrata, WA 98823 • (509) 766-0379
Fax: (509) 325-7666

☐ Bellingham Office • 119 N Commercial Suite 350
Bellingham, WA 98225 • (360) 734-9163
Fax: (360) 738-9524
☐ Tacoma Office • 2607 Bridgeport Way W #2H2
Tacoma, WA 98466 • (253) 779-5485
Fax: (253) 779-5486
☐ Spokane Office • 1814 N Normandie St
Spokane, WA 99205 • (509) 325-7766
Fax: (509) 325-7666
☐ Aberdeen Office • 403 W State Street, Suite 101
Aberdeen, WA 98520 • (360) 637-4024
Fax: (360) 352-5417

Linda Larocque
November 22, 2025
Page 2

Experts in my area routinely rely upon our day to day work including clinical communications with the billing departments of local providers, regional data and publications, as well as a particular patient's medical records, bills, bill summaries and testimony of medical personnel in formulating opinions on the reasonable value of medical services in a particular case and time period.

## ASSESSMENT:

By way of brief summary I have researched the costs of medical/rehabilitation treatment and services, equipment and other needs described in the bills noted above to determine the reasonableness of the costs. I am commenting on the reasonableness of the costs, not the medical necessity of the treatment. Cost totals are identified as follows:

| PROVIDER | DATES | TOTAL |
|---|---|---|
| Multicare Allenmore Hospital | 6/11/2023-12/8/2023 | $274,765.82 |
| Anchor Physical Therapy | 5/10/2023-4/17/2025 | $19,392.50 |
| Multicare Orthopedics and Sports | 5/9/2023-6/22/2023 | $2,085.00 |
| Multicare Lakewood Clinic | 12/14/2023-12/23/2024 | $3,290.00 |
| Multicare Allemore Building C | 12/22/2023-1/22/2025 | $4,904.00 |
| Multicare Tacoma General | 11/15/2024-6/11/2025 | $296.00 |
| Multicare Pulse Heart Institute | 6/6/2023-12/2/2024 | $1,666.00 |
| Multicare Gig Harbor Medical | 5/1/2025 | $3,548.00 |
| Multicare TG Retail/Specialty Pharmacy | 6/27/2023 | $6.17 |

**The total of the above is $309,953.49.** These charges are reasonable and consistent with the charges of other, similar, medical providers during these same time periods. These charges are consistent with the charges in Life Care Plans coordinated with other clients during these same time periods.

Please contact me should you have any comments or questions concerning this information. I reserve the right to revise or amend this report if new or additional information becomes available.

Sincerely,

*Cloie B Johnson*

Cloie B. Johnson, M.Ed., ABVE, CCM
Vocational Rehabilitation Counselor/Case Manager

# EXHIBIT C



VOCATIONAL SYSTEMS, INC.

February 23, 2026


Robert Wilke, Attorney at Law
PO Box 1157
1201 Pacific Ave., Ste. 2100
Tacoma, WA 98401-1157


Re:     Linda Larocque
DOB:  2/9/1958
DOI: 5/6/2023


Dear Mr. Wilke:

This will serve as a Supplement to my report of November 22, 2025. Since that time, I have reviewed updated medical bills and records and have consulted with Bruce Rolfe, MD. This information, in addition to my prior review of medical treatment records, billings and correspondence from Multicare Allenmore Hospital, Anchor Physical Therapy, Multicare Orthopedics and Sports, Multicare Lakewood Clinic, Multicare Allemore Building C, Multicare Tacoma General, Multicare Pulse Heart Institute, Multicare Gig Harbor Medical, and Multicare TG Retail/Specialty Pharmacy have informed my opinion.

It is not my intent to restate these records or consultation in their entirety for purposes of this report.

In performing this work I have followed accepted methodologies and standards of practice. As a Vocational Rehabilitation Counselor, Case Manager and Life Care Planner, I have looked to the medical community to define the nature and extent of impairment. I have then translated those limitations and recommendations to the world of work, independent living, coordination of future medical and rehabilitation services and the costs associated to promote quality of life in the least restrictive environment with respect for independence and human dignity. I have received input for those items prescribed or deemed medically necessary and appropriate from the requisite professional(s); and then provided case management and vocational rehabilitation foundation and expertise for the identification of additional items, as well as costs and replacement rate for the various items identified. I have then ascertained the reasonableness of the costs associated. My opinions are based upon my knowledge, training and experience combined with my clinical judgment.

☐ Main Office (Bothell) • 10132 NE 185ᵗʰ St
Bothell, WA 98011 • (425) 486-4040
Fax: (425) 486-8701
☐ Mount Vernon Office • 205 Stewart Rd Ste 108-7
Mount Vernon, WA 98273 • (360) 424-6239
Fax: (360) 738-9524
☐ Olympia Office • 924 7ᵗʰ Ave SE Suite B
Olympia, WA 98501 • (360) 352-5078
Fax: (253) 779-5486
☐ Wenatchee Office • 200 Palouse St Ste 201-4
Wenatchee, WA 98801 • (509) 665-8382
Fax: (509) 325-7666

☐ Edmonds Office • 7500 212ᵗʰ St SW Suite 216
Edmonds, WA 98026 • (425) 672-9600
Fax: (425) 776-5375
☐ Burien Office • 601 SW 152ⁿᵈ St
Burien, WA 98166• (206) 243-1300
Fax: (206) 243-0366
☐ Kingston Office • 26127 Calvary Lane Suite 300
Kingston, WA 98346 • (360) 633-4252
Fax: (360) 352-5417
☐ Moses Lake Office • 2130 Basin St SW Suite A
Ephrata, WA 98823 • (509) 766-0379
Fax: (509) 325-7666

☐ Bellingham Office • 119 N Commercial Suite 350
Bellingham, WA 98225 • (360) 734-9163
Fax: (360) 738-9524
☐ Tacoma Office • 2607 Bridgeport Way W #2H2
Tacoma, WA 98466 • (253) 779-5485
Fax: (253) 779-5486
☐ Spokane Office • 1814 N Normandie St
Spokane, WA 99205 • (509) 325-7766
Fax: (509) 325-7666
☐ Aberdeen Office • 403 W State Street, Suite 101
Aberdeen, WA 98520 • (360) 637-4024
Fax: (360) 352-5417

Part of my job duties and clinic practice as a Rehabilitation Counselor/Case Manager and Life Care Planner involves the knowledge and assessment of the reasonable value and charges for various medical and life care goods and services. This requires that I keep current on the charges for such goods and services in this region. I use my knowledge and experience when approving or recommending various medical goods and equipment for governmental agencies and private clients. I am also hired to provide my expertise on the reasonable value of medical goods, services and bills in the forensic arena, and have been qualified and accepted as an expert on this subject area by multiple courts.

Experts in my area routinely rely upon our day to day work including clinical communications with the billing departments of local providers, regional data and publications, as well as a particular patient's medical records, bills, bill summaries and testimony of medical personnel in formulating opinions on the reasonable value of medical services in a particular case and time period.

## CONSULTATION:

I had the opportunity to consult with Dr. Rolfe on February 22, 2026 and February 23, 2026. We reviewed the prognosis, treatment recommendations and permanent limitations associated with the injuries sustained.  The recommendations for current and future care and services were clarified and are included in the life care plan below.

## ASSESSMENT:

By way of brief summary, I have researched the costs of medical/rehabilitation treatment and services, equipment and other needs described in the bills noted above to determine the reasonableness of the costs. I am commenting on the reasonableness of the costs, not the medical necessity of the treatment. Cost totals are identified as follows:

| PROVIDER | DATES | TOTAL |
|---|---|---|
| Multicare Allenmore Hospital | 6/11/2023-12/8/2023 | $274,765.82 |
| Anchor Physical Therapy | 5/10/2023-4/17/2025 | $19,392.50 |
| Multicare Orthopedics and Sports | 5/9/2023-6/22/2023 | $2,085.00 |
| Multicare Lakewood Clinic | 12/14/2023-12/23/2024 | $3,290.00 |
| Multicare Allemore Building C | 12/22/2023-1/22/2025 | $4,904.00 |
| Multicare Tacoma General | 11/15/2024-6/11/2025 | $296.00 |
| Multicare Pulse Heart Institute | 6/6/2023-12/2/2024 | $1,666.00 |
| Multicare Gig Harbor Medical | 5/1/2025 | $3,548.00 |
| Multicare TG Retail/Specialty Pharmacy | 6/27/2023 | $6.17 |
| Olympic Sports and Spine | 1/20/2026-1/28/2026 | $1,098.00 |

**The total of the above is $310,907.49.** These charges are reasonable and consistent with the charges of other, similar, medical providers during these same time periods. These charges are

consistent with the charges in Life Care Plans coordinated with other clients during these same time periods.

**LIFE CARE PLAN:**

Life Care Planning is a longstanding tool of Case Management used to coordinate current and future medical and rehabilitation needs for people who experience a serious injury or illness. A Life Care Plan is a dynamic document based upon published standards of practice, comprehensive assessment, data analysis, and research which provides an organized, concise plan for current and future needs with associated costs, for individuals who have experienced catastrophic injury or have chronic health care needs.

Ms. Larocque's condition and sequelae will require ongoing medical, rehabilitation, and durable medical equipment needs over her lifetime to enable her to maintain her life roles and responsibilities as an adult.

Based on the recommendations for current and future medical and rehabilitation needs, I have researched and identified providers, costs and frequencies of replacement for the identified equipment and items. I have completed a thorough and comprehensive coordination and facilitation of resources and costs to address medical and rehabilitation needs.

The Life Care Plan is reflective of information obtained from the available medical records, my clinical interview, consultations with Dr. Rolfe and my specialized knowledge, training, experience and clinical judgment.

Per the Life Care Planning Standards of Practice [1]and the Majority and Consensus statements derived from Life Care Planning Summits since 2000[2], the associated costs noted in the Life Care Plan are derived from a combination of costs gathered from my day costs noted in the attached Preliminary Life Care Plan are gathered from my day-to-day clinical practice, including but not limited to: Costs obtained from actual provider bills; and/or a survey of costs from geographically appropriate providers; and/or conservative estimations obtained from resources routinely relied upon within the sub-specialty practice of Life Care Planning. The cost for each item represents a base cost for geographically appropriate resources that are routinely and reliably available, now and in the future. Sales taxes, shipping, handling, and installation fees are not included, unless otherwise specified. All costs reflect the usual and ordinary charge for each item (the average cost) within a specific geographic area.

---

[1] 4th Edition published by the Life Care Planning Section of the International Association of Rehabilitation Professionals, (2022), Journal of Life Care Planning, Vol. 20, No. 3, pp 7-23.

[2] Johnson, C., Williams, C., MacKenzie, A., and Feerick, B., Consensus and Majority Statements since 2000: Updated at the 2025 Life Care Planning Summit. Journal of Life Care Planning, 23(2), 72–79.

Linda Larocque
February 23, 2026
Page 4

| ITEM | FREQUENCY | DURATION | BASE COST | TOTAL COST |
|---|---|---|---|---|
| Orthopedic Evaluation Monitoring and Treatment | Average every two years | Current Age to Life Expectancy | $398.40 | $3,187.20 |
| Cane | Average every 4 years (4 total) | Current Age to Life Expectancy | $35.00 | $140.00 |
| Walker | Average every 4 years (4 total) | Current Age to Life Expectancy | $230.00 | $920.00 |
| Manual Wheelchair | Average every 7 years (3 total) | Current Age to Life Expectancy | $1,100.00 | $3,300.00 |
| Shower Bench | Average every 7 years (3 total) | Current Age to Life Expectancy | $99.95 | $299.85 |
| Hand Held Shower | Average every 7 years (3 total) | Current Age to Life Expectancy | $39.95 | $119.85 |
| Grab bars (2) | Average every 7 years (3 total) | Current Age to Life Expectancy | $40.00 | $240.00 |
| Scooter for mobility | Average every 7 years (3 total) | Current Age to Life Expectancy | $2,315.00 | $6,945.00 |
| Batteries | Average every 2 years | Current Age to Life Expectancy | $600.00 | $4,800.00 |
| Lift for Scooter | Average every 7 years (3 total) | Current Age to Life Expectancy | $2,193.50 | $6,580.50 |
| Maintenance | Average annually | Current Age to Life Expectancy | $200.00 per year | $3,400.00 |
| Household/Chore Services[3] | Average 4 to 6 hours per week | Current Age to Life Expectancy | $48.50 per hour | $171,496.00 to $257,244.00 |

According to the 2020 Washington State Insurance Commissioners Table[4], the life expectancy remaining is an additional 17.45 years. Calculations are made utilizing 17 years. **The total costs associated with the Life Care Plan range from $196,408.70 to $287,176.45.**

---

[3] Household services are those activities which are normally performed to maintain oneself and one's family, and typically consist of such task groups as housecleaning, meal preparation and clean up, laundry, minor maintenance, lawn and garden care, transportation, shopping, and record keeping. Dr. Rolfe indicated the impact of the left knee injury resulted in impaired abilities requiring replacement for household chores, driving, etc..

[4] https://www.insurance.wa.gov/life-expectancy-table

Linda Larocque
February 23, 2026
Page 5


Please contact me should you have any comments or questions concerning this information. I reserve the right to revise or amend this report if new or additional information becomes available.

Sincerely,

*Cloie B. Johnson*

Cloie B. Johnson, M.Ed., ABVE, CCM
Vocational Rehabilitation Counselor/Case Manager

# EXHIBIT D

# <u>CURRICULUM VITAE</u>

# BRUCE ARTHUR ROLFE, M. D.

**PERSONAL INFORMATION:**

Work address:          Orthopedic Forensic Advisors, LLC
                       11900 NE 1st Street
                       Suite 300
                       Bellevue WA 98005

Phone                  Cell: (425) 417 7069

Email                  brucerolfe@gmail.com

Birthdate:             December 28th, 1957

Birthplace:            Seattle, Washington

Dependents:            Justin, Sarah, Nathaniel, and John

## <u>EDUCATION:</u>
University of Illinois, Urbana, Illinois, 1976-1977

*Bachelor of Science*
University of Oregon, Eugene, Oregon, 1977-1980

*Medical Degree*
Oregon Health Sciences University, Portland, Oregon, 1980-1984

## <u>POST GRADUATE TRAINING</u>
*Rotational Internship*
Oregon Health Sciences University, Portland, Oregon, 1984-1985.

*Orthopedic Fellowship*
Mount Sinai Medical Center, Miami Beach, Florida, 1985-1986.

