# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON AT TACOMA

| | | |
|---|---|---|
| LINDA LAROCQUE, | ) | Civil Case No. 2:25-cv-05380-TMC |
| Plaintiff, | ) ) | |
| v. | ) ) | **DEFENDANTS THE KROGER CO. AND FRED MEYER STORES, INC., DBA TACOMA-STEVENS FRED MEYER'S FIRST SUPPLEMENTAL DISCLOSURE OF EXPERT TESTIMONY** |
| THE KROGER CO., a foreign corporation doing business in Washington state; and, FRED MEYER STORES, INC., a foreign corporation doing business in Washington state, a/k/a TACOMA-STEVENS FRED MEYER, GATEKEEPER SYSTEMS, INC., a foreign corporation doing business in Washington State, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

Pursuant to FRCP 26(a)(2), Defendants The Kroger Co and Fred Meyer Stores, Inc., dba Tacoma-Stevens Fred Meyer makes the following expert disclosures, as set forth below:

**Alan Brown, M.D.**
c/o Medconnect Pro, LLC
16100 NW Cornell Rd #100
Beaverton, OR 97006

Dr. Brown is a board-certified orthopedic surgeon. He may testify regarding his background, education and training as such. Dr. Brown's curriculum vitae, testimony list and fee schedule have already been produced. Attached as **Exhibit 1** is Dr. Brown's records review report.

Dr. Brown will base his opinions on his review of Plaintiff's medical records provided in this case and may perform an IME of Plaintiff and offer testimony as to his findings. Any of the reviewed materials may be used as exhibits at the time of trial to summarize or support his opinions. Testimony anticipated is regarding Plaintiff's claims of injury, causation of any injuries

DEFENDANTS THE KROGER CO. AND FRED MEYER STORES, INC., DBA TACOMA-STEVENS FRED MEYER'S FIRST SUPPLEMENTAL DISCLOSURE OF EXPERT TESTIMONY - 2:25-cv-05380

KRO224.0010

sustained, the care rendered to Plaintiff, Plaintiff's prognosis/damages, the reasonableness and necessity of the care and treatment received, and the potential future medical treatment needed, if any. Dr. Brown will respond to the testimony offered by Plaintiff's expert and will discuss the accuracy and/or inaccuracy of that expert's testimony.

**Manuel Meza-Arroyo**
c/o ESi
1174 Oak Valley Drive
Ann Arbor, MI 48108

Manuel Meza-Arroyo is a biomechanical engineer and human factors expert. He may testify regarding his opinions based on his background, education and training. Mr. Meza-Arroyo's curriculum vitae, testimony list and fee schedule have already been produced. Attached as **Exhibit 2** is the joint Investigative Report.

Testimony anticipated will be based upon his investigation into the facts of this incident, a site visit and inspection of the flooring at the store, review of discovery in this case, and witness deposition testimony. Any of the reviewed materials may be used as exhibits at the time of trial to summarize or support his opinions. In addition, Mr. Meza-Arroyo will respond to the testimony offered by Plaintiff's expert and will discuss the accuracy and/or inaccuracy of that expert's testimony.

**Gadir Hazime**
c/o ESi
1174 Oak Valley Drive
Ann Arbor, MI 48108

Gadir Hazime is a mechanical engineer. She may testify regarding her opinions based on her background, education and training. Ms. Hazime's curriculum vitae, testimony list and fee schedule have already been produced. Attached as **Exhibit 2** is the joint Investigative Report.

Testimony anticipated will be based upon her investigation into the facts of this incident, a site visit and inspection of the flooring at the store, review of discovery in this case, and witness deposition testimony. Any of the reviewed materials may be used as exhibits at the time of trial to summarize or support her opinions. In addition, Ms. Hazime will respond to the testimony offered

by Plaintiff's expert and will discuss the accuracy and/or inaccuracy of that expert's testimony.

Discovery in this case is ongoing. As such, Defendants reserve the right to supplement this disclosure of expert witnesses and to call experts or treating providers who become involved in the care of Plaintiff and/or her subject conditions after the date of this disclosure.

DATED this 8th day of May, 2026.

**CHOCK BARHOUM LLP**

John R. Barhoum, WSBA #42776
Email: john.barhoum@chockbarhoum.com
Sarah Tuthill-Kveton, WSBA #51801
Email: sarah@chockbarhoum.com
Electronic Service: e-service@chockbarhoum.com
    Attorneys for Defendants The Kroger Co. and Fred
    Meyer Stores, Inc. dba Tacoma-Stevens Fred Meyer

IN THE UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON AT TACOMA

| | |
|---|---|
| LINDA LAROCQUE, ) | |
| Plaintiff, ) | Civil Case No. 2:25-cv-05380-TMC |
| v. ) | **CERTIFICATE OF SERVICE** |
| THE KROGER CO., a foreign corporation doing ) business in Washington state; and, FRED ) MEYER STORES, INC., a foreign corporation ) doing business in Washington state, a/k/a ) TACOMA-STEVENS FRED MEYER, ) GATEKEEPER SYSTEMS, INC., a foreign ) corporation doing business in Washington ) State, ) | |
| Defendants. ) | |

I hereby certify that on this 8th day of May, 2026, a true copy of the foregoing **DEFENDANTS THE KROGER CO. AND FRED MEYER STORES, INC., DBA TACOMA-STEVENS FRED MEYER'S FIRST SUPPLEMENTAL DISCLOSURE OF EXPERT TESTIMONY** was served as stated below on:

| | |
|---|---|
| Robert C. Wilke Gordon Thomas Honeywell, LLP 1201 Pacific Avenue, Suite 2100 Tacoma, WA 98402 *Attorneys for Plaintiff* | ☐ By hand delivery ☐ By first-class mail* ☐ By facsimile transmission ☐ Fax #: (253) 620-6565 ☒ By e-mail: rwilke@gth-law.com ileifer@gth-law.com sishii-huffer@gth-law.com sweger@gth-law.com ☐ By court eFiling Application |
| Francis S. Floyd Skyler P. Urban Floyd Pflueger, P.S. 3101 Western Avenue, Suite 400 Seattle, WA 98121 *Attorneys for Defendant Gatekeeper Systems, Inc.* | ☐ By hand delivery ☐ By first-class mail* ☐ By facsimile transmission ☐ Fax #: ☒ By e-mail: ffloyd@nwtrialattorneys.com surban@nwtrialattorneys.com ecampbell@nwtrialattorneys.com skatinas@nwtrialattorneys.com ☐ By court eFiling Application |

CERTIFICATE OF SERVICE - 2:25-cv-05380
KRO224.0010

\*With first-class postage prepaid and deposited in Portland, Oregon.

DATED this 8th day of May, 2026.

**CHOCK BARHOUM LLP**

_Sarah Tuthill-Kveton_

John R. Barhoum, WSBA #42776
Email: john.barhoum@chockbarhoum.com
Sarah Tuthill-Kveton, WSBA #51801
Email: sarah@chockbarhoum.com
Electronic Service: e-service@chockbarhoum.com
  Attorneys for Defendants The Kroger Co. and Fred
  Meyer Stores, Inc. dba Tacoma-Stevens Fred Meyer

CERTIFICATE OF SERVICE - 2:25-cv-05380



MedConnect Pro, LLC
1500 NW Bethany Blvd. #255
Beaverton, OR 97006
www.medconnectpro.com

Phone:   (503) 922 – 2160
Fax:      (503) 530 – 8272
Fax 2:    (503) 214 – 8267
info@medconnectpro.com

# MEDICAL RECORD REVIEW

May 7, 2026

Sarah Tuthill-Kveton
Attorney at Law
Chock Barhoum, LLP
121 Southwest Morrison Street, Suite 500
Portland, Oregon  97204

| | |
|---|---|
| **Claimant:** | **Linda Larocque (*Larocque v. The Kroger Co., et al*)** |
| **Court Number:** | **Tacoma Division 2:25-cv-00970** |
| **File Number:** | **KRO224.0010** |
| **Date of Loss:** | **May 6, 2023** |

Dear Ms. Tuthill-Kveton:

An Independent Medical File Review is enclosed for your review.  This review has been performed by Alan B. Brown, MD, JD, Orthopedic Surgeon.

A file of medical records has been furnished for this evaluation.  While not every document in the file is described in detail, all the data thereof has been incorporated into the formulation of my findings and opinions and to a degree sufficient to understand the rationale thereof.  My opinions given in this report are to what I believe is a reasonable degree of medical probability.

The opinions expressed in this report are those of the physician and do not reflect the opinions of MedConnect Pro, LLC.  The opinions are expressed with reasonable medical certainty based on the available data provided.

Please review the following report:

## CHART REVIEW:

I received records, beginning with a cover letter dated April 21, 2026, indicating the date of loss as May 6, 2023.

Index of records.

Exhibit 1 - Page 1 of 22

LEGAL RECORDS

Copy of the Complaint for Damages:

Background indicated on May 6, 2023, Ms. Larocque went to Fred Meyer, and upon exiting the door, an anti-theft mechanism engaged on her cart, and her left knee struck the back of the cart.  The complaint indicated that Ms. Larocque was status post a left total knee replacement on February 8, 2023, and that subsequent x-rays showed a patellar shift requiring a 2nd surgery.  The records indicate Ms. Larocque had a 3rd surgery with revision of her total knee replacement.

Depositions:

Deposition transcript of Steven Larocque taken on September 11, 2025.  It begins with some background information and personal information.  He testified she had been retired for six years from the Tacoma Public Library as a maintenance custodian.

He gave a description for subject incident.  He testified that his wife's knee hit a cart when it stopped, and he noticed a red mark just below her kneecap.  He was asked about his wife's prior knee surgery.  He testified that after he and his wife got home from the store, her knee was "more than bothering her."  He testified her knee was swollen.  He testified she also developed bruising in the area that her knee hit the cart.  She had an appointment with her provider within a day or two.  He testified to some of Ms. Larocque's postoperative symptoms from the surgery done after the subject incident.  Then, he testified to the 3rd surgery, or the 2nd surgery after the subject incident.  He testified that she had significant arthritis in her knee, leading to the 1st surgery, which was prior to the subject incident.  He testified to some of the impact on his life as a result of the subject incident and the subsequent knee surgeries.

Examination by Skyler Urban, representing the Defendant, Gatekeeper.  Mr. Larocque was asked about some of his wife's symptoms prior to the 1st surgery, the original total knee replacement.  He was asked about his wife's mobility in the period between the 1st knee replacement surgery and the cart incident.  He was asked about some exhibits.  There is some additional testimony regarding the subject incident.  He was asked about some assistive devices.  The deposition then concluded.

Deposition transcript of Ms. Larocque taken on September 12, 2025.  The deposition begins with some background information and personal information.  She testified she worked as a teacher's assistant in a school before she retired.  She testified to some of her crafting activities.  She was asked about a MultiCare visit from January 12, 2023, where on her active problem list, it included osteoarthritis, which she described as in her lower back.  She was asked about some of her other past medical history.  She testified to some of her prior back pain.  She was asked about her history of depression.  She testified to her history of chronic pain in her back.  She testified to having a handicapped placard prior to her 1st surgery for her lower back pain.  She testified she used a cane for

Exhibit 1 - Page 2 of 22

balance prior to her 1st knee surgery. She testified to several activities prior to her original knee replacement surgery. She was asked about some of the risks of the knee replacement surgery and whether she was aware of them. She testified that she started driving approximately three weeks after her 1st knee replacement surgery.

She was asked about some of the exhibits and the area where she had her injury. She gave a general description about the subject incident. She testified to her need to use a shopping cart for mobility. She testified there was some bruising on her knee the following day. She testified that Dr. Bones told her that her patella shifted as a result of the subject incident. She testified to some of her subsequent surgeries. She testified to some of her postsurgical rehabilitation. She gave some additional description of the subject incident. There was some questioning about hypothetical liability issues, and there was an examination by Mr. Wilke. The deposition then concluded.

Interrogatories and Responses:

Set of Interrogatories and Responses. Interrogatory number 4 asks for a list of injuries. Interrogatory number 25 asks for a description of the subject accident.

Plaintiff's responses to Defendant Gatekeeper's Interrogatories.

Rule 26 Expert Disclosure Document:

Named experts included Dr. Rolfe, Cloie Johnson, and Levi Dixon.

Curriculum Vitae:

Curriculum Vitae of Cloie Johnson.

Exhibit:

Exhibit B dated November 22, 2025, which is a review of medical bills for reasonableness of cost.

Supplemental Reports:

Supplemental report for updated medical records and after-consultation with Dr. Rolfe regarding Cloie Johnson's Life Care Plan.

Supplemental report from Cloie Johnson regarding reasonableness of charges.

INDEPENDENT MEDICAL EXAMINATIONS/RECORD REVIEWS:

Curriculum Vitae of Bruce Rolfe.

Exhibit 1 - Page 3 of 22

Report from Dr. Rolfe from October 3, 2025.  History included that Ms. Larocque reported that her low back became painful during rehabilitation.  Dr. Rolfe gives a current history indicating pain daily, cooking in a limited fashion while sitting, and limited housework, as well as other difficulties and limitations.  Diagnosis included a left knee patellar tendon rupture, left hip and low back strain, and right knee aggravation as a result of the May 6, 2023, injury.

Copy of Dr. Rolfe's report dated April 2, 2026.  Dr. Rolfe's opinions at the end of the Addendum were left patellar tendon rupture, left hip strain, low back strain, and right knee aggravation, all as a result of the May 6, 2023, accident.

VOCATIONAL REHABILITATION:

November 22, 2025, report from OSC Vocational Systems regarding reasonableness of bills.  This is from Cloie Johnson.

Report from Levi Dixon.

February 23, 2026, Supplement from Cloie Johnson with a list of future medical expenses.

February 23, 2026, note from Cloie Johnson, which is a Supplemental Report.

OTHER DOCUMENTS:

Copy of Dr. Rolfe's October 3, 2025, report.

Copy of the November 22, 2025, report from Cloie Johnson.

Copy of the February 25, 2026, report from Applied Cognitive Sciences.

Additional copy of Levi Dixon's Safety Report.

MEDICAL RECORDS:

May 15, 2018, note from Lakewood Family Practice for chronic pain syndrome, myofascial muscle pain, as well as migraines and depression.

Report of a CT of the abdomen and pelvis from May 16, 2018.

Family practice note from October 18, 2018, for Nancy Minjire, ARNP, indicating Ms. Larocque fell at home while gardening, felt a pop in the lateral aspect of her knee, and was complaining of swelling and inability to fully weightbear.

Family practice note from October 18, 2018, for continued knee pain, onset date October 16, 2018.

Exhibit 1 - Page 4 of 22

Family practice note from May 1, 2019, by Dr. Dawson for chief complaint of chronic pain management. Notes back, knee, and abdominal pain, with three falls onto her left knee. Assessment included chondromalacia patella on the left side, degeneration of the lumbar spine, and myofascial muscle pain.

Encounter from May 21, 2019, from Dr. Dawson for physical exam. Ms. Larocque was complaining of leg cramps with no known injury or cause.

May 21, 2019, orthopedic and sports medicine note for complaints of left knee pain. Impression was grade 4 degenerative joint disease of the left knee and morbid obesity, as well as opioid dependence. Recommendation was for wellness program and weight loss.

X-ray report of the left knee from May 21, 2019, showing advanced degenerative arthritis.

Index of records.

Note from June 4, 2019, from Dr. Vranna, a chiropractor, for complaints of cervical, thoracic, and lumbar spine symptoms.

Intake forms from Accident & Injury Chiropractic from June 6, 2019, and June 10, 2019.

Chiropractic notes continue through June 2019 and July 2019.

July 23, 2019, Ms. Larocque was reporting pain levels of 4/10 to 5/10, except for the left knee was 8/10.

Additional chiropractic notes through August and September 2019. They continue through October and November, as well as December 2019.

December 24, 2019, family practice note for pain management follow-up.

Additional chiropractic notes from December 2019 and January 2020.

February 25, 2000, family practice note for chief complaint of diabetes, hypertension, depression, and hoarding disorder. Patient information forms on Obsessive-Compulsive Disorder.

Additional chiropractic notes from May 2020.

June 11, 2020, family practice note from Dr. Dawson. Ms. Larocque's weight was 264 pounds. Plan was continuation of Norco for myofascial pain syndrome.

Additional chiropractic notes from June 2020 through August 2020.

Exhibit 1 - Page 5 of 22

Family practice note from September 3, 2020, for follow-up of chronic pain syndrome.

Additional chiropractic notes through 2020 from Accident & Injury Chiropractic.  The chiropractic notes continue until 2021.

Intake form from Lakewood Family Practice from February 23, 2021, with an encounter from Dr. Dawson for chronic pain from spinal arthritis and diabetic neuropathy, as well as complaints of depression and hoarding disorder.

Anchor Physical Therapy note from March 10, 2021.

Additional chiropractic notes from 2021 through August 2021.

August 30, 2021, Pulse Heart Institute cardiovascular consult, along with copies of laboratory reports.

Additional chiropractic notes for 2021.

Pulmonology note from September 14, 2021, for obstructive sleep apnea.

Additional chiropractic notes from Accident & Injury Chiropractic through September 2021, additional cardiology notes through 2021, and family practice notes.

On October 14, 2021, Mr. Larocque was seen by her family practitioner for knee pain, as well as Depressive Disorder, obstructive sleep apnea, and heart failure.  Her weight was 261 pounds.

Additional chiropractic notes through October 2021.

Pulse Heart Institute from October 21, 2021.

Additional notes from Pulse Heart Institute from October 21, 2021.

Additional chiropractic notes from October and November 2021.

November 3, 2021, heart catheterization study.

Orthopedic encounter from November 9, 2021, for evaluation of left knee degenerative arthritis and chronic pain.

Encounter from November 10, 2021, from the pulmonary clinic.

Additional chiropractic notes from November 2021.

Additional Pulse Heart Institute cardiology notes through 2021.

Exhibit 1 - Page 6 of 22

Chiropractic note from November 30, 2021, from Dr. Bulmer of Accident & Injury Chiropractic.

Encounter from January 4, 2022, a chiropractic note, for cervical, thoracic, and lumbar pain.

Additional chiropractic notes through February 2022 and March 2022.

Chiropractic notes continue through March 2022.

X-ray from April 13, 2022, showing degenerative scoliosis, mild degenerative arthritis of the hip, and spondylolisthesis of L4-5.

Copies of x-ray studies of the cervical spine and thoracic spine.  The thoracic spine shows multilevel degenerative changes and scoliosis.

Additional copies of x-rays in a note from April 19, 2022, a chiropractic note.

Encounter from May 23, 2022, from the Pulse Heart Institute.

Copies of laboratory reports.

Family practice note from May 25, 2022, from Dr. Dawson.  Weight was noted to be 262 pounds.

Additional chiropractic notes from 2022 and notes from the Pulse Heart Institute through June 2022.

Additional chiropractic notes from July 2022.

Family practice note from August 30, 2022, for chief complaint of medications and depression.

Additional chiropractic notes from October 2022.

Note from October 31, 2022, from Pulse Heart Institute.  The primary concern on that visit was leg aching.

Copies of laboratory reports.

Additional family practice notes, including a note from November 29, 2022.

Additional chiropractic notes through 2022, as well as physical therapy notes for bilateral hip and low neck pain.

Exhibit 1 - Page 7 of 22

Physical therapy notes continue through December 2022.

Orthopedic note from December 22, 2022, for left knee pain.  Ms. Larocque's weight was 247 pounds.  Plan was consideration for knee replacement surgery.

Additional physical therapy notes from December 2022 and chiropractic notes from December 2022 and January 2023.  The physical therapy and chiropractic notes continue through January 2023.

Office visit with the Orthopedic Clinic from January 12, 2023.  Plan was for a total knee replacement.

Additional physical therapy notes.

January 12, 2023, pulmonary note.

Additional physical therapy and chiropractic notes through January 2023.

Note from February 8, 2023, for admission for chronic left knee pain.  Physical therapy and additional inpatient notes, including nursing notes and flow sheets.

Operative note from February 8, 2023, for left total knee replacement.

Orthopedic note from February 28, 2023, where they continued the use of continuous passive motion.

Additional physical therapy notes through February 2023.

Chiropractic note from March 8, 2023, for cervical, thoracic, and lumbar spine symptoms.

Physical therapy notes continue through March 2023.

