

# Investigative Report

## Linda LaRocque v Kroger

ESi Matter No:  118934

EXHIBIT 3 - Page 1 of 59



# Investigative Report

## Linda LaRocque v Kroger

ESi Matter No:  118934

**Report Prepared for:**
Chock Barhoum LLP
121 SW Morrison Street, Suite 500
Portland, OR 97204

**Submitted by:**

_____     May 8, 2026
Manuel Meza-Arroyo, Ph.D., P.E., CHFP                 Date
Director of Human Factors and Senior Managing Consultant
MI P.E.  |  No. 6201310563  |  Expires: 12/07/2027

_____     May 8, 2026
Gadir Hazime, M.S.E                                              Date
Senior Staff Consultant

This report and its contents are the Work Product of Engineering Systems Inc. (ESi). This report should only be duplicated or distributed in its entirety. This report may contain confidential or court protected information; please contact an authorized entity prior to distributing. Conclusions reached and opinions offered in this report are based upon the data and information available to ESi at the time of this report, and may be subject to revision after the date of publication, as additional information or data becomes available.

Copyright ESi © 2026 — All Rights Reserved

Phone: 934-794-8100  |  Fax: 734-794-8115   | Toll Free: 866-596-3994
**www.engsys.com**

EXHIBIT 3 - Page 2 of 59



# Table of Contents

**1 Summary** ........................................................................................................ **1**

**2 Basis for this Report** .................................................................................... **1**

  2.1 Qualifications and Experience ................................................................... 1

    2.1.1 Manuel Meza-Arroyo, Ph.D., P.E., CHFP ........................................ 1

    2.1.2 Gadir Hazime, M.S.E. ...................................................................... 1

  2.2 General Methodology ................................................................................ 2

    2.2.1 Brief Introduction to Human Factors ............................................... 2

**3 Background**.................................................................................................... **3**

**4 Investigation** ................................................................................................. **5**

  4.1 Summary of Relevant Testimony .............................................................. 5

    4.1.1 Linda LaRocque – Plaintiff ............................................................. 6

    4.1.2 Steven LaRocque – Plaintiff's Husband ......................................... 9

    4.1.3 Brenton Wheeler – Store Employee............................................... 11

    4.1.4 Chad Peterson – Fred Meyer Stores, Inc., and The Kroger Co. 30 (b)(6) ...... 13

    4.1.5 Ryan Harter – Gatekeeper Systems, Inc. 30(b)(6) ......................... 14

  4.2 Digital Media Evidence ............................................................................. 17

  4.3 Site and Cart Inspection ........................................................................... 18

  4.4 Selected Medical Records ........................................................................ 18

**5 Analysis and Discussion**............................................................................ **19**

  5.1 Environmental Conditions ......................................................................... 19

  5.2 Warnings and Safety Guidelines............................................................... 20

    5.2.1 ANSI Z535.4 – Product Safety Signs and Labels........................... 20

  5.3 Cart Operator Experience, Behavior, and Expectancy .............................. 21

  5.4 Cart Geometry .......................................................................................... 22

  5.5 Anthropometry .......................................................................................... 22

  5.6 Pedestrian Gait Analysis........................................................................... 23

  5.7 Surrogate Testing ..................................................................................... 25

  5.8 Perception and Attention .......................................................................... 28

  5.9 Human Error ............................................................................................. 28

  5.10 Review of Report of Mr. Levi Dixon ......................................................... 29

  5.11 Review of Report of Dr. Alan B. Brown.................................................... 31

**6 Conclusions and Opinions**......................................................................... **32**

EXHIBIT 3 - Page 3 of 59

i


# Table of Figures

Figure 1. Aerial view of the subject Fred Meyer store. ....................................................................... 4

Figure 2. LaRocque's clothing and knee brace. ................................................................................. 5

Figure 3. Ms. LaRocque's deposition Exhibit 2 noting with the smaller yellow circle where the LaRocque's parked upon returning to Fred Meyer.............................................................................. 7

Figure 4. Mr. LaRocque's deposition Exhibit 1 marked with the general parking location circled in yellow, the general ATM location marked by red, and the doors through which the LaRocques entered and exited marked by a green circle (pp. 60-61). ....................................................................... 9

Figure 5. Purchek Solution Components - Door Area Devices (GK_0004)............................................ 15

Figure 6. Gatekeeper part number M-8033B – the cart warning and mounting kit................................. 16

Figure 7. Warning label advising customers about wheels locking. ................................................ 17

Figure 8. Warning label on shopping cart, advising customer that cart may stop unexpectedly. ....... 17

Figure 9. HME diagram related to subject incident....................................................................... 19

Figure 10. Shopping cart geometry. ........................................................................................... 23

Figure 11. Normal walking gait, adapted from Chambers, et al. ................................................... 24

Figure 12. Height-matched surrogate in a normal standing position with both hands on the shopping cart handle, demonstrating the approximate knee-to-cart basket clearance................................ 25

Figure 13. Synchronized video frames from a surrogate test run showing wheel-lock activation followed by arrest/cancellation of the surrogate's gait. ....................................................... 26

Figure 14. Synchronized video frames from a surrogate test run showing wheel-lock activation during gait progression............................................................................................................. 27

EXHIBIT 3 - Page 4 of 59

ii



# 1  Summary

This investigative report involves the examination of issues related to an incident that occurred on May 6, 2023 at 4505 S. 19th Street in Tacoma, Washington. Engineering Systems Inc. (ESi) was engaged on March 3, 2026 by Chock Barhoum LLP. The incident involved wheels locking on a shopping cart at a Fred Meyer store while in use by Ms. Linda LaRocque (hereafter, Ms. LaRocque). The scope of ESi's investigation and analysis is directly related to the Biomechanics and Human Factors aspects of the incident. This report, prepared at the request of Chock Barhoum LLP, represents the results of ESi's investigation performed to date.

# 2    Basis for this Report

This report, and the opinions and conclusions stated throughout, are based on the education, training, and experience of the authors, as well as on the analysis and review of materials that have been conducted in this matter to date. The items that have been received in this matter, to date, are listed in **Appendix A**. The documentation reviewed is based upon the state of documents as received by ESi.

## 2.1  Qualifications and Experience

### 2.1.1  Manuel Meza-Arroyo, Ph.D., P.E., CHFP

Dr. Meza-Arroyo is an Industrial and Human Factors Engineer whose expertise includes human perception and cognition, occupational biomechanics, and human performance under real-world task demands, including the effects of lighting conditions and aging on visual performance. His forensic work focuses on the relationship between available stimuli and human behavior—what information was available to be perceived (visual, auditory, and tactile cues), whether it was sufficiently detectable and conspicuous to capture attention, and whether an effective response was feasible given the time, distance, and constraints present, including perception-response and time-distance considerations relevant to detectability, conspicuity, and response feasibility. He has conducted and supported multidisciplinary forensic investigations involving automobile and commercial-vehicle collisions (including low-illumination conditions), workplace and industrial injuries, slip/trip/misstep-and-fall incidents, and the evaluation of warnings, procedures, and safety communications. His research and applied work address cognition, attention and eye movements, visual information processing relevant to hazard and collision detection, visibility and conspicuity under reduced illumination (including factors such as contrast, glare, occlusion, and expectancy), perception-response timing, occupant kinematics in low-speed impacts, the human factors implications of lighting technologies for visual performance and perception, and the assessment of safety communications as they relate to human behavior and performance.

### 2.1.2  Gadir Hazime, M.S.E.

Ms. Gadir Hazime holds a master's degree in Industrial and Systems Engineering in Human Factors. She is also a degreed Mechanical Engineer and Bioengineer. She has extensive experience in human perception and cognition, injury analyses, human motion analyses, product testing, failure analysis, and accident reconstruction. Her professional experience also includes scene, vehicle, equipment, and building inspections, data acquisition, and testing. She has conducted and participated in many

EXHIBIT 3 - Page 5 of 59

Page 1 of 33


multidisciplinary investigations involving automobile and trucking accidents, nighttime incidents; industrial and occupational injuries; slip-and-fall incidents; and analysis of warnings, procedures, and instructions.

A comprehensive list of qualifications and publications of the authors is set forth in **Appendix B** and **Appendix C** attached to this report. A list of cases in which the authors have testified at trial or in deposition over the past four years is also attached (see **Appendix D** and **E**).

## 2.2  General Methodology

During the course of investigation and analysis in this matter, to date, ESi has performed the following activities:

- Review and analysis of received materials.

- Site and exemplar cart inspection on April 29, 2026.

- Biomechanics and Human Factors research and analysis.

ESi's methodology includes the application of the scientific method as a framework for forensic analysis. These methods are widely accepted within the fields of biomechanics and human factors and have been peer-reviewed and published. [1, 2, 3]

### 2.2.1  Brief Introduction to Human Factors

Human Factors (also referred to as ergonomics) is the scientific discipline concerned with human capabilities and limitations and how those characteristics influence behavior, performance, and safety in real-world tasks. Human Factors integrates engineering and the behavioral sciences to understand how people perceive information, allocate attention, interpret and remember information, make decisions, and execute actions within physical, environmental, and organizational constraints.

In a forensic context, human factors principles are applied to evaluate human performance under the circumstances present during an incident. This includes assessing what information was available to be perceived through different sensory channels (e.g., visual, auditory, and tactile cues), whether that information was sufficiently detectable and conspicuous to capture attention, how it was likely to be interpreted based on context and expectations, and whether an effective response was feasible given the time, distance, task demands, and physical constraints involved. The purpose of this work is not to assume what a person "must have" done, but to evaluate what a person could reasonably perceive, process, and do under the conditions that existed.

Human factors evaluations commonly consider the interaction of: *(1)* the person (capabilities and limitations, including experience, training, and age-related factors when relevant), *(2)* the task (what the person was doing and what was required), *(3)* the environment (lighting, noise, vibration, surface conditions, layout, clutter/occlusion, and other factors affecting perception and action), and *(4)* the system

---

[1] Knox, E. H. et al. (2015). METHODS OF ACCIDENT RECONSTRUCTION: BIOMECHANICAL AND HUMAN FACTORS CONSIDERATIONS. *Proceedings of the ASME 2015 International Mechanical Engineering Conference and Exposition*, 1–11.

[2] Noon, R. (2009). Scientific Method: Applications in Failure Investigation and Forensic Science. CRC Press.

[3] Liptai, L., & Cecil, J. (2009). Forensic Engineering and the Scientific Method. *Journal of the National Academy of Forensic Engineers*, *XXVI*(1), 147–155.

EXHIBIT 3 - Page 6 of 59

Page 2 of 33


or organization (procedures, communications, roles, and constraints that shape behavior). Depending on the circumstances, relevant considerations may include sensory detectability and conspicuity (whether a cue stands out enough to attract attention), cognitive workload and divided attention, expectancy and situational awareness, decision-making under time pressure, and response feasibility.

Human factors is also an established discipline across safety-critical industries, and many large organizations maintain dedicated human factors programs to support design, operations, training, and risk reduction. For example, NASA has agency-level human factors functions that support missions and strategic efforts, including human-system integration considerations across operations and training.[4] Similarly, the Federal Aviation Administration (FAA) maintains a human factors policy and programmatic work focused on applying knowledge of human capabilities and limitations to systems, procedures, training, and environments in support of safe and effective performance.[5]

# 3 Background

According to the provided Complaint dated June 26, 2025, at approximately 3:00 PM on May 6, 2023, Ms. Linda LaRocque (DOB: 2/19/59; age: 64 years)[6] and her husband went together to the Fred Meyer store located at 4505 S. 19th Street, Tacoma, WA 98405. Upon entering the store through the "grocery side,"[7] The LaRocques retrieved an available Fred Meyer shopping cart, instrumented with an asset anti-theft system that was manufactured by Gatekeeper Systems, Inc., near the store entryway. The item the LaRocques intended to purchase was not available, so Ms. LaRocque and her husband left the store without making a purchase. Ms. LaRocque and her husband proceeded to exit the store without passing through the checkout area. Upon exiting the Fred Meyer store doors, the anti-theft mechanism on the shopping cart caused the cart's wheels to lock. When the cart's wheels locked, the cart suddenly stopped, and Ms. LaRocque's left knee struck the back of the cart.

Ms. LaRocque is claiming resulting injuries from the subject incident. According to the provided Complaint, there were no signs warning customers that the shopping carts had an anti-theft mechanism that would cause the carts' wheels to lock if the cart was walked through an invisible perimeter.[8] **Figure 1** shows an area view of the subject incident site, including the parking lot area where Ms. LaRocque's incident occurred.

---

[4] Extracted on March 17, 2021 from: Human Systems Integration Division @ NASA Ames - Human Factors 101.
[5] Extracted on March 26, 2021 from: FAA Order 9550.8 - Human Factors Policy.
[6] Plaintiff's Response to 1st Interrogatories and Requests for Production, dated Jun 25, 2025 [ESi 5.302].
[7] Plaintiff's Responses to Gatekeeper's First Interrogatories and Requests for Production, dated August 29, 2025 [ESi 5.301].
[8] Plaintiff's First Amended Complaint, dated June 26, 2025 [ESi 5.001].

EXHIBIT 3 - Page 7 of 59                                    Page 3 of 33




**Figure 1. Aerial view of the subject Fred Meyer store. [9]**

According to legal documents reviewed by ESi, "LaRocque's patella shifted when her knee came into contact with the shopping cart, which ruptured her patella tendon." Ms. LaRocque has not suffered any similar injury in which a shopping cart has struck her knee. [10] Ms. LaRocque recounted,

*"On Saturday, May 6, 2023, at around 2:30 p.m. Ms. LaRocque and her husband … arrived at the Fred Meyer this time around 3:00 p.m. Ms. LaRocque and her husband decided to go into Fred Meyer since they were already there to purchase a bottle of magnesium citrate... Mr. LaRocque got a shopping cart in the foyer area of the Fred Meyer and gave it to Ms. LaRocque as she had recently had knee surgery and used the shopping cart for support and balance while walking inside a store. After entering the store, they looked for the magnesium supplement but Fred Meyer did not have it. They decided to leave and try to get the supplement at Walmart. Ms. LaRocque and her husband walked past the front check-out registers to the same door from which they entered, near the produce section. Ms. LaRocque was pushing the shopping cart through the right side of the door when the shopping cart abruptly and without warning stopped and locked up, causing Ms. LaRocque to slam her left knee into the cart. Ms. LaRocque had a left knee brace on—she wore it all the time following the surgery to her left knee.*

---

[9] Aerial view captured from Google Earth, 5/1/26.
[10] Plaintiff's Response to 1st Interrogatories and Requests for Production, dated Jun 25, 2025 [ESi 5.302].

