EXHIBIT 1

# LaRocque

*vs*

# The Kroger Co., et al.

---

# DEPOSITION OF

# 30(B)(6) GATEKEEPER SYSTEMS, INC. - RYAN HARTER

## April 14, 2026

---



16212 Bothell Everett Hwy | Suite F328
Mill Creek, WA 98012
Phone: 206-940-9200
carriereportingllc@outlook.com

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT TACOMA

---

| | |
|---|---|
| LINDA LAROCQUE, | ) |
| | ) |
| Plaintiff, | ) |
| vs. | ) |
| | ) |
| THE KROGER CO., a foreign | )    Case No. |
| corporation doing business in | )    2:25-cv-05380 |
| Washington state; and, FRED | ) |
| MEYER STORES, INC., a foreign | ) |
| corporation doing business in | ) |
| Washington state, a/k/a | ) |
| TACOMA-STEVENS FRED MEYER, | ) |
| GATEKEEPER SYSTEMS, INC., a | ) |
| foreign corporation doing | ) |
| business in Washington state, | ) |
| | ) |
| Defendants. | |

---

REMOTE VIDEOTAPED 30(B)(6) DEPOSITION UPON ORAL

EXAMINATION OF GATEKEEPER SYSTEMS, INC. DESIGNEE

RYAN HARTER

---

1:00 p.m.
April 14, 2026
Remote via Zoom

CARRIE L. PUMNEA, RPR, CCR #2130
CARRIE REPORTING, LLC
16212 Bothell-Everett Highway, Suite F-328
Mill Creek, Washington  98012
206.940.9200
carriereportingllc@outlook.com

30(b)(6) Gatekeeper Systems, Inc. - Ryan Harter - April 14, 2026

Page 2

A P P E A R A N C E S

FOR THE PLAINTIFF:

    ROBERT C. WILKE
    Gordon Thomas Honeywell LLP
    1201 Pacific Avenue, Suite 2200
    Tacoma, Washington  98402
    253.620.6500
    rwilke@gth-law.com

FOR DEFENDANTS THE KROGER COMPANY and FRED MEYER STORES:

    HANNA LUKES
    Chock Barhoum LLP
    121 Southwest Morrison Street, Suite 500
    Portland, Oregon  97204
    503.223.3000
    hanna.lukes@chockbarhoum.com

FOR DEFENDANTS GATEKEEPER SYSTEMS, INC.:

    SKYLER P. URBAN
    Floyd, Pflueger, Kearns, Nedderman & Gress, P.S.
    3101 Western Avenue, Suite 400
    Seattle, Washington  98121
    206.441.4455
    surban@nwtrialattorneys.com

ALSO PRESENT:

    Andrew Mac Tavish, Videographer

30(b)(6) Gatekeeper Systems, Inc. - Ryan Harter - April 14, 2026

Page 8

reporter can't capture nonverbal responses like "mm-hmm."  They will try.  They will put "mm-hmm" in the transcript, but it's also --

A.  Yeah.

Q.  -- unclear.

So if I say, "Is that a yes or a no," again, I'm not trying to be rude.  It does sound rude, but I'm not trying to be.

What is your role at Gatekeeper?

A.  So I'm the senior director of systems support.

Q.  Can you explain to the jury what that means?

A.  So it's a -- more commonly known as technical services, I guess you'd say, and more industry standard.  So I oversee design, monitoring, and technical support for the field installation teams.

Q.  Are you limited to a geographic area of the states, or is it nationwide for you?

A.  I'm global.

Q.  You're global?  Not even just -- not even just North America.

What other countries is Gatekeeper located in or operates in?  What continents?

A.  Canada -- Canada, Europe, UK, Australia.  And then we have third parties in Latin America, South America.

Q. Okay. Can you briefly describe your educational background?

A. Yeah. My background is mostly construction management. I started off in housing market building houses, and then I worked for the federal government, for HUD, for a while as a field services manager managing their properties. Then after the crash of '08, came over to Gatekeeper, and I've been at Gatekeeper for about 12 and a half years. Started off as a field manager, national field manager, and I worked my way through service installs, and now I'm a technical service director.

