# EXHIBIT 2

was grocery shopping and the day of the incident, I was in there for a specific item and that was it.

BY MR. URBAN:

Q.   I understand.

A.   I didn't want to spend more time.

Q.   Prior to your first knee replacement, did you ever use one of those mobility scooters that they have at the front of the store?

A.   No.

Q.   So I referenced this yesterday with your husband.  I took a look through some of the journals you produced to us and you referenced getting your knee replacement as a gift for yourself.  What did you mean by that?

A.   It all came down to the dates of when I could have my knee replacement done.  I wanted it closest to my birthday, which is February 9th.  So that was my gift to my 65th birthday, was to get my knee replaced and to have more accessibility to my kids, my grandkids, to get up and go.  So I wanted to have more -- a better quality of life.

Q.   So prior to the knee surgery, what issues were you having with accessibility and being with your, you know, grandchildren or children?

A.   Accessibility to them?



Q.    How many times had you gone to a grocery store post surgery before the car incident.

A.    To any store?

Q.    Any store with a shopping cart?  Grocery store, Walmart, anything like that?

A.    I would say once a week.

Q.    Your husband mentioned to us yesterday that you started driving at some point in time.  Do you know when you started driving post surgery?

A.    After the first surgery, three weeks.

Q.    So moving kind of to the day of the accident, in that general timeframe, were you still experiencing any pain or swelling in your left knee?

A.    Just some mild pain at that time.

Q.    Okay.  And your husband answered some of these questions for us yesterday, but I'd like to ask you. How many times have you shopped at this Fred Meyer's before?

A.    In years or a lot of times?

Q.    It -- was his testimony accurate?  He said something like a couple times a week for 20 or so years?

A.    It was frequent, I would say at least once or twice for me, because my doctor's office is just down the road.

Q.    Okay.  How many times when you would go shop



at this Fred Meyer's did you use a shopping cart for stability like you had talked about earlier?

A.    Every time.

Q.    So I did this with your husband yesterday and I would like to ask you as well.  I'm going to pull up a map of the parking lot or a map of the store and the parking lot, and when you first arrived at the Safeway, where did you park?

A.    It wasn't at Safeway.

Q.    I'm sorry.  Fred Meyer's, Fred Meyer's.

A.    On the grocery side where the disability spots are.

Q.    So here is where your husband said; is that accurate or is it a different location based on your memory?

A.    It was in that area or just the one at that spot right at the very corner of the sidewalk.

Q.    When you say the spot at the very corner, here (indicating) or a different location?

A.    Different location, across the way.

Q.    To the right?

A.    Right there.  There's a disability spot right there. (indicating).

Q.    Okay.  So your testimony is you parked either this island of parking or this corner spot (indicating)?



A.    Correct.

Q.    Okay.  But you can't recall for certain which one?

A.    No.

Q.    Okay.  And then I understand you went to the BECU ATM; is that accurate?

A.    The BECU ATM machine, yes.

Q.    Okay.  And what did you do after withdrawing cash from the ATM?

A.    Left and we went down to the public storage and I went to pay my son's storage.  Okay.

Q.    And let me just say for the record, I used a yellow highlighter to circle the possible parking locations.  So you left the premises after receiving cash from the ATM; correct?

A.    Correct.

Q.    Okay.  Your husband testified a little differently.  He testified that you went straight into the store.  Why is his testimony different than yours?

        MR. WILKE:  Object to form.

        You can answer, Linda.

A.    I put money back in the account at the BECU ATM.

        MR. WILKE:  Listen to his question.  It's fine.  Just listen to what he's asking.



BY MR. URBAN:

Q.    So your husband testified that after getting cash from the ATM, you two went directly into the store. Your testimony is you got AT -- cash from the ATM and then left and went to a separate location.

A.    Correct.

Q.    My question is, which version am I -- which version should I believe?  Which is accurate?

A.    Going to the ATM, taking the cash out and we left and then we came back.

Q.    Why do you think your husband's recounting of the events are different than yours?

A.    I don't know.

Q.    Okay.  Fair enough.  Why did you leave with cash?  What were you trying to do?

A.    Need to pay storage for Steven's storage unit in Okinawa.

Q.    Okay.

A.    And I walked -- went back into the account, so that's why we returned.

Q.    Okay.  And when you returned, where did you park?

A.    On the very end one.

Q.    Okay.  By the very end one, do you mean the smaller circle?



A.    Correct.

Q.    Yellow circle?

A.    Correct.

Q.    Okay.  Are you certain that's where you parked or is it like the first time, you're not sure?

A.    I'm not sure.

Q.    Okay.  So it could have been either this corner spot or this island of parking?

A.    Correct.

Q.    Okay.  And then can you describe to me how you got into the store?  Your husband kind of explained it, but I'd like you to tell me what you did after you returned and parked?

A.    He needed some magnesium citrate for an upcoming colonoscopy.  He wanted to go to Walmart and I said, "No, we're already here, we're going in and see if they have it here."  Because they always have it there. So we walked through the foyer, got me a cart, got the cart, pushed through the second door.

        We went around, the whole store had been remodeled, we weren't sure where everything was.  And we walked around for probably 15 minutes, couldn't find it and we just came back around in front of the registers to the door to exit.

Q.    Okay.  Just a quick followup.  So we talked



about the ATM is kind of in this area here; right?

A.   Correct.

Q.   So when you parked, can you describe to me how you maneuvered to the ATM?  Did you need any assistance?

A.   I got out the van and I had my cane and Steve and I walked together, so she knew I went in the store.

Q.   Okay.  So you go to the ATM deposit the cash and then go to the entrance?

A.   Correct.

MR. URBAN:  Okay.  I think that should be good for this, so I will stop sharing and we'll mark this as Exhibit 2.

(Exhibit No. 2 was marked.)

MR. WILKE:  Skyler, can we take a bathroom break in the next 10 to 15, whatever works for you?

MR. URBAN:  I think now's an okay time if that works for you.

MR. WILKE:  Yeah.  Take five or ten, either one works for us.

MR. URBAN:  Let's do ten.  I will refill my coffee.  We'll do --

MR. WILKE:  Sounds good.  I'll see you at 11:33?

MR. URBAN:  Sounds good.

(Off the record.)



BY MR. URBAN:

Q.    All right.  Ms. Larocque.  Let me take a look at my notes here and see where we are.

Okay.  So you mentioned you two came back to the store and decided to get magnesium supplements; is that correct?

A.    Correct.

Q.    Okay.  And your husband retrieved the cart for you?

A.    Yes.

Q.    Do you recall if it was a full-sized cart or one of those mini carts?

A.    Full-sized cart.

Q.    While he was retrieving the cart, where did you stand?

A.    Close by.  We were in the foyer area.  He was getting the cart right there.

Q.    And you weren't intending to purchase any other grocery just the supplement for him?

A.    Just the supplement.

Q.    So what was the purpose of the cart?

A.    For balance.

Q.    Is it fair to say you were still in a recovery period from your surgery?

A.    Yes.



Q.   Can you explain to me how you used the cart for balance?

A.   I mainly put my purse and my coat in the top part where you put the little kids, and then I put both hands on the cart and I stand up straight, push it to keep my balance.

Q.   Outside of your two hands, were -- was any part of your body touching the cart?

A.   No.

Q.   Did you ever lean or put your body weight on the cart for support?

A.   No.

Q.   Okay.  Tell me what happened after you went to the store?

A.   We went into the store and went to the right produces, kind of walked down, got back in.  Like I said, it was all remodeled.  So we -- I hadn't been there in a long time.  So we went, you know, finally found the aisle and we could not find the merchandise we needed, so I'm like, "Let's just go to Walmart."

That's what he wanted to do.  And so we just went out, like, through the area, like, in the front with, like, the restroom and the banking lot and things. We just walked past all the registers and went out the door, the first door.



Q.   And then that was the same door you entered through?

A.   Correct.

Q.   All right.  Why don't you tell me about what happened when the cart stopped?

A.   Well, it was a shock.  I'm pushing the cart and we lifted the -- you know, the door's kind of wide, so we were on the right side of it.  And I'm pushing the cart and it just like stops and my knee hit that underneath.  And I'm just like, "What's going on? What's wrong?"

I thought I hit something, thought there was something under the wheel.  So I looked down there and I could see that the cart wheel was, like, right on the track of the door because it was open.  So I was like, "What's going on Steve?"  And he's like, "I don't know."

And I said, "Well, this is ridiculous."  So I'm trying to push it and it wouldn't go.  It wouldn't even budge.  So I'm like, "Okay.  What are we supposed to do?"  And then he goes, "I don't know."

And then the guy that was sitting over by the little Starbucks kiosk thing, he came over and he's kind of like, you know, "It's no big deal, this happens a couple times a day."  And he had this little like wand thing in his hand.  And I said, "Well, what's going on?"



He goes, "Oh, it stops."

And I said, "Why?"  And he said, "Well, to prevent theft."  And I said, "What, you think I want to steal your shopping cart?  Seriously, dude, if I wanted that, I'd done it in the parking lot."

And so he goes, "No, it's for -- you know, I want homeless people, okay?  Because they're stealing the shopping carts all the time over there."  And so he said -- he goes, "No, it's just a locking mechanism. Did you buy anything?"

And I said, "No.  Why?"  And he goes, "Well, if you don't buy something and go through the registers to deactivate the cart wheel, then it will stop you at the door."  And I said, "What?"  He goes, "Well, that's what happens."

Then I said -- and now mind you, there's people all around and I'm starting to get upset.  And it's 3:00 in the afternoon, 3:30, there's people trying to come in, there's people behind me and they're getting grumpy and I'm just put on the spot.

And the way he said it to me was like humiliating, like, I was trying to seal something, you know.  And I'm like, "I don't understand."  And he goes, "Well, I'll just take the -- it's like a long thing.  It looks like a mouse.



Q.    Okay.

A.    Or something.  He just takes it and I'm looking down at him and he's waving it under -- on the wheel on the left -- right side of the cart to deactivate.  And so by now, more people are there because it's really busy.  And I'm just like, "Come on, let's go, Steve."

And Steve was upset with the guy.  Steve thought it was like no big deal and I'm like -- so suddenly the cart moves and I pushed it out of the way, and I'm like, "I'm out of here.  I'm out of here."

So I left.  He was mad.  Steve was mad at this guy, because he thought it was kind of like a joke.  And He goes, "My wife just had knee surgery.  This isn't funny."  And so I was so upset.  By then I was crying and I walked over -- back over by myself to the BECU machine, okay?

And I waited there thinking Steve was next to me.  He wasn't.  He was still back there with the guy. And there was another.  I was carrying on about, you know, just another reason not to shop at Fred Meyer's, because it was getting so bad with the violence and the criminals and that whole area by Cheney Stadium and everything.

So I was becoming very uncomfortable to shop



at that store.  And the security wasn't really, you know, what I thought it should be.  So I apologized to the gentleman and I stand at the machine and waited for Steve.  And I'm like, "Come on, just tell him to tell his manager this happened."

Steve goes, "What?"  And I said, "Just tell him to tell his manager this happened.  I want to go."  You know, so I was just besides myself by then.  So he came and we got in the car and we left.  Left to go to Walmart.  Come to find out that it was taken off the market.

Q.    Okay.  Okay.

A.    So that's what happened.

Q.    Understood.  When the employee came over -- let me backtrack.  After the cart stopped, did you inspect the cart at all?  Where did you look on the cart?

A.    I was standing and I looked down to see if I had, like, run -- excuse me, went over something, you know, like a rock got stuck in the door or something like that stopped it like that and it didn't.  And I'm like -- and it was like the track in the -- like, part of the wheel was on that side of the track, and the other part was on this side of the track to me.

So it just -- it wouldn't move.  And so I



could see it, Steve couldn't because he was behind me, but that's where it was and that's where it stopped and it would not budge.  I tried moving it, he tried moving it, we didn't understand why it was locked up like that.  And then that's when the guy came over and told us this stuff.

Q.    Before speaking to the employee, did you notice any of the wheel were different than the others?

A.    No.

Q.    Okay.  Did you look, again, before the employee came over, did you specifically look for any signs or something on the cart, any warnings?

A.    Yeah.  We were kind of like, "What's going on?"  And, you know, there was nothing.  It was just like an empty cart.  There was nothing, no tags, no nothing.

Q.    So earlier when you were kind of explaining as you were standing by the ATM making a reference, you know, kind of joking about -- saying, you know, another reason not to shop at this Fred Meyer's, you mentioned the crime and violence.  What -- I'm unfamiliar with kind of the area.

A.    Oh it's --

Q.    What crime or violence are you referencing?

A.    There's a lot of homelessness in that area,



because there's a walkway that can go just off to -- you can go out the door and go to the right.  There's a huge pathway that can go all the way down, and like that something is called, I think it's snake trail.

Anyway, there's a walkway that you can take and they were -- all the homeless people were coming in there, you know, taking over.  Coming in the store, you know, they are harassing people in the parking lot.

And it just became an issue of not going there, but we had to go there because it was that or 38th Street, 38th Street's even worse because they're sitting right on the floor next to the ATM machine.  So that's one of the reasons I said not another reason to come here.

Q.   Had you seen the homeless that were kind of taking over the store, take shopping carts before or had you seen them strewn about?

A.   They were everywhere.  They were out in the parking lots, they were over across the street at the metro place, they were by the Cheney Stadium, grass area.  They're all over the place.

Q.   What was the inside of the store where -- was that just an issue in the parking lot or were there issues inside the store too that you witnessed?

A.   That I can't recall.



don't slip and fall or anything like that.  And I was advised through my PT and my doctors to use a shopping cart as balance.  In fact, I had my PT say, "Can you go down to Fred Meyer's and go around the store couple times for laps?"  After my sessions.  That's why I use a shopping cart.

BY MR. URBAN:

Q.   Understood.  Would you agree that the shopping cart's not designed to be used like that?

MR. WILKE:  Object -- same objection. Counsel, you've asked the same question, I understand she's not giving an answer that you want.  She's already answered.

You can answer again.

BY MR. URBAN:

Q.   Did you ever considering using one of those mobility scooters at the store?

A.   At the time of the incident?

Q.   Yeah.

A.   No.

Q.   Did you look for one when you entered the store?

A.   No.

Q.   Did anyone at Fred Meyer or my client, Gatekeeper, tell you that it was safe to use a shopping



cart to assist with your mobility?

A. No.

Q. Okay. We can move on a little bit from the incident. You underwent two additional operations; correct?

A. Correct.

Q. I think the first one was a patella or patella repair; is that accurate?

A. My patella shifted from where it was supposed to be to the left side of my knee. Yeah.

Q. Okay. Your husband testified there was a red mark and then you experienced some bruising in the next day; is that accurate?

A. That's correct.

Q. Are there any photos of the red mark or the bruising that you experienced after?

A. I took photos, but I can't get on account, my phone died. I'm old school.

Q. Would you have the phone that the photos were on?

A. No.

Q. When did you get rid of it?

A. I gave it to a person to see if they could get to the photos so I could have it and they couldn't do it.

