# EXHIBIT 3

# In the Matter Of:

## LAROCQUE vs THE KROGER CO.

3:25-cv-05380-MJP

## LEVI DIXON MS

*May 20, 2026*



800.211.DEPO (3376)
EsquireSolutions.com

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT TACOMA


LINDA LAROCQUE,                )
                               )
            Plaintiff,         )
                               )
            vs.                )    No. 3:25-cv-05380-MJP
                               )
THE KROGER CO., a foreign )
corporation doing business)
in Washington state,          )
et al.,                       )
                               )
            Defendants.        )
                               )




REMOTE DEPOSITION OF

LEVI DIXON, M.S.

*    *    *

May 20, 2026

Spokane, Washington

10:00 a.m.






Reported by:

Gwen Dickson, CSR/RPR/CCR




APPEARANCES:

For the Plaintiff:

      GORDON THOMAS HONEYWELL
      BY:  Robert Wilke, Esq. (Via vc)
      1201 Pacific Avenue, #2100
      Tacoma, WA 98401
      Rwilke@gth-law.com

For the Defendant Kroger/F.Meyer:

      CHOCK BARHOUM
      BY:  Samuel Behar, Esq. (Via vc)
      121 SW Morrison, #500
      Portland, OR 97204
      Sam.behar@chockbarhoum.com

For the defendant Gatekeeper:

      FLOYD PFLUEGER
      BY:  Skyler Urban, Esq. (via vc)
      3101 Western Avenue, #400
      Seattle, WA 98121
      Surban@nwtrialattorneys.com



times per year, and I recall there being some discussion about having the warning placards replaced from Gatekeeper is my understanding.

Q.   Okay.   We can move on to kind of my next topic here.   We'll come back to the actual incident in a bit.

I want to get a few things out of the way. Are you offering any opinion that -- let me just strike that and we'll set the stage here.

Going forward, when I say the Gatekeeper system, I'm referring to the locking wheel on the cart and the components that make it activate and work, right?   Are we on the same page when I say Gatekeeper system?

A.   Yes, sir.

Q.   Okay.   And if I say the Purcheck system, do you have an understanding that's referring to the same thing?

A.   Yes, sir.

Q.   Okay.   Great.   Are you offering any opinion that the Gatekeeper system deviated from their design specifications?

A.   I am not offering that opinion, no.

Q.   Okay.   Are you offering any opinion that the unit at issue, so the one that was involved in



Ms. Larocque's injury, was somehow different than the other units manufactured by Gatekeeper?

A.    I am not offering that opinion either.

Q.    Okay.  Have you ever worked as an expert or been retained as an expert in other product liability claims?

A.    Yes, sir.

Q.    Would those be included in the testimony list that were provided to my office?

A.    I believe that I've been deposed in some of those but not all of those.

Q.    Okay.  One second.  Share my screen.  This will be -- this is going to be your testimony list that was provided to us.  And I'll mark this as Exhibit 1.

(EXHIBIT marked.  Exhibit 1.)

Q.    I'm not trying to quiz you but I want to scroll down and if any of these spark your memory as being product liability cases or product liability cases or cases dealing with inadequate warnings, let me know.  And just tell me to go slow or fast or stop if you need to.

A.    If you could actually stop there and maybe we can go page-by-page.

Q.    Perfect.



Q.   Okay.  And you're not offering any opinion that the product failed to conform in line with that warranty?

A.   I agree with that and I am not offering that conclusion.

Q.   Same answer regarding whether it's an implied or express warranty?

A.   That is correct, I am not offering that conclusion.

Q.   Are you aware of any specific industry standards that govern the design of shopping carts or shopping cart safety systems?

A.   As I sit here nothing comes to mind. That's not to say they don't exist, but nothing comes to mind as I sit here.

Q.   Okay.  Do you have any opinion that Gatekeeper's product, the safety system, failed to comply with applicable industry standards?

A.   I haven't done that analysis so I can't opine one way or the other.

Q.   Did you perform any analysis or create any opinions regarding whether alternative designs were technically feasible for Gatekeeper when they manufactured the system?

A.   I haven't done a specific analysis of



alternative designs other than I am aware that the Smart Exit system is a measure that can reduce the empty cart activations.

Q.    Did you perform any analysis of what an ordinary consumer would contemplate regarding the existence of an anti-theft shopping cart system?

A.    I'm sorry, can I have your question again, please?

Q.    Yeah.  That was maybe a bit wordy.

Did you perform any analysis -- strike that.

Through your analysis did you consider what the expectations would be of an ordinary consumer?

A.    I would say that that's certainly something that I considered in my analysis.  If you look at shopping carts, we have a general expectation that they're going to roll freely absent any other obstruction; and if you look at the dozens of incidents reports, a number of them talk about it being unexpected.  Mr. Wheeler said people are confused when this happens.  All of that illustrates that the expectation that it's going to be roll freely is being violated when the cart unexpectedly locks and stops.

Q.    Have you reviewed any consumer research,



market research, or literature addressing a consumer's awareness of anti-theft cart systems?

A.   I don't recall anything specifically off the top of my head.

Q.   Did you perform any cost analysis regarding the Gatekeeper product?

A.   That was beyond the scope of my analysis, so no.

Q.   Okay.  Do you know what Fred Meyer paid for the Gatekeeper system?

A.   I recall there being some sort of invoice or table that had a breakdown of the cost but I don't recall specifically.

Q.   Okay.  Just to kind of set some ground facts here and make sure we're on the same page. You're of the understanding that Gatekeeper sells the product to retailers and businesses, not to the consumers themselves.  Right?

A.   That's my general understanding, yes.

Q.   And in this case Gatekeeper sold the system to Fred Meyer, a large grocer?

A.   Fred Meyer or Kroger, I'm using those really one and the same, but that's my understanding.

Q.   Same.  If I say Kroger or Fred Meyer we're



advertisements, different placards, things of that nature?

Q.   Correct.

A.   I think it's reasonable to conclude Fred Meyer or Kroger, but I don't have specific evidence one way or the other.

Q.   All right.  Then let's move on to the language itself.  Do you have any issues with the language itself?

A.   I do.  Really the fact that it may stop, and the word "may" is the issue that I take with it is that it's ambiguous as to when it actually will stop and what conditions actually cause it to stop. So simply telling someone that there may be a hazard, well, the person needs to know when there actually is a hazard, what the hazard is, what they need to do to avoid it.

Q.   So do you have any -- do you have proposed alternative language that should have been used?

A.   I haven't been asked to recreate the warning system, so no.

Q.   Do you believe that it should have said: shopping carts will stop unexpectedly at exit doors?

A.   Well, therein lies the issue.  If they



will stop unexpectedly, it's still not telling the user when it's actually going to stop.  And so the fact that it's unexpected, that's the issue is that if it's unexpected, then how do they anticipate and know where it's actually going to stop, what the stop is going to entail, and what they need to do to avoid it, especially when shopping carts going out into the parking lot is something that should be expected.  For example, if someone purchases merchandise, it's common behavior to take it out to the parking lot into their vehicle, for example.

Q.    If they purchased merchandise this wouldn't have happened, though.  Right?  Because they passed through checkout.

A.    I would say there would be a reduced likelihood.  But if you look at the various incident reports, there's a number of them that did pay for merchandise, yet it still locked.

Q.    So should the warning sign have laid out specifically what would cause the cart to lock, so you don't have to go through checkout, should it have listed that on the sign?

A.    I would say it's a basic component of a warning that needs to alert the user what the hazard is, what the consequences are, and how you



avoid exposure to that hazard.  So what you're describing would be consistent with that last component of how you avoid this.

Q.   Did you do any analysis on the impact that that would have on the utility of preventing shoplifting?

A.   Not specifically, no.

Also, it doesn't have to be right now, just when you're at a good stopping point.  We've been going about an hour.  Whenever you're at a good point, if we can take a five-minute restroom break, I'd appreciate it.

Q.   Give me a second.  Might be at a good spot.

I think we are.  Let's take a five minute break.

(RECESS is taken, 10:58 to 11:06 a.m.)

BY MR. URBAN:

Q.   Mr. Dixon, regarding warning signs, you mentioned that they're not - this is probably butchering what you said - but they're not the best way to prevent harm to someone.  Can you explain what you mean by that?  Or why is it so low on the totem pole?

A.   Really, if you look at the safety hierarchy, or the totem pole, it starts with



again, if you look at the various incident reports in this case, I believe there was one that even talked about the cart locking, tipping and injuring a child.  So again, those are not mutually exclusive.

Q.   Have you reviewed or seen any data specifically addressing injuries - the rate of injuries to individuals hitting carts when they lock because they're going through a shoplifting system?

A.   Other than reviewing the incident reports that were provided in this case, I believe there was more than 70 of them, I haven't reviewed specific incident rates documentation.

Q.   And you don't have any idea how many shoppers in total passed through those stores that provided those incident reports on a daily basis, do you?

A.   Not specifically.  And it's really irrelevant to my analysis on whether this creates a potential danger.

Q.   Okay.

A.   In other words, incident rates are not the proper metric to analyze the safety of any given condition.



about it being unexpected.  In other words, if it's unexpected, how can someone know when that's going to happen, where it's going to happen, and prepare for that.  It doesn't actually communicate what needs to be done to avoid that.  Things of that nature.

Q.   So earlier you said you don't have a recommendation on alternative language to use but you did just list some things that should be included.  So I'm trying to figure out here what you think the warning should have said, because you listed a whole lot of information and what we just looked at said warnings that are too technical may limit someone's understanding.  So I'm trying to figure out what words do you think the warning should have used.

So we can start with the first issue is "shopping carts may."  So you can't use "will" you said that's also incorrect.  So should it have said "shopping carts will stop at the first exit door if taken out without crossing through checkout"?  Is that what you're recommending?  Or do you have any recommendation as to what it should have said?

A.   I haven't been asked to redesign the warnings and provide recommendations.  But what I



the need for signs, that they would provide them.
Or something along those lines.

Q.   Okay.  Fair to say then that from your
perspective -- strike that.

Fair to say then if Gatekeeper did not
receive one of those orders, they would not know
whether the carts were missing a warning sign.

A.   Absent doing any specific inspection I
would agree with you.

Q.   Okay.  So to the extent we're talking about
your criticism regarding the missing warning sign,
if Gatekeeper doesn't know whether a cart is
missing a sign or not, is it fair to say that
criticism would be directed to the individual
stores rather than Gatekeeper?

A.   I would generally agree with that, yes.
Again, even with the warning placard in place, it's
still an unreliable warning.  But without it in
place it goes without saying that it can't change
behavior.

Q.   Got it.  One other issue, I don't think I'm
going to hit on this too much, but there's
obviously the warning signs on the sliding doors.
Right?

A.   Yes, sir.



Q.   Okay.  And in your report you note that there's a lot of other information on those doors, like other advertisements or placards beyond just the warning sign?

A.   I would agree.  And it goes beyond just being on the doors.  Just in the general environment.  If you're in the vestibule there's potential for other advertisements, people, people interacting with shopping carts, people coming out through the doors, people coming in.  If you're inside the store you've got merchandise displayed, you've got the potential for other people.  You've got a variety of environmental stimuli that would be competing for someone's attention and increasing the risk that they never perceived the presence of a warning sticker on the glass.

Q.   Okay.  Do you have a recommendation or opinion on how those warning signs that are on the glass should have been presented?

A.   Again, it's really beyond the scope of my analysis to redesign the warning system.  I'm really just doing an analysis of what was in place. But I would say following basic principles, you would want to make them conspicuous and attention-grabbing.  You'd want to make sure that



how many dealt with an empty cart being locked up at the exit?

A.   Can you clarify which set?  Are you referring to the approximate 70 incident reports, how many dealt with empty carts?

Q.   Correct.

A.   Boy, I don't recall that level of detail as I sit here.

Q.   Do you know if it was less than 25 percent?

A.   I would have to go back and do a detailed analysis of those.  I just don't recall as I sit here.  I do know that the classification log the day of the incident showed that there were, I believe, 12 empty cart activations just on the day of this incident alone.

Q.   Do you know if any of those included injury?

A.   I know Miss Larocque's did.

Q.   Right.  Do you know if any others did?

A.   I don't know as I sit here.  I haven't seen any documentation showing that they did.

Q.   Okay.  You haven't seen incident reports that would correlate to any of those 12 other than Miss Larocque -- well, we don't have an incident report.  But outside of Miss Larocque's incident.



they're not obscured such as when the doors are open and they're blocked from view.  You've got this warning says that the wheels may lock unexpectedly if removed from the store.  In other words, that actually contradicts the warning placard that says at the exit doors.  So that would lull someone into the false sense that I can actually get all the way to outside before they're going to lock versus locking at the first set of the doors potentially.

Q.   Okay.  You reviewed the incident reports that were produced in this case.  Right?  The past ones.

A.   Yes, sir.

Q.   So do you have any information as to whether those instances were communicated to Gatekeeper or, if they were, when they were communicated to Gatekeeper?

A.   If you're referring to each and every one of them, I don't know that I have specific information about that.  I do recall that Gatekeeper had discovery that it was aware of various claims of people striking or colliding with carts when the wheels locked up.

Q.   Of the claims you reviewed, do you recall



intended use of Gatekeeper system is?

A. To reduce the risk of push-outs or people loading up shopping carts and stealing merchandise.

Q. Okay. We've addressed these -- I think we've addressed these, but I want to put a fine point on it. Did you contact any risk utility analysis through your process?

A. I am not familiar with a risk utility analysis so I did not conduct that.

Q. Okay. You're not offering an alternative system engineering design of the system. Right?

A. I am not intending to offer an alternative engineering design, that's correct.

Q. Did you conduct a consumer expectation analysis?

A. I wouldn't say that I conducted a specific consumer expectation analysis but I certainly, from a safety and human factors perspective, analyzed the expectation of shoppers based on our previous experience using shopping carts, things of that nature.

Q. And in performing that analysis did you utilize any data regarding injuries with shopping cart anti-theft systems?

A. Not specifically other than I considered


ESQUIRE
DEPOSITION SOLUTIONS

the evidence in this case which involved a number of other incidents involving the locking wheels from the theft system.

Q.   Okay.  Earlier when we were talking about the process for replacing warning signs, fair to say you'd agreed that Gatekeeper would not know if a cart is missing a warning sign unless they were notified by the store.  Right?

A.   Other than if Gatekeeper did an inspection and observed that, I would generally agree with you.

Q.   Okay.  Did you, at any point in your analysis, look at what the warning language was -- bad question.  Strike that.

During your analysis did you look at any warning signs used by competing shopping cart anti-theft companies?

A.   Not to my recollection, no.

MR. URBAN:  I think that's everything for me, Mr. Dixon.  Great to see you.  Appreciate your time.

THE WITNESS:  Good to see you as well.

CROSS-EXAMINATION

BY MR. BEHAR:

Q.   Hi, Mr. Dixon.  Samuel Behar here on behalf



are put at a serious risk of striking the cart with
their torso, lower limbs or the like and/or losing
their balance or falling.

How did you come to the conclusion that the
specific mechanism of injury in this case is part
of this generalized serious risk?

A.   Well, if you look at all of the evidence
in this case, Miss Larocque's testimony is
consistent with the cart abruptly stopping, and
then she describes that she then strikes her lower
limb on it.  Look at the stack of incident reports
and you'll see people repeatedly describing
slamming into the cart, striking their shin,
striking their knees.  One kid I believe gets hit
in the face.  So there's a whole bunch of incident
reports describing an abrupt stop and then people
striking the cart, which is consistent with what
Miss Larocque described occurred.

Q.   Did you perform any sort of kinematics
analysis to determine how her knee could have
possibly made contact with the shopping cart?

A.   I did not do so.  That's really beyond the
scope of my analysis.

Q.   You said, middle of page four:  The
evidence I have reviewed indicates that the

