HONORABLE TIFFANY M. CARTWRIGHT

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

LINDA LAROCQUE,

                              Plaintiff,

v.

THE KROGER CO., a foreign corporation doing business in Washington state; and, FRED MEYER STORES, INC., a foreign corporation doing business in Washington state, a/k/a TACOMA-STEVENS FRED MEYER; GATEKEEPER SYSTEMS, INC., a foreign corporation doing business in Washington state

                              Defendants.

NO.  3:25-cv-05380

PLATINTIFF LINDA LAROCQUE'S OPPOSITION TO GATEKEEPER SYSTEMS, INC.'S MOTION FOR SUMMARY JUDGMENT

NOTED: JULY 6, 2026

## I.    INTRODUCTION

On May 6, 2023, Plaintiff Linda LaRocque visited the Tacoma-Stevens Fred Meyer store ("the Store") to purchase a magnesium supplement. Ms. LaRocque, who had recently undergone knee surgery, was pushing a shopping cart. The cart bore no warning that it could automatically lock at the exit. After determining the Store did not have magnesium supplement, Ms. LaRocque proceeded to exit. As Ms. LaRocque exited, the cart suddenly and without warning locked, causing her to strike her recently operated knee against the

PLTF'S OPP TO GATEKEEPER'S MSJ - 1 of 25
[4871-5472-8598]

back of the cart and sustain significant injury.

Unbeknownst to Ms. LaRocque, the Store's carts were equipped with Gatekeeper's anti-theft locking system designed to engage at the exits if customers do not follow a "correct" path. That path, however, is not disclosed or visible to customers. Ms. LaRocque was exiting with an empty cart—a circumstance that frequently triggers the locking mechanism, as customers reasonably do not anticipate that a theft-prevention device will activate when nothing is being removed from the store.

Gatekeeper knew that over half of wheel lock activations involved innocent customers with empty carts. It designed a technology that solved that problem, but chose to sell that safety feature only as an optional upgrade while continuing to market the original system. This technology called Smart Exit  prevents what are called empty-cart activations, but that safer (and more expensive) option was not implemented. In its tender letter to Gatekeeper, Fred Meyer asserts that the failure to upgrade to the Smart Exit was a cause of Ms. LaRocque's injuries.

Here, there are two bases for Ms. LaRocque's product liability claims against Gatekeeper. The first is that Gatekeeper's anti-theft shopping cart locking mechanism ("Purchek") was not reasonably safe because the warning signs Gatekeeper provided to Fred Meyer were inadequate. (RCW 7.72.030(1). Ms. LaRocque's human factors expert, Levi Dixon, opines the warning language was inadequate where the actual message of the warning placards and signage is misleading, ambiguous, and contradictory in nature. The warning signs do not inform a customer of when or why a cart will lock, only that it may lock up. The warning signs on the Fred Meyer doors were placed by Gatekeeper and are partially or completely obscured.

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
1201 PACIFIC AVENUE, SUITE 2200
TACOMA, WASHINGTON  98402
(253) 620-6500  -  FACSIMILE (253) 620-6565

The second basis is that Gatekeeper's product was not reasonably safe as designed.  (RCW 7.72.030(1). Gatekeeper was aware of the danger posed to customers by the "empty cart scenario" and in 2022 designed a change to the Purchek system that identifies the empty cart scenario and prevents the cart from locking up, which it calls the Smart Exit system. Despite being aware of the danger posed by the original iteration of the Purchek system, Gatekeeper chose to hide this design change by a paywall, requiring Purchek customers to purchase the Smart Exit system as a separate upgrade.

Mr. Dixon opines that on a more probable than not basis that the interaction of the unsafe design and failure to provide adequate warnings were a cause of Ms. LaRocque's injury incident.

Ms. LaRocque's orthopedic surgeon exert, Dr. Bruce Rolfe, MD, opines that on a more probable than not basis and to a reasonable degree of medical certainty, Ms. LaRocque's injuries were caused by Ms. LaRocque striking her knee on the back of the shopping cart when the cart locked and abruptly came to a stop.

Because there is evidence that Gatekeeper's Purchek product was not reasonably safe as designed and its warnings were inadequate and that both failures were a cause of Ms. LaRocque's injuries, Gatekeeper's motion for summary judgment should be denied.[1]

## II.    BACKGROUND

**A.    Ms. LaRocque Was Injured When a Fred Meyer Shopping Cart Outfitted with Gatekeeper's Product Abruptly Locked After She Attempted to Exit the Store With an Empty Cart**

On May 6, 2023, Plaintiff Linda LaRocque and her husband went shopping at Tacoma-Stevens Fred Meyer to purchase a magnesium supplement. (ECF 84-1, LaRocque Dep. at 48:11-24). Ms. LaRocque used one of the Fred Meyer shopping carts while

[1] Ms. LaRocque is not asserting a claim based on a strict manufacturing / construction liability claim under RCW 7.72.030(2).

PLTF'S OPP TO GATEKEEPER'S MSJ - 3 of 25
[4871-5472-8598]

shopping. (*Id.*). The cart did not contain any warning about potentially locking at the exit. (ECF 84-1 at 56:7-16, 58:14-24; *see also* Declaration of Levi Dixon, Ex. Nos. 2 and 3). After discovering Fred Meyer did not have that supplement, she proceeded to exit the store without making a purchase. (ECF 84-1 at 48:20-24). Unbeknownst to Ms. LaRocque, the anti-theft locking mechanism installed on Fred Meyer's shopping carts had been programmed to activate at the exit unless a cart first passes through the checkout area. (ECF 84-5, Kroger and Fred Meyer 30(b)(6) dep. at 146:16-147:1).

As Ms. LaRocque exited the store, the empty cart's anti-theft locking mechanism abruptly and unexpectedly engaged. (ECF 84-1 at 51:13 – 54:17; 55:6 – 56:16). The sudden stop caused Ms. LaRocque's knee—on which surgery had been performed only months earlier—to collide with the cart. (ECF 84-1 at 50:24 – 54:17). The impact displaced Ms. LaRocque's patella, necessitating two additional surgeries. (ECF 116; 116-2; 116-3).

Fred Meyer did not create an incident report following Ms. LaRocque's injury. (ECF 84-5 at 66:22 – 67:7). A Fred Meyer store employee unlocked the cart and told Ms. LaRocque that "this happens a couple times a day." (ECF 84-1 at 52:4-24). The employee did not report the injury or create an incident report, and no contemporaneous incident report was produced in discovery. (ECF 84-1 at 55:6 -11; Ex. 5 at 66:22-25).

B.    **The Wheel Locking Warning Signs Are Missing from Some Carts and the Warning Signs Affixed to the Sliding Doors Are Obstructed**

There are two types of warning signs related to the anti-theft locking mechanism at the Tacoma Stevens Fred Meyer. The first are affixed to the sliding glass entrance/exit doors and state:

> Attention Shoppers! Shopping cart wheels may lock unexpectedly if removed from the store. Shopping cart wheels will lock if taken beyond parking lot.

The asset protection warning sign affixed to the sliding door is almost completely obscured

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
1201 PACIFIC AVENUE, SUITE 2200
TACOMA, WASHINGTON 98402
(253) 620-6500 - FACSIMILE (253) 620-6565

when the doors are open for customers to enter or exit. (ECF 84-7, Fred Meyer's Responses to Requests for Admission Nos. 1, 2).

Meanwhile, the warning sign affixed to *some* of the carts states:

> Shopping Carts may stop unexpectedly at exit doors and carts will stop if taken beyond the perimeter of the parking lot. !WARNING! **Asset Protection Device Installed.**

(*See* Declaration of Levi Dixon in Support of Ms. LaRocque's Opp. to Gatekeeper's MSJ, Ex. 2, Report). As such, the carts indicate that it is an asset protection device, which presumptively would only activate when assets, like merchandise, are in a cart.

Gatekeeper testified that its employee Tim Wright installed the warning signs on the doors when he also installed the Purchek system at the Tacoma Fred Meyer Store. (ECF 84-3, Excerpts from Gatekeeper's 30(b)(6) dep at 40:2-23). Mr. Dixon observed numerous carts with the Gatekeeper locking system installed that were missing warning signs no longer affixed to the cart. (*See* Dixon Declaration, Ex. 2).

Mr. Dixon opines that installing the warning signs in a location that renders them concealed or partially concealed compromises the reliability of the warnings because it increase the risk of a customer not receiving the warning in the first place. (Declaration of Levi Dixon at ¶ 9). A warning that is not perceived by the user is not capable of changing behavior to reduce the risk of an incident occurring. (*Id.*).

C.   **Fred Meyer Documents 70 Incident Reports of Injuries Sustained by Customers Using Gatekeeper's Product**

During discovery, Ms. LaRocque requested all incident reports relating to injuries caused by the anti-theft cart locking mechanism at Fred Meyer Washington stores since 2020. In response, Fred Meyer produced 70 incident reports documenting *reported* injuries caused by the mechanism. These reports show that customers have suffered a wide range of injuries when the cart wheels suddenly lock, such as bruised and swollen

PLTF'S OPP TO GATEKEEPER'S MSJ - 5 of 25
[4871-5472-8598]

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
1201 PACIFIC AVENUE, SUITE 2200
TACOMA, WASHINGTON  98402
(253) 620-6500  -  FACSIMILE (253) 620-6565

shins and knees; bloodied nose; sprained wrists; a cracked rib; injuries to neck, back, and shoulder areas; the inability to lift an injured arm; and aggravations of preexisting injuries. (ECF 84-9, Incident Reports, *see* Second Notice of Physical Filing, ECF 83),  Notably, vulnerable populations such as young children sitting in the carts, pregnant women, people with preexisting injuries, or elderly individuals seem to be more severely injured. (*Id.*). Significantly, nearly one-third of the injured customers who completed incident reports indicated they either received medical treatment or intended to seek medical care as a result of their injuries caused by the cart locking up. (*Id.*).

Throughout the incident reports, customers frequently describe the locking mechanism as activating "unexpectedly." (ECF 84-9; 83). In many of the Incident Reports, injured customers report that the shopping carts did not have any warning signs affixed. (*Id.*).

Notably, the incident reports capture only those injuries that are reported to Fred Meyer store managers and documented in accordance with company policy. Incidents like Ms. LaRocque's therefore go unreported. (ECF 84-5 at 72:5-24). Meanwhile, the incident reports capture injuries only at Fred Meyer—not other Kroger stores. (ECF 84-9; 83).

Gatekeeper flouted this Court's Order requiring it to produce tender letters and responses by May 27, 2026. (ECF 96; *see also* ECF 111). On June 24, 2026 Gatekeeper re-produced all the tender letters Fred Meyer had already produced—Gatekeeper left Fred Meyer's original Bates Label on its "production"—and produced 7 new additional tender letters. (Wilke Decl. at ¶ 4; Wilke Decl. Ex. 3, Gatekeeper Tender Letter Production; *cf.* Wilke Decl., Ex. 5, Fred Meyer Tender Letter Production; Ex. 2, Discovery Supplement). Notably, Fred Meyer authored the 7 newly produced tender letters but Fred Meyer failed to produce them in response to discovery, despite representing to the Court in a joint discovery hearing

PLTF'S OPP TO GATEKEEPER'S MSJ - 6 of 25
[4871-5472-8598]

that it had produced all tender letters it had authored.  We now know that representation was false.

Gatekeeper produced no responses to the tender letters. (*Id.*). The tender letters that were produced describe numerous examples of lawsuits filed by Fred Meyer customers who were injured when parts of their body struck a shopping cart that abruptly stopped after Gatekeeper's locking system activated. (Wilke Decl., Ex. 3).

### D.    Gatekeeper Testified it Designed a Product that Prevents Empty Cart Scenario Activations Called Smart Exit that Was Available in 2022

Gatekeeper testified it provided the cart warning placards and the warning signs affixed to the Store's sliding glass doors. (ECF 84-3 at 23:24 – 24:8). Gatekeeper confirmed it manufactures several systems, including one system that only locks shopping cart wheels that are taken beyond a store parking lot and a system where wheels lock when a cart has not gone through the checkout stand and made a purchase, called the Purchek system. (ECF 84-3  at 25:15 - 26:18). The Purchek system is installed at the Store. (ECF 84-3 at 36:15-20).

Gatekeeper also installed its Video Classification product at the Store. (ECF 84-3 at 56:24-57:3). Video Classification video records every activation of the wheel locks, and categorizes the wheel lock event as a pushout—an attempted theft—or an empty cart scenario. (ECF 84-3 at 26:22-28:25; 42:21-43:13; 58:17-59:6). Gatekeeper confirmed it and Fred Meyer possess data regarding the percentage of cart activations that do not involve attempted theft. (ECF 84-3 at 64:25- 66:6).

Notably, Gatekeeper testified it offers a product called Smart Exit to customers with the Purchek system that will prevent carts from activating when a customer like Ms. LaRocque attempts to exit the store with an empty cart, a scenario that mimics an attempted theft because the cart does not travel the pathway through the checkout

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
1201 PACIFIC AVENUE, SUITE 2200
TACOMA, WASHINGTON  98402
(253) 620-6500  -  FACSIMILE (253) 620-6565

register. (ECF 84-3 at 32:13-36:9; 55:21-25;). Gatekeeper testified the empty cart scenario is the "same pattern as a pushout. So the system sees it as that." (*Id.* at 34:15-18). Gatekeeper testified it offered Smart Exit to "stop empty carts from locking." (*Id.* at 55:21-25). Following a joint discovery statement and conference with the Court, Gatekeeper produced the cart classification log for May 6, 2023, the date of Ms. LaRocque's incident. (Wilke Decl., Ex. 1, May 6, 2023 Cart Classification Log). Out of 21 total cart locking activations that occurred at that Fred Meyer store on May 16, twelve of the activations were empty cart activations, meaning over half of all activations were empty cart scenarios. (Wilke Decl., Ex. 1, May 6 Cart Classification Log).

Gatekeeper testified that Kroger has adopted the Smart Exit at some of its stores, but at none of its Fred Meyer stores. (ECF 84-3 at 32:13-36:9). In contrast to the inaccurate representation of its 30(b)(6) testimony in its motion for summary judgment, Gatekeeper actually testified that the Smart Exit system is available for purchase, but Fred Meyer has simply chosen not to purchase it., while its affiliated entity Kroger has installed Smart Exit in a trial use. (ECF 84-3 at 35:3 24, Q:"Does Gatekeeper have any Smart Exit systems installed for any client that isn't a test or trial? A: Yes, we do.").

E.    **Gatekeeper's Public Statements and Videos Confirm its Smart Exit Product Was Available in 2022, and that Activated Carts Stop Suddenly**

Gatekeeper maintains a YouTube channel where it posts content related to its anti-theft products. Despite claims that when the anti-theft mechanism activates the carts do not suddenly stop, videos posted by Gatekeeper of the carts activating demonstrate that when the wheels lock the carts abruptly and suddenly stop and cannot be moved forward. (ECF 84-11, Gatekeeper Video; *see also* ECF 79, Notice of Physical Filing). Gatekeeper testified its YouTube videos are "factual." (ECF 84-3 at 22:6-23:3).

Moreover, Gatekeeper was aware that the empty cart scenario, in which a legitimate

PLTF'S OPP TO GATEKEEPER'S MSJ - 8 of 25
[4871-5472-8598]

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
1201 PACIFIC AVENUE, SUITE 2200
TACOMA, WASHINGTON  98402
(253) 620-6500  -  FACSIMILE (253) 620-6565

customer attempts to leave the store without placing anything in their cart, was problematic because that scenario mimicked a cart push-out scenario and accounted for over half of cart activations. (ECF 84-10, May 6, 2022 Gatekeeper Video, *see* ECF 79). As early as 2022, Gatekeeper provided a product called Smart Exit that identifies empty carts and prevents the anti-theft activating when customers with empty carts exit the store.  (ECF 84-3 at 32:13-34:24, ECF 84-10, ECF 79).

Gatekeeper testified Kroger only recently implemented Smart Exit at a handful of stores despite its earlier availability. (ECF 84-3 at 35:3-24).

Gatekeeper admits that a significant percentage of anti-theft cart activations involve empty carts. (ECF 84-10, ECF 79.) Accordingly, customers are exposed to sudden and unexpected cart lockups despite having no items in their carts, creating an unreasonably dangerous condition.

F.    **In its Tender Letter to Gatekeeper, Fred Meyer Asserts Gatekeeper Failed to Install the Smart Exit Product**

The tender letter involving Ms. LaRocque's injury asserts that Gatekeeper "failed to maintain the required maintenance signage, the cart's smart wheels and the **smart exit** controls leading to [Ms. LaRocque's] injury and subsequent lawsuit. " Specifically, the tender letter in this case contains allegations by Fred Meyer that Gatekeeper's product was not reasonably safe:

//

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
1201 PACIFIC AVENUE, SUITE 2200
TACOMA, WASHINGTON  98402
(253) 620-6500  -  FACSIMILE (253) 620-6565

Exhibit F of the Agreement provides that Gatekeeper Services Inc. promised to "conduct a full assessment to the [Purchek Pushout Theft Prevention] system, customer awareness signage and operator training to optimize the theft prevention performance" and to "update system components to latest version or upgrade lane designs and smart exit controls as requested to ensure system is not obsolete and under-performing." See Page 26 of Agreement, "Performance Verification Services for Purchek Pushout Theft Prevention System." Gatekeeper specifically promised to address "expected degradation and accidental damage to outside, in-ground antenna lines and ensure customer awareness signage controls liability and improves the shopper experience." See page 26 of Agreement, "Cart Containment System and Smart Wheels On-site Preventative Maintenance." Further, as part of Gatekeeper System Inc's Preventative Maintenance and Performance Verification Services, Gatekeeper promised to "inspect for proper Site Management/Customer Awareness signage and notify customer of any missing signage." See page 30 of Agreement, "Scope of Work." Gatekeeper's Scope of Work explicitly included inspection and/or maintenance of "Smart exit control sensors" and "Customer awareness signage on carts and CartKey." See page 31 of Agreement. Per the agreement, Gatekeeper was required to report and maintain customer awareness signage, the smart wheels installed on our client's shopping carts, and the smart exit controls to mitigate liability in the instance its Purchek Pushout Theft Prevention failed. In the present matter, Gatekeeper failed to maintain the required customer maintenance signage, the cart's smart wheels and the smart exit controls leading to Plaintiff's injury and subsequent lawsuit.

(Wilke Decl., Ex. 4, LaRocque Tender Letter at DEF Fred Meyer_000013). Most importantly, Fred Meyer asserts that Gatekeeper failed to upgrade or update its system to include the Smart Exit control system, which as discussed above prevents the empty cart scenario that led to Ms. LaRocque striking her knee on the back of the shopping cart when the cart abruptly locked. (*Id.*).

G.    **Plaintiff's Human Factors Expert, Levi Dixon, Opines that Gatekeeper's Unsafe Design and Failure to Provide Adequate Warnings Were a Cause of Ms. LaRocque's Injury Incident**

Ms. LaRocque's human factors expert, Levi Dixon, is a Senior Engineer at Applied Cognitive Sciences. Mr. Dixon is a Certified Safety Professional, Certified Human Factors Professional, and Certified XL Tribometrist. Mr. Dixon obtained his Masters in Human Factors and Ergonomics from San Jose State University. Mr. Dixon's qualifications and credentials are set forth in greater detail in his CV. (Dixon Decl., Ex. 1, CV).

Mr. Dixon timely provided two reports in this matter. (*See* Dixon Decl., Ex. 2, February 25, 2026 report; Ex. 3, May 7, 2026 supplemental report). Generally, Mr. Dixon

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
1201 PACIFIC AVENUE, SUITE 2200
TACOMA, WASHINGTON  98402
(253) 620-6500  -  FACSIMILE (253) 620-6565

opines that Gatekeeper's shopping cart locking mechanism product was unsafe and posed a serious risk of harm to pedestrians due to unexpected contact with the cart, especially because the warning signs Gatekeeper provided to Fred Meyer as part of its sale of the product to Fred Meyer were inadequate as they are unreliable and inconsistent with basic principles for warnings, thereby compromising their effectiveness at communicating the basic components of a warning to users. (Dixon Decl. at ¶ 5;. Ex. Nos. 2 and 3). He opines the actual message of the warning placards and signage is misleading, ambiguous, and contradictory in nature. (*Id.*).

For example, the signage on the glass doors states that the shopping cart wheels may lock unexpectedly "if removed from the store", whereas the placards inside the carts state that they may stop unexpectedly "at exit doors." In other words, the signage and placards provide conflicting information regarding the location of where the wheel may lock (i.e., at the exit doors or only if they are removed from the store). (*Id.*). Mr. Dixon explains the language "if removed from the store" suggests the wheels will lock only if the cart is removed from the building itself whereas "at exit doors" suggests that the wheels will lock at the threshold itself. (*Id.*). In addition, it is unclear whether the exit doors refer to the interior foyer doors, the exterior set of doors, or both, which creates ambiguity. (*Id.*). Mr. Dixon notes people routinely take their shopping cart outside of the facility (such as to go to their vehicle to unload it. (*Id.*).

Mr. Dixon opines that a warning stating that the wheels may lock if removed from the store and/or at the exit doors conflicts with our everyday experience and expectations, which can compromise the credibility of the warning and the uncertainty of when the wheels will actually lock versus when they "may" lock (if at all). (*Id.*).

Mr. Dixon also notes both the placards and signage repeatedly describe that the

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
1201 PACIFIC AVENUE, SUITE 2200
TACOMA, WASHINGTON 98402
(253) 620-6500 - FACSIMILE (253) 620-6565

wheels "may" lock/stop unexpectedly. (Dixon Decl. at ¶ 6, Ex. Nos. 2 and 3).  While this illustrates appreciation and awareness that the carts were at risk of unexpectedly stopping (which poses a risk of harm to patrons, as discussed in more detail in Mr. Dixon's reports), the wording that the carts "may" stop/lock unexpectedly is ambiguous and does not clearly communicate to the user when the cart is actually going to stop/lock and put them at risk of harm. (*Id.*).

Mr. Dixon opines that even if a patron knows that the carts "may" unexpectedly lock, they are still at risk of contacting the cart, since it may happen unexpectedly, such that they do not have time to prepare for and/or avoid striking the cart. (Dixon Decl. at ¶ 7). Mr. Dixon explains the ambiguous language stating that the wheels "may" lock/stop increases the risk of a patron being uncertain on various information, such as where the wheels will lock (if at all), if the cart is actually equipped with the locking wheels and/or if the system is active, the nature of the stop (will it be abrupt vs. gradual), and the like. (*Id.*). Mr. Dixon opines that even if a customer does receive the message contained within the warnings, they will still be put at risk of contacting the cart if the wheels unexpectedly stop, given that the cart is at risk of unexpectedly stopping at a time and place that is unknown and not clearly defined to the user, along with the unknown nature of the wheels locking (i.e., abrupt vs. gradual) and the lack of information provided to the user regarding what needs to be done in the event of the wheels locking to avoid contacting/striking the cart. (*Id.*).

Mr. Dixon opines Gatekeeper's shopping cart locking mechanism was unsafe and posed a serious risk of harm to customers, especially because adequate warnings were not provided to communicate the information necessary to reliably warn a customer of the hazard, the consequence, and how to avoid the hazard. (Dixon Decl. at ¶ 8).  Mr. Dixon

PLTF'S OPP TO GATEKEEPER'S MSJ - 12 of 25
[4871-5472-8598]

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
1201 PACIFIC AVENUE, SUITE 2200
TACOMA, WASHINGTON  98402
(253) 620-6500  -  FACSIMILE (253) 620-6565

explains that even if Ms. LaRocque had seen the warning signs, the warning signs failed to provide sufficient information regarding what needs to be done in the event of the wheels locking to avoid contacting/striking the cart, or sufficient information of what behavior, such as taking an empty cart through the exits, would cause the cart to lock up to avoid the cart locking up in the first place. (*Id.*). Based on Mr. Dixon's education, training, and experience in Safety and Human Factors Engineering, along with his review of the evidence in this case, it is Mr. Dixon's opinion on a more probable than not basis that the interaction of the unsafe design and failure to provide adequate warnings were a cause of Ms. LaRocque's injury incident. (*Id.*).

Fred Meyer admits that the warning signage on the automatic doors is obstructed when the doors are open and that there are no other warning signs affixed to entrances.(ECF 84-7, RFA responses; *see also* 84-2, photographs). Mr. Dixon confirms that the warning signs were installed in a location that puts them at risk of being of being concealed or partially obscured.(Dixon Decl. at ¶ 9). Mr. Dixon acknowledges that Gatekeeper testified its employee Tim Wright installed the warning signs when it installed the anti-theft shopping cart locking mechanism at the Tacoma Fred Meyer store. (ECF 84-3 at 40:2-23, Dixon Decl. at ¶ 9). Mr. Dixon opines that installing the warning signs in a location that renders them concealed and/or partially obscured compromises the reliability of the warnings, because such an action increases the risk of a customer not perceiving the warning in the first place; hence, a warning that is not perceived by the user is not capable of changing behavior to reduce the risk of an incident occurring. (Dixon Decl. at ¶ 9). Mr. Dixon explains that consistent with this discussion, Ms. LaRocque had not observed the concealed and/or partially obscured warnings, which is not surprising given their placement and the environmental conditions that exist in the general area. (*Id.*). In

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
1201 PACIFIC AVENUE, SUITE 2200
TACOMA, WASHINGTON  98402
(253) 620-6500  -  FACSIMILE (253) 620-6565

light of this conversation, Mr. Dixon opines that on a more probable than not basis that the presence of concealed and/or partially obscured warnings were unreliable and a cause of Ms. LaRocque's injury incident. (*Id.*).

Regarding the Smart Exit system, and as Mr. Dixon testified in his May 20, 2026 deposition (Wilke Decl., Ex. 6, Dixon Dep at 22:7-16; 24:21 – 25:3; 25:9-24; 38:3-17; 60:14-21; 108:11-16), Mr. Dixon opines that Gatekeeper has designed an engineering control, the Smart Exit system, to eliminate and/or reduce the risk of empty cart activations occurring in the first place, thereby protecting pedestrians from the risk of harm posed by the shopping cart abruptly/unexpectedly stopping when taking an empty cart back out of the facility. (Dixon Decl. at ¶ 10). Mr. Dixon opines that despite an appreciation of the need to eliminate and/or reduce empty cart activations, Mr. Dixon understands that the system is an option required to be purchased, rather than a standard feature, despite being a safety feature that protects customers from empty cart activations and the risk of harm they pose. (*Id.*).

Mr. Dixon reviewed the May 6, 2022, Gatekeeper YouTube video in which Gatekeeper acknowledges the empty cart scenario was problematic because that scenario mimicked a cart push-out scenario and accounted for potentially over half of cart activations. (Dixon Decl. at ¶ 11. Mr. Dixon explain that in that video Gatekeeper also acknowledges that it developed the Smart Exit system that identifies empty carts and prevents the locking wheels from activating when customers with empty carts exit the store, thereby protecting them from the risk of harm posed by the shopping cart unexpectedly stopping and "provide a better shopper experience."(*Id.*).

Mr. Dixon opines that based on his education, training, and experience, such actions illustrate that Gatekeeper appreciated that the Purchek system is flawed due to

PLTF'S OPP TO GATEKEEPER'S MSJ - 14 of 25
[4871-5472-8598]

the likelihood of empty cart activations that put non-stealing/innocent customers at risk of harm due to the unexpected and abrupt lock-up of a shopping cart. (Dixon Decl. at ¶ 12). Mr. Dixon explains that Gatekeeper designed a system to eliminate and/or reduce the risk of empty cart activations and the risk they pose to customers, but requires customers to pay extra for this safety feature. (*Id.*). Mr. Dixon opines that if the Smart Exit system had been implemented and was functioning properly, that would have prevented harm to customers exiting the stores with empty carts due to empty cart activations, with no or minimal effect on the usefulness of the product. (*Id.*). Mr. Dixon opines that if Gatekeeper had equipped its system with Smart Exit as a standard safety featured instead of an option, it is more likely than not that Ms. LaRocque's empty shopping cart would not have abruptly/unexpectedly stopped and her incident would not have occurred. (*Id.*).

Mr. Dixon explains Gatekeeper's 2022 introduction of the Smart Exit product confirms Gatekeeper appreciated that there was a risk of empty cart activations with the potential to harm customers when an empty cart unexpectedly stopped. (Dixon Decl. at ¶ 14). In addition to implementing an engineering control like the Smart Exit system on all of its Purchek systems (instead of it being an option), Gatekeeper could have reduced the risk of empty cart activations by providing warnings that were consistent with basic principles for warnings, rather than ambiguous warnings that were at risk of being concealed and/or partially obscured. (*Id.*). Mr. Dixon opines that on a more probable than not basis that the failure of Gatekeeper to implement engineering controls and/or warnings that were consistent with basic principles for warnings was a cause of Ms. LaRocque's injury incident. (*Id.*).

Lastly, Mr. Dixon opines that based on the above as well as the 70 other incidents at Washington Fred Meyer stores involving injuries caused by the shopping cart locking

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
1201 PACIFIC AVENUE, SUITE 2200
TACOMA, WASHINGTON 98402
(253) 620-6500 - FACSIMILE (253) 620-6565

mechanism, the warnings are inadequate. (Dixon Decl. at ¶ 13). Mr. Dixon explains the significant number of customers injured by Gatekeeper's product supports this conclusion. (*Id.*). Mr. Dixon opines the inadequate warnings are more likely than not a cause of Ms. LaRocque's incident because the empty shopping carts unexpectedly locking catch customers off guard, resulting in the customer being put at risk of harm due to running into and/or making contact with the shopping cart that abruptly and unexpectedly stopped. (*Id.*).

### H.     Plaintiff's Orthopedic Surgeon, Dr. Bruce Rolfe, MD, Opines that on a More Probable Than Not Basis the Shopping Cart Locking Up and Causing Ms. LaRocque to Strike her Knee on the Back of the Cart was the Cause of Ms. LaRocque's Injuries

Dr. Bruce Rolfe, MD's—Ms. LaRocque's orthopedic surgeon expert—qualifications and credentials are set forth in his CV. (ECF 116, Rolfe Declaration; ECF 116-1, CV). Dr. Rolfe has produced two timely reports in this matter. (ECF 116-2; 116-3). As discussed in his February 26, 2026 report (ECF 116-2) and his Declaration (ECF 116), Dr. Rolfe opines that on a more probable than not basis and to a reasonable degree of medical certainty, Ms. LaRocque's knee injury was caused by the May 6, 2023 incident in which her left knee struck the back of a Fred Meyer shopping cart. (ECF 116 at ¶ 5).  As Ms. LaRocque was leaving the Fred Meyer store, walking back out towards the parking area, the cart locked up, and Ms. LaRocque struck her recently operated left knee on the shopping cart. (*Id.*). Dr. Rolfe explains that evaluation by Ms. LaRocque's medical providers soon after the May 6, 2023 incident showed a nondisplaced fracture of the patella. (*Id.*).

Dr. Rolfe's conclusion that the shopping cart incident caused a nondisplaced fracture of Ms. LaRocque's patella is based on a number of items, including Ms. LaRocque's treating providers' records. (ECF 116 at ¶ 6). Dr. Rolfe points to a May 9, 2023 chart note from Alexandria Bones, PA-C that confirms that Ms. LaRocque's injury was

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
1201 PACIFIC AVENUE, SUITE 2200
TACOMA, WASHINGTON  98402
(253) 620-6500  -  FACSIMILE (253) 620-6565

caused by her left knee striking the shopping cart. (*Id.*). Dr. Rolfe also points to Ms. LaRocque's May 9, 2023 and June 22, 2023 imaging studies demonstrate that her patella shifted following her February 9, 2023 surgery, which is consistent with when Ms. LaRocque's knee came into contact with the shopping cart on May 6, 2023. (ECF 116 at ¶ 7).

Dr. Rolfe also notes that Dr. W. Frederick Thompson, MD, the orthopedic surgeon who performed Ms. LaRocque's first total knee replacement, noted during Ms. LaRocque's Pre-Op Evaluation for her second surgery, that Ms. LaRocque had been healing uneventfully, but then the incident with the shopping cart occurred and ruptured her patella tendon. (ECF 116 at ¶ 8). Dr. Rolfe also reviewed Ms. LaRocque's deposition testimony, and evaluated Ms. LaRocque in person. (ECF 116 at ¶ 9). Based on his education, training, experience, and all the materials Dr. Rolfe reviewed, Dr. Rolfe opines that on a more probable than not basis and to a reasonable degree of medical certainty, Ms. LaRocque's patellar tendon rupture was caused by the May 6, 2023 shopping cart incident in which the cart suddenly locked. (*Id.*).

### III.    ARGUMENT

### A.    Summary Judgment Standard

Rule 56 governs summary judgment motions and provides that "[t]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
1201 PACIFIC AVENUE, SUITE 2200
TACOMA, WASHINGTON  98402
(253) 620-6500  -  FACSIMILE (253) 620-6565

B.      The WPLA Supplants Common Law Claims

The WPLA is the exclusive remedy for product liability claims. *Scott v. Amazon.com, Inc.,* 583 P.3d 1155, 1160 (2026) (citing *Potter v. Wash. State Patrol,* 165 Wash.2d 67, 87, 196 P.3d 691 (2008)).  It supplants all common law claims or actions based on harm caused by a product. *Wash. State Physicians Ins. Exch. & Ass'n v. Fisons Corp.,* 122 Wn.2d 299, 323, 858 P.2d 1054 (1993); *Wash. Water Power Co. v. Graybar Elec. Co.,* 112 Wn.2d 847, 853, 774 P.2d 1199, 779 P.2d 697 (1989).  Insofar as a negligence claim is product-based, the negligence theory is subsumed under the WPLA product liability claim. *Hue v. Farmboy Spray Co., Inc.,* 127 Wn.2d 67, 87, 896 P.2d 682 (1995); *Wash. State Physicians Ins. Exch. & Ass'n,* 122 Wn.2d at 323, 858 P.2d 1054; *Wash. Water Power,* 112 Wn.2d at 853, 774 P.2d 1199 (1989). Unlike Fred Meyer, whose liability is not limited to claims brought under RCW 7.72.040(1) but also for its negligence as a premises owner, Ms. LaRocque's claims against Gatekeeper as the manufacturer of the subject product are set forth under RCW 7.72.030.

It is worth noting that the Act provides that "[t]he previously existing applicable law of this state on product liability is modified only to the extent set forth in" the Act. RCW 7.72.020(1). Moreover, with respect to failure to warn claims in particular, courts have concluded that the legislature intended that the Act's provisions themselves carry forward principles that we previously recognized under the common law. Specifically, RCW 7.72.030 governs claims that a product manufacturer is liable in that the product is not reasonably safe because the manufacturer failed to provide adequate warnings or instructions. Strict liability principles apply to both defective design and failure to warn cases. RCW 7.72.030(1), (2); see *Falk v. Keene Corp.,* 113 Wn.2d 645, 782 P.2d 974 (1989) (design defects); *Ayers ex rel. Ayers v. Johnson & Johnson Baby Prods. Co.,* 117

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
1201 PACIFIC AVENUE, SUITE 2200
TACOMA, WASHINGTON  98402
(253) 620-6500  -  FACSIMILE (253) 620-6565

Wn.2d 747, 762–63, 818 P.2d 1337 (1991) (failure to warn). These are the strict liability principles that were defined by the court under the common law prior to the WPLA. *Falk,* 113 Wn.2d at 650–54, 782 P.2d 974; see *Couch v. Mine Safety Appliances Co.,* 107 Wn.2d 232, 728 P.2d 585 (1986); *Seattle–First Nat'l Bank v. Tabert,* 86 Wn.2d 145, 542 P.2d 774 (1975).

Accordingly, whilst Ms. LaRocque's product liability claims against Gatekeeper are subsumed under the WPLA, which therefore supplants Ms. LaRocque's negligence and premises liability claims as to Gatekeeper, the Court may still look to those common law principles which were not strictly modified by the WPLA.

## C.    Gatekeeper Violated the WPLA

Under Washington law, product manufacturers have a duty to provide a reasonably safe product. *See Anderson v. Dreis & Krump Manufacturing Corporation,* 48 Wn. App. 432, 440, 739 P.2d 1177 (1987). The WPLA imposes a duty upon product manufacturers to design products that are reasonably safe. RCW 7.72.030. A product manufacturer like Gatekeeper is liable to claimants like Ms. LaRocque if:

(1)    "the claimant's harm was proximately caused by the negligence of the manufacturer in that the product was not reasonably safe as designed" (**design defect**);

(2)    "the claimant's harm was proximately caused by the negligence of the manufacturer in that the product was … not reasonably safe because adequate warnings or instructions were not provided" (**failure to warn at the time of sale); or**

(3)    "the claimant's harm was proximately caused by the fact that the product was not reasonably safe in construction" (**construction defect**).

RCW 7.72.030(1), (2).

Here, the evidence establishes all of the elements of Gatekeeper's violations of the WPLA as to a design defect, failure to warn, and causation as to Ms. LaRocque's injury as

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
1201 PACIFIC AVENUE, SUITE 2200
TACOMA, WASHINGTON 98402
(253) 620-6500  -  FACSIMILE (253) 620-6565

a result of the WPLA violations. At a minimum, there are issues of fact which preclude granting summary judgment in favor of Gatekeeper.

### 1.   Design Defect

A manufacturer's liability for a defective design is established under RCW 7.72.030 in two distinct ways. *Soproni v. Polygon Apartment Partners*, 137 Wn.2d 319, 326, 971 P.2d 500 (1999). "On the one hand, a plaintiff may attempt to establish liability by showing that, at the time of manufacture, the likelihood that the product would cause the plaintiff's harm or similar harms, and the seriousness of those harms, outweighed the manufacturer's burden to design a product that would have prevented those harms and any adverse effect a practical, feasible alternative would have had on the product's usefulness." *Id*.; RCW 7.72.030(1)(a)). "This is the so-called 'risk utility test.' " *Soproni*, 137 Wn.2d at 326. "Alternatively, a plaintiff may employ the 'consumer expectations' test, which requires the plaintiff to show that the product was 'unsafe to an extent beyond that which would be contemplated by the ordinary consumer.'" *Id*. at 326-27 (*citing Falk*, 113 Wn.2d at 654; RCW 7.72.030(3)).

The consumer expectations test recognizes that certain situations exist where the type of accident itself may establish a defect:

> In the type of case in which there is no evidence, direct or circumstantial, available to prove exactly what sort of manufacturing flaw existed, or exactly how the design was deficient, the plaintiff may nonetheless be able to establish his right to recover, by proving that the product did not perform in keeping with the reasonable expectations of the user.

*Pagnotta v. Beall Trailers of Or., Inc.*, 99 Wn. App. 28, 37, 991 P.2d 728 (2000).

Relevant considerations under the consumer expectations test include "[t]he relative cost of the product, the gravity of the potential harm from the claimed defect and the cost and feasibility of eliminating or minimizing the risk." *Falk*, 113 Wn.2d at 649.

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
1201 PACIFIC AVENUE, SUITE 2200
TACOMA, WASHINGTON  98402
(253) 620-6500  -  FACSIMILE (253) 620-6565

Additionally, "'[i]n other instances the nature of the product or the nature of the claimed defect may make other factors relevant to the issue.'" *Id*.

The evidence in this case establishes Gatekeeper's violation of the WPLA under both the "risk-utility" theory and the "reasonable consumer expectation" theory. As demonstrated by the over 400 pages of incident reports of substantially similar injuries suffered by customers using the subject product, the product as designed poses a clear hazard to the ordinary consumers of said product. The evidence presented establishes that the risk of harm was outweighed by a feasible alternative design. (ECF 84-9, Incident Reports, *see* Second Notice of Physical Filing, ECF 83); Dixon Decl.).

Mr. Dixon opines that Gatekeeper could have incorporated its Smart Exit system on all its systems which would have ensured customers like Ms. LaRocque were not injured by the locking mechanism in the often-occurring empty cart scenario. (*See* Dixon Decl. and Ex. Nos. 2 and 3). Instead, Gatekeeper chose to keep its Smart Exit system behind a paywall. The evidence at a minimum creates a disputed issue of fact as to whether the faulty design of the subject product caused Ms. LaRocque's injuries.

2.    Failure to Warn

RCW 7.72.030 states in pertinent part:

A product manufacturer is subject to liability to a claimant if the claimant's harm was proximately caused by the negligence of the manufacturer in that the product was not reasonably safe … because adequate warnings or instructions were not provided.

RCW 7.72.030(1).

Under Washington law, a plaintiff may establish liability by using either a risk-utility test or a consumer expectation test for both design defect and failure to warn claims. *Ayers v. Johnson & Johnson Baby Prods. Co.*, 117 Wn.2d 747, 818 P.2d 1337 (1992) (*en banc*) (failure to warn claim); *Falk v. Keene Corp.*, 113 Wn.2d 645, 782 P.2d 974 (1989) (*en*

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
1201 PACIFIC AVENUE, SUITE 2200
TACOMA, WASHINGTON 98402
(253) 620-6500 - FACSIMILE (253) 620-6565

*banc*) (design defect claim). Although RCW 7.72.030 uses the term "negligence," strict liability is the applicable standard for a failure to warn or a design defect claim maintained under RCW 7.72.030(a) or (b). *Ayers*, 117 Wn.2d at 765, 818 P.2d 1337. However, for failure to warn claims involving a danger that becomes known after manufacture, a negligence standard is applied. *Ayers*, 117 Wn.2d at 765, 818 P.2d 1337.

To determine whether a warning is adequate requires an analysis of the warnings as a whole and the language used in the package insert. *Laisure-Radke v. Par Pharm., Inc.*, 426 F. Supp. 2d 1163, 1172 (W.D. Wash. 2006) (*citing Estate of LaMontagne v. Birstol-Myers Squibb*, 127 Wn. App. 335, 344, 111 P.3d 857 (2005). The court must examine the meaning and context of the language and the manner of expression to determine if the warning is accurate, clear and consistent and whether the warning portrays the risks involved. *Martin v. Hacker*, 83 N.Y.2d 1, 10–11, 628 N.E.2d 1308, 607 N.Y.S.2d 598 (1993); *cf. Little v. PPG Indus., Inc.*, 92 Wn.2d 118, 594 P.2d 911 (1979) (determining the adequacy of a warning by examining whether the warning sufficiently attracted the attention of the product users and informed them of the dangers of the product).

As already described extensively in this brief, Gatekeeper's product engages in abrupt braking which has caused many injuries to customers. Mr. Dixon concluded that the product is unsafe in part due to the unexpected and sudden nature of the braking mechanism which poses a hazard in that customers using Gatekeeper's product may not expect the sudden change and alter their behavior in time to respond or to avoid the braking altogether. Particularly in the situation involving Ms. LaRocque's injury due to the braking occurring when she attempted to exit the store with an empty cart, there is no evidence that any warning were displayed on the cart used by Ms. LaRocque suggesting

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
1201 PACIFIC AVENUE, SUITE 2200
TACOMA, WASHINGTON 98402
(253) 620-6500 - FACSIMILE (253) 620-6565

the cart will experience an abrupt stop if a customer attempts to leave the store without any merchandise in the shopping cart.

### D.     Gatekeeper's Defective Product Proximately Caused Ms. LaRocque's Injuries

Gatekeeper argues that its product did not cause Ms. LaRocque's injuries. However, issues pertaining to causation are issues of fact and not proper for summary judgment, particularly here with all facts support a finding of causation.  The "WPLA incorporates common law principles of proximate cause." *Scott v. Amazon.com, Inc.*, 583 P.3d 1155, 1160 (2026).  Proximate cause is generally a fact question for the trier of fact. *Hertog, ex rel. S.A.H. v. City of Seattle*, 138 Wn.2d 265, 275, 979 P.2d 400 (1999).

Here, Ms. LaRocque testified clearly and unequivocally that the shopping cart wheel locked abruptly and caused her to strike her knee on the back of the shopping cart.  Her injuries are consistent with the many injuries sustained by Fred Meyer customers who, like Ms. LaRocque, were injured due to the abrupt braking of the shopping cart locking mechanism. (ECF 84-9, Incident Reports, *see* Second Notice of Physical Filing, ECF 83). Dr. Rolfe concluded the only reasonably plausible cause of Ms. LaRocque's injuries was the hazard posed by the product itself and its abrupt braking mechanism. (ECF 116; 116-2; 116-3). Levi Dixon similar concluded the abrupt braking of the shopping cart mechanism and Gatekeeper's failure to adequately warn about the danger of the mechanism was the cause of Ms. LaRocque's injuries.  (*See* Dixon Decl.. and Ex. Nos. 2 and 3).

At a minimum, this evidence creates a disputed issue of fact as to causation therefore requiring denial of Gatekeeper's motion for summary judgment as to Ms. LaRocque's claims brought under the WPLA.

PLTF'S OPP TO GATEKEEPER'S MSJ - 23 of 25
[4871-5472-8598]

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
1201 PACIFIC AVENUE, SUITE 2200
TACOMA, WASHINGTON  98402
(253) 620-6500  -  FACSIMILE (253) 620-6565

IV.     CONCLUSION

Based on the foregoing, Ms. LaRocque respectfully requests that the Court deny Gatekeeper's motion for summary judgment as to her claims brought under the WPLA.

Counsel certifies that this memorandum contains 6,772 words, in compliance with the Local Civil Rules.

Dated this 29th day of June, 2026.

GORDON THOMAS HONEYWELL LLP

By  _____
Robert C. Wilke, WSBA No. 49937
rwilke@gth-law.com
Ian M. Leifer, WSBA No. 56670
ileifer@gth-law.com
Attorneys for Ms. LaRocque

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
1201 PACIFIC AVENUE, SUITE 2200
TACOMA, WASHINGTON  98402
(253) 620-6500  -  FACSIMILE (253) 620-6565

## DECLARATION OF SERVICE

I hereby declare that on June 29, 2026, in Tacoma, Washington, I caused the foregoing affixed document to be served on the following parties in the manner indicated herein:

| John R. Barhoum, WSBA #42776<br>Sarah Tuthill-Kveton, WSBA #51801<br>Hanna R. Lukes, WSBA #62610<br>Chock Barhoum LLP<br>121 SW Morrison Street, Suite 500<br>Portland, OR 97204<br>john.barhoum@chockbarhoum.com<br>sarah@chockbarhoum.com<br>hanna.lukes@chockbarhoum.com<br>michelle.heilbrun@chockbarhoum.com<br>devon.haggart@chockbarhoum.com<br>e-service@chockbarhoum.com | ☐ Via Legal Messenger<br>☐ Via U.S. Mail<br>☒ Via CM/ECF E-Filing<br>☒ Via Email |
|---|---|
| Francis S. Floyd, WSBA No. 10642<br>Skyler P. Urban, WSBA No. 58761<br>Floyd, Pflueger, Kearns, Nedderman, & Gress, P.S.<br>3101 Western Avenue, Suite 400<br>Seattle, WA  98121<br>ffloyd@nwtrialattorneys.com<br>surban@nwtrialattorneys.com<br>ecampbell@nwtrialattorneys.com<br>skatinas@nwtrialattorneys.com | ☐ Via Legal Messenger<br>☐ Via U.S. Mail<br>☒ Via CM/ECF E-Filing<br>☒ Via Email |

I DECLARE UNDER THE PENALTY OF PERJURY OF THE LAWS OF THE STATE OF WASHINGTON THAT THE FOREGOING IS TRUE AND CORRECT.

_____
Sarah M. Weger, Legal Assistant
sweger@gth-law.com

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
1201 PACIFIC AVENUE, SUITE 2200
TACOMA, WASHINGTON  98402
(253) 620-6500  -  FACSIMILE (253) 620-6565