# EXHIBIT 4



**SARAH TUTHILL-KVETON**

*Admitted in Oregon, Washington, & Idaho*

Direct: (971) 302-6426

Email: sarah@chockbarhoum.com

June 30, 2025

**VIA FIRST CLASS MAIL**

Gatekeeper Systems Inc.                      Gatekeeper Systems Inc.
**Attn: SVP Sales and Marketing**            **Attn: Craig Greenberg**
90 Icon                                       8 Studebaker
Foothill Ranch, CA 92610                      Irvine, CA 92618

     RE:    **Larocque v. The Kroger Co., et al**
              **Western District Court of Washington, Case No. 3:25-cv-05380-MJP**
              **Our File No.: KRO224.0010**

**TENDER OF DEFENSE AND INDENMITY**

To Whom It May Concern:

    This office represents The Kroger Co. and Fred Meyer Stores, Inc., in a civil case filed by Plaintiff Linda Larocque in the captioned case. Enclosed is a copy of Plaintiff's Complaint for your review. Our client hereby tenders the defense and indemnity for this matter to Gatekeeper Systems Inc. pursuant to the Master Services Agreement (the "Agreement") terms entered into between the Gatekeeper Systems Inc. ("Gatekeeper"), and our client, for defense of Plaintiffs' claims. Attached to this tender as Exhibit A is a copy of the Agreement.

    Plaintiff alleges that our client is liable for injuries she sustained to her knee when the anti-theft mechanism on the store's exit doors activated, causing the smart wheels of her shopping cart to lock and her knee to strike the cart. Plaintiff further alleges that there were no signs warning customers that the shopping carts were equipped with an anti-theft mechanism that would suddenly lock when exiting the store.

DEF FRED MEYER_000012

Gatekeeper Systems Inc.
Page 2

Exhibit F of the Agreement provides that Gatekeeper Services Inc. promised to "conduct a full assessment to the [Purchek Pushout Theft Prevention] system, customer awareness signage and operator training to optimize the theft prevention performance" and to "update system components to latest version or upgrade lane designs and smart exit controls as requested to ensure system is not obsolete and under-performing." See Page 26 of Agreement, "Performance Verification Services for Purchek Pushout Theft Prevention System." Gatekeeper specifically promised to address "expected degradation and accidental damage to outside, in-ground antenna lines and ensure customer awareness signage controls liability and improves the shopper experience." See page 26 of Agreement, "Cart Containment System and Smart Wheels On-site Preventative Maintenance." Further, as part of Gatekeeper System Inc's Preventative Maintenance and Performance Verification Services, Gatekeeper promised to "inspect for proper Site Management/Customer Awareness signage and notify customer of any missing signage." See page 30 of Agreement, "Scope of Work." Gatekeeper's Scope of Work explicitly included inspection and/or maintenance of "Smart exit control sensors" and "Customer awareness signage on carts and CartKey." See page 31 of Agreement. Per the agreement, Gatekeeper was required to report and maintain customer awareness signage, the smart wheels installed on our client's shopping carts, and the smart exit controls to mitigate liability in the instance its Purchek Pushout Theft Prevention failed. In the present matter, Gatekeeper failed to maintain the required customer maintenance signage, the cart's smart wheels and the smart exit controls leading to Plaintiff's injury and subsequent lawsuit.

In the event of legal proceedings such as those commenced by Plaintiff, Gatekeeper agreed to indemnify and hold our client harmless. Specifically, the following provision of the Agreement provides the relevant language pertaining to Gatekeeper's agreement to indemnify our client in the circumstances of litigation:

**10.    INDEMNIFICATION AND INSURANCE**

10.1    <u>Indemnification</u>.  Service Provider will indemnify, at Kroger's option, defend, and hold harmless Kroger, and its officers, directors, employees, subsidiaries, and affiliates, from and against all third party suits, proceedings, claims, damages, liabilities, costs, payments, and expenses (including reasonable attorneys' fees) asserted against Kroger or incurred by Kroger, to the extent arising out of (i) Service Provider's breach of this Agreement, (ii) any employment claims related to Service Provider Personnel, (iii) any claim for damages to property or injuries to persons, caused by or resulting from the willful or grossly negligent acts or omissions of Service Provider or Service Provider Personnel, or (iv) any claim by any party regarding the Project Deliverables including Kroger's use thereof, including, without limitation, intellectual property infringement claims.  Service Provide will have no obligation to defend, indemnify or hold Kroger harmless from any losses arising out of Kroger's gross negligence or willful misconduct.

Please be advised that if you fail to accept this tender, you will be bound by any action taken by our client and bound by any determination of fact. In addition, our client will hold Gatekeeper liable for all costs, expenses and losses incurred in this case, including the amount of any judgment, reasonable settlement, attorney's fees, and expert costs.

DEF FRED MEYER_000013

Gatekeeper Systems Inc.
Page 3


       We look forward to receiving a prompt response to this Tender of Defense and Indemnity from you. We appreciate your cooperation in addressing this matter.

                    Very truly yours,

                    Sarah Tuthill-Kveton

STK:vjs
Enclosure

DEF FRED MEYER_000014

# KROGER TECHNOLOGY SERVICES AGREEMENT

THIS KROGER TECHNOLOGY SERVICES AGREEMENT ("Agreement"), effective the date of last signature ("Effective Date"), is made by and between The Kroger Co. ("Kroger"), an Ohio corporation having a principal place of business at 1014 Vine Street, Cincinnati, OH 45202, on behalf of itself and its affiliates and subsidiaries, and Gatekeeper Systems Inc. ("Service Provider"), a Delaware Corporation having a principal place of business at 90 Icon  Foothill Ranch, CA 92610. This Agreement governs the relationship between Kroger and Service Provider (each a "Party," and collectively the "Parties") for the provision of services by Service Provider to Kroger.

## 1.    DEFINITIONS

1.1 "Acceptance Criteria" means the specifications and criteria for acceptance set forth in the applicable SOW.

1.2 "Background Intellectual Property" or "Background IP" is broadly defined and includes, without limitation, any and all patents, trademarks, copyrights, trade secrets, patentable subject matter, or Know How created by either Party prior to the execution of this Agreement, or otherwise developed independently but not pursuant to this Agreement in a capacity other than as an employee, agent, or Service Provider of Kroger.

1.3 "Confidential Information" is information however delivered, disclosed or discovered during the term of this Agreement, which the recipient has, or should have, reason to believe is confidential or which the disclosing party designates as confidential, including, but not limited to, information relating to Kroger's prospective and existing customers, vendors, and other lists, operations, facilities, computer systems, computer terminals, programs, systems design, communications networks, finances, product development plans, business processes, business directions, and marketing plans.  The terms, conditions. and subject matter of this Agreement and each SOW are Confidential Information. Confidential Information does not include information that has ceased to be confidential by reason of any of the following:

   1.3.1   Recipient had the information in its possession prior to disclosure by the disclosing party and the information was acquired without restriction through sources other than the disclosing party;

   1.3.2   The information has become generally and verifiably available to the public other than through disclosure by recipient; or

   1.3.3   The information is disclosed by recipient with the disclosing party's prior written consent.

1.4 "Service Provider Personnel" means Service Provider's officers, directors, partners, employees, or agents.

1.5 "Intellectual Property" shall be broadly defined and shall include, without limitation any and all trade secrets, all patentable subject matter, know-how, processes, patents, copyrights, and trademarks whether existing prior to or generated in the course of or after performance of this Agreement or any SOW.

1.6 "Know How" means any and all expertise, information, creative developments, shared experience, technical contribution, business contribution, patentable subject matter, intellectual property and any and all intellectual capital provided by Kroger personnel, partners, Service Providers, or contractors.

1.7 "Kroger Supplied Materials" means any computer programs, specifications, data, works of authorship, or any other materials furnished by Kroger to Service Provider. Kroger retains all ownership in and to the Kroger Supplied Materials.

1.8 "Service Deliverables" means the Work Product, other materials, whether or not completed or delivered, and all work performed by Service Provider, whether completed or not, resulting from the services rendered by Service Provider.

1.9 "Fees" means the fees specified in a SOW or Exhibit for Services and Products..

1.10 "Service Schedule" means the schedule set forth in a Statement of Work for the performance of Services and delivery of Project Deliverables.

1.11 "Service Term" means the period of time beginning on the services commencement date specified in the SOW and continuing until the end date specified in the SOW.

1.12 "Services" means system installation, training, maintenance services, and any other services requested by Kroger as more fully described in the applicable SOW.

1.13 "Statement of Work" or "SOW" means a document made under this Agreement substantially in the form attached to this Agreement as Exhibit A signed by both parties describing the Services that Service Provider will provide to Kroger.

1.14 "Work Product" means all works of authorship, designs (including, but not limited to, all optical, mechanical or electrical designs), software, algorithms, models, data, designs, drawings, blueprints, or other Intellectual Property developed, created or acquired by Service Provider, alone or jointly with others, in the course of Service Provider's performance of Services under a signed SOW and paid for by Kroger.

1.15 "Products" means all goods provided by Service Provider under this Agreement as defined in Exhibit E.

1.16 "Purchase Order" or "Order" means a KROGER system-generated document that contains the required delivery schedules for specified quantities of Products and prices, and any terms and conditions set forth or referenced therein.

**2.    PERFORMANCE OF SERVICES; PROJECT COORDINATORS; ACCEPTANCE**

2.1 Performance Obligations. Service Provider will diligently, efficiently, and in a highly professional manner, provide all materials (except Kroger Supplied Materials) and labor to perform the Services and deliver the Project Deliverables in accordance with the Service Schedule. Service Provider agrees that time is of the essence. The parties understand that Service Provider may elect not to enter into a particular SOW with Kroger. Nothing in this Agreement shall prevent Service Provider from providing similar services to a third party so long as no Kroger Confidential Information, personnel, Know-How, or Kroger Supplied Materials is used, or prevent Service Provider from developing similar products so long as such products are independently arrived at through independent research, development, design, and manufacturing and without use of any Kroger Confidential Information, Know-How, personnel, or Kroger Supplied Materials.

2.2 Project Coordinators. Each party will identify a Project Coordinator in the SOW responsible for coordinating the work performed under that SOW. At the request of Kroger's Project Coordinator, the Project Coordinators shall schedule and attend status meetings (either in person or by telephone) at a location selected by the Kroger Project Coordinator.

Kroger Vendor Data Protection Addendum (June 2, 2022)                                    2

DEF FRED MEYER_000016

2.3 <u>Acceptance of Project Deliverables</u>. Kroger may review the Project Deliverables to determine if the Project Deliverables are error free and meet the Acceptance Criteria. Service Provider If the Project Deliverables or any portion thereof are rejected, Service Provider agrees to promptly make any necessary changes. If Service Provider fails to make such changes or, notwithstanding such changes, the Project Deliverables still do not meet the Acceptance Criteria, Kroger may terminate this Agreement or the specific SOW upon written notice to Service Provider, Kroger shall have no further payment obligations to Service Provider, and Service Provider shall refund the applicable Project Fees related to the nonconforming Project Deliverables.

**3.      SERVICE PROVIDER PERSONNEL**

3.1 <u>Supervision</u>. Service Provider is solely responsible for the actions of Service Provider Personnel performing work under any SOW and for the supervision, daily direction, control, payment of salary, including withholding taxes and social security, workers' compensation, disability, and all other employment matters for Service Provider Personnel. Service Provider will ensure that all Service Provider Personnel are qualified to perform the Services. Service Provider will, at its own expense, ensure that Service Provider Personnel providing Services at Kroger facilities have passed a drug screen and background test comparable to that which Kroger has performed on its potential employees.

3.2 <u>Employment Matters</u>. Nothing in this Agreement will be construed as granting Service Provider Personnel any rights under any employee benefit offered by Kroger, or any affiliated company, to its employees, including, without limitation, matching FICA/Medicare payments, workers' compensation, leave of absence, health care, disability, life insurance, retirement and savings plans, deferred compensation, and stock plans. Service Provider will be solely responsible for all employment matters relating to Service Provider Personnel. Service Provider will secure adequate workers' compensation coverage in accordance with state laws. Service Provider represents and warrants that it will comply with all applicable federal, state and local laws, including the Fair Labor Standards Act, immigration laws, Title VII of the Civil Rights Act of 1964, as amended, and all other laws prohibiting employment discrimination.

3.3 <u>Work Rules</u>. Service Provider Personnel will follow Kroger's work place and security policies and will not violate any laws while working at Kroger facilities. Service Provider will be responsible for the failure of any Service Provider Personnel to comply with the foregoing.

3.4 <u>Removal of Service Provider Personnel</u>. Upon Kroger's written request, Service Provider will remove a Service Provider Personnel for unsatisfactory performance or for violating the terms of this Agreement or Kroger policies. Kroger will provide at least 24 hours' notice of removal. Kroger may request the immediate replacement of any removed Service Provider Personnel. If Kroger requests the removal of a Service Provider Personnel for unsatisfactory performance after the Service Provider Personnel begins Services on a project, Kroger will pay Service Provider at the full applicable rate for all Services performed by the Service Provider .

**4.      ORDERING & FULLFILMMENT**

4.1 <u>Fulfillment.</u> Service Provider will provide the appropriate resources to enter, track, and fulfill orders as placed. Service Provider will work with KROGER personnel in a project management capacity to plan shipments and inventories to support target delivery dates. SERVICE PROVIDER performance will be measured on SERVICE PROVIDER's ability to effectively manage projects and processes, meet commitments, proactively advise KROGER personnel (and its assigned third parties) of opportunities and/or changes that affect order schedules, and foresee overall needs. SERVICE PROVIDER will provide one email address for receipt of all KROGER Purchase Orders. Late payments from one KROGER Division shall not delay the processing or delivery of KROGER

DEF FRED MEYER_000017

Orders to any other KROGER Division.  SERVICE PROVIDER shall not withhold delivery of an order due to any late payment.

4.2  Quantity of Products Ordered. Kroger will have the option to order any specific quantity of Products from SERVICE PROVIDER.  Following the applicable Lead Time, SERVICE PROVIDER will fulfill all Purchase Orders for a quantity of Products that is less than or equal to the quantity of Products specified in Kroger's most recent Forecast, plus any increased production capability in accordance with Section 3.4.  If Kroger places a Purchase Order that exceeds such quantity of Products, SERVICE PROVIDER will provide the quantity of Products specified in Kroger's most recent Forecast, plus the applicable required increased production capability, and will notify Kroger within 15 days following the date of the applicable Purchase Order of the date on which SERVICE PROVIDER will deliver the remaining Products.

## 5.  DELIVERY

5.1  Service Provider Responsibilities. SERVICE PROVIDER is ultimately responsible for the safe and timely delivery of all Products ordered regardless of delivery location or logistical conditions.  Crating and packaging must be designed in such a manner as to uphold the integrity of the Product(s) during warehousing, shipping, and handling.  Service Provider will deliver or arrange the delivery of Products to Kroger or Kroger's Designee as may be indicated in the applicable Purchase Order, at the specified delivery location. Unless Service Provider is responsible for late shipment charges or expedited freight charges resulting from Service Provider failing to ship Products on or before a confirmed shipment date, Kroger will be solely responsible for the cost of freight and transportation from and after Supplier delivers the Products to the delivery location. Title risk of loss to products will pass to Company upon receipt of Products by Kroger or its designee at the delivery location as evidenced by the authorized signature of Kroger of its designee.

5.2  Packaging Requirements. If shipping to a KROGER site is required, SERVICE PROVIDER is responsible for fully understanding KROGER's requirements at the point of receiving shipments, including the use of packaging, packing slips, and labeling that best meet the KROGER receiving location environment.

5.3  Freight. Freight will be managed by the SERVICE PROVIDER and will be prepaid and add, FOB KROGER's location. SERVICE PROVIDER will assure that "best option" and "best value" freight choices are made for both prescheduled and unscheduled orders. In the event of urgent or special delivery requests, drop shipments, and the like, SERVICE PROVIDER will ensure appropriate delivery.  SERVICE PROVIDER will be responsible for processing all freight claims. Carrier freight costs will be a direct pass-through to KROGER and no additional fees will be applied.  KROGER retains the right to audit freight records during the Term of the Agreement to the extent that SERVICE PROVIDER does not breach any outstanding agreements with other parties.

5.4  Shipment Errors. In the event of a SERVICE PROVIDER order or shipment error, SERVICE PROVIDER will maintain a single-call, no-charge process for expeditiously authorizing a return and order replacement processing and shipment. If Supplier fails to ship Products on or before a Confirmed Shipment Date, Supplier will be responsible for any Late or expedited Shipment Charges.  Any payment of Late Shipment Charges represents a reasonable estimation of Kroger's costs for Supplier's failure to adhere to the confirmed shipment date.  This amount is not a penalty and Supplier's payment of Late Shipment Charges will not waive or diminish any other rights or remedies available to Company under this Agreement, at law or in equity.

5.5  Managed Freight. SERVICE PROVIDER agrees that during the Term of this Agreement, at KROGER's sole discretion, management of inbound freight of Products shipped by SERVICE PROVIDER may be transitioned from SERVICE PROVIDER or its agent, to KROGER or a third-party freight solution provider selected by KROGER.  SERVICE PROVIDER agrees that all Products provided hereunder, regardless of which party takes responsibility for managing freight, will be packaged for shipment in a manner that meets reasonable industry standards and reasonably ensures delivery to the final destination without damage. In each case where KROGER elects to

DEF FRED MEYER_000018

manage inbound freight title for Product purchased will transfer when the goods are made available at SERVICE PROVIDER's dock for loading into KROGER's third-party carrier. .

5.6 <u>Damaged or Missing Shipments.</u> In the event a shipment arrives in a damaged condition (visible damage), to facilitate SERVICE PROVIDER processing a successful claim for recovery from the carrier, KROGER will make proper notations of condition of the shipment on both carrier's and KROGER 's copies of the delivery receipt at time of delivery. Kroger will notify Service Provider of: (a) any shortage or other inaccuracy (i.e. failure to meet the quantity or models) of Products ordered pursuant to any Purchase Order within 15 days after receipt of Products at the Kroger's or its Designee's facilities or third party warehouse; and (b) any failure of the Products to conform to Product Specifications or apparent defect in the Products (i.e. each, a "Non-Conforming Product") within 60 days after receipt of Products at Delivery Point, unless Kroger does not become aware of such failure to conform to Product Specifications or apparent defect within such 60-day period, in which case Kroger will inform Service Provider of such failure to conform to Product Specifications or apparent defect as promptly as reasonably practical. Service Provider will, within 15 days of receipt of any such notice from Kroger pursuant to this Section 3.8.2), or within any shorter time period requested by Kroger if Kroger determines that the failure materially affects Kroger's ability to meet its business needs, proceed to correct such shortage, inaccuracy or defect. With respect to Non-Conforming Products pursuant to Section 3.8.2(b) above, Service Provider will, at Kroger's option and Service Provider's sole expense, either deliver to Kroger replacement Products within 30 days at no additional cost to Kroger or issue Kroger a refund for such Non-Conforming Products (including any charges to Kroger for freight, shipping and handling of the Non-Conforming Products). If Service Provider is unable or unwilling to correct the shortage, inaccuracy or defect in a manner and in a time period acceptable to Kroger, Service Provider will credit Kroger for the full amount of the Product Prices for the affected Products and, with respect to Non-Conforming Products, will reimburse Kroger for any other Losses and Expenses associated with such Non-Conforming Products. If Products are urgently required to meet Kroger's requirements and Service Provider cannot respond promptly, Kroger also reserves the right to take actions to clear or accept the Non-Conforming Products through a screening and repair process. In such circumstances, Service Provider, at Kroger's request, will promptly pay for, or reimburse the actual cost of such screening, repairs and any additional Losses and Expenses incurred by Kroger. If Kroger fails to notify Service Provider of order shortages or inaccuracies of Product defects within the time periods set forth in this Section 3.8.2, Kroger will be deemed to have accepted the Products. Service Provider will not be liable for damage to Products due to failure of Kroger or its third party providers to adhere to Service Provider's written instructions for the transportation and handling of the Products.

For concealed damage or missing items, KROGER will have ten (10) business days from the date of delivery to claim damage to the SERVICE PROVIDER, properly documenting the claim with pictures of damage and notes of missing items.

## 6.    COMPENSATION

6.1 <u>Fees</u>. Kroger will pay to Service Provider the Fees set forth in each SOW as full payment for the Services rendered and Project Deliverables delivered under each SOW. Such fees may increase by the lesser of the Consumer Price Index for All Urban Consumers (CPI-U) or 3% annually or as otherwise justified or agreed to by the parties

6.2 <u>Expense Reimbursement</u>. Kroger will reimburse Service Provider for reasonable, travel and living expenses actually incurred in providing Services subject to the limitations set forth in any SOW and in accordance with Kroger's Travel Expense Policy, appended to this Agreement as <u>Exhibit D</u>.

DEF FRED MEYER_000019

6.3 <u>Invoice and Payment</u>.  Unless otherwise specified in the SOW, Service Provider will invoice Kroger monthly by submitting a completed and signed invoice.  Kroger will pay properly invoiced, undisputed amounts within 90 days after receipt of the invoice.

6.4 <u>Books and Records</u>.  Service Provider must maintain complete and accurate accounting records, in accordance with generally accepted accounting practices, to substantiate its charges to   Kroger. Such records include payroll records, job cards, attendance cards, and job summaries.  Service Provider shall retain such records for the period of three years from the date of the final payment under each SOW.

6.5 <u>KPS, LLC</u>.  KPS, LLC, a subsidiary of Kroger, may place orders on behalf of Kroger under this Agreement.  Kroger will guarantee the payment of any orders made by KPS, LLC on its behalf under this Agreement.

## 7.  CONFIDENTIALITY

7.1 <u>Nondisclosure</u>.  During and after the term of this Agreement, neither party will disclose Confidential Information of the other party to third parties nor use Confidential Information for any purpose whatsoever except as authorized in this Agreement and any SOW.  Service Provider is authorized to use Kroger Confidential Information only to perform Services under a SOW or this Agreement.  Kroger may disclose any Project Deliverable, regardless of whether it is Service Provider Confidential Information, to its employees, agents, and contractors under an obligation to maintain confidentiality. Service Provider may only disclose Kroger Confidential Information to its employees, agents, and contractors who (a) have a reasonable and legitimate need to know, and (b) are under an obligation to maintain confidentiality.  The use of the Kroger Confidential Information must be limited solely to performing Services under the signed SOW for which the Confidential Information relates until such time as those Services are fulfilled or the SOW is terminated.

7.2 <u>Cooperation</u>.  Service Provider warrants that it has entered into a recent nondisclosure agreement of sufficient scope to cover all Kroger Confidential Information and Know-How with each of its Service Provider Personnel who will have or may have access to Kroger's Confidential Information that adequately protects Kroger's Confidential Information.  Service Provider will fully assist Kroger in all matters relating to the protection from unauthorized use or disclosure of Confidential Information, including, without limitation, reminding Service Provider Personnel of their nondisclosure obligations during employment and at exit interviews, notifying Kroger immediately upon the discovery of any actual or alleged breach of any Service Provider Personnel's obligations, and providing all reasonable assistance to Kroger in any proceeding brought by Kroger to prevent disclosure or further disclosure of Confidential Information.

## 8.  RIGHTS IN WORK

8.1 <u>Ownership</u>.  Service Provider shall retain exclusive ownership of all Intellectual Property which it owned prior to commencement of this Agreement.  Kroger shall retain exclusive ownership of all Intellectual Property which it owned prior to commencement of this Agreement.  Service Provider acknowledges that Kroger is paying for the Services performed and Project Deliverables delivered under this Agreement and each SOW.  As such, both parties agree and acknowledge that Kroger is the sole owner of the Project Deliverables and all Intellectual Property therein, including without limitation all patentable subject matter, Know-How, patents, copyrights, trademarks, and trade secrets.  Kroger shall retain the ownership of Kroger Supplied Materials and all Intellectual Property and proprietary rights therein.

8.2 <u>Inventions</u>.  Service Provider will promptly disclose and does hereby assign to Kroger and its successors and assigns the Project Deliverables, and all right, title and interest in or to any and all inventions, patentable subject matter, creations, works, improvements, and developments, whether or not patentable

DEF FRED MEYER_000020

or copyrightable, which Service Provider itself, or on behalf of Service Provider, made, assisted in making, conceived, or reduced to practice in whole or in part, in connection with this Agreement, in performing the Services under each SOW and this Agreement, and any renewal thereof, including all copyrights, trade secrets, patents, and applications for patents for such inventions, creations, works, improvements, and developments in the United States and any foreign country.

8.3    Copyrights.  Except for any Background IP, the Project Deliverables delivered by Service Provider shall constitute "works made for hire" for Kroger, as defined in the Copyright Act of 1976.  Kroger shall be considered the author and shall be the copyright owner of all Project Deliverables.  If and to the extent that this Section 6 does not operate to fully and effectively vest in Kroger such rights, Service Provider hereby grants and assigns to Kroger all rights which may not have so vested, subject to Service Provider's rights in the Background IP.  If any of the Project Deliverables do not qualify for treatment as a "work for hire" or if Service Provider retains any interest in any components of the Project Deliverables for any other reason, subject to Service Provider's rights in the Background IP, Service Provider hereby grants, assigns and transfers to Kroger ownership of all United States and international copyrights and all other intellectual property rights in the Project Deliverables, subject to certain rights of Service Provider described herein, and all the rights of use with respect thereof which are intended to be conferred hereunder, free and clear of any and all claims for royalties or other compensation except as stated in this Agreement.  All Background IP shall remain the property of Service Provider, except that Service Provider grants to Kroger a non-exclusive, irrevocable, paid-up license to use or practice the Background IP incorporated into any of the Project Deliverables.

8.4    Cooperation.  Service Provider agrees to do any and all acts, and to execute any and all instruments, which Kroger may request to secure, evidence, and effectuate its ownership rights obtained or reserved under this Section 6 free and clear of all liens, charges, or encumbrances of any kind, including all rights relating to the inventions, Project Deliverables, creations, improvements, developments, patents, copyrights, trade secrets, developments, and other intellectual property rights, in the United States and in any foreign country.  Service Provider's obligations in this Section 6 shall extend beyond the termination of this Agreement.

8.5    Limited Use.  Service Provider shall use the Project Deliverables and Kroger Supplied Materials solely for the benefit of Kroger and for no other purpose.

**9.    SERVICE PROVIDER'S REPRESENTATIONS AND WARRANTIES**

9.1    Service Provider represents and warrants to Kroger that:

9.1.1    all Services rendered under a SOW and all Project Deliverables will be performed or created in a highly professional manner; and,

9.1.2    all Services rendered under a SOW and all Project Deliverables will comply with all laws, ordinances, codes, rules, and regulations; and,

9.1.3    Service Provider is or will be the author of, and has or will have exclusive right, title and interest (including the right to assign and other rights granted herein) in the Project Deliverables; and,

9.1.4    the Project Deliverables do not infringe any trademark, copyright, patent, trade secret, or other intellectual property right of any third party; and,

9.1.5    Service Provider is under no obligation or restriction nor will it assume any obligation or restriction that would interfere or be inconsistent, with, or present a conflict of interest concerning, the Services provided by Service Provider under this Agreement.

DEF FRED MEYER_000021

## 10.    INDEMNIFICATION AND INSURANCE

10.1    Indemnification.  Service Provider will indemnify, at Kroger's option, defend, and hold harmless Kroger, and its officers, directors, employees, subsidiaries, and affiliates, from and against all third party suits, proceedings, claims, damages, liabilities, costs, payments, and expenses (including reasonable attorneys' fees) asserted against Kroger or incurred by Kroger, to the extent arising out of (i) Service Provider's breach of this Agreement, (ii) any employment claims related to Service Provider Personnel, (iii) any claim for damages to property or injuries to persons, caused by or resulting from the willful or grossly negligent acts or omissions of Service Provider or Service Provider Personnel, or (iv) any claim by any party regarding the Project Deliverables including Kroger's use thereof, including, without limitation, intellectual property infringement claims.  Service Provide will have no obligation to defend, indemnify or hold Kroger harmless from any losses arising out of Kroger's gross negligence or willful misconduct.

10.2    Insurance.  Service Provider will maintain at all times while providing the Services and Project Deliverables, at Service Provider's own cost and expense, insurance coverage of the types and in such amounts as described in Exhibit B with a company that has an A.M. Best rating of "A-" or better. Service Provider may comply with the required *per occurrence*" limit through a combination of Primary and Excess Liability insurance policies. The insurance must be primary and not excess or contributing with any insurance or self-insurance maintained by Kroger.  Service Provider must maintain the insurance coverage required under this Agreement for a minimum period of two years following any services rendered to Kroger.  Service Provider will deliver to Kroger, prior to performing services, a Certificate of Insurance including "The Kroger Co. and Kroger's Affiliates and Subsidiaries" as Additional Insureds.  Such Additional Insured status may be given by either an Additional Insured Endorsement or blanket Additional Insured coverage built into the Service Provider's General Liability policy form.  The Certificate of Insurance must identify all self-insured retentions and/or the current ISO general liability policy.  In the event of cancellation or expiration of said insurance during the period of time insurance coverage is required under this Agreement, Service Provider must provide proof of replacement insurance a minimum of 30 days in advance of the effective date of such cancellation or expiration.  Failure to provide such proof of insurance will result in payments being withheld by Kroger until proof of replacement insurance is received.

## 11.    TERM AND TERMINATION

11.1    Term.  This Agreement will commence on the Effective Date and continue until terminated as specified in Section 11.2.

11.2    Termination.  Either party may terminate this Agreement upon at least 30 days prior written notice to the other.  Kroger may terminate any SOW immediately upon written notice effective as of the date specified in the notice.  Any SOW may be terminated by either party if the other party is in breach of the SOW or this Agreement and such breach has not been cured within 30 days of receiving notice thereof.

11.3    Effect of Termination.  Upon termination of this Agreement or any SOW, Service Provider will return or destroy, at Kroger's option, all originals and copies of Confidential Information then in Service Provider's possession, without retaining any copies thereof, and at Kroger's request Service Provider will certify to Kroger in writing that it has returned or destroyed the same.  Kroger will pay all amounts owed for authorized work rendered before termination so long as Service Provider invoices Kroger no later than within 60 days after termination.  If any Service includes housing Kroger data, upon termination, Service Provider will return such data and provide transition assistance.

11.4    Survival. Sections 4.4 (Compensation – Books and Records), 5 (Confidentiality), 6 (Rights in Work), 7 (Reps & Warranties), 8 (Indemnification and Insurance), 9 (Term and Termination), 10 (LoL),

DEF FRED MEYER_000022

11 (Taxes), 12 (Notices), 13 (Applicable Law and Arbitration), and 14 (Miscellaneous) shall survive the termination or expiration of this Agreement.

## 12.    LIMITATION OF LIABILITIES

IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL, OR PUNITIVE DAMAGES ARISING OUT OF OR RELATED TO THIS AGREEMENT OR ANY STATEMENT OF WORK.  HOWEVER, THIS LIMITATION OF LIABILITY DOES NOT APPLY TO ANY LIABILITIES OF SERVICE PROVIDER TO KROGER UNDER THE PROVISIONS OF THIS AGREEMENT RELATING TO CONFIDENTIALITY, RIGHTS IN    WORK,    SERVICE    PROVIDER'S    REPRESENTATIONS    AND    WARRANTIES, INDEMNIFICATION, AND INSURANCE.

## 13.    TAXES

Service Provider is responsible for paying all federal, state and local taxes or contributions imposed or required under unemployment insurance, social security, and income tax laws and for filing all required tax forms with respect to any amounts paid by Kroger to Service Provider hereunder and any amounts paid by Service Provider to its employees.  Service Provider shall indemnify, defend and hold Kroger, and its officers, directors, employees, agents, subsidiaries, and affiliates, harmless against any claim or liability (including penalties) resulting from failure of Service Provider to pay such taxes or contributions, or failure of Service Provider to file any such tax forms.

## 14.    NOTICES

Any notices required or permitted by this Agreement shall be in writing and sent to the following:

If to Service Provider:                                    If to Kroger:

_____                                    The Kroger Co.
_____                                    Attention:  Kroger Technology, VP **[insert correct VP]**
_____                                    1014 Vine Street
                                                            Cincinnati, OH  45202

Gatekeeper Systems Inc
SVP Sales and Marketing
90 Icon
Foothill Ranch CA
92610

                                                            With copy to:
                                                            The Kroger Co.
                                                            Attention:  Law Department
                                                            1014 Vine Street
                                                            Cincinnati, Ohio 45202

Notices shall be deemed given on the day after the date deposited in the mail or upon the delivery date if sent by certified mail or other method with evidence of delivery.  Either party may change its address for notice upon written notice to the other party.

## 15.    APPLICABLE LAW AND ARBITRATION

13.1        Applicable Law.  This Agreement and each SOW, and any claims arising under or related to, will be governed by the laws of the State of Ohio without regard to the conflict of law provisions thereof. The state and federal courts in Hamilton County, Ohio will be the exclusive venue for all claims.

Kroger Vendor Data Protection Addendum (June 2, 2022)                                                    9

DEF FRED MEYER_000023

13.2      Arbitration.  Any controversy or claim arising out of or relating to this Agreement or any SOW, or the breach thereof will be settled by binding arbitration before a single arbitrator knowledgeable in the field of law, business, or technology that is the subject of the dispute, provided that if the claim is for $3,000,000 or more there will be three arbitrators, one selected by each party, and one by those arbitrators and acceptable to both parties.  The arbitration will be held in Cincinnati, Ohio, and conducted in accordance with the Commercial Arbitration Rules of the American Arbitration Association, except to the extent in conflict with this Section, in which case this Section will apply.  The arbitrator's decision shall be in writing, be binding, and enforceable by a court of competent jurisdiction. Each party will bear its own costs and expenses associated with the arbitration, including attorneys' fees. Either party may bring claims solely for injunctive relief to the appropriate court.

**16.      MISCELLANEOUS**

14.1      Assignment.  This Agreement shall be binding upon, and inure to the benefit of the parties and their successors and assigns.  The obligations under this Agreement may not be assigned, delegated, or subcontracted by either party without the other party's prior written consent, except that Kroger may assign this Agreement to any successor-in-interest to all or substantially all of its business, or to any individual or entity who acquires that portion of the assets of Kroger that relate to a SOW.

14.2      Independent Contractor.  Service Provider and Kroger are and shall remain independent contractors.

14.3      Integrated Agreement.  This Agreement and each SOW constitutes the complete integrated agreement between the parties concerning the subject matter hereof and supersedes all prior agreements, understandings, or representations.

14.4      Amendments.  Neither Agreement nor any Statement of Work may be amended except in writing signed by both parties.

14.5      Waiver.  The failure of either party to give notice of nonperformance, breach, or termination, or to otherwise enforce any rights hereunder, shall not constitute a waiver of any terms or conditions of this Agreement or any SOW.

14.6      Severability.  If any provision of this Agreement is judged invalid, void, or unenforceable, the remaining provisions of this Agreement shall not be affected thereby, that the provision in question may be replaced by the lawful provision that most nearly embodies the original intent of the parties, and this Agreement shall otherwise remain valid and enforceable.

14.7      Publicity.  Service Provider will not use Kroger's name or logos, or the name or logos of any Kroger subsidiary or affiliate, in any materials, including press releases, without Kroger's prior written consent.

14.8      Non-Exclusive Relationship: Kroger may purchase any quantity of similar Products from other Service Providers at its sole discretion.

14.9      Most Favored Nations.  The prices for the Products set forth in this Agreement shall be no more than that which is offered by SERVICE PROVIDER to any of its other customers for the Term of this Agreement (as defined in the Addendum) for substantially similar Products in substantially similar quantities and on substantially similar terms and conditions.  If, at any time during the Term of this Agreement, SERVICE PROVIDER offers pricing to SERVICE PROVIDER'S other customers that is less than the pricing set forth in this Agreement for substantially similar quantities on substantially similar terms and conditions, then SERVICE PROVIDER will adjust the pricing set forth in this

Kroger Vendor Data Protection Addendum (June 2, 2022)                                      10

DEF FRED MEYER_000024

Agreement to be reflective of the lower pricing offered by SERVICE PROVIDER to its other customers, and such lower pricing shall be effective as of the date that SERVICE PROVIDER offered the lower pricing to its other customers.

14.10    Warehouse Requirements: SERVICE PROVIDER may not charge KROGER for any outside storage charges unless explicitly authorized to do so in writing by KROGER.

14.11    Inventory. Any KROGER obligations for SERVICE PROVIDER maintained Product inventory will be set forth in the Addendum.

14.12    Cost Reduction Opportunities. Throughout the Term of this Agreement, SERVICE PROVIDER will pro-actively pursue cost reduction opportunities for the Product(s) by working both independently and collaboratively with KROGER. SERVICE PROVIDER will inform KROGER of any other customer order loss of business, production overrun, market condition fluctuations, or any other event that represents a cost reduction opportunity or other value to KROGER.

14.13    Product Warranties:  Service Provider hereby represents and warrants that the Products (a) shall meet Kroger's specifications and (b) be of merchantable quality. Further, Service Provider warrants that the Products will be free from defects in material and workmanship in accordance with the terms in Section 14.4.  If any Product provided by Service Provider fails to meet the specifications, is not of merchantable quality, or shows defects in material or workmanship, Service Provider will, at its option, repair or replace the defective Product if (i) Service Provider has received notice of such defects within the warranty period specified in Section 14.14  (ii) upon Service Provider's request, the defective item is returned at Service Provider's cost to a location designated by Service Provider. Service Provider represents and warrants that its Products are safe for use and have been tested and approved by Underwriter's Laboratory or Electrical Testing Laboratory and the National Sanitation Foundation; and meet all applicable Occupational Safety and Health Administration standards.

In addition, Service Provider represents and warrants to Kroger that (i) all Products and all actions of Service Provider related to this Agreement will comply with all applicable laws, ordinances, codes, rules and regulations, both domestic and foreign, including without limitation OSHA regulations and (ii) Service Provider is under no obligation or restriction nor will it assume any obligation or restriction that would in any way interfere or be inconsistent with, or present a conflict of interest concerning, the Products to be furnished by Service Provider under this Agreement.

Service Provider represents and warrants that the prices charged, allowances, and services furnished, if any, in connection with the sale of Products to Kroger are not discriminatory and were made available on proportionately equal terms to other customers of Service Provider, and the prices charged for the Products shipped are the lowest lawful prices available from Service Provider.

14.14    Product Warranty Period.
A.) Mechanical Warranty. Service Provider warrants all products will be of mechanical merchantable quality or defect free for a period of 1 years. This Mechanical Warranty applies to the moving parts of any machine or system, it also includes but not limited to the plastics of the outer wheels hub, cover, bushings, and internal moving parts.
B.) Electrical Warranty. Service provider warrants all products be of  merchantable quality and preform as exepcted  for a period of 3 years. This Electrical Warrranty pertains to the creation and application of equipment that uses (or produces) electricity, such as but not limited to, a PCBA board, elecrical internals of a drive motor, antennas, and battery.
C.) Battery Warranty. Service provider warrants al batteries will perform as expected and at a merchantable quality standard for a period of 5 years. This battery warranty refers o a manufacturing defect related to the battery itself.

DEF FRED MEYER_000025

14.15        Warranty Claims. During the applicable Warranty Period, Service Provider will repair or replace products covered under this warranty that are returned to its designated facility in accordance with Service Provider's standard Return Merchandise Authorization ("**RMA**") process, which requires that Kroger or Kroger 3rd party service providers return the products to Service Provider. Service Provider will ship the repaired / replacement product, freight prepaid, to the Kroger designated location. Service Provider will own all parts removed from repaired products. Service Provider uses new and reconditioned parts made by various manufacturers in performing warranty repairs and building replacement products. If Service Provider repairs or replaces a product, the Warranty Period is not extended. Service Provider shall ship the repaired or replacement Product back to designated location within 20 business days upon receipt of the returned product.

14.16        Warranty Reporting. Service provider will generate and issue to Kroger, per a period as defined by Kroger's fiscal schedule, a warranty claims report detailing the makes, models, claim date, date of receipt of returned product, replacement product ship date, the status of in flight warranty claims, within a meidum and format as determined by Kroger.

14.17        Warranty Service Levels. Service Provider will render the Warranty Claims services above in a manner that meets or exceeds all appliable performance standards set forth in the Warranty Service Level Table below.

(i)        Failure by Service Provider to meet the Service level expectations will result in a service credit, to be applied to a future Service Provider invoice of Kroger's preference within the same fiscal year the remedy is assessed.

(ii)        Service Provider shall be excused from a failure to meet a service level if and to the extent Service Provider reasonably demonstrates that such failure is: 1) the direct result of Kroger's failure to comply with the defined return merchandise process, 2.) excused pursuant to a Force Majeure event, 3.) Instances in which more than 3 pallets of returned product are shipped to Gatekeeper for Warranty Claims and received on the same day.

(iii)        Service Provider shall develop a proposed action plan to correct the performance ("Resolution Plan") that Kroger agrees to within 14 days following any given month in which Service Provider failed to meet or exceed the SLA Objective.

WARRANTY SERVICES SLA

| Service Level | Service Level Objective | Service Level Measurement Process | Reporting Frequency | Service Level Remedy | Remedy Calculation |
|---|---|---|---|---|---|
| Warranty Return Merchandise Timeliness | 95% of repaired or replacement product to be shipped within 20 business days from approved RMA claim | Number of approved RMA warranty claims in which replacement product is shipped within 20 business days of the RMA claim divided by the total number of approved for RMA claims | Kroger Period Basis | 1 Period Below 95%=$15 per each warranty claim outside of 20 days, below the 95% service level objective.

2 consecutive months or two non-consecutive months within a 3-month time period=$25 per each warranty claim outside of 20 days and | Number of warranty claims below the service level objective warranty production multiplied by the applicable remedy amount. |

Kroger Vendor Data Protection Addendum (June 2, 2022)                                                    12

DEF FRED MEYER_000026

|  |  |  |  | below the 95% service level objective. |  |
|---|---|---|---|---|---|

14.18 <u>Supplier Diversity</u>.  Kroger is committed to providing meaningful opportunities for minority-owned business enterprises ("<u>MBE</u>") and women-owned enterprises ("<u>WBE</u>") to be our business partners.  Kroger carries out this commitment in many ways, including on-going efforts to identify and track expenditures with MBEs and WBEs.  Service Provider will supply to Kroger upon Kroger's request MBE and WBE information about Service Provider's organization and entities with whom Service Provider does business.

14.19 <u>Code of Conduct</u>. Kroger requires all of its Service Providers, Service Providers, and suppliers that provide products and services to Kroger to maintain safe and fair working environments for their workers at their facilities and meet all other requirements of the Kroger Service Provider Code of Conduct  (https://www.thekrogerco.com/wp-content/uploads/2017/09/code-of-conduct.pdf).    Kroger has a zero-tolerance policy for human rights violations like child and forced labor, discrimination and violations of law.  If suppliers (or their suppliers) do not live up to this Code, Kroger will not do business with them.

14.10 <u>Right to Audit</u>.  Service Provider shall maintain complete and accurate accounting records in accordance with generally accepted accounting practices, to substantiate its charges to Kroger hereunder, during the Term of this Agreement for a period of three (3) years from the date of final payment made under this Agreement.    Such records shall include, but not be limited to, invoices, freight charges, payroll records, time cards, attendance cards, and job summaries.  Service Provider shall allow access by Kroger, Kroger's employees or agents, including a third party of Kroger's choosing, to review Service Provider's books and records for a period of up to five (5) years, at a date, time, and location agreed upon by the parties; provided, however, that (i) Kroger provides Service Provider with at least thirty (30) days' notice of its intent to conduct such a review; (ii) any third party Kroger chooses to perform such review shall not be a known competitor of Service Provider; and (iii) such third party will be obligated to confidentiality obligations at least as protective as those imposed on Kroger hereunder.  Kroger will notify Service Provider if any review finds that Service Provider owes payment to Kroger within thirty (30) days of review closeout.  Service Provider shall make any payment owed to Kroger in a timeframe consistent with the payment terms set forth hereunder.

14.11 <u>Business Continuity Program</u>.  If the Services performed by Service Provider are identified by Kroger as critical services, Service Provider will maintain a business continuity program that has been agreed to and is supported by Service Provider's executive management.  The program must include Business Continuity Plans ("<u>BCP</u>") to recover critical business functions, Disaster Recovery Plans ("<u>DRP</u>") to recover technology, and a Crisis Management Plan ("<u>CMP</u>") to manage events that may have a significant impact on Service Provider's ability to provide Services.  Service Provider will comply with Kroger's Requirements of Critical Services, appended to this Agreement as <u>Exhibit C</u>.  Service Provider will test the BCP, DRP, and CMP at least annually, and upon Kroger's request, will provide Kroger with a written summary of the test results.  Service Provider will provide Kroger annually written certification by an executive of Service Provider attesting to the validity of the programs.

If Service Provider experiences a disruption in its ability to provide Services, Service Provider will notify the designated Kroger contact immediately.  Kroger may suspend Services under an applicable SOW until Service is able to be restored at the appropriate level and Kroger may be entitled to credits as set forth in the applicable SOW.

DEF FRED MEYER_000027

14.12    Purchase Orders.    Service Provider shall not perform any work without a Kroger written Purchase Order or written approval from a Kroger's Sourcing Manager.

Any preparations made or work performed by Service Provider or its suppliers or subcontractors prior to issuance of the Purchase Order shall be at Service Provider's expense. Notwithstanding any provision of this Agreement to the contrary, Kroger shall not be liable for any costs or expenses incurred in connection with or as a result of: a) procurement of materials in advance of contracted lead times in effect at the time of such material procurement and b) commencement of production in advance of Service Provider's contracted lead time for the Product. The lead-time for all items is defined in the Addendum in calendar days.  Lead-time is defined as the calendar days from the date the Purchase Order is issued to the date that Products are delivered at the Kroger location, as defined on the Purchase Order. Kroger will have the option to order and purchase Products through one or more Purchase Orders delivered to Supplier by Kroger from time to time during the Term.  Orders for Products placed pursuant to a Purchase Order will not be binding on Kroger until Supplier has delivered a Purchase Order Acceptance in accordance with Section 24.1.  Once Supplier delivers a Purchase Order Acceptance, Purchase Orders are binding on Supplier and Kroger and, absent a Force Majeure Event, may not be varied, delayed or canceled without the other Party's prior written consent.

Service Provider will not make any changes to Purchase Orders that Kroger or its Designee has submitted to Service Provider and for which Service Provider has issued a Purchase Order Acceptance, including Product, item number or quantity, unless Kroger has requested the change in writing or has otherwise approved the change in writing.  Kroger will use reasonable efforts to request such changes to Purchase Orders prior to the Confirmed Shipment Date, and Service Provider will promptly acknowledge receipt of any such change and will comply with such changes in a timely manner.  Service Provider will provide Kroger with a new Confirmed Shipment Date for the Purchase Order if necessary.  If Service Provider has already delivered a Purchase Order Acceptance to Kroger, then Kroger may modify a Purchase Order only in accordance with the terms and conditions set forth in Schedule C.  If Service Provider already has begun or completed production of the Products ordered by Kroger pursuant to the applicable Purchase Order, Service Provider will immediately notify Kroger of the same.  At Kroger's direction Service Provider will, at Kroger's expense: (i) dispose of the Works in Progress and Product(s) in the manner directed by Kroger; or (ii) immediately ship or deliver the Works in Progress and completed Products to the Delivery Point.  If Service Provider does not ship the completed Works in Progress and Products within five days of receiving instruction from Kroger to ship such Works in Progress and Products, Kroger will have no obligation to accept or purchase any such Works in Progress and completed Products.

[*Remainder of page left intentionally blank.*]

DEF FRED MEYER_000028

IN WITESS WHEREOF, the Parties hereto have duly executed this Agreement as of the last date of signature below.

**THE KROGER CO.**

*Paula Kash*
750209ABB8EF456...

Name: ____Paula Kash____

Title: ____GVP, Retail Operations____

Date: ____7/3/2024____

DS  DS  DS  DS
PJ  MN  aM  CH

**SERVICE PROVIDER**

GD2648ED63B048A...

Name: ____Craig Greenberg____

Title: ____Chief Commercial Officer____

Date: ____7/1/2024____

Federal Tax I.D. Number:_____

Kroger Vendor Data Protection Addendum (June 2, 2022)

15

**EXHIBIT A**

**STATEMENT OF WORK**
**(FORM)**

THIS STATEMENT OF WORK ("SOW") is submitted by The Kroger Co. ("Kroger"), and is accepted by _____ ("Service Provider") pursuant to the Kroger Technology Services Agreement between Kroger and the Service Provider dated _____ (the "Agreement").

1. **Project Title and Description.**
   a. The Project title is Purchek push out prevention project_____ ("Project").
   b. Description and requirements:

2. **Project Coordinators.**
   a. The Kroger Project Coordinator is _____.
      Contact Information:

   b. The Service Provider Project Coordinator is__Evan Lawson _____.
      Contact Information:

3. **Project Schedule.**

   a. The Project start date is _____.
   b. The Project is expected to take _____.
   c. The Project end date is _____.
   d. The Project Schedule is set forth below:

4. **Project Fees.**
   a. The fees for this Project are ____per individual store installation qotes, annual video classification renewal rates and annual system monitoring renewal rates _____.
   b. The total fees will not exceed _____ without Kroger's prior written consent.

5. **Project Deliverables.**
   The Project Deliverables are _per scope of work(s) on Purchek, Cart Control, Systems Monitoring and Video Classification_____.

6. **Acceptance Criteria.**
   The acceptance criteria are set forth below:

7. **Location of Work.**
   The work will be done at _____.

8.     **Is this Service a critical service?** _____.

**THE KROGER CO.**                    **SERVICE PROVIDER**

_____        _____

Name:_____        Name:_____

Title:_____        Title:_____

Date:_____        Date:_____

DEF FRED MEYER_000032

**EXHIBIT B**

| DATA SENSITIVE PROVIDER - INSURANCE REQUIREMENTS |
|---|

The Kroger Co. and/or Kroger's affiliates and subsidiaries may require higher insurance coverage limits and/or different coverages for certain product and service providers.

| Coverage provided by Insurance Carriers rated A- or higher by A.M. Best |
|---|

| The following wording must be included in the Description of Operations box on all Certificates:<br><br>> "The Kroger Co. and its subsidiaries, affiliates, directors, officers, agents and employees are Additional Insureds with respect to General Liability"<br>> "All insurance policies (excluding Workers' Compensation) are Primary and Non-Contributory to any other insurance owned, secured or in place by The Kroger Co."<br>> A Waiver of Subrogation in favor of The Kroger Co. applies to all coverage evidenced on the Certificate of Insurance | Certificate Holder Name and Address:<br>The Kroger Co. and Kroger's affiliates and subsidiaries<br>C/o The Kroger Co.<br>1014 Vine Street<br>Cincinnati, OH 45202 |
|---|---|

**General Liability**

| | |
|---|---|
| Commercial General Liability | Yes |
| Occurrence Basis | Yes |
| Product Liability / Completed Operations | Yes |
| Each Occurrence | $2,000,000 |

**Technology Errors and Omissions/Privacy Insurance**

| | |
|---|---|
| Per Claim | $5,000,000 |
| Network / Cyber / Internet / Data Breach | Yes |

**Auto Liability** (for any supplier whose employees or agents will be driving onto any premise owned or leased by The Kroger Co. or making delivery on behalf of The Kroger Co.)

| | |
|---|---|
| Any Auto | Yes |
| Combined Single Limit | $1,000,000 |

**Workers Compensation**

| | |
|---|---|
| Statutory Limits | Yes |

**Employers Liability**

| | |
|---|---|
| Each Accident | $500,000 |
| Disease    Policy Limit | $500,000 |
| Disease    Each Employee | $500,000 |

*Note: a) Required coverage limits can be achieved through a combination of your Primary & Excess Liability coverage. Excess coverage must "drop down" for exhausted underlying aggregate limits of liability coverage. b) In certain instances, "Claims Made" policies may be acceptable with automatic tail coverage of 5 years.*

Self-funding or self-insurance of liability, other than workers' compensation and/or automobile liability is allowed, so long as Supplier or Supplier's Parent maintains a net worth of at least $100,000,000.

Please UPLOAD your compliant certificate to your Service Provider record within Kroger's Supplier Information Management (SIM) program. If a certificate is uploaded to your Service Provider record, a paper copy of the certificate is not required to be mailed. If you have not yet registered in the program, please visit www.thekrogerco.com to begin the supplier self-registration process.

| Contact Name: | Contact Title / Company: | Contact Phone: | Contact e-Mail: |
|---|---|---|---|
| Supplier Integrity Team | Supplier Integrity – Kroger | 1-844-277-6165 | suppliercompliance@kroger.com |

Last Revision: October 18, 2017

DEF FRED MEYER_000033

DocuSign Envelope ID: 9106E8B6-61E9-4446-AA09-858444EF11FE

## EXHIBIT C

## REQUIREMENTS OF CRITICAL SERVICES

Service Provider will:

1. Have a comprehensive business continuity plan covering all critical areas of Service Provider's business;

2. Have documented plans that identify recovery teams, resources and needs for:

    a. The recovery of business function – BCP;

    b. The recovery of technology – DRP;

    c. The coordination of recovery and risks management – CMP, and

    d. Pandemic plans for the loss of people in the 30-40% range.

3. Test BCP, DRP, and CMP at least annually;

4. Provide Kroger with the ("RTO") (as defined below) and Recovery Time Capability ("RTC") (as defined below) for all systems required to provide the Services;

5. Upon Kroger's request, provide a summary of the most recent test results that validate the RTC for all systems required to provide the Services;

6. Notify Kroger immediately if there is a disruption impacting Service Provider's ability to provide the Services and to implement Service Provider's BCP, DRP, CMP, or pandemic plan;

7. Provide Kroger with an annual written certification by one of Service Provider's executives attesting the validity of its business continuity program; and

8. Allow Kroger to audit Service Provider's books and records in order to show compliance with these requirements.

Recovery Time Capability ("RTC") means the amount of time it took to actually recover a system or service as evidenced during a test or the amount of time Service Provider commits to for recovery based on its BCP or DRP.

Recovery Time Objective ("RTO") means the amount of time a business function or process can be unavailable before the impact (financial, shareholder, image, regulatory, contractual, etc.) becomes unacceptable to Service Provider.

Kroger Vendor Data Protection Addendum (June 2, 2022)                                                      20

DEF FRED MEYER_000034

## EXHIBIT D

## KROGER TRAVEL EXPENSE POLICIES

**1.    Airfare**

Service Providers will make airline reservations as early as possible to take advantage of advance purchase discounts. Extended weekend stays are available if weekend airfare results in net savings after considering additional lodging and meal costs.  Pre-approval from the Kroger project manager is necessary for extended weekend stays. The least expensive flight matching the below criteria must be selected.

1) Flights with equal to or less than one stop each way
2) Flight is within 2 hours of desired flight times
3) Flights is within $200 of the least expensive alternative
4) If an alternate airport is within 2 hours driving time of the local Kroger office and the savings of driving to/from that airport exceed $500 net, the alternate airport must be chosen.
5) Coach class airfare must be booked for all travel.
6) For international travel, the trip approver may authorize another class of service.
   a. If another class of service is approved, vouchers or frequent flyer miles earned on Company travel must be used before a higher class of service is paid for.

If an airline charges for checked bags, Kroger will reimburse one piece of personal luggage (if the first checked bag is free, no reimbursement will be given). All other airline fees are not reimbursable by the Company, and include but are not limited to in flight movies, checking multiple bags, frequent flyer miles, in flight internet access and in-flight beverage charges. In-flight meals are subject to the guidance regarding "Meals" below. In-flight internet costs are NOT reimbursable.

**2.    Hotel Accommodations**

Service Providers will make hotel reservations as early as possible to take advantage of advance purchase discounts. Hotels chosen will be within a reasonable distance from the Kroger location(s).

Allowable hotel expenses:

- High speed internet access for business purposes while traveling, if not included in the rate

Disallowed hotel expenses:

- Dry cleaning

- Shoeshine

- Movie rental charges

- Hotel gift shop charges

- Personal toiletries

- Tipping

- "No show" charges for hotel, if the result is due to Service Provider's negligence.

**3.    Rental Cars**

The Service Provider who rents a car is the <u>only authorized driver</u> on the vehicle. Under no circumstances will anyone other than the Service Provider who rents the car drive the car.

Service Providers are required to book a midsize car or smaller, unless traveling with a larger group that could travel more cost effectively in a larger vehicle or van.  Employees/Contractors are to choose whichever fueling option provides the cheapest rate. Disallowed car rental expenses:

- Upgrade costs that are deemed unreasonable

Kroger Vendor Data Protection Addendum (June 2, 2022)                                                    21

DEF FRED MEYER_000035

- Parking or traffic tickets
- Personal accident insurance
- "No show" charges for car rentals, if the result is due to employee/contractor negligence.
- Service Provider is responsible for any damages if there is an accident

Taxi and shuttle services may be a more cost-effective mode of transportation than a car rental. Taxi and shuttle services are reimbursable when this is the case.

### 4. Personal Car Usage Guidelines

Service Providers may use their personal car for business purposes when use of a personal car is less expensive than renting a car, taking a taxi or alternate transportation. It is the personal responsibility of the owner of a vehicle being used for business to carry adequate insurance coverage.

Service Providers will be reimbursed for business usage of personal cars at the rate of $0.57.5 (mileage rate as of 1/1/2015) per kilometer/mile.

Disallowed personal car usage expenses:

- Any repairs to your personal car even if these costs result from business travel.
- Routine auto maintenance/tune-ups on your personal car.
- Transportation between home and the Service Provider's normal work location.

### 5. Other Disallowed Items

- Loss/theft of personal funds or property
- Purchase of luggage and briefcases
- Magazines, books, newspapers, while traveling
- Corporate credit card delinquency fees/finance charges

### 6. Meals

Meal reimbursements will not exceed an average of $45/day/person, for the length of the trip. Reimbursement for higher cost areas (New York, Alaska, and Southern California) will not exceed an average of $60/day/person. These dollar limits include tip. These amounts do NOT represent per diems, but are average daily meal expenditure limits not to be exceeded.

Breakfast on the day of departure from home is not reimbursable. The dollar limitations apply to meals whether they are in connection with a trip, or an in-town business meal.

Lunches, whether in or out of town, are not reimbursable. Being out of town on a business trip does not constitute a business purpose for lunch. Dinners are reimbursable when traveling overnight, or while in town with a business purpose.

Dinners on the day of return are not reimbursable unless travel plans or unusual travel delays occur that result in not reaching home until evening (8:00 pm or later). If a meal expense is included in the total of the hotel bill, the meal portion must be totaled and reported independently.

### 7. Other Expenses

No other expenses will be reimbursed by The Kroger Co.

**EXHIBIT E**

**PRODUCT PRICING**

| SALES CODE | Item No. | Description | Current Price | New Price | Date | Notes |
|---|---|---|---|---|---|---|
| KR | D-1143 | UPS Battery Backup w/ Mounting | $215.00 | N/C | 2/1/2023 | |
| KR | D-5960 | GatorPave | $107.50 | N/C | 2/1/2023 | |
| KR | D-9102-1 | System Monitor Additional Year | $150.00 | $173.00 | 2/1/2023 | |
| KR | D-91022US | Cellular Base USA | $1,375.00 | N/C | 2/1/2023 | |
| KR | D-9126 | Central Transmitter w/ Monitor | $1,495.00 | N/C | 2/1/2023 | |
| KR | D-9601 | PURCHASE MANAGER UNIT | $215.00 | N/C | 2/1/2023 | |
| KR | D-9601A | PURCHASE MANAGER(E-Purchek) | $215.00 | N/C | 2/1/2023 | |
| KR | D-9670A | SMT LRT w/ Power Supply | $215.00 | N/C | 2/1/2023 | |
| KR | D-9671A | Long Range Transmitter Hub | $215.00 | N/C | 2/1/2023 | |
| KR | D-9672A | SMT LRT w/ data cable | $215.00 | N/C | 2/1/2023 | |
| KR | D-9676 | SRT w/ ISOLE Sensor | $420.00 | N/C | 2/1/2023 | |
| KR | D-9677 | SRT w/ IDEC Sensor | $420.00 | N/C | 2/1/2023 | |
| KR | D-9753 | ENCLOSURE,18X16X8,WEATHER PROO | $440.00 | N/C | 2/1/2023 | |
| KR | S-1202 | Register | $125.00 | N/C | 2/2023 | |
| KR | D-9801 | DOOR MANAGER, (US) | $984.50 | N/C | 2/1/2023 | |
| KR | D-9813 | wireless lock kit for D-9801 | $1,295.00 | N/C | 2/1/2023 | |
| KR | D-9815 | Door Manager w/ Modem kit | $1,495.00 | N/C | 2/1/2023 | |
| KR | D-9817 | Purchek Door Kit w/Key Pad | $1,595.00 | N/C | 2/1/2023 | |
| KR | K-9100 | NanoKey | $95.00 | N/C | 2/1/2023 | |
| KR | K-9805 | CartKey2 | $110.00 | N/C | 2/1/2023 | |
| KR | M-8000 | Containment Painted Zones (Per Store) | $150.00 | N/C | 2/1/2023 | |
| KR | M-8002-EUSSSA | purchek/containment wall signs | $19.00 | N/C | 2/1/2023 | |
| KR | M-8002WC-EUSSSA | purchek/containment Win Cling | $19.00 | N/C | 2/1/2023 | |
| KR | M-8020 | CART SIGN KIT, ENGLISH/SPANISH | $3.50 | N/C | 2/1/2023 | |
| KR | M-8033 | frameless sign Assy | $3.50 | N/C | 2/1/2023 | |
| KR | M-8056 | Parking Lot Sign Kit W/ Posts | $155.00 | N/C | 2/1/2023 | |
| KR | M-8080 | PARKING LOT SIGN KIT, ENG/SPAN | $55.00 | N/C | 2/1/2023 | |
| KR | PA509705-R18 | CARTMANAGER XD PLUS | $5,692.13 | N/C | 2/1/2023 | |
| KR | PA509707-R39 | CM XDW-i 115V DT | $3,695.00 | $3,795.00 | 2/1/2023 | Digital Throttle Chip |
| KR | PW-9470A | PairSmartWheel 2.0 QS/Ultra | $70.00 | $73.00 | 2/1/2023 | Chip / Electronics |
| KR | PW-9471A | PairSmartWheel2QS ULT w/o Cast | $70.00 | $73.00 | 2/1/2023 | Chip / Electronics |
| KR | PW-9475A | PairSmartWheel2QS ULT w/ Cast | $70.00 | $73.00 | 2/1/2023 | Chip / Electronics |
| KR | S-1000 | Wheel Assembly Installation | $8.00 | Labor | 2/1/2023 | |
| KR | S-1004 | Wheel Installation Only | $5.00 | Labor | 2/1/2023 | |
| KR | S-1008 | Indoor Wired Lock Installation | $1,325.00 | N/C | 2/1/2023 | |

Kroger Vendor Data Protection Addendum (June 2, 2022)

23

DEF FRED MEYER_000037

| | | | | | | |
|---|---|---|---|---|---|---|
| KR | S-1100 | Sign Post Installation | $110.00 | N/C | 2/1/2023 | |
| KR | S-1111 | Purchek Wrd Lock/Perm Install | $2,250.00 | N/C | 2/1/2023 | |
| KR | S-5900 | Containment Sys Installation | $3.95 | N/C | 2/1/2023 | |
| KR | S-5905 | Push-out System Installation | $3,295.00 | $3,459.75 | 2/1/2023 | Labor |
| KR | S-5906 | Push-out System Installation | $5,495.00 | $5,769.75 | 2/1/2023 | Labor |
| KR | S-5907 | Push-out System Installation | $7,295.00 | $7,659.75 | 2/1/2023 | Labor |
| KR | D93035B | Push-out Confirmation | $625.00 | N/C | 2/1/2023 | |
| KR | S-6105SS | Push-out Site Survey | $795.00 | N/C | 2/1/2023 | |
| KR | S-6100 T | Containment Site Visit | $295.00 | N/C | 2/1/2023 | |
| KR | S-6102 | Hourly Rate Containment | $75.00 | $ 85.00 | 2/1/2023 | Labor |
| KR | S-6103 | Hourly Rate Pushout | $125.00 | N/C | 2/1/2023 | New |
| KR | S-6103-SV | Pushout Site Visit | $325.00 | N/C | 2/1/2023 | New |
| KR | S-9100 | Per Foot Cat5 Cable | $4.75 | N/C | 2/1/2023 | |
| KR | S-9102 | Cellular Base Install | $250.00 | N/C | 2/1/2023 | |
| KR | S-9407 | Per Camera Install Labor | $300.00 | N/C | 2/1/2023 | |
| KR | W-4000 | Anti-Tilt Bar (P) | $2.25 | N/C | 2/1/2023 | |
| KR | W-4007 | Unarco Anti-Tilt | $3.25 | N/C | 2/1/2023 | |
| KR | W-4008 | Technibilt  Anti-Tilt | $3.25 | N/C | 2/1/2023 | |
| KR | W-9218E | SmartWheel 2.0QS w/Plastic Cas | $46.00 | $ 48.00 | 2/1/2023 | Chip / Electronics |
| KR | W-9470A | SmartWheel QS/Ultrasonic ver | $42.00 | $ 44.00 | 2/1/2023 | Chip / Electronics |
| KR | W-9471A | SmartWheel 2.0 ULT w/o Caster | $42.00 | $ 44.00 | 2/1/2023 | Chip / Electronics |
| KR | W-9940 | SmartWheel 2.0QS Tread Kit | $6.50 | $ 8.00 | 2/1/2023 | Duty, Tariff, Materials |
| KR | W-9970 | Locking Caster Nut Instal Kit | $1.08 | N/C | 2/1/2023 | |

DEF FRED MEYER_000038

<u>**EXHIBIT F**</u>
<u>**GATEKEEPR SERVICES**</u>

# Gatekeeper Systems
# Loss Prevention Services
## 1. Overview of Gatekeeper Loss Prevention Services and Service Agreements

## <u>Installation and System Upgrades, Site Remodels</u>

- **Planning and installation of new systems**
  - Site survey and custom store design per fixture plan
  - System installation, tuning and test, operator training to your LP standards, all with professional coordination and project management from order to go-live.

- **Project Management Desk** and **On-site Performance Verification Services** to assist with store remodels, checkout lane or fixture changes, and technology upgrade projects.
  - A planned approach to work with your construction and LP teams to ensure a smooth and convenient project and maintain the system's theft prevention performance.
  - Includes site plan redesign, service plan and on-site "systems" technician, and project management services

## <u>Existing System Support and Services</u>

- **Customer Experience Desk**
  - A general support center for store assistance, wheel re-ordering or emergency service requests
  - Basic troubleshooting of system
  - Ordering replacement CartKey, batteries
  - Quote any preventive maintenance, performance verification or emergency service call outs.
  - Provide a service plan for an emergency service call out:  on-site dispatch upon work order approval
  - Confirm scheduling of on-site technician visits, order products/part or material required, coordinate with flooring or electrical contractors as needed.
  - Update the customer's portal for work orders, job status, invoicing

- **IoT-based Systems Monitoring and Remote Support** for early detection of problems and cost-effective remote troubleshooting to reduce the need for on-site dispatch.
  - Technology embedded in the system to provide the central monitoring desk with fault alerts and other operating data.
  - Remote Support Technicians investigate and resolve issues within a defined time period.  If on-site visit required, a service plan is defined to reduce the on-site technician time and possibility of requiring a return visit.

DEF FRED MEYER_000039

- **Cart Containment System and Smart Wheels On-site Preventative Maintenance** to prevent unexpected downtime and costly on-site repairs for cart containment systems, and smart wheels.
  - o Addresses the expected degradation and accidental damage to outside, in-ground antenna lines and ensure customer awareness signage controls liability and improves the shopper experience
  - o Checks proper functioning and connectivity of central transmitter
  - o Regular scheduled maintenance extends the life of the system and protects valuable cart assets

- **Performance Verification Services for Purchek Pushout Theft Prevention System**
  - o A coordinated and prescriptive service to follow up after your cart and wheel service provider visit.  Work performed by a Certified Systems Support Technician
  - o Smart services based on wheel health data, fault alerts, device connectivity data and the Remote Support performance report
  - o Ensures entire system of smart wheels, cameras, sensor devices, modems and associated system tuning by Gatekeeper factory certified systems support technicians
  - o Conduct a full assessment of the system, customer awareness signage and operator training to optimize the theft prevention performance
  - o Update system components to latest version or upgrade lane designs and smart exit controls as requested to ensure system is not obsolete and under-performing

- **Smart Wheel Replacement and Service Training for Cart Service Organizations**
  - o Convenient online certification training to replace and service Gatekeeper smart wheels under the Gatekeeper Wheel Works program
  - o Provides the ability for your cart service vendor to install and replace smart wheels during their maintenance visits

DEF FRED MEYER_000040

## 2.  Gatekeeper Field Support Structure and Key Organization Contact Points

### Regional Loss Prevention Services

Gatekeeper has 8 service regions located to provide local relationships with construction, LP/AP and facility managers. Regional Service Managers constantly train and develop their service and system support technicians on Gatekeeper technology and practices, conduct on-site quality audits, conduct operator go-live training, schedule preventative maintenance and address any service issues.

Within each region is a team of service technicians trained by system type:

- Smart wheels – Service Technician
- Cart Containment – Service Technician
- Pushout Theft Prevention – System Support Technician



Gatekeeper earns its reputation through technology and customer service, from new installs through the life of the system to meet your objectives.

We have the structure to address key requirements for new systems, on-going preventive maintenance, remote support, remodels, upgrades and ensuring your system continues to achieve the performance you expect.

DEF FRED MEYER_000041

## 3. Field Service "Call Out" Labor Rates (Non-Service Agreement)

| I. Cart Containment & Wheel Services |
| --- |
| **Service Labor Rate:** $85.00 per hour for U.S. except the Pacific Northwest<br><br>*Pacific Northwest regional rate $100.00 per hour* |
| **Site Visit:** $295.00 (includes 1 hour of service labor for metro areas greater than 500,000 population excluding Alaska, Wyoming, Montana, Dakotas)<br><br>*Pacific Northwest regional site visit $310.00* |
| **Remote Zone 1 Adder (between 50-100 miles from origin): $150.00** |
| **Remote Zone 2 Adder (between 101-200 miles from origin): $250.00** |
| **Remote Zone 3 Adder greater than 200 miles: Quoted to include travel costs** |
| |
| II. Pushout Theft System Services |
| **Service Labor Rate:** $125.00 per hour except the Pacific Northwest<br><br>Pacific Northwest $165.00 per hour (labor and licensing cost factors) |
| **Site Visit:** $325.00 (includes 1 hour of service labor for metro areas greater than 500,000 population excluding Alaska, Wyoming, Montana, Dakotas)<br><br>*Pacific Northwest site visit $365.00* |
| **Remote Zone 1 Adder (between 50-100 miles from origin): $240.00** |
| **Remote Zone 2 Adder (between 101- and 200 miles from origin): $320.00** |
| **Remote Zone 3 Adder greater than 200 miles: Quoted to include travel costs** |

**Gateekpeeper will assess only one instance of a Site Visit per a service ticket excluding those instances in which Gatekeeper must make a return visit per Kroger or as a result of Kroger's actions.**

**Notes:**
- Includes after-hours labor
- Excludes weekends and holidays (2x standard rates)
- Labor pricing adjusted annually
- Regional pricing in effect for the Pacific Northwest are due to special labor rates and technician licensing requirements

DEF FRED MEYER_000042

## 4. Service Agreement Program Summary:

| Program | Description |
|---|---|
| **Emergency Service Call-Out, Time and Material-based** *Quoted Services* | Non-Agreement, first come first serve scheduling, quotes products, parts and estimated required labor. Controlled by NTE and customer approval. Replacement products used for service ordered on demand. |
| **Subscription Systems Monitoring and Remote Support Agreements** | Monitoring and problem event solution or escalation based on subscription dates. |
| **Preventative Maintenance** *Standard Agreement* **-Cart Containment** | Scheduled preventative maintenance services to reduce possibility of an on-demand emergency service call out and customer downtime. |
| **Preventative Maintenance** *Plus Agreement* **– Cart Containment** | Provides PM Standard coverage, plus pre-approved amount of smart wheel replacements while on-site for the PM. |
| **Performance Verification Services – Pushout Theft** | To augment traditional cart maintenance and for store remodels, and lane upgrades. Provides complete system optimization to maintain Purchek ROI and state of the art equipment status. |

## Exclusive Gatekeeper Systems "*Smart Preventative Maintenance*" Program

Leveraging the power of the internet and connected devices. Gatekeeper provides a **prescriptive** preventative maintenance (PM) based on actual performance data of the site's system.

Combined with the Gatekeeper System Monitoring program, the PM visit is scoped to address both general maintenance and specific issues related to the store's specific system. This may include wheels with low batteries, problematic checkout lane permissions, camera angles, line breaks, etc.

The Gatekeeper technical support team will create a store specific service plan for the PM technician to follow ensuring improved uptime and system effectiveness.

With additional product and system developments, the Gatekeeper Smart PM program will be even better in the future with:

- Leveraging internet connected devices
- System monitoring by expert remote system specialists
- Optional classification services and analytics

**Program Benefits**

- Prescriptive services based on store's actual system performance
- Protect valuable cart assets and store merchandise
- Optimize system capabilities and reduce unexpected system downtime or major repairs
- Maintain system and equipment to current factory standards
- Reduce liability
- Improve shopper's experience

## Pricing for Preventative Maintenance and Performance Verification Services

The below programs are priced based on store volume, time of day allowed for service, quantity of visits per year, store location and fleet size. Stores are required to be brought up to standard condition before service agreement can begin. A specific quote can be prepared to optimize the service route and services. A typical store visit ranges from $850-$1,200 depending on above factors, plus any wheel replacements.

**Preventative Maintenance Agreement
Cart Containment and CAPS Systems**

DEF FRED MEYER_000043

## Smart Wheel Services

**Pre-scheduled, on-site preventative maintenance visit by Gatekeeper Authorized Service Technician(s)**

### Scope of Work

#### PM "Standard"
- If site under a Systems Monitoring Subscription, review the Smart PM recommendations.
- Inspect the perimeter antenna line for any damage or evidence of wear or exposure.
- Repair and reseal up to 10 feet of exposed antenna line. Extra length cost is quoted.
- Inspect for proper Site Management/Customer Awareness signage and notify customer of any missing signage.
- Re-paint any faded containment zone striping as per what was originally installed.
- Inspect the Central Transmitter and test modem connection and CartKey. Replace low batteries.
- Complete a visual inspection of the cart fleet and report damage to cart signage and incorrectly installed or missing smart wheels
- Perform a full system test and review with store manager.

#### *PM "Plus" - Additional Cart/Wheel Work with Pre-Authorized Wheel/Sign Replacement*
- Inspect and test entire cart fleet and Smart Wheels
- Replace non-responsive wheels with new Gatekeeper Smart Wheels
    - Includes install labor and cutting defective wheels off if corroded
    - Includes possible anti-tilt bar replacement if equipped
    - Includes cart customer awareness signage replacement if needed
    - Return In warranty, non-responsive wheels to Gatekeeper for factory evaluation and possible credit.

**Program Benefits**
- Protect valuable cart assets and store merchandise, reduce liability
- Optimize system capabilities and reduce unexpected system downtime or major repairs. Maintain equipment to factory standards.

## Performance Verification Service
## Purchek and POPS Systems

**Pre-scheduled, on-site Performance Verification and System Upgrade visit by Systems Support Technician**

### Scope of Work

**Pushout Theft Prevention System.** Includes inspection and/or maintenance of:
- In-floor installed permission and lock antenna loops
- RF sensors and transmitters installed in operated and self-service checkout lanes

DEF FRED MEYER_000044

- Camera systems and LTE enclosure/modems
- Smart exit control sensors
- Door manager, strobe/audio alarms and modems
- Shopping cart installed Gatekeeper smart locking wheels and anti-tilt bars
- Customer awareness signage on carts and CartKey
- Recommendations or approved upgrade of devices and modems to latest version

**Performance Verification Service**
- If site under a Systems Monitoring/Remote Support Subscription, review the Smart PM recommendations and wheel health report
- Inspect permission and lock loops for exposure, wear, or damage.  Reseal if loops are not covered by flooring tile/carpet.
- Check operation of each check lane sensor/transmitter, replace up to 2 inoperable lane devices
- Inspect and test operation of all door managers, alarms, modems, and smart exit control sensors.  Re-tune RF signals at checkout lanes.
- Replacement of obsolete or under-performing devices and modems per request
- Camera repair and adjustment - inspect images for clarity.  Clean camera lenses as necessary (lift rental fees apply)
- Conduct visual inspection of cart fleet and report any mis-installed wheels, anti-tilts, or damaged/missing customer awareness signage
- Replace CartKey batteries
- Test entire system and meet with the store manager.  Review verification report and any issues and provide additional system operation training as necessary.

**Program Benefits**
- Protect valuable cart assets and store merchandise, reduce liability
- Optimize system capabilities and reduce unexpected system downtime or major repairs.  Maintain equipment to factory standards.

DEF FRED MEYER_000045

**EXHIBIT G**
**Standards and Service Levels (Specifications)**
**Gatekeeper Maintenance**

**TABLE OF CONTENTS**

Part 1 – General
1.1  Definitions
1.2  Scope
1.3  Equipment Background and History
1.4  Existing Equipment Warranty Information

Part 2 – Responsibility of Vendor
2.1 Service Level Expectations
2.2 Key Performance Indicators (KPI's)
2.3 CMMS Requirements
2.4 On Site Requirements
2.5 Status Meetings
2.6 Quality Control
2.7 Reporting
2.8 Not To Exceed Policies
2.9 Invoicing
2.10 Submittals

Part 3 – Technical Specifications
3.1 Quality Standards
3.2 Equipment, Parts and Materials
3.3 Operations and Maintenance Manuals

Part 4 – Vendor Personnel
4.1 Key Vendor Personnel
4.2 Subcontractors
4.3 Attire
4.4 Conduct

Part 5 – Safety
5.1 General Safety
5.2 Safety Data Sheets

Part 6 – Deliverables
6.1 Five (5) Business Days After The Contract Award
6.2 Fifteen (15) Business Days After The Contract Award

**PART 1 – GENERAL**

1.1  DEFINITIONS – The following definitions are in addition to those set forth in Section1 of the Agreement:

DEF FRED MEYER_000046

A. Account Manager – Vendor's Personnel are responsible for managing day to day business under this Agreement. Shall have full authority to act for Vendor and have overall responsibility for the Services to be carried out.

B. Best Practice – A method or technique that has consistently shown results superior to those achieved with other means

C. Break / fix – Service method for providing repairs, reactive Service

D. CMMS– (Computerized Maintenance Management System)– Kroger's enterprise wide, web based electronic application for managing maintenance Services within the Kroger Locations, and available to authorized Kroger vendors.

E. Division – Operating division or subsidiary of Kroger

F. KCAC – Kroger Central Alarm Center

G. OSHA – Occupational Safety and Health Administration (U.S. Department of Labor)

H. PM – Preventive maintenance Services, scheduled Services

I. Subcontractor – The person or entity contracted with Vendor, either directly or indirectly, to provide Services under the Agreement

J. Supervisor – Vendor's Personnel who supervises and leads skilled staff and directs work assignments. Experienced above a Technician and in managing technical personnel in this trade.

K. Technician – Vendor Personnel who is experienced, competent, educated in the trade

L. Vendor – The person or entity identified as such in the Master Services Agreement and is referred to throughout as if singular in number. The term Vendor means Vendor or Vendor's authorized representative

M. VPN – Virtual private network

## 1.2 SCOPE

A. The scope of Services for this specification include break / fix Services, labor and materials for Gatekeeper Equipment.

B. Additional scope under this specification includes authorized PM Services for this equipment and components. PM Scope to be determined by the Kroger division maintenance contact.

## 1.3 EQUIPMENT BACKGROUND AND HISTORY

A. With Kroger's numerous formats and Kroger Locations' ages the equipment and design intent vary by division.

## 1.4 EXISTING EQUIPMENT WARRANTY INFORMATION

A. Vendors authorized to perform manufacturer's warranty repairs may be requested to perform warranty work by the manufacturer, the equipment supplier or Kroger.

## PART 2 – RESPONSIBILITY OF VENDOR

## 2.1 SERVICE LEVEL EXPECTATIONS

A. Vendor shall be actively engaged in Gatekeeper maintenance Services as described in Attachment B. Vendor shall have adequate tools, equipment, supplies, Vendor Personnel, and all necessary certifications to provide effective and efficient Service for break / fix work.

B. Service levels for Gatekeeper break / fix work are as follows:

|  | Service Level Matrix for Gatekeeper | | |
|---|---|---|---|
| **Priority** | **Acknowledge Within** | **Arrive Within** | **Complete Within** |
| 0-20 | 1 Hour | 2 Hours | 12 Hours |
| 21-40 | 2 Hours | 4 Hours | 48 Hours |
| 41-60 | 2 Hours | 24 Hours | 72 Hours |
| 61-80 | 2 Hours | 48 Hours | 168 Hours |
| 81-99 | 2 Hours | 72 Hours | 336 Hours |

C.   Service levels for Gatekeeper Preventive Maintenance work are as follows:

|  | PM Service Level Matrix for Gatekeeper | | |
|---|---|---|---|
| **Priority** | **Acknowledge Within** | **Arrive Within** | **Complete Within** |
| 0-99 | 2 Hour | 336 Hours | 672 Hours |

D.   In the event Vendor cannot execute the work order within the agreed upon service levels, or Vendor rejects the call, Kroger shall have the right to issue a work order to a secondary service provider without any obligation to Vendor under this Agreement.

E.   If Kroger enters into a maintenance/service agreement with Vendor, Vendor will not additionally invoice for any maintenance that is included in the service agreement.

2.2 KEY PERFORMANCE INDICATORS (KPI'S)

A.   Vendor will be measured on (7) key performance indicators for break / fix Services:
1.   Response time to <u>acknowledge</u> Service call in the CMMS
2.   Response time to <u>arrival</u> on site
3.   Time to <u>complete</u> (close) the call action
4.   Fault/Cause/Remedy input into the CMMS
5.   First trip completion rate
6.   Number of return trips per call
7.   Overtime hours as a percentage to total labor hours billed

B.   Vendor will be measured on (3) key performance indicators for preventive maintenance Service:
1. Preventive maintenance labor hours divided by the break / fix labor hours
2. Percent of PM calls completed within 10 days of expected completion date
3. Dollar spend of parts as a percentage to labor

2.3 CMMS REQUIREMENTS

A.   Kroger utilizes a CMMS to "log a call" for needed maintenance Services for equipment and building repairs. The call is assigned a priority of 0 through 99 then routed by Kroger dispatch personnel to the appropriate Vendor or in-house technician.  Once the call has been dispatched to Vendor Vendor's responsibilities within the CMMS application are as follows:

Acknowledge the Call

1.   Acknowledge the call within time parameters outlined in the Service Level Matrix for Gatekeeper.
2.   Communicate Vendor's estimated time of arrival according to the service priority set in the call.
3.   State any instructions that convey plans for estimated time of arrival.
4.   If rejecting a call within the CMMS, follow-up with a phone call to the Kroger dispatch contact.

Kroger Vendor Data Protection Addendum (June 2, 2022)                                                                34

DEF FRED MEYER_000048

Arrive on Site

1. State actual date and time of arrival.
2. Arrive on site according to the established key performance indicators and call priority.
3. In the Notes field, communicate who the Technician confirmed arrival on site with, i.e. name of Kroger Location management or department head.

Close the Call

1. State actual date and time for closing the call.
2. Complete and close the call according to key performance indicators and call priority.
3. Include thorough service notes that describe in detail what Service was performed.
4. If applicable, associate equipment with the call.
5. Document all new parts installed to complete the repair in the Notes field within the CMMS. Documentation to include:
   a. Manufacturer
   b. Part Number
   c. Quantity
   d. Description

Additional Vendor CMMS responsibilities include:

Managing Users
1. Ensure that your company properly manages who has access to the CMMS.
2. Terminate access when employees leave the company.

Faults Cause Remedies

1. For each Service call, identify faults cause and remedies, including a note identifying problem resolution.

Equipment History

1. Review information about past equipment history before each Service call.

Second Actions with same Service call

1. Follow Kroger division protocol for approving parts and additional equipment if needed to complete the call for a second action.

B. For additional information see:
   1. Video – CMMS-Introduction for Sub Contractors

2.4 ON SITE REQUIRMENTS

A. Upon arrival to the Kroger Location, Vendor must report to the store management.  Vendor must report to store management prior to leaving the premises for any reason.  During the initial check-in report with store management Vendor may be asked to sign in and sign out on a designated vendor visit form.

B. Vendor may be asked to sign a store work order authorization for Kroger internal purposes.  A duplicate copy of this form will be provided to the Technician and must accompany the invoice. (Kroger Division-specific requirement)

Kroger Vendor Data Protection Addendum (June 2, 2022)                                                     35

DEF FRED MEYER_000049

C.   Access to the roof, mezzanine or mechanical room may require a burglary alarm contact to be disabled by KCAC. In the event KCAC needs to disable an alarm contact store management must initiate the call to KCAC. Vendor shall not bypass or disable any burglary alarm.

D.   Vendor shall be responsible for housekeeping during the performance and upon completion of all its Services. This includes removal from the Kroger Location of all debris and cleaning of the equipment from grease, oil and dirt.

E.   In the event that work is to be performed on the sales area floor or within the backroom operations of the store Vendor shall keep the working area clean and secure from customers and Kroger employees at all times.

F.   Vendor shall not utilize any Kroger space for permanent storage of tools, equipment, parts or supplies related to or unrelated to the nature of the Services. Temporary storage space shall be limited to the repair work being performed. Such temporary space must be approved by the Kroger Division maintenance contact.

G.   Hair nets are required when entering any food service department. Hair nets are located within the food service department and are available to Vendor.

H.   Vendor's Personnel are permitted to smoke in designated areas only.

I.   Vendor's Personnel are prohibited from carrying firearms on Kroger premises.

J.   Vendor shall park all vehicles in marked parking spaces away from heavy traffic areas, preferably in the outer 1/3 of the customer parking area. Vendor Personnel requiring handicapped parking may use designated handicapped parking spaces provided the vehicle is properly marked as required by local jurisdictions.

K.   Vendor shall be required to follow all Kroger, federal, state or local health and safety guidelines.


## 2.5 STATUS MEETINGS

A.   Vendor shall establish a semiannual status performance review with the Kroger Division maintenance contact at times and dates agreed upon by the Kroger Division maintenance contact. Subject to the coordination of this meeting with the Kroger Division maintenance contact this meeting may be held on-site, at the Kroger Division office or at Vendor's office.

B.   The Account Manager shall be available for this review. KPI's should be reviewed during this review and corrective action discussed for underperforming indicators.


## 2.6 QUALITY CONTROL

A.   Vendor shall implement an effective quality control program as a means to monitor and measure work performance and to ensure that Services are being provided in accordance with the Agreement.

B.   Vendor's quality control program will provide for quarterly scheduled and unscheduled on-site inspections by Vendor's Account Manager. At various times, either scheduled or unscheduled, a Kroger maintenance representative may accompany the Account Manager during the inspections.

C.   Vendor will submit to the Kroger Division maintenance contact an electronic formatted report detailing the inspections performed on the quarterly basis. The report shall include Kroger Locations, time and date, Technician's name and corrective actions required.

D.   The number of inspections per quarter shall be no less than 8% of the total break / fix service calls. If PM services are being performed under the agreement 10% of the PM inspections shall be inspected. Inspections should be coordinated in a manner that ensures all stores under the agreement are inspected over the life of the contract to extent practice.

DEF FRED MEYER_000050

E.   The baseline of the total service calls for the purpose of establishing the number of inspections shall be established in the first full three months of the contract.

F.   During each of the required inspections Vendor shall retain all replaced parts for inspection by a Kroger representative. Parts shall be tagged with the CMMS call number and removed from the Kroger Location by Vendor.  Parts shall be safely stored by Vendor at Vendor's facility for a period of 30 days.

G.   During the course of the Service call Kroger may request Vendor to retain for inspection any replaced parts. Kroger may perform quality control inspections independently of Vendor inspections.

## 2.7 REPORTING

A.   Vendor shall report the following to the Kroger Division maintenance contact on a monthly basis, and upon request to corporate maintenance:
   1.   Quality control inspections
   2.   Outstanding billing issues
   3.   Outstanding material / parts submittals

## 2.8 NOT TO EXCEED POLICY

A.   When Not to Exceed dollar amount exists, this will be communicated within the CMMS work orders.

## 2.9 INVOICING

A.   Vendor is to submit properly completed invoice(s) and emailed or mailed to the specified address in the purchase order.  Invoicing must be timely and not delayed by more than 30 days.

B.   Each invoice shall include line item detail for the following regarding the Services completed:
   1.   Labor hours required
   2.   Labor rates and extended cost
   3.   Material / part description and quantity
   4.   Material / part unit price and extended cost
   5.   Applicable service charges / fees and details, i.e., travel
   6.   Applicable taxes
   7.   Invoice total
   8.   Date of Service
   9.   Call action number (CMMS work order number) or contract number if applicable
   10.  Kroger Location's number and address

C.   All invoices must include Vendor's name, contact phone number, email address and remit to address.

D.   Only one invoice will be accepted for each Service call.

E.   Stocking or re-stocking fees of parts, materials or supplies is subject to the terms of Schedule 1 – Cost Structure.

F.   Fax transmissions of invoices for payment will not be accepted.

G.   All labor hours shall be billed in actual time increments.

H.   For Divisions requiring a signed work order authorization a copy of this form shall be submitted with the invoice for payment.

I.   Vendor will not bill for airfare, transportation cost/rental, per diem, or lodging without prior approval of the Kroger Division maintenance contact.

DEF FRED MEYER_000051

2.10 SUBMITTALS

    A.   Submittals shall be made to the designated Kroger Division maintenance contact.


PART 3 – TECHNICAL SPECIFICATIONS

3.1 QUALITY STANDARDS

    A.   Gatekeeper work shall comply with applicable requirements and recommendations of standards published by listed agencies and trade associations, except to extent where more detailed and stringent requirements are required by governing regulations.

    B.   Listing of Associations, Standards and Abbreviations Specific to Gatekeeper work conform to the following applicable standards:

| | |
|---|---|
| AEE | - Association of Energy Engineers |
| AHRI | - Air-Conditioning, Heating, and Refrigeration Institute |
| ANSI | - American National Standards Institute |
| ARI | - Air/Conditioning and Refrigeration Institute |
| ASC | - Adhesive and Sealant Council |
| ASHRAE | - American Society of Heating, Refrigeration & Air Conditioning Engineers |
| ASME | - American Society of Mechanical Engineers |
| ASPE | - American Society of Plumbing Engineers |
| ASSE | - American Society of Sanitary Engineering |
| AWS | - American Welding Society, Inc. |
| CAGI | - Compressed Air and Gas Institute |
| CARB | -California Air Resources Board |
| CTI | - Cooling Technology Institute |
| EPA | - Environmental Protection Agency |
| FM | - Factory Mutual System Green Mechanical Council |
| ICC | - International Code Council |
| IRCA | - International Compressor Remanufacturers Assoc. |
| MCAA | - Mechanical Contractors Association of America |
| MSCA | - Mechanical Service Contractors of America |
| NAEC | - National Association of Elevator Contractors |
| NIST | - National Institute for Standards and Technology |
| (NBS) | - (formerly National Bureau of Standards) |
| NEC | - National Electrical Code by NFPA |
| NEMA | - National Electrical Manufacturer's Association |
| NFPA | - National Fire Protection Association |
| NSF | - National Sanitation Foundation |
| OSHA | - Occupational Safety and Health Administration (U.S. Department of Labor) |
| PDI | - Plumbing and Drainage Institute |
| TIMA | - Thermal Insulation Manufacturers Association |
| UL | - Underwriter's Laboratories, Inc. |

    C.   All work shall be executed in a highly skilled manner consistent with the highest industry trade standards as published by the applicable trade agencies and associations except when more detailed and stringent requirements are required by governing regulations.

    D.   Vendor shall not remove or alter any part of the building structure in performance of this work.  Components of equipment removed for access shall be properly re-installed prior to closing the work order.  In instances where a return trip is required all weather proofing and safety components must be re-installed rather the equipment is operational or not.

Kroger Vendor Data Protection Addendum (June 2, 2022)         38

E.  Equipment not affected by the performed service must remain in working order at all times.  When it is necessary to shut down any equipment adjacent to, connected to or ancillary to the affected equipment the shutdown must be minimized so that store conditions are not negatively impacted.  Contact the Kroger Division maintenance contact and notify store management for any shutdowns lasting more that (1) hour.

## 3.2 EQUIPMENT, PARTS AND MATERIALS

A.  All equipment, parts and materials furnished under this Agreement shall be new, unused, manufacturer's latest model and in current production. All materials shall have the physical and chemical properties to withstand the intended service.

B.  Like for like brands shall be used.  Brands of equal quality, performance and use may be considered, provided Vendor submits for approval to the Kroger Division maintenance contact the brand, model and other data for comparison prior to the repair. Rebuilt parts to manufactures specifications may be considered provided Vendor submits for approval to the Kroger Division maintenance contact the brand, model, and other data for comparison prior to the repair.

C.  Subject to the approved use of rebuilt parts, parts with a core salvage value shall be charged to Kroger with a net price (minus core charge).  Core parts damaged and not acceptable for salvage can be billed at cost subject to approval by the Kroger Division maintenance contact.  Vendor is responsible for the return and credit of the core part.

D.  Compatibility:  Provide products which are compatible with other products of the work.

E.  Scrap material generated from the Service call shall be removed from the Kroger facility by Vendor.

F.  All manufacturer's and supplier's parts warranties shall be made available to Kroger.  Any materials and labor provided shall carry standard warranty coverage furnished by the trade in general.

G.  Kroger shall receive the benefit of all manufactures and suppliers parts and labor warranties.

## 3.3  OPERATIONS AND MAINTENANCE MANUALS

A.  After the Contract execution and at the request of Vendor, Kroger will provide an operations and maintenance manual for currently specified equipment.  Kroger will make all reasonable efforts to locate and provide operations and maintenance manuals for legacy equipment.  All manuals provided by Kroger will remain the property of Kroger and shall be returned to Kroger at the end of the contract.

## 3.4  GATEKEEPER PLANNED MAINTENANCE SPECIFICATION

A.  When authorized the agreed upon Gatekeeper PM Services shall be performed.

B.  All repairs completed during PM Service must be detailed in the CMMS notes.

C.  All replacement of parts used during PM Service must be detailed in the CMMS notes.

D.  A copy of an approved PM form for each piece of equipment undergoing PM Service shall be sent to the Kroger Division maintenance contact.

E.  The form shall include:
    1.  Date
    2.  Company name
    3.  Technician name
    4.  Store location

Kroger Vendor Data Protection Addendum (June 2, 2022)

39

DEF FRED MEYER_000053

     5. CMMS Call Number
     6. Kroger Equipment ID Number
     7. Equipment manufacturer
     8. Equipment model number
     9. Equipment serial number

F. Preventative maintenance and service contracts.
     1. Vendor to provide suggested PM, testing, and repair detail to follow all local and state building and fire code.
     2. Vendor to provide the jurisdictional requirements by location of PM intervals.
     3. Maintenance service contracts will be considered. Vendor to provide detail and all associated pricing of proposed service contracts.

## PART 4 – VENDOR PERSONNEL

## 4.1 KEY VENDOR PERSONNEL

A. All Services covered under this Agreement shall be performed by fully qualified and trained Technicians. Supervisors shall possess the necessary skills and experience to perform Services as identified in this Attachment B.

B. Vendor shall provide a qualified and experienced Account Manager for this Agreement. The Account Manager shall have full authority to act for Vendor and have overall responsibility for the Services.

C. Vendor shall submit within (5) working days after the execution of the Work Authorization a contact list of Key Vendor Personnel to the Kroger Division maintenance contact. The contact list shall include a back-up to the Account Manager.

D. When staffing changes are made Vendor shall update the Key Vendor Personnel list and submit to the Kroger Division maintenance contact.

## 4.2 SUBCONTRACTORS

A. Vendors may utilize Subcontractors to perform the Services only with prior written approval by Kroger.

B. All Subcontractors shall be held to the Standards and Service Levels of this Agreement.

## 4.3 ATTIRE

A. Vendor's Personnel and all Subcontractors must appear in a clean and professional manner. Attire shall not be deemed inappropriate or offensive to the public or Kroger.

## 4.4 CONDUCT

A. Vendor's Personnel at all times at the Kroger Locations, whether on or off duty, shall conduct themselves in a professional, orderly and safe manner. Harassment of any type, rudeness, fighting, being under the influence of alcohol and or drugs or possessing and or consuming alcohol or drugs, gambling, soliciting, stealing and any other conduct that interferes or has potential to interfere with Vendor's performance under this Agreement, shall not be permitted on at the Kroger Location and shall result in the immediate and permanent removal of the Vendor Personnel from any Services on Kroger Location's facilities.

## PART 5 – SAFETY

## 5.1 GENERAL SAFETY

A. Vendor shall comply with all applicable Federal OSHA / State Work-Place Safety, Federal EPA or State Department of Environmental Quality, and any Local health, fire and safety regulations at all times, as required by the Agreement.

B. Vendor shall supply and ensure that all safety equipment, devices, personal protective equipment and clothing for Vendor Personnel are utilized and worn as required.

C. Vendor shall be responsible for initiating, maintaining and supervising all safety precautions and programs in connection with the performance of the Agreement.  Vendor shall take all necessary precautions for safety of, and shall provide reasonable protection to prevent damage, injury or loss to persons, properties, equipment and vehicles.

D. All aisles, pathways, entrances, exits or right-of-ways to fire protection must be kept unobstructed at all times.

E. Kroger reserves the right to stop work if hazards are deemed to exist.

F. Vendor shall immediately report to the Kroger Division maintenance contact all injuries and citations incurred during performance of Services.

G. Vendor must have current written safety plans and procedures detailing compliance with all applicable health, workplace safety and environmental regulations, local and federal.

H. Vendor shall provide to Kroger by April 30th of each calendar year a copy of Vendor's previous year's OHSA 300-A Summary.

## 5.2 SAFETY DATA SHEETS

A. If the Services include provision of products, which include hazardous chemicals Vendor shall at the time of product delivery provide the Kroger Maintenance contact with copies of the Safety Data Sheets for such chemicals.

## PART 6 – DELIVERABLES

## 6.1 FIVE (5) BUSINESS DAYS AFTER EXECUTION OF WORK AUTHORIZATION

A. Provide names and contact information of the Account Manager and all Supervisors.

B. Provide name and contact information for accounts payable.

C. Provide names and EPA certifications of all Technicians proposed to perform work under this contract.

D. Provide company names and addresses of all intended Subcontractors.

## 6.2 FIFTEEN (15) BUSINESS DAYS AFTER EXECUTION OF WORK AUTHORIZATION

A. Provide the quality control plan that details how Vendor will ensure that all requirements of the Agreement will be met.

END OF SECTION

**Kroger Vendor Data Protection Addendum**

Kroger Vendor Data Protection Addendum (June 2, 2022)                                          41

DEF FRED MEYER_000055

*(Processors and Service Providers)*

This Data Protection Addendum ("**Addendum**") forms part of the Kroger Technology Services Agreement dated 5/24/2024] ("**Master Agreement**") between: (i) The Kroger Co. ("**Kroger**"); and (ii) Gatekeeper Systems Inc. ("**Vendor**") acting on its own behalf and as agent for each Vendor Affiliate.

In consideration of the mutual obligations set out herein, the parties hereby agree that the terms and conditions set out below shall be added as an Addendum to the Master Agreement. Except where the context requires otherwise, references in this Addendum to the Master Agreement are to the Master Agreement as amended by, and including, this Addendum. Except as modified below, the terms of the Master Agreement shall remain in full force and effect. The Master Agreement and any documents referenced therein, together with this Addendum constitute the "Agreement."

1.      Definitions. The following definitions apply in this Addendum. Capitalized terms not otherwise defined herein shall have the meaning given to them in the Master Agreement.

1.1      "**CCPA**" means the California Consumer Privacy Act of 2018, as may be amended, or superseded from time to time, as well as any implementing regulations. This includes the California Privacy Rights Act of 2020 ("**CPRA**"), which amends the CCPA.

1.2      "**Data Subject**" means an individual who is the subject of Kroger Data.

1.3      "**Kroger Affiliate**" means an entity that owns or controls, is owned or controlled by or is or under common control or ownership with Kroger, where control is defined as the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of an entity, whether through ownership of voting securities, by contract or otherwise.

1.4      "**Kroger Data**" means any information or data processed by Vendor or any Subprocessor on behalf of a Kroger Group Member pursuant to or in connection with the Master Agreement. Without limitation, Kroger Data includes Personal Information.

1.5      "**Kroger Group Member**" means Kroger or any Kroger Affiliate.

1.6      "**Personal Information**" means any information that (a) identifies, relates to, describes, is reasonably capable of being associated with, or could reasonably be linked, directly or indirectly, with a particular individual or household; or (b) the applicable Privacy and Data Protection Laws otherwise define as protected personal information, personal data, or the like.

1.7      "**Privacy and Data Protection Laws**" means all applicable federal, state, provincial, municipal, and foreign laws and regulations relating to the processing, protection, or privacy of Personal Information that are applicable to a particular Party's performance under the Agreement, including where applicable, the guidance and codes of practice issued by regulatory bodies (including industry self-regulation) in any relevant jurisdiction. This includes, but is not limited to, the CCPA, as well as any law or regulation that comes into effect after the date of execution of this Addendum, including applicable data protection laws such as the California Consumer Privacy Act, the California Privacy Rights Act, the Virginia Consumer Data Protection Act, the Colorado Privacy Act, the Utah Consumer Privacy Act, section 5 of the FTC Act, state data breach notification laws, the Controlling the Assault of Non-Solicited Pornography and Marketing ("CAN-SPAM" Act), the Telephone Consumer Protection Act ("TCPA"), and any other similar privacy, cybersecurity or data protection laws applicable to the protection and processing of Personal Information that may be enacted during the term of this Agreement..

DEF FRED MEYER_000056

1.7      "**Security Incident**" means any: (a) unauthorized, acquisition, loss, access, or use of any Kroger Data; (b) breach of security leading to the accidental or unlawful destruction, loss, alteration, unavailability, unauthorized disclosure of or access to Kroger Data; or (c) any act or omission that compromises the security, confidentiality, or integrity of Kroger Data, or the physical, technical, administrative, or organizational safeguards put in place to protect it. To clarify, the loss, theft, or unavailability of, or unauthorized access, disclosure, acquisition or other processing of Kroger Data is a Security Incident whether or not the incident rises to the level of a security breach or incident requiring notification under the Privacy and Data Protection Laws.

1.8      "**Subprocessor**" means any person or entity (including any third party and any Vendor Affiliate but excluding Vendor employees) appointed by or on behalf of Vendor to process Kroger Data on behalf of any Kroger Group Member or that Vendor otherwise makes Kroger Data available for a business purpose.

1.9      "**Vendor Affiliate**" means an entity that owns or controls, is owned or controlled by or is or under common control or ownership with Vendor, where control is defined as the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of an entity, whether through ownership of voting securities, by contract or otherwise.

1.10      "**Collect**," "**contractor**," "**controller**," "**process**," "**processor**," "**sell**," "**share**," "**sensitive data**," and "**service provider**," shall be interpreted as defined by that term or the similar and reasonably equivalent terms under applicable Privacy and Data Protection Laws. Their cognate terms shall be construed accordingly.

2.      Authority and communications. Vendor warrants and represents that, before any Vendor Affiliate processes any Kroger Data on behalf of any Kroger Group Member, Vendor's entry into this Addendum as agent for and on behalf of that Vendor Affiliate will have been duly and effectively authorized (or subsequently ratified) by that Vendor Affiliate. Vendor will facilitate all communications between Kroger and any such Vendor Affiliates to the extent required.

3.      Personal Information Types and Processing Purposes

3.1      As between the parties, Kroger is the Controller of the Kroger Data and Vendor is the Processor or Service Provider, as applicable. As such, Kroger retains control of the Kroger Data and remains responsible for its compliance obligations under the applicable Privacy and Data Protection Laws, including providing any required notices and obtaining any required consents, and for the processing instructions it gives to Vendor.

3.2      **Appendix A** to this Addendum sets out certain information regarding the processing of Kroger Data by Vendor (and any Subprocessors) including the categories of Personal Information, Data Subject types, business purpose, duration of the processing of the Kroger Data, and any Subprocessors.

4.      Vendor's Obligations

4.1      Vendor shall comply with all applicable Privacy and Data Protection Laws in the processing of Kroger Data and provide the same level of privacy protection as may be required by the applicable Privacy and Data Protection Laws.

DEF FRED MEYER_000057

4.2     Kroger Data disclosed to Vendor (or collected by Vendor on behalf of a Kroger Group Member) only for the limited purpose of providing the Services or as otherwise set forth in the Master Agreement. Vendor will only process Kroger Data as a Processor, and only to the extent, and in such a manner, as is necessary to provide the Services in accordance with Kroger's written instructions. Kroger and Vendor agree that the Master Agreement (including any orders made and statements of work executed thereunder) and this Addendum constitute Kroger's instructions to Vendor at the time signing of this Addendum

4.3     Vendor is prohibited from (a) selling or sharing the Kroger Data; (b) retaining, using, or disclosing the Kroger Data for any purpose other than for providing the Services as directed by Kroger or as otherwise required by Privacy and Data Protection Laws; (c) retaining, using, or disclosing the information outside of the direct business relationship between the Vendor and Kroger; (d) combining Kroger Data with Personal Information that the Vendor receives on behalf of another person or entity, or collects from its own interactions with a Data Subject unrelated to the Services; and (e) processing or using any Kroger Data that qualifies as Sensitive Data or Sensitive Personal Information unless expressly instructed to do so by Kroger.

4.4     Vendor must promptly notify Kroger if Vendor makes a determination that it can no longer meet its obligations under the Privacy and Data Protection Laws.

4.5     Vendor will maintain the confidentiality of all Kroger Data, will not disclose it to anyone unless Kroger, the terms of the Master Agreement, or this Addendum specifically authorizes the disclosure, or the disclosure is required by law. If a law requires Vendor to process or disclose Kroger Data, Vendor must first inform Kroger of the legal requirement and give Kroger an opportunity to object or challenge the requirement, unless the law prohibits such notice.

4.6     Vendor will reasonably assist Kroger to meet its compliance obligations under the Privacy and Data Protection Laws, taking into account the nature of Vendor's processing and the information available to Vendor.

4.7     Any notice or method used by Vendor in connection with the collection of Kroger Data by Vendor must be consistent with Vendor's obligations in the Master Agreement, this Addendum, and the applicable Privacy and Data Protection Laws. Without limitation, any such notice or method must be consistent with Vendor being a "service provider" or "processor" to Kroger, as those terms are defined under the applicable Privacy and Data Protection Laws.

4.8     If the Master Agreement permits Vendor to deidentify or anonymize Kroger Data or create or use aggregate Data Subject information (collectively, "**De-Identified Data**"), Vendor must do so in a way so that it no longer meets the applicable Privacy and Data Protection Laws' definition of Personal Information, and in a manner that cannot be reconstructed to identify any Kroger Group Member. Vendor will (a) take reasonable measures to ensure that the De-Identified Data cannot be associated with a natural person or Kroger Group Member; (b) publicly commit to maintaining and using the De-Identified Data without attempting to re-identify the data; and (c) contractually obligate recipients of De-Identified Data to comply with all provisions of this Section 4.8.

4.9     If the Services use or incorporate technology that uses machine learning, artificial intelligence, or other similar technologies (together, "**AI Technology**"), Vendor represents and warrants that it will use reasonable and appropriate safeguards in its design and operation of AI Technology including, without limitation, to identify and mitigate the risk of bias, prevent discrimination, and otherwise meet reasonable industry practices and evolving legal and regulatory obligations applicable to the development and use of AI Technologies.

Kroger Vendor Data Protection Addendum (June 2, 2022)                                                    44

DEF FRED MEYER_000058

4.10    Vendor grants to Kroger the right, upon notice, to take reasonable and appropriate steps to (a) help ensure that Vendor uses Kroger Data in a manner consistent with Kroger's obligations under the Data Privacy and Protection Laws; and (b) stop and remediate unauthorized use of Kroger Data.

5.    Vendor's Personnel

5.1    Vendor will limit Kroger Data access to: (a) those Vendor personnel who require Kroger Data access to perform the Services and otherwise meet Vendor's obligations under this Addendum and the Master Agreement; and (b) the part or parts of the Kroger Data that those personnel strictly require for the performance of their duties.

5.2    Vendor will ensure that all Vendor personnel: (a) are informed of the Kroger Data's confidential nature and use restrictions and are obligated to keep the Kroger Data confidential; (b) have undertaken training on the applicable Privacy and Data Protection Laws. Further, Vendor will take reasonable steps to ensure the reliability, integrity, and trustworthiness of all of Vendor's personnel with access to the Kroger Data.

6.    Security Practices. Vendor must at all times implement reasonable and appropriate technical and organizational measures designed to safeguard Kroger Data against unauthorized or illegal access, destruction, use, modification, processing, copying, or disclosure and against accidental loss, destruction, or damage including, but not limited to, the security compliance requirements set forth in Appendix B ("**Security Compliance Requirements**"). Vendor must document those measures in writing and periodically review them, at least annually, to ensure they remain current and complete. Further, Vendor must take reasonable precautions to preserve the integrity of any Personal Information it processes and to prevent any corruption or loss of the Personal Information, including but not limited to establishing effective back-up and data restoration procedures.

7.    Security Incidents

7.1    Vendor will within 24 hours notify Kroger if it becomes aware of any Security Incident. Upon becoming aware of any Security Incident, Vendor will take prompt action to reasonably contain, mitigate risks and further harm, and recover from the Security Incident in a manner that preserves relevant evidence and can support an appropriate subsequent investigation.

7.2    Vendor will also reasonably cooperate with and provide assistance to Kroger to support Kroger's review, investigation and response to the Security Incident. This coordination may include: (a) assisting with any forensic investigation or review of the incident; (b) providing Kroger with physical access to any facilities and operations affected; (c) facilitating interviews with Vendor's and its Subprocessors' personnel, former employees and others involved in the matter as may be appropriate; and (d) making available all relevant and non-privileged records, logs, files, data reporting, forensic reports, and other materials required to comply with all Privacy and Data Protection Laws or as otherwise reasonably required by Kroger.

7.3    Subject to applicable Privacy and Data Protection Laws, Vendor agrees that Kroger has the sole right to determine: (i) whether to provide notice of the Security Incident to any Data Subjects, regulators, law enforcement agencies, or others, as required by law or regulation or in Kroger's discretion, including the contents and delivery method of the notice; and (ii) whether to offer any type of remedy to affected Data Subjects, including the nature and extent of such remedy.

DEF FRED MEYER_000059

7.4     Unless a Security Incident is attributable to the negligent acts or omissions of Kroger (or of any Kroger personnel), Vendor shall directly pay (or promptly reimburse Kroger upon request) all reasonable costs and expenses (including reasonable attorneys' and vendors' fees and expenses) related to investigating, mitigating, and remediating the effects of a the Security Incident ("**Costs**"), including but not limited to Costs relating to notification letters, regulatory investigations or litigation (including but not limited to litigation under the CCPA and damages that may be recovered as a result of such litigation, including a settlement thereof), and credit monitoring for a specified period not to exceed 12 months, unless a longer period of time is required under applicable law,) to individuals impacted by a Security Incident.

8.     Subprocessors

8.1     Vendor may only authorize a Subprocessor process the Kroger Data if: (a) the Kroger is given an opportunity to object within 30 days after the Vendor supplies the Kroger with details regarding such Subprocessorr; (b) the Vendor enters into a written contract with the Subprocessor that contains terms substantially the same as those set out in this Addendum; and (c) the Vendor maintains control over all Kroger Data it entrusts to the Subprocessor. A list of Vendor's current Subprocessors as of the effective date of this Addendum is included in Appendix A attached hereto. Kroger approves such Subprocessors.

8.2     In the event Kroger exercises its right to object to a new Subprocessor as described in Section 8.1(b), Vendor will use reasonable efforts to make available to Kroger a change in the Services or recommend a commercially-reasonable change to Customer's configuration or use of the Services to avoid processing of Kroger Data by the objected-to new Subprocessor without unreasonably burdening the Kroger. If Vendor is unable to make available such change within a reasonable time period, which shall not exceed thirty (30) days, Kroger may terminate the applicable order form or agreement that relates to those Services which cannot be provided by Vendor without the use of the objected-to new Subprocessor by providing written notice to Vendor. Vendor will refund Kroger any prepaid fees covering the remainder of the term of such order forms or agreement, as applicable, following the effective date of termination with respect to such terminated service.

8.3     Vendor will be liable for the acts and omissions of its Subprocessors (and their downstream Subprocessors) to the same extent that Vendor would be liability if performing the Services of each Subprocessor directly. Nothing in this Section 8 shall limit any requirements or obligations imposed on Vendor relating to Vendor's use of Subprocessors in the Master Agreement.

9.     Complaints and Data Subject Requests

9.1     Vendor must promptly notify Kroger (but in no event later than three (3) business days) if it receives any complaint, notice, or communication that directly or indirectly relates to the processing of Kroger Data or to either party's compliance with the Privacy and Data Protection Laws.

9.2     Vendor shall cooperate with and assist Kroger in its response to (and fulfillment of) Data Subject requests. If Vendor receives a request directly from a Data Subject to exercise their rights under to applicable Privacy and Data Protection Laws with respect to their Kroger Data, then, unless otherwise agreed in writing, Vendor shall promptly notify Kroger in accordance with the provisions in section 9.1 and inform the Data Subject that the request cannot be acted upon because it has been sent to a service provider. If the disclosure is required by law, then Vendor must give Kroger prior written notice, to the extent legally permitted, prior to making the disclosure.

DEF FRED MEYER_000060

10.    Term. This Addendum will remain in full force and effect so long as: (a) the Master Agreement remains in effect; or (b) Vendor retains any Kroger Data related to the Master Agreement in its possession or control (the **"Term"**).

11.    Data Return and Destruction

11.1    Upon request from Kroger and/or on expiration or termination of the Master Agreement for any reason, within thirty (30) calendar days of receipt of the request or expiration or termination of the Master Agreement, Vendor will securely destroy or, if directed in writing by Kroger, return and not retain, all or any Kroger Data related to this agreement in its possession or control, except that Vendor may temporarily retain one copy made for backup purposes in the ordinary course; provided that such archive copy will be subject to the ongoing obligations contained herein and shall be destroyed upon the normal expiration of backup files. Vendor shall provide any such returned Kroger Data in the format and media reasonably specified by Kroger, together with information sufficient for Kroger to interpret such information.

11.2    If any law, regulation, or government or regulatory body requires Vendor to retain any documents or materials that Vendor would otherwise be required to return or destroy, it will notify Kroger in writing of that retention requirement, giving details of the documents or materials that it must retain, the legal basis for retention, and establishing a specific timeline for destruction once the retention requirement ends. Vendor may only use this retained Kroger Data for the required retention reason or audit purposes.

11.3    Upon request, Vendor will certify in writing that it has destroyed the Kroger Data.

12.    Records. Vendor will keep reasonably detailed, accurate, and up-to-date records regarding any processing of Kroger Data it carries out for the Kroger, including but not limited to, the access, control, and security of the Kroger Data, approved Subprocessors, the processing purposes, and any other records required by the applicable Privacy and Data Protection Laws (the "Records"). Vendor will ensure that the Records are sufficient to enable Kroger to verify the Vendor's compliance with its obligations under this Addendum. Upon reasonable request of Kroger, Vendor shall make such Records available to Kroger and its third-party representatives.

13.    Assessments; Privacy and Security Reports

13.1    Assessments. During the Term and for two (2) years after this Addendum terminates, upon reasonable request of Kroger, upon at least 30 days' notice, Vendor shall allow, and cooperate with, reasonable assessments by Kroger or Kroger's third-party representatives to evaluate Vendor's compliance with the terms of this Addendum. The notice requirements in Section 13 will not apply if Kroger reasonably believes that a Security Incident has occurred or is occurring, or Vendor is in breach of any of its obligations under this Addendum. Kroger's will limit its right to conduct assessments of Vendor to no more than once per calendar year, unless Kroger reasonably believes that a Security Incident has occurred or is occurring.

13.2    Privacy and Security Reports. At least once per year, Vendor will conduct site audits of its Personal information processing practices and the information technology and information security controls for all facilities and systems used in complying with its obligations under this Addendum, including but not limited to, obtaining a network level vulnerability assessment performed by a recognized third-party audit firm based on recognized industry best practices. Upon Kroger's written request, Vendor will make all of the relevant security audit reports available to Kroger for review, including, as applicable: Statement on Standards for Attestation Engagements (SSAE) No. 18 audit reports for Reporting on Controls at a Service Organization,

DEF FRED MEYER_000061

reports relating to its ISO/IEC 27001 certification and other similar reports. Kroger will treat such audit reports as Vendor's confidential information under this Agreement.

13.3     Remediation. Vendor will promptly address any material or critical issues, concerns, or exceptions noted in assessments or reports or with the development and implementation of a corrective action plan, that addresses the issues, concerns, or exceptions.

14. Warranties. Vendor warrants and represents it has no reason to believe that any Privacy and Data Protection Laws prevent it from providing any of the Master Agreement's contracted services.

15.     Indemnification and Reimbursement

15.1     In addition to any indemnification obligations set forth in the Master Agreement, Vendor agrees to indemnify, keep indemnified, defend and hold harmless Kroger and its Affiliates, officers, directors, agents, and employees against all costs, claims, damages, or expenses ("**Losses**") incurred by Kroger or for which Kroger may become liable due to (a) any failure by Vendor or its employees, Subprocessors, or agents to comply with any of its obligations under this Addendum, (b) any violation by Vendor, its employees, Subprocessors or agents of applicable Privacy and Data Protection Laws; or (c) a Security Incident compromising the security, confidentiality or integrity of Kroger Data in the custody or control of Vendor or any of its Subprocessors.

15.2     Any limitation of liability set forth in the Master Agreement will not apply to this Addendum's indemnity or Vendor's reimbursement obligations in Section 7.4 of this Addendum.

16.     Miscellaneous Provisions.

16.1     Compliance. Nothing herein relieves either party of its own direct responsibilities and liabilities under the applicable Privacy and Data Protection Laws.

16.2     Governing law; Jurisdiction. The parties submit to the choice of jurisdiction and law stipulated in the Master Agreement with respect to any disputes or claims arising under this Addendum.

16.3     Notice. Except as set forth in Appendix B, Vendor agrees to provide any notice or other communication given in connection with this Addendum in writing to: KrogerPrivacyOffice@Kroger.com, Attention: Privacy Officer with a copy to: The Kroger Co., 1014 Vine Street, Cincinnati, Ohio 45202, Attention:  General Counsel. Vendor has appointed a privacy officer, other person responsible for privacy, and that person may be reached as indicated below. Any notice or other communications given in connection with this Addendum to Vendor may be sent to the Vendor privacy officer or contact as set forth below. This Notice section does not apply to the service of any proceedings or other documents in any legal action or, where applicable, any arbitration or other method of dispute resolution.

16.4     Order of Precedence. Nothing in this Addendum reduces Vendor's obligations under the Master Agreement in relation to the protection of Kroger Data or permits Vendor or to process (or permit the processing of) Kroger Data in a manner which is prohibited by the Master Agreement. With regard to the subject matter of this Addendum, in the event of inconsistencies between the provisions of this Addendum and any other agreements between the parties, including the Master Agreement and including (except where

DEF FRED MEYER_000062

DocuSign Envelope ID: 9106E8B6-61E9-4446-AA89-858444EF11FE

explicitly agreed otherwise in writing, signed on behalf of the parties) agreements entered into or purported to be entered into after the date of this Addendum, the provisions of this Addendum shall prevail.

       16.5    <u>Severability</u>.  Should any provision of this Addendum be invalid or unenforceable, then the remainder of this Addendum shall remain valid and in force. The invalid or unenforceable provision shall be either (i) amended as necessary to ensure its validity and enforceability, while preserving the parties' intentions as closely as possible or, if this is not possible, (ii) construed in a manner as if the invalid or unenforceable part had never been contained therein.

[SIGNATURES ON NEXT PAGE]

DEF FRED MEYER_000063



IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date set forth above.

KROGER

The Kroger Co.

By _____
   Paula Kash
   750209ABB8EF458...

Name: Paula Kash

Title:  GVP, Retail Operations

VENDOR

Gatekeeper Systems Inc.

By _____
   CD2648ED63B048A...

Name:  Craig L Greenberg

Title: Chief Commercial Officer

VENDOR PRIVACY OFFICER OR CONTACT

Name: TechGDPR

Telephone:  +49 (0)30 5490 8661 Email: alex@techgdpr.com

Techgdpr.com

CONFIDENTIAL

50

DEF FRED MEYER_000064

APPENDIX A

**Kroger Data Processing Purposes and Details**

1.    **Nature and purpose of processing or access for a business purpose**

The business purposes are described in the Master Agreement.

2.    **Data subject types**


Anyone who pushes a cart outside of the store. This could include:

Associates

Customers

B2B

3.    **Duration of the processing**

The duration of processing is set forth in the Master Agreement.

4.    **Subprocessors**

| Subprocessor name and contact information | Services to be provided | Locations where Kroger Data is stored and accessed from |
|---|---|---|
| Google | Data Processing/Storage | United States of America |
| Cleantech solutions 110 Retreat, Irvine CA 92603  Parent Company to Rhomboid Engineering Pvt Ltd | Purchek event based video review and classification | Google Cloud, United States of America |
| Rhomboid Engineering Pvt Ltd  Harivallabh' Nr. Govt Polytechnic Ambawadi, Ahmedabad 380015 | Purchek event based video review and classification | Google Cloud, United States of America |


5.    **Kroger Data to be Processed by Vendor including Categories of Personal Information**
The following describes Kroger Data including categories of Personal Information, if any, that may be disclosed to Vendor (or collected by Vendor on behalf of a Kroger Group Member (together, "disclosed") for processing under the Master Agreement or an applicable SOW:



Video data and video meta data

CONFIDENTIAL                                                                                                    51

DEF FRED MEYER_000065



System performance data collected on each individual event including wheel data – wheel ID, time of activation, door location of activation, wheels days in use and current battery status of individual wheel – data is used for continuous improvement and remote support

Door Transmitters – provide data through modem including – on /off, by pass, power and loop status. – data is used for Kroger enterprise reporting and remote support to ensure performance optimization d

Inferences made from that data

6.     **Description of Sensitive Data to be Processed by Vendor**
The following categories of Sensitive Data may be disclosed to Vendor for processing under the Master Agreement or an applicable SOW:

N/A

DEF FRED MEYER_000066



**APPENDIX B**

**Security Compliance Requirements**

1. <u>Application of Security Compliance Requirements</u>. These Security Compliance Requirements apply to all Kroger Data which is: (A) Processed by Vendor; (B) provided by or on behalf of Kroger and/or its Affiliates to Vendor; (C) learned or otherwise used by Vendor in connection with the performance of Services; or, (D) otherwise collected or gathered from Kroger or third parties in connection with the Services.

   Notwithstanding any contrary terms or conditions in the Master Agreement or any agreements between Vendor and Kroger, any exclusion in the Master Agreement or such agreements to the definition of Confidential Information shall not apply to Kroger Data.

2. <u>Generally Applicable Security Compliance Requirements</u>: In all events, with respect to Kroger Data, Vendor  shall:

   (A) follow the industry best practice of ISO 27002:2005, Information Technology – Security Techniques - code of Practice for Information Security Management ("**ISO Security Standard**") or a similar industry frameworks approved by Kroger.

   (B) logically and/or physically segregate Kroger Data from the data of any third party (excluding, for the avoidance of doubt, data of Kroger and its Affiliates necessary to fulfill the Purpose) and implement the rule of least privilege and reasonable industry standard access controls.

   (C) encrypt (utilizing AES-GSM 256-bit encryption or better) Kroger Data if it is stored on network infrastructure owned and/or managed by Vendor or on any approved cloud hosted infrastructure, or where Personal Information is transmitted over the internet or on a portable device.

   (D) When deleting Kroger Data, Vendor shall comply with "NIST Guidelines for Media Sanitization (Draft SP 800-88)".

   (E) implement Multi-Factor Authentication ("MFA") for any external access to an internal network where Kroger Data is accessible.

   (F) notify the Kroger Information Security organization promptly of any Security Incident by sending email to isoc@kroger.com, in addition to notifying the primary business contact at Kroger, as well as to the primary Kroger business contact. Such notification must be made in conformance with the timing requirements set forth in the Addendum. The notification requirements and recipients in this Section 2(F) are in addition to the notification requirements and obligations in the main body of the Addendum.

   (G) take prompt corrective action(s) to remedy a violation of (and to prevent any future violation of) any Security Compliance Requirement.

   (H) regularly monitor for and take prompt corrective action(s) to remediate any vulnerabilities or security concerns (i) identified by Kroger; or (ii) identified by Vendor and which present a high or critical risk to the systems that support the Services to Kroger and/or Process Kroger Data.

   (I) implement corrective action(s) for each of the above provisions (G) through (H) in a timeframe reasonably appropriate in light of the risk or as otherwise agreed upon with Kroger.

CONFIDENTIAL                                                                                              53

DEF FRED MEYER_000067



(J) host Kroger Data on servers located in the United States. No transfers of Kroger Data outside of the United States are permitted unless otherwise approved in writing by Kroger.

(K)  maintain cybersecurity liability insurance reasonable and appropriate to the nature of Vendor's business and Services provided to Kroger.

3.    <u>Certification Requirements</u>:

Company shall:

(A) comply with both the general certification requirements set forth in this Section and any other applicable certification requirement(s) set forth elsewhere in these Security Compliance Requirements or Vendor's agreement(s) with Kroger.

(B) provide certification of compliance with the applicable Security Compliance Requirements by either obtaining such certification from an independent information security service company or through an annual self-assessment and certification, as approved by Kroger.

(C) provide written certification to Kroger that Kroger Data has been destroyed in accordance with the requirements of this <u>Appendix B</u>.

These certifications shall be sent via email to the Kroger Information Security organization (**isoc@kroger.com** ).

4.    <u>Non-compliance.</u> Vendor's failure to comply with any Security Compliance Requirement (including, without limitation, failure to implement any corrective action(s) within the required timeframe) is a material breach of Vendor's agreement(s) with Kroger. Without limiting any other right or remedy that Kroger may have, Kroger reserves the right to terminate, for default/breach, those agreement(s) affected (directly or indirectly) by such non-compliance.

DEF FRED MEYER_000068