Exhibit 6

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT TACOMA


LINDA LAROCQUE,                    )
                                   )
          Plaintiff,               )
                                   )
          vs.                      )    No. 3:25-cv-05380-MJP
                                   )
THE KROGER CO., a foreign )
corporation doing business)
in Washington state,       )
et al.,                            )
                                   )
          Defendants.              )
                                   )


REMOTE DEPOSITION OF

LEVI DIXON, M.S.

*      *      *

May 20, 2026

Spokane, Washington

10:00 a.m.


Reported by:

Gwen Dickson, CSR/RPR/CCR



APPEARANCES:


For the Plaintiff:

      GORDON THOMAS HONEYWELL
      BY:   Robert Wilke, Esq. (Via vc)
      1201 Pacific Avenue, #2100
      Tacoma, WA 98401
      Rwilke@gth-law.com


For the Defendant Kroger/F.Meyer:

      CHOCK BARHOUM
      BY:   Samuel Behar, Esq. (Via vc)
      121 SW Morrison, #500
      Portland, OR 97204
      Sam.behar@chockbarhoum.com


For the defendant Gatekeeper:

      FLOYD PFLUEGER
      BY:   Skyler Urban, Esq. (via vc)
      3101 Western Avenue, #400
      Seattle, WA 98121
      Surban@nwtrialattorneys.com



Q.   Did you review any information about the amount of theft that was prevented?

A.   If you're asking for specific dollar figures, I don't recall that.  I do recall, I believe it was in the Gatekeeper videos, where it discussed how there was a reduction in theft from the system.

Q.   Did you do any analysis of how many total shoppers are at the subject store on a given day?

A.   Not specifically.  I recall there being testimony that there are, I believe, thousands over the course of a week.

Q.   Okay.  Did you perform any analysis regarding the cost contributed to lost or stolen carts?

A.   No.  That's really beyond the scope of my analysis.

Q.   Why would that be beyond the scope of your analysis but not what you mentioned earlier which is it might reduce theft?

A.   Well, whether or not it reduces theft, that's really not something that I needed to analyze.  It's my understanding that that's what the system is intended for.

Q.   Okay.  Obviously a big part of what we're



going to talk about today is the warning, so I'll get to that in a second.  So I want to talk about specifically, though, the system itself, the warnings signs aside.  You're not proposing any specific alternative engineering design of the system.  Correct?

A.    I would say it was beyond the scope of my analysis to redesign the system.  Certainly if you look at the safety hierarchy, warnings are really at the bottom because they're known to be unreliable.  And it's my understanding that, really, an engineering control has been designed, the Smart Exit system to analyze when there are empty carts and reduce the risk of empty cart activations occurring in the first place rather than relying on warnings.

Q.    Okay.  During your review due did you look at anything you'd consider to be industry standards regarding shopping carts?

A.    Are you referring to standards for the design of a shopping cart, for example?

Q.    Yeah.  Designs for shopping carts in general and then we can narrow it more specifically, shopping carts with an anti-theft system.



800.211.DEPO (3376)
EsquireSolutions.com

Q.   Okay.  And you're not offering any opinion that the product failed to conform in line with that warranty?

A.   I agree with that and I am not offering that conclusion.

Q.   Same answer regarding whether it's an implied or express warranty?

A.   That is correct, I am not offering that conclusion.

Q.   Are you aware of any specific industry standards that govern the design of shopping carts or shopping cart safety systems?

A.   As I sit here nothing comes to mind. That's not to say they don't exist, but nothing comes to mind as I sit here.

Q.   Okay.  Do you have any opinion that Gatekeeper's product, the safety system, failed to comply with applicable industry standards?

A.   I haven't done that analysis so I can't opine one way or the other.

Q.   Did you perform any analysis or create any opinions regarding whether alternative designs were technically feasible for Gatekeeper when they manufactured the system?

A.   I haven't done a specific analysis of



alternative designs other than I am aware that the Smart Exit system is a measure that can reduce the empty cart activations.

Q. Did you perform any analysis of what an ordinary consumer would contemplate regarding the existence of an anti-theft shopping cart system?

A. I'm sorry, can I have your question again, please?

Q. Yeah. That was maybe a bit wordy.

Did you perform any analysis -- strike that.

Through your analysis did you consider what the expectations would be of an ordinary consumer?

A. I would say that that's certainly something that I considered in my analysis. If you look at shopping carts, we have a general expectation that they're going to roll freely absent any other obstruction; and if you look at the dozens of incidents reports, a number of them talk about it being unexpected. Mr. Wheeler said people are confused when this happens. All of that illustrates that the expectation that it's going to be roll freely is being violated when the cart unexpectedly locks and stops.

Q. Have you reviewed any consumer research,



elimination of hazards and then guarding of hazards or restricting access to them.

Q.    Do you have any opinions regarding changes Gatekeeper should have made to eliminate or guard against the hazard?

A.    I would say that ultimately the Smart Exit system that exists now from the 30(b)(6) testimony is consistent with an engineering control that would be -- that would reduce the risk of an empty cart activation.

Q.    And so if that system was present at the time of the subject incident, would that have been sufficient on the engineering and guarding level, and then we get down to the warning level?

A.    Ultimately if that system was in place and operated properly, then Miss Larocque's cart wouldn't have abruptly stopped in the first place.

Q.    Okay.  Do you know when the Smart Exit system became available?

A.    I don't have a specific date.  I recall the 30(b)(6) stating that it was relatively recent, but I don't have a specific date of when the initial design was put in place.

Q.    Let me just clarify this.  When you say the Smart Exit system, can you explain to me what your



understanding of - what are you referencing when you say that?  What system is that?

A.    In the 30(b)(6) deposition it was my understanding that the Smart Exit really involves a camera that is looking for empty carts and if there's an empty cart approaching it will deactivate the locking mechanism so that the empty cart can pass through the doorway without locking up.

Q.    Do you know if that system is deployed in any stores anywhere?

A.    He testified that it was deployed in various Kroger stores I believe as a test.

Q.    But not deployed en masse as a consumer product?

A.    I don't recall one way or the other.  I don't recall if that was even asked.

Q.    Okay.  Is testing products before they're deployed en masse to the general public an important part of this process you're talking about?

A.    I would say that as a general premise it's a good idea to test products to make sure that they're adequately controlling identified hazards.

Q.    All right.  So let me share - I've got a



A.    I do.

Q.    Okay.  So given that even the best warnings are not always a hundred percent reliable or effective -- strike that.  Let's move on.  I might come back to that.  Move on here.

Do you agree with this sentence here that: Frequently, it is not possible to eliminate all hazards and still have the product function as intended?

A.    I would say that as a general premise I don't dispute that.  I would say it really depends on the product or the system, but I generally agree with that.

Q.    Did you perform any analysis about the interplay between the hazards of the Gatekeeper system and having it function as intended?

A.    I would say that, yes, I did consider that.  Again, if you look at the Smart Exit system, that illustrates that it can still function as intended but you can reduce or eliminate empty cart activations like we have here.

Q.    So if you were to provide an alternative design or system to use, you would point to that Smart Exit system that can stop the carts based on the camera seeing the empty cart?

me as an expert to determine fault.  But what I would say is let's say you have an enclosure that invites children to climb and somebody climbs up that, that's a condition that you could implement an engineering control to make a surface that's not climbable in the first place rather than relying on a warning.  So I would go back to -- I would need more information.  But if you can design out that hazard or implement engineering controls, I would suggest you do that rather than rely on warnings.

Q.   You're not going to be testifying as to any sort of engineering changes that would need to be done in the Gatekeeper system, are you?

A.   Not specifically engineering design changes.  But again, the Smart Exit system illustrates an example of an engineering control.

Q.   So you're going to be testifying that there are speculative things that could be done but that you're unaware of what they might be.

A.   I wouldn't say that the Smart Exit system is speculative.  The 30(b)(6) deponent talked about there being technology to identify empty carts and deactivate the locking system so that the empty cart activations are reduced or eliminated.

Q.   Are you going to be giving an opinion that

