EXHIBIT 3



**Applied Cognitive Sciences**

May 7, 2026

Robert Wilke
Gordon Thomas Honeywell
1201 Pacific Avenue, Suite 2100
Tacoma, Washington 98402

**Re: Larocque vs. The Kroger Co., et al.**

Dear Mr. Wilke:

Since authoring my initial report dated February 25, 2026, I have reviewed additional discovery material and depositions in the above referenced matter, including incident reports and the 30(b)(6) Depositions of Brenton Wheeler, Chad Peterson, and Ryan Harter. This new information does not alter any of the key conclusions expressed in my initial report. In fact, the new material I have reviewed provides further support for my conclusions, as discussed in detail below. I reserve the right to, and intend to, update my conclusions upon receipt and review of new discovery material that becomes available.

The information I have reviewed since my initial report further illustrates that the Defendants knew and appreciated the risk of harm posed by the cart wheels unexpectedly locking, and that the hazard has been recurring across Fred Meyer facilities in Washington State for years. Notably, the Defendant produced dozens of incident reports involving the locking of shopping cart wheels at Fred Meyer facilities in Washington State, including a number that described injuries occurring prior to Ms. LaRocque's incident. It is beyond the scope of this supplemental analysis to summarize each and every incident, but salient examples of incidents involving the locking of the shopping cart wheels and resultant injuries to patrons include the following:

1. On January 27, 2021, over two years prior to Ms. LaRocque's incident, an incident occurred at the Yakima Fred Meyer involving a customer (DEF FRED MEYER 000115-119). According to the incident report, the customer had made a purchase, and as she was exiting the store, the Purchek wheels on her shopping cart locked up. Notably, in her own statement, the customer described that the cart "locked up in the doorway, throwing me over the handle and bending my hands/wrists in an unnatural motion/position." As a result, the customer reported that her right and left hands were injured, including a sprained right wrist.

2. On May 5, 2023, the day before Ms. LaRocque's incident, another incident occurred at the Renton Fred Meyer involving a customer named Juliana Proctor (DEF FRED MEYER 000480-487). According to the incident report, Ms. Proctor had finished

10501 South Lambs Lane • Mica, WA 99023 • 509-624-3714 telephone

shopping and went to Starbucks within the store before attempting to exit the building. As she was exiting, the cart she was using locked up at the entranceway pedestals. Ms. Proctor reported pain in her left shoulder, and the incident report noted that she "cannot lift arm" as a result of the incident.

3. On October 15, 2024, an incident occurred at the Vancouver, Washington Fred Meyer involving a customer named Marcia Birian (DEF FRED MEYER 000138-142). According to the incident report, Ms. Birian was exiting the store when the wheels of her shopping cart unexpectedly locked. In her own statement, Ms. Birian described that "the wheels unexpectedly stopped. The sudden halt caused my knee to collide. Shopping cart went up and landed down on my knee." Ms. Birian reported throbbing pain in her left knee. (NOTE: Similar to Ms. LaRocque, Ms. Birian described her knee colliding/striking the cart when it abruptly and unexpectedly stopped while she was exiting the store, consistent with the discussion of the hazard in my initial report.)

4. On December 2, 2024, the Defendant received a letter from a customer, Mr. Andrew Cleman, regarding two prior incidents involving members of his family at the Ellensburg Fred Meyer (DEF FRED MEYER 000143-148). It was described that both Mr. Cleman's wife and his daughter sustained injuries within five days of one another due to the Purchek cart wheels locking up. In his letter, Mr. Cleman described the locking of the wheels as an "abrupt and unannounced action" and characterized the system as "ongoing and dangerously reckless." Mr. Cleman further stated that "...many customers have been injured and are complaining," and he requested that the Defendants either fix the cart software so it would not engage incorrectly, or pull the system entirely.

Beyond the incident reports illustrating that there have been a number of incidents where the wheels locked and injured a customer, the deposition testimony of the Defendants' representatives provides further support for my conclusions in this matter. Salient examples include the following:

1. Mr. Brenton Wheeler, a Lead Assistant Store Leader for Fred Meyer, testified that:
   a. There were times when he would have to unlock a cart, despite the person not actually stealing anything; the person would come into the store, not purchase anything, then attempt to leave, and the cart would lock.
   b. He does not know if customers would be surprised when the wheels locked, but he would say that they would be "**mostly confused**." (NOTE: This perfectly illustrates the unreliable nature of the warning signage in communicating information about the presence of locking wheels and/or the unexpected nature of the wheels locking.)
   c. It would surprise him if there were multiple people that were injured by the system; he had not seen any of the incident reports produced in this matter.
   d. The carts will sometimes lock up when employees are using them for stocking; he would hope that they would be aware it was going to lock, "unless it was their first day." It doesn't make sense if you don't know what it's doing, and they wouldn't anticipate it "unless they've read the signs at the door that explain the system or the warning placards on the carts themselves." (NOTE: In other words,

2

Mr. Wheeler is describing that even employees are at risk of the carts locking, despite the warnings being in place.)

    e.   Carts that are missing the warning placard are moved to the "graveyard"; he is not sure if that is a policy or a best practice. (Note: During my site visit, I observed a number of carts in the vestibule area that had missing warning placards regarding the locking wheels.)

2. Mr. Peterson, Store Manager of the Subject Fred Meyer, testified that:

    a.   When asked if he has any knowledge if Fred Meyer took any action with regard to the shopping cart locking mechanism in relation to a March 2021 incident where a customer reported the cart locking, which resulted in the customer running into the cart, he replied "They're running into the carts... I don't see them needing to do anything." (NOTE: The risk of running into the cart after it stops is a hazard and poses a risk of harm to the customer, as discussed in my initial report.)

    b.   If you get hurt on a cart, "it's due to inattention." (NOTE: Such an assertion is consistent with falsely attributing the failure mode, which will result in the continuation of the hazard and users continuing to be put at risk of harm; hence, it is not surprising that incidents were routinely occurring at Fred Meyer facilities in Washington).

    c.   Fred Meyer does not have a policy that customers are not supposed to enter and exit the store without buying anything; if they don't go through the check stand, the cart will lock.

    d.   Some of the carts will make a sound when they are going to lock, and some will not.

3. Mr. Harter, Senior Director of Systems Support for Gatekeeper, testified that:

    a.   If a cart does not go through a transaction point, it will lock up at the door.

    b.   Gatekeeper has technology that results in the cart not locking up if the cart is empty; it's called "SmartExit." Gatekeeper decided to offer this system "to stop empty carts from locking."

    c.   Kroger has a few stores that are in trial with SmartExit, but none have been purchased.

    d.   Gatekeeper is aware of people striking their bodies against a cart when it locks.

The point to be made from the foregoing is that the Defendants knew and/or should have known of incidents involving people being injured by the cart wheels unexpectedly locking, even with the warning signage in place. The recurring themes across these reports include patrons not expecting the cart to suddenly stop, and/or colliding with and/or running into the cart and/or sustaining injuries; these overarching and recurring themes are consistent with the discussion of the hazard associated with this system found in my initial report. In short, the testimony and incident reports showing that dozens of incidents have been documented at Fred Meyer facilities in Washington State provide more support for my conclusions in this matter, and it also illustrates that the plan chosen to attempt to mitigate the hazard (i.e., the warnings) is unreliable.

3

Notably, the existence of the SmartExit system is an engineering control (higher on the Safety Hierarchy than warnings) designed to reduce the risk of empty cart activations (like Ms. LaRocque's). In other words, instead of relying solely on warning signage to attempt to alert pedestrians of the risk that their cart may unexpectedly stop, an engineering control like SmartExit appears to have been designed to reduce the underlying hazard by preventing the cart wheels from locking up when a customer is not engaged in theft and has an empty cart (which is consistent with what occurred in this case). The SmartExit system offered by Gatekeeper provides more support for the conclusion that an empty cart locking scenario is a foreseeable/recurring event, and that there is a measure available to more reliably reduce the risk of injury associated with it relative to reliance on the various warnings (which are unreliable for all reasons discussed in my initial report). However, I have seen no evidence that Kroger/Fred Meyer had purchased and/or installed the system to reduce the risk of harm posed by the locking shopping carts at the subject Fred Meyer.

In short, none of the conclusions expressed in my initial report have changed, and the new information I have reviewed (including the prior incidents at multiple Fred Meyer facilities in Washington State and the deposition testimony of Mr. Wheeler, Mr. Peterson, and Mr. Harter) all provide further support for my conclusions in this matter.

Please let me know if I can be of any further assistance.

Sincerely,

Levi Dixon, M.S., CXLT, CSP, CHFP
Senior Engineer

4