*Residency in Orthopedic Surgery*
Montefiore Medical Center/The Albert Einstein College of Medicine, Bronx, New York, 1986-1990.

## <u>FELLOWSHIP</u>
Sports Medicine Fellow, Southern California Orthopedic Institute, Van Nuys, California, 1991-1992.

## BOARD STATUS

## ABOS: Orthopaedics

Initially Certified 07/15/1994-12/31/2004
Recertified 01/01/2005-12/31/2014
Recertified 01/01/2015-12/31/2024
Recertified 01/01/2025-12/31/2034

## LICENSURE TO PRACTICE
California License #G068454 (inactive)
Florida License #ME0047392 (inactive)
New York License #1628080 (inactive)
Washington License #29212 (active)

## HONORS

Top Doctors 2022, Seattle Magazine *"Seattle magazine's 22nd annual list of the best physicians in the Puget Sound region"*

## PROFESSIONAL ACTIVITIES

Current:
2022 – present        Orthopedic Forensic Advisors LLC
                      Bellevue Washington

Private Practice:

2016 – 2021           EvergreenHeath
                      Department of Orthopedics
                      Kirkland, Washington

1998 – 2016           KneeFootAnkleCenter
                      Kirkland, Washington

1991 – 1997           Orthopedic Surgery and Sports Medicine
                      Washington Orthopedics & Sports Medicine, Kirkland, Washington

1990 – 1991           Attending Orthopedist, Kaiser Permanente Hospital
                      Oakland, California

## PROFESSIONAL SOCIETIES

**American Academy Orthopedic Surgeons**

## WOK EXPERIENCE

Sports medicine, Washington Sports Medicine 1992 – 1998
    Especially knee shoulder and trauma
    Support colligate sports teams including soccer, softball and track & field
    Supported hs football Issaquah high school
Lower extremity
    KneeFootAnkleCenter 1998 – 2016
    Sports medicine knee, foot ankle injuries and surgeries.
EvergreenHealth 2016 - 2022
    Hip & Knee replacement surgery

**Clinical Experience:** 30 years in private practice
    Arthroscopic knee surgeries – 4000
    Arthroscopic shoulder surgeries - 300
    Knee replacement surgeries-  600
    Hip replacement surgeries -   300
    Patient examinations-          60,000

## PUBLICATIONS:

Rolfe, B.; Patten, R.; Sullivan, j.: Changes in tibial-femoral alignment, which occur during knee flexion-a study of normal and unicompartmental arthritic knees. Orthopefic Transactions, at press.

Rolfe, B., Bramwell, S., Scurlock, S. and Wallace, K., Outpatient ACL Reconstruction. Orthopedic Transactions, 1993.

Rolfe, B., and Sowa, D.: Mixed gonococcal and mycobacterial sepsis of the wrist. Clin. Orthopedic 257:100, August 1990.

Rolfe, B., Nordt, W., and Sallis, J.: Assessing fibular length using bimalleolar angular measurements. Foot and Ankle, 10(2): 104, October 1989.

Beals, R.K., and Rolfe, B.A.: VATER Association. A unifying concept of multiple anomalies. J. Bone and Joint Surg., 71-A: 948950, July 1989.

Rolfe, B., Rubman, M., Hannafin, J., and Sadler, A.: Fractures and dislocations associated with seizures Orthopedic Transactions, published 1989.

Rosenberg, L. and Rolfe, B.: Femoral allograft reconstruction after trauma. Orthopedic Grand Rounds. 5:10-16, December 1988.

## LECTURES AND PRESENTATIONS:

### *National & International:*

Changes In Tibiofemoral Alignment Which Occur Curing Knee Flexion – A study of Normal and Unicompartmental Arthritic Knees accepted for poster presentation Patten, R., Sullivan, J. at AAOS conference, New Orleans, February 1994.

**Outpatient ACL Reconstruction** with Bramwell, S., Scurlock, J. and Wallace K., American Academy of Orthopedic Surgeons Annual Conference. San Francisco, California, February 1992.

**Fibular Shortening in Unstable Ankle Fractures** with Liebermann, G., Distefano, M., and Sallis, J., AOA Residents Conference. Newport California, March 1990.

**Fractures and Dislocations Associated** with Seizures with Rubman, M., Hannafin, J., and Sadler, A., American Orthopedic Foot and Ankle Society Annual Meeting. Canterbury, England, November 1988.

**Seizure Associated Shoulder Injuries** with Rubman, M., Hannafin, J., and Sadler, A., American Orthopedic Foot and Ankle Society Annual Meeting. Sun Valley, Idaho, August 1989.

**Fibular Shortening in Unstable Ankle Fractures** with Liebermann, G., Distefano, M., and Sallis, J., British Foot and Ankle Society Annual Meeting. Canterbury, England, November 1988.

**Assessing Fibular Length Using Bimalleolar Angular Measurements** with Nordt, W., and Sallis, J., American Orthopedic Foot and Ankle Society Annual Meeting. Minneapolis, Minnesota, July 1988.

### *Local:*

**Creating Great Throwers,** 8th Annual Coaches Conference, Husky Stadium, August 9, 1993.

**Evaluation and Treatment of Foot Stress Fractures.** Washington Orthopedics & Sports Medicine Continuing Topics in Sports Medicine CME conference, June 1993.

**Young People with Old Knees – Advances in Evaluation and treatment of Acute Injuries,** Eureka, California, May 1993.

**Impingement Syndrome – Path mechanics and Treatment, and Biceps Tendon Problems.** Rainier Medical Imaging Center/ Washington Orthopedics Sports Medicine Joint conference – Recent Advances in Shoulder Disorders, Woodinville, Washington, April 1993

**Pay Me Now… or Pay Me Later –** Exercises and maintenance for Knees Open Community Seminar, Kirkland, Washington, March 1993.

**Operative Treatment of Patellar Instability.** Rainier Medical Imaging Center/Washington Orthopedics & Sports Medicine Joint conference – Advances in Diagnosis & Treatment of Patellofemoral Complaints, Kirkland, Washington, October 1992.

**Upper Extremity Injuries in Athletics – Initial Evaluations.** Seventh Annual Coaches Conference, Washington Sports Medicine/Department of Intercollegiate Athletics – University of Washington, Seattle, Washington, August 1992.

**Vertebral Malformations and Associated Anomalies** with Robbins, J., and beals, R., Oregon Orthopedic Society Annual Meeting, Portland, Oregon, May 1984.


**Hobbies:**
Skiing, Flying and Scuba diving

# Exhibit E

**REASON FOR THE EXAMINATION:**

Left knee injury on May 6, 2023.

**LOCATION OF EXAMINATION:**

Examination is in Bellevue, Washington.

**OTHERS IN ATTENDANCE:**

None.

**DOCTOR/PATIENT RELATIONSHIP:**

Ms. Larocque was informed that a written report would be sent to the requesting agency and that the examination was for evaluative purposes only.  Furthermore, Ms. Larocque was informed that the purpose of the examination was to address specific injuries or conditions as outlined by the requesting party, was not meant to constitute a general medical examination, and is not a substitute for a personal physician(s) or health care.  Ms. Larocque was informed at the time of the examination not to engage in any physical maneuvers beyond what could be tolerated or which were felt to be beyond their personal limits or could cause physical harm or injury.

The opinions formed in this report are based on the provided medical records and the interview and examination of the claimant on the day of the examination.  The opinions formed in this report are given "on a more-probable-than-not" basis. The conclusions of this report are subject to review if additional information is provided

Medicine is both an art and a science.  The recommendations within this report reflect the author's current understanding of medical education, experience and peer-reviewed, medical scientific literature.  Recommendations for a return to work or leisure activities are based on the accepted concepts of risk, capacity, and tolerance.  The opinions in this report do not guarantee that the claimant will not be injured with activity but do represent the assessment of risk according to the findings of this evaluation.

Records Reviewed:

1. Anchor Physical Therapy:  01/04/2023 – 04/03/2025
2. MultiCare:  01/12/2023 – 05/01/2025

**CHIEF COMPLAINT:**

Left knee pain.

**HISTORY OF PRESENT INJURY:**

Linda Larocque is a 67-year-old female who recalls an injury she sustained on May 6, 2023.  On that day, she was shopping with her husband.  She was still in the recovery phase

from left total knee replacement and thus, she used a shopping cart for stability.  As she was leaving the store, walking back out into the parking area, the cart locked up, and she ran into the car with her recently operated left knee.  She had immediate pain.  Evaluation soon after showed a nondisplaced fracture of the patella.  She was sent for physical therapy.  Several weeks went by, but her pain was excruciating, and she had increased swelling.  She was evaluated by her surgeon and deemed to have a patellar tendon rupture.  Surgery for stabilization was done June 26, 2023.

Prior to the accident, she had just completed her physical therapy.  She was walking without a cane.  She could climb and descend stairs.  Her walking endurance was up to 30-plus minutes.  Her pain relief after surgery had been dramatic.  She was extremely pleased with her improved function. She was walking without a walker or cane. Her physical therapist had noted that her range of motion was quite good at 0 to 125 degrees.  She was released from physical therapy on May 4, 2023.

She has the accident two days later, on May 6th 2023. Following the accident, she required the use of a cane.  She had significant knee swelling and pain.  She made no progress in physical therapy.  Revision surgery to repair her patellar tendon was done on June 26, 2023.  Unfortunately, two months later, on August 31, 2023, her patella once again was out of position, indicating that the surgical repair of the patellar tendon had failed.  She had a second opinion by doctor Adler resulting in an extensive total knee revision with patellectomy and a mesh graft on December 4, 2023.    The scar was quite long.  The hospitalization was one week and required an extensive period of bracing with restricted motion and then casting.  The post operative casting was three months.  The cast caused a significant limitation in her mobility.  Also, the cast had suspension issues slipping down against her foot causing pain and abrasions.

Her mobility was quite impaired.  Her weight bearing was restricted to toe-touch. She had limited mobility with a walker and often had to use a wheelchair.

Following her casting, she was braced for another three months.

She completed physical therapy after her patellectomy and knee revision.  However, her functional limitations are significant and persist.

Her low back became painful during the rehabilitation due to restrained left leg weight bearing and casting. Her low back has been treated with physical therapy, but daily and pain persists.

Her right knee arthritis has flared since the accident. The right knee has received several injections. A conversation between Ms. Larocque and her treating physician has started about doing right knee replacement.

## CONDITION PRIOR TO ACCIDENT:

Condition activities prior to the accident included gardening. She did wedding planning and floral arrangements. She cooked extensively and routinely.  She did housework.  She went shopping, and she would drive.

She was able to help her daughter-in-law, who is a nurse, providing parenting/daycare services for her two year old grand-daughter.  She was sole care provider for the grand-daughter prior to the accident.  She had returned to full parenting capacity following her knee replacement and prior to the accident.

## CURRENT CONDITION:

Her left knee aches every day.  The aching extends up into the hip and causes a limp.  She requires the use of a cane in her right hand.  She has difficulty sleeping.  She has to ice on and off every day, more or less continuously.  She is unable to drive. She can do gardening, but it is quite limited.  She has to place seats in certain areas so that she can do some potting, etc., while sitting.

She cooks in a limited fashion while sitting.  She can do some housework, but mostly, it is whatever she can do while sitting.

She has difficulty with stairs, doing them one by one, and requires a railing.

She has low back pain radiating into left posterior hip pain with any walking activity.  Her right knee is also painful, and knee replacement has been recommended on her right knee. She is aware that she puts additional strain on her right knee as a result of protecting her left.

## WORK:

Semi-retired.  Wedding planning and floral arrangements.

## RECREATION:

Cooking

## ACTIVITY OF DAILY LIVING:

Limited in standing, walking, stairs, and lifting.

## PAST MEDICAL HISTORY:

Past medical history includes hypertension, sleep apnea, depression, and supraventricular tachycardia.  Special procedure:  CPAP.

**REVIEW OF SYSTEMS:**

**MEDICATIONS:**   Medications include alprazolam, aspirin, duloxetine (Cymbalta), hydrochlorothiazide, hydroxyzine, lisinopril, Ozempic – currently off, Crestor, tramadol – currently off, and verapamil.

**ALLERGIES:**   Allergies of December 23, 2024, include Effexor, Paxil, pravastatin, Prozac, Zoloft, codeine, Lipitor, metoprolol, Voltaren, and simvastatin.

**HABITS:**  non-smoker

**FAMILY HISTORY:**

Non-contributory

**SOCIOECONOMIC HISTORY:**

**MARITAL STATUS:**  Married

**MILITARY SERVICE:**  None.

**EDUCATION:**  High school.

**OCCUPATION:**  She previously worked at Nordstrom in Bellevue in housekeeping.  She was a school teacher's assistant and playground supervisor until she retired in 1998.

**RECORD REVIEW:**

2019 - 2023    Accident & Injury Chiropractic,  Multiple visits for cervical, thoracic and lumber treatments.

**2021 -2024**    Achor Physical Therapy. 80 + visits addressing low back pain and left knee arthritis before and after surgeries. Several visits discuss right knee pain due to increased stress protecting left knee. Neck pain addressed 2021. Left hip complaints addressed 2021, and 2023 prior to and after surgery.

05/15/2021    Lakewood Family Practice. Treater Rachel Dawson MD. Refill Cymbalta and hydrocodone for chronic pain syndrome due to degenerative spine disease and myofascial pain syndrome.

10/14/2018     Lakewood Family Practice. Chronic pain management with Cymbalta and hydrocodone. Back and knee issues.

10/18/2018     Lakewood Family Practice. 2 day history of right knee pain. Likely sprain or flare of underlying arthritis.

05/01/2019     Lakewood Family Practice. Chronic pain management with Cymbalta and hydrocodone. Back and knee issues.

08/18/2019     Lakewood Family Practice. Chronic pain management with Cymbalta and hydrocodone. Back and knee issues.

12/24/2019     Lakewood Family Practice. Chronic pain management with Cymbalta and hydrocodone. Back and knee issues.

09/03/2020     Lakewood Family Practice. Chronic pain management with Cymbalta and hydrocodone. Back and knee issues.

11/10/2020     Lakewood Family Practice. Chronic pain management with Cymbalta and hydrocodone.

02/08/2021     Lakewood Family Practice. Treater Rachel Dawson MD. Refill Cymbalta and hydrocodone for chronic pain.

02/23/2021     Lakewood Family Practice. Treater Rachel Dawson MD.    Follow-up chronic pain from spinal arthritis myofascial muscle pain. She is going to chiropractor for adjustments and it is helping. Continue to have pain neck and her left low back area and left lateral hip has been more painful since the fall 11/2019.

04/05/2021     Lakewood Family Practice. Treater Rachel Dawson MD. Follow up for chronic pain. Complaints include neck, low back, left knee. Treatment includes Tylenol and hydrocodone.

05/21/2021     MultiCare Orthopedics. Evaluation for left knee pain. Treater was William Thompson MD. Linda presents for evaluation of left knee. She describes a history of multiple falls in 2015 when she landed on her left knee. She had two falls in 2016. She has some chronic low back pain with degenerative disc disease. Physical exam includes body weight at 264 lbs. Height 5 foot 5 inches. Antalgic limp. Left knee range of motion 10 to 100°. Plan is non-surgical at this time. Consider surgery once BMI is approximately 38.

05/25/2022     Lakewood Family Practice. Follow up for management of chronic non cancer pain. Impression: lumbar disc disease, chronic pain syndrome, major

depressive disorder, myofascial pain, obstructive sleep apnea, primary osteoarthritis multiple joints, BMI 45 to 49.9. Treatment: Hydrocodone.

06/03/2021    MultiCare Orthopedics. Evaluation for left knee pain. Treater was William Thompson MD. Continue conservative care with medical optimization and weight loss.

06/14/2021    Lakewood Family Practice. Chronic pain management with narcotic support.

11/09/2021    MultiCare Orthopedics. Evaluation for left knee pain. Treater was William Thompson MD. Follow up on treatment plan for left knee arthritis. She has been working in physical therapy and chiropractic care period she has been losing weight. Diabetes is well controlled with hemoglobin A1C at 6.5. Range of motion 10 to 100° Plan is to evaluate with pulmonologist and cardiologist in preoperative assessment.

11/29/2022    Lakewood Family Practice. Just completed emergency laser eye surgery for retinal tear. Having a hard time with balance due to her knee pain. Can't carry groceries due to fear of falling. Annual exam completed. Treater was Rachel Dawson MD.

01/04/2023    Anchor Physical Therapy.  This is noted to be visit number 10, with an initial treatment date of December 6, 2022, for diagnoses of myalgia, other site, and low back pain.  Ms. Larocque reported she was still having left knee pain, but it was improving.  Chiropractic seemed to be helping her back.  She was performing a home exercise program.

12/22/2022    MultiCare Orthopedics. Evaluation for left knee pain. Treater was William Thompson MD. Exam shows antalgic limp. Various deformity of the left knee. Range of motion 10 to 100°. X-rays show advanced Tri compartmental arthritis, Kellgren Lawrence grade four. Conservative and surgical options discussed. Plan for the left total knee replacement.

01/05/2023 &
01/12/2023    Physical therapy provided on January 5, 2023, and January 12, 2023.

01/12/2023    Anchor Physical Therapy.  Patient Progress Note.  Ms. Larocque had been scheduled for left total knee arthroplasty on February 8, 2023, and she was provided with prerehabilitation material.  She appeared to be responding to physical therapy at a fair level, and the degree of lumbosacral tissue irritation and continued hip/core weakness would be a potential challenge for her after her procedure, and her progression of physical therapy had been limited by this.

01/12/2023    MultiCare Orthopedics and Sports Medicine.  Alexandria Bones, PA-C.  Ms. Larocque was seen for preoperative examination and was cleared for surgery.

01/12/2023    MultiCare Pulmonary Specialists.  Lam-Phuong Nguyen, MD.  Ms. Larocque was seen for sleep apnea follow-up.  She had not been seen since July 2021.  She demonstrated excellent compliance with her APAP.  She would be considered low risk from a pulmonary standpoint for upcoming knee replacement surgery.

01/12/2023    Allenmore Diagnostic Imaging.  Chest x-ray was read by Lawrence Tang, MD.

01/17/2023 –
02/02/2023    Physical therapy provided on January 17, 2023; January 19, 2023; January 24, 2023; January 26, 2023; and February 2, 2023.

01/26/2023    MultiCare Lakewood Family Practice.  Rachel Dawson, MD.  Ms. Larocque was seen for a rash in her groin area.

02/06/2023    Anchor Physical Therapy.  Patient Progress Note.  Ms. Larocque continued to have left knee and lower extremity discomfort.  She had recently traveled to San Diego, which may have flared her symptoms.  She would return three weeks post total knee arthroplasty for physical therapy follow-up.

02/07/2023    Physical therapy provided on February 7, 2023.

02/08/2023    Left knee total knee arthroplasty.  W. Frederick Thompson, MD.  (PDF Multicare – MC_000001-3185, page 1707)

02/15/2023    MultiCare Lakewood Family Practice.  Rachel Dawson, MD.  Ms. Larocque was seen in follow-up from her hospital stay for surgery.  She felt like her chronic pain was better.

02/20/2023    Anchor Physical Therapy.  Patient Evaluation.  Ms. Larocque was feeling less pain than she had prior to surgery but now felt more "surgery pain."  Home exercise program provided by the hospital was reviewed.  She appeared to have a good prognosis.

02/22/2023 –
03/21/2023    Physical therapy provided on February 22, 2023; March 1, 2023; March 7, 2023; March 9, 2023; March 14, 2023; March 16, 2023; and March 21, 2023.

02/28/2023    MultiCare Orthopedics and Sports Medicine.  Alexandria Bones, PA-C.  Ms. Larocque presented for postoperative follow-up.  She stated she was doing very well and was very pleased with her progress thus far.  She stated

she had already noticed pain relief as compared to prior to surgery. She had begun physical therapy.

03/23/2023    Anchor Physical Therapy. Patient Progress Note. Ms. Larocque had been progressing well overall but appeared to have self-progressed too quickly and had developed right knee irritation and walked with more of a limp and limited ability to participate with her daily activities. She was right on track and meeting her goals.

03/28/2023 –
04/25/2023    Physical therapy provided on March 28, 2023; March 30, 2023; April 4, 2023; April 6, 2023; April 10, 2023; April 13, 2023; April 18, 2023; April 20, 2023; and April 25, 2023.

03/28/2023    MultiCare Orthopedics and Sports Medicine. Alexandria Bones, PA-C. Ms. Larocque was very pleased with how she was recovering from her left total knee replacement. She had made excellent progress on range of motion in physical therapy and was working on strengthening. Range of motion was 0 to 125 degrees.

04/27/2023    Anchor Physical Therapy. Patient Progress Note. Ms. Larocque was trying to keep up with her home exercise program and self-progressing. She had been progressing well with her ability to walk, stand, and go up and down steps. Her active knee range of motion was progressing well, and she had diminished level of edema to a mild level.

05/02/2023 –
05/25/2023    Physical therapy provided on May 2, 2023; May 4, 2023; May 10, 2023; May 11, 2023; May 15, 2023; May 18, 2023; May 23, 2023; and May 25, 2023.

05/09/2023    MultiCare Orthopedics and Sports Medicine. Alexandria Bones, PA-C. Ms. Larocque reported she had been progressing nicely and had been discharged from physical therapy until a week prior, when she hit her knee on a shopping cart, making her stumble. She had been using the cart as support when it suddenly locked up, and she was told that the carts do that automatically if they do not go through the register. She had had pain since then and felt that she had taken steps back in recovery. Her right knee had also become increasingly painful since April 19, when she was kneeling on the floor and felt a pop upon standing. She stated it felt like a shift in the knee, and she had difficulty weightbearing initially.

On physical examination, the left knee demonstrated moderate soft tissue swelling, most significantly to the contusion area of impact, with trace effusion. She had full range of motion with discomfort. The right knee demonstrated mild soft tissue swelling and diminished range of motion secondary to discomfort, with increased tenderness to joint line.

She was reassured that with some time her knee should return to prior function and comfort. She would continue conservative measures. A course of physical therapy was recommended for the right knee.

05/09/2023   MultiCare Orthopedics and Sports Medicine Imaging. Left knee x-rays were read by W. Frederick Thompson, MD. Impression: Left total knee arthroplasty with satisfactory position of implants. Small avulsion fracture at inferior tip of patella with satisfactory patella position, recommend clinical correlation regarding extensor mechanism competence. Possible osteochondral loose body suprapatellar.

05/16/2023   MultiCare Orthopedics and Sports Medicine. Alexandria Bones, PA-C. Ms. Larocque stated she was still experiencing increased left knee pain, which she stated had become radiating down her leg into her shin and also into her left hip. She had also noted some popping noises. She stated she had gone significantly backward and was unable to complete her physical therapy session due to pain and had to use her cane at all times. She had resumed physical therapy, but her therapist had to do limited modalities. She was encouraged to continue efforts with physical therapy and continue conservative measures and use of an ambulatory aid.

05/25/2023   Anchor Physical Therapy. Progress Note. Ms. Larocque reported she saw a chiropractor for the first time. She had a slight knee adjustment and felt she did okay but did throw up. She indicated the knee remained irritated but was better since the adjustment. She was walking with a cane at all times, advanced from a walker, and needed to stop after two to three minutes. She had had a setback, and they were currently addressing her elevated edema and pain and reestablishing motor control to help with her degree of function and safety.

06/01/2023 –
06/08/2023   Physical therapy provided on June 1, 2023; June 6, 2023; and June 8, 2023.

06/01/2023   MultiCare Orthopedics and Sports Medicine. Alexandria Bones, PA-C. Ms. Larocque stated her left knee continued to be significantly painful and described a sensation of feeling like her scar is ripping. Physical therapy had been difficult. She was increasingly frustrated by her setback and slow progression back to where she was prior to the incident. Plan was unchanged. Massage was added to her regimen.

06/08/2023   Anchor Physical Therapy. Progress Note. Ms. Larocque stated she had more good than bad days but noted her level of activity remained very limited. She was frustrated with her progress. She had an injury with a

shopping cart in early May and returned to physical therapy on May 10, 2023.  She had been making fair progress overall.

06/13/2023 –
06/22/2023    Physical therapy provided on June 13, 2023; June 15, 2023; June 20, 2023; and June 22, 2023.

06/22/2023    MultiCare Orthopedics and Sports Medicine Imaging.  Left knee x-rays were read by W. Frederick Thompson, MD.  Impression:  Left knee total knee replacement with patella alta consistent with infrapatellar tendon rupture.  Osteochondral loose body left knee.

06/22/2023    MultiCare Orthopedics and Sports Medicine.  Alexandria Bones, PA-C.  Ms. Larocque had noticed a worsening of her left knee over the past two to three weeks.  The pain was constant and could be sharp and stabbing to a dull ache.  She was unable to lift the leg and had to have manual assistance to do so.  This was affecting her ability to do her own activities of daily living and also had a significant impact on her mental status.  Her decline could be directly attributed to the incident with the shopping cart.  X-rays findings were consistent with left patellar tendon avulsion/rupture.  They would proceed with emergent surgical intervention.

06/26/2023    MultiCare Interventional Cardiology.  Daniel Guerra, MD.  Ms. Larocque was seen for cardiovascular follow-up for known coronary artery disease, which was stable.

06/26/2023    Left knee repair of infrapatellar tendon – primary without graft.  W. Frederick Thompson, MD.  (PDF Multicare – MC_003214-3474, page 30)

07/06/2023    MultiCare Orthopedics and Sports Medicine.  Alexandria Bones, PA-C.  Ms. Larocque was seen for postoperative follow-up.  She described having intense pain in the recovery room and sensation of deep burning, but her discomfort was now tolerable.  She stated the brace continued to drift down her leg and was causing irritation to the positive leg.  On physical examination, the left leg was maintained in full extension during the visit.  Staples were removed, and knee immobilizer was adjusted and placed.  She was progressing as expected.  The importance was stressed to her of maintaining full extension and wearing the brace at all times except for showering.  She could be weightbearing with the brace in place.

08/03/2023    MultiCare Orthopedics and Sports Medicine.  Alexandria Bones, PA-C.  Ms. Larocque stated she was doing okay but had started to have some mild left hip pain.  She had moderate soft tissue swelling and limited range of motion on examination.  She was healing without complications.  She was placed in a range-of-motion brace and set at 0 to 40 degrees, and she would progressively advance this every week.  She was to continue home exercise

program, and formal physical therapy would be initiated at next follow-up in one week.

08/10/2023    MultiCare Orthopedics and Sports Medicine.  Alexandria Bones, PA-C.  Ms. Larocque was having increased pain, mainly to her hip and groin region, and she stated the discomfort increased as she attempted to lift her leg.  She was still having difficulty with the brace sliding down.  Flexion was 80 degrees.  The brace was readjusted to 0 to 90 degrees, and she was to continue to wear the brace at all times.  Once she was comfortably stabilized at 90 degrees, she could begin weaning from the brace.  She should continue using an ambulatory assistive device.

08/15/2023    Anchor Physical therapy.  Reevaluation Note.  Ms. Larocque returned to physical therapy after having a second surgery on June 22, 2023, in which she had to have her left kneecap repositioned and stabilized.  She had been on nonweightbearing to partial weightbearing and returned walking with a front-wheeled walker and weightbearing as tolerated.

08/18/2023 –
08/30/2023    Physical therapy provided on August 18, 2023; August 21, 2023; August 23, 2023; August 28, 2023; and August 30, 2023.

08/31/2023    MultiCare Orthopedics and Sports Medicine.  Alexandria Bones, PA-C.  Ms. Larocque felt like her knee had stayed the same, despite physical therapy.  She had intermittent shooting and stabbing pain, as well as a burning sensation up to the lateral superior portion of the knee.  She was using the brace for support as well as ambulatory, as she did not feel stable without it.  Range of motion was 5 to 100 degrees.  She was unable to perform straight leg raise.  X-rays were performed and reviewed, and there was concern for patella position with change from initial postoperative films.  She was instructed to continue the brace and hold physical therapy at that time.  Her case would be discussed with her surgeon, and they would contact her with a plan.

09/29/2023    MultiCare Orthopedics and Sports Medicine.  Zachary Adler, MD.  Ms. Larocque was seen in the Adult Reconstruction Clinic for consultation.  She reported that her pain and dysfunction were worsening.  On physical examination, range of motion of the left knee was -48 to 126 active and -2 to 126 passive with crepitus.  She had positive medial and lateral joint line tenderness and 2+ effusion.  Left knee alignment was neutral, and there was flexion contracture present.  She had 4/5 motor strength in the ankle and toes.  She had an antalgic gait.  X-rays were independently reviewed and demonstrated severe patella alta with complete disruption of the extensor mechanism and a likely periprosthetic fracture off the inferior pole.  Assessment was left patella tendon rupture, status post left total knee replacement.  Treatment options were discussed, and she would be scheduled for conversion to a hinged total knee replacement with

reconstruction of the extensor mechanism and patellectomy, which would require two to three months of immobilization in a long-leg cast.

11/02/2023   MultiCare Lakewood Family Practice.   Rachel Dawson, MD. Ms. Larocque was seen for chronic pain management follow-up.  She had multiple stressors surrounding her left knee issues.  Impression included chronic pain syndrome; primary osteoarthritis of left knee; myofascial muscle pain; degeneration of lumbar or lumbosacral intervertebral disk; primary osteoarthritis involving multiple joints; Major Depressive Disorder, recurrent episode, moderate; and obstructive sleep apnea, obesity with BMI 45 to 49.9. Oxycodone and Cymbalta were refilled.

11/22/2023   MultiCare Orthopedics and Sports Medicine Imaging.  Left knee x-rays were read by Zachary Adler, MD.  Impression:  Left total knee arthroplasty in place.  Severe patella alta with complete disruption of the extensor mechanism.  Likely periprosthetic patella fracture off the inferior pole.

11/22/2023   MultiCare Orthopedics and Sports Medicine.  Shane Turner, PA-C. Ms. Larocque was seen for preoperative examination and was cleared for surgery.

12/04/2023   Left revision hinged total knee arthroplasty, extensor mechanism reconstruction, patellectomy, and disposable negative pressure wound therapy. Zachary Adler, MD.  (PDF Multicare – MC_003214-3474, page 106)

12/14/2023   MultiCare Lakewood Family Practice.   Rachel Dawson, MD. Ms. Larocque presented for follow-up of hospital admission and pain management.   They planned to stop morphine and switch over to hydrocodone.

12/22/2023   MultiCare Orthopedics and Sports Medicine Imaging.  Left knee x-rays were read by Zachary Adler, MD.  Impression:  Stable left revision total knee arthroplasty with associated findings as outlined above.

12/22/2023   MultiCare Orthopedics and Sports Medicine.  Shane Turner, PA-C. Ms. Larocque was doing well postoperatively.  She had been wearing the hinged knee brace locked in extension as directed.  She otherwise had no new complaints.  On examination, she had mild tenderness to palpation throughout the left knee with moderate effusion.  Imaging revealed an intact-appearing left total knee arthroplasty.  She was placed into a long-leg cylinder fiberglass cast and would be casted for a total of two and a half months.  She could continue weightbearing as tolerated in the cast.

12/28/2023   MultiCare Orthopedics and Sports Medicine.  Andrea Steele, MA. Ms. Larocque was seen for cast adjustment.  The ankle cuff was not protecting the edges as it should be and was starting to rub a sore area.  They

were able to provide a fix until her orthopedic follow-up the following week.

01/05/2024     MultiCare Orthopedics and Sports Medicine. Shane Turner, PA-C. Ms. Larocque was doing well. She was placed back into a long-leg fiberglass cast. She could be heel weightbearing for transfers.

02/02/2024     MultiCare Orthopedics and Sports Medicine. Shane Turner, PA-C. Ms. Larocque presented for a cast change. She was doing well. She had minimal tenderness to palpation about the left knee surgery site and minimal effusion. She would return in one month for transition back to her hinged range-of-motion brace.

02/08/2024     MultiCare Lakewood Family Practice. Rachel Dawson, MD. Ms. Larocque presented for pain management follow-up. Her case was rubbing on her Achilles tendon and was very painful. She was changed from Victoza to Ozempic for diabetes and weight loss. Xanax and tramadol were refilled.

02/09/2024     MultiCare Orthopedics and Sports Medicine. Shane Turner, PA-C. Ms. Larocque presented for a cast check. Her cast was modified about the Achilles to relieve pressure.

03/01/2024     MultiCare Orthopedics and Sports Medicine Imaging. Left knee x-rays were read by Zachary Adler, MD. Impression: Stable left revision total knee arthroplasty with associated findings as outlined above.

03/01/2024     MultiCare Orthopedics and Sports Medicine. Zachary Adler, MD. Ms. Larocque was doing well postoperatively. She had completed physical therapy and had resumed full activity in keeping with standard restrictions for total joint replacement patients. She had not returned to work or her previous activities and required analgesics for the operative knee. Her cast was removed without complications. On physical examination, she had 0 to 20 degrees of active range of motion of the left knee. She had no hip pain at extreme ranges of motion. There was 1+ effusion. Distal neurovascular examination was normal. A physical therapy prescription was provided to initiate range of motion, and she was placed back into her hinged knee brace set at 0 to 45 degrees, which she would maintain for one month. She would increase to 60 degrees for one month, then to 90 degrees for one month. She could be weightbearing as tolerated in the brace locked in full extension. She would continue activity as tolerated per total knee arthroplasty protocol.

03/06/2024     Anchor Physical Therapy. Initial Evaluation Note. Ms. Larocque was now wearing a left knee brace, with the knee fixed at 0 to 40 degrees. She was having a moderate level of deficits with walking with her front-wheeled

walker. She had a moderate level of pain/discomfort, and her level of irritation had been more constant.

03/07/2024 –
04/02/2024      Physical therapy provided on March 7, 2024; March 12, 2024; March 14, 2024; March 19, 2024; March 22, 2024; March 26, 2024; March 28, 2024; April 1, 2024; and April 2, 2024. which

04/02/2024      Anchor Physical Therapy. Progress Note. Ms. Larocque stated her left knee pain had declined, but the region along the scar and the gastrocnemius was tender. She was having more issues with walking and felt that was affecting her back, which was irritating her back and slowing her down. She had not pushed herself but was not actively not doing anything. She had been dedicated to her home exercise program and appeared ready to progress more, but they would need the splint restrictions modified to allow additional knee flexion. Her prognosis was good.

04/02/2024      MultiCare Lakewood Family Practice. Rachel Dawson, MD. Ms. Larocque was out of a wheelchair and using a walker. She was attending physical therapy and doing home exercise program. She was upset at how much weight she had gained but could now start cooking more appropriate food. She was sitting comfortably with no pain behaviors on examination and was able to stand up on the first try using her hands. Gait was slow with walker and knee brace. Health maintenance issues were discussed.

04/09/2024 –
04/30/2024      Physical therapy provided on April 9, 2024; April 11, 2024; April 16, 2024; April 18, 2024; April 23, 2024; April 25, 2024; and April 30, 2024.

04/12/2024      MultiCare Orthopedics and Sports Medicine. Zachary Adler, MD. Ms. Larocque was doing well. She had returned to work and/or previous activities and was not requiring analgesics for the left knee. Range of motion was passively to full extension and actively -6 to 72 degrees. There was no laxity to varus or valgus stress at full extension and midflexion. She was placed back into the hinged knee brace set at 0 to 70 degrees, which she would maintain for two weeks and then increase to 90 degrees for one month. She could work on active and passive range of motion exercises and begin resisted extension.

04/30/2024      Anchor Physical Therapy. Progress Note. Ms. Larocque reported improvement in overall functioning and was 50 percent better in the left knee. Her back felt about 20 percent better. She reported constant mild pain in her right knee that got up to 5/10.

05/02/2024 –
05/30/2024    Physical therapy provided on May 2, 2024; May 7, 2024; May 9, 2024; May 14, 2024; May 16, 2024; May 21, 2024; May 23, 2024; and May 30, 2024.

05/15/2024    MultiCare Lakewood Family Practice. Rachel Dawson, MD. Ms. Larocque stated that getting over her left knee surgery had been tough. She was still struggling with mobility issues but was getting better every day. She really wanted to lose weight and be more mobile. She would pay the copayment for Ozempic as Victoza was no longer covered.

05/24/2024    MultiCare Orthopedics and Sports Medicine. Zachary Adler, MD. Ms. Larocque had not completed physical therapy yet. She reported lower right back and hip pain. She had been ambulating with a locked brace and walker. On examination, active range of motion was to -15 degrees, and active range of motion was 0 to 104 degrees. She could unlock her hinged knee brace on June 1, 2024, and then wean out of it on June 8, 2024, and wean off her assistive device as function and balance allowed.

05/28/2024    MultiCare Lakewood Family Practice. Rachel Dawson, MD. Ms. Larocque reported that she had aggravated her chronic back issues. She stated on May 4, 2024, one of her grandchildren jumped on her right leg while she was sitting in bed, and she had had pain in her right leg and low back ever since. The pain shot down her leg from her back, mainly when she was walking. She would walk with her walker, but it was painful. She could not do physical therapy currently because of the pain so had put that on hold. She was overall much better than right after the injury but was still not back to baseline.

On physical examination, her gait was normal without a limp. She could heel walk and toe walk with discomfort, but there was no discomfort on dorsiflexion or plantarflexion. Hip range of motion was intact, but there was slight medial groin discomfort to palpation, which she felt was not the joint but her myofascial pain issue. There was knee discomfort with range of motion, especially medially. Assessment included right lumbar radiculopathy. She elected to try chiropractic care first for her pain.

05/30/2024    Anchor Physical Therapy. Progress Note. Ms. Larocque stated she had made 85 to 90 percent progress with her left knee in terms of improving functioning. Her biggest issue at that point was low back pain, which she believed was caused as a result of compensation for her left knee during gait. She requested to be provided activities to address this.

06/04/2024    Physical therapy provided on June 4, 2024; June 6, 2024; June 11, 2024; June 13, 2024; June 18, 2024; June 20, 2024; June 25, 2024; June 27, 2024; and July 2, 2024.

07/02/2024    Anchor Physical Therapy.  Progress Note.  Ms. Larocque reported a "pulling/tearing" sensation in her right thigh that was really concerning to her because it had not been improving significantly despite multiple conservative measures.  She stated, "My quality of life isn't where it needs to be."  The left knee had been doing "pretty good."

07/10/2024    DEXA bone density study.  Anand Suresh, MD.  Impression:  The patient has normal bone mass.

07/10/2024    MultiCare Orthopedics and Sports Medicine.  Zachary Adler, MD. Ms. Larocque's primary complaint at that time was progressively severe right knee pain.  Left knee range of motion was 0 degrees passive and -18 to 114 degrees actively.  Right knee range of motion was 0 to 114 degrees. Examination revealed positive crepitus, joint line tenderness, and 2+ effusion.  Assessment was progressively severe right knee degenerative joint disease.  She had clinical and/or radiographic findings that supported right total knee arthroplasty, but she would need to get her weight down below 260 pounds before proceeding.  Injection was performed in the office. She would continue the hinged knee brace for the left knee and could wean off the walker/cane as she was able.

07/10/2024    Right knee intra-articular injection.  Zachary Adler, MD.  (PDF Multicare – MC_003214-3474, page 205)

08/05/2024    MultiCare Lakewood Family Practice.  Rachel Dawson, MD. Ms. Larocque had not recovered from the injury where her grandchild jumped on her leg.  She did not go to the chiropractor, and physical therapy just seemed to make things worse.  The injection she received helped for about two weeks.  Her back pain continued unchanged.  She needed right knee joint replacement surgery but needed to get her weight down to 245 pounds.  She was cheerful on examination but discouraged with her mobility limitations due to the right knee.  She was to continue chiropractic and increase Ozempic to aid in weight loss.

08/08/2024    Physical therapy provided on August 8, 2024.

08/08/2024    Anchor Physical Therapy.  Discharge Summary.  Ms. Larocque reported she had the mobility to do all of her usual activities.  She stated when she did not do the exercises, things began to feel tight.  She was unable to drive due to right thigh pain.  She stated her back was not getting any better.  Right total knee arthroplasty was awaiting scheduling possibly end of 2024 or beginning of 2025.  She was agreeable to discharge from physical therapy to a home exercise program.

11/05/2024    MultiCare Lakewood Family Practice.  Rachel Dawson, MD. Ms. Larocque was having worsening back pain and was walking with the aid of a walker or cane.  Regarding her depression, the year had been a really

hard one for her, but she had been doing better lately. She had had a really negative attitude. She had responded well to chiropractic in the past, but it was difficult for her to continue care due to finances. She would continue Ozempic.

12/02/2024    MultiCare Interventional Cardiology. David Guerra, MD. Ms. Larocque presented for follow-up and seemed stable from this standpoint. She would continue her cardiac medications.

12/23/2024    MultiCare Lakewood Family Practice. Rachel Dawson, MD. Ms. Larocque presented for six-month pain medication review. She stated her back was the main issue. Her left knee got pain in the anterior portion and electric shocks from time to time. It did not feel stable, but she had not fallen. Her right leg was dragging at times, and she felt off balance when walking. On examination, she had some tenderness to palpation of the anterior knee. Back range of motion was intact but with discomfort. She was nontender to palpation along the spine but had pain in the entire lumbar area otherwise. Gait was normal without limp or foot drop, but she was almost shuffling. No balance issues. Her pain medications were refilled: tramadol and Cymbalta..

01/08/2025    MultiCare. X-rays of the lumbar spine were read by an unknown provider. Impression: No acute findings in the lumbar spine. Multilevel degenerative changes.

01/16/2025    Anchor Physical Therapy. Physical Therapy Initial Evaluation Note. Ms. Larocque noted she had significantly declined since discharge from physical therapy in August 2024 where she was ambulating with a single-point cane. She noted persistent swelling in the left knee with episodes of instability and buckling occasionally. She had been experiencing despondency, with periods of not wanting to get out of bed for the last five to six months. She had not been compliant with her home exercise program due to her physical and emotional state.

01/22/2025    MultiCare Orthopedics and Sports Medicine. Zachary Adler, MD. Ms. Larocque reported the same moderate right knee pain, with no improvement with conservative measures. She experienced instability in both of her knees. Left knee range of motion was -24 degrees passively and 0 to 114 degrees actively with positive crepitus. Right knee range of motion was 0 to 128 degrees with crepitus with medial joint line tenderness and 1+ effusion. She was classified as having Kellgren-Lawrence grade 4 arthritis of the right knee, with degenerative changes most severe in the patellofemoral compartment. Right knee injection was performed in the office. She had met criteria for right total knee arthroplasty, but she did not want surgical intervention at that time and wanted to continue with nonoperative treatments.

01/22/2025    Right knee intra-articular injection.  Zachary Adler, MD.  (PDF Multicare – MC_003214-3474, page 239)

01/23/2025 –
02/13/2025    Physical therapy provided on January 23, 2025; January 28, 2025; January31, 2025; February 4, 2025; February 6, 2025; February 11, 2025; and February 13, 2025.

02/13/2025    Anchor Physical Therapy.  Physical Therapy Progress Note.  Ms. Larocque expressed concern about using up her appointments, especially with potential right knee surgery planned for summer.  She had been adhering to her home exercise program.  She had subjective reports of mild improvement in right knee pain and function.  She still demonstrated significant impairments in bilateral, left greater than right, knee extension strength and gait stability without use of a front-wheeled walker.

02/20/2025 –
04/03/2025    Physical therapy provided on February 20, 2025; February 27, 2025; March 5, 2025; March 13, 2025; March 21, 2025; March 27, 2025; April 10, 2025; and April 3, 2025.

03/25/2025    MultiCare Lakewood Family Practice.  Rachel Dawson, MD. Ms. Larocque did not feel that she was making much progress in physical therapy for strengthening her leg.  She could not walk very far at all and was very disabled.  Although she had knee joint arthritis, she did not feel it was the knee pain that was stopping her from being able to continue walking.  She needed to lose weight to have a knee replacement. Assessment was that she was failing conservative management with physical therapy.  They recommended a lumbar spine MRI.

04/02/2025    MultiCare Interventional Cardiology.  David Guerra, MD.  Ms. Larocque was seen for follow-up of her chronic coronary artery disease, which seemed stable.

05/01/2025    MultiCare.  MRI of the lumbar spine without contrast was read by an unknown provider. Impression: (1) Suggestion of presence of lumbosacral transitional vertebrae with lumbarized S1.  There are 12 paired thoracic ribs that are confirmed on a chest CT of November 15, 2012.  Numbering is counted from above beginning with the first rib-free vertebra as L1 to be consistent.  Attention recommended if there is any future plans for intervention.  (2) No MRI evidence of acute osseous abnormality of the lumbar spine identified.  (3) Advanced degenerative disk at L1-L2 with obliteration of disc space associated with fusion of the vertebral bodies. (4) Mild to moderate degenerative disk within the remaining lumbar levels, most prominent at L4-L5 and LS-S1.  (5) Combination of spondylosis, ligamentum flavum complex hypertrophy, and facet nephropathy resulting in moderate spinal canal narrowing and moderate bilateral neural foraminal

stenoses at L4-L5 and L5-S1. (6) Also, mild neural foraminal stenoses at L1-L2, L2-L3, and L3-L4. (7) Chronic degenerative 4-millimeter retrolisthesis of L1 over L2, 3-millimeter anterolisthesis of L4 over L5, and 4-millimeter anterolisthesis of L5 over S1.

12/02/2025    TRA medical imaging, MRI Left ankle. History of left ankle injury, peroneal tendon injury. Impression severe peroneal longus tendinopathy with high grade partial thickness to near full thickness tearing. Fluid in the tendon sheath suggesting potential tenosynovitis. Read by Anand Suresh MD.

01/20/2026    Physical therapy initial assessment. Treater Hardeep Gill PT. Linda Larocque is a 67-year-old female who presents today with left ankle pain due to a turn on stairs. She was on the first set of stairs and turning to go up onto the landing when she heard a pop and felt some felt like immediate pulling. Date of onset November 20th, 2020, five. She saw a doctor on the 25th. The whole bottom of her foot was bruised on the side. X-rays we're done and negative an MRI was ordered. She recently had an injection in her hip for a different pain. She had three knee surgeries on her right including total knee, kneecap replacement, and another total knee she had tendons taken from ankle to anchor her knee. *(Editor's note: the ankle tendon transfer idea was not supported by the op reports).*

Linda Larocque has clinical signs and symptoms consistent with left ankle sprain, possible peroneal tendon tear she is unable to walk to get groceries, stair negotiation requires railing, going to the basement patient walks backwards. Possibly impacting POC (point of care) includes 3 knee surgeries on left knee in the span of 10 months. Complex trauma on knee post total knee replacement. Recommend 12 visits physical therapy.

1/20/26 –    Four visits of Physical Therapy provided
1/30/26

**BILLS:**

Charges for Anchor Physical Therapy, 2023-2025, reviewed.

Charges for MultiCare, 2019, 2021-2025, reviewed.

Charges for Olympic Sports and Spine 2026, reviewed.

**<u>PHYSICAL EXAMINATION</u>:**

On physical exam, she is a healthy-appearing female in no apparent distress. She walks with an obvious limp and requires the use of a crutch in her right hand.

Her control is good. Her limp is significant.

She demonstrated a few stairs today. She walks one-by-one using her right side for power. She turns 45 degrees both for climbing and descending, and she is very stair-rail dependent.

Examination of her cervical spine shows a supple full range of motion with extension of 50 degrees, flexion 40 degrees, right and left rotation 55 degrees without pain.

Both shoulders have a supple full range of motion with forward flexion of 140 degrees. In the abducted position, she can externally rotate 70 degrees and internally rotate 70 degrees.

Strength testing of the shoulder in abduction, internal, and external rotation is 5/5, normal, and bilaterally symmetric.

Stability testing of the shoulder, apprehension testing, and impingement testing all negative.

Both elbows have a supple full range of motion with normal strength.

Both hands, fingers, and hand intrinsics have grossly normal motor power 5/5 all joints tested.

Light touch sensation is intact bilaterally.

Grip strength is 37 pounds on her right hand (*she is right-handed*) and 39 pounds on her left.

Pinch strength is 8 pounds on her right hand and 8.5 pounds on her left.

Lumbar spine exam shows has limited flexibility with forward flexion to 50 degrees producing posterior left hip pain in and around the sciatic notch, but also to the lateral side of the hip. Lumbar lateral tilts are restricted at 10 degrees bilaterally, extension approximately 10 degrees. Palpation of the lumbar spine shows a vague tenderness deep, primarily on the left, in the lumbar paraspinal musculature. She has no midline step-offs or tenderness. Straight leg raising is mildly positive on the left, reproducing posterior hip pain. Straight leg raising is negative on the right.

Hip mobility shows posterior hip pain on the left side elicited with flexion and internal rotation (positive FADIR). Hips have no pain with external rotation. Biliteral hip flexion is approximately 120 degrees, limited by soft tissue. Strength testing of the hips includes 5-/5 in flexion bilaterally.

Left knee has a long incision that measured 28 centimeters. She has softness of her distal quadriceps, especially her vastus medialis oblique. Circumference testing of the quadriceps shows 52 centimeters bilaterally. Calf circumference shows 43 centimeters bilaterally. Strength testing of the knees shows the left knee at 3/5 in extension, 4/5 in flexion. Right knee is 5/5 in flexion and extension. Left knee range of motion 0 to 114 degrees passively,

10 to 115 degrees actively. The right knee has 0 to 120 degrees of motion. Stability testing grossly normal for both knees.

Distal sensation of both lower extremities is normal.

Ankle movement is supple, full.  Stability is normal, and strength is normal.

**DIAGNOSTIC STUDIES:**

01/12/2023     Chest x-ray, unremarkable.  No orthopedic findings.

01/12/2023     Allenmore Building.  Imaging is January 12, 2023, chest x-ray, anteroposterior and lateral films.  No orthopedic issues.

01/12/2023     Chest x-ray unremarkable.  No orthopedic findings.

02/08/2023     Cemented total knee replacement with appropriate position.  Staples noted.

02/08/2023     Cemented total knee replacement with appropriate position.  Staples noted.

02/08/2023     Two-view left knee with staples.  Recent total knee replacement.  Staples noted.  Bone quality normal.  Alignment normal.  Normal postoperative appearance, cemented total knee replacement.

03/09/2023     Two-view left knee x-ray.  Total knee replacement with high-riding patella, patella alta, and a suprapatellar ossicle  Impression:  probable extensor mechanism failures resulting in patella alta.

05/09/2023     Four-view x-ray, right knee.  Advanced osteoarthritis, especially in the patellofemoral compartment, but tricompartmental involvement.  Bone-on-bone findings in patellofemoral compartment.

05/09/2023     two-view x-ray, left knee. Status post total knee replacement. Femoral and tibial components appear appropriately placed and aligned. Patella shows a small minimally displaced inferior pole fracture.

06/22/2023     Three-view left knee shows extremely high patella position, i.e., severe patella alta.  Calcifications are noted in the anterior joint at the level of the prosthesis and also in the suprapatellar space.  Impression:  extensor mechanism failure with fragments or loose bodies. Femoral and tibial components appear to be properly aligned and well fixed.

06/22/2023     Three-view left knee shows advanced patella alta.  Patella now 10 centimeters elevated from usual location.  The x-rays are otherwise normal for a total knee replacement.

06/22/2023     Three-view left knee shows extremely high patellar position, i.e., severe patella alta.  Calcifications noted in the anterior joint at the level of the

prosthesis and in the suprapatellar space.  Impression: extensor mechanism failure with fragments or loose bodies.  Femoral and tibial components appear to be properly aligned and well fixed.

06/27/2023   X-ray, two view, left knee.  Staples in place.  Patella alta persists.  Bony loose fragments in the anterior knee and suprapatellar region persist.

06/27/2023   X-ray, two-view, left knee.  Staples in place.  Patella alta persists.  Bony loose fragments in the anterior knee and suprapatellar region persist.

06/27/2023   Allenmore Hospital.  Anteroposterior and lateral view.  Staples in place.  Total knee replacement.  Patella alta persists, and bone or cement fragment in the suprapatellar pouch still noted.  An additional fragment also seen closer to the joint line.

08/31/2023   Three-view of the left knee.  Intact total knee replacement with proper alignment and fixation of femur and tibia.  Patella alta with bony fragments noted, unchanged from prior studies.

08/31/2023   MultiCare Orthopedics.  Three-view of the left knee shows a total knee replacement with high-riding patella, approximately 12 centimeters elevated from normal position.  Knee otherwise unremarkable.

08/31/2023   Three-view of the left knee.  Intact total knee replacement with proper alignment and fixation of femur and tibia.  Patella alta with bony fragments noted, unchanged from prior studies.

11/22/2023   Two-view, left knee.  Persistent patella alta.  Persistent bony fragments in the anterior joint and the suprapatellar region.  Well-fixed femoral and tibial components.

11/22/2023   MultiCare Hospital, anteroposterior and lateral total knee replacement with severe patella alta.  The kneecap is displaced 10 to 15 centimeters proximal to the native position.

11/22/2023   Two-view, left knee.  Persistent patella alta.  Persistent bony fragments in the anterior joint and the suprapatellar region.  Well-fixed femoral and tibial components.

12/04/2023   Revision components to femur and tibia with stems.  Patella and loose fragments are absent (patellectomy).

12/04/2023   Revision components to femur and tibia with stems.  Patella and loose fragments are absent (patellectomy).

12/04/2023   Allenmore Hospital.  Two-view, anteroposterior and lateral, status post stemmed cemented knee revision with constrained prosthesis.  The patella is now absent (patellectomy).

| | |
|---|---|
| 12/22/2023 | Two-view of revision, total knee replacement, cemented with stems hinge type. Alignment appropriate. |
| 12/22/2023 | MultiCare, anteroposterior and lateral, showing a cemented, constrained, revision total knee replacement with no patella. No change from preoperative position. |
| 12/22/2023 | Two-view of revision total knee replacement cemented with stems, hinge-type. Alignment appropriate. |
| 02/02/2024 | X-ray left knee, three views, shows a revision total knee replacement, hinge type with cemented stems. No significant change. Patellectomy noted. |
| 02/02/2024 | X-ray, left knee, three views, shows a revision total knee replacement, hinge-type, with cemented stems. No significant change. Patellectomy noted. |
| 02/02/2024 | MultiCare Orthopedics. X-ray, anteroposterior and lateral (three views), shows a cemented stemmed revision total knee replacement with appropriate alignment and position. No patella. |
| 03/01/2024 | Two-view x-ray, left knee. Hinged revision, total knee replacement. Cemented. No significant change in alignment. |
| 03/01/2024 | Four-view x-ray, right knee, shows advanced patellofemoral arthritis with bone-on-bone changes, squaring of condyles, both medially and laterally, but reasonably preserved joint space. Impression: tricompartmental arthritis, most advanced in the patellofemoral compartment. |
| 03/01/2024 | Anteroposterior and lateral shows postoperative films of a constrained total knee replacement. Stems, cement, no significant change. Appropriate position. |
| 03/01/2024 | Two-view x-ray, left knee. Hinged revision total knee replacement, cemented. No significant change in alignment. Four-view x-ray, right knee, shows advanced patellofemoral arthritis with bone-on-bone changes, squaring of condyles both medially and laterally, but reasonably preserved joint space. Impression: tricompartmental arthritis most advanced in the patellofemoral compartment. |
| 05/24/2024 | MultiCare Orthopedics. X-ray of left knee, two-view, shows a stem cemented revision constrained total knee replacement in appropriate position. |
| 05/28/2024 | Lakewood family practice. Today patient reports she is aggravated her chronic back issues. "She is very clear that the pain is primarily in her low back going down her right leg to below the knee." |

07/10/2024    MultiCare Orthopedics.  X-ray, three-view, right knee, shows advanced patellofemoral arthritis with bone-on-bone changes.  Overall alignment of the limb is normal.  There is an ossicle on the lateral side of the patella, which may be a bipartite patella.  The joint spaces are reasonably well preserved.  Kellgren-Lawrence grade II (however, bone-on-bone in the patellofemoral joint).

08/05/2024    Lakewood family practice. 66 year old with hypertension, diabetes, chronic pain and chronic back pain with osteoarthritis multiple joints. Using Ultram and Tylenol. Discussion of possible right knee joint replacement. Needs to have body weight down prior to surgery.

10/27/2024    Lakewood family practice. Medication refill. Cymbalta, tramadol.

01/08/2025    Three-view, lumbar spine.  Posture shows increased lordosis.  Bone quality appears to be thin, i.e., osteopenia.  Retrolisthesis, L4-5.  There is profound disk loss between T12 and L1.

              Impression:  advanced multilevel arthritis, lumbar spine.  Mild degenerative scoliosis with apex of the curve, left, near L2.

01/08/2025    Three-view, lumbar spine.  Posture shows increased lordosis.  Bone quality appears to be thin, i.e., osteopenia.  Retrolisthesis L4-5.  There is profound disk loss between T12 and L1.  Impression:  advanced multilevel arthritis, lumbar spine.  Mild degenerative scoliosis with apex of the curve left near L2.

## DIAGNOSES:

All of the opinions offered are on a more-probable-than-not basis and to a reasonable degree of medical certainty.

Injuries sustained in the accident of May 6, 2023, include:

1.  Left knee patellar tendon rupture.

2.  Left hip strain.

3.  Low back strain.

4.  Right knee aggravation.


Injuries unrelated to the accident of May 6, 2023, include:

    Left ankle injury 2026

**TIME LINE (Left knee):**

02/08/2023   Left knee total knee arthroplasty.  W. Frederick Thompson, MD.

05/06/2023   **Accident**

06/26/2023   Left knee repair of infrapatellar tendon. W. Frederick Thompson, MD.

12/04/2023   Left revision hinged total knee arthroplasty, extensor mechanism reconstruction, patellectomy, and disposable negative pressure wound therapy. Zachary Adler, MD.

03/06/2024-
08/24/2024   Anchor Physical Therapy.

**DISCUSSION:**

Ms. Larocque was doing quite well after a left total knee replacement performed on February 8, 2023.  She had graduated from physical therapy.  She was independent.  She was driving.  She was walking without a cane.  Her walking endurance was up to 30-plus minutes.  Her return of flexibility was full.  She was "extremely pleased."

Unfortunately, on May 6, 2023, she was walking with a shopping cart which locked up colliding with and re-injuring her left knee. This collision caused a patellar tendon rupture first evidenced by x-rays taken May 9, 2023.  Ms. Larocque was treated conservatively but did poorly.  She eventually was diagnosed with a patellar tendon rupture, after x-rays revealed wide separation of the patella from its tendon.

As a result of the injury, she underwent a patellar tendon repair on June 6, 2023. Unfortunately, this repair failed.  She sought a second opinion and subsequently required an extensive surgery with a total knee revision, removal of her patella (patellectomy), and reconstruction of her extensor mechanism using synthetic mesh performed on December 4, 2024.  This surgery was followed by months of immobilization with a brace and cast. Her mobility was severely impaired.  Her strength levels went downhill, and the asymmetry caused difficulties with her back and hip. The surgery for repairing the patellar tendon on June 6, 2023, was due to the accident on May 6, 2023. The revision surgery on December 4, 2023, was due to the accident on May 6, 2023.

She has completed physical therapy after her revision surgery.  However, her function is far lower than she was in the days immediately prior to the accident.  She is device-dependent for ambulation.  Her endurance is low.  Her strength levels are low.  Her ability to climb and descend stairs is low.  Even though she was only 10 weeks out from her initial

knee replacement at the time of the accident, she had been in very good condition with excellent function.

The evaluations, the treatments, the patella repair and left total knee revision surgery, and the need for ongoing care in her back and left hip are all related to the shopping cart striking her left knee on May 6, 2023.

Ms. Larocque's right knee, the other knee, has become tender. The accident has had the effect of temporarily exacerbating her underlying disease because of favoring her injured left knee. A total knee replacement has been recommended for her right side. The knee replacement was inevitable. The accident had the effect of temporarily worsening her symptoms. The knee replacement will be due to the natural progression of her preexisting disease and not related to the accident. However, she will have to have to have her right knee replacement surgery sooner than if she had not been injured in the shopping cart incident of May 6, 2023.

Ms. Larocque's left knee has received extensive care including two surgeries and courses of physical therapy. Ms. Larocque is on a home exercise program. No current or future treatment is needed. Ms. Larocque's left knee is at maximal medical improvement (MMI). As such, her limitations in strength, flexibility and function are permanent.

The AMA impairment rating for the left knee is 20% whole body impairment due to limp and walker dependance, according to the AMA guides to permanent impairment, 5th edition.

Ms. Larocque had a chronic history of low back and left hip discomfort treated for several years with chiropractic care, physical therapy and with pain management including narcotic support for several years. However, with additional stress related to her multiple knee surgeries have temporarily exacerbated her back and left hip pain. The asymmetric demands of multiple knee surgeries caused her back and hip to be temporarily exacerbated for one year following the accident of May 6, 2023. The evaluations and treatments of her low back and hip, including pain management are related to the accident of May 6, 2023. After one year, her back pain and hip issues returned to the normal progression of her pre-existing disease and are no longer related to the accident of May 6, 2023.

These are my opinions based on the information available to date. My opinions may change if I am provided with additional information.

The treatments provided, as documented in the medical record, are reasonable, necessary, and on a more-probable-than-not basis related to the accident of May 6, 2023. The ankle injury January 2026 in unrelated to the accident of May 6, 2023.

The charges for evaluations and treatments documented in the records provided for all treatment such as left knee patella tendon repair, left knee revision surgery and all subsequent treatment were reasonable, necessary, and on a more-probable-than-not basis related to the accident of May 6, 2023.

This examiner reserves the right to amend these opinions if further information becomes available in the future.

*I declare under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.*

*SIGNED and DATED this 26th day of February 2026 in Bellevue, Washington.*

Bruce Rolfe, MD
Orthopedic Surgeon

BR/imt23e:imt21:imt19k

# EXHIBIT F


Applied Cognitive Sciences

# Levi Dixon, M.S., CXLT, CSP, CHFP
10501 South Lambs Lane
Mica, WA 99023
Phone/Fax: (509) 624-3714
Email: Levi@acsciences.com

## CERTIFICATIONS:

*Certified Safety Professional – 2021*
- By the Board of Certified Safety Professionals
- Number: 39014

*Certified Human Factors Professional – 2021*
- By the Board of Certification in Professional Ergonomics
- Number: 2208

*Certified XL Tribometrist – 2015*
- By Excel Tribometers
- Number: 1511574

*Associate Safety Professional – 2015*
- By the Board of Certified Safety Professionals
- Number: 24715

*Associate Human Factors Professional – 2018*
- By the Board of Certification in Professional Ergonomics
- Number: 2208

## EDUCATION:

*San José State University – 2018*
- M.S. in Human Factors & Ergonomics
- Department of Industrial & Systems Engineering
- GPA: 4.0 out of 4.0

_____

*Eastern Washington University – 2015*
- B.S. in Technology – Manufacturing Option
- Department of Engineering
- Graduated Cum Laude

## PROFESSIONAL EXPERIENCE:

*Applied Cognitive Sciences – 2014 to Present*
I was initially hired as an intern and shortly thereafter appointed to a full time permanent position as an Assistant Engineer followed by an Associate Engineer, wherein I took on a broader area of responsibilities including: reading and generating summaries of discovery material, accident case file material, and depositions; conducting research in the field of safety and risk management; and conducting accident scene site inspections which involves making relevant field observations, taking measurements and photographs, documenting all relevant information, as well as conducting both on scene and laboratory testing. As an Associate Engineer, I was involved in the investigation and analysis of over 1,000 legal cases, for both the plaintiff and defense, nationwide. I am currently a Senior Engineer wherein the focus of my work is in Human Factors Engineering and Safety and Risk Management. My areas of expertise include, but are not limited to: facility design and fall incidents (falls from elevation and falls at elevation), workplace injuries, warnings and hazard communications, and automotive incidents.

*Davenport Hotels – 2009 to 2016*
I was originally hired as part of the Banquet Setup staff, and shortly thereafter was promoted to a supervisory position. As a supervisor, I was responsible to ensure a large and diverse team worked together effectively and efficiently to provide excellent service to all guests. One of the largest responsibilities I had was maintaining a high level of safety for guests and employees alike, by ensuring the safety protocols were properly implemented and enforced. By working with a small team of supervisors and management, we would work to minimize the risk of workplace injuries by ensuring that the entire staff knew the proper safety protocols for various situations.

## HONORS AND AWARDS:

*San José State University*
- Nominated by Faculty for the "Bertha Kalm" Scholarship

___

*Eastern Washington University*
- College of Science, Technology, Engineering, and Mathematics "Outstanding Student" Award

- Dean's List Winter 2012, Spring 2012, Fall 2012, Winter 2013, Fall 2013, Spring 2014, Fall 2014, and Winter 2015

- "High Demand Student" Scholarship for 2014-2015 academic year

- "High Demand Student" Scholarship for 2013-2014 academic year

*Davenport Hotels*
- "Guest Worthy" Award in February 2015

- "Superstar of the Quarter" Award in Fall 2012

## PUBLICATIONS:

- Dixon, L., DeBusk, H., Fenley, E., Gill, J. (2024). Evaluating the Slip Resistance of Various Walkway Surface Contaminants. *Proceedings of the 68th HFES International Meeting.*

- DeBusk, H., Dixon, L., Gill, J., Gill, R. (2019). Measuring the Static Coefficient of Friction of Non-Fluid Contaminants. *Proceedings of the Human Factors and Ergonomics Society Annual Meeting,* (63)1, 537-541.

- Dixon, L., and Nathan-Roberts, D. (2017). Watch Out! Or do we? A Review of Literature on Human Locomotion, Visual Gaze, and Expectation of Trip Hazards. *Proceedings of the Human Factors and Ergonomics Society Annual Meeting*, (61)1, 1252-1256.

## PRESENTATIONS:

- Dixon, L., and Nathan-Roberts, D. Watch Out! Or do we? A Review of Literature on Human Locomotion, Visual Gaze, and Expectation of Trip Hazards. Presented at the Human Factors and Ergonomics Society 2017 Annual Meeting, October 2017.

- Gill, R., and Dixon, L. Human Factors Engineering. Invited Presentation by the Rotary Club of Spokane, November 2015.

_____

**PROFESSIONAL MEMBERSHIPS:**

- American Society of Safety Professionals
  - Inland Northwest Chapter

- Human Factors and Ergonomics Society
  - Puget Sound Chapter

- American Society for Testing and Materials
  - F13 Committee

**CONSULTING PROJECTS:**

- Slip Resistance Testing of Tiles with Various Treatments; Fireclay Tiles; Co-Consultant; 2024

- Evaluation of Warnings and Instruction Manual for Gantry Crane; Spanco; Co-Consultant; 2023

- Preliminary Hazard Analysis and Evaluation of Warnings and Safety Instructions; Tipke Manufacturing Inc.; Co-Consultant; 2021

- Slip Resistance Testing of Pool Deck and Alternative Flooring Treatments; Kahala Nui; Principal Consultant; 2018 - 2019

- Evaluation of Product Disclaimer, Packaging, and Product Insert for Single-use Pass/Fail BAC Testers; Think Twice; Co-Consultant; 2018.

- Evaluation of Product Label and Safety Instructions for Multi-Plug; Davis Company; Principal Consultant; 2018

- Slip Resistance Testing of Alternative Flooring Treatments; Four Seasons Hotel, Ko Olina; Co-Consultant; 2016

**PEER REVIEWER:**

- The Human Factors and Ergonomics Society's 2025 Annual Meeting Proposal Reviewer. Technical Groups: Forensics Professional, Occupational Ergonomics, and General Sessions.

- The Human Factors and Ergonomics Society's 2024 Annual Meeting Proposal Reviewer. Technical Groups: Forensics Professional, Safety, Product Design, Occupational Ergonomics, and Perception & Performance.

- The Human Factors and Ergonomics Society's 2023 Annual Meeting Proposal Reviewer for the Safety Technical Group

- The Human Factors and Ergonomics Society's 2019 Annual Meeting Proposal Reviewer. Technical Groups: Forensics Professional and Safety.

## CONTINUING EDUCATION:

- The Role of Architects in Slip, Trip, and Fall accidents: Bad Design or Careless Behavior?; Live Webinar Through the Human Factors and Ergonomics Society; October 2023

- Slips, Trips, and Falls International Conference; June 2023

- Human Factors and Ergonomics Society 65th Annual Meeting Virtual Edition; October 2021

- Human Factors and Ergonomics Society, Puget Sound Chapter's Virtual Symposium; October 2021.

- Human Factors and Ergonomics Society's Annual Meeting; Austin, Texas; October 2017.

- Institute of Police Technology and Management (IPTM) "At-Scene Traffic Crash/Traffic Homicide Investigation" 80 Hour Course; Certificate #nA71YIHz8L; August 2017.



**Applied Cognitive Sciences**

February 25, 2026

Robert Wilke
Gordon Thomas Honeywell
1201 Pacific Avenue
Suite 2100
Tacoma, Washington 98402

**Re: Larocque vs. The Kroger Co., et al.**

Dear Mr. Wilke:

As requested, I reviewed the discovery material and performed an inspection of the Fred Meyer facility in the above referenced matter. Based on this information, along, with my education, training, and experience in Safety and Human Factors Engineering, the following report summarizes my findings and conclusions to date. I reserve the right to, and intend to, update my conclusions upon receipt and review of new discovery material that becomes available. My curriculum vitae highlights my training, experience, and expertise as it pertains to Human Factors Engineering and Safety and Risk Management. I have a B.S. in Technology – Manufacturing option and an M.S. in Human Factors & Ergonomics; I have 16 years of experience in Safety and Risk Management, with my emphasis being in Human Factors Engineering for the past 11 years. In addition, I have provided consulting services to private industry and businesses in the fields of Safety and Risk Management and Human Factors Engineering. Also, as noted in my CV, I am a Certified Human Factors Professional, a Certified Safety Professional, and a Certified XL Tribometrist.

**Material Reviewed**
1. Plaintiff's Responses to Defendants The Kroger Co. and Fred Meyer Stores, Inc.'s First Set of Interrogatories and Requests for Production, with First Supplemental Responses
2. Plaintiff's Responses to Gatekeeper Systems, Inc.'s First Set of Interrogatories and Requests for Production
3. The Kroger Co.'s Responses to First Requests for Admission Propounded by Plaintiff Linda LaRocque
4. The Kroger Co. Response to Plaintiff's First Request for Interrogatories and First Request for Production, with Amended Responses (DEF Kroger 00001-122)
5. The Kroger Co.'s Response to Second Request for Admissions to Defendant the Kroger Co.
6. The Kroger Co. and Fred Meyer Stores Inc.'s Responses to Third Requests for Admission Propounded by Plaintiff Linda LaRocque
7. The Kroger Co.'s Response to Plaintiff's Second Request for Interrogatories, with Amended Responses

---

10501 S. Lambs Lane • Mica, WA 99023 • 509-624-3714 telephone

8. The Kroger Co.'s Second and Third Amended Response to Plaintiff's First Request for Interrogatories and First Request for Production
9. The Kroger Co.'s Response to Third Interrogatories Propounded by Plaintiff Linda LaRocque
10. The Kroger Co's Response to Plaintiff's Fourth Request for Interrogatories and Third Request for Production
11. The Kroger Co's Response to Second Request for Production Propounded by Plaintiff Linda LaRocque
12. Fred Meyer Stores, Inc.'s Responses to First, Second, and Third Requests for Admission Propounded by Plaintiff Linda LaRocque
13. Fred Meyer Stores Response to Plaintiff's First Request for Interrogatories and First Request for Production, with Amended Responses
14. Fred Meyer Stores, Inc.'s Response to Plaintiff's Second Request for Interrogatories and Request for Production of Documents, with Supplemental Responses
15. Fred Meyer Stores, Inc.'s Response to Plaintiff's Third Request for Production
16. Plaintiff's First Set of Requests for Admission to Gatekeeper Systems, Inc. – and Responses Thereto
17. Plaintiff's First Set of Interrogatories and Requests for Production to Defendant Gatekeeper Systems, Inc. – and Responses Thereto, with First and Second Supplemental Responses
18. Deposition of Linda LaRocque
19. Deposition of Steven LaRocque

**Description of Incident**
On May 6, 2023, the LaRocques arrived at Fred Meyer to purchase merchandise prior to Mr. LaRocque's upcoming medical appointment. After parking the vehicle, they walked into the foyer, obtained a shopping cart, and proceeded into the facility; Ms. LaRocque testified that she was using the shopping cart for stability, as she was still recovering from surgery. After searching for the merchandise they were looking for, they could not find it, so they proceeded back toward the front to the exit door. Ms. LaRocque described that she had her purse and coat in the child seating area of the cart, and that she had both hands on the cart while she was pushing it. After pushing the cart in front of the register area, Ms. LaRocque pushed it back through the door where she entered. However, as she was pushing the shopping cart, the cart suddenly and unexpectedly stopped, which resulted in Ms. LaRocque's knee contacting the cart. Notably, Mr. LaRocque testified that he was walking behind Ms. LaRocque, such that he walked into her after the cart stopped.

During her deposition, Ms. LaRocque testified that an employee came over after the cart stopped and alerted her that it occurs multiple times each day. She stated that the employee further explained that if the cart wheel is not deactivated when you purchase items and/or go through the register area, then the cart will stop at the door. Notably, Ms. LaRocque also described that the cart was "empty", as there were no signs, tags, or the like on it. Both Mr. and Ms. LaRocque testified that prior to this incident, they were not aware that the shopping carts had the wheel locking system installed on them.

**Safety Analysis**
*Struck-by/Contact Injuries*
It is well understood in the Safety industry that being struck by objects puts people at risk of being injured. The Occupational Safety and Health Administration (OSHA) notes that "Struck-by objects" are a leading cause of construction related deaths. Notably, the National Safety Council (NSC) documented that in 2022 alone, there were 738 workers who died due to this type of incident. Additionally, in 2021-2022, there were over 780,000 incidents involving "Days Away from Work, Job Restriction, or Transfer"(DART), and over 450,000 incidents involving "Days away from work" (DAFW). Obviously, this is not to suggest that Ms. LaRocque was a "construction worker" and/or that Fred Meyer was a "construction site." Instead, my inclusion of this is to illustrate that people being struck by objects is a notorious hazard, so it is important to have a plan in place to identify risks associated with people being struck by objects to decrease the risk of someone being injured.

The potential to be injured by being struck-by and/or contacted by shopping carts in a retail environment is also well-known. For example, Kim, et al. (2015)[1] analyzed incidents that occurred inside retail stores in 2012. The researchers broke incidents into different categories, including "contact accidents" which were defined as an incident "in which the patient was injured as a result of unintentionally coming into contact with an object or person (e.g., hit by, ran into, pinched by, or caught in an object)". Notably, the researchers estimated that in 2012, there were 21,731 "contact accidents" accounting for over 25% of all store-related injuries that occurred inside retail stores. Of all contact accidents, the object involved was a shopping cart in over 31% of incidents. The researchers also looked at injuries associated with different objects/conditions and noted that for fractures, carts were referenced in 23.4% of the incidents. Notably, the researchers found that internal organ injuries were most often associated with carts, which represented 56.9% of the internal organ injuries. The bottom line from this discussion is that the risk of harm posed by being struck-by and/or coming into contact with a shopping cart in a retail setting is well known, which underscores the importance of implementing measures to reduce the risk of such incidents occurring.

*Risk of Harm Posed by Shopping Cart Abruptly Stopping*
As noted above, years prior to this incident, there was published research about the potential to be injured by coming into contact with a shopping cart. In this case, the sudden and unexpected nature of the shopping cart wheels stopping (and as a result, the cart suddenly decelerating and/or stopping) poses a risk of harm to pedestrians that puts them at risk of injury due to contact with the cart and/or from a perturbation to their balance and a resultant fall. For example, shopping carts are commonly used in retail facilities, and we have a general expectation that they will have rolling wheels that allow us to push them around freely, place items into them, and maneuver around displays, people, and the like. While pushing a shopping cart, it is relatively common for pedestrians to grasp the handlebar with both hands and slightly lean forward while pushing it. It is also common for pedestrians to have their elbows bent, which results in the handlebar being closer to their torsos as they traverse through the facility (rather than having their arms extended straight ahead). In fact, some pedestrians may even lean forward and/or place their torso/chest against the handlebar as they walk forward. The bottom line is that while pushing a shopping cart

---

[1] Kim, R., Crump, C., Harley, E., Nauhaus, G., & Yigit-Elliot, S. (2015). Store-related injuries to children and adults. Proceedings of the Human Factors and Ergonomics Society 59thAnnual Meeting, 1457-1461.

through a retail facility, pedestrians will naturally have the expectation that, absent any obstructions in their pathway (i.e., like a display, a curb, or the like), a shopping cart will roll forward when they are pushing it forward.

The factors above are important from a safety perspective, given that the presence of the locking mechanism on the subject shopping carts puts pedestrians at risk of the cart abruptly and unexpectedly stopping, thereby putting them at risk of "running into" the shopping cart and/or a perturbation to their balance and resultant fall. That is, when a shopping cart abruptly and unexpectedly stops while a pedestrian is pushing it forward, there is a mismatch between the forward momentum of the shopping cart and the pedestrian. In other words, if the cart wheel(s) unexpectedly lock, then the cart will be at risk of quickly decelerating and/or stopping, despite the pedestrian still moving forward toward the cart. In light of this, the pedestrian is at risk of essentially striking and/or "running into" the stopped shopping cart, especially since they will have limited time to perceive the abrupt and unexpected stop of the cart and implement action to avoid striking it.

That is, given a pedestrian will predictably be pushing the shopping cart in front of them with their elbows bent, the shopping cart will potentially be within inches of the pedestrian when it abruptly stops. Assuming a distance of two feet from the handlebar to their torso when the cart abrupt stops, the pedestrian would have approximately half a second to perceive the abruptly stop of the cart and stop their forward momentum (assuming a typical walking speed of 4 feet per second). Obviously, this is not to say that every pedestrian will be walking with their torso exactly two feet from the handlebars (some may have more distance, and some may have less distance), nor that every pedestrian walks at 4 feet per second. Rather, my inclusion is simply to illustrate that if the shopping cart wheels unexpectedly lock and stop the cart, pedestrians are put at serious risk of striking the cart (with their torso, lower limbs, or the like) and/or losing their balance and falling.

The point to be made from this discussion is that if a shopping cart wheel(s) were to unexpectedly lock and stop the cart, just as Ms. Larocque described occurred, pedestrians would be put at risk of harm due to striking the cart and/or losing their balance and falling. As discussed in detail below, the evidence I have reviewed indicates that the Defendants were aware of the potential for the shopping cart wheels to unexpectedly stop even when people were not "shoplifting" (and the risk of harm associated with them doing so), but the chosen safety plan to reduce the risk of an incident occurring was unreliable and contrary to basic Safety and Human Factors Engineering principles.

*Summary*
In summary, the sudden and abrupt locking of the subject cart wheel(s) created a hazard that put patrons like Ms. LaRocque at risk of harm due to striking and/or coming into the shopping cart. As discussed in more detail below, the Defendants knew and/or should have known that the overall locking system posed a risk of harm to patrons, but the safety measures implemented to attempt to reduce the risk of harm it posed were unreliable.

**Unreliable Safety Measures**
*Hierarchical Process for Mitigating Hazards Used in Safety and Human Factors Engineering*
The fields of Human Factors Engineering and Safety use a hierarchical process to determine the mitigation strategy to employ when eliminating and reducing the risk of harm posed by a walkway hazard. This hierarchical approach to safety is endorsed by entities such as the Centers for Disease Control and Prevention (CDC), the National Safety Council (NSC), the Occupational Safety and Health Administration (OSHA), and the National Institute for Occupational Safety and Health (NIOSH). The first and most effective tier is to Eliminate or Design-Out the hazard (i.e., Safety by Design), and if that is not possible/feasible, then the implementation of Engineering Controls or Guarding should be considered. In the event that the hazard cannot be eliminated or guarded, then administrative controls and/or warnings can be implemented to attempt to minimize the risk of people being exposed to the hazard.

It should be noted that reliance on administrative controls and/or warnings is known to be unreliable (which is why it is lower on the hierarchy), as such methodologies rely more on the human component and are "active" in nature rather than "passive." Safety literature emphasizes the importance of only resorting to active safety alone when it is not possible to implement passive safety (i.e., such as eliminating a hazard or restricting access to it) because it is well understood that active safety measures are unreliable in nature.[2] As such, it is critically important for an entity that resorts to measures like warnings to implement them consistent with state-of-the-art methodologies. However, even then, they can still be unreliable and ineffective, given that people may not detect them, the hazard still exists, and so forth.

*Principles for Warnings*
As discussed above, Safety Professionals and Human Factors Engineers utilize a hierarchical approach for mitigating hazards, and the use of warnings to attempt to alter user behavior is lower on the hierarchy of controls because warnings are known to be ineffective (i.e., the hazard still exists, people may not perceive warnings, and the like). In light of this, it is important that an entity relying on warnings implement them consistent with the basic principles of warning. That is, research has shown that there is a variety of principles to follow to increase the likelihood that warnings create the requisite behavior to minimize the risk of a user being exposed to and/or injured by a hazard. For example, a safety message must attract the user's attention, motivate the user to read and process the information, and have sufficient credibility.[3] Even if a safety message/warning is noticed, that does not mean that the user is likely to read it, much less read all of its contents, particularly if it is burdensome to do so and/or if the user feels they already possess the knowledge to use the product safely. That is, we live in an information rich society; it is not possible to read and process all of the information we encounter in everyday life. Humans are selective information processors such that we selectively attend to and process a subset of the information that is available to us at any given moment in time; a long wordy warning is not likely to be read.

---

[2] Lee, J. D., Wickens, C. D., Liu, Y., & Boyle, L. N. (2017). *Designing for people: an introduction to human factors engineering* (3rd ed.). Charleston, SC: CreateSpace.
[3] Ayers, T.J, et al. (1989). What is a warning and when will it work? *Proceeding of the Human Factors Society 33rd Annual Meeting.*

Even if the user's attention can be captured by a safety message in a warning and/or instructions, and they can be persuaded to read it, that still is not sufficient to create the requisite behavior. The content of the message is an important factor in determining its likely ability to create the desired behavior. To be effective, a warning must clearly convey to the user several basic components, including the nature of the hazard, the consequences of exposure, and how to avoid it. Finally, it should also be pointed out that warnings should be explicit, clear, and concise, and located proximate in time and location to where behavior needs to be changed. In short, warnings are known to be unreliable, so it is important that basic principles for warnings are followed if an entity chooses to rely on warnings (which are an active safety measure) in lieu of passive measures (i.e., elimination of the hazard, guarding of the hazard, and the like).

Site Inspection Observations of Warnings

During my site visit, I had the opportunity to inspect the general area of this incident, along with a number of different shopping carts, including two different sizes of carts (smaller/compact and the normal/typical size). During my site visit, I observed that there were generally two types of warnings in use in the general area, including warning placards on most of the carts, along with a sign placed on the sliding glass door. Figures 1 and 2 show two different shopping carts that had the warning placard inside them. I observed that some of the carts had the placard at the front of the cart, such that they faced the handlebar area. I also observed that some of the carts had the placard on the "sidewall" of the cart, such that it would be at an oblique angle to a shopper pushing the shopping cart from the handle bar area. The signage states "!WARNING! Shopping Carts may stop unexpectedly at exit doors, and carts will stop if taken beyond the perimeter of the parking lot." Notice in Figure 1 that there is a piece of tape covering a portion of the warning.



**Warning Placard**

**Figure 1. Placard on Front of Cart**



**Figure 2. Placard on Sidewall**

Figure 3 below is a photograph I took showing a view looking toward the interior of Fred Meyer when standing in the foyer area where the shopping carts are located. Notice that there is a variety of stimuli competing for one's attention, including various signage posed on standalone displays, the wall, and even the glass. While the glass doors in the center of the photograph appear to be automatic sliding doors, they remained open during my entire site visit. Notably, I observed that when in the open position, the signage about the locking shopping cart wheels was partially obscured, as marked in Figure 3. Figure 4 shows an up-close view of the sign from the foyer area.



**Figure 3. Warning Signage on Glass Door Obstructed**



**Figure 4. Up-Close View of Partially Obstructed Signage**

Figure 5 shows a view looking toward the same doors and signage from inside the facility; the photograph was taken when walking towards the glass doors from the register area. Here again, notice that there is a variety of environmental stimuli competing for one's attention as they approach the doors (the ATM, signage, merchandise displayed for purchase, and the like). I observed that there was a security guard who stood in the general area, and I also observed that, depending on one's angle of approach, the signage on the glass door regarding the locking shopping cart wheels was obstructed, as seen in Figure 6. Figure 7 shows an up-close view of the signage, which notes that the shopping cart wheels "may lock unexpectedly if removed from the store" and that they "will lock if taken beyond the parking lot."



**Figure 5. Signage Placed on Glass Door**



**Figure 6. Signage Blocked**



**Figure 7. Signage Warning of Unexpected Wheel Locking**

During her deposition, Ms. LaRocque testified that there was no signage on the shopping cart that she was utilizing at the time of her incident. Consistent with Ms. LaRocque's testimony, I observed a number of shopping carts that were devoid of the warning signage. For example, Figure 8 below shows a "small" cart that is devoid of the warning signage regarding the shopping cart wheels locking. Figure 9 shows a "normal" size cart that is also devoid of the warning signage. Again, these are just a few examples of the numerous carts that I observed were devoid of the warning signage regarding the shopping cart wheels unexpectedly locking.



**Figure 8. Small Cart Devoid of Warning About Locking Wheels**



**Figure 9. Normal Cart Devoid of Warning About Locking Wheels**

*Knowledge and Appreciation of Potential for Wheels to Stop/Lock*
As noted above, the warning placards and signage illustrate an appreciation of the potential for the cartwheels to unexpectedly stop, thereby creating a condition that poses a risk of harm to pedestrians. However, I also reviewed additional evidence indicating that Defendants Fred Meyer and Gatekeeper were aware of prior instances of the cart wheels unexpectedly stopping/locking. For example, Ms. LaRocque testified that the employee came over and described that the wheels locking happened multiple times each day. Consistent with this, Mr. LaRocque testified that the employee described that it had already occurred multiple times prior to Ms. LaRocque's incident. Notably, I was provided a document showing that there was another injury incident involving a locked shopping cart on September 5, 2020. In fact, even after Ms. LaRocque's injury, incidents involving locking shopping cart wheels continued to occur at the subject Fred Meyer. For example:

1. August 19, 2023: Customer was exiting store when the shopping cart wheels locked and she jammed her wrist. There are signs on the doors entering the store that carts "may" lock up.

2. August 21, 2023: Cart locked up and shin hit bottom of cart, resulting in knot and bruising.

3. December 23, 2023: Cart locked up, causing customer to fall and suffer a variety of injuries.

4. November 7, 2024: Customer pushed cart out of door and the cart locked up, which caused the child to fall out of the cart.

I was also provided a document produced by Defendant Gatekeeper that illustrates that Gatekeeper was aware of several claims at a Fred Meyer facility in Washington State prior to Ms. LaRocque's incident. For example, the document showed that there were two claims in 2021 at a Fred Meyer in Washington State. In fact, the document also showed that there were a number of claims after Ms. LaRocque's incident as well.

*Unreliable Nature of Warning Signage*
While I observed that there were various warnings about the wheels that "may" unexpectedly stop, it is critical to point out that there are a number of inconsistencies with basic warning principles associated with the warnings that were utilized to attempt to alert pedestrians of the hazards associated with the wheels locking. Salient examples include:

1. Potential for Obstruction:
   As a basic principle for warnings, it is critical that they are received by the user; in other words, if a warning is not received by a user (such as from it being blocked from view), then it will not be capable of informing them of the basic components (i.e., the hazard, the consequences, and how to avoid it). In this case, both types of warning signage (i.e., the placards on the cart and the sign on the glass) would be at an increased risk of never even being received by a user due to being obstructed/partially obstructed in a stimulus-rich environment that has a variety of stimuli competing for their attention.

For example, shopping carts are specifically intended to be used for transporting merchandise throughout the store. In light of this, it is expected that patrons will obtain merchandise and place it into the shopping cart, which puts the placard at risk of being blocked from the shopper's view (if there is even a placard mounted on the cart); they may also place a child in the provided seat, which creates a partial visual obstruction. Hence, if the placard is blocked from one's view, then there is a decreased risk of the patron receiving the message it contains.

Alternatively, the signage placed on the glass door is placed in a location where it is expected that it will be partially obstructed from one's view when coming into the store, as well as when going out of the store. For example, as a pedestrian approaches the sign from the foyer area, there is a risk of the door being in the open position, where the sign is partially obstructed by the metal frame of the adjacent door. Even if the door is "closed" and the sign is not obstructed by the frame, it is at risk of being blocked from view by other patrons attempting to enter, and it is also expected that the door will then move to an open position as one approaches it, thereby reverting back to a partially obscured condition. In other words, by the time a pedestrian enters the facility and begins shopping, it is predictable that they will not have even received the message on the sign, especially since the foyer has a variety of stimuli competing for one's attention, which decreases the likelihood of someone perceiving and reading the sign even if it is not blocked from view.

After going through the register area and approaching the exit doors where the sign is located (on the interior of the facility), there is also a variety of environmental stimuli that will naturally compete for one's attention, including other shoppers, merchandise just purchased and/or displayed for purchase, a receipt, and the like. In fact, there are a number of items/objects that would predictably block one's view of the sign as they approach it from the register area, including other people, signage, the ATM, and the like. Furthermore, depending on one's angle of approach, the sign itself may be blocked from view, as shown in Figure 6 above. The bottom line from the foregoing is that the predictable nature of the warning signage to be blocked/partially blocked from one's view increases the potential for a patron to not even receive the warning message prior to being exposed to a risk of harm from the shopping cart unexpectedly stopping/locking.

2. <u>Ambiguous and Contradictory Messages:</u>
   In addition to the potential for the warning signage to be blocked/partially blocked, it is important to point out that the actual message of the warning placards and signage is misleading, ambiguous, and contradictory in nature. For example, the signage on the glass doors states that the shopping cart wheels **may** lock unexpectedly "if removed from the store", whereas the placards inside the carts stated that they **may** stop unexpectedly "at exit doors." In other words, the signage and placards provide conflicting information regarding the location of where the wheel **may** lock (i.e., at the exit doors or only if they are removed from the store). That is, "if removed from the store" suggests the wheels will lock only if the cart is removed from the building itself, whereas "at exit doors" suggests that the wheels will lock at the threshold itself. In addition, it is unclear whether the exit doors refer to the interior foyer doors, the exterior set of doors, or both, which creates

ambiguity. Notably, people routinely take their shopping cart outside of the facility (such as to go to their vehicle to unload it). A warning stating that the wheels may lock if removed from the store and/or at the exit doors conflicts with our everyday experience and expectations, which can compromise the credibility of the warning and the uncertainty of when the wheels will actually lock versus when they "may" lock (if at all).

Additionally, both the placards and signage repeatedly describe that the wheels "may" lock/stop unexpectedly. While this illustrates and appreciation and awareness that the carts were at risk of unexpectedly stopping (which poses a risk of harm to patrons, as discussed above), the wording that the carts "may" stop/lock unexpectedly is ambiguous and does not clearly communicate to the user when the cart is actually going to stop/lock. In other words, even if a patron knows that the carts "may" unexpectedly lock, they are still at risk of contacting the cart (as discussed above) since it may happen **unexpectedly**, such that they do not have time to prepare for and/or avoid striking the cart. Furthermore, the ambiguous language of the wheels "may" lock/stop increases the risk of a patron being uncertain on various information, such as where the wheels **will** lock, if the cart is actually equipped with the locking wheels and/or if the system is active, the nature of the stop (will it be abrupt versus gradual), and the like.

The bottom line from the foregoing is that the warning system in place shows an appreciation that the cart wheels are at risk of unexpectedly locking, which poses a risk of harm to pedestrians. However, the warning system in place is an unreliable safety strategy, given that patrons may not even receive the warnings (such as if they are missing from the shopping cart, blocked from view, and the like). In fact, even if a pedestrian does receive the message contained within the warnings, they will still be put at risk of contacting the cart if the wheels unexpectedly stop, given that the cart is at risk of unexpectedly stopping at a time and place that is unknown and not clearly defined to the user, along with the unknown nature of the wheels locking (i.e., abrupt vs. gradual) and the lack of information provided to the user regarding what needs to be done in the event of the wheels locking to avoid contacting/striking the cart. Notwithstanding, the LaRocques both testified that they had not observed the warning signage on the glass doors, and they both affirmatively testified that the subject cart did not have a warning placard attached to it.

*Summary*
In summary, the information I have reviewed illustrates that the Defendants were both aware of the potential for the wheels to unexpectedly lock, thereby putting patrons at risk of striking/contacting the cart and/or being knocked off balance. Despite this, the chosen safety strategy (i.e., warning signage) was unreliable (for all reasons discussed above), especially since the LaRocques both testified that the shopping cart they were using did not even have the placard in place. In other words, the Defendants were aware of the risk of harm posed by the wheels unexpectedly stopping/locking, but they failed to implement safety measures to eliminate/reduce the risk and/or reliably warn patrons like Ms. LaRocque about the risk.

**Ms. LaRocque's Behavior**

From a Safety and Human Factors Engineering perspective, Ms. LaRocque's overall behavior was predictable at the time of this incident. For example:

1. For all reasons discussed above, Ms. LaRocque was exposed to a risk of harm due to the shopping cart wheel(s) unexpectedly locking up as she was pushing the cart.

2. Ms. LaRocque described that she had no prior knowledge that the shopping carts were at risk of unexpectedly locking up and stopping. In fact, she described that she had not perceived the various warnings that were utilized to attempt to alert users of the risk of the wheels locking, which was predictable for all reasons discussed above. Here again, the testimony illustrates that the subject shopping cart did not even have the warning placard on it, which is consistent with my observations at the site, wherein I observed a number of carts devoid of the warning placard.

3. Given typical behavior at a grocery store, it should be expected that, at times, patrons will exit the facility with their shopping cart and take it into the parking lot and/or their vehicle (such as when loading groceries into their vehicle, obtaining something from their vehicle that they are taking back into the store, and the like). In other words, there is no reason to criticize Ms. LaRocque for taking the shopping cart through and/or past the exit doors, especially since I have seen no evidence she would somehow know that the locking function of the wheels had not been deactivated.

4. I have seen nothing indicating that Ms. LaRocque was in a rush/hurry, nor that she was engaged in horseplay at the time of her incident.

5. There is nothing indicating that she was impaired by alcohol or recreational drugs.

**Conclusions**

I have formed the following conclusions, which are expressed to a reasonable degree of Safety and Human Factors Engineering certainty:

1. Prior to Ms. LaRocque's incident, the Defendants knew and/or should have known that the shopping cart wheels were at risk of locking up and/or unexpectedly stopping, even if someone was not "shoplifting."

2. The cart wheels unexpectedly locking and/or stopping the forward motion of the shopping cart poses a risk of harm to pedestrians due to putting them at risk of striking/contacting the shopping cart and/or a loss of balance.

3. The overall warning system that was utilized to attempt to alert pedestrians of the risk of the shopping cart wheels locking and/or the shopping cart unexpectedly stopping was unreliable and inconsistent with basic principles for warnings.

4. Despite relying on warnings placards placed on the shopping carts, the shopping cart that Ms. LaRocque was using at the time of this incident was devoid of the warning placard.

5.  From a Safety and Human Factors Engineering perspective, Ms. LaRocque's overall behavior was predictable.

Please let me know if I can be of any further assistance.

Sincerely,

Levi Dixon, M.S., CXLT, CSP, CHFP
Senior Engineer

DECLARATION OF SERVICE

I hereby declare that on March 2, 2026, in Tacoma, Washington, I caused the foregoing affixed document to be served on the following parties in the manner indicated herein:

| | | |
|---|---|---|
| John R. Barhoum, WSBA #42776<br>Sarah Tuthill-Kveton, WSBA #51801<br>Hanna R. Lukes, WSBA #62610<br>Chock Barhoum LLP<br>121 SW Morrison Street, Suite 500<br>Portland, OR 97204<br>john.barhoum@chockbarhoum.com<br>sarah@chockbarhoum.com<br>hanna.lukes@chockbarhoum.com<br>michelle.heilbrun@chockbarhoum.com<br>devon.haggart@chockbarhoum.com<br>e-service@chockbarhoum.com | ☒ | Via Email |
| Francis S. Floyd, WSBA No. 10642<br>Skyler P. Urban, WSBA No. 58761<br>Floyd, Pflueger, Kearns, Nedderman, & Gress, P.S.<br>3101 Western Avenue, Suite 400<br>Seattle, WA 98121<br>ffloyd@nwtrialattorneys.com<br>surban@nwtrialattorneys.com<br>ecampbell@nwtrialattorneys.com<br>skatinas@nwtrialattorneys.com | ☒ | Via Email |

I DECLARE UNDER THE PENALTY OF PERJURY OF THE LAWS OF THE STATE OF WASHINGTON THAT THE FOREGOING IS TRUE AND CORRECT.

_____
Shane A. Ishii-Huffer, Paralegal
sishii-huffer@gth-law.com

PLTF'S EXPERT DISCLOSURE - 4
(3:25-cv-05380)
[4917-1150-5554]

Law Office
GORDON THOMAS HONEYWELL LLP
1201 PACIFIC AVENUE, SUITE 2200
TACOMA, WASHINGTON 98401-1157
(253) 620-6500 - FACSIMILE (253) 620-6565