Orthopedic note from March 28, 2023, indicating Ms. Larocque was doing "great" following her total knee replacement.  She was still doing physical therapy, and there are additional physical therapy notes through April 2023.

Additional chiropractic and physical therapy notes through April 2023.

Physical therapy note from May 2, 2023, noting Ms. Larocque was having pain on the top of her knee.

Chiropractic note from May 3, 2023.

Exhibit 1 - Page 8 of 22

Additional physical therapy note from May 4, 2023, where Ms. Larocque was reporting being tired from running errands.  She felt as if her knee was doing well, but she was complaining of left hip pain.

**Date of Loss:  May 6, 2023.**

Orthopedic note from May 9, 2023, for left knee pain, right shoulder pain, and right knee pain.  Ms. Larocque was reporting increased pain in the left knee after hitting her knee on a shopping cart.

Note from May 9, 2023, where Ms. Larocque was 253 pounds and complaining of pain in the right knee after an incident kneeling and went to her knee.  X-rays show a small avulsion on the tip of the patella on the left, and she was reporting increasing pain since her injury, hitting the knee on the cart.

Various physical therapy notes from May 10, 2023, and May 2023.

Note from May 16, 2023, from MultiCare Orthopedics, where Ms. Larocque was reporting increasing pain and swelling.

Additional chiropractic and physical therapy notes through May 2023.

Orthopedic note from June 1, 2023, for follow-up of left knee pain.

Physical therapy notes continue through June 2023, with continued complaints of left knee pain.

Physical therapy and chiropractic notes continue through June 2023.

Orthopedic note from June 22, 2023, where Ms. Larocque was reporting not making any progress with physical therapy.  She was fitted with a knee immobilizer, and she reported she was unable to lift her left leg.

Cardiovascular follow-up visit note from June 26, 2023.

Operative note from Dr. Thompson from June 26, 2023, for left knee infrapatellar tendon rupture, posttraumatic.

Follow-up note from July 6, 2023.

Additional index of records.

Encounter from August 10, 2023, from the Orthopedic Clinic.  Ms. Larocque reported she was doing worse since her previous visit and that her "leg and hip have been 'on fire'." Plan was for physical therapy.

Exhibit 1 - Page 9 of 22

Additional physical therapy notes starting on August 15, 2023, from Anchor Physical Therapy.

Therapy notes continue through August 2023.

Note from the Orthopedic Clinic from August 31, 2023. X-rays show "concern for patella position with change from initial postoperative films."

Encounter from September 29, 2023, from MultiCare Orthopedic Clinic. Assessment was a patellar tendon rupture and likely periprosthetic patellar fracture of the inferior pole. Plan was for revision to a hinged component.

Additional chiropractic notes from October 2023.

Chiropractic note from October 14, 2023, noting an upcoming 3rd surgery on the left knee.

Chiropractic notes continue through October 2023.

Family practice note from November 2, 2023, for anxiety and chronic pain management. Plan was referral to Behavioral Health in our Substance Use Disorders Clinic.

Additional chiropractic encounters from November 2023.

Orthopedic note from November 22, 2023, for preoperative evaluation for revision total knee replacement.

December 4, 2023, through December 8, 2023, admission for revision total knee replacement. Series of inpatient notes, nursing notes, copies of laboratories, and physical therapy notes, as well as flow sheets from the inpatient stay after the revision total knee arthroplasty.

Anesthesia notes and additional inpatient physical therapy notes from December 4, 2023, to December 8, 2023.

Message encounter from December 7, 2023, regarding medication refills.

Additional message encounters and imaging questionnaires.

Note from December 14, 2023, from Lakewood Family Medicine for follow-up after surgery.

Pharmacy notes and additional message encounters regarding prescriptions and prescription refills.

Exhibit 1 - Page 10 of 22

Encounter from Shane Turner, PA-C, for follow-up after revision total knee arthroplasty. Ms. Larocque was reportedly doing well.

December 28, 2023, note regarding a cast adjustment.

Encounter from January 5, 2024, from the Orthopedic Clinic for follow-up after revision total knee arthroplasty.  Ms. Larocque was reporting discomfort from the cast rubbing on her foot.  Pain was 2/10.

Additional forms.

Family practice note from February 8, 2024, for follow-up of pain management and medical complaints.

Orthopedic note from February 9, 2024, for a cast check.

March 1, 2024, note from the Orthopedic & Sports Medicine Clinic from Dr. Adler.

Physical therapy note from Anchor Physical Therapy from March 6, 2024.

Additional physical therapy notes through March 2024 and April 2024.

Family practice note from April 2, 2024.  Ms. Larocque was out of her cast and going to physical therapy with a hinged brace, weightbearing as tolerated, and full extension.

Additional physical therapy notes from April 2024.

Encounter from MultiCare Orthopedic Clinic from April 12, 2024.  Ms. Larocque was reporting her knee was doing "much better."  Her pain levels were 1/10.  Recommendation was continued hinged brace, 0 degrees to 70 degrees for two weeks, and then increase 0 degrees to 90 degrees for one month.

Additional physical therapy notes, which continue through April 2024 and May 2024.

Family practice note from May 15, 2024.

Additional physical therapy notes from May 2024.

Encounter from the Orthopedic Clinic from May 24, 2024.  Ms. Larocque was six months out from her revision total knee arthroplasty.  She was noted to be using a walker to ambulate.

Additional physical therapy notes from May and June 2024.

Exhibit 1 - Page 11 of 22

In July 2024, there is report of a DEXA bone density study and some additional screening studies.

Orthopedic note from July 10, 2024.  Primary complaint at that time was progressively severe right knee pain.  Assessment included right knee arthritis and status post revision left knee arthroplasty, and Ms. Larocque was given a right knee injection. Recommendation was that Ms. Larocque would discontinue her hinged knee brace.

Family practice note from August 5, 2024.

Additional physical therapy notes from August 2024.

Physical therapy note from August 8, 2024, indicated that with the left knee, Ms. Larocque could do all of her usual activities in terms of mobility, but due to the right leg, she was unable to drive due to right thigh pain.  She also reported her back was "not good."

Note from Dr. Dawson from November 5, 2024, for follow-up of diabetes and obesity.

Additional notes from November 2024 and December 2024 from Family Practice and Cardiovascular Clinic.

Additional physical therapy notes from 2025.

Note from Dr. Adler's office from January 22, 2025, where an injection had been done.

Another index of records.

Additional physical therapy notes through February 13, 2025.

Additional physical therapy notes, which continue through February and March 2025.

Note from Dr. Dawson from March 25, 2025, for follow-up of chronic pain and depression.

Cardiovascular visit follow-up note from Dr. Guerra.

Additional physical therapy notes, which continue through April 2025.

Physical therapy discharge summary from April 17, 2025.  The physical therapy discharge note indicates overall improvement with exercises helping Ms. Larocque's back, and she was appropriate for discharge.

Report of lumbar spine MRI from May 1, 2025, showing degenerative disk and degenerative joint disease, with moderate stenosis at L4-5 and L5-S1 and a chronic listhesis of L1-2 and L4-5, as well as L5-S1.

Exhibit 1 - Page 12 of 22

Refill requests.

Family practice note from October 15, 2025, for left hip and knee pain.

November 7, 2025, note from the Orthopedic Clinic indicating worsening right knee pain and progressively worsening left lower extremity pain.  Plan was for follow-up in four months.

Orthopedic note from November 18, 2025, for left hip injection.

Encounter from December 3, 2025, which is a family practice note, for follow-up of chronic pain and medical problems, including depression.

Orthopedic Clinic note from December 11, 2025, for left ankle injury.

Additional physical therapy notes and forms.

Physical Therapy Plan of Care from January 20, 2026, for left ankle sprain.

Administrative forms.

 SUMMARY:

In summary, Ms. Larocque has a long history of orthopedic complaints.  As early as May 15, 2018, she was being seen by her family practitioner with a visit diagnosis of chronic pain syndrome and myofascial muscle pain, as well as migraines and major depression.  On October 18, 2018, she was seen by her family practitioner reporting a one-day history of right knee pain.  She reported falling while gardening and was having right knee pain and swelling.  At that time, she was noted to be 272 pounds.

On May 1, 2019, she reported a history of left knee pain.  She was also having back pain.  She reported having fallen three times onto her left knee, and she was having pain that was peripatellar, medial and posterior.  On May 21, 2019, she was evaluated at the MultiCare Orthopedic & Sports Medicine Clinic, complaining of left knee pain.  She reported it had been painful since 2015 after a fall at home.  She also reported "back injuries."  X-rays at that time showed degenerative arthritis of the left knee.  She was also noted to have opioid dependence and morbid obesity.  On June 4, 2019, she was evaluated by her chiropractor for pain in the cervical, thoracic, and lumbar spine.  When she was seen on July 23, 2019, at Accident & Injury Chiropractic, she was reporting 3/10 to 5/10 pain in her cervical, thoracic, and low back, and she was having left knee pain, 8/10.  She continued with chiropractic and follow-up for back pain and knee pain.  On February 23, 2021, she was noted to be 272 pounds.

On March 10, 2021, she was evaluated at Anchor Physical Therapy for low back pain and left knee pain.  The note from that visit indicated that she needed assistance with stepping

Exhibit 1 - Page 13 of 22

up and down, squatting, etc., with respect to her hip.  For her low back, she was noted to be 65 percent to 85 percent of normal with range of motion.  On October 14, 2021, she was noted to be 261 pounds.  She continued with chiropractic manipulations.

On March 17, 2022, when Ms. Larocque was seen by her chiropractor, she was noted to have cervical, thoracic, and lumbar spine pain.  She was also noted to have left knee pain.  An x-ray done by her chiropractor, which appears to be from 2022, showed scoliosis as well as spondylolisthesis at L4-5.  On December 6, 2022, when she was seen by her therapist, she was reporting fatigue with under five minutes of standing activities.  On December 22, 2022, Ms. Larocque was seen at MultiCare Orthopedic & Sports Medicine Clinic for left knee pain.  Her weight was 247 pounds.  Her diagnosis was chronic left knee pain and osteoarthritis of the left knee.  Surgical options were discussed at that time.

On February 8, 2023, Ms. Larocque had a left total knee arthroplasty done by Dr. W. Frederick Thompson.  Postoperatively, Ms. Larocque started physical therapy.  She was initially evaluated after her surgery on February 20, 2023.  She continued with physical therapy, and on March 28, 2023, she was having difficulty with stepping up and down, rising from a low chair, ascending and descending stairs, and she was unable to squat.  Her knee flexion and extension strength was 3-/5.  She continued with physical therapy, and on April 18, 2023, she was complaining of continued left knee and hip pain and was reporting she was more limited by her left hip and gluteus.  Her knee strength in flexion and extension was 3-/5.

On April 20, 2023, when she was seen by her physical therapist, she was reporting less left knee pain but continued left hip pain.  On April 27, 2023, there is a note from Anchor Physical Therapy where Ms. Larocque reported she had been trying to keep up with her home exercise program and was self-progressing.  She reported hip and piriformis tightness and reported "one incident where she 'took a knee,' but did not have any elevated symptoms."  The note indicated she was progressing well with her ability to walk, stand, and go up and down stairs, and her range of motion was improving.  However, it also reported that she remained deficient with hip and quadriceps recruitment, affecting her capacity to walk or stand for more than 30 to 45 minutes.  She reported being challenged with walking or climbing stairs and needed to use railings to stabilize her stance.  Her knee flexion and extension on that visit was 4-/5.

On May 2, 2023, she was seen at Anchor Physical Therapy, reporting that the top of her knee was bothering her.  It was hurting her at rest and when she was "doing things."  She was using a cane due to lack of confidence in her knee and balance.  She also reported issues with her right knee.  Assessment was improvement in the knee range of motion and strength, but she was having difficulty balancing, and recommendation was for further therapy.  On May 3, 2023, Ms. Larocque saw her chiropractor, and it noted that the left knee was "straight A-P with bolster–only***left knee ligament laxity."  On May 4, 2023, or two days before the subject incident, Ms. Larocque reported she was tired from running errands, her knee was doing well, and she felt like she was stronger.  However, she was still complaining of left hip pain and pain with stairs.  She was able to do terminal knee

Exhibit 1 - Page 14 of 22

extension with elastic bands.  The note indicated that visit was her last physical therapy visit, and she had continued improvement in her left knee symptoms.  However, the note indicated she still had some degree of weakness in the quadriceps and was limited in her ability to squat and perform stairs without compensation patterns.

On May 6, 2023, Ms. Larocque was involved in the subject incident.  According to her deposition transcript, she was at Walmart, using a cart to help her ambulate.  She testified it was a full-sized cart.  She testified she did not lean or put her body weight on the cart. She went into the store, and as she was going out of the store, without putting any items in the cart, the cart stopped due to an anti-theft device.  She testified that she was pushing the cart, and when it stopped, her "knee hit that underneath."  She looked down to see if there was something stuck on the wheel.  She was trying to push the cart, and it would not go.  She testified she left the store.  She testified she was "so upset."  She then testified she was "crying" and walked over to an ATM or Boeing Employees' Credit Union machine.  She testified at the point of the impact with the cart and her knee, there was a red mark and bruising.  She also testified in her deposition that when she was at the Walmart, she was braced.  Very specifically, on page 74 of her deposition, she testified that she had worn a brace.  Very specifically, on page 73, she was asked, "Were you wearing a brace at the time of this incident?" Her answer was, "Yes."  Again, the question was, "Okay.  You were wearing a knee brace at the time of this incident?"  Her answer was again, "Yes."  Her description was of a hinged knee brace.  She gave some additional testimony regarding a description of the incident, and she testified that when she was pushing the cart, it stopped, "The next step [she] took was into the cart."  She testified that her knee hit the back of a plastic component of the cart.  She testified she lifted her knee and walked into the cart.

Three days after the subject incident, Ms. Larocque went in to see the MultiCare Orthopedic and Sports Medicine Clinic.  She reported that her left knee was having increased pain for one week after hitting her knee on a shopping cart.  She was 253 pounds, and she reported that her right knee had become increasingly painful since April 19, when she was kneeling on the floor and felt a pop upon standing.  She felt a shift in her right knee at that time.  On her left knee, she showed moderate sit-to-stand symptoms, noted most significant "to contusion area of impact with trace effusion."  However, there was no note of a bruise or red mark.  Recommendation was for supervised physical therapy.  X-ray examination showed a small avulsion fracture at the inferior tip of the patella, but the patella was located in a satisfactory position.  The following day, she was seen by her physical therapist, again reporting the shopping cart incident.  She was reporting constant pain, having to use a cane, was limited with her standing and walking, and felt her knee was worse than prior to the subject incident.  She was noted to have reduced active and passive range of motion of the left knee.  On May 16, 2023, she was again seen in the MultiCare Orthopedic Clinic for follow-up of her left knee.  She reported it was not getting better since her May 6, 2023, shopping cart incident. The note indicated limited range of motion secondary to pain, but did not notice any red marks or bruising. Plan was for follow-up in two weeks.

Exhibit 1 - Page 15 of 22

On May 25, 2023, when she was seen by her therapist, Ms. Larocque reported she had seen her chiropractor for the 1st time postoperatively and had a "slight knee adjustment and [felt] she did okay, but did throw up."  When Ms. Larocque was seen by her orthopedist on June 1, 2023, she reported significant pain in her knee and a sensation of her scar "ripping."  She was also seen by her therapist on June 1, 2023, noting some increased ability to bend her knee, and her knee felt a little bit stronger.  On June 26, 2023, there is a note from Dr. Thompson, which is a procedure note for an infrapatellar tendon rupture, posttraumatic following a left total knee arthroplasty.  He did a patellar tendon repair.  On July 6, 2023, when she was seen for a postoperative visit, there were still moderate sit-to-stand symptoms noted, and the leg was maintained in full extension.  On August 10, 2023, in the postoperative follow-up note from the Orthopedic Clinic, Ms. Larocque was reporting increased pain in her hip and groin.

On August 15, 2023, Ms. Larocque was seen by her physical therapist, reporting burning in her left knee and weakness, as well as limited ability to stand.  An x-ray was done on August 31, 2023, showing the patella had shifted from her postoperative films, and on September 29, 2023, recommendation was for a revision total knee arthroplasty with a hinged prosthesis.  This was done on December 4, 2023.  Postoperatively, again, Ms. Larocque was immobilized initially, and on March 1, 2024, Dr. Adler removed her cast.  She continued with physical therapy, and on April 2, 2024, when she was seen by her family practitioner, she was still in a hinged brace.  On May 24, 2024, her orthopedic note indicated she was doing well.  On July 2, 2024, she was reporting a sensation of right thigh pulling or tearing.  Her left knee was "okay."  On July 10, 2024, she again reported her left knee was doing well, and the right knee and low back were her problems.

On August 8, 2024, there is a physical therapy note indicating Ms. Larocque reported she had the mobility to do "all of her usual activities."  However, back was "not good," and she was unable to drive due to right knee pain.  She was given a right knee injection on January 22, 2025, and again continued physical therapy.  On February 13, 2025, there is a physical therapy note indicating Ms. Larocque was planning surgery the following summer.

On March 25, 2025, Ms. Larocque was seen by Dr. Dawson for her chronic pain syndrome and depression.  She reports she was unable to stand for any length of time because of her back.  On April 17, 2025, she was discharged from physical therapy, and on May 1, 2025, an MRI study of the lumbar spine showed multilevel degenerative changes with a spondylolisthesis at L4-5.

She continued with bilateral knee pain, and on November 7, 2025, when she was seen at the Orthopedic Clinic, she reported worsening severe knee pain on the right and progressively worsening pain on the left, which Ms. Larocque attributed to her left hip pain.

On December 11, 2025, there is a note indicating Ms. Larocque had injured her ankle, and on January 20, 2026, she started physical therapy for an ankle sprain.

Exhibit 1 - Page 16 of 22

**DIAGNOSTIC STUDIES (PERSONALLY REVIEWED):**

I have received three folders of imaging.

MULTICARE DISC ONE:

January 12, 2023, chest x-ray.

February 8, 2023, left knee x-ray showing the staples are still in place, and there is a well-positioned total knee arthroplasty.  The distal pole of the patella is intact.  On the anteroposterior view, however, there is a superomedial calcification or cement.

May 9, 2023, left knee x-ray showing a small avulsion fracture of the distal patella and slight patella alta.  The distal patellar pole fracture is displaced approximately 5 millimeters.  May 9, 2023, merchant view and tunnel view.  The tunnel view shows the patella is somewhat laterally subluxed.  There is an anteroposterior and lateral of the right knee showing severe degenerative arthritis, tricompartmental of the right knee with subluxation of the patella or dislocation of the patella, and medial joint space narrowing.

June 22, 2023, x-ray of the left knee.  It shows complete disruption of the patellar tendon with the small patellar pole still embedded in the proximal patellar tendon.  The anteroposterior view shows what looks like a superior pole patellar fracture through one of the anchor holes for the patellar button.

June 27, 2023, x-ray of the left knee showing the patellar tendon has been disrupted.  There are still staples in place.

August 31, 2023, x-ray of the left knee showing patella alta, fracture of the patella through one of the anchor holes for the patellar button, and complete disruption of the extensor mechanism.

November 22, 2023, x-ray of the left knee showing complete disruption of the extensor mechanism and fracture of the patella.

December 4, 2023, postoperative x-ray showing a hinged total knee arthroplasty, and the patella has been excised.

December 22, 2023, left knee x-ray, again showing the hinged prosthesis, cemented, well positioned, and Ms. Larocque had a patellectomy.

February 2, 2024, left knee series showing well-positioned hinged total knee arthroplasty, cemented, long stem.

March 1, 2024, and May 24, 2024, knee x-rays showing well-positioned total knee arthroplasty.

Exhibit 1 - Page 17 of 22

July 10, 2024, x-ray of the right knee showing subluxation of the patella and tricompartmental degenerative changes, most significant at the patellofemoral joint.

MULTICARE IMAGING DISC TWO:

January 8, 2025, Lumbar spine series showing spondylolisthesis at L4-5 with no apparent instability and a slight scoliosis.

MULTICARE IMAGING DISC THREE:

November 25, 2025, ankle x-ray of the left ankle showing no fracture.

November 25, 2025, foot x-ray showing no foot fracture.

Ultrasound order and ultrasound study from November 18, 2025.

Hip x-ray from November 7, 2025, with an anteroposterior pelvis showing minimal degenerative changes of the hip.  The joint space is relatively well maintained.

November 7, 2025, x-ray of the left knee showing well-positioned long-stem hinged arthroplasty and degenerative arthritis of the right knee.  The hinged arthroplasty is on the left.

November 7, 2025, knee series of the right knee showing severe degenerative arthritis with subluxation or dislocation of the patella.

May 1, 2025, lumbar spine MRI showing a slight spondylolisthesis at L3-4, grade 1 spondylolisthesis at L4-5, and a retrolisthesis at T12-L1 with significant degenerative changes at that level on the axial view.  There is some spinal stenosis, predominantly at L4-5 and L5-S1.

**DISCUSSION:**

Specifically in response to the questions I have been asked to address:

1.   ***What injuries or conditions, if any, are causally related to the incident of May 6, 2023 (the "incident")?***

     On a more-probable-than-not basis, Ms. Larocque was not injured as a result of the subject incident.

2.   ***Did Ms. Larocque suffer any permanent injuries or conditions as a result of the incident?   If so, please comment on the nature and extent of the permanency.***

Exhibit 1 - Page 18 of 22

Not applicable.  Ms. Larocque was not injured.

3.    ***Are any of Ms. Larocque's ongoing complaints related to the incident? Please explain.***

Ms. Larocque's ongoing complaints are not related to the subject incident, as she was not injured.

4.    ***Are Ms. Larocque's ongoing complaints supported by objective findings? Please explain.***

Ms. Larocque's ongoing complaints are supported by a multitude of objective findings.  She had a primary total knee arthroplasty complicated by a failure of her patellar tendon or extensor mechanism.  This was unrelated to the subject accident.  Ms. Larocque had two subsequent surgeries after her primary total knee arthroplasty.  The first was a patellar tendon reconstruction.  The second was a hinged total knee arthroplasty with patellectomy.  Given the extent of her surgery, she has significant objective findings to support ongoing complaints.  She also has ongoing complaints from her unrelated right knee degenerative osteoarthritis, and she has degenerative disk and degenerative joint disease of the lumbar spine, which are objectively supported by imaging and are symptomatic.

5.    ***Did Ms. Larocque have any preexisting conditions that are relevant or related to the claims currently being made as a result of the incident?  If so, to what degree, if any, did the incident change the normal course or progression of any preexisting conditions?***

Ms. Larocque has a host of preexisting conditions that are relevant.  She has a history of low back and bilateral knee degenerative changes.  She also has a history of cervical and thoracic symptoms, treated by her chiropractor since at least 2019.  She also has a history of left knee symptoms, as for example was noted by her family practitioner on February 23, 2021, when she reported neck and left low back pain along with left lateral hip pain that had been made "more painful" since a fall in November 2019.  Also, for example, on March 10, 2021, she was noted to have left hip and gluteal pain after she hurt herself.  The note indicated she needed assistance for most dynamic functional activities with her hip.  She also was morbidly obese and had obstructive sleep apnea.  She has a history of significant psychological complaints.  For example, on October 14, 2021, she reported depression, anxiety, and "significant situational stressors."  She had a history of what was described as myofascial muscle pain, noted at least as early as May 15, 2018, by her family practitioner.  When she was seen on May 1, 2019, she reported to her family practitioner that she was caring for a friend with dementia, had a partner who had cancer and needed treatment, and had "ongoing issues w/marriage."  She also reported that her spouse had ongoing issues with his health, and her finances remained "tight."  She reported she was "not sure what she is going to do."  She also reported requiring pain medications to help keep her

Exhibit 1 - Page 19 of 22

active, taking four Norco a day.  She reported multiple falls.  She reported she was "determined not to let her pain stop her from doing life activities."

6.    *Is Ms. Larocque capable of working and/or capable of performing normal daily activities?  Please describe any restrictions if applicable.*

Ms. Larocque is not more or less capable of working or performing normal daily activities than she would have been absent the subject incident.  She was not injured as a result of the subject incident.

7.    *What is the probability Ms. Larocque will need future medical care for any related injuries or conditions as a result of the incident?  If warranted, what is the nature and extent of the care that may be required?*

It is quite likely that Ms. Larocque will need future medical care for both of her knees and her low back.  However, none of this is related to the subject incident.  She was not injured as a result of the subject incident.

8.    *How much of the treatment Ms. Larocque received would be reasonable and necessary for the injuries or conditions related to the incident, if any?*

Ms. Larocque needed no medical care as a result of the subject incident, as she was not injured.

9.    *Is Ms. Larocque medically stationary with regard to the incident?  If so, please indicate when she would have been considered medically stationary.  If not, please indicate when she should be expected to become medically stationary.*

Not applicable.  She was not injured.

I have carefully reviewed the deposition testimony of both Mr. Larocque and Ms. Larocque.  There is no plausible mechanism of injury that could reasonably explain how her patellar tendon was ruptured as a result of the subject accident, or, in fact, how she could have had any significant injury as a result of the cart stopping.  Had she had a patellar tendon disruption as a result of the subject incident, I would have expected immediate severe pain or at least immediate severe disability, as her extensor mechanism would have failed.  I have noted that she had a small avulsion fracture inferiorly at the patella, which was not present in the immediate postoperative films.  It was noted on her 1st postoperative films, viewed on May 9, 2023.  On a more-probable-than-not basis, however, given that it only distracted about 4 or 5 millimeters, she did not have a complete disruption of her extensor mechanism, either as a result of the subject incident or by the time she was seen on May 9, 2023.  This is supported by the fact that she could walk to the ATM after the subject incident and was not noted to be bedbound or wheelchair-bound by her providers after the subject incident.  On a more-probable-than-not basis, and to a reasonable degree of medical certainty, Ms. Larocque had a

Exhibit 1 - Page 20 of 22

relatively slow failure of the extensor mechanism unrelated to the subject incident. Post-operative failure of the extensor mechanism is a known complication of total knee arthroplasty procedures.  She described hitting her knee on the cart when it stopped, and she also described that she was lifting her leg when this happened.  There would be no reasonable way she could injure the inferior patella if her leg was bent at that time.  Also, she reported in her deposition that she was wearing a brace, which would have been expected to give her additional protection from any impact to her knee.

I have reviewed Dr. Rolfe's report.  I agree that evaluation soon after the subject incident showed not a nondisplaced fracture of the inferior patella but a fracture that was displaced 3 millimeters to 4 millimeters.  This did not even particularly concern her providers as she continued with physical therapy, and although she reported to Dr. Rolfe that she had excruciating pain at that time, the records support that she was having increasing, but not necessarily excruciating pain.  Her pain complaints were more consistent with a slow rupture of the extensor mechanism as a result of her surgery, not as a result of the subject accident.  Ms. Larocque reported that just prior to the accident, she had completed physical therapy, was walking without a cane, and could climb and descend stairs.  She was reporting that her walk endurance was up to 30-plus minutes, and her pain relief after surgery had been dramatic.  The physical therapy notes show that on April 27, 2023, or about a week before the subject incident, she was still reporting pain in her left knee to her physical therapist.  She reported she had an incident where she "took a knee" when her hip and piriformis had become tight.  She did not report any elevated symptoms, but the physical therapist noted deficiencies in the hip and quadriceps recruitment, affecting her capacity to walk or stand for over 30 minutes to 45 minutes.  This is essentially not consistent with her report to Dr. Rolfe that her walk endurance was up to 30-plus minutes.  In fact, her walking endurance was about 30 minutes.  However, the note from just before the accident pointed out that she had been "challenged w/walking/climbing stairs and needs to use railings to stabilize her stance."  She was having balance and hip and quadriceps strength deficits.  This was affecting her shopping, stairs, and navigating over objects or uneven surfaces.  Just two days before the subject incident, she was reporting fatigue from running errands.  She also reported to her therapist that her knee was doing well, and she was feeling stronger, but she was still having left hip pain with motion and doing stairs, and although she was noting continued improvement and that was her last visit with physical therapy, she was still reporting weakness in her quadriceps and limited in her ability to squat and perform stairs without "compensation patterns."

Dr. Rolfe's note indicated that after the May 6, 2023, incident, she required the use of a cane.  However, the note from May 9, 2023, noted that she had actually been having increasing pain for a week, even though the subject incident was only three days prior.  She was 253 pounds, but she was reporting her right knee was also becoming increasingly painful.  She was having moderate sit-to-stand symptoms, which would indicate that she could go from sit to stand using the left knee.  This is also inconsistent with complete patellar tendon disruption.  She was also noted to have the same symptoms, although less so, on the right side.  Recommendation was for physical therapy for the right knee and follow-up.  When she was seen the following day by her physical

Exhibit 1 - Page 21 of 22

therapist, at that point in time, she did report that she was using a cane to assist with standing and walking.

Dr. Rolfe's report indicated that Ms. Larocque's low back pain became painful during the rehabilitation process.  However, Ms. Larocque's low back pain had been a problem for her in terms of pain and required chronic pain management and narcotic analgesics, and her symptoms long predated the subject incident.  She had severe right knee arthritis, and although Dr. Rolfe reported that the right knee arthritis flared since the incident, this is not reported by the records.  The records merely show that her right knee pain became progressively worse, as would be expected given the severe nature of her degenerative arthritis in the right knee.  Dr. Rolfe's discussion indicated that the May 6, 2023, incident caused Ms. Larocque's knee to collide with the cart, reinjuring it.  However, he does not give any plausible explanation as to how this could have happened, given Ms. Larocque's description and given the proposed mechanism of injury, which was her left knee hitting the cart when it suddenly stopped.  Again, I note she testified in her deposition that she was able to walk, apparently without any significant difficulty after that, as she reported going to an ATM machine and having discussions with one of the employees of the store.

Thank you for allowing me to assist on this case.  If I can be of further assistance, please do not hesitate to contact me through MedConnect Pro.

I have personal knowledge of and am competent to testify to the following facts:

Dated this 7th day of May 2026.

I HEREBY DECLARE THAT THE ABOVE STATEMENT IS TRUE AND TO THE BEST OF MY KNOWLEDGE AND BELIEF, THAT THE OPINIONS STATED ARE ACCORDING TO A REASONABLE DEGREE OF MEDICAL CERTAINTY ON A MORE-PROBABLE-THAN-NOT BASIS, AND THAT I UNDERSTAND THAT IT IS MADE FOR SUCH USE AS EVIDENCE IN COURT AND IS SUBJECT TO PENALTY FOR PERJURY.

Thank you,

_____
Alan B. Brown, MD, JD
Orthopedic Surgeon

ABB:imt25k

Exhibit 1 - Page 22 of 22



# Investigative Report

## Linda LaRocque v Kroger

ESi Matter No:  118934

Exhibit 2 - Page 1 of 59



# Investigative Report

## Linda LaRocque v Kroger

ESi Matter No:  118934

**Report Prepared for:**
Chock Barhoum LLP
121 SW Morrison Street, Suite 500
Portland, OR 97204

**Submitted by:**

_____

Manuel Meza-Arroyo, Ph.D., P.E., CHFP
Director of Human Factors and Senior Managing Consultant
MI P.E.  |  No. 6201310563  |  Expires: 12/07/2027

May 8, 2026
_____
Date

_____

Gadir Hazime, M.S.E
Senior Staff Consultant

May 8, 2026
_____
Date

This report and its contents are the Work Product of Engineering Systems Inc. (ESi). This report should only be duplicated or distributed in its entirety. This report may contain confidential or court protected information; please contact an authorized entity prior to distributing. Conclusions reached and opinions offered in this report are based upon the data and information available to ESi at the time of this report, and may be subject to revision after the date of publication, as additional information or data becomes available.

Copyright ESi © 2026 — All Rights Reserved

Phone: 934-794-8100  |  Fax: 734-794-8115  | Toll Free: 866-596-3994
**www.engsys.com**

Exhibit 2 - Page 2 of 59



# Table of Contents

1    **Summary** ...................................................................................................................... **1**

2    **Basis for this Report** ................................................................................................... **1**

   2.1    Qualifications and Experience ................................................................................. 1

      2.1.1    Manuel Meza-Arroyo, Ph.D., P.E., CHFP ....................................................... 1

      2.1.2    Gadir Hazime, M.S.E. .................................................................................... 1

   2.2    General Methodology ............................................................................................. 2

      2.2.1    Brief Introduction to Human Factors ............................................................ 2

3    **Background** .................................................................................................................. **3**

4    **Investigation** ............................................................................................................... **5**

   4.1    Summary of Relevant Testimony ............................................................................ 5

      4.1.1    Linda LaRocque – Plaintiff ........................................................................... 6

      4.1.2    Steven LaRocque – Plaintiff's Husband ........................................................ 9

      4.1.3    Brenton Wheeler – Store Employee ............................................................. 11

      4.1.4    Chad Peterson – Fred Meyer Stores, Inc., and The Kroger Co. 30 (b)(6) ...... 13

      4.1.5    Ryan Harter – Gatekeeper Systems, Inc. 30(b)(6) ........................................ 14

   4.2    Digital Media Evidence ........................................................................................... 17

   4.3    Site and Cart Inspection ......................................................................................... 18

   4.4    Selected Medical Records ....................................................................................... 18

5    **Analysis and Discussion** ............................................................................................. **19**

   5.1    Environmental Conditions ...................................................................................... 19

   5.2    Warnings and Safety Guidelines ............................................................................. 20

      5.2.1    ANSI Z535.4 – Product Safety Signs and Labels ........................................... 20

   5.3    Cart Operator Experience, Behavior, and Expectancy ............................................. 21

   5.4    Cart Geometry ....................................................................................................... 22

   5.5    Anthropometry ...................................................................................................... 22

   5.6    Pedestrian Gait Analysis ......................................................................................... 23

   5.7    Surrogate Testing ................................................................................................... 25

   5.8    Perception and Attention ....................................................................................... 28

   5.9    Human Error .......................................................................................................... 28

   5.10    Review of Report of Mr. Levi Dixon ...................................................................... 29

   5.11    Review of Report of Dr. Alan B. Brown .................................................................. 31

6    **Conclusions and Opinions** .......................................................................................... **32**


# Table of Figures

Figure 1. Aerial view of the subject Fred Meyer store. ....................................................................... 4
Figure 2. LaRocque's clothing and knee brace. ................................................................................. 5
Figure 3. Ms. LaRocque's deposition Exhibit 2 noting with the smaller yellow circle where the LaRocque's parked upon returning to Fred Meyer.................................................................................. 7
Figure 4. Mr. LaRocque's deposition Exhibit 1 marked with the general parking location circled in yellow, the general ATM location marked by red, and the doors through which the LaRocques entered and exited marked by a green circle (pp. 60-61). ....................................................................... 9
Figure 5. Purchek Solution Components - Door Area Devices (GK_0004)........................................... 15
Figure 6. Gatekeeper part number M-8033B – the cart warning and mounting kit............................... 16
Figure 7. Warning label advising customers about wheels locking. ................................................. 17
Figure 8. Warning label on shopping cart, advising customer that cart may stop unexpectedly. ....... 17
Figure 9. HME diagram related to subject incident.......................................................................... 19
Figure 10. Shopping cart geometry. ............................................................................................... 23
Figure 11. Normal walking gait, adapted from Chambers, et al. ..................................................... 24
Figure 12. Height-matched surrogate in a normal standing position with both hands on the shopping cart handle, demonstrating the approximate knee-to-cart basket clearance................................................ 25
Figure 13. Synchronized video frames from a surrogate test run showing wheel-lock activation followed by arrest/cancellation of the surrogate's gait. ......................................................................... 26
Figure 14. Synchronized video frames from a surrogate test run showing wheel-lock activation during gait progression.................................................................................................................... 27




# 1  Summary

This investigative report involves the examination of issues related to an incident that occurred on May 6, 2023 at 4505 S. 19th Street in Tacoma, Washington. Engineering Systems Inc. (ESi) was engaged on March 3, 2026 by Chock Barhoum LLP. The incident involved wheels locking on a shopping cart at a Fred Meyer store while in use by Ms. Linda LaRocque (hereafter, Ms. LaRocque). The scope of ESi's investigation and analysis is directly related to the Biomechanics and Human Factors aspects of the incident. This report, prepared at the request of Chock Barhoum LLP, represents the results of ESi's investigation performed to date.

# 2    Basis for this Report

This report, and the opinions and conclusions stated throughout, are based on the education, training, and experience of the authors, as well as on the analysis and review of materials that have been conducted in this matter to date. The items that have been received in this matter, to date, are listed in **Appendix A**. The documentation reviewed is based upon the state of documents as received by ESi.

## 2.1  Qualifications and Experience

### 2.1.1  Manuel Meza-Arroyo, Ph.D., P.E., CHFP

Dr. Meza-Arroyo is an Industrial and Human Factors Engineer whose expertise includes human perception and cognition, occupational biomechanics, and human performance under real-world task demands, including the effects of lighting conditions and aging on visual performance. His forensic work focuses on the relationship between available stimuli and human behavior—what information was available to be perceived (visual, auditory, and tactile cues), whether it was sufficiently detectable and conspicuous to capture attention, and whether an effective response was feasible given the time, distance, and constraints present, including perception-response and time-distance considerations relevant to detectability, conspicuity, and response feasibility. He has conducted and supported multidisciplinary forensic investigations involving automobile and commercial-vehicle collisions (including low-illumination conditions), workplace and industrial injuries, slip/trip/misstep-and-fall incidents, and the evaluation of warnings, procedures, and safety communications. His research and applied work address cognition, attention and eye movements, visual information processing relevant to hazard and collision detection, visibility and conspicuity under reduced illumination (including factors such as contrast, glare, occlusion, and expectancy), perception-response timing, occupant kinematics in low-speed impacts, the human factors implications of lighting technologies for visual performance and perception, and the assessment of safety communications as they relate to human behavior and performance.

### 2.1.2  Gadir Hazime, M.S.E.

Ms. Gadir Hazime holds a master's degree in Industrial and Systems Engineering in Human Factors. She is also a degreed Mechanical Engineer and Bioengineer. She has extensive experience in human perception and cognition, injury analyses, human motion analyses, product testing, failure analysis, and accident reconstruction. Her professional experience also includes scene, vehicle, equipment, and building inspections, data acquisition, and testing. She has conducted and participated in many

Exhibit 2 - Page 5 of 59



multidisciplinary investigations involving automobile and trucking accidents, nighttime incidents; industrial and occupational injuries; slip-and-fall incidents; and analysis of warnings, procedures, and instructions.

A comprehensive list of qualifications and publications of the authors is set forth in **Appendix B** and **Appendix C** attached to this report. A list of cases in which the authors have testified at trial or in deposition over the past four years is also attached (see **Appendix D** and **E**).

## 2.2 General Methodology

During the course of investigation and analysis in this matter, to date, ESi has performed the following activities:

- Review and analysis of received materials.

- Site and exemplar cart inspection on April 29, 2026.

- Biomechanics and Human Factors research and analysis.

ESi's methodology includes the application of the scientific method as a framework for forensic analysis. These methods are widely accepted within the fields of biomechanics and human factors and have been peer-reviewed and published. [1, 2, 3]

### 2.2.1 Brief Introduction to Human Factors

Human Factors (also referred to as ergonomics) is the scientific discipline concerned with human capabilities and limitations and how those characteristics influence behavior, performance, and safety in real-world tasks. Human Factors integrates engineering and the behavioral sciences to understand how people perceive information, allocate attention, interpret and remember information, make decisions, and execute actions within physical, environmental, and organizational constraints.

In a forensic context, human factors principles are applied to evaluate human performance under the circumstances present during an incident. This includes assessing what information was available to be perceived through different sensory channels (e.g., visual, auditory, and tactile cues), whether that information was sufficiently detectable and conspicuous to capture attention, how it was likely to be interpreted based on context and expectations, and whether an effective response was feasible given the time, distance, task demands, and physical constraints involved. The purpose of this work is not to assume what a person "must have" done, but to evaluate what a person could reasonably perceive, process, and do under the conditions that existed.

Human factors evaluations commonly consider the interaction of: *(1)* the person (capabilities and limitations, including experience, training, and age-related factors when relevant), *(2)* the task (what the person was doing and what was required), *(3)* the environment (lighting, noise, vibration, surface conditions, layout, clutter/occlusion, and other factors affecting perception and action), and *(4)* the system

---

[1] Knox, E. H. et al. (2015). METHODS OF ACCIDENT RECONSTRUCTION: BIOMECHANICAL AND HUMAN FACTORS CONSIDERATIONS. *Proceedings of the ASME 2015 International Mechanical Engineering Conference and Exposition*, 1–11.

[2] Noon, R. (2009). Scientific Method: Applications in Failure Investigation and Forensic Science. CRC Press.

[3] Liptai, L., & Cecil, J. (2009). Forensic Engineering and the Scientific Method. *Journal of the National Academy of Forensic Engineers*, *XXVI*(1), 147–155.



or organization (procedures, communications, roles, and constraints that shape behavior). Depending on the circumstances, relevant considerations may include sensory detectability and conspicuity (whether a cue stands out enough to attract attention), cognitive workload and divided attention, expectancy and situational awareness, decision-making under time pressure, and response feasibility.

Human factors is also an established discipline across safety-critical industries, and many large organizations maintain dedicated human factors programs to support design, operations, training, and risk reduction. For example, NASA has agency-level human factors functions that support missions and strategic efforts, including human-system integration considerations across operations and training. [4] Similarly, the Federal Aviation Administration (FAA) maintains a human factors policy and programmatic work focused on applying knowledge of human capabilities and limitations to systems, procedures, training, and environments in support of safe and effective performance. [5]

# 3 Background

According to the provided Complaint dated June 26, 2025, at approximately 3:00 PM on May 6, 2023, Ms. Linda LaRocque (DOB: 2/19/59; age: 64 years) [6] and her husband went together to the Fred Meyer store located at 4505 S. 19th Street, Tacoma, WA 98405. Upon entering the store through the "grocery side," [7] The LaRocques retrieved an available Fred Meyer shopping cart, instrumented with an asset anti-theft system that was manufactured by Gatekeeper Systems, Inc., near the store entryway. The item the LaRocques intended to purchase was not available, so Ms. LaRocque and her husband left the store without making a purchase. Ms. LaRocque and her husband proceeded to exit the store without passing through the checkout area. Upon exiting the Fred Meyer store doors, the anti-theft mechanism on the shopping cart caused the cart's wheels to lock. When the cart's wheels locked, the cart suddenly stopped, and Ms. LaRocque's left knee struck the back of the cart.

Ms. LaRocque is claiming resulting injuries from the subject incident. According to the provided Complaint, there were no signs warning customers that the shopping carts had an anti-theft mechanism that would cause the carts' wheels to lock if the cart was walked through an invisible perimeter. [8] **Figure 1** shows an area view of the subject incident site, including the parking lot area where Ms. LaRocque's incident occurred.

---

[4] Extracted on March 17, 2021 from: Human Systems Integration Division @ NASA Ames - Human Factors 101.
[5] Extracted on March 26, 2021 from: FAA Order 9550.8 - Human Factors Policy.
[6] Plaintiff's Response to 1st Interrogatories and Requests for Production, dated Jun 25, 2025 [ESi 5.302].
[7] Plaintiff's Responses to Gatekeeper's First Interrogatories and Requests for Production, dated August 29, 2025 [ESi 5.301].
[8] Plaintiff's First Amended Complaint, dated June 26, 2025 [ESi 5.001].




**Figure 1. Aerial view of the subject Fred Meyer store. [9]**

According to legal documents reviewed by ESi, "LaRocque's patella shifted when her knee came into contact with the shopping cart, which ruptured her patella tendon." Ms. LaRocque has not suffered any similar injury in which a shopping cart has struck her knee. [10] Ms. LaRocque recounted,

> *"On Saturday, May 6, 2023, at around 2:30 p.m. Ms. LaRocque and her husband … arrived at the Fred Meyer this time around 3:00 p.m. Ms. LaRocque and her husband decided to go into Fred Meyer since they were already there to purchase a bottle of magnesium citrate... Mr. LaRocque got a shopping cart in the foyer area of the Fred Meyer and gave it to Ms. LaRocque as she had recently had knee surgery and used the shopping cart for support and balance while walking inside a store. After entering the store, they looked for the magnesium supplement but Fred Meyer did not have it. They decided to leave and try to get the supplement at Walmart. Ms. LaRocque and her husband walked past the front check-out registers to the same door from which they entered, near the produce section. Ms. LaRocque was pushing the shopping cart through the right side of the door when the shopping cart abruptly and without warning stopped and locked up, causing Ms. LaRocque to slam her left knee into the cart. Ms. LaRocque had a left knee brace on—she wore it all the time following the surgery to her left knee.*

---

[9] Aerial view captured from Google Earth, 5/1/26.
[10] Plaintiff's Response to 1st Interrogatories and Requests for Production, dated Jun 25, 2025 [ESi 5.302].


*After the incident, Mr. LaRocque who was walking behind Ms. LaRocque asked her if she was alright. Ms. LaRocque who was in pain told him she hit her knee on the shopping cart. Ms. LaRocque was trying to move the cart out of the way but it was locked and she couldn't move it. Ms. LaRocque didn't understand that the shopping cart had locked due to an anti-theft locking mechanism. She did not see any warnings posted warning customers that shopping carts may lock..."*[11]

Ms. LaRocque was wearing Sketcher's, a pair of cotton pants, and a floral t-shirt as shown in **Figure 2**.



**Figure 2. LaRocque's clothing and knee brace.** [12]

# 4  Investigation

The purpose of this section is to document the materials reviewed and the investigative steps undertaken as part of this evaluation. It summarizes pertinent information and observations derived from the available sources. The section is intended to provide a transparent foundation for the analysis that follows.

## 4.1  Summary of Relevant Testimony

The deposition summaries provided below were prepared by ESi as part of the analysis of available evidence and file materials. The information contained herein is not intended to be an exclusive recitation of all the evidence and facts relied upon in the depositions received by ESi.

---

[11] Plaintiff's Response to 1st Interrogatories and Requests for Production, dated Jun 25, 2025 [ESi 5.302].
[12] Extracted from LAROCQUE 000005 and LAROCQUE 000012 [ESi 4.002].



### 4.1.1 Linda LaRocque – Plaintiff

Ms. Linda LaRocque was deposed on September 12, 2025. Ms. LaRocque is the Plaintiff in the subject matter and was pushing the subject grocery cart the day of the subject incident. Ms. LaRocque weighed about 245 pounds at the time of her first knee replacement (p. 31). Ms. LaRocque wears reading glasses (p. 17).

Ms. LaRocque is married to Steven LaRocque (p. 9). Ms. LaRocque moved to Washington in 1964 (p. 11). Ms. LaRocque previously worked as a teacher's assistant and retired in the 2020s before COVID (pp. 12-13). Prior to the subject incident, Ms. LaRocque has been diagnosed with osteoarthritis in her lower back, major depressive disorder, hammer toes, supraventricular tachycardia, pre-diabetes, and chronic pain in her upper back, lower back, and left knee, and sleep apnea. (pp. 20-21, 25, 29, 32).

After her first knee replacement surgery, Ms. LaRocque was in a straight leg brace and completed physical therapy. The recovery process was estimated to be 6 to 8 weeks, and Ms. LaRocque was not to do anything without assistance (p. 42).

Prior to the subject incident, Ms. LaRocque would shop at the subject Fred Meyer's one to two times per week as her doctor's office is just down the road (p. 44). Every time Ms. LaRocque shopped at the subject Fred Meyer's, she would use a shopping cart for stability (p. 45). Ms. LaRocque never used one of the mobility scooters that they have at the front of the store (p. 36). Ms. LaRocque identifies the typical use of a shopping cart is to gather items and go shop in the grocery store (pp. 61-62). Ms. LaRocque never considered using one of the mobility scooters at the store (p. 63). No one at Fred Meyer or Gatekeeper told Ms. LaRocque that it was safe to use a shopping cart to assist with her mobility (pp. 63-64).

On the day of the subject incident, May 6th (p. 74), Ms. LaRocque parked on the grocery side of the Fred Meyer's building where the disability spots are (p. 45). After going to the BECU ATM machine, Ms. LaRocque left and went to the public storage down the street. Upon returning to Fred Meyer's, the LaRocques parked in the end parking spot as noted by the smaller yellow circle in Exhibit 2 (**Figure 3**), and Ms. LaRocque put money back into the account at the BECU ATM (p. 46-48). At this time, Ms. LaRocque had her cane (p. 49).




**Figure 3. Ms. LaRocque's deposition Exhibit 2 noting with the smaller yellow circle where the LaRocque's parked upon returning to Fred Meyer.**

On the day of the subject incident, Ms. LaRocque was shopping for one specific item and didn't want to spend more time in the store (p. 36). According to Ms. LaRocque,

> *"[Mr. LaRocque] needed some magnesium citrate for an upcoming colonoscopy…So we walked through the foyer, [Mr. LaRocque] got me a [full sized] cart, got the cart, pushed through the second door. We went around, the whole store had been remodeled, we weren't sure where everything was, and we walked around for probably 15 minutes, couldn't find it and we just came back around in front of the registers to the door to exit (p. 48, 50)."*

Per Ms. LaRocque, the purpose of the cart was for balance as she was still in the recovery period from her surgery (p. 50). "I mainly put my purse and my coat in the top part where you put the little kids, and then I put both hands on the cart and I stand up straight, put it to keep my balance." Other than her two hands, no part of Ms. LaRocque's body was touching or leaning on the cart for support (p. 51). Ms. LaRocque was not holding any of her weight on the cart; she was pushing the shopping cart with her arms extended in front of her (p. 79).

> *"I was holding the cart and pushing it, that's it…because leaning is not going to do me any good for my knee…I have to straight up and down (p. 79)."*

> *"We went into the store and went to the right produces, kind of walked down, got back in…finally found the aisle and we could not find the merchandise we needed, so I'm like, 'Let's just go to Walmart.' That's what [Mr. LaRocque] wanted to do. And so we just went out…in the front with, like, the restroom and the banking lot and things. We just walked past all the registers and went out…the first door (p. 51)."*

 


*"I was pushing going out the door and standing up straight and it was not with the basket we put the kids in, it was that part that's underneath it. So I was just pushing the cart and like I said, it just stopped and the next step I took was into the cart. That's it…I was walking and I stepped forward into the cart and then the other foot was just right next to it at the next step (p. 81)."*

Ms. LaRocque's knee hit the back plastic part that's angled away, "…because I lifted my knee, walked right into it and that was it (p. 82)." Ms. LaRocque entered and exited through the same door. When the cart stopped,

*"…it was a shock. I'm pushing the cart and we lifted the – you know, the door's kind of wide, so we were on the right side of it. And I'm pushing the cart and it just like stops and my knee hit that underneath. And I'm just like, 'What's going on? What's wrong?'*

*I thought I hit something, thought there was something under the wheel. So I looked down there and I could see that the cart wheel was…right on the track of the door because it was open…So I'm trying to push it and it wouldn't go. It wouldn't even budge…(p. 52)"*

*"I had the shopping cart physically in my hand and I ran into it and it wasn't my fault it was there (p. 89)."*

When Ms. LaRocque inspected the cart, part of the wheel was on one side of the track and the other part of the wheel was on the other side of the track (p. 55). Mr. LaRocque was behind Ms. LaRocque. They both tried moving the cart as they did not understand why the cart was locked up. The LaRocques did not know what was going on as it was an empty cart and there were no tags (p. 56). Per Ms. LaRocque, there was no warning sign or sticker on the cart warning about the cart suddenly stopping (p. 58). "I am positive there was no sign (p. 59)." Following the subject incident, Ms. LaRocque has gained the understanding that she needs to pass through the check out or the wheel might lock (p. 61). Ms. LaRocque sustained a red mark and some bruising in the next day (p. 64).

Ms. LaRocque accounts for the differences in incident recollection between her and Mr. LaRocque by noting, "Yesterday, [Mr. LaRocque's] blood sugar was going down and he was confused – getting confused…(p. 60)." Ms. LaRocque does not remember Mr. LaRocque brushing against her (p. 93).

Ms. LaRocque was wearing a leg brace from her thigh to her ankle at the time of the subject incident; Ms. LaRocque would wear it all day (p. 73). Ms. LaRocque was cleared from physical therapy on May 4th but had to wear her brace all the time until she was cleared by the doctor on May 9th (p. 76). At the time of the subject incident, Ms. LaRocque's brace did not restrict her leg's movement (p. 75). Ms. LaRocque was able to freely bend and straighten her knee as if she were not wearing the brace (p. 77). Ms. LaRocque was not having any trouble with flexion or extension of her knee at the time of the incident (p. 80). There was nothing abnormal about Ms. LaRocque's gait at the time of the subject incident (pp. 80-81).

Ms. LaRocque thinks Fred Meyer should have had more notifications about the safety of their customers (p. 86).



### 4.1.2  Steven LaRocque – Plaintiff's Husband

Mr. Steven LaRocque was deposed on September 11, 2025. Mr. LaRocque has been married to Ms. LaRocque for over 41 years and together have three children (p. 7). At the time of the subject incident, Mr. LaRocque's son Christopher and Christopher's wife were living with Mr. and Ms. LaRocque (p. 8).

Mr. LaRocque described Ms. LaRocque's health prior to the subject incident as generally well (p. 10). Prior to the subject incident, Ms. LaRocque was issued a handicap plaque due to her inability to maneuver or walk because of her knee complaints (p. 52). Ms. LaRocque had knee surgery prior to the subject incident in February 2023 (p. 47), and Mr. LaRocque stated her recovery from that surgery was great and the doctors were praising her (p. 11).

Mr. LaRocque was present for the subject incident on May 6, 2023 (p. 13, 57). The LaRocques parked in the handicap spot in the parking lot (p. 15). Ms. LaRocque went to an ATM to get some cash (p. 57). Mr. LaRocque was using his cane and had his arm out for Ms. LaRocque (pp. 16, 65). Mr. LaRocque walked up to the big cart, pulled it out of the rack, and handed it to Ms. LaRocque who was right behind him. Before grabbing the cart, Ms. LaRocque was walking with the assistance of Mr. LaRocque and a cane (pp. 15, 65-66). The LaRocques parked in the yellow circled area, went to the ATM which was located approximately at the red mark, and entered at the entrance noted by the green circle on **Figure 4** (pp. 60-61).



**Figure 4. Mr. LaRocque's deposition Exhibit 1 marked with the general parking location circled in yellow, the general ATM location marked by red, and the doors through which the LaRocques entered and exited marked by a green circle (pp. 60-61).**

Ms. LaRocque used a cart for balance rather than her cane because, "…[Ms. LaRocque] used two hands, much more easier for her to push a cart than hold on to her husband's arm and use her cane especially when you have people walking around. And the chances of her falling and getting hurt are quite high, so that's why she uses a cart (p. 18)." Ms. LaRocque was standing next to Mr. LaRocque waiting for the



cart, then she put her cane in the cart (pp. 16, 65). The store doors were open during this time period as a stream of people were coming and going. Mr. LaRocque did not see the doors closed at any time (p. 67). Mr. LaRocque recounted,

> *"We had to get some medical supplies 'cuz I was having a scheduled colonoscopy. So the wife and I were out driving around and the place we usually get…the liquid magnesium, we usually got it from Fred Meyer's, so we went over to…get the magnesium. So we go into Fred Meyer's and I grab the cart for my wife because she needs it to help her walk around. And we go in and we start looking and looking; couldn't seem to find it. So we didn't want to bother to ask because it was busy, so we said, 'Let's just go,' so we went to leave. And so as we were leaving out the front door I'm right behind her and as she got to that part, the cart locked up. She stopped and said, 'Ow,' and I bumped into her because I was right behind her…I go, 'What's wrong? What's wrong?' She goes, 'The cart, it stopped, and I hit my knee.' And I said, 'What?' and I looked at her knee and she had a little mark on there. And then by that time…the worker who's standing there comes over…I pushed the cart out of the way because it was locked and he was trying to unlock it. And I took my wife, we went to the car, we went home, and she complained about the pain…(pp. 13-14)"*

Mr. LaRocque noted they were walking, "Not that fast (p. 19)." Mr. and Ms. LaRocque were walking the same speed, and Mr. LaRocque was walking with a cane. The LaRocques were moving slowly while maintaining six to twelve inches apart (pp. 19-20). After seeing the store was out of the magnesium citrate, the LaRocques headed straight to the exit (p. 68).

Mr. LaRocque did not personally see the cart stop (p. 68). He was behind Ms. LaRocque looking ahead over her shoulder (p. 68). Mr. LaRocque heard Ms. LaRocque say "Ow," but he did not hear any other noises; he did not hear Ms. LaRocque's knee strike the cart nor hear the cart come to a halt. The wheels did not skid or stutter (p. 20). The cart stopped in line with the doors (p. 68).

> *"And I didn't bumper her. I, you know, like, just whoa…Just brushing into her. I didn't push her or anything (p. 69)."*

Ms. LaRocque did not fall to the ground at any point in time, "...she didn't buckle over but she did grab her knee (p. 69)." Mr. LaRocque did not hit Ms. LaRocque hard, "just like a slight touch bump because…she stopped all of a sudden. I did not slam into her. It was just like a bump (p. 20)." The nudge from Mr. LaRocque against Ms. LaRocque hardly moved Ms. LaRocque's body at all and did not cause her to move into the cart nor the cart to move (p. 21). Mr. LaRocque noted the cart was almost impossible to move (p. 70).

Upon inspecting the cart, Mr. LaRocque did not notice any warning signs or plaques that were posted on the cart nor doors (pp. 70-71). "On that cart I looked to see if – is there a reason why it's not moving and the cart had absolutely nothing on it to tell me (p. 71)."

When Mr. LaRocque inspected Ms. LaRocque's knee, he observed a little red mark right where her knee is, right below the knee (p. 21). The mark was more on her lower left kneecap, was a little bigger than a quarter, and looked like an angry ouch; the next day they saw the bruising (p. 22). Ms. LaRocque went



to the doctor the next day or the day after, and she got the bad news that her knee was all messed up and wasn't the way it was supposed to be (p. 15).

The LaRocques used to shop at the subject Fred Meyer's all the time, but since the subject incident, they've only shopped there once or twice (p. 16). Prior to the subject incident Mr. LaRocque used to shop at the subject Fred Meyer three to four times per week; Ms. LaRocque was with him two to three times per week for the past 25 years (p. 17). The LaRocque's used a shopping cart every time they shopped at Fred Meyer, and Ms. LaRocque would use the cart for stability before the first knee surgery (pp. 24, 66). They typically went through the same entrance at Fred Meyer's. They had never seen the warning sign on the sliding glass door (p. 24). The LaRocques did not know or see these systems at Fred Meyer or other stores until after the subject incident (p. 26).

### 4.1.3  Brenton Wheeler – Store Employee

Mr. Brenton Wheeler was deposed on March 26, 2026. At the time of deposition, Mr. Wheeler was the lead assistant store leader at Fred Meyer's (p. 9). Mr. Wheeler has worked for Kroger or Fred Meyer for 22 years (p. 12). Mr. Wheeler was at the subject Tacoma Stevens location from October 2023 through one week before deposition (p. 10). As lead assistant store leader, Mr. Wheeler's responsibilities include to follow the store leader in all expectations in their time off so the store runs the way the leader would like it to and to be a partner to tackle any type of operational or merchandising expectations the company or store leader have set or provided (p. 11). Mr. Wheeler does not have any direct reports (p. 11). Mr. Chad Peterson was the store leader when Mr. Wheeler was at the Tacoma Stevens location (p. 12). Mr. Peterson was the Tacoma Stevens store manager in May 2023 (p. 23).

Mr. Wheeler was 16 years old when he started with Fred Meyer/Kroger and has been with them for his adult working life (p. 17). Over this time, the only cart related responsibility Mr. Wheeler has had was to unlock a cart for a customer if needed (p. 17). Mr. Wheeler is frequently anywhere but at the store entrances (p. 17). As operations assistant store leader, Mr. Wheeler would deal with issues with the registers or store equipment if need be, but there were front-end managers that largely dealt with those items including registers, terminals, and shopping carts (p. 14). Mr. Wheeler was never operations at the Tacoma Stevens location (p. 15).

Mr. Wheeler does not know when the antitheft shopping cart mechanisms were installed at the Tacoma Stevens Fred Meyer; they were present before Mr. Wheeler started at the Tacoma Stevens store (pp. 24, 55). Mr. Wheeler was provided a description of how the system works (p. 24).

Mr. Wheeler was fairly familiar with the cart system by the time he arrived at the Tacoma Stevens store as most stores in the Pacific Northwest had implemented the Gatekeeper system (p. 26). The wheel mechanism is affixed to two wheels opposite of each other, one on the front and one on the back (p. 35). There is a geofence that's around the store so the shopping carts will lock up if someone tries to take the cart off the property. If a cart has not gone through a register and payment made, the system is designed to stop the cart at the store doors and remain there until unlocked (p. 25).



> *"So when associates use a shopping cart for stocking or putting cardboard or whatever in and they no longer need to use it, they didn't go through a register, so the cart will lock up at the door. It requires the key to be used to disactivate [sic]…, release whatever brake is holding that wheel, and then they can put the cart back into the lobby for customer use.*
>
> *And when that happens…it's happened to me. You start to hear it. It makes like a clicking sound that I now know, just through my experience, is the beginning of the brake or whatever system is in that wheel to make the wheel not move anymore, and within a very short amount of time, the cart does not move forward anymore unless you use an obnoxious amount of force (pp. 30-31)."*

When a cart locks upon exiting the store without making a purchase, Mr. Wheeler doesn't know that patrons would be surprised; rather, they are confused (pp. 27, 32). "It's not a shocking thing that happens. It's not a big event. It just stops moving. So there's more confusion than anything, not shock (p. 27)." "Unless they've read the signs at the door that explain the system or the warning placards on the carts themselves. If they've read those, great, they would know that it could unexpectedly stop and they might have that knowledge (p. 32)." "…the vast majority of people that shop in the Pacific Northwest are familiar with these types of systems now, as they've been used for years and years and years and years (p. 28)." Fred Meyer has keys made available for both Fred Meyer employees and the third-party non-Fred Meyer employees to utilize to unlock the shopping carts (p. 48).

There are cart warnings on the doors of the Tacoma Stevens store (p. 55). In Mr. Wheeler's experience and what he's observed, the more detailed a warning is, the less they tend to pay attention to said warning (p. 34). In Mr. Wheeler's experience, the shopping carts that have the Gatekeeper system have the sign on them; there would be no sign if the cart did not have the Gatekeeper system (p. 68). When cart supplement shipments come in, it's possible the carts are not equipped with the Gatekeeper system (p. 69).

Mr. Wheeler is not aware of any customer in all his time at Fred Meyers that were injured in any official way and not reported to him (p. 28). It would shock Mr. Wheeler for multiple people to be injured by the cart system.

> *"Because…when a cart locks up, it just stops moving. It's not like – it doesn't bite you, doesn't jump up at you, doesn't explode. It just simply won't go forward anymore. And the stop is not an immediate, super, abrupt stop. It has a … braking mechanism that you can hear start to activate and slows the wheel to a stop (p. 29)."*

If a customer brings an incident to any member of the store leadership, the leadership calls the incident into Sedgwick to start a claim (p. 61). Reported incidents go to Sedgewick one hundred percent of the time if reported to store leadership (p. 61). When a customer reports an injury, an incident report is filled out, and the asset protection team finds any and all footage of the incident and burns it to a physical copy (p. 50). The store incident packet would include a description of the incident, date and time, where it happened, a description of the person, and all the details that are wanted (p. 62).


### 4.1.4  Chad Peterson – Fred Meyer Stores, Inc., and The Kroger Co. 30 (b)(6)

Mr. Chad Peterson was deposed on April 2, 2026 as the corporate representative of Fred Meyer Stores and The Kroger Company. Mr. Peterson started working for Fred Meyer after he graduated high school (p. 48). Mr. Peterson has been the store manager of the Tacoma Stevens Fred Meyer going on five years (p. 9). Mr. Peterson has worked for Fred Meyer or Kroger for the past 31 years (pp. 10, 49). Mr. Peterson reports to the district manager, Michelle Davison, and has five direct reports including the lead assistant store leader, presently James Yule and previously Brenton Wheeler (p. 12-13).

The antitheft shopping cart locking mechanism system existed and was already in place at the Tacoma Stevens store prior to Mr. Peterson's start at the location in October 2021 (pp. 10-11, 161). The subject store experiences about 4,000 transactions a day, this does not include the total number of people who visit the store (p. 163). Fred Meyer has regular inspections of the carts (p. 77). Any customer can use a shopping cart (p. 78). Mr. Peterson is aware of 75 reported incidents with the locking of the carts (p. 22).

It is Fred Meyer's general practice to have warning signs on the carts (p. 74). If a warning sign fell off, Mr. Peterson would contact the main office who would then contact West Coast Carts to reaffix a warning sign (pp. 156, 161, 169-170). Mr. Peterson is familiar with the warning signs both on the cart and the doors that are related to the antitheft shopping cart locking mechanism (p. 49). Mr. Peterson does not know when the warning signs were placed nor by whom as he was not at the subject store when the signs were installed (pp. 34, 50). On both sets of doors of the lobbies, the inner doors of the lobbies have a double-sided decal placed right next to the metal frame where the door opens with a caution and show a picture of the cart (pp. 49, 54-55, 155).

> *"…when the cart enters the store,…once it travels through a register, the sensor sees the cashier, disarms the wheel, the cart goes out. And when the cart goes out of after going through a register, it…rearms after that, so then that way when it comes back in, it would do the same job (p. 59)."*

The shopping carts will lock if they don't go through the register and pay (pp. 59-60). "The cashier does have to be in front of the checkstand when the person passes through there, also. There is a sensor that reads that there's a person at the register (p. 60)." The carts don't stop very fast, and a cart is not going to go backwards unless it is pulled backwards (pp. 104, 167-168).

> *"…when you hit the door, you'll – and some of them will make a sound, some don't. They'll kind of start to slow down and then stop…it slows down before it ever stops…It's not very fast. (pp. 168-169)."*

The locking mechanism is affixed to one wheel in the front and one in the rear of the cart (p. 61).  There is a remote that unlocks the carts if they have locked up (p. 64). The general policy is every cart has the locking mechanism; however, "[the Tacoma Stevens store has] had many carts replaced from other stores. We don't verify that they have Gatekeeper on them when they show up (p. 63)."

Fred Meyer was not aware of Ms. LaRocque's claims prior to this lawsuit and therefore does not know what specific shopping cart Ms. LaRocque was using (pp. 74, 158). If a customer or employee is injured, employees are instructed to notify the store manager in every instance (p. 72). When an incident causing claimed injuries is reported, Fred Meyer will look for a video though sometimes the video is not available


as they don't have a camera in every corner. If the footage is there, the video is burned to a disc, an incident report is created, and these are sent to Sedgwick, the insurance company (p. 62). If any item is involved in an injury, Fred Meyer would review the safety of that piece; the manager who responds to that incident would inspect everything to ensure safety, would make note, and would take photos (pp. 108, 110).

On the date of the subject incident, May 6, 2023, the warnings for the Gatekeeper system were affixed to the sliding interior doors (p. 160). Those warnings were affixed to the subject store for the entire time Mr. Peterson worked at the Tacoma Stevens location (p. 161). Mr. Peterson was working the day of the subject incident, and he was not notified of an injury that day (p. 76). To his knowledge, Ms. LaRocque's incident was not reported, so there was no way to get the cart nor surveillance video to investigate (pp. 157, 160-163). If Ms. LaRocque were to report the incident to a store employee, then that would be transmitted to a manager (p. 161).

### 4.1.5  Ryan Harter – Gatekeeper Systems, Inc. 30(b)(6)

Mr. Ryan Harter was deposed on April 14, 2026 as the corporate representative of Gatekeeper Systems, Inc. Mr. Harter is the senior director of systems support at Gatekeeper and as such he oversees design, monitoring, and technical support for the field installation teams globally (p. 8).

Gatekeeper drafted the language of both the shopping cart and door warning signs (pp. 23-24). Gatekeeper provides the signs upon the purchase of a Gatekeeper product (p. 24). Mr. Harter is not aware of any warning sign verbiage changes in the last 10 years (pp. 24-25).

Gatekeeper has two cart lock systems: the cart containment system and Purchek. The cart containment system is Gatekeeper's exterior perimeter system whose sole purpose is to lock any carts at the perimeter of the property line that is designated by the customer to prevent the cart or asset from leaving the property. The indoor system is Purchek, which is designed to prevent pushout theft. If a cart doesn't go through a transaction point of sale, the cart will lock at the door (p. 26). The Purchek system was installed at the subject Fred Meyer in 2017 (p. 57) [13]. Gatekeeper offers a Video Classification system, or theft intelligence – a system that only records a 20 second video if an event takes place, that was installed at the subject Fred Meyer on February 14, 2019 (pp. 27, 57). Gatekeeper does not maintain the video longer than a year unless it's a pushout theft (p. 59).

The Purchek system at the subject Tacoma-Stevens Fred Meyer was installed by Gatekeeper employee, Tim Wright, and the wheels were installed by West Coast Casters, which is a third party (p. 36). Most likely a Gatekeeper employee placed the warning signs on the doors, but Mr. Harter cannot speak one hundred percent as he was not there. The subject store work order identified that Mr. Wright installed the "clings," or warning signs (p. 40). Per the paperwork, West Coast Carts installed the warning signs on the carts (p. 44). Per the paperwork, there were SmartWheels installed on every cart at the Tacoma-Stevens location (p. 56).

Mr. Harter has seen the photos of the warning signs at the Tacoma-Stevens Fred Meyer store. From the pictures Mr. Harter saw, he can see the warning signs when the doors were open (p. 42).

---

[13] Deposition of Ryan Harter, dated April 14, 2026, Exhibit 6 – GK_0013-GK_0015 [ESi 6.005].



*"I noticed all of the photos from the exterior looking in. But the decals are actually on the interior, facing the interior of the store. So if you're coming from the store out, they're pretty visible (p. 41)."*

*" …they're double-sided, so you can see them from both sides. But they're adhered onto the interior side of the door on the bypass door that slides on the top panel bottom left corner. So when a door is closed, they're front and center (p. 41)."*

*"…the point of the stickers is so you can see it as you're exiting if you're approaching that lock loop…the primary focus is going to be anybody approaching that lock loop…The point of where that cart will lock (p. 44)."*

When there's an activation, there is an alarm chirp and a strobe that is activated (p. 48, 50). The horn and strobe are one packaged unit; the cart itself does not emit any sound upon activation (p. 50). The alarm at each door is not as loud as a fire alarm, but it is loud enough to be heard. "Then Fred Meyer actually installed one at the front end since the registers are so far away from the front end so that it also goes off so the store personnel can hear it (p. 49)." The alarm is a third-party green Potter horn strobe (p. 49). The general Purchek Door Area Devices are seen in Mr. Harter's Exhibit 5 excerpt (**Figure 5**) below.



**Figure 5. Purchek Solution Components - Door Area Devices (GK_0004).**

It can take a couple of seconds for the cart to activate, "…it is a motor and a gear that's driven. So once it hears that command, it has to activate and go through the cycle before it locks. Once activated, the cart can no longer move forward (pp. 50-51)." Fred Meyer utilizes the paired wheel system, so there are two Purchek wheels on each cart counter from one another. The primary wheel activates first as soon as it receives the signal, and it can take a couple of seconds for the secondary to activate (pp. 51-52). The cart does not stop more abruptly with the paired wheels compared to one wheel, but it cannot be moved after activation due to having more friction points (p. 57). "But by having the primary/secondary, it actually



gives a more slowed, controlled stop, because the one wheel locks and then the other one locks up momentarily afterwards. So they don't lock at the same time. There's a delay between (pp. 57-58)."

Once a customer checks out, there is a one hour timer that will reset after one hour (p. 52). Fred Meyer can use their fob to bypass the system, and the system will automatically turn itself back on after 30 seconds (p. 54).

Gatekeeper has no maintenance agreements with Kroger (p. 44). If something breaks, Kroger for Fred Meyer will reach out to Gatekeeper, generate a work order, and schedule a service (p. 45). From the records Mr. Harter saw, the Tacoma-Stevens Fred Meyer location did not have any service records (p. 45, 47).

If one of the warning signs was missing from the shopping cart, Kroger or Fred Meyer would go through the work order channel and have Gatekeeper replace the warning sign or have their maintenance department complete the service after ordering the parts from Gatekeeper (p. 46). Gatekeeper tells its customers that the warning signs need to be replaced if they are damaged or missing (p. 70). Fred Meyer has replaced a missing or damaged warning sign on a shopping cart (p. 47).

Mr. Harter is only aware of people striking their bodies when a cart activates from claims like this (p. 58). "Personally, I watch thousands of videos a month, and I've never noticed or seen anybody hit their body on the cart (p. 58)." Gatekeeper doesn't maintain any sort of database of alleged injuries that occur related to the Purchek system (p. 60). Gatekeeper learned of Ms. LaRocque's incident at the Tacoma-Stevens Fred Meyer after the lawsuit was filed and the insurance company notified Gatekeeper (p. 68).

Mr. Harter's deposition Exhibit 4 (**Figure 6**) looks like a representation of the warning sign that Gatekeeper provides that is affixed to shopping carts with the SmartWheel system installed. The mounting brackets go on the outside and sandwiches the warning sign between the wire frame and the cart so the warning sign stays in place (pp. 61-62).



**Figure 6. Gatekeeper part number M-8033B – the cart warning and mounting kit.**



## 4.2 Digital Media Evidence

ESi received photographs of posted warning signs within the subject Fred Meyer location as well as warning signs attached to the store's carts (see **Figure 7** and **Figure 8**).



**Figure 7. Warning label advising customers about wheels locking.** [14]



**Figure 8. Warning label on shopping cart, advising customer that cart may stop unexpectedly.** [15]

---

[14] Extracted from DEF KROGER_000098 [ESi 4.001].
[15] Extracted from DEF KROGER_000099 and DEF KROGER_000100 [ESi 4.001].



## 4.3  Site and Cart Inspection

On April 29, 2026, ESi conducted a site inspection and exemplar shopping cart testing at the subject store. The inspection included documentation of the store entrance/exit area, cart path of travel, floor surfaces, door threshold, warning signage, and exemplar cart geometry through measurements, photographs, and video. Testing included cart acceleration measurements during wheel-lock activation and surrogate testing to evaluate the relative position of the user's knees and the cart basket during interrupted gait.

## 4.4  Selected Medical Records

According to Ms. LaRocque's provided medical record, Ms. LaRocque was 5 feet 6 inches tall and weighed approximately 253 pounds around the time of the subject incident. [16]

Prior to the subject incident, Ms. LaRocque had a total left knee replacement surgery on February 8, 2023. The left knee is the same knee that allegedly struck the back of the shopping cart on May 6, 2023. Prior to the subject incident, Ms. LaRocque was undergoing physical therapy for her left knee at Anchor Physical Therapy. [17]

**<<< Intentionally left blank >>>**

---

[16] Office Visit in MultiCare Orthopedic and Sports Medicine – Mountain, dated March 30, 2023 [ESi 7.201].
[17] Plaintiff's Responses to Gatekeeper's First Interrogatories and Requests for Production, dated August 29, 2025 [ESi 5.301].

Page 18 of 33

Exhibit 2 - Page 22 of 59



# 5 Analysis and Discussion

Understanding the contributing factors of an accident can be complex, particularly when considering the potential roles of the individuals involved, the environment in which the event occurred, and the equipment, products, or other agents that may have influenced the outcome. To provide a structured assessment of potential contributing factors, the discussion that follows is organized using the Haddon Matrix framework, which emphasizes evaluating the roles and interactions of (1) the individuals involved, (2) the equipment/products/agents involved, and (3) the physical and operational environment in the circumstances of an event.[18] A Human, Machine, Environment (HME) chart relating to the subject incident can be seen in **Figure 9** below.

| Human: Cart Operator/Pedestrian  | Machine: Shopping Cart  |
|---|---|
| • Mrs. Linda LaRocque (age 64 at the time of the incident).<br>• Stature ≈ 5'6" (168 cm); weight ≈ 253 lbs.<br>• Three months post left total knee arthroplasty; cleared from physical therapy two days prior.<br>• Wearing full-length left knee brace, Sketchers, cotton pants, floral shirt<br>• Using cart as a mobility aid in lieu of available cane, spousal support, and store mobility scooter. | • Standard full-size Fred Meyer shopping cart.<br>• Gatekeeper Purchek SmartWheel anti-theft system (paired front/rear locking wheels).<br>• Sequenced primary–secondary lock yields a controlled, gradual deceleration at the lock loop.<br>• On-cart warning placard (general store practice).<br>• Designed for merchandise transport, not as a mobility aid. |

| Environment  |
|---|
| • Fred Meyer Store, 4505 S. 19th Street, Tacoma, WA. On Saturday, May 6, 2023, ≈ 3:00 PM (daylight / photopic conditions).<br>• Indoor foyer/exit area; well-illuminated by overhead artificial light and storefront daylight.<br>• Sliding doors in open position; steady patron flow. ≈ 4,000 transactions per day (well-trafficked area)<br>• Gatekeeper Purchek installed at this store in 2017.<br>• Double-sided warning decals on interior bypass doors, front-and-center when closed; visible from both interior and exterior when open. |

**Figure 9. HME diagram related to subject incident.**

## 5.1 Environmental Conditions

The subject incident occurred on May 6, 2023 at 4505 S. 19th Street, Tacoma, WA 98405 at approximately 3:00 PM.[19] The incident occurred indoors at the foyer/exit area of the subject store, which was illuminated by overhead artificial lighting in addition to natural light entering through the storefront glass and the open sliding doors. Per the testimony of both Mr. and Ms. LaRocque, the doors were in the open position at the time of the incident with a steady stream of patrons entering and exiting. Per the testimony of Mr. Wheeler and Mr. Peterson, the subject store experiences approximately 4,000 transactions per day, supporting the observation that the foyer/exit area is a well-trafficked, regularly used pedestrian space.

---

[18] Allan F. Williams. (1999). The Haddon Matrix: Its Contribution to Injury Prevention and Control. *3rd National Conference on Injury Prevention and Control*.

[19] Plaintiff's First Amended Complaint, dated June 26, 2025 [ESi 5.001].



## 5.2  Warnings and Safety Guidelines

Warnings are a risk reduction strategy. The Handbook of Human Factors and Ergonomics outlines several guiding principles to determine whether a warning should be used including whether a hazard of appropriate severity exists. [20]  Overusing warnings by identifying every risk can have a negative effect on user safety. [21] Potential warnings should be prioritized based on the level of risk of a hazard in order to present the most critical information. [22] Further, multiple modes of sensory engagement, such as visual and auditory, provide high warning efficacy. [23] The use of pictorials not only attracts attention but allows for great communication to a wider audience. [24]

Based on ESi's inspection and the deposition testimony of Mr. Wheeler, Mr. Peterson, and Mr. Harter, multiple, redundant warnings concerning the Gatekeeper Purchek SmartWheel anti-theft system were available to patrons of the subject Fred Meyer at the time of the subject incident. These warnings consisted of: (**1**) double-sided decals affixed to the interior bypass doors of both lobby door sets, positioned in the bottom-left corner of the top panel such that they are visible from both inside and outside the store and are "front and center" when the doors are in the closed position, and (**2**) warning placards mounted to individual shopping carts equipped with the Gatekeeper SmartWheel, sandwiched between the cart's wire frame and an exterior bracket so the placard remains in place during use, and (**3**) an audible alarm chirp and visible strobe  at the lock-loop perimeter that activates when a cart engages, with an additional alarm at the front end of the store installed at Fred Meyer's request. In order to evaluate these warnings against recognized standards, the relevant guidance from the American National Standards Institute (ANSI) Z535 family was reviewed.

### 5.2.1  ANSI Z535.4 – Product Safety Signs and Labels

The ANSI Z535.4 standard establishes recommended guidelines for the design and location of product safety information. The main purpose of the standard is to establish a consistent and uniform visual layout for the efficient development of safety signs and labels. [25] The effective implementation of warnings can include two main formatting components, Signal Words and Safety Alert Symbols. ANSI Z535.4 provides guidelines for the use of both these two components.

The ANSI Z535.4 standard suggests the use of four signal words: DANGER, WARNING, CAUTION, and NOTICE. The standard defines the signal words DANGER and WARNING as follows: [26]

1.  DANGER: Indicates a hazardous situation that, if not avoided, will result in death or serious injury. This signal word is to be limited to the most extreme situations.

2.  WARNING: Indicates a hazardous situation that, if not avoided, could result in death or serious injury.

---

[20] Salvendy, G. (2012). Handbook of Human Factors and Ergonomics: Fourth Edition.

[21] Frantz, J. et al. (1999). Potential Problems Associated with Overusing Warnings. Proceedings of the Human Factors and Ergonomics Society, 1991, 916–920.

[22] Laughery, K. & Wogalter, M. (2006). Designing Effective Warnings. Reviews of Human Factors and Ergonomics, 2(1), 241–271.

[23] Wogalter, M. (2006). Purposes and Scope of Warnings. In M. S. Wogalter (Ed.), Handbook of Warnings. Lawrence Erlbaum Associates.

[24] Laughery, K. & Wogalter, M. (2006). Designing Effective Warnings. Reviews of Human Factors and Ergonomics, 2(1), 241–271.

[25] ANSI Z535.4-2011, Pg. 1.

[26] ANSI Z535.4-2011, Pg. 3.


The safety labels and signs available at the subject Fred Meyer entry doors and on the shopping carts implemented one of these signal words. The signal word "WARNING" was employed both on the door decals and on the cart placards, paired with the standardized triangular safety alert symbol. The selection of the "WARNING" signal word is consistent with ANSI Z535.4 guidance: the hazard associated with a cartwheel locking at the door is one that, if not avoided, could potentially result in injury, but is not of the most extreme severity for which "DANGER" would be reserved. The signal word selected, the use of the safety alert symbol, the inclusion of a pictorial representation of the cart, and the textual content describing the location and condition under which the cartwheels may stop are all consistent with the formatting and content guidance set forth by ANSI Z535.4.

A complementary formatting component in a warning is the use of safety alert symbols. The intention of such a symbol is to transmit a message without the use of words in order to represent a hazard, a hazardous situation, a precaution to avoid a hazard, the result of not avoiding a hazard, or any combination of these.[27] Per ANSI Z535.4, the safety alert symbol may be used in combination with signal words. The standard provides specific graphical considerations and requirements for the use of the safety alert symbol in order to indicate the presence of a potential hazard. The safety alert triangle was present on both the cart placard and the door decals at the subject Fred Meyer location, satisfying ANSI Z535.4 guidance for the use of this complementary symbol.

## 5.3  Cart Operator Experience, Behavior, and Expectancy

Expectancy is a human factor consideration related to Ms. LaRocque's ability to avoid potential interaction with the cart. Expectancy is a key factor in visual and auditory perception and plays a major role in our ability to detect objects. Expectancy affects our predictions about the environment and the kinds of responses that we may have to make. Expectancy affects the manner in which we estimate whether a reaction is needed. When there is no expectancy, or an individual's expectancy is incorrect, it may take longer to respond properly to an event, the response may be wrongly or poorly executed, or there may not be any response at all.

It was identified that the Gatekeeper Purchek or similar systems are installed at most stores in the Pacific Northwest and "…the vast majority of people that shop in the Pacific Northwest are familiar with these types of systems now, as they've been used for years and years and years and years."[28] The Purchek system at the subject Fred Meyer was installed in 2017 (Harter Dep., p. 57), and Ms. LaRocque's incident occurred on May 6, 2023, approximately five and a half years after installation.

Ms. LaRocque testified that she shopped at the subject Fred Meyer one to two times per week, with her doctor's office located just down the road. Mr. LaRocque testified that he and Ms. LaRocque had been shopping at the subject Fred Meyer for approximately 25 years and that she accompanied him two to three times per week.[29] Using Ms. LaRocque's own conservative figure of one shopping trip per week from the date of Purchek installation (late 2017) through the date of the subject incident (May 6, 2023), she would have entered and exited the subject store on the order of 280 occasions, a figure that doubles

---

[27] ANSI Z535.4-2011, Pg. 2.
[28] Deposition of Brenton Wheeler, dated March 26, 2026, p. 28 [ESi 6.003].
[29] Deposition of Steven LaRocque, dated September 11, 2025, p. 17 [ESi 6.002].


to approximately 560 occasions at her stated upper-bound frequency of two trips per week, and which is greater still under Mr. LaRocque's recollection. On every such occasion, she had the opportunity to be exposed to the door decals and on-cart placards, as well as to the audible/visual alarm chirp at the lock loop on any occasion the system activated for any patron.

From a human factors perspective, this very substantial exposure history supports the formation of an expectancy regarding the operation of the Purchek system, even in the absence of a specific recollection of any single warning. As mentioned previously, expectancy can be formed both from explicit instruction (e.g., reading a warning) and from repeated exposure to a system in operation, including incidental observation of other patrons' carts engaging at the lock loop.

## 5.4  Cart Geometry

The shopping cart geometry provides clearance between the user's knees and the rear of the cart basket during normal cart use. The cart handle is approximately 3 feet 5 inches above the floor. The bottom of the cart basket is approximately 1 foot 9.5 inches above the floor. The top rear portion of the basket is positioned approximately 3.5 inches horizontally forward of the handle centerline, while the lower rear portion of the basket is positioned approximately 10 inches horizontally forward of the handle centerline.

This geometry is relevant because the cart basket slopes away from the user as it extends downward (see **Figure 10**). As a result, the lower portion of the basket is farther forward from the user than the upper portion of the basket. During normal use, with the user's hands on the handle, this geometry creates additional clearance between the user's knees and the rear/lower portion of the basket.

## 5.5  Anthropometry

Anthropometric estimates were used to evaluate the approximate vertical relationship between Ms. LaRocque's knee and the rear/lower portion of the shopping cart basket. Ms. LaRocque's estimated knee height was calculated using the Chumlea knee-height relationship:

$$Knee\ height\ (cm) = \frac{Height\ (cm) - 82.21 + (0.21 \times Age)}{1.85}$$

Using a reported height of approximately 168 cm and an age of 64 years, Ms. LaRocque's estimated knee height was approximately 53.6 cm, or approximately 21 inches from the floor. This estimate assumes the applicable White, non-Hispanic anthropometric equation.

The bottom portion of the exemplar shopping cart basket was measured at approximately 21.5 inches above the floor. Therefore, the lower portion of the cart basket was positioned approximately 0.5 inches higher than Ms. LaRocque's estimated knee height.

This comparison indicates that Ms. LaRocque's estimated knee height was vertically closest to the bottom portion of the cart basket. The bottom portion of the basket was also the portion positioned farthest forward from the user, due to the rearward-to-forward slope of the basket. Therefore, the area of the basket most vertically aligned with Ms. LaRocque's knee was also the area with the greatest horizontal clearance from the user during normal cart use (see **Figure 12**).









**Figure 10. Shopping cart geometry.**

## 5.6 Pedestrian Gait Analysis

Basic gait, or the manner in which a person walks, is a coordinated movement involving the interaction of musculoskeletal structures, neuromuscular control, and external forces to produce efficient forward movement. A complete gait cycle constitutes the interval between successive foot strikes of the same limb and is divided into two main phases: the stance phase, when the foot is in contact with the ground, and the swing phase, when the limb advances forward. During this gait cycle, the body continuously shifts its center of mass in a controlled pattern, an ongoing balance between falling forward and recovery. Normal gait depends on key functional requirements including stability during stance, clearance of the swinging limb, proper foot/limb placement for the next step, and adequate step length. [30]

During swing phase, the knee generally remains behind the foot/toe as the limb advances forward. The knee may move slightly ahead of the toe when the limb is trailing during double support and near foot lift-off (**Figure 11**); however, during the forward swing of the limb, the foot is the leading portion of the lower extremity. This relationship is relevant to the subject incident because the alleged contact involved the

---

[30] Chambers, H.G. & Sutherland, D.H. (2002) A Practical Guide to Gait Analysis, 10(3), 222-231.



knee contacting the rear/lower portion of the shopping cart basket. For knee contact to occur during forward walking, the user's body position, lower-extremity position, and cart geometry must allow the knee to close the horizontal clearance to the cart (see **Figure 12**).



**Figure 11. Normal walking gait, adapted from Chambers, et al. [31]**

Gait termination is the transition from steady-state walking to a complete stop. Gait termination may be planned, such as intentionally stopping at a known location, or unplanned, such as stopping in response to an unexpected external event. The literature indicates that the ability to stop within the next step depends in part on walking speed and the amount of time available to respond. One study reported that, during normal walking cadence, when a stop cue was provided approximately 300 milliseconds after the signal to stop, all subjects were able to terminate gait within one step. [32] The study also reported that walking speed affected stopping strategy, with faster walking requiring additional response time to terminate gait within the next step. Mr. LaRocque described their walking speed as "not that fast" and indicated that they were moving slowly while walking at the same speed and maintaining approximately 6 to 12 inches of separation. [33] This testimony is relevant because slower walking speeds are generally associated with greater available time and opportunity to terminate gait after an unexpected interruption.

Age-related gait termination research also indicates that older adults can successfully terminate gait, although they may use different biomechanical strategies than younger adults. Another study reported that middle-aged and elderly women used generally similar unplanned gait termination strategies, but the elderly group generated less lower-extremity braking force and relied more heavily on the hip joint during termination. [34]

---

[31] Chambers, H.G. & Sutherland, D.H. (2002) A Practical Guide to Gait Analysis, 10(3), 222-231.

[32] Bishop, M., Brunt, D., Pathare, N., & Patel, B. (2004). The effect of velocity on the strategies used during gait termination. Gait & Posture, 20(2), 134–139.

[33] Deposition of Steven LaRocque, dated September 11, 2025, p. 19 [ESi 6.002].

[34] Jung, S., Yi, J., & Song, C. (2016). Biomechanical alterations of gait termination in middle-aged and elderly women. Journal of Physical Therapy Science, 28(3), 861–867.



## 5.7 Surrogate Testing

Surrogate testing was performed to evaluate the relative position of the user's knees and the shopping cart basket during wheel-lock activation. A height-matched surrogate was used for the testing. In a normal standing position with both hands on the cart handle, the total clearance between the surrogate's knees and the cart basket was approximately 22 inches (see **Figure 12**).

The surrogate pushed the cart through the exit without passing through checkout so that the cart's wheel-lock system would activate. Testing was performed at slow, normal, and fast walking speeds. Accelerometers were mounted to the cart basket to document cart motion during the wheel-lock event. Video cameras recorded the testing from multiple angles, with rulers and scales placed in view to allow distance measurements and review of the surrogate's body position relative to the cart.

A total of seven test runs were completed. The synchronized video views showed that the wheel lock occurred during different phases of the surrogate's gait cycle. In one representative run, wheel lock occurred as the foot contacted the ground, after which the surrogate's gait was effectively arrested and no forward knee contact with the cart basket occurred (see **Figure 13**). In another representative run, the wheel lock occurred as the opposite foot contacted the ground, and the surrogate began a subsequent swing phase after the wheel lock. However, that swing was interrupted and did not complete as a full forward step into the cart (see **Figure 14**).

Across all seven runs, regardless of the gait phase interrupted by the wheel-lock event, the closest knee remained at least 10 inches from the rear of the cart basket. This minimum clearance was maintained even when the surrogate continued forward motion after the wheel locked. The testing demonstrated that, under the tested conditions, wheel-lock activation did not cause the cart basket to contact the surrogate's knees. The testing also showed that the surrogate's gait response to wheel-lock activation varied by gait phase, but the resulting motion did not eliminate the knee-to-cart clearance.




**Figure 12. Height-matched surrogate in a normal standing position with both hands on the shopping cart handle, demonstrating the approximate knee-to-cart basket clearance.**

Exhibit 2 - Page 29 of 59





*Toe-off*        *Foot clearance*



*Wheel lock & foot strike*        *Opposite toe-off*



*Opposite back on ground*

**Figure 13. Synchronized video frames from a surrogate test run showing wheel-lock activation followed by arrest/cancellation of the surrogate's gait.**





**Wheel lock & opposite foot strike**

**Toe-off**



**Incomplete swing**



**Opposite backward step**



**Final stance**

**Figure 14. Synchronized video frames from a surrogate test run showing wheel-lock activation during gait progression.**

Moreover, the measured acceleration data showed that wheel-lock activation occurred as a brief but staged cart response, rather than as an instantaneous stop of the entire cart. This finding is consistent with the testimony of Ryan Harter, Gatekeeper Systems, Inc.'s 30(b)(6) representative, who explained that the subject Fred Meyer carts use a paired-wheel system with two Purchek wheels positioned opposite one another. According to Mr. Harter, the primary wheel activates first upon receiving the signal, and then the secondary wheel activates. He further explained that the paired-wheel system does not stop the cart more abruptly than a single-wheel system; rather, the delayed activation produces a more slowed, controlled stop because the two wheels do not lock simultaneously.



## 5.8 Perception and Attention

Perception and attention are foundational concepts in human factors. The human visual system is a selective, capacity-limited information processor: in any complex environment, only a small portion of the visual information available at a given moment is consciously processed. The salience of a cue (its conspicuity), the observer's expectancy for it, the observer's task demands, and the duration and frequency of exposure all influence whether a cue is detected and acted upon.

Based on ESi's site inspection, the warning decals on the bypass doors and the warning placards on the carts were physically present, legible, and visible from the typical pedestrian path of approach to the door (both inbound and outbound), consistent with Mr. Harter's testimony that the decals are "front and center" when the doors are closed and remain visible from both the interior and exterior when the doors are open. [35]

It should be noted that ANSI Z535 and the human factors warnings literature do not require, or even support a presumption, that an individual user consciously read every warning on every encounter in order for that warning to be effective. Repeated exposure to a warning, even without conscious rehearsal of its content, can support hazard awareness and the formation of appropriate expectancies. As discussed previously, Ms. LaRocque's extensive prior shopping history at the subject store (estimated 280–560+ visits between Purchek installation and the date of the subject incident) provided ample opportunity for both explicit perception of the warnings and implicit expectancy formation regarding the operation of the cart-containment system.

## 5.9 Human Error

In the field of Human Factors, human error can be defined as a lengthy and complex chain of breakdowns that affect the overall system. [36] In his book, *Human Error Reduction and Safety Management,* [37] Dan Petersen discussed the many causes of human error and how the understanding of human error can be applied to safety management. Operator incidents, such as Ms. LaRocque's incident, are events that can be linked directly to human error. They can happen due to random events, or they can be caused by systemic events. The difference is not always readily apparent given the complexity of risk factors.

In the present matter, Ms. LaRocque's decision to use a full-size shopping cart as her primary mobility aid is a significant individual-level factor. The cart was designed and intended for the transport of merchandise; it is not a mobility aid, an assistive walking device, or a substitute for a rollator. Ms. LaRocque had with her on the date of the incident a cane, her husband's arm for support, and access to the mobility scooters that the subject Fred Meyer made available at the front of the store, all three of which are intended uses for assistance with ambulation. By her own testimony, she elected to use the shopping cart instead. No representative of Fred Meyer or of Gatekeeper informed her that it was safe to use a shopping cart as a mobility aid, and the carts themselves are not designed, marked, or instructed for that use.

---

[35] Deposition of Ryan Harter, dated April 14, 2026, pp. 41-44 [ESi 6.005].
[36] Wickens, C. D., & Hollands, J. G. (2000). Human Error. In *Engineering Psychology and Human Performance* (3rd ed., p. 493). Prentice-Hall, Inc.
[37] Petersen, D. (1984). Human-error reduction and safety management.



A second individual-level factor concerns the reported sequence of events at the moment of contact. By Ms. LaRocque's own description, the cart stopped first, and her knee contacted the cart on the next step she took: "the next step I took was into the cart… I lifted my knee, walked right into it". [38] Mr. LaRocque's description is consistent, he did not hear an abrupt impact, only Ms. LaRocque saying "Ow," and he described the cart as having decelerated to a stop in line with the doors. A continued forward foot placement after the cart had already come to a controlled stop is the proximate physical explanation for knee contact with the cart, not an abrupt cart-induced perturbation.

These observations describe, in human factors terms, the chain of decisions and actions that produced the contact. The system itself functioned as designed: it engaged, decelerated the cart in a controlled manner at the lock loop, and should have produced an audible/visual alarm. The available warnings were present and consistent with applicable ANSI guidance. The user-side factors, choice of the cart as a mobility aid in lieu of available alternatives, and the continuation of forward motion after the cart had stopped are properly characterized as human-factors contributors to the incident.

## 5.10  Review of Report of Mr. Levi Dixon

ESi received a report written by Mr. Levi Dixon dated February 25, 2026. In such report, Mr. Dixon concludes that:

> *"Prior to Ms. LaRocque's incident, the Defendants knew and/or should have known that the shopping cart wheels were at risk of locking up and/or unexpectedly stopping, even if someone was not "shoplifting."*
>
> *The cart wheels unexpectedly locking and/or stopping the forward motion of the shopping cart poses a risk of harm to pedestrians due to putting them at risk of striking/contacting the shopping cart and/or a loss of balance.*
>
> *The overall warning system that was utilized to attempt to alert pedestrians of the risk of the shopping cart wheels locking and/or the shopping cart unexpectedly stopping was unreliable and inconsistent with basic principles for warnings.*
>
> *Despite relying on warnings placards placed on the shopping carts, the shopping cart that Ms. LaRocque was using at the time of this incident was devoid of the warning placard.*
>
> *From a Safety and Human Factors Engineering perspective, Ms. LaRocque's overall behavior was predictable."* [39]

ESi has reviewed Mr. Dixon's report and respectfully disagrees with several of his opinions and the analytical framework on which they rest. Specific points of disagreement, organized by Mr. Dixon's numbered conclusions, are set forth below.

- ***Knowledge that the cartwheels could lock outside of a "shoplifting" event***. ESi does not dispute that the Purchek system, by design, locks any cart that exits the perimeter without passing

---

[38] Deposition of Steven LaRocque, dated September 11, 2025, pp. 81-82 [ESi 6.002].
[39] Report of Levi Dixon, dated February 25, 2026 [ESi 9.001].



through the point-of-sale, regardless of the user's intent. This is the design intent of a pushout-prevention system. The relevant human factors question is not whether the operator of a patron-facing system should anticipate every possible patron behavior, but whether reasonable warnings and a reasonable design were in place. The Purchek system at the subject Fred Meyer included redundant visual warnings (door decals and on-cart placards) and an audible/visual alarm at the perimeter, a multi-modal warning architecture consistent with established human factors guidance.

- ***Risk of harm from cartwheels stopping***. The premise that cart deceleration "poses a risk of harm to pedestrians" is overstated when applied to the Purchek paired-wheel system. The Purchek system is engineered to produce a gradual, controlled stop: the primary wheel locks first, the secondary wheel engages momentarily afterward, and the cart slows over a brief interval rather than halting abruptly. Mr. Dixon's analysis assumes a 0.5-second perception–response window using an idealized 4 ft/s walking speed and a 2-foot handle-to-torso distance. Both Mr. and Ms. LaRocque testified that they were walking slowly at the time of the incident,[40] which extends (not shortens) the available perception–response window. As discussed in the ESi's analysis, ESi's surrogate testing demonstrated that the surrogate's knees and lower extremities did not come into close proximity with the cart during brake-lock trials at normal, slow, or fast walking speeds.

- ***Reliability of the warning system***. Mr. Dixon characterizes the warning system as "unreliable and inconsistent with basic principles for warnings." ESi disagrees. The warnings in place at the subject Fred Meyer satisfy the core ANSI Z535 formatting components (signal word, safety alert symbol, pictorial, and hazard description); employ multiple sensory modalities (visual decal/placard, audible alarm, visual strobe); are placed proximate in time and place to the hazard (the door lock loop); and are redundant across two physical surfaces (the door and the cart). The fact that a warning system can theoretically be perfected does not render the deployed system unreliable; the relevant standard is reasonableness against established guidance, which the deployed system satisfies.

- ***Allegedly missing placard on the subject cart.*** The opinion that the specific cart Ms. LaRocque was using lacked a warning placard is based on Ms. LaRocque's post-hoc recollection. The defendants were not contemporaneously notified of the incident; the cart itself was not preserved or identified to the defendants; and no surveillance video of the incident was obtained. The general practice at the subject store, per Mr. Peterson, was that all carts were equipped with placards.[41] Even setting that point aside, on-cart placards are one of three layered warning channels at the subject location; the door decals and the perimeter audible/visual alarm are present and active regardless of any single cart's placard status. Reliance on the alleged absence of a single placard as the operative warning failure ignores the redundant warnings provided by the door decals and the perimeter alarm device.

- ***Predictability of Ms. LaRocque's behavior.*** Mr. Dixon opines that Ms. LaRocque's overall behavior was predictable. ESi disagrees as a matter of human factors analysis: the use of a full-size shopping cart as a primary mobility aid for an individual recovering from a total knee

---

[40] Deposition of Steven LaRocque, dated September 11, 2025, p. 19-20 [ESi 6.002].
[41] Deposition of Chad Peterson, dated April 2, 2026, p. 74 [ESi 6.004].



arthroplasty, in lieu of an available cane, an available companion's arm, and the store's available mobility scooters, is not the predictable use of a shopping cart. The shopping cart's designed and labeled function is the transport of merchandise; mobility-aid use is outside that function and outside the foreseeable design envelope of an anti-theft cart-containment system.

- ***Other prior incidents.*** Mr. Dixon references a small number of prior and subsequent incidents at the subject location and elsewhere. In the broader denominator of approximately 4,000 transactions per day at the subject store alone, and in the context of a system that has been deployed regionally for years, the rate of reported injury claims associated with a cart-lock event is exceedingly low. Mr. Harter, who oversees Gatekeeper's global field installation team and reviews thousands of activation videos per month, testified that he has never observed a person striking their body on a cart in the activation videos he has reviewed.

## 5.11 Review of Report of Dr. Alan B. Brown

ESi received a Medical Record Review prepared by Alan B. Brown, MD, JD, Orthopedic Surgeon, dated May 7, 2026. Dr. Brown reviewed Ms. LaRocque's medical records, deposition testimony, and imaging studies and addressed a series of causation questions concerning the subject incident.

Dr. Brown's principal conclusion, expressed to a reasonable degree of medical probability, is that on a more-probable-than-not basis Ms. LaRocque was not injured as a result of the subject incident. Dr. Brown noted the long pre-incident history of bilateral knee, low back, cervical, and thoracic complaints; the morbid obesity and opioid dependence; the left total knee arthroplasty performed approximately three months prior to the incident; the small inferior-pole patellar avulsion (approximately 4–5 mm of displacement) noted on the May 9, 2023 imaging; and the subsequent slow failure of the extensor mechanism – a known complication of total knee arthroplasty. Dr. Brown opined that there is no plausible mechanism by which a patellar tendon could have been ruptured by the contact described, that an immediate severe disability would have been expected if the tendon had ruptured at the time of the incident, and that the documented record of Ms. LaRocque walking to the ATM after the incident is inconsistent with an acute extensor-mechanism failure at that moment.

Dr. Brown's medical conclusions are consistent with the mechanism analysis presented in the present report. The Purchek system produces a controlled, gradual stop of the cart, and the surrogate testing and gait/geometry analysis indicate that knee contact with the cart's lower plastic component would not be expected to occur with high energy from typical cart-pushing posture. A low-energy contact of the type ESi's analysis predicts is consistent with Dr. Brown's opinion that the contact would not be expected to produce a high-energy, tendon-disrupting injury at the moment of impact.

*<<< Intentionally left blank >>>*



# 6 Conclusions and Opinions

The following conclusions are based on the inspection and analysis as described above, and on the education, training, and experience of the authors.

**Manuel Meza-Arroyo**:

1. The warnings made available to patrons of the subject Fred Meyer concerning the Gatekeeper Purchek SmartWheel anti-theft system, including the double-sided decals on the interior bypass doors, the warning placards on the carts, and the audible/visual alarm at the lock-loop perimeter were present, conspicuous, and consistent with the formatting and content guidance set forth in ANSI Z535.4 and with established human factors principles for the design of redundant, multi-modal warnings.

2. The Purchek system is engineered to produce a controlled, gradual stop of the cart at the lock-loop perimeter rather than an abrupt halt. The paired-wheel design produces a sequenced primary–secondary lock, yielding a slow and controlled stop. Mr. LaRocque, who was walking immediately behind Ms. LaRocque, did not hear the cart's wheels skid, stutter, or come abruptly to a halt.

3. Ms. LaRocque's own description of the incident is consistent with a continued forward foot placement after the cart had already come to a controlled stop and is not consistent with an abrupt cart-induced perturbation that drove her body into the cart.

4. Based on the testimony of Mr. and Ms. LaRocque, Ms. LaRocque had shopped at the subject Fred Meyer one to two times per week over a period of more than 25 years. Between the 2017 installation of the Purchek system and the subject incident on May 6, 2023, she is conservatively estimated to have entered and exited the subject store on the order of 280 to 560+ occasions. This very substantial exposure history provided ample opportunity for both explicit perception of the door decals and on-cart placards and implicit expectancy formation regarding the operation of the cart-containment system.

5. From a Human Factors perspective, the use of a full-size shopping cart as the primary mobility aid for an individual recovering from a total knee arthroplasty is outside the cart's designed and intended function. Ms. LaRocque had with her a cane, the support of her husband's arm, and access to the store's mobility scooters at the front of the store, all three of which are intended uses for ambulation assistance. Her election to use the cart for that purpose is a user-side factor independent of the warnings or the Purchek system.

6. The criticisms set forth in Mr. Dixon's February 25, 2026, report do not adequately account for:

   a. The multi-modal, redundant nature of the warning system at the subject location (door decals, on-cart placards, perimeter audible/visual alarm);

   b. the gradual and controlled stop produced by the paired-wheel Purchek design;

   c. the role of slow walking in lengthening the available perception–response window;

   d. Ms. LaRocque's substantial prior opportunity to perceive the warnings and form expectancies regarding the system over the 5.5 years between Purchek installation and the subject incident.


**Gadir A. Hazime**:

7. The exemplar shopping cart geometry provided sufficient horizontal clearance between a user of similar height to Ms. LaRocque and the rear of the cart basket during normal use to avoid interaction between the knees and the rear of the cart basket.

8. Ms. LaRocque's estimated knee height was closest vertically to the lower portion of the cart basket. At the same time, the lower portion of the back of the basket is also positioned furthest from the user due to the slope of that basket component.

9. During normal forward walking, the foot is generally the leading portion of the lower extremity during swing phase, not the knee. Therefore, knee contact with the back of the cart would require the knee to traverse the entirety of the horizontal clearance between the normal gait pattern and the rear of the cart basket.

10. Published research on unplanned gait termination indicates that, at typical walking cadence, gait can be terminated in a single step within approximately 300 ms, and that strategies for unplanned gait termination are similar across age groups.

11. The gait termination literature also indicates that slower walking speeds provide greater opportunity to stop or arrest gait after an unexpected interruption. Both Mr. and Ms. LaRocque testified that they were walking slowly at the time of the subject incident, which extends, not shortens, the available interval between successive foot strikes for gait termination.

12. During ESi's testing of the exemplar shopping cart, the wheel-lock system produced a controlled stopping response characterized by successive activation of the two wheel locks.

13. In surrogate testing, wheel-lock activation occurred during different phases of gait, including foot contact and subsequent attempted swing. In each condition, the surrogate's gait was either arrested, or the subsequent swing was interrupted before the knee approached the cart basket.

14. Across all seven test runs, the closest knee remained at least 10 inches from the rear of the cart basket, even after wheel-lock activation and continued forward motion.

15. Under the tested conditions, wheel-lock activation did not result in contact between cart basket and the surrogate's knees.

16. Anthropometric and cart-geometry data, supported by ESi surrogate testing on April 29, 2026, indicate that under the cart-handling posture Ms. LaRocque described, straight upright posture, both hands on the cart, arms extended forward, no body weight on the cart, the surrogate's knees and lower extremities did not come into close proximity with the rearward edge of the cart basket during normal, slow, and fast walking speeds, including during brake-lock trials.

The conclusions and opinions formulated during this investigation and presented herein are based on information available to date. ESi reserves the right to supplement or otherwise amend this report should other information become available.

<<<  **End of Report Text**  >>>

# APPENDIX A

Exhibit 2 - Page 38 of 59


| Idx | Name |
|---|---|
| **01 - Organizational** | |
| 01.101 | 118934 New Matter Acceptance -signed |
| 01.102 | T&C,Fee Sheet, and W9 |
| **02 - Work Product** | |
| 02.401 | 118934-V001-20260429-Cart Handle-NSF |
| 02.402 | 118934-V002-20260429-Overview-NSF |
| 02.403 | 118934-V003-20260429-Thresh Hold-NSF |
| 02.404 | 118934-V004-20260429-Low Angle-NSF |
| 02.501 | 118934-P001-20260429-NSF |
| 02.901 | 118934 Investigative Report |
| **04 - Received Data** | |
| 04.001 | Photographs of cart and entrance warnings |
| 04.002 | Photographs of plaintiff's clothing footwear and knee brace |
| **05 - Legal** | |
| 05.001 | 2025.06.26_Pltf's 1st Amended Complaint |
| 05.101 | 2026.03.11_Defs Kroger & Fred Meyer's MSJ (conformed) |
| 05.301 | 2025.08.29 Pltf RROGs & RRFPs to Def Gatekeeper |
| 05.302 | 2025.06.27_Pltf's RRFP and RROGs to Def Kroger and FM |
| 05.501 | 2026.04.02 Plaintiff's 2nd Supp Expert Disclosure |
| **06 - Depositions** | |
| 06.001 | 2025.09.11_Depopsition Transcript_Linda Larocque (full print) |
| 06.002 | 2025.09.11_Depopsition Transcript_Steven Larocque (full print) |
| 06.003 | 2026.03.26_Deposition Transcript_Brenton Wheeler |
| 06.004 | 2026.04.02 Depo Transcript Chad Peterson_full |
| 06.005 | 2026.04.14 Gatekeeper FRCP 30(b)(6) Depo Transcript of Ryan Harter |
| 06.006 | 2026.03.11_STK Decl. ISO Defs Kroger & Fred Meyer's MSJ with exhibits |
| **07 - Medical** | |
| 07.201 | Pltf Medical Record preceding incident with height and weight |
| **09 - Expert** | |
| 09.001 | Plaintiff Expert Docs |

Exhibit 2 - Page 39 of 59



| 12 - Literature | |
|---|---|
| 12.001 | Knox_Stern - 2015 - Methods of Accident Recon - |
| 12.002 | Noon - Scientific Method |
| 12.003 | Liptai - Forensic Engineering |
| 12.004 | HF NASA HF 101 |
| 12.005 | FAA Order 9550.8 |
| 12.006 | Williams - Haddon Matrix |
| 12.007 | ANSI Z535.4-2011 |
| 12.008 | Salvendy, G. (2012). Handbook of Human Factors and Ergonomics: Fourth Edition. |
| 12.009 | Frantz, J. et al. (1999). Potential Problems Associated with Overusing Warnings. Proceedings of the Human Factors and Ergonomics Society, 1991, 916–920. |
| 12.010 | Laughery, K. & Wogalter, M. (2006). Designing Effective Warnings. Reviews of Human Factors and Ergonomics, 2(1), 241–271. |
| 12.011 | Wogalter, M. (2006). Purposes and Scope of Warnings. In M. S. Wogalter (Ed.), Handbook of Warnings. Lawrence Erlbaum Associates. |
| 12.012 | Chambers, H.G. & Sutherland, D.H. (2002) A Practical Guide to Gait Analysis, 10(3), 222-231. |
| 12.013 | Bishop, M., Brunt, D., Pathare, N., & Patel, B. (2004). The effect of velocity on the strategies used during gait termination. Gait & Posture, 20(2), 134–139. |
| 12.014 | Jung, S., Yi, J., & Song, C. (2016). Biomechanical alterations of gait termination in middle-aged and elderly women. Journal of Physical Therapy Science, 28(3), 861–867. |
| 12.015 | Wickens, C. D., & Hollands, J. G. (2000). Human Error. In Engineering Psychology and Human Performance (3rd ed., p. 493). Prentice-Hall, Inc. |
| 12.016 | Petersen, D. (1984). Human-error reduction and safety management. |

Exhibit 2 - Page 40 of 59

# APPENDIX B

Exhibit 2 - Page 41 of 59

# Manuel Meza-Arroyo
## PhD, PE, CHFP
## Director, Senior Managing Consultant



Dr. Meza-Arroyo has extensive experience in the field of industrial and human factors engineering. He specializes in human perception and cognition, and occupational biomechanics. He has significant experience in experimental design, the application of statistical analyses, and the implementation of computational modeling for assessing human performance. He has conducted and participated in multiple disciplinary investigations involving automobile and trucking accidents, nighttime or low-illumination incidents; industrial and occupational injuries; slip/fall/trip/misstep incidents; and the analysis of warnings, procedures and instructions.

Dr. Meza-Arroyo's research has included the study of eye movements and visual attention during driving tasks, visual information processing for collision detection, visual perception under low-illumination conditions, occupant kinematics during low-speed impacts, and the photometric characteristics and human factors implications of different headlamp technologies for the transportation industry.

At ESi, Dr. Meza-Arroyo implements human-subject testing to assess human performance and behavior by employing tools such as motion capture technology, calibrated photography and videography, tri-axial accelerometers, binaural microphones, and custom programming for various applications including statistics, biomechanics, and psychophysics.

Dr. Meza-Arroyo has authored multiple technical reports addressing various topics, including low-illumination accidents, visual perception and conspicuity, auditory warnings and perception, trip/fall/slip/misstep incidents, headlamp and street illumination, and statistical analyses for industrial processes.

**Contact Information**

mmarroyo@engsys.com

(734) 794-8109

**ESi Ann Arbor**

1174 Oak Valley Drive
Ann Arbor, MI 48108

**Areas of Specialization**

- Perception and Attention
- Human Error Analyses
- Night and Daytime Visibility and Conspicuity
- Biomechanics and Human Motion Analysis
- Human Factors Engineering
- Risk Assessment, Experimental Design & Statistical Data Analysis

## Education

PhD, Industrial Engineering. Texas Tech University. Lubbock, TX, 2015

MS, Industrial Engineering. Texas Tech University. Lubbock, TX, 2009

BS, Industrial & System Engineering. Tecnológico de Monterrey. Mexico, 2007

Exhibit 2 - Page 42 of 59



## Licenses & Certifications

- State of Michigan P.E. License 6201310563

- Professional Industrial & Systems Engineer – SEP Cédula: 5456536, Mexico

- Certified Human Factors Professional (CHFP) by the Board of Certification in Professional Ergonomics (BCPE), Certification No. 1973

## Languages

- English, Spanish, Portuguese.

## Positions Held

**Engineering Systems Inc., Ann Arbor, Michigan**

- Director, 2026 - Present

- Senior Managing Consultant, 2023 – Present

- Senior Consultant, 2022 – 2023

- Senior Staff Consultant, 2020 – 2021

- Staff Consultant, 2016 – 2019

- Research Analyst, 2015 – 2016

**University of Texas, Arlington, Texas**

- Adjunct Professor, Summer 2015

**Texas Tech University, Lubbock, Texas**

- Research-Teaching Assistant and Graduate Instructor, 2007 – 2015

**ALSTOM Power, Morelia, Mich. Mexico**

- Tendering Engineer (Intern), January 2007 – May 2007

**CIETec, Tecnológico de Monterrey, Morelia, Mich. Mexico**

- Researcher- Data collection and analysis, 2005 - 2007

## Continuing Education

- **RP-43, Lighting for People in Outdoor Environments** – Certificate of Attendance, IES, 2021

- **Roadway Lighting – Lighting and Health** – Certificate of Attendance, IES, 2020

- **Traffic Signal Timing Records Interpretation and Analysis** – Certificate of Achievement, Traffic Signal Academy, University of Tennessee. October 2020

Exhibit 2 - Page 43 of 59


- **Show Me the Data: Does LED Lighting Influence Roadway Safety?** – Certificate of Attendance, IES, July 2020

- **Germicidal Ultraviolet Disinfection in the Days of COVID-19** – Certificate of Attendance, IES, May 2020

- **Traffic Crash Reconstruction for the Forensic Engineer** – Certificate of Achievement, Northwestern University, March 1, 2019

- **A New Measure of Color Discrimination** – Certificate of Attendance, IES, November 2018

- **Automotive Lighting: Testing and Requirements Seminar**– Certificate of Achievement, SAE International, April 6, 2017

- **Automotive Lighting: Design and Technology Seminar**– Certificate of Achievement, SAE International, April 4, 2017

- **Vehicular Crash Reconstruction Methods Seminar**– Certificate of Achievement, SAE International, Troy, MI, May 2016

## Professional Affiliations/Honors

**Human Factors & Ergonomics Society (HFES)**

- Member

**Illuminating Engineering Society (IES)**

- Member

**Society of Automotive Engineers (SAE)**

- Member

**Alpha Pi Mu (Industrial Engineering Honor Society)**

- Awarded

**Raider Rojos National Alumni Scholarship**

- Scholarship recipient, 2014

**American-Mexican Waterman Friendship Scholarship**

- Recipient, 2008 – 2015

**Virtual Environment & Forensics Professional Technical Groups**

- HFES member

## Peer Reviewer

Journal of Failure Analysis and Prevention, **M. Meza-Arroyo**

SAE Manuscript, **M. Meza-Arroyo**


## Publications

"When a Flashlight Looks Like a Threat: A Multifaceted Human Factors Approach in the Accident Reconstruction of a Police Officer Shooting," **M. Meza-Arroyo**, G.A. Hazime, and K.B. Zakutansky, International Society for Occupational Ergonomics & Safety, XXXVIIth Annual Occupational Ergonomics and Safety Conference, Orlando, FL, July 2025.

"Flip-Flops: A Survey of Risk Perception and Acceptance," D. Fortenbaugh, P. Shibata, **M. Meza-Arroyo**, K. Thobe, and T. Welch, In Proceedings of the Human Factors and Ergonomics Society Annual Meeting, Sage CA: Los Angeles, CA: SAGE Publications, Vol. 66, No. 1, pp. 513 - 517, September 2022.

"Final Report: Phase IV of Compliance Testing for Locomotive LED Headlights and Auxiliary Lights," **M. Meza-Arroyo**, P.A. Shibata, J.K. Sprague, and S. Woods, U.S. Department of Transportation, Federal Railroad Administration, Office of Railroad Policy and Development Office of Research and Development, Washington, DC, 20590, 2021.

"Final Report: Phase III of Compliance Testing for Locomotive LED Headlights and Auxiliary Lights," **M. Meza-Arroyo**, P.A. Shibata, and J.K. Sprague, U.S. Department of Transportation, Federal Railroad Administration, Office of Railroad Policy and Development Office of Research and Development, Washington, DC, 20590, 2021.

"Final Report: Phase II of Compliance Testing for Locomotive LED Headlights and Auxiliary Lights," **M. Meza-Arroyo**, P.A. Shibata, J.K. Sprague, and S. Capser, U.S. Department of Transportation, Federal Railroad Administration, Office of Railroad Policy and Development Office of Research and Development, Washington, DC, 20590, 2019.

"Final Report: Phase I of Compliance Testing for Locomotive LED Headlights and Auxiliary Lights," **M. Meza-Arroyo**, P.A. Shibata, and S. Woods, U.S. Department of Transportation, Federal Railroad Administration, Office of Railroad Policy and Development Office of Research and Development, Washington, DC, 20590, 2018.

"Continuous Response Monitoring of Relative Time-to-Conduct Judgments: Does Effective Information Change During an Approach Event?" P.R. DeLucia, **M. Meza-Arroyo**, R. Baurés, M. Ranjit, S. Hsiang, and J.C. Gorman, Ecological Psychology, Vol. 28, No. 1, pp. 1–22, 2016. http://doi.org/10.1080/10407413.2016.1121735

"Analysis of Eye Movements and Collision Judgments in Younger and Older Observers for the Development of a Reinforcement Learning," **M. Meza-Arroyo**, Ph.D. Dissertation, Texas Tech University, Lubbock, TX 2015.

"Comparing Visual Performance & Useful Field of View of Older and Younger Drivers," **M. Meza-Arroyo**, P. Patterson, and H. Nakayasu, Rocky Mountain Bioengineering Symposium, 46th International ISA Biomedical Sciences Instrumentation Symposium, Milwaukee, WI, ISA Vol. 476, pp. 83–85, April 2009.

"Analysis of Visual Attention and Useful Field of View among Experienced, Inexperienced and Older Drivers," **M. Meza-Arroyo**, P. Patterson, and H. Nakayasu, Instrument Society of America, Biomedical Sciences Instrumentation, Vol. 45, pp. 83 - 88, February 2009.



## Presentations

"Enhancing Contrast-Sensitivity Charts for Validating Visual Representations of Low-Illumination Scenes," J.K. Sprague, **M. Meza-Arroyo**, P.A. Shibata, and J. L. Auflick, SAE 2019 World Congress & Exhibition, 2019.

"The Kinematic Analysis of Occupant Excursions and Accelerations During Staged Low Speed Far-Side Lateral Vehicle-to-Vehicle Impacts," P.A. Shibata, J.M. Roberts, J.K. Sprague, A.E. Light, J.A. Stegemann, **M. Meza-Arroyo**, and S. Casper, SAE 2019 World Congress & Exhibition, 2019.

"Head Acceleration Measurements During Vehicle Driving Tasks and Lateral Impacts Relative to Head Accelerations During Activities of Daily Living," P.A. Shibata, A.C. Mathias, A.E. Light, **M. Meza-Arroyo**, J.K. Sprague, and A. Rath Stern, Rocky Mountain Bioengineering Symposium, 2019.

"Comparative Lumbar Spine Acceleration Data During Activities of Daily Living, Tasks of Daily Driving and Low Speed Lateral Vehicle Impacts," P.A. Shibata, A.C. Mathias, A.E. Light, **M. Meza-Arroyo**, J.K. Sprague, and A. Rath Stern, Rocky Mountain Bioengineering Symposium, 2019.

"What's After College?" **M. Meza-Arroyo**, Guest Lecturer, Tecnológico de Monterrey, IE Senior Project Course Morelia, Mich. México, 2014.

"Visual Attention Differences between Younger and Older Drivers," **M. Meza-Arroyo**, Department of Environmental and Occupational Health at Texas A&A HSC, Seminar, College Station, TX, 2013.

"The effect of music genres on oxygen uptake during a cycling exercise," Y.J. Chun and **M. Meza-Arroyo**, Proceedings of 2011 Texas Regional Human Factors & Ergonomics Conference, 2011.

"Useful Field of View of Aging Drivers as a Design Tool for In-Vehicle Visual Aids," **M. Meza-Arroyo**, P. Patterson, and H. Nakayasu, HFES 53rd Annual Meeting, San Antonio, TX, October 2009.

"Analysis of Visual Attention and Useful Field of View among Experienced, Inexperienced and Older Drivers," **M. Meza-Arroyo**, P. Patterson, and H. Nakayasu, Paper presented at the 17th World Congress on Ergonomics, IEA 2009, Beijing, China, August 2009.

"Comparing Visual Performance & Useful Field of View of Older and Younger Drivers," **M. Meza-Arroyo**, M.Sc. Thesis, Texas Tech University, Lubbock, TX, 2009.

"Relationship between Visual Attention and the Surrounding Environment During Driving Tasks: A Cognitive Experiment," **M. Meza-Arroyo**, INFORMS Southwest Regional Conference, Texas A&M University, College Station, TX, April 2008.

# APPENDIX C

Exhibit 2 - Page 47 of 59

# Gadir Hazime
## Senior Staff Consultant



Ms. Gadir Hazime is a degreed Mechanical Engineer, Bioengineer and Industrial Engineer specializing in human factors. Ms. Hazime is a Senior Staff Consultant for Engineering Systems Inc. (ESi) and works closely with the human factors, biomechanics, consumer product, automotive, and safety industries. She has experience in visibility, conspicuity, injury analyses, human motion analyses, product testing, failure analysis, and accident reconstruction. Her professional experience also includes scene, vehicle, equipment, and building inspections, data acquisition, and testing.

## Education

MSE, Industrial & Systems Engineering in Human Factors. University of Michigan.

BSE, Mechanical Engineering. University of Michigan.

BSE, Bioengineering. University of Michigan.

## Languages

- English, Arabic.

## Positions Held

**Engineering Systems Inc., Ann Arbor, Michigan**

- Senior Staff Consultant, 2025 – Present
- Staff Consultant, 2022 – 2024
- Engineering Intern, 2021 – 2022

**Michigan Sports Medicine, Dearborn Heights, Michigan**

- Research and Medical Associate, 2018 – 2021

## Continuing Education

- **Traffic Crash Reconstruction for Engineers** – Northwestern University Center for Public Safety, 2024
- **Bosch CDR Tool Technician** – Certification of Training, IPTM, University of North Florida, 2023

### Contact Information

gahazime@engsys.com

(734) 274-8321

**ESi Ann Arbor**

1174 Oak Valley Drive
Ann Arbor, MI 48108

### Areas of Specialization

- Human Factors
- Visibility and Conspicuity
- Accident Investigation and Reconstruction
- Industrial and Occupational Injury Investigation
- Consumer Products
- Safety
- Biomechanical Analysis
- Data Acquisition

Exhibit 2 - Page 48 of 59



- **Mycometer Surface Fungi Sampling & Analysis** – Proficiency Certification Award, 2022

- **FARO Focus 3D Operator** – Certificate of Training, Aurora, IL, 2022

- **Sensation and Perception**

- **Human Factors and Ergonomics**

- **Production & Operation Engineering**

- **Vehicle Ergonomics**

- **Human- Computer Interaction**

- **Advanced Biomechanics**

- **Anatomy & Physiology**

- **Engineering Dynamics**

## Professional Affiliations/Honors

**Society of Automotive Engineers (SAE)**

- Member

**Pi Tau Sigma, Engineering Honor Society**

- Member

## Project Experience

Daytime and Nighttime Visibility Studies

- Evaluation of visibility and conspicuity under varying lighting conditions, including headlamp, ambient, and glare effects on perception.

Auditory Cue Evaluation

- Assessment of warning signals and auditory information in accident reconstruction and safety contexts.

Acceleration and Vibration Analyses

- Testing and data acquisition on accelerations and vibrations affecting human occupants in transportation and consumer product contexts.

Wheelchair Accident Investigations

- Biomechanical and human factors analyses of wheelchair-related incidents, including stability, user motion, and environmental interaction.


<u>Slips, Trips, and Falls</u>

- Analysis of pedestrian kinematics, gait variability, and environmental factors to assess fall mechanisms and potential biomechanical injury mechanisms.

<u>Warnings and Safety Information</u>

- Review and analysis of product labeling, warnings, and instructions for usability and compliance with human factors principles.

<u>Surrogate Testing</u>

- Design and execution of surrogate human testing protocols to replicate real-world movements and responses for accident reconstruction and product safety analysis.

## Publications

"Elevator Passenger Accelerations During Emergency Stops, Normal Elevator Travel, and Everyday Activities," A.C. Mathias, **G.A. Hazime**, H. Chan, J.M. Roberts, M.E. Kelley, Biomedical Sciences Instrumentation, 62nd Annual Rocky Mountain Bioengineering Symposium, St. George, UT. Biomedical Sciences Instrumentation Journal, Vol. 61, No. 1, April 2025.

"When a Flashlight Looks Like a Threat: A Multifaceted Human Factors Approach in the Accident Reconstruction of a Police Officer Shooting," M. Meza-Arroyo, **G.A. Hazime**, and, K.B. Zakutansky, International Society for Occupational Ergonomics & Safety, XXXVIIth Annual Occupational Ergonomics and Safety Conference, Orlando, FL. July, 2025

## Presentations

"Elevator Passenger Accelerations During Emergency Stops, Normal Elevator Travel, and Everyday Activities," Presenter, **G.A. Hazime**, 62nd Annual Rocky Mountain Bioengineering Symposium, St. George, UT. April 10-12, 2025

"When a Flashlight Looks Like a Threat: A Multifaceted Human Factors Approach in the Accident Reconstruction of a Police Officer Shooting," Presenter, **G.A. Hazime**, XXXVIIth Annual Occupational Ergonomics and Safety Conference, Orlando, FL. July 24-25, 2025

# APPENDIX D

Exhibit 2 - Page 51 of 59



# MANUEL MEZA-ARROYO, PH.D., P.E., CHFP
# SENIOR CONSULTANT
**mmarroyo@engsys.com**

| MATTER | STATE | |
|---|---|---|
| **2026** | | |
| **Jaclyn Renee Berhow, et al v. Henderson Products, Inc.**<br>LACV030136<br>District Court in and for Hamilton County | IA | (Deposition) |
| **Jesse Bugarin vs PepsiCo Beverage Sales, LLC., et al**<br>2024CI21327<br>District Court of Bexar County | TX | (Deposition) |
| **Robert Binder v. Divco Construction Corp.,**<br>2024-CA-000091-0001-01<br>County Court of the Twentieth Judicial Circuit in and for Collier County | FL | (Trial) |
| **Brian M. Douglas v. Wendell Duprey**<br>24EV002431<br>State Court of Fulton County | GA | (Deposition) |
| **Pennie Livingston v. Palmetto Goodwill & Chancel Construction, Inc.,**<br>2023-CP-26-03906<br>Circuit Court of the 15th Judicial District | SC | (Deposition) |
| **Robert Binder v. Divco Construction Corp. and Pipestone Painting, LLC**<br>11-2024-CA-000091-0001-01<br>County Court, in and for Collier County, Florida | FL | (Deposition) |
| **2025** | | |
| **Jason Flores v. Accurpress, Accurpress America, et al.**<br>2:24-CV-81<br>District Court for Eastern District of TX<br>Marshall Division | TX | (Deposition) |
| **Elmer Bailey v. Southwest Airlines Company, et al.**<br>22-001407<br>Circuit Court of the 17th Judicial District | FL | (Deposition) |


**Fidencio Carreon Castro v. FlexSteel Pipeline Technologies, et al.**   TX   (Deposition)
202459400
District Court of Harris County, TX
281 Judicial District

**Joseph Gillenwater v. Rachelle Moyer and Cintas Corporation No. 2**   IN   (Deposition)

49D03-2309-CT-036169
Marion County Superior Court

**Preston, et al. v. Waste Connections of Texas, LLC, et al.**   TX   (Deposition)
471-04499-2023
District Court, 471st Judicial District, Collin County, TX

**Larry Albright v. West Bend Mutual Insurance Company, et al.**   WI   (Deposition)
23CV634
State of Wisconsin, Circuit Court, Eau Claire County

**Mark Coleman v. Benderson Development Company, LLC, et al.**   FL   (Arbitration)
24-CA-001194
Circuit Court of the Twentieth Judicial Circuit in and
For Lee County, Florida

**Rosanne Berman Executrix of the Estate of Martin Berman v. Essential Medical Supply, Inc., et al.**   CT   (Deposition)
HHD CV 23 6172771-S
Superior Court, J.D., of Hartford at Hartford

**Juan Carlos Aguilar Salazar v. Oahu Transit Services, Inc., a Hawaii nonprofit corporation, dba The Bus, et al.**   HI   (Deposition)
1CC191000715
In the Circuit Court of the First Circuit,
State of Hawaii

**Capuchino, et al. and Chapman, et al. v. Edwards, Jr., v. Brown, Jr., et al.**   TX   (Deposition)
2021-21971 (consolidated with 2021-27727)
In the District Court, 215th Judicial District,
Harris County, Texas

**Rebmann v. Astec, et al.**   NY   (Deposition)
1:21-CV-00879-JLS
In the United States District Court Western District
of New York

**Joanna Lookingland and Michael Lookingland v. Landfill Drilling & Piping, Inc., a foreign corporation; and Scott D. Mazur**   IL   (Deposition)
3:22-cv-50050
United States District Court, Northern District of
Illinois, Western Division



**Darren Findling, as Personal Representative of the Estate of Bahman Ashrafi, deceased v. Theodore Lawrence Thiry and Dawn, Incorporated d/b/a Dawn Farm, jointly and severally**
    23-001305-NI
    Circuit Court for the County of Washtenaw, State of Michigan
      MI    (Deposition)

**Destry Ritch v. CSX Transportation, Inc.**
    1:22-cv-0863-BKS-CFH
    Northern District of New York
      NY    (Deposition)

**Jessie Lee Shifflett v. Stephane Routhier and Couture Expressway**
    5:23-cv-00046-EKD
    In the United States District Court for the
    Western District of Virginia Harrisonburg Division
      VA    (Deposition)

**Lloyd Tyler Fairbanks, v. CSX Transportation, Inc., a corporation**
    01-CV-903213
    In the Circuit Court of Jefferson County, Alabama
      AL    (Deposition)

**Barbara Branes, as Independent Administrator of the Estate of John Bradley Barnes, Deceased, v. Greenwood Motor Lines, Inc. a Foreign Corporation d/b/a R+L Carriers and Michael Christopher Hegger**
    3:21-cv-03257-SEM-TSH
    In the United States District Court
    Central District of Illinois
      IL    (Deposition)

**Katherine C. Early, Jubal Early, and E2 Mechanical and Industrial Refrigeration, LLC v. Quick-Deck, Inc., United Rentals (North America), Inc., individually and as successor-in-interest to PAC-Van, Inc., and Craig Katona**
    22-CVS-17066
    In the General Court of Justice Superior Court Division
    County of Mecklenburg, State of North Carolina
      NC    (Deposition)

**Vale Payton v. Warren Henry Automobiles, Inc.**
    22-001606-CA-01
    In the Circuit Court of the 11th Judicial Circuit in
    And for Miami-Dade County, Florida
      FL    (Deposition)

**L.P., a minor, by and through her natural mother and Next Friend, Eileen Williams, Elizabeth Perkins, Individually and as the natural mother of Nicholas Perkins, deceased, Summer Tailor, individually and as Next Friend of her natural son, D.T., a minor v. Wabash National Corporation**
    2022-CC00495
    In the Circuit Court of the City of St. Louis 22nd Judicial Circuit
    State of Missouri
      MO    (Trial)


**Zachary Martin v. Polaris Inc.; Polaris Industries Inc.;**
**Polaris Sales Inc.**            TN      (Trial)
     3:22-cv-00322
     In the United States District Court for the
     Eastern District of Tennessee Northern District

**Jeff Greening v. Johnathan Green and Door Dash, Inc.**      TX      (Deposition)
     2021CI18178
     285th Judicial District, Bexar County, Texas

**Zachary Martin v. Polaris Inc.; Polaris Industries Inc.;**
**Polaris Sales Inc.**            TN      (Deposition)
     3:22-cv-00322
     In the United States District Court for the
     Eastern District of Tennessee Northern District

**Jeramy Beau Keplinger v. Michael Duane Odom, Jr., et al.**      AL      (Deposition)
     25-CV-2022-900156.00
     In the Circuit Court of Cullman County, Alabama

**Matthew McQuillen and Elizabeth McQuillen, as Limited**      IO      (Trial)
**Co-Guardians and Co-Conservators of**
**Margaret G. McQuillen, and Individually v.**
**West Side Transport, Inc. and Clifford Charles Takes**
     LACV099133
     In the Iowa District Court for Linn County

**Jeffrey Brungart v. Zakaria Awwad, individually,**      IL      (Trial)
**LMZ Transportation, Inc., an Illinois Corporation,**
**I & L Transportation, Inc., an Illinois corporation**
     2021 L 7653
     In the Circuit Court of Cook County, Illinois
     County Department, Law Division

**Lianne Onishi, Individually and as Co-Next Friend for**      HI      (Deposition)
**Minor Children M.O. and R.O.; Jason Onishi,**
**Individually and as Co-Next Friend for Minor Children**
**M.O. and R.O. v. Westpac International Inc.;**
**Glenn Langaman; Costco Wholesale Corporation;**
**and Doe Defendants 1-10.**
     1CCV-22-0001638
     In the Circuit Court of the First Circuit
     In the State of Hawaii

**Jeffrey Brungart v. Zakaria Awwad, et al.**      IL      (Deposition)
     2021 L 7653
     In the Circuit Court of Cook County,
     Illinois County Department, Law
     Division



**Matthew McQuillen and Elizabeth McQuillen, as**      IO     (Deposition)
**Limited Co-Guardians and Co-Conservators**
**Of Margaret G. McQuillen, and Individually v.**
**West Side Transport, Inc., and Clifford Charles Takes**
     LACV099133
     In the Iowa District Court for Linn County

**Michael Powasnick v. Beitzel Corp.,**      NJ     (Deposition)
**H&H Millwright Services Inc.,**
**Phoenix Pinelands Corp.,**
**Precision Pully & Idler,**
**Carter's International Material**
**Handling Equipment, Metso Outotec f/k/a Metso**
**Minerals, Weir Minerals a/k/a**
**Weir Minerals North America,**
**John Doe 1-10 (fictitious defendants),**
**ABC Partnerships 1-10, ABC LLCs 1-10**
**And ABC Corp. 1-10 (fictitious corporate defendants)**
     20-cv-12775
     United States District Court
     District of New Jersey
     Trenton Vicinage

**Ronald Geraci v. Harbor Freight Tools USA, Inc.**      KS     (Deposition)
     2:23-cv-2006-EFM-GEB
     United States District Court
     for the District of Kansas

**Terri Speegle, et. al. v. Arrowhead Environmental Partners, LLC, et.al.**      AL     (Deposition)
     CV-22-000002
     Perry County Circuit Court

**State of South Dakota v. Kevin Rudloff**      SD     (Trial)
     33CRI23-00016
     First Judicial Circuit Court, County of Hutchinson

**Sylvia Villalobos v. Wellcome Lodge, LLC, et. al.**      WA     (Deposition)
     No. 21-2-02207-06
     Superior Court for the State of Washington, Clark County

**Laryssa Larson v. City of Trenton, et. al.**      MI     (Deposition)
     No. 22-003315-NI
     Circuit Court for Wayne County, State of Michigan

<u>**2023**</u>

**Thomas Goggin, et. al. v. Blythe Construction, Inc., et. al.**      SC     (Deposition)
     No. 7:21-CV-03157-DCC and 7:21-CV-03158-DCC
     United States District Court
     for the District of South Carolina Spartanburg Division

**Nancy Rogers v. Springboard Ventures, LLC**      MO     (Deposition)
     No. 2031-CC01509
     Circuit Court for the County of Greene, Missouri


**L.P., a Minor, et. al. v. Wabash National Corporation, et. al.**          MO          (Deposition)
    No. 2022-CC00495
    Circuit Court for the City of St. Louis, State of Missouri

**L.P., a Minor, et. al. v. Wabash National Corporation, et. al.**          MO          (Deposition)
    No. 2022-CC00495
    Circuit Court for the City of St. Louis, State of Missouri

**Brooke Alcantar v. John Retzlaff and David Retzlaff**          IL          (Arbitration)
    No. 2021 L 000785
    Circuit Court for Will County, State of Illinois

**Jeffrey LeFevre v. Petra Construction Corporation, et. al.**          CT          (Deposition)
    No. NNH-CV20-6104985-S
    Superior Court Judicial District of New Haven
    **Volume II**

**Jeffrey LeFevre v. Petra Construction Corporation, et. al.**          CT          (Deposition)
    No. NNH-CV20-6104985-S
    Superior Court Judicial District of New Haven
    **Volume I**

**Brooke Alcantar v. John Retzlaff and David Retzlaff**          IL          (Deposition)
    No. 2021 L 000785
    Circuit Court for Will County, State of Illinois

**Barbara Monson v. City of Danville**          IL          (Deposition)
    No. 13 L 71
    Circuit Court for Vermilion County, State of Illinois

**Floricelda Rodas, by her Guardian, Owen Mazariegos (Plaintiff) and Hilda Mendez and Luis Mendez (Intervening Plaintiffs) v Nathan Secor Frame and West Michigan Dirtworks, LLC**          MI          (Trial)
    No. 19-02412-NI
    In the Circuit Court
    for the County of Kent, State of Michigan

**Jami Geissler, Individually, As Surviving Spouse and Representative of the Estate of Brian Geissler, et. Al. v. BZ Lawn Care, LLC d/b/a BZ Lawn Care & Irrigation, et. al.**          TX          (Trial)
    No. 19-1960-362
    362nd District Court, County of Denton, State of Texas

**Alexa Peltier and David Paul Spehar v. Suburban Mobility Authority For Regional Transportation, a regional transportation authority, and Vernon Colists Williams, an individual**          MI          (Deposition)
    No. 20-006503-NI
    Circuit Court for Wayne County, State of Michigan

# APPENDIX E

Exhibit 2 - Page 58 of 59



## GADIR HAZIME
## SENIOR STAFF CONSULTANT
**gahazime@engsys.com**

| MATTER | STATE |
|---|---|

**2026**

**Sarah Kutz v. Oscar de la Torre and KS Energy Services, LLC**  IL  (Deposition)
2025L002218
Circuit Court of Cook County