EXHIBIT 3 - Page 8 of 59

Page 4 of 33



*After the incident, Mr. LaRocque who was walking behind Ms. LaRocque asked her if she was alright. Ms. LaRocque who was in pain told him she hit her knee on the shopping cart. Ms. LaRocque was trying to move the cart out of the way but it was locked and she couldn't move it. Ms. LaRocque didn't understand that the shopping cart had locked due to an anti-theft locking mechanism. She did not see any warnings posted warning customers that shopping carts may lock...*"[11]

Ms. LaRocque was wearing Sketcher's, a pair of cotton pants, and a floral t-shirt as shown in **Figure 2**.



**Figure 2. LaRocque's clothing and knee brace.** [12]

# 4   Investigation

The purpose of this section is to document the materials reviewed and the investigative steps undertaken as part of this evaluation. It summarizes pertinent information and observations derived from the available sources. The section is intended to provide a transparent foundation for the analysis that follows.

## 4.1   Summary of Relevant Testimony

The deposition summaries provided below were prepared by ESi as part of the analysis of available evidence and file materials. The information contained herein is not intended to be an exclusive recitation of all the evidence and facts relied upon in the depositions received by ESi.

---

[11] Plaintiff's Response to 1st Interrogatories and Requests for Production, dated Jun 25, 2025 [ESi 5.302].
[12] Extracted from LAROCQUE 000005 and LAROCQUE 000012 [ESi 4.002].

EXHIBIT 3 - Page 9 of 59                                    Page 5 of 33



### 4.1.1 Linda LaRocque – Plaintiff

Ms. Linda LaRocque was deposed on September 12, 2025. Ms. LaRocque is the Plaintiff in the subject matter and was pushing the subject grocery cart the day of the subject incident. Ms. LaRocque weighed about 245 pounds at the time of her first knee replacement (p. 31). Ms. LaRocque wears reading glasses (p. 17).

Ms. LaRocque is married to Steven LaRocque (p. 9). Ms. LaRocque moved to Washington in 1964 (p. 11). Ms. LaRocque previously worked as a teacher's assistant and retired in the 2020s before COVID (pp. 12-13). Prior to the subject incident, Ms. LaRocque has been diagnosed with osteoarthritis in her lower back, major depressive disorder, hammer toes, supraventricular tachycardia, pre-diabetes, and chronic pain in her upper back, lower back, and left knee, and sleep apnea. (pp. 20-21, 25, 29, 32).

After her first knee replacement surgery, Ms. LaRocque was in a straight leg brace and completed physical therapy. The recovery process was estimated to be 6 to 8 weeks, and Ms. LaRocque was not to do anything without assistance (p. 42).

Prior to the subject incident, Ms. LaRocque would shop at the subject Fred Meyer's one to two times per week as her doctor's office is just down the road (p. 44). Every time Ms. LaRocque shopped at the subject Fred Meyer's, she would use a shopping cart for stability (p. 45). Ms. LaRocque never used one of the mobility scooters that they have at the front of the store (p. 36). Ms. LaRocque identifies the typical use of a shopping cart is to gather items and go shop in the grocery store (pp. 61-62). Ms. LaRocque never considered using one of the mobility scooters at the store (p. 63). No one at Fred Meyer or Gatekeeper told Ms. LaRocque that it was safe to use a shopping cart to assist with her mobility (pp. 63-64).

On the day of the subject incident, May 6th (p. 74), Ms. LaRocque parked on the grocery side of the Fred Meyer's building where the disability spots are (p. 45). After going to the BECU ATM machine, Ms. LaRocque left and went to the public storage down the street. Upon returning to Fred Meyer's, the LaRocques parked in the end parking spot as noted by the smaller yellow circle in Exhibit 2 (**Figure 3**), and Ms. LaRocque put money back into the account at the BECU ATM (p. 46-48). At this time, Ms. LaRocque had her cane (p. 49).

EXHIBIT 3 - Page 10 of 59

Page 6 of 33





**Figure 3. Ms. LaRocque's deposition Exhibit 2 noting with the smaller yellow circle where the LaRocque's parked upon returning to Fred Meyer.**

On the day of the subject incident, Ms. LaRocque was shopping for one specific item and didn't want to spend more time in the store (p. 36). According to Ms. LaRocque,

> *"[Mr. LaRocque] needed some magnesium citrate for an upcoming colonoscopy…So we walked through the foyer, [Mr. LaRocque] got me a [full sized] cart, got the cart, pushed through the second door. We went around, the whole store had been remodeled, we weren't sure where everything was, and we walked around for probably 15 minutes, couldn't find it and we just came back around in front of the registers to the door to exit (p. 48, 50)."*

Per Ms. LaRocque, the purpose of the cart was for balance as she was still in the recovery period from her surgery (p. 50). "I mainly put my purse and my coat in the top part where you put the little kids, and then I put both hands on the cart and I stand up straight, put it to keep my balance." Other than her two hands, no part of Ms. LaRocque's body was touching or leaning on the cart for support (p. 51). Ms. LaRocque was not holding any of her weight on the cart; she was pushing the shopping cart with her arms extended in front of her (p. 79).

> *"I was holding the cart and pushing it, that's it…because leaning is not going to do me any good for my knee…I have to straight up and down (p. 79)."*

> *"We went into the store and went to the right produces, kind of walked down, got back in…finally found the aisle and we could not find the merchandise we needed, so I'm like, 'Let's just go to Walmart.' That's what [Mr. LaRocque] wanted to do. And so we just went out…in the front with, like, the restroom and the banking lot and things. We just walked past all the registers and went out…the first door (p. 51)."*

EXHIBIT 3 - Page 11 of 59

Page 7 of 33



*"I was pushing going out the door and standing up straight and it was not with the basket we put the kids in, it was that part that's underneath it. So I was just pushing the cart and like I said, it just stopped and the next step I took was into the cart. That's it…I was walking and I stepped forward into the cart and then the other foot was just right next to it at the next step (p. 81)."*

Ms. LaRocque's knee hit the back plastic part that's angled away, "…because I lifted my knee, walked right into it and that was it (p. 82)." Ms. LaRocque entered and exited through the same door. When the cart stopped,

*"…it was a shock. I'm pushing the cart and we lifted the – you know, the door's kind of wide, so we were on the right side of it. And I'm pushing the cart and it just like stops and my knee hit that underneath. And I'm just like, 'What's going on? What's wrong?'*

*I thought I hit something, thought there was something under the wheel. So I looked down there and I could see that the cart wheel was…right on the track of the door because it was open…So I'm trying to push it and it wouldn't go. It wouldn't even budge…(p. 52)"*

*"I had the shopping cart physically in my hand and I ran into it and it wasn't my fault it was there (p. 89)."*

When Ms. LaRocque inspected the cart, part of the wheel was on one side of the track and the other part of the wheel was on the other side of the track (p. 55). Mr. LaRocque was behind Ms. LaRocque. They both tried moving the cart as they did not understand why the cart was locked up. The LaRocques did not know what was going on as it was an empty cart and there were no tags (p. 56). Per Ms. LaRocque, there was no warning sign or sticker on the cart warning about the cart suddenly stopping (p. 58). "I am positive there was no sign (p. 59)." Following the subject incident, Ms. LaRocque has gained the understanding that she needs to pass through the check out or the wheel might lock (p. 61). Ms. LaRocque sustained a red mark and some bruising in the next day (p. 64).

Ms. LaRocque accounts for the differences in incident recollection between her and Mr. LaRocque by noting, "Yesterday, [Mr. LaRocque's] blood sugar was going down and he was confused – getting confused…(p. 60)." Ms. LaRocque does not remember Mr. LaRocque brushing against her (p. 93).

Ms. LaRocque was wearing a leg brace from her thigh to her ankle at the time of the subject incident; Ms. LaRocque would wear it all day (p. 73). Ms. LaRocque was cleared from physical therapy on May 4th but had to wear her brace all the time until she was cleared by the doctor on May 9th (p. 76). At the time of the subject incident, Ms. LaRocque's brace did not restrict her leg's movement (p. 75). Ms. LaRocque was able to freely bend and straighten her knee as if she were not wearing the brace (p. 77). Ms. LaRocque was not having any trouble with flexion or extension of her knee at the time of the incident (p. 80). There was nothing abnormal about Ms. LaRocque's gait at the time of the subject incident (pp. 80-81).

Ms. LaRocque thinks Fred Meyer should have had more notifications about the safety of their customers (p. 86).

EXHIBIT 3 - Page 12 of 59

Page 8 of 33



### 4.1.2 Steven LaRocque – Plaintiff's Husband

Mr. Steven LaRocque was deposed on September 11, 2025. Mr. LaRocque has been married to Ms. LaRocque for over 41 years and together have three children (p. 7). At the time of the subject incident, Mr. LaRocque's son Christopher and Christopher's wife were living with Mr. and Ms. LaRocque (p. 8).

Mr. LaRocque described Ms. LaRocque's health prior to the subject incident as generally well (p. 10). Prior to the subject incident, Ms. LaRocque was issued a handicap plaque due to her inability to maneuver or walk because of her knee complaints (p. 52). Ms. LaRocque had knee surgery prior to the subject incident in February 2023 (p. 47), and Mr. LaRocque stated her recovery from that surgery was great and the doctors were praising her (p. 11).

Mr. LaRocque was present for the subject incident on May 6, 2023 (p. 13, 57). The LaRocques parked in the handicap spot in the parking lot (p. 15). Ms. LaRocque went to an ATM to get some cash (p. 57). Mr. LaRocque was using his cane and had his arm out for Ms. LaRocque (pp. 16, 65). Mr. LaRocque walked up to the big cart, pulled it out of the rack, and handed it to Ms. LaRocque who was right behind him. Before grabbing the cart, Ms. LaRocque was walking with the assistance of Mr. LaRocque and a cane (pp. 15, 65-66). The LaRocques parked in the yellow circled area, went to the ATM which was located approximately at the red mark, and entered at the entrance noted by the green circle on **Figure 4** (pp. 60-61).



**Figure 4. Mr. LaRocque's deposition Exhibit 1 marked with the general parking location circled in yellow, the general ATM location marked by red, and the doors through which the LaRocques entered and exited marked by a green circle (pp. 60-61).**

Ms. LaRocque used a cart for balance rather than her cane because, "…[Ms. LaRocque] used two hands, much more easier for her to push a cart than hold on to her husband's arm and use her cane especially when you have people walking around. And the chances of her falling and getting hurt are quite high, so that's why she uses a cart (p. 18)." Ms. LaRocque was standing next to Mr. LaRocque waiting for the

EXHIBIT 3 - Page 13 of 59

Page 9 of 33



cart, then she put her cane in the cart (pp. 16, 65). The store doors were open during this time period as a stream of people were coming and going. Mr. LaRocque did not see the doors closed at any time (p. 67). Mr. LaRocque recounted,

> *"We had to get some medical supplies 'cuz I was having a scheduled colonoscopy. So the wife and I were out driving around and the place we usually get…the liquid magnesium, we usually got it from Fred Meyer's, so we went over to…get the magnesium. So we go into Fred Meyer's and I grab the cart for my wife because she needs it to help her walk around. And we go in and we start looking and looking; couldn't seem to find it. So we didn't want to bother to ask because it was busy, so we said, 'Let's just go,' so we went to leave. And so as we were leaving out the front door I'm right behind her and as she got to that part, the cart locked up. She stopped and said, 'Ow,' and I bumped into her because I was right behind her…I go, 'What's wrong? What's wrong?' She goes, 'The cart, it stopped, and I hit my knee.' And I said, 'What?' and I looked at her knee and she had a little mark on there. And then by that time…the worker who's standing there comes over…I pushed the cart out of the way because it was locked and he was trying to unlock it. And I took my wife, we went to the car, we went home, and she complained about the pain…(pp. 13-14)"*

Mr. LaRocque noted they were walking, "Not that fast (p. 19)." Mr. and Ms. LaRocque were walking the same speed, and Mr. LaRocque was walking with a cane. The LaRocques were moving slowly while maintaining six to twelve inches apart (pp. 19-20). After seeing the store was out of the magnesium citrate, the LaRocques headed straight to the exit (p. 68).

Mr. LaRocque did not personally see the cart stop (p. 68). He was behind Ms. LaRocque looking ahead over her shoulder (p. 68). Mr. LaRocque heard Ms. LaRocque say "Ow," but he did not hear any other noises; he did not hear Ms. LaRocque's knee strike the cart nor hear the cart come to a halt. The wheels did not skid or stutter (p. 20). The cart stopped in line with the doors (p. 68).

> *"And I didn't bumper her. I, you know, like, just whoa…Just brushing into her. I didn't push her or anything (p. 69)."*

Ms. LaRocque did not fall to the ground at any point in time, "...she didn't buckle over but she did grab her knee (p. 69)." Mr. LaRocque did not hit Ms. LaRocque hard, "just like a slight touch bump because…she stopped all of a sudden. I did not slam into her. It was just like a bump (p. 20)." The nudge from Mr. LaRocque against Ms. LaRocque hardly moved Ms. LaRocque's body at all and did not cause her to move into the cart nor the cart to move (p. 21). Mr. LaRocque noted the cart was almost impossible to move (p. 70).

Upon inspecting the cart, Mr. LaRocque did not notice any warning signs or plaques that were posted on the cart nor doors (pp. 70-71). "On that cart I looked to see if – is there a reason why it's not moving and the cart had absolutely nothing on it to tell me (p. 71)."

When Mr. LaRocque inspected Ms. LaRocque's knee, he observed a little red mark right where her knee is, right below the knee (p. 21). The mark was more on her lower left kneecap, was a little bigger than a quarter, and looked like an angry ouch; the next day they saw the bruising (p. 22). Ms. LaRocque went

EXHIBIT 3 - Page 14 of 59

Page 10 of 33



to the doctor the next day or the day after, and she got the bad news that her knee was all messed up and wasn't the way it was supposed to be (p. 15).

The LaRocques used to shop at the subject Fred Meyer's all the time, but since the subject incident, they've only shopped there once or twice (p. 16). Prior to the subject incident Mr. LaRocque used to shop at the subject Fred Meyer three to four times per week; Ms. LaRocque was with him two to three times per week for the past 25 years (p. 17). The LaRocque's used a shopping cart every time they shopped at Fred Meyer, and Ms. LaRocque would use the cart for stability before the first knee surgery (pp. 24, 66). They typically went through the same entrance at Fred Meyer's. They had never seen the warning sign on the sliding glass door (p. 24). The LaRocques did not know or see these systems at Fred Meyer or other stores until after the subject incident (p. 26).

### 4.1.3 Brenton Wheeler – Store Employee

Mr. Brenton Wheeler was deposed on March 26, 2026. At the time of deposition, Mr. Wheeler was the lead assistant store leader at Fred Meyer's (p. 9). Mr. Wheeler has worked for Kroger or Fred Meyer for 22 years (p. 12). Mr. Wheeler was at the subject Tacoma Stevens location from October 2023 through one week before deposition (p. 10). As lead assistant store leader, Mr. Wheeler's responsibilities include to follow the store leader in all expectations in their time off so the store runs the way the leader would like it to and to be a partner to tackle any type of operational or merchandising expectations the company or store leader have set or provided (p. 11). Mr. Wheeler does not have any direct reports (p. 11). Mr. Chad Peterson was the store leader when Mr. Wheeler was at the Tacoma Stevens location (p. 12). Mr. Peterson was the Tacoma Stevens store manager in May 2023 (p. 23).

Mr. Wheeler was 16 years old when he started with Fred Meyer/Kroger and has been with them for his adult working life (p. 17). Over this time, the only cart related responsibility Mr. Wheeler has had was to unlock a cart for a customer if needed (p. 17). Mr. Wheeler is frequently anywhere but at the store entrances (p. 17). As operations assistant store leader, Mr. Wheeler would deal with issues with the registers or store equipment if need be, but there were front-end managers that largely dealt with those items including registers, terminals, and shopping carts (p. 14). Mr. Wheeler was never operations at the Tacoma Stevens location (p. 15).

Mr. Wheeler does not know when the antitheft shopping cart mechanisms were installed at the Tacoma Stevens Fred Meyer; they were present before Mr. Wheeler started at the Tacoma Stevens store (pp. 24, 55). Mr. Wheeler was provided a description of how the system works (p. 24).

Mr. Wheeler was fairly familiar with the cart system by the time he arrived at the Tacoma Stevens store as most stores in the Pacific Northwest had implemented the Gatekeeper system (p. 26). The wheel mechanism is affixed to two wheels opposite of each other, one on the front and one on the back (p. 35). There is a geofence that's around the store so the shopping carts will lock up if someone tries to take the cart off the property. If a cart has not gone through a register and payment made, the system is designed to stop the cart at the store doors and remain there until unlocked (p. 25).

EXHIBIT 3 - Page 15 of 59                                    Page 11 of 33

 

> *"So when associates use a shopping cart for stocking or putting cardboard or whatever in and they no longer need to use it, they didn't go through a register, so the cart will lock up at the door. It requires the key to be used to disactivate [sic]…, release whatever brake is holding that wheel, and then they can put the cart back into the lobby for customer use.*
>
> *And when that happens…it's happened to me. You start to hear it. It makes like a clicking sound that I now know, just through my experience, is the beginning of the brake or whatever system is in that wheel to make the wheel not move anymore, and within a very short amount of time, the cart does not move forward anymore unless you use an obnoxious amount of force (pp. 30-31)."*

When a cart locks upon exiting the store without making a purchase, Mr. Wheeler doesn't know that patrons would be surprised; rather, they are confused (pp. 27, 32). "It's not a shocking thing that happens. It's not a big event. It just stops moving. So there's more confusion than anything, not shock (p. 27)." "Unless they've read the signs at the door that explain the system or the warning placards on the carts themselves. If they've read those, great, they would know that it could unexpectedly stop and they might have that knowledge (p. 32)." "…the vast majority of people that shop in the Pacific Northwest are familiar with these types of systems now, as they've been used for years and years and years and years (p. 28)." Fred Meyer has keys made available for both Fred Meyer employees and the third-party non-Fred Meyer employees to utilize to unlock the shopping carts (p. 48).

There are cart warnings on the doors of the Tacoma Stevens store (p. 55). In Mr. Wheeler's experience and what he's observed, the more detailed a warning is, the less they tend to pay attention to said warning (p. 34). In Mr. Wheeler's experience, the shopping carts that have the Gatekeeper system have the sign on them; there would be no sign if the cart did not have the Gatekeeper system (p. 68). When cart supplement shipments come in, it's possible the carts are not equipped with the Gatekeeper system (p. 69).

Mr. Wheeler is not aware of any customer in all his time at Fred Meyers that were injured in any official way and not reported to him (p. 28). It would shock Mr. Wheeler for multiple people to be injured by the cart system.

> *"Because…when a cart locks up, it just stops moving. It's not like – it doesn't bite you, doesn't jump up at you, doesn't explode. It just simply won't go forward anymore. And the stop is not an immediate, super, abrupt stop. It has a … braking mechanism that you can hear start to activate and slows the wheel to a stop (p. 29)."*

If a customer brings an incident to any member of the store leadership, the leadership calls the incident into Sedgwick to start a claim (p. 61). Reported incidents go to Sedgewick one hundred percent of the time if reported to store leadership (p. 61). When a customer reports an injury, an incident report is filled out, and the asset protection team finds any and all footage of the incident and burns it to a physical copy (p. 50). The store incident packet would include a description of the incident, date and time, where it happened, a description of the person, and all the details that are wanted (p. 62).

EXHIBIT 3 - Page 16 of 59

Page 12 of 33



### 4.1.4 Chad Peterson – Fred Meyer Stores, Inc., and The Kroger Co. 30 (b)(6)

Mr. Chad Peterson was deposed on April 2, 2026 as the corporate representative of Fred Meyer Stores and The Kroger Company. Mr. Peterson started working for Fred Meyer after he graduated high school (p. 48). Mr. Peterson has been the store manager of the Tacoma Stevens Fred Meyer going on five years (p. 9). Mr. Peterson has worked for Fred Meyer or Kroger for the past 31 years (pp. 10, 49). Mr. Peterson reports to the district manager, Michelle Davison, and has five direct reports including the lead assistant store leader, presently James Yule and previously Brenton Wheeler (p. 12-13).

The antitheft shopping cart locking mechanism system existed and was already in place at the Tacoma Stevens store prior to Mr. Peterson's start at the location in October 2021 (pp. 10-11, 161). The subject store experiences about 4,000 transactions a day, this does not include the total number of people who visit the store (p. 163). Fred Meyer has regular inspections of the carts (p. 77). Any customer can use a shopping cart (p. 78). Mr. Peterson is aware of 75 reported incidents with the locking of the carts (p. 22).

It is Fred Meyer's general practice to have warning signs on the carts (p. 74). If a warning sign fell off, Mr. Peterson would contact the main office who would then contact West Coast Carts to reaffix a warning sign (pp. 156, 161, 169-170). Mr. Peterson is familiar with the warning signs both on the cart and the doors that are related to the antitheft shopping cart locking mechanism (p. 49). Mr. Peterson does not know when the warning signs were placed nor by whom as he was not at the subject store when the signs were installed (pp. 34, 50). On both sets of doors of the lobbies, the inner doors of the lobbies have a double-sided decal placed right next to the metal frame where the door opens with a caution and show a picture of the cart (pp. 49, 54-55, 155).

> *"…when the cart enters the store,…once it travels through a register, the sensor sees the cashier, disarms the wheel, the cart goes out. And when the cart goes out of after going through a register, it…rearms after that, so then that way when it comes back in, it would do the same job (p. 59)."*

The shopping carts will lock if they don't go through the register and pay (pp. 59-60). "The cashier does have to be in front of the checkstand when the person passes through there, also. There is a sensor that reads that there's a person at the register (p. 60)." The carts don't stop very fast, and a cart is not going to go backwards unless it is pulled backwards (pp. 104, 167-168).

> *"…when you hit the door, you'll – and some of them will make a sound, some don't. They'll kind of start to slow down and then stop…it slows down before it ever stops…It's not very fast. (pp. 168-169)."*

The locking mechanism is affixed to one wheel in the front and one in the rear of the cart (p. 61). There is a remote that unlocks the carts if they have locked up (p. 64). The general policy is every cart has the locking mechanism; however, "[the Tacoma Stevens store has] had many carts replaced from other stores. We don't verify that they have Gatekeeper on them when they show up (p. 63)."

Fred Meyer was not aware of Ms. LaRocque's claims prior to this lawsuit and therefore does not know what specific shopping cart Ms. LaRocque was using (pp. 74, 158). If a customer or employee is injured, employees are instructed to notify the store manager in every instance (p. 72). When an incident causing claimed injuries is reported, Fred Meyer will look for a video though sometimes the video is not available

EXHIBIT 3 - Page 17 of 59

Page 13 of 33



Linda LaRocque v Kroger
ESi Matter No: 118934

as they don't have a camera in every corner. If the footage is there, the video is burned to a disc, an incident report is created, and these are sent to Sedgwick, the insurance company (p. 62). If any item is involved in an injury, Fred Meyer would review the safety of that piece; the manager who responds to that incident would inspect everything to ensure safety, would make note, and would take photos (pp. 108, 110).

On the date of the subject incident, May 6, 2023, the warnings for the Gatekeeper system were affixed to the sliding interior doors (p. 160). Those warnings were affixed to the subject store for the entire time Mr. Peterson worked at the Tacoma Stevens location (p. 161). Mr. Peterson was working the day of the subject incident, and he was not notified of an injury that day (p. 76). To his knowledge, Ms. LaRocque's incident was not reported, so there was no way to get the cart nor surveillance video to investigate (pp. 157, 160-163). If Ms. LaRocque were to report the incident to a store employee, then that would be transmitted to a manager (p. 161).

### 4.1.5  Ryan Harter – Gatekeeper Systems, Inc. 30(b)(6)

Mr. Ryan Harter was deposed on April 14, 2026 as the corporate representative of Gatekeeper Systems, Inc. Mr. Harter is the senior director of systems support at Gatekeeper and as such he oversees design, monitoring, and technical support for the field installation teams globally (p. 8).

Gatekeeper drafted the language of both the shopping cart and door warning signs (pp. 23-24). Gatekeeper provides the signs upon the purchase of a Gatekeeper product (p. 24). Mr. Harter is not aware of any warning sign verbiage changes in the last 10 years (pp. 24-25).

Gatekeeper has two cart lock systems: the cart containment system and Purchek. The cart containment system is Gatekeeper's exterior perimeter system whose sole purpose is to lock any carts at the perimeter of the property line that is designated by the customer to prevent the cart or asset from leaving the property. The indoor system is Purchek, which is designed to prevent pushout theft. If a cart doesn't go through a transaction point of sale, the cart will lock at the door (p. 26). The Purchek system was installed at the subject Fred Meyer in 2017 (p. 57) [13]. Gatekeeper offers a Video Classification system, or theft intelligence – a system that only records a 20 second video if an event takes place, that was installed at the subject Fred Meyer on February 14, 2019 (pp. 27, 57). Gatekeeper does not maintain the video longer than a year unless it's a pushout theft (p. 59).

The Purchek system at the subject Tacoma-Stevens Fred Meyer was installed by Gatekeeper employee, Tim Wright, and the wheels were installed by West Coast Casters, which is a third party (p. 36). Most likely a Gatekeeper employee placed the warning signs on the doors, but Mr. Harter cannot speak one hundred percent as he was not there. The subject store work order identified that Mr. Wright installed the "clings," or warning signs (p. 40). Per the paperwork, West Coast Carts installed the warning signs on the carts (p. 44). Per the paperwork, there were SmartWheels installed on every cart at the Tacoma-Stevens location (p. 56).

Mr. Harter has seen the photos of the warning signs at the Tacoma-Stevens Fred Meyer store. From the pictures Mr. Harter saw, he can see the warning signs when the doors were open (p. 42).

---

[13] Deposition of Ryan Harter, dated April 14, 2026, Exhibit 6 – GK_0013-GK_0015 [ESi 6.005].

EXHIBIT 3 - Page 18 of 59                                    Page 14 of 33



*"I noticed all of the photos from the exterior looking in. But the decals are actually on the interior, facing the interior of the store. So if you're coming from the store out, they're pretty visible (p. 41)."*

*" …they're double-sided, so you can see them from both sides. But they're adhered onto the interior side of the door on the bypass door that slides on the top panel bottom left corner. So when a door is closed, they're front and center (p. 41)."*

*"…the point of the stickers is so you can see it as you're exiting if you're approaching that lock loop…the primary focus is going to be anybody approaching that lock loop…The point of where that cart will lock (p. 44)."*

When there's an activation, there is an alarm chirp and a strobe that is activated (p. 48, 50). The horn and strobe are one packaged unit; the cart itself does not emit any sound upon activation (p. 50). The alarm at each door is not as loud as a fire alarm, but it is loud enough to be heard. "Then Fred Meyer actually installed one at the front end since the registers are so far away from the front end so that it also goes off so the store personnel can hear it (p. 49)." The alarm is a third-party green Potter horn strobe (p. 49). The general Purchek Door Area Devices are seen in Mr. Harter's Exhibit 5 excerpt (**Figure 5**) below.



**Figure 5. Purchek Solution Components - Door Area Devices (GK_0004).**

It can take a couple of seconds for the cart to activate, "…it is a motor and a gear that's driven. So once it hears that command, it has to activate and go through the cycle before it locks. Once activated, the cart can no longer move forward (pp. 50-51)." Fred Meyer utilizes the paired wheel system, so there are two Purchek wheels on each cart counter from one another. The primary wheel activates first as soon as it receives the signal, and it can take a couple of seconds for the secondary to activate (pp. 51-52). The cart does not stop more abruptly with the paired wheels compared to one wheel, but it cannot be moved after activation due to having more friction points (p. 57). "But by having the primary/secondary, it actually

EXHIBIT 3 - Page 19 of 59

Page 15 of 33



gives a more slowed, controlled stop, because the one wheel locks and then the other one locks up momentarily afterwards. So they don't lock at the same time. There's a delay between (pp. 57-58)."

Once a customer checks out, there is a one hour timer that will reset after one hour (p. 52). Fred Meyer can use their fob to bypass the system, and the system will automatically turn itself back on after 30 seconds (p. 54).

Gatekeeper has no maintenance agreements with Kroger (p. 44). If something breaks, Kroger for Fred Meyer will reach out to Gatekeeper, generate a work order, and schedule a service (p. 45). From the records Mr. Harter saw, the Tacoma-Stevens Fred Meyer location did not have any service records (p. 45, 47).

If one of the warning signs was missing from the shopping cart, Kroger or Fred Meyer would go through the work order channel and have Gatekeeper replace the warning sign or have their maintenance department complete the service after ordering the parts from Gatekeeper (p. 46). Gatekeeper tells its customers that the warning signs need to be replaced if they are damaged or missing (p. 70). Fred Meyer has replaced a missing or damaged warning sign on a shopping cart (p. 47).

Mr. Harter is only aware of people striking their bodies when a cart activates from claims like this (p. 58). "Personally, I watch thousands of videos a month, and I've never noticed or seen anybody hit their body on the cart (p. 58)." Gatekeeper doesn't maintain any sort of database of alleged injuries that occur related to the Purchek system (p. 60). Gatekeeper learned of Ms. LaRocque's incident at the Tacoma-Stevens Fred Meyer after the lawsuit was filed and the insurance company notified Gatekeeper (p. 68).

Mr. Harter's deposition Exhibit 4 (**Figure 6**) looks like a representation of the warning sign that Gatekeeper provides that is affixed to shopping carts with the SmartWheel system installed. The mounting brackets go on the outside and sandwiches the warning sign between the wire frame and the cart so the warning sign stays in place (pp. 61-62).



**Figure 6. Gatekeeper part number M-8033B – the cart warning and mounting kit.**

EXHIBIT 3 - Page 20 of 59

Page 16 of 33



## 4.2 Digital Media Evidence

ESi received photographs of posted warning signs within the subject Fred Meyer location as well as warning signs attached to the store's carts (see **Figure 7** and **Figure 8**).



**Figure 7. Warning label advising customers about wheels locking.** [14]



**Figure 8. Warning label on shopping cart, advising customer that cart may stop unexpectedly.** [15]

---

[14] Extracted from DEF KROGER_000098 [ESi 4.001].
[15] Extracted from DEF KROGER_000099 and DEF KROGER_000100 [ESi 4.001].

EXHIBIT 3 - Page 21 of 59

Page 17 of 33



## 4.3  Site and Cart Inspection

On April 29, 2026, ESi conducted a site inspection and exemplar shopping cart testing at the subject store. The inspection included documentation of the store entrance/exit area, cart path of travel, floor surfaces, door threshold, warning signage, and exemplar cart geometry through measurements, photographs, and video. Testing included cart acceleration measurements during wheel-lock activation and surrogate testing to evaluate the relative position of the user's knees and the cart basket during interrupted gait.

## 4.4  Selected Medical Records

According to Ms. LaRocque's provided medical record, Ms. LaRocque was 5 feet 6 inches tall and weighed approximately 253 pounds around the time of the subject incident. [16]

Prior to the subject incident, Ms. LaRocque had a total left knee replacement surgery on February 8, 2023. The left knee is the same knee that allegedly struck the back of the shopping cart on May 6, 2023. Prior to the subject incident, Ms. LaRocque was undergoing physical therapy for her left knee at Anchor Physical Therapy. [17]

**<<< Intentionally left blank >>>**

---

[16] Office Visit in MultiCare Orthopedic and Sports Medicine – Mountain, dated March 30, 2023 [ESi 7.201].
[17] Plaintiff's Responses to Gatekeeper's First Interrogatories and Requests for Production, dated August 29, 2025 [ESi 5.301].

EXHIBIT 3 - Page 22 of 59                    Page 18 of 33



# 5  Analysis and Discussion

Understanding the contributing factors of an accident can be complex, particularly when considering the potential roles of the individuals involved, the environment in which the event occurred, and the equipment, products, or other agents that may have influenced the outcome. To provide a structured assessment of potential contributing factors, the discussion that follows is organized using the Haddon Matrix framework, which emphasizes evaluating the roles and interactions of (1) the individuals involved, (2) the equipment/products/agents involved, and (3) the physical and operational environment in the circumstances of an event. [18] A Human, Machine, Environment (HME) chart relating to the subject incident can be seen in **Figure 9** below.

| Human: Cart Operator/Pedestrian  | Machine: Shopping Cart  |
|---|---|
| • Mrs. Linda LaRocque (age 64 at the time of the incident).<br>• Stature ≈ 5'6" (168 cm); weight ≈ 253 lbs.<br>• Three months post left total knee arthroplasty; cleared from physical therapy two days prior.<br>• Wearing full-length left knee brace, Sketchers, cotton pants, floral shirt<br>• Using cart as a mobility aid in lieu of available cane, spousal support, and store mobility scooter. | • Standard full-size Fred Meyer shopping cart.<br>• Gatekeeper Purchek SmartWheel anti-theft system (paired front/rear locking wheels).<br>• Sequenced primary–secondary lock yields a controlled, gradual deceleration at the lock loop.<br>• On-cart warning placard (general store practice).<br>• Designed for merchandise transport, not as a mobility aid. |

| Environment  |
|---|
| • Fred Meyer Store, 4505 S. 19th Street, Tacoma, WA. On Saturday, May 6, 2023, ≈ 3:00 PM (daylight / photopic conditions).<br>• Indoor foyer/exit area; well-illuminated by overhead artificial light and storefront daylight.<br>• Sliding doors in open position; steady patron flow. ≈ 4,000 transactions per day (well-trafficked area)<br>• Gatekeeper Purchek installed at this store in 2017.<br>• Double-sided warning decals on interior bypass doors, front-and-center when closed; visible from both interior and exterior when open. |

**Figure 9. HME diagram related to subject incident.**

## 5.1  Environmental Conditions

The subject incident occurred on May 6, 2023 at 4505 S. 19th Street, Tacoma, WA 98405 at approximately 3:00 PM. [19] The incident occurred indoors at the foyer/exit area of the subject store, which was illuminated by overhead artificial lighting in addition to natural light entering through the storefront glass and the open sliding doors. Per the testimony of both Mr. and Ms. LaRocque, the doors were in the open position at the time of the incident with a steady stream of patrons entering and exiting. Per the testimony of Mr. Wheeler and Mr. Peterson, the subject store experiences approximately 4,000 transactions per day, supporting the observation that the foyer/exit area is a well-trafficked, regularly used pedestrian space.

---

[18] Allan F. Williams. (1999). The Haddon Matrix: Its Contribution to Injury Prevention and Control. *3rd National Conference on Injury Prevention and Control*.
[19] Plaintiff's First Amended Complaint, dated June 26, 2025 [ESi 5.001].

EXHIBIT 3 - Page 23 of 59

Page 19 of 33


## 5.2 Warnings and Safety Guidelines

Warnings are a risk reduction strategy. The Handbook of Human Factors and Ergonomics outlines several guiding principles to determine whether a warning should be used including whether a hazard of appropriate severity exists. [20] Overusing warnings by identifying every risk can have a negative effect on user safety. [21] Potential warnings should be prioritized based on the level of risk of a hazard in order to present the most critical information. [22] Further, multiple modes of sensory engagement, such as visual and auditory, provide high warning efficacy. [23] The use of pictorials not only attracts attention but allows for great communication to a wider audience. [24]

Based on ESi's inspection and the deposition testimony of Mr. Wheeler, Mr. Peterson, and Mr. Harter, multiple, redundant warnings concerning the Gatekeeper Purchek SmartWheel anti-theft system were available to patrons of the subject Fred Meyer at the time of the subject incident. These warnings consisted of: (**1**) double-sided decals affixed to the interior bypass doors of both lobby door sets, positioned in the bottom-left corner of the top panel such that they are visible from both inside and outside the store and are "front and center" when the doors are in the closed position, and (**2**) warning placards mounted to individual shopping carts equipped with the Gatekeeper SmartWheel, sandwiched between the cart's wire frame and an exterior bracket so the placard remains in place during use, and (**3**) an audible alarm chirp and visible strobe at the lock-loop perimeter that activates when a cart engages, with an additional alarm at the front end of the store installed at Fred Meyer's request. In order to evaluate these warnings against recognized standards, the relevant guidance from the American National Standards Institute (ANSI) Z535 family was reviewed.

### 5.2.1 ANSI Z535.4 – Product Safety Signs and Labels

The ANSI Z535.4 standard establishes recommended guidelines for the design and location of product safety information. The main purpose of the standard is to establish a consistent and uniform visual layout for the efficient development of safety signs and labels. [25] The effective implementation of warnings can include two main formatting components, Signal Words and Safety Alert Symbols. ANSI Z535.4 provides guidelines for the use of both these two components.

The ANSI Z535.4 standard suggests the use of four signal words: DANGER, WARNING, CAUTION, and NOTICE. The standard defines the signal words DANGER and WARNING as follows: [26]

1. DANGER: Indicates a hazardous situation that, if not avoided, will result in death or serious injury. This signal word is to be limited to the most extreme situations.

2. WARNING: Indicates a hazardous situation that, if not avoided, could result in death or serious injury.

---

[20] Salvendy, G. (2012). Handbook of Human Factors and Ergonomics: Fourth Edition.

[21] Frantz, J. et al. (1999). Potential Problems Associated with Overusing Warnings. Proceedings of the Human Factors and Ergonomics Society, 1991, 916–920.

[22] Laughery, K. & Wogalter, M. (2006). Designing Effective Warnings. Reviews of Human Factors and Ergonomics, 2(1), 241–271.

[23] Wogalter, M. (2006). Purposes and Scope of Warnings. In M. S. Wogalter (Ed.), Handbook of Warnings. Lawrence Erlbaum Associates.

[24] Laughery, K. & Wogalter, M. (2006). Designing Effective Warnings. Reviews of Human Factors and Ergonomics, 2(1), 241–271.

[25] ANSI Z535.4-2011, Pg. 1.

[26] ANSI Z535.4-2011, Pg. 3.

EXHIBIT 3 - Page 24 of 59

Page 20 of 33



The safety labels and signs available at the subject Fred Meyer entry doors and on the shopping carts implemented one of these signal words. The signal word "WARNING" was employed both on the door decals and on the cart placards, paired with the standardized triangular safety alert symbol. The selection of the "WARNING" signal word is consistent with ANSI Z535.4 guidance: the hazard associated with a cartwheel locking at the door is one that, if not avoided, could potentially result in injury, but is not of the most extreme severity for which "DANGER" would be reserved. The signal word selected, the use of the safety alert symbol, the inclusion of a pictorial representation of the cart, and the textual content describing the location and condition under which the cartwheels may stop are all consistent with the formatting and content guidance set forth by ANSI Z535.4.

A complementary formatting component in a warning is the use of safety alert symbols. The intention of such a symbol is to transmit a message without the use of words in order to represent a hazard, a hazardous situation, a precaution to avoid a hazard, the result of not avoiding a hazard, or any combination of these.[27] Per ANSI Z535.4, the safety alert symbol may be used in combination with signal words. The standard provides specific graphical considerations and requirements for the use of the safety alert symbol in order to indicate the presence of a potential hazard. The safety alert triangle was present on both the cart placard and the door decals at the subject Fred Meyer location, satisfying ANSI Z535.4 guidance for the use of this complementary symbol.

## 5.3  Cart Operator Experience, Behavior, and Expectancy

Expectancy is a human factor consideration related to Ms. LaRocque's ability to avoid potential interaction with the cart. Expectancy is a key factor in visual and auditory perception and plays a major role in our ability to detect objects. Expectancy affects our predictions about the environment and the kinds of responses that we may have to make. Expectancy affects the manner in which we estimate whether a reaction is needed. When there is no expectancy, or an individual's expectancy is incorrect, it may take longer to respond properly to an event, the response may be wrongly or poorly executed, or there may not be any response at all.

It was identified that the Gatekeeper Purchek or similar systems are installed at most stores in the Pacific Northwest and "…the vast majority of people that shop in the Pacific Northwest are familiar with these types of systems now, as they've been used for years and years and years and years."[28] The Purchek system at the subject Fred Meyer was installed in 2017 (Harter Dep., p. 57), and Ms. LaRocque's incident occurred on May 6, 2023, approximately five and a half years after installation.

Ms. LaRocque testified that she shopped at the subject Fred Meyer one to two times per week, with her doctor's office located just down the road. Mr. LaRocque testified that he and Ms. LaRocque had been shopping at the subject Fred Meyer for approximately 25 years and that she accompanied him two to three times per week.[29] Using Ms. LaRocque's own conservative figure of one shopping trip per week from the date of Purchek installation (late 2017) through the date of the subject incident (May 6, 2023), she would have entered and exited the subject store on the order of 280 occasions, a figure that doubles

---

[27] ANSI Z535.4-2011, Pg. 2.
[28] Deposition of Brenton Wheeler, dated March 26, 2026, p. 28 [ESi 6.003].
[29] Deposition of Steven LaRocque, dated September 11, 2025, p. 17 [ESi 6.002].

EXHIBIT 3 - Page 25 of 59                    Page 21 of 33



to approximately 560 occasions at her stated upper-bound frequency of two trips per week, and which is greater still under Mr. LaRocque's recollection. On every such occasion, she had the opportunity to be exposed to the door decals and on-cart placards, as well as to the audible/visual alarm chirp at the lock loop on any occasion the system activated for any patron.

From a human factors perspective, this very substantial exposure history supports the formation of an expectancy regarding the operation of the Purchek system, even in the absence of a specific recollection of any single warning. As mentioned previously, expectancy can be formed both from explicit instruction (e.g., reading a warning) and from repeated exposure to a system in operation, including incidental observation of other patrons' carts engaging at the lock loop.

## 5.4  Cart Geometry

The shopping cart geometry provides clearance between the user's knees and the rear of the cart basket during normal cart use. The cart handle is approximately 3 feet 5 inches above the floor. The bottom of the cart basket is approximately 1 foot 9.5 inches above the floor. The top rear portion of the basket is positioned approximately 3.5 inches horizontally forward of the handle centerline, while the lower rear portion of the basket is positioned approximately 10 inches horizontally forward of the handle centerline.

This geometry is relevant because the cart basket slopes away from the user as it extends downward (see **Figure 10**). As a result, the lower portion of the basket is farther forward from the user than the upper portion of the basket. During normal use, with the user's hands on the handle, this geometry creates additional clearance between the user's knees and the rear/lower portion of the basket.

## 5.5  Anthropometry

Anthropometric estimates were used to evaluate the approximate vertical relationship between Ms. LaRocque's knee and the rear/lower portion of the shopping cart basket. Ms. LaRocque's estimated knee height was calculated using the Chumlea knee-height relationship:

$$Knee\ height\ (cm) = \frac{Height\ (cm) - 82.21 + (0.21 \times Age)}{1.85}$$

Using a reported height of approximately 168 cm and an age of 64 years, Ms. LaRocque's estimated knee height was approximately 53.6 cm, or approximately 21 inches from the floor. This estimate assumes the applicable White, non-Hispanic anthropometric equation.

The bottom portion of the exemplar shopping cart basket was measured at approximately 21.5 inches above the floor. Therefore, the lower portion of the cart basket was positioned approximately 0.5 inches higher than Ms. LaRocque's estimated knee height.

This comparison indicates that Ms. LaRocque's estimated knee height was vertically closest to the bottom portion of the cart basket. The bottom portion of the basket was also the portion positioned farthest forward from the user, due to the rearward-to-forward slope of the basket. Therefore, the area of the basket most vertically aligned with Ms. LaRocque's knee was also the area with the greatest horizontal clearance from the user during normal cart use (see **Figure 12**).

EXHIBIT 3 - Page 26 of 59

Page 22 of 33








**Figure 10. Shopping cart geometry.**

## 5.6 Pedestrian Gait Analysis

Basic gait, or the manner in which a person walks, is a coordinated movement involving the interaction of musculoskeletal structures, neuromuscular control, and external forces to produce efficient forward movement. A complete gait cycle constitutes the interval between successive foot strikes of the same limb and is divided into two main phases: the stance phase, when the foot is in contact with the ground, and the swing phase, when the limb advances forward. During this gait cycle, the body continuously shifts its center of mass in a controlled pattern, an ongoing balance between falling forward and recovery. Normal gait depends on key functional requirements including stability during stance, clearance of the swinging limb, proper foot/limb placement for the next step, and adequate step length. [30]

During swing phase, the knee generally remains behind the foot/toe as the limb advances forward. The knee may move slightly ahead of the toe when the limb is trailing during double support and near foot lift-off (**Figure 11**); however, during the forward swing of the limb, the foot is the leading portion of the lower extremity. This relationship is relevant to the subject incident because the alleged contact involved the

---

[30] Chambers, H.G. & Sutherland, D.H. (2002) A Practical Guide to Gait Analysis, 10(3), 222-231.

EXHIBIT 3 - Page 27 of 59

Page 23 of 33



knee contacting the rear/lower portion of the shopping cart basket. For knee contact to occur during forward walking, the user's body position, lower-extremity position, and cart geometry must allow the knee to close the horizontal clearance to the cart (see **Figure 12**).



**Figure 11. Normal walking gait, adapted from Chambers, et al. [31]**

Gait termination is the transition from steady-state walking to a complete stop. Gait termination may be planned, such as intentionally stopping at a known location, or unplanned, such as stopping in response to an unexpected external event. The literature indicates that the ability to stop within the next step depends in part on walking speed and the amount of time available to respond. One study reported that, during normal walking cadence, when a stop cue was provided approximately 300 milliseconds after the signal to stop, all subjects were able to terminate gait within one step. [32] The study also reported that walking speed affected stopping strategy, with faster walking requiring additional response time to terminate gait within the next step. Mr. LaRocque described their walking speed as "not that fast" and indicated that they were moving slowly while walking at the same speed and maintaining approximately 6 to 12 inches of separation. [33] This testimony is relevant because slower walking speeds are generally associated with greater available time and opportunity to terminate gait after an unexpected interruption.

Age-related gait termination research also indicates that older adults can successfully terminate gait, although they may use different biomechanical strategies than younger adults. Another study reported that middle-aged and elderly women used generally similar unplanned gait termination strategies, but the elderly group generated less lower-extremity braking force and relied more heavily on the hip joint during termination. [34]

---

[31] Chambers, H.G. & Sutherland, D.H. (2002) A Practical Guide to Gait Analysis, 10(3), 222-231.

[32] Bishop, M., Brunt, D., Pathare, N., & Patel, B. (2004). The effect of velocity on the strategies used during gait termination. Gait & Posture, 20(2), 134–139.

[33] Deposition of Steven LaRocque, dated September 11, 2025, p. 19 [ESi 6.002].

[34] Jung, S., Yi, J., & Song, C. (2016). Biomechanical alterations of gait termination in middle-aged and elderly women. Journal of Physical Therapy Science, 28(3), 861–867.

EXHIBIT 3 - Page 28 of 59                    Page 24 of 33


## 5.7 Surrogate Testing

Surrogate testing was performed to evaluate the relative position of the user's knees and the shopping cart basket during wheel-lock activation. A height-matched surrogate was used for the testing. In a normal standing position with both hands on the cart handle, the total clearance between the surrogate's knees and the cart basket was approximately 22 inches (see **Figure 12**).

The surrogate pushed the cart through the exit without passing through checkout so that the cart's wheel-lock system would activate. Testing was performed at slow, normal, and fast walking speeds. Accelerometers were mounted to the cart basket to document cart motion during the wheel-lock event. Video cameras recorded the testing from multiple angles, with rulers and scales placed in view to allow distance measurements and review of the surrogate's body position relative to the cart.

A total of seven test runs were completed. The synchronized video views showed that the wheel lock occurred during different phases of the surrogate's gait cycle. In one representative run, wheel lock occurred as the foot contacted the ground, after which the surrogate's gait was effectively arrested and no forward knee contact with the cart basket occurred (see **Figure 13**). In another representative run, the wheel lock occurred as the opposite foot contacted the ground, and the surrogate began a subsequent swing phase after the wheel lock. However, that swing was interrupted and did not complete as a full forward step into the cart (see **Figure 14**).

Across all seven runs, regardless of the gait phase interrupted by the wheel-lock event, the closest knee remained at least 10 inches from the rear of the cart basket. This minimum clearance was maintained even when the surrogate continued forward motion after the wheel locked. The testing demonstrated that, under the tested conditions, wheel-lock activation did not cause the cart basket to contact the surrogate's knees. The testing also showed that the surrogate's gait response to wheel-lock activation varied by gait phase, but the resulting motion did not eliminate the knee-to-cart clearance.




**Figure 12. Height-matched surrogate in a normal standing position with both hands on the shopping cart handle, demonstrating the approximate knee-to-cart basket clearance.**

EXHIBIT 3 - Page 29 of 59

Page 25 of 33





*Toe-off*                                    *Foot clearance*



*Wheel lock & foot strike*                   *Opposite toe-off*



*Opposite back on ground*

**Figure 13. Synchronized video frames from a surrogate test run showing wheel-lock activation followed by arrest/cancellation of the surrogate's gait.**

EXHIBIT 3 - Page 30 of 59

Page 26 of 33





*Wheel lock & opposite foot strike*    *Toe-off*



*Incomplete swing*    *Opposite backward step*



*Final stance*

**Figure 14. Synchronized video frames from a surrogate test run showing wheel-lock activation during gait progression.**

Moreover, the measured acceleration data showed that wheel-lock activation occurred as a brief but staged cart response, rather than as an instantaneous stop of the entire cart. This finding is consistent with the testimony of Ryan Harter, Gatekeeper Systems, Inc.'s 30(b)(6) representative, who explained that the subject Fred Meyer carts use a paired-wheel system with two Purchek wheels positioned opposite one another. According to Mr. Harter, the primary wheel activates first upon receiving the signal, and then the secondary wheel activates. He further explained that the paired-wheel system does not stop the cart more abruptly than a single-wheel system; rather, the delayed activation produces a more slowed, controlled stop because the two wheels do not lock simultaneously.

EXHIBIT 3 - Page 31 of 59

Page 27 of 33



## 5.8 Perception and Attention

Perception and attention are foundational concepts in human factors. The human visual system is a selective, capacity-limited information processor: in any complex environment, only a small portion of the visual information available at a given moment is consciously processed. The salience of a cue (its conspicuity), the observer's expectancy for it, the observer's task demands, and the duration and frequency of exposure all influence whether a cue is detected and acted upon.

Based on ESi's site inspection, the warning decals on the bypass doors and the warning placards on the carts were physically present, legible, and visible from the typical pedestrian path of approach to the door (both inbound and outbound), consistent with Mr. Harter's testimony that the decals are "front and center" when the doors are closed and remain visible from both the interior and exterior when the doors are open. [35]

It should be noted that ANSI Z535 and the human factors warnings literature do not require, or even support a presumption, that an individual user consciously read every warning on every encounter in order for that warning to be effective. Repeated exposure to a warning, even without conscious rehearsal of its content, can support hazard awareness and the formation of appropriate expectancies. As discussed previously, Ms. LaRocque's extensive prior shopping history at the subject store (estimated 280–560+ visits between Purchek installation and the date of the subject incident) provided ample opportunity for both explicit perception of the warnings and implicit expectancy formation regarding the operation of the cart-containment system.

## 5.9 Human Error

In the field of Human Factors, human error can be defined as a lengthy and complex chain of breakdowns that affect the overall system. [36] In his book, *Human Error Reduction and Safety Management,* [37] Dan Petersen discussed the many causes of human error and how the understanding of human error can be applied to safety management. Operator incidents, such as Ms. LaRocque's incident, are events that can be linked directly to human error. They can happen due to random events, or they can be caused by systemic events. The difference is not always readily apparent given the complexity of risk factors.

In the present matter, Ms. LaRocque's decision to use a full-size shopping cart as her primary mobility aid is a significant individual-level factor. The cart was designed and intended for the transport of merchandise; it is not a mobility aid, an assistive walking device, or a substitute for a rollator. Ms. LaRocque had with her on the date of the incident a cane, her husband's arm for support, and access to the mobility scooters that the subject Fred Meyer made available at the front of the store, all three of which are intended uses for assistance with ambulation. By her own testimony, she elected to use the shopping cart instead. No representative of Fred Meyer or of Gatekeeper informed her that it was safe to use a shopping cart as a mobility aid, and the carts themselves are not designed, marked, or instructed for that use.

---

[35] Deposition of Ryan Harter, dated April 14, 2026, pp. 41-44 [ESi 6.005].
[36] Wickens, C. D., & Hollands, J. G. (2000). Human Error. In *Engineering Psychology and Human Performance* (3rd ed., p. 493). Prentice-Hall, Inc.
[37] Petersen, D. (1984). Human-error reduction and safety management.

EXHIBIT 3 - Page 32 of 59

Page 28 of 33


A second individual-level factor concerns the reported sequence of events at the moment of contact. By Ms. LaRocque's own description, the cart stopped first, and her knee contacted the cart on the next step she took: "the next step I took was into the cart… I lifted my knee, walked right into it". [38] Mr. LaRocque's description is consistent, he did not hear an abrupt impact, only Ms. LaRocque saying "Ow," and he described the cart as having decelerated to a stop in line with the doors. A continued forward foot placement after the cart had already come to a controlled stop is the proximate physical explanation for knee contact with the cart, not an abrupt cart-induced perturbation.

These observations describe, in human factors terms, the chain of decisions and actions that produced the contact. The system itself functioned as designed: it engaged, decelerated the cart in a controlled manner at the lock loop, and should have produced an audible/visual alarm. The available warnings were present and consistent with applicable ANSI guidance. The user-side factors, choice of the cart as a mobility aid in lieu of available alternatives, and the continuation of forward motion after the cart had stopped are properly characterized as human-factors contributors to the incident.

## 5.10 Review of Report of Mr. Levi Dixon

ESi received a report written by Mr. Levi Dixon dated February 25, 2026. In such report, Mr. Dixon concludes that:

> *"Prior to Ms. LaRocque's incident, the Defendants knew and/or should have known that the shopping cart wheels were at risk of locking up and/or unexpectedly stopping, even if someone was not "shoplifting."*

> *The cart wheels unexpectedly locking and/or stopping the forward motion of the shopping cart poses a risk of harm to pedestrians due to putting them at risk of striking/contacting the shopping cart and/or a loss of balance.*

> *The overall warning system that was utilized to attempt to alert pedestrians of the risk of the shopping cart wheels locking and/or the shopping cart unexpectedly stopping was unreliable and inconsistent with basic principles for warnings.*

> *Despite relying on warnings placards placed on the shopping carts, the shopping cart that Ms. LaRocque was using at the time of this incident was devoid of the warning placard.*

> *From a Safety and Human Factors Engineering perspective, Ms. LaRocque's overall behavior was predictable."* [39]

ESi has reviewed Mr. Dixon's report and respectfully disagrees with several of his opinions and the analytical framework on which they rest. Specific points of disagreement, organized by Mr. Dixon's numbered conclusions, are set forth below.

- ***Knowledge that the cartwheels could lock outside of a "shoplifting" event***. ESi does not dispute that the Purchek system, by design, locks any cart that exits the perimeter without passing

---

[38] Deposition of Steven LaRocque, dated September 11, 2025, pp. 81-82 [ESi 6.002].
[39] Report of Levi Dixon, dated February 25, 2026 [ESi 9.001].

EXHIBIT 3 - Page 33 of 59

Page 29 of 33



through the point-of-sale, regardless of the user's intent. This is the design intent of a pushout-prevention system. The relevant human factors question is not whether the operator of a patron-facing system should anticipate every possible patron behavior, but whether reasonable warnings and a reasonable design were in place. The Purchek system at the subject Fred Meyer included redundant visual warnings (door decals and on-cart placards) and an audible/visual alarm at the perimeter, a multi-modal warning architecture consistent with established human factors guidance.

- ***Risk of harm from cartwheels stopping***. The premise that cart deceleration "poses a risk of harm to pedestrians" is overstated when applied to the Purchek paired-wheel system. The Purchek system is engineered to produce a gradual, controlled stop: the primary wheel locks first, the secondary wheel engages momentarily afterward, and the cart slows over a brief interval rather than halting abruptly. Mr. Dixon's analysis assumes a 0.5-second perception–response window using an idealized 4 ft/s walking speed and a 2-foot handle-to-torso distance. Both Mr. and Ms. LaRocque testified that they were walking slowly at the time of the incident,[40] which extends (not shortens) the available perception–response window. As discussed in the ESi's analysis, ESi's surrogate testing demonstrated that the surrogate's knees and lower extremities did not come into close proximity with the cart during brake-lock trials at normal, slow, or fast walking speeds.

- ***Reliability of the warning system***. Mr. Dixon characterizes the warning system as "unreliable and inconsistent with basic principles for warnings." ESi disagrees. The warnings in place at the subject Fred Meyer satisfy the core ANSI Z535 formatting components (signal word, safety alert symbol, pictorial, and hazard description); employ multiple sensory modalities (visual decal/placard, audible alarm, visual strobe); are placed proximate in time and place to the hazard (the door lock loop); and are redundant across two physical surfaces (the door and the cart). The fact that a warning system can theoretically be perfected does not render the deployed system unreliable; the relevant standard is reasonableness against established guidance, which the deployed system satisfies.

- ***Allegedly missing placard on the subject cart.*** The opinion that the specific cart Ms. LaRocque was using lacked a warning placard is based on Ms. LaRocque's post-hoc recollection. The defendants were not contemporaneously notified of the incident; the cart itself was not preserved or identified to the defendants; and no surveillance video of the incident was obtained. The general practice at the subject store, per Mr. Peterson, was that all carts were equipped with placards.[41] Even setting that point aside, on-cart placards are one of three layered warning channels at the subject location; the door decals and the perimeter audible/visual alarm are present and active regardless of any single cart's placard status. Reliance on the alleged absence of a single placard as the operative warning failure ignores the redundant warnings provided by the door decals and the perimeter alarm device.

- ***Predictability of Ms. LaRocque's behavior.*** Mr. Dixon opines that Ms. LaRocque's overall behavior was predictable. ESi disagrees as a matter of human factors analysis: the use of a full-size shopping cart as a primary mobility aid for an individual recovering from a total knee

---

[40] Deposition of Steven LaRocque, dated September 11, 2025, p. 19-20 [ESi 6.002].
[41] Deposition of Chad Peterson, dated April 2, 2026, p. 74 [ESi 6.004].

EXHIBIT 3 - Page 34 of 59                    Page 30 of 33



arthroplasty, in lieu of an available cane, an available companion's arm, and the store's available mobility scooters, is not the predictable use of a shopping cart. The shopping cart's designed and labeled function is the transport of merchandise; mobility-aid use is outside that function and outside the foreseeable design envelope of an anti-theft cart-containment system.

- ***Other prior incidents.*** Mr. Dixon references a small number of prior and subsequent incidents at the subject location and elsewhere. In the broader denominator of approximately 4,000 transactions per day at the subject store alone, and in the context of a system that has been deployed regionally for years, the rate of reported injury claims associated with a cart-lock event is exceedingly low. Mr. Harter, who oversees Gatekeeper's global field installation team and reviews thousands of activation videos per month, testified that he has never observed a person striking their body on a cart in the activation videos he has reviewed.

## 5.11 Review of Report of Dr. Alan B. Brown

ESi received a Medical Record Review prepared by Alan B. Brown, MD, JD, Orthopedic Surgeon, dated May 7, 2026. Dr. Brown reviewed Ms. LaRocque's medical records, deposition testimony, and imaging studies and addressed a series of causation questions concerning the subject incident.

Dr. Brown's principal conclusion, expressed to a reasonable degree of medical probability, is that on a more-probable-than-not basis Ms. LaRocque was not injured as a result of the subject incident. Dr. Brown noted the long pre-incident history of bilateral knee, low back, cervical, and thoracic complaints; the morbid obesity and opioid dependence; the left total knee arthroplasty performed approximately three months prior to the incident; the small inferior-pole patellar avulsion (approximately 4–5 mm of displacement) noted on the May 9, 2023 imaging; and the subsequent slow failure of the extensor mechanism – a known complication of total knee arthroplasty. Dr. Brown opined that there is no plausible mechanism by which a patellar tendon could have been ruptured by the contact described, that an immediate severe disability would have been expected if the tendon had ruptured at the time of the incident, and that the documented record of Ms. LaRocque walking to the ATM after the incident is inconsistent with an acute extensor-mechanism failure at that moment.

Dr. Brown's medical conclusions are consistent with the mechanism analysis presented in the present report. The Purchek system produces a controlled, gradual stop of the cart, and the surrogate testing and gait/geometry analysis indicate that knee contact with the cart's lower plastic component would not be expected to occur with high energy from typical cart-pushing posture. A low-energy contact of the type ESi's analysis predicts is consistent with Dr. Brown's opinion that the contact would not be expected to produce a high-energy, tendon-disrupting injury at the moment of impact.

*<<< Intentionally left blank >>>*

EXHIBIT 3 - Page 35 of 59

Page 31 of 33


# 6 Conclusions and Opinions

The following conclusions are based on the inspection and analysis as described above, and on the education, training, and experience of the authors.

**Manuel Meza-Arroyo**:

1. The warnings made available to patrons of the subject Fred Meyer concerning the Gatekeeper Purchek SmartWheel anti-theft system, including the double-sided decals on the interior bypass doors, the warning placards on the carts, and the audible/visual alarm at the lock-loop perimeter were present, conspicuous, and consistent with the formatting and content guidance set forth in ANSI Z535.4 and with established human factors principles for the design of redundant, multi-modal warnings.

2. The Purchek system is engineered to produce a controlled, gradual stop of the cart at the lock-loop perimeter rather than an abrupt halt. The paired-wheel design produces a sequenced primary–secondary lock, yielding a slow and controlled stop. Mr. LaRocque, who was walking immediately behind Ms. LaRocque, did not hear the cart's wheels skid, stutter, or come abruptly to a halt.

3. Ms. LaRocque's own description of the incident is consistent with a continued forward foot placement after the cart had already come to a controlled stop and is not consistent with an abrupt cart-induced perturbation that drove her body into the cart.

4. Based on the testimony of Mr. and Ms. LaRocque, Ms. LaRocque had shopped at the subject Fred Meyer one to two times per week over a period of more than 25 years. Between the 2017 installation of the Purchek system and the subject incident on May 6, 2023, she is conservatively estimated to have entered and exited the subject store on the order of 280 to 560+ occasions. This very substantial exposure history provided ample opportunity for both explicit perception of the door decals and on-cart placards and implicit expectancy formation regarding the operation of the cart-containment system.

5. From a Human Factors perspective, the use of a full-size shopping cart as the primary mobility aid for an individual recovering from a total knee arthroplasty is outside the cart's designed and intended function. Ms. LaRocque had with her a cane, the support of her husband's arm, and access to the store's mobility scooters at the front of the store, all three of which are intended uses for ambulation assistance. Her election to use the cart for that purpose is a user-side factor independent of the warnings or the Purchek system.

6. The criticisms set forth in Mr. Dixon's February 25, 2026, report do not adequately account for:

   a. The multi-modal, redundant nature of the warning system at the subject location (door decals, on-cart placards, perimeter audible/visual alarm);

   b. the gradual and controlled stop produced by the paired-wheel Purchek design;

   c. the role of slow walking in lengthening the available perception–response window;

   d. Ms. LaRocque's substantial prior opportunity to perceive the warnings and form expectancies regarding the system over the 5.5 years between Purchek installation and the subject incident.

EXHIBIT 3 - Page 36 of 59

Page 32 of 33



**Gadir A. Hazime**:

7. The exemplar shopping cart geometry provided sufficient horizontal clearance between a user of similar height to Ms. LaRocque and the rear of the cart basket during normal use to avoid interaction between the knees and the rear of the cart basket.

8. Ms. LaRocque's estimated knee height was closest vertically to the lower portion of the cart basket. At the same time, the lower portion of the back of the basket is also positioned furthest from the user due to the slope of that basket component.

9. During normal forward walking, the foot is generally the leading portion of the lower extremity during swing phase, not the knee. Therefore, knee contact with the back of the cart would require the knee to traverse the entirety of the horizontal clearance between the normal gait pattern and the rear of the cart basket.

10. Published research on unplanned gait termination indicates that, at typical walking cadence, gait can be terminated in a single step within approximately 300 ms, and that strategies for unplanned gait termination are similar across age groups.

11. The gait termination literature also indicates that slower walking speeds provide greater opportunity to stop or arrest gait after an unexpected interruption. Both Mr. and Ms. LaRocque testified that they were walking slowly at the time of the subject incident, which extends, not shortens, the available interval between successive foot strikes for gait termination.

12. During ESi's testing of the exemplar shopping cart, the wheel-lock system produced a controlled stopping response characterized by successive activation of the two wheel locks.

13. In surrogate testing, wheel-lock activation occurred during different phases of gait, including foot contact and subsequent attempted swing. In each condition, the surrogate's gait was either arrested, or the subsequent swing was interrupted before the knee approached the cart basket.

14. Across all seven test runs, the closest knee remained at least 10 inches from the rear of the cart basket, even after wheel-lock activation and continued forward motion.

15. Under the tested conditions, wheel-lock activation did not result in contact between cart basket and the surrogate's knees.

16. Anthropometric and cart-geometry data, supported by ESi surrogate testing on April 29, 2026, indicate that under the cart-handling posture Ms. LaRocque described, straight upright posture, both hands on the cart, arms extended forward, no body weight on the cart, the surrogate's knees and lower extremities did not come into close proximity with the rearward edge of the cart basket during normal, slow, and fast walking speeds, including during brake-lock trials.

The conclusions and opinions formulated during this investigation and presented herein are based on information available to date. ESi reserves the right to supplement or otherwise amend this report should other information become available.

## <<<  End of Report Text  >>>

EXHIBIT 3 - Page 37 of 59

Page 33 of 33

# APPENDIX A

EXHIBIT 3 - Page 38 of 59

| Idx | Name |
|---|---|
| **01 - Organizational** | |
| 01.101 | 118934 New Matter Acceptance -signed |
| 01.102 | T&C,Fee Sheet, and W9 |
| **02 - Work Product** | |
| 02.401 | 118934-V001-20260429-Cart Handle-NSF |
| 02.402 | 118934-V002-20260429-Overview-NSF |
| 02.403 | 118934-V003-20260429-Thresh Hold-NSF |
| 02.404 | 118934-V004-20260429-Low Angle-NSF |
| 02.501 | 118934-P001-20260429-NSF |
| 02.901 | 118934 Investigative Report |
| **04 - Received Data** | |
| 04.001 | Photographs of cart and entrance warnings |
| 04.002 | Photographs of plaintiff's clothing footwear and knee brace |
| **05 - Legal** | |
| 05.001 | 2025.06.26_Pltf's 1st Amended Complaint |
| 05.101 | 2026.03.11_Defs Kroger & Fred Meyer's MSJ (conformed) |
| 05.301 | 2025.08.29 Pltf RROGs & RRFPs to Def Gatekeeper |
| 05.302 | 2025.06.27_Pltf's RRFP and RROGs to Def Kroger and FM |
| 05.501 | 2026.04.02 Plaintiff's 2nd Supp Expert Disclosure |
| **06 - Depositions** | |
| 06.001 | 2025.09.11_Depopsition Transcript_Linda Larocque (full print) |
| 06.002 | 2025.09.11_Depopsition Transcript_Steven Larocque (full print) |
| 06.003 | 2026.03.26_Deposition Transcript_Brenton Wheeler |
| 06.004 | 2026.04.02 Depo Transcript Chad Peterson_full |
| 06.005 | 2026.04.14 Gatekeeper FRCP 30(b)(6) Depo Transcript of Ryan Harter |
| 06.006 | 2026.03.11_STK Decl. ISO Defs Kroger & Fred Meyer's MSJ with exhibits |
| **07 - Medical** | |
| 07.201 | Pltf Medical Record preceding incident with height and weight |
| **09 - Expert** | |
| 09.001 | Plaintiff Expert Docs |

EXHIBIT 3 - Page 39 of 59


| 12 - Literature | |
|---|---|
| 12.001 | Knox_Stern - 2015 - Methods of Accident Recon - |
| 12.002 | Noon - Scientific Method |
| 12.003 | Liptai - Forensic Engineering |
| 12.004 | HF NASA HF 101 |
| 12.005 | FAA Order 9550.8 |
| 12.006 | Williams - Haddon Matrix |
| 12.007 | ANSI Z535.4-2011 |
| 12.008 | Salvendy, G. (2012). Handbook of Human Factors and Ergonomics: Fourth Edition. |
| 12.009 | Frantz, J. et al. (1999). Potential Problems Associated with Overusing Warnings. Proceedings of the Human Factors and Ergonomics Society, 1991, 916–920. |
| 12.010 | Laughery, K. & Wogalter, M. (2006). Designing Effective Warnings. Reviews of Human Factors and Ergonomics, 2(1), 241–271. |
| 12.011 | Wogalter, M. (2006). Purposes and Scope of Warnings. In M. S. Wogalter (Ed.), Handbook of Warnings. Lawrence Erlbaum Associates. |
| 12.012 | Chambers, H.G. & Sutherland, D.H. (2002) A Practical Guide to Gait Analysis, 10(3), 222-231. |
| 12.013 | Bishop, M., Brunt, D., Pathare, N., & Patel, B. (2004). The effect of velocity on the strategies used during gait termination. Gait & Posture, 20(2), 134–139. |
| 12.014 | Jung, S., Yi, J., & Song, C. (2016). Biomechanical alterations of gait termination in middle-aged and elderly women. Journal of Physical Therapy Science, 28(3), 861–867. |
| 12.015 | Wickens, C. D., & Hollands, J. G. (2000). Human Error. In Engineering Psychology and Human Performance (3rd ed., p. 493). Prentice-Hall, Inc. |
| 12.016 | Petersen, D. (1984). Human-error reduction and safety management. |

EXHIBIT 3 - Page 40 of 59

# APPENDIX B

EXHIBIT 3 - Page 41 of 59

# Manuel Meza-Arroyo
## PhD, PE, CHFP
## Director, Senior Managing Consultant



Dr. Meza-Arroyo has extensive experience in the field of industrial and human factors engineering. He specializes in human perception and cognition, and occupational biomechanics. He has significant experience in experimental design, the application of statistical analyses, and the implementation of computational modeling for assessing human performance. He has conducted and participated in multiple disciplinary investigations involving automobile and trucking accidents, nighttime or low-illumination incidents; industrial and occupational injuries; slip/fall/trip/misstep incidents; and the analysis of warnings, procedures and instructions.

Dr. Meza-Arroyo's research has included the study of eye movements and visual attention during driving tasks, visual information processing for collision detection, visual perception under low-illumination conditions, occupant kinematics during low-speed impacts, and the photometric characteristics and human factors implications of different headlamp technologies for the transportation industry.

At ESi, Dr. Meza-Arroyo implements human-subject testing to assess human performance and behavior by employing tools such as motion capture technology, calibrated photography and videography, tri-axial accelerometers, binaural microphones, and custom programming for various applications including statistics, biomechanics, and psychophysics.

Dr. Meza-Arroyo has authored multiple technical reports addressing various topics, including low-illumination accidents, visual perception and conspicuity, auditory warnings and perception, trip/fall/slip/misstep incidents, headlamp and street illumination, and statistical analyses for industrial processes.

### Contact Information

mmarroyo@engsys.com

(734) 794-8109

**ESi Ann Arbor**

1174 Oak Valley Drive
Ann Arbor, MI 48108

### Areas of Specialization

- Perception and Attention
- Human Error Analyses
- Night and Daytime Visibility and Conspicuity
- Biomechanics and Human Motion Analysis
- Human Factors Engineering
- Risk Assessment, Experimental Design & Statistical Data Analysis

## Education

PhD, Industrial Engineering. Texas Tech University. Lubbock, TX, 2015

MS, Industrial Engineering. Texas Tech University. Lubbock, TX, 2009

BS, Industrial & System Engineering. Tecnológico de Monterrey. Mexico, 2007


## Licenses & Certifications

- State of Michigan P.E. License 6201310563

- Professional Industrial & Systems Engineer – SEP Cédula: 5456536, Mexico

- Certified Human Factors Professional (CHFP) by the Board of Certification in Professional Ergonomics (BCPE), Certification No. 1973

## Languages

- English, Spanish, Portuguese.

## Positions Held

**Engineering Systems Inc., Ann Arbor, Michigan**

- Director, 2026 - Present

- Senior Managing Consultant, 2023 – Present

- Senior Consultant, 2022 – 2023

- Senior Staff Consultant, 2020 – 2021

- Staff Consultant, 2016 – 2019

- Research Analyst, 2015 – 2016

**University of Texas, Arlington, Texas**

- Adjunct Professor, Summer 2015

**Texas Tech University, Lubbock, Texas**

- Research-Teaching Assistant and Graduate Instructor, 2007 – 2015

**ALSTOM Power, Morelia, Mich. Mexico**

- Tendering Engineer (Intern), January 2007 – May 2007

**CIETec, Tecnológico de Monterrey, Morelia, Mich. Mexico**

- Researcher- Data collection and analysis, 2005 - 2007

## Continuing Education

- **RP-43, Lighting for People in Outdoor Environments** – Certificate of Attendance, IES, 2021

- **Roadway Lighting – Lighting and Health** – Certificate of Attendance, IES, 2020

- **Traffic Signal Timing Records Interpretation and Analysis** – Certificate of Achievement, Traffic Signal Academy, University of Tennessee. October 2020



- **Show Me the Data: Does LED Lighting Influence Roadway Safety?** – Certificate of Attendance, IES, July 2020

- **Germicidal Ultraviolet Disinfection in the Days of COVID-19** – Certificate of Attendance, IES, May 2020

- **Traffic Crash Reconstruction for the Forensic Engineer** – Certificate of Achievement, Northwestern University, March 1, 2019

- **A New Measure of Color Discrimination** – Certificate of Attendance, IES, November 2018

- **Automotive Lighting: Testing and Requirements Seminar**– Certificate of Achievement, SAE International, April 6, 2017

- **Automotive Lighting: Design and Technology Seminar**– Certificate of Achievement, SAE International, April 4, 2017

- **Vehicular Crash Reconstruction Methods Seminar**– Certificate of Achievement, SAE International, Troy, MI, May 2016

## Professional Affiliations/Honors

### Human Factors & Ergonomics Society (HFES)

- Member

### Illuminating Engineering Society (IES)

- Member

### Society of Automotive Engineers (SAE)

- Member

### Alpha Pi Mu (Industrial Engineering Honor Society)

- Awarded

### Raider Rojos National Alumni Scholarship

- Scholarship recipient, 2014

### American-Mexican Waterman Friendship Scholarship

- Recipient, 2008 – 2015

### Virtual Environment & Forensics Professional Technical Groups

- HFES member

## Peer Reviewer

Journal of Failure Analysis and Prevention, **M. Meza-Arroyo**

SAE Manuscript, **M. Meza-Arroyo**



## Publications

"When a Flashlight Looks Like a Threat: A Multifaceted Human Factors Approach in the Accident Reconstruction of a Police Officer Shooting," **M. Meza-Arroyo**, G.A. Hazime, and K.B. Zakutansky, International Society for Occupational Ergonomics & Safety, XXXVIIth Annual Occupational Ergonomics and Safety Conference, Orlando, FL, July 2025.

"Flip-Flops: A Survey of Risk Perception and Acceptance," D. Fortenbaugh, P. Shibata, **M. Meza-Arroyo**, K. Thobe, and T. Welch, In Proceedings of the Human Factors and Ergonomics Society Annual Meeting, Sage CA: Los Angeles, CA: SAGE Publications, Vol. 66, No. 1, pp. 513 - 517, September 2022.

"Final Report: Phase IV of Compliance Testing for Locomotive LED Headlights and Auxiliary Lights," **M. Meza-Arroyo**, P.A. Shibata, J.K. Sprague, and S. Woods, U.S. Department of Transportation, Federal Railroad Administration, Office of Railroad Policy and Development Office of Research and Development, Washington, DC, 20590, 2021.

"Final Report: Phase III of Compliance Testing for Locomotive LED Headlights and Auxiliary Lights," **M. Meza-Arroyo**, P.A. Shibata, and J.K. Sprague, U.S. Department of Transportation, Federal Railroad Administration, Office of Railroad Policy and Development Office of Research and Development, Washington, DC, 20590, 2021.

"Final Report: Phase II of Compliance Testing for Locomotive LED Headlights and Auxiliary Lights," **M. Meza-Arroyo**, P.A. Shibata, J.K. Sprague, and S. Capser, U.S. Department of Transportation, Federal Railroad Administration, Office of Railroad Policy and Development Office of Research and Development, Washington, DC, 20590, 2019.

"Final Report: Phase I of Compliance Testing for Locomotive LED Headlights and Auxiliary Lights," **M. Meza-Arroyo**, P.A. Shibata, and S. Woods, U.S. Department of Transportation, Federal Railroad Administration, Office of Railroad Policy and Development Office of Research and Development, Washington, DC, 20590, 2018.

"Continuous Response Monitoring of Relative Time-to-Conduct Judgments: Does Effective Information Change During an Approach Event?" P.R. DeLucia, **M. Meza-Arroyo**, R. Baurés, M. Ranjit, S. Hsiang, and J.C. Gorman, Ecological Psychology, Vol. 28, No. 1, pp. 1–22, 2016. http://doi.org/10.1080/10407413.2016.1121735

"Analysis of Eye Movements and Collision Judgments in Younger and Older Observers for the Development of a Reinforcement Learning," **M. Meza-Arroyo**, Ph.D. Dissertation, Texas Tech University, Lubbock, TX 2015.

"Comparing Visual Performance & Useful Field of View of Older and Younger Drivers," **M. Meza-Arroyo**, P. Patterson, and H. Nakayasu, Rocky Mountain Bioengineering Symposium, 46th International ISA Biomedical Sciences Instrumentation Symposium, Milwaukee, WI, ISA Vol. 476, pp. 83–85, April 2009.

"Analysis of Visual Attention and Useful Field of View among Experienced, Inexperienced and Older Drivers," **M. Meza-Arroyo**, P. Patterson, and H. Nakayasu, Instrument Society of America, Biomedical Sciences Instrumentation, Vol. 45, pp. 83 - 88, February 2009.



## Presentations

"Enhancing Contrast-Sensitivity Charts for Validating Visual Representations of Low-Illumination Scenes," J.K. Sprague, **M. Meza-Arroyo**, P.A. Shibata, and J. L. Auflick, SAE 2019 World Congress & Exhibition, 2019.

"The Kinematic Analysis of Occupant Excursions and Accelerations During Staged Low Speed Far-Side Lateral Vehicle-to-Vehicle Impacts," P.A. Shibata, J.M. Roberts, J.K. Sprague, A.E. Light, J.A. Stegemann, **M. Meza-Arroyo**, and S. Casper, SAE 2019 World Congress & Exhibition, 2019.

"Head Acceleration Measurements During Vehicle Driving Tasks and Lateral Impacts Relative to Head Accelerations During Activities of Daily Living," P.A. Shibata, A.C. Mathias, A.E. Light, **M. Meza-Arroyo**, J.K. Sprague, and A. Rath Stern, Rocky Mountain Bioengineering Symposium, 2019.

"Comparative Lumbar Spine Acceleration Data During Activities of Daily Living, Tasks of Daily Driving and Low Speed Lateral Vehicle Impacts," P.A. Shibata, A.C. Mathias, A.E. Light, **M. Meza-Arroyo**, J.K. Sprague, and A. Rath Stern, Rocky Mountain Bioengineering Symposium, 2019.

"What's After College?" **M. Meza-Arroyo**, Guest Lecturer, Tecnológico de Monterrey, IE Senior Project Course Morelia, Mich. México, 2014.

"Visual Attention Differences between Younger and Older Drivers," **M. Meza-Arroyo**, Department of Environmental and Occupational Health at Texas A&A HSC, Seminar, College Station, TX, 2013.

"The effect of music genres on oxygen uptake during a cycling exercise," Y.J. Chun and **M. Meza-Arroyo**, Proceedings of 2011 Texas Regional Human Factors & Ergonomics Conference, 2011.

"Useful Field of View of Aging Drivers as a Design Tool for In-Vehicle Visual Aids," **M. Meza-Arroyo**, P. Patterson, and H. Nakayasu, HFES 53rd Annual Meeting, San Antonio, TX, October 2009.

"Analysis of Visual Attention and Useful Field of View among Experienced, Inexperienced and Older Drivers," **M. Meza-Arroyo**, P. Patterson, and H. Nakayasu, Paper presented at the 17th World Congress on Ergonomics, IEA 2009, Beijing, China, August 2009.

"Comparing Visual Performance & Useful Field of View of Older and Younger Drivers," **M. Meza-Arroyo**, M.Sc. Thesis, Texas Tech University, Lubbock, TX, 2009.

"Relationship between Visual Attention and the Surrounding Environment During Driving Tasks: A Cognitive Experiment," **M. Meza-Arroyo**, INFORMS Southwest Regional Conference, Texas A&M University, College Station, TX, April 2008.

EXHIBIT 3 - Page 46 of 59

# APPENDIX C

EXHIBIT 3 - Page 47 of 59

# Gadir Hazime
## Senior Staff Consultant



Ms. Gadir Hazime is a degreed Mechanical Engineer, Bioengineer and Industrial Engineer specializing in human factors. Ms. Hazime is a Senior Staff Consultant for Engineering Systems Inc. (ESi) and works closely with the human factors, biomechanics, consumer product, automotive, and safety industries. She has experience in visibility, conspicuity, injury analyses, human motion analyses, product testing, failure analysis, and accident reconstruction. Her professional experience also includes scene, vehicle, equipment, and building inspections, data acquisition, and testing.

## Education

MSE, Industrial & Systems Engineering in Human Factors. University of Michigan.

BSE, Mechanical Engineering. University of Michigan.

BSE, Bioengineering. University of Michigan.

## Languages

- English, Arabic.

## Positions Held

**Engineering Systems Inc., Ann Arbor, Michigan**

- Senior Staff Consultant, 2025 – Present
- Staff Consultant, 2022 – 2024
- Engineering Intern, 2021 – 2022

**Michigan Sports Medicine, Dearborn Heights, Michigan**

- Research and Medical Associate, 2018 – 2021

## Continuing Education

- **Traffic Crash Reconstruction for Engineers** – Northwestern University Center for Public Safety, 2024
- **Bosch CDR Tool Technician** – Certification of Training, IPTM, University of North Florida, 2023

### Contact Information

gahazime@engsys.com

(734) 274-8321

**ESi Ann Arbor**

1174 Oak Valley Drive
Ann Arbor, MI 48108

**Areas of Specialization**

- Human Factors
- Visibility and Conspicuity
- Accident Investigation and Reconstruction
- Industrial and Occupational Injury Investigation
- Consumer Products
- Safety
- Biomechanical Analysis
- Data Acquisition



- **Mycometer Surface Fungi Sampling & Analysis** – Proficiency Certification Award, 2022

- **FARO Focus 3D Operator** – Certificate of Training, Aurora, IL, 2022

- **Sensation and Perception**

- **Human Factors and Ergonomics**

- **Production & Operation Engineering**

- **Vehicle Ergonomics**

- **Human- Computer Interaction**

- **Advanced Biomechanics**

- **Anatomy & Physiology**

- **Engineering Dynamics**

## Professional Affiliations/Honors

**Society of Automotive Engineers (SAE)**

- Member

**Pi Tau Sigma, Engineering Honor Society**

- Member

## Project Experience

Daytime and Nighttime Visibility Studies

- Evaluation of visibility and conspicuity under varying lighting conditions, including headlamp, ambient, and glare effects on perception.

Auditory Cue Evaluation

- Assessment of warning signals and auditory information in accident reconstruction and safety contexts.

Acceleration and Vibration Analyses

- Testing and data acquisition on accelerations and vibrations affecting human occupants in transportation and consumer product contexts.

Wheelchair Accident Investigations

- Biomechanical and human factors analyses of wheelchair-related incidents, including stability, user motion, and environmental interaction.



Slips, Trips, and Falls

- Analysis of pedestrian kinematics, gait variability, and environmental factors to assess fall mechanisms and potential biomechanical injury mechanisms.

Warnings and Safety Information

- Review and analysis of product labeling, warnings, and instructions for usability and compliance with human factors principles.

Surrogate Testing

- Design and execution of surrogate human testing protocols to replicate real-world movements and responses for accident reconstruction and product safety analysis.

## Publications

"Elevator Passenger Accelerations During Emergency Stops, Normal Elevator Travel, and Everyday Activities," A.C. Mathias, **G.A. Hazime**, H. Chan, J.M. Roberts, M.E. Kelley, Biomedical Sciences Instrumentation, 62nd Annual Rocky Mountain Bioengineering Symposium, St. George, UT. Biomedical Sciences Instrumentation Journal, Vol. 61, No. 1, April 2025.

"When a Flashlight Looks Like a Threat: A Multifaceted Human Factors Approach in the Accident Reconstruction of a Police Officer Shooting," M. Meza-Arroyo, **G.A. Hazime**, and, K.B. Zakutansky, International Society for Occupational Ergonomics & Safety, XXXVIIth Annual Occupational Ergonomics and Safety Conference, Orlando, FL. July, 2025

## Presentations

"Elevator Passenger Accelerations During Emergency Stops, Normal Elevator Travel, and Everyday Activities," Presenter, **G.A. Hazime**, 62nd Annual Rocky Mountain Bioengineering Symposium, St. George, UT. April 10-12, 2025

"When a Flashlight Looks Like a Threat: A Multifaceted Human Factors Approach in the Accident Reconstruction of a Police Officer Shooting," Presenter, **G.A. Hazime**, XXXVIIth Annual Occupational Ergonomics and Safety Conference, Orlando, FL. July 24-25, 2025

# APPENDIX D

EXHIBIT 3 - Page 51 of 59



Ann Arbor, MI 48108

## MANUEL MEZA-ARROYO, PH.D., P.E., CHFP
## SENIOR CONSULTANT
mmarroyo@engsys.com

| MATTER | STATE | |
|---|---|---|

**2026**

| | | |
|---|---|---|
| **Jaclyn Renee Berhow, et al v. Henderson Products, Inc.**<br>LACV030136<br>District Court in and for Hamilton County | IA | (Deposition) |
| **Jesse Bugarin vs PepsiCo Beverage Sales, LLC., et al**<br>2024CI21327<br>District Court of Bexar County | TX | (Deposition) |
| **Robert Binder v. Divco Construction Corp.,**<br>2024-CA-000091-0001-01<br>County Court of the Twentieth Judicial Circuit in and for Collier County | FL | (Trial) |
| **Brian M. Douglas v. Wendell Duprey**<br>24EV002431<br>State Court of Fulton County | GA | (Deposition) |
| **Pennie Livingston v. Palmetto Goodwill & Chancel Construction, Inc.,**<br>2023-CP-26-03906<br>Circuit Court of the 15th Judicial District | SC | (Deposition) |
| **Robert Binder v. Divco Construction Corp. and Pipestone Painting, LLC**<br>11-2024-CA-000091-0001-01<br>County Court, in and for Collier County, Florida | FL | (Deposition) |

**2025**

| | | |
|---|---|---|
| **Jason Flores v. Accurpress, Accurpress America, et al.**<br>2:24-CV-81<br>District Court for Eastern District of TX<br>Marshall Division | TX | (Deposition) |
| **Elmer Bailey v. Southwest Airlines Company, et al.**<br>22-001407<br>Circuit Court of the 17th Judicial District | FL | (Deposition) |


**Fidencio Carreon Castro v. FlexSteel Pipeline Technologies, et al.**     TX     (Deposition)
    202459400
    District Court of Harris County, TX
    281 Judicial District

**Joseph Gillenwater v. Rachelle Moyer and Cintas Corporation No. 2**     IN     (Deposition)
    49D03-2309-CT-036169
    Marion County Superior Court

**Preston, et al. v. Waste Connections of Texas, LLC, et al.**     TX     (Deposition)
    471-04499-2023
    District Court, 471st Judicial District, Collin County, TX

**Larry Albright v. West Bend Mutual Insurance Company, et al.**     WI     (Deposition)
    23CV634
    State of Wisconsin, Circuit Court, Eau Claire County

**Mark Coleman v. Benderson Development Company, LLC, et al.**     FL     (Arbitration)
    24-CA-001194
    Circuit Court of the Twentieth Judicial Circuit in and
    For Lee County, Florida

**Rosanne Berman Executrix of the Estate of Martin Berman v. Essential Medical Supply, Inc., et al.**     CT     (Deposition)
    HHD CV 23 6172771-S
    Superior Court, J.D., of Hartford at Hartford

**Juan Carlos Aguilar Salazar v. Oahu Transit Services, Inc., a Hawaii nonprofit corporation, dba The Bus, et al.**     HI     (Deposition)
    1CC191000715
    In the Circuit Court of the First Circuit,
    State of Hawaii

**Capuchino, et al. and Chapman, et al. v. Edwards, Jr., v. Brown, Jr., et al.**     TX     (Deposition)
    2021-21971 (consolidated with 2021-27727)
    In the District Court, 215th Judicial District,
    Harris County, Texas

**Rebmann v. Astec, et al.**     NY     (Deposition)
    1:21-CV-00879-JLS
    In the United States District Court Western District
    of New York

**Joanna Lookingland and Michael Lookingland v. Landfill Drilling & Piping, Inc., a foreign corporation; and Scott D. Mazur**     IL     (Deposition)
    3:22-cv-50050
    United States District Court, Northern District of
    Illinois, Western Division


**Darren Findling, as Personal Representative of the Estate of Bahman Ashrafi, deceased v. Theodore Lawrence Thiry and Dawn, Incorporated d/b/a Dawn Farm, jointly and severally**     MI     (Deposition)
    23-001305-NI
    Circuit Court for the County of Washtenaw, State of Michigan

**Destry Ritch v. CSX Transportation, Inc.**     NY     (Deposition)
    1:22-cv-0863-BKS-CFH
    Northern District of New York

**Jessie Lee Shifflett v. Stephane Routhier and Couture Expressway**     VA     (Deposition)
    5:23-cv-00046-EKD
    In the United States District Court for the
    Western District of Virginia Harrisonburg Division

**Lloyd Tyler Fairbanks, v. CSX Transportation, Inc., a corporation**     AL     (Deposition)
    01-CV-903213
    In the Circuit Court of Jefferson County, Alabama

**Barbara Branes, as Independent Administrator of the Estate of John Bradley Barnes, Deceased, v. Greenwood Motor Lines, Inc. a Foreign Corporation d/b/a R+L Carriers and Michael Christopher Hegger**     IL     (Deposition)
    3:21-cv-03257-SEM-TSH
    In the United States District Court
    Central District of Illinois

**Katherine C. Early, Jubal Early, and E2 Mechanical and Industrial Refrigeration, LLC v. Quick-Deck, Inc., United Rentals (North America), Inc., individually and as successor-in-interest to PAC-Van, Inc., and Craig Katona**     NC     (Deposition)
    22-CVS-17066
    In the General Court of Justice Superior Court Division
    County of Mecklenburg, State of North Carolina

**Vale Payton v. Warren Henry Automobiles, Inc.**     FL     (Deposition)
    22-001606-CA-01
    In the Circuit Court of the 11th Judicial Circuit in
    And for Miami-Dade County, Florida

**L.P., a minor, by and through her natural mother and Next Friend, Eileen Williams, Elizabeth Perkins, Individually and as the natural mother of Nicholas Perkins, deceased, Summer Tailor, individually and as Next Friend of her natural son, D.T., a minor v. Wabash National Corporation**     MO     (Trial)
    2022-CC00495
    In the Circuit Court of the City of St. Louis 22nd Judicial Circuit
    State of Missouri



**Zachary Martin v. Polaris Inc.; Polaris Industries Inc.;**
**Polaris Sales Inc.**
    3:22-cv-00322
    In the United States District Court for the
    Eastern District of Tennessee Northern District
        TN    (Trial)

**Jeff Greening v. Johnathan Green and Door Dash, Inc.**
    2021CI18178
    285th Judicial District, Bexar County, Texas
        TX    (Deposition)

**Zachary Martin v. Polaris Inc.; Polaris Industries Inc.;**
**Polaris Sales Inc.**
    3:22-cv-00322
    In the United States District Court for the
    Eastern District of Tennessee Northern District
        TN    (Deposition)

**Jeramy Beau Keplinger v. Michael Duane Odom, Jr., et al.**
    25-CV-2022-900156.00
    In the Circuit Court of Cullman County, Alabama
        AL    (Deposition)

**Matthew McQuillen and Elizabeth McQuillen, as Limited**
**Co-Guardians and Co-Conservators of**
**Margaret G. McQuillen, and Individually v.**
**West Side Transport, Inc. and Clifford Charles Takes**
    LACV099133
    In the Iowa District Court for Linn County
        IO    (Trial)

**Jeffrey Brungart v. Zakaria Awwad, individually,**
**LMZ Transportation, Inc., an Illinois Corporation,**
**I & L Transportation, Inc., an Illinois corporation**
    2021 L 7653
    In the Circuit Court of Cook County, Illinois
    County Department, Law Division
        IL    (Trial)

**Lianne Onishi, Individually and as Co-Next Friend for**
**Minor Children M.O. and R.O.; Jason Onishi,**
**Individually and as Co-Next Friend for Minor Children**
**M.O. and R.O. v. Westpac International Inc.;**
**Glenn Langaman; Costco Wholesale Corporation;**
**and Doe Defendants 1-10.**
    1CCV-22-0001638
    In the Circuit Court of the First Circuit
    In the State of Hawaii
        HI    (Deposition)

**Jeffrey Brungart v. Zakaria Awwad, et al.**
    2021 L 7653
    In the Circuit Court of Cook County,
    Illinois County Department, Law
    Division
        IL    (Deposition)



**Matthew McQuillen and Elizabeth McQuillen, as**          IO          (Deposition)
**Limited Co-Guardians and Co-Conservators**
**Of Margaret G. McQuillen, and Individually v.**
**West Side Transport, Inc., and Clifford Charles Takes**
    LACV099133
    In the Iowa District Court for Linn County

**Michael Powasnick v. Beitzel Corp.,**          NJ          (Deposition)
**H&H Millwright Services Inc.,**
**Phoenix Pinelands Corp.,**
**Precision Pully & Idler,**
**Carter's International Material**
**Handling Equipment, Metso Outotec f/k/a Metso**
**Minerals, Weir Minerals a/k/a**
**Weir Minerals North America,**
**John Doe 1-10 (fictitious defendants),**
**ABC Partnerships 1-10, ABC LLCs 1-10**
**And ABC Corp. 1-10 (fictitious corporate defendants)**
    20-cv-12775
    United States District Court
    District of New Jersey
    Trenton Vicinage

**Ronald Geraci v. Harbor Freight Tools USA, Inc.**          KS          (Deposition)
    2:23-cv-2006-EFM-GEB
    United States District Court
    for the District of Kansas

**Terri Speegle, et. al. v. Arrowhead Environmental Partners, LLC, et.al.**          AL          (Deposition)
    CV-22-000002
    Perry County Circuit Court

**State of South Dakota v. Kevin Rudloff**          SD          (Trial)
    33CRI23-00016
    First Judicial Circuit Court, County of Hutchinson

**Sylvia Villalobos v. Wellcome Lodge, LLC, et. al.**          WA          (Deposition)
    No. 21-2-02207-06
    Superior Court for the State of Washington, Clark County

**Laryssa Larson v. City of Trenton, et. al.**          MI          (Deposition)
    No. 22-003315-NI
    Circuit Court for Wayne County, State of Michigan

**2023**

**Thomas Goggin, et. al. v. Blythe Construction, Inc., et. al.**          SC          (Deposition)
    No. 7:21-CV-03157-DCC and 7:21-CV-03158-DCC
    United States District Court
    for the District of South Carolina Spartanburg Division

**Nancy Rogers v. Springboard Ventures, LLC**          MO          (Deposition)
    No. 2031-CC01509
    Circuit Court for the County of Greene, Missouri



**L.P., a Minor, et. al. v. Wabash National Corporation, et. al.**      MO    (Deposition)
    No. 2022-CC00495
    Circuit Court for the City of St. Louis, State of Missouri

**L.P., a Minor, et. al. v. Wabash National Corporation, et. al.**      MO    (Deposition)
    No. 2022-CC00495
    Circuit Court for the City of St. Louis, State of Missouri

**Brooke Alcantar v. John Retzlaff and David Retzlaff**      IL    (Arbitration)
    No. 2021 L 000785
    Circuit Court for Will County, State of Illinois

**Jeffrey LeFevre v. Petra Construction Corporation, et. al.**      CT    (Deposition)
    No. NNH-CV20-6104985-S
    Superior Court Judicial District of New Haven
    **Volume II**

**Jeffrey LeFevre v. Petra Construction Corporation, et. al.**      CT    (Deposition)
    No. NNH-CV20-6104985-S
    Superior Court Judicial District of New Haven
    **Volume I**

**Brooke Alcantar v. John Retzlaff and David Retzlaff**      IL    (Deposition)
    No. 2021 L 000785
    Circuit Court for Will County, State of Illinois

**Barbara Monson v. City of Danville**      IL    (Deposition)
    No. 13 L 71
    Circuit Court for Vermilion County, State of Illinois

**Floricelda Rodas, by her Guardian, Owen Mazariegos (Plaintiff) and Hilda Mendez and Luis Mendez (Intervening Plaintiffs) v Nathan Secor Frame and West Michigan Dirtworks, LLC**      MI    (Trial)
    No. 19-02412-NI
    In the Circuit Court
    for the County of Kent, State of Michigan

**Jami Geissler, Individually, As Surviving Spouse and Representative of the Estate of Brian Geissler, et. Al. v. BZ Lawn Care, LLC d/b/a BZ Lawn Care & Irrigation, et. al.**      TX    (Trial)
    No. 19-1960-362
    362nd District Court, County of Denton, State of Texas

**Alexa Peltier and David Paul Spehar v. Suburban Mobility Authority For Regional Transportation, a regional transportation authority, and Vernon Colists Williams, an individual**      MI    (Deposition)
    No. 20-006503-NI
    Circuit Court for Wayne County, State of Michigan

# APPENDIX E



## GADIR HAZIME
## SENIOR STAFF CONSULTANT
**gahazime@engsys.com**

| MATTER | STATE |
|---|---|

**2026**

**Sarah Kutz v. Oscar de la Torre and KS Energy Services, LLC**        IL      (Deposition)
2025L002218
Circuit Court of Cook County