Q. Cool. Where did you go to high school?

A. Paloma Valley High School in Menifee, California.

Q. Okay. And I think you said before we went on the record you're in California right now.

A. Correct.

Q. Okay. Where is Gatekeeper's headquarters in the states?

A. Foothill Ranch, California.

Q. Where is Foothill Ranch?

A. South Orange County.

Q. Ah. So you fly in and out of John Wayne?

A. John Wayne or Ontario.

30(b)(6) Gatekeeper Systems, Inc. - Ryan Harter - April 14, 2026

Page 23

MR. URBAN:  Objection.  Beyond the scope.

Answer if you can, Ryan.

A.  Yeah, it's factual.

Q.  Are you familiar with the language of warning signs at the Tacoma-Stevens Fred Meyer store that are related to the Purchek system?

A.  Yes, I am.

Q.  Okay.  And I'm asking about the language, not the physical signs themselves.

Who drafted the language in those warning signs?

A.  I do not know that answer as far as --

(Crosstalk.)

Q.  Did Gate- --

A.  Sorry.

Q.  No, no, no.  I cut you off.  Go ahead.

A.  I was going to say, I do not know the answer as far as who the individual is who drafted those.

Q.  That's a good point.

I don't mean the individual.  Do you know if it was Fred Meyer, or was it Gatekeeper that drafted it?

A.  Gatekeeper.

Q.  Okay.  And so there's two sets of signs at the Tacoma-Stevens store.  There's the ones on the shopping

30(b)(6) Gatekeeper Systems, Inc. - Ryan Harter - April 14, 2026

Page 24

cart, and there's the adhesives on the doors.

Did Gatekeeper manufacture both of those signs?

A.  Yes, we did.

Q.  When a store purchases a Gatekeeper product like Purchek, does it have a choice of what the signs say, or does Gatekeeper simply provide those signs?

A.  Gatekeeper provides the signs.

Q.  And, to your knowledge, has the language changed at all, let's say, in the last ten years?

A.  Not to my knowledge.

Q.  Do you have any knowledge of them changing at all from when you started working at Gatekeeper to the present?

A.  No.  Maybe just the addition of different languages.

Q.  Yeah, I'm curious about that.  Do you have any knowledge of what the different language or the language changes were?

A.  It depends on the regions.  We are global.  So we cover all the languages that are dominant within the regions.

Q.  Oh, you're talking about the language --

A.  Yeah, yeah.

(Crosstalk.)

is going to be our exterior perimeter system, and its sole purpose is to lock any carts at the perimeter line, at the property line, which is designated by the customer to prevent that cart or that asset from leaving the property.

Then the indoor systems are --

(Crosstalk.)

Q. Cart --

A. I'm sorry. Go ahead.

Q. No, no. That's called the cart containment system?

A. Yes.

Q. Gotcha. Okay. And the other one?

A. The other one is called Purchek, and that's going to be our interior system, and it's designed to prevent pushout theft.

So if a cart does not go through a transaction point, point of sale, it will lock up at the door.

Q. Got it. And I know that there -- it looks like there's some add-on services that a Gatekeeper client can purchase.

There's a video monitoring service that Gatekeeper offers with Purchek; correct?

A. Correct.

Q. What is that called?

30(b)(6) Gatekeeper Systems, Inc. - Ryan Harter - April 14, 2026

Page 27

A.  Video Classification.  Or theft intelligence we call it too.  So it's a -- we install a camera that only records an event that takes place.  So it's a 20-second video showing the approach, the actual lock event, and then their response.  And then that video is classified as theft, put together as a case, and then provided to the customer.

Q.  Oh.  So you're collecting statistics on cart lockups?

A.  Not --

MR. URBAN:  Hold on, Ryan.

Objection.  It seems like this is out of the scope of the identified topics.  We're talking about a different system.

Ryan, go ahead and answer with what you can.

A.  Yeah.  We're not quite in the analytics or data.  We're actually just recording the physical lock event so we can videotape and classify that theft attempt and flag it to the customer.

Q.  So tell me what classification is if it's not an analytic.

A.  It's classifying what that -- what that event is, whether it's an empty cart, a pushout, suspicious. It 's not -- it's hard to classify them all.  Some we will mark as suspicious and leave it to the AP team and

30(b)(6) Gatekeeper Systems, Inc. - Ryan Harter - April 14, 2026

Page 32

empty-cart activations are.

A.   Really not something I can give you.  It's going to be very, very general.

Q.   That's okay.  Just the best --

(Crosstalk.)

Q.   -- you can answer.

A.   But it's a very, very small percentage.  I would say empty carts...  And, again, it's based on store as well, because store operations, some store operations generate a lot of empty carts by how they move them around, because an empty cart typically will lock because it's not going through a pay point.

Q.   Right.  And Gatekeeper has the technology not to activate the Purchek locking system if it's an empty cart; correct?

A.   We do have that technology, yeah.

Q.   Okay.  And so tell me how -- is there a name for that technology?  Is it called, like, empty cart something?

A.   It's called SmartExit.

Q.   So tell me how SmartExit works.

A.   It's an overhead sensor that looks down at the cart as it passes through.  It can do a visual recognition based off certain machine learning and recognize if the cart is full or empty.  If the cart is

30(b)(6) Gatekeeper Systems, Inc. - Ryan Harter - April 14, 2026

Page 33

empty, it changes the status of a lock loop into what we called surveillance.  It will physically lock that cart.

Q.  And you said -- a moment ago you said, "Well, empty carts a lot of times will activate the system because they didn't go through the register."

Can you explain what you mean?

A.  So, by design of the system, it's to detect if a cart went through a purchase or not.  So if you have a cart that carries a path that doesn't take it through a point of sale or a place where a purchase can take place, it will lock, by design, at the door, because it's ultimately alerting a pushout event.

Q.  What are some circumstances in which a shopper might have an empty cart and is not stealing and tries to exit the store?

A.  Then that cart will lock, because it can't determine.

Q.  Sorry.  Go ahead.

A.  That's it.

Q.  Okay.  All right.  I didn't want to interrupt you again.

No, my question is little bit different, and I probably phrased it not great.

What are the circumstances in which a customer

experience working at Gatekeeper?

A. Yes.

Q. Do you know if any Kroger store has purchased the SmartExit system?

A. There's a couple in trial, but none have been actively on purchase and put in production.

Q. What does that mean? What do you mean, "in trial"?

A. Kind of a proof of concept, a POC, with the customer.

Q. Does Gatekeeper have any SmartExit systems installed for any client that isn't a test or trial?

A. Yes, we do.

Q. Okay. But Kroger has only done a trial use of the SmartExit system; is that correct?

A. Correct.

Q. Okay. Do you know what state Kroger is trying the SmartExit?

A. Not without research.

Q. Okay. Do you know -- and just to the best of your ability, do you know if any of them are in Washington state?

A. Not to my knowledge. I don't believe any are under the Fred Meyer banner.

Q. Okay. Is SmartExit, that product, is it

Page 39

shopping carts from all the major manufacturer brands that are out there.  And for Kroger, we can cover 100 percent of their carts.

Q.   Got it.  Okay.  And then who -- was Gatekeeper involved in the actual placement of warning signs on the doors to the Tacoma-Stevens Fred Meyer?

A.   We ask for them to put in the line of sight, but it's -- typically the placement is dictated by the store manager on duty who signs off on the paperwork.

Q.   Got it.

(Crosstalk.)

Q.   Got it.

A.   He will reserve that --

Q.   So Gate-

(Crosstalk.)

Q.   So is it fair to say that Gatekeeper recommends putting the signs on the door somewhere where customers will see them, but it's up to Fred Meyer to actually place them?

A.   Yes.  Well, we place them, but we use their -- off their guidance.  So we'll ask them where they want them, because we want to make sure it's going to -- we'll lance them where it's not going to be removed or replaced by something else.  So we ask for their guidance on placement where they want it.  So it's more

likely to be kept in that place.

Q. Got it. Okay. So do you know whether at this particular store, the Tacoma-Stevens Fred Meyer store, whether a Gatekeeper employee physically placed the warning signs on the door/doors?

A. Most likely, but I can't speak a hundred percent because I wasn't there.

Q. Okay.

A. And it doesn't specifically say that in the paperwork.

Q. In the work order?

A. Yeah.

Q. I saw it identifies -- like they call them clings?

A. Yeah. It identified that he installed the clings and then also the wall signs.

Q. When you say "he," are you referring to Tim?

A. Yes, I am.

Q. Okay. So does that -- is it your understanding that the work order confirms that Tim installed them or just that they were delivered? Do you know?

A. My interpretation is he installed them.

Q. Have you seen some of the photos of the placement of the warning signs at the Tacoma-Stevens

30(b)(6) Gatekeeper Systems, Inc. - Ryan Harter - April 14, 2026

Page 44

A.   It does from this angle.  But again, like I was saying before, this is from the vestibule looking into the store.  So the point of the stickers is so you can see it as you're exiting if you're approaching that lock loop.

Q.   Got it.  So the point of this warning sticker isn't to notify people coming into the store; it's as they're coming out?

MR. URBAN:  Object to form.

A.   The point is both.  That's why it's double-sided.  But the primary focus is going to be anybody approaching that lock loop.

Q.   When you say "lock loop," you mean exiting the store?

A.   Yeah.  The point of where that cart will lock.

Q.   Okay.  Okay.  We were talking about the signs on the door.

What about the signs on the cart, on the carts, does Gatekeeper -- did Gatekeeper install those?

A.   Yes.  Per the paperwork, West Coast Carts installed them.

Q.   Okay.  As part of your agreement with Kroger, what kind of maintenance is Gatekeeper supposed to -- is required to perform related to the Purchek system?

A.   We have no maintenance agreements with Kroger.

Page 45

It's a break-fix only.

Q.   Okay.   Break-fix of what?

A.   Anything.   So break-fix meaning if something needs service, Kroger would reach out to us, and then we would schedule a service.

Q.   Would a work order be generated if that occurred?

A.   Yes.   Kroger or Fred Meyer would generate a work order to us, then we would quote, schedule, and commence the service based off of that.

Q.   How many times did Gatekeeper service anything on a break-fix at the Tacoma-Stevens Fred Meyer location?

A.   From the records I saw, I didn't see any service records.

Q.   If Fred Meyer wanted -- well, let me ask you this:  Fred Meyer testified at its 30(b)(6) and one of its store managers testified that carts are sometimes damaged in its parking lot.

Is that something that you've seen happen before with clients?

MR. URBAN:  Object to form to the extent it misstates prior testimony.

Go ahead, Ryan.

A.   I was actually going to ask you to rephrase

that one too.

Q.  Are carts ever damaged in grocery store parking lots?

A.  Oh, yeah.  They are.

Q.  Okay.  And let's say one of the -- or do carts ever get vandalized by customers or other people in the area?

A.  Yes.

Q.  Okay.  If one of the warning signs was gone from the shopping cart for whatever reason, how would Kroger go about getting a replacement warning sign to be placed on that cart?

A.  They're either through the work order channel and have us come do it directly or their maintenance department sometimes does the service as well and they would order parts from us.

Q.  Okay.  Would you have a record of their maintenance department ordering a replacement warning sign?

A.  Possibly.  I would have to -- I would have to check with my sales team and look.  It would depend --

(Crosstalk.)

Q.  Would you have -- sorry.

A.  Sorry.  I was going to say it would depend how the order came in, if it came directly for that store

Page 51

MR. URBAN:  Object to form.

A.  Correct.

Q.  And which wheel is the mechanism affixed to?

A.  Can you rephrase that?

Q.  Well -- yeah, yeah, yeah.  My understanding of the Purchek system is there's a Purchek wheel on the front set of wheels and then one on the back; is that right?

A.  Yes, it is.  So we have two options:  a paired wheel and a single wheel.

Fred Meyer does utilize the paired wheel, so there's going to be two wheels on the cart.

Q.  And does that -- when it says paired wheel, is it the same side?  Like if you're looking at the cart and this is the driver's side, can you point to me of the four wheels which ones would have the system?

A.  So we're going to -- we have our primary, which is the one that locks off the signal received.  Then the secondary, which is tethered to the primary, then it activates off the primary's command.  Primary is always on the left-hand side of the cart.  So it depends on if it's a primary front or a primary rear, but it's always going to be primary left, secondary right, and always going to be counter from each other.  So primary front left and secondary right.

30(b)(6) Gatekeeper Systems, Inc. - Ryan Harter - April 14, 2026

Page 56

Q.   Did Gatekeeper perform any training for Fred Meyer employees on the Purchek system?

A.   Yes, we did.

Q.   And who is trained?  Is it managers?

A.   Yes.  The manager on duty and anybody else designated by the manager on duty, sometimes front-end key holders, AP personnel, loss prevention, et cetera. It's part of the final stages of installation, because we do a training to explain how to operate the system, the functionality, and then we also do a go-live when we turn on the system with the store manager, and then repeat that training.

Q.   Okay.  Are the SmartWheels -- do you know at the Tacoma-Stevens location specifically if SmartWheels were installed on every cart?

A.   From the paperwork, yes, there was.

MR. WILKE:  We've been going for about an hour.  Let's go ahead and take a break.  Let's go off the record.

THE VIDEOGRAPHER:  Thank you.  We're off record at 2:02.

(A break was taken.)

THE VIDEOGRAPHER:  On record.  2:13.

Q.   (By Mr. Wilke)  All right.  We took a break. Ryan, were you able to find out when the Video

Page 57

Classification was installed at the Tacoma-Stevens Fred Meyer?

A.   Yeah.  It's, like, February 14th, 2019.

Q.   Was that -- I could look it up.  How soon after the installation of the Purchek system was that?

A.   The Purchek installation was 2017.

Q.   Okay.  Is that October 2017, you think?  It doesn't matter.  Strike that question.  I can look it up.

Okay.  So it -- Fred Meyer -- Tacoma-Stevens Fred Meyer had the Purchek system for some period of -- amount of time, and then they had the Video Classification installed?

A.   Yes.

Q.   Okay.  And then we were talking about the two-wheel system.  What did you call it when there's two wheels instead of just one?

A.   Paired.  Paired wheels.

Q.   Paired.  Paired wheels.

With the paired wheels, does the cart stop more abruptly compared to the one wheel?

A.   It doesn't stop more abruptly, but it has a -- it can't be moved after that because it has more friction points.  But by having the primary/secondary, it actually gives a more slowed, controlled stop,

Page 58

because the one wheel locks and then the other one locks up momentarily afterwards.  So they don't lock at the same time.  There's a delay between.

Q.  Is Gatekeeper aware of people striking their bodies when a cart activates?

MR. URBAN:  Object to form.

A.  Only from claims like this.

Q.  Okay.  I mean, I was just watching videos on Gatekeeper's YouTube of pushouts, and I'm just wondering if Gatekeeper has any knowledge of watching pushouts or thieves where when the cart stops they strike their body against the cart after it activates.

MR. URBAN:  Object to form.

A.  No.  Personally, I watch thousands of videos a month, and I've never noticed or seen anybody hit their body on the cart.

Q.  We talked about the Video Classification system.  And so as part of that classification system you said it will identify whether it was a pushout, an empty cart, and what was the other -- was there another category?

A.  Yeah.  There's employee, vendor, empty, merchandise, confirmed, suspicious, possible, and ORC for organized retail crime.

Q.  And so Gatekeeper maintains this information

30(b)(6) Gatekeeper Systems, Inc. - Ryan Harter - April 14, 2026

Page 62

Q.   The ones I'm pointing to, the circular disk and the screws, and --

A.   Yeah.  They go --

Q.   -- that's how they go onto the cart?

A.   Correct.  It's goes on the outside, and that's what sandwiches it in between the wire frame and the cart so it stays in place.

Q.   Okay.  So if one of these was damaged or came off, if there was a purchase order by the store or by Fred Meyer generally, does it ship with -- does the replacement packet ship with the mounting bracket, screws, and the sign?

A.   Yes.  That's the M-8033B kit.  It comes with everything pictured there.  So three sets of screws for different size carts and different orientations.

Q.   Okay.  And you don't -- you didn't see it in preparing for today's deposition that Tacoma-Stevens Fred Meyers specifically have ordered the M-8033B following installation?

A.   No, I did not see any.

Q.   We will mark this 5.

(Exhibit No. 5 introduced.)

Q.   I will pull it up here in a second.

Have you seen this before?  This is the Purchek Pushout Theft Solution Troubleshooting Guide.

Page 66

A.  We should, yes.

Q.  Would you have a Video Classification Report for 2023?

A.  Yes.  We retain the data from it; we just don't retain the video.

Q.  Just not the actual video.

I won't spend too much time on this.  I think we went over it.  This is -- one, two, three, four, five, six.  I'm just pulling up the work orders that were produced in discovery.

(Exhibit No. 6 introduced.)

Q.  Okay.  This is a total of three pages.  We have the installation work order.  This is dated October 2017.

Is this the paperwork for when the Purchek system was installed by Tim?

A.  Yes.  Tim and Kevin.

Q.  We see their names down here under the text name.  Kevin is the apprentice?

A.  Yes.

Q.  Okay.  All right.  And so it says hang six window clings and six wall signs and deliver four CartKeys and ten NanoKeys.

When we were talking about what you could glean, whether Gatekeeper is the one that installed the

Page 68

A.  If the store wants service, they have a service app they go through.  I believe Kroger -- again, I'm not in the service department -- they use KroGo.  So they'll go in there and issue a work order, and then we have our own account in KroGo, and it comes straight to us as one of their vendors.

Q.  Yeah.

A.  And then from that, we -- that's where we access our PO, and then we coordinate and schedule from there.

Q.  Got it.  And you checked before today's dep to see if any of those -- any type of work order came in at the Tacoma-Stevens store?

A.  Yes.  I didn't see anything.

Q.  Okay.  Cool.  When did Gatekeeper learn that Ms. LaRocque was injured at the Tacoma-Stevens Fred Meyer, generally?  Was it after she filed a lawsuit?  Was it when Gatekeeper saw the Video Classification?  That's what I'm trying to get at.

A.  It would have been when -- after it was filed and the insurance company notified us.

Q.  Okay.  And Fred Meyer tendered the claim to Gatekeeper, correct, for indemnification?  Do you have any understanding of that?

A.  A little bit from my understanding, yes.

30(b)(6) Gatekeeper Systems, Inc. - Ryan Harter - April 14, 2026

Page 69

Q.   Do you have any knowledge of whether Gatekeeper accepted its tender?

A.   I do not.

MR. WILKE:   Let's go off the record.

THE VIDEOGRAPHER:   Thank you.   We're off record at 2:31.

(A break was taken.)

THE VIDEOGRAPHER:   On record.   2:40.

Q.   (By Mr. Wilke)   All right.   Just a couple questions, Ryan.   I appreciate your time today.

You said you've testified as a designee before.   Have you testified in any cases in which a plaintiff alleged they were injured by Purchek system or any other Gatekeeper system?

A.   Yes.   But the last one was mediation.   It didn't go to a deposition.

Q.   Got it.   Okay.   Was that in Washington?   Was that a Washington state case?

A.   No, it was not.

Q.   What state was that in?

A.   New Mexico.

Q.   Oh, okay.   Enchantment state.   They call it that.

Okay.   Any others, other cases that you're aware of?

30(b)(6) Gatekeeper Systems, Inc. - Ryan Harter - April 14, 2026

Page 70

A.   Not that I'm aware of, not for Gatekeeper.

Q.   Okay.  I had a question about Topic 11, which is Gatekeeper's knowledge of what should be done when warning signs fall off or are no longer present on shopping carts.

Does Gatekeeper tell its customers that those warning signs need to be replaced if they're damaged or missing?

A.   Yeah.  During the install when we're talking about service and the troubleshooting, I believe it's covered.  I would have to look at the guide again. But, yeah, it's general knowledge that when it's damaged, it needs to be serviced.

Q.   Okay.  And do you know if Tacoma-Stevens managers were told that upon installation?

A.   Not being there, I couldn't tell you a hundred percent, but they should have been as far --

Q.   Okay.  Policy --

A.   -- as the SOP.

Q.   Gatekeeper's policy is to tell its customers that, "Hey, if these signs are damaged or go missing, they need to be replaced"?

A.   Yeah.

MR. WILKE:  I don't have any further questions.  I really appreciate your time, Ryan.

Carrie Reporting, LLC - CarrieReportingLLC@outlook.com