LINDA LAROCQUE,

                Plaintiff,

     v.

THE KROGER CO., a foreign corporation doing business in Washington state; and FRED MEYER STORES, INC., a foreign corporation doing business in Washington state, a/k/a TACOMA-STEVENS FRED MEYER; GATEKEEPER SYSTEMS, INC., a foreign corporation doing business in Washington state,

                Defendants.

NO. 3:25-cv-05380-MJP

GATEKEEPER SYSTEM, INC.'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

NOTE ON MOTION CALENDAR: MONDAY, JULY 6, 2026

ORAL ARGUMENT REQUESTED

## I.    INTRODUCTION

Plaintiff's Response confirms what Gatekeeper's motion established: Plaintiff cannot prove the essential elements of her product liability claims under the Washington Product Liability Act ("WPLA"). Plaintiff's failure-to-warn claim fails because she has not conducted any analysis of the likelihood or seriousness of harm at the time of manufacture, proposed no adequate alternative warning language, and her expert, Mr. Dixon, expressly declined to "redesign the warning system." Plaintiff's design defect claim likewise fails because Mr. Dixon

FLOYD | PFLUEGER
KEARNS, NEDDERMAN & GRESS P.S.
3101 Western Avenue, Suite 400
Seattle, WA 98121-3017
206-441-4455

explicitly testified he did not conduct a risk-utility analysis, was unfamiliar with that test, and performed no consumer expectation analysis. Despite Plaintiff's assertions to the contrary, the SmartExit system, Plaintiff's sole proposed alternative design, was not commercially available at the time of the incident and remains unavailable to Fred Meyer stores today. Plaintiff cannot manufacture genuine disputes of material fact by misrepresenting her expert's opinions or substituting legal conclusions for evidence. This Court should grant summary judgment dismissing all claims against Gatekeeper.

## II.     REPLY

### A.     Plaintiff Fails to Satisfy the Essential Elements of Her Inadequate Warning Claim

Plaintiff bears the burden of showing that Gatekeeper's warnings were inadequate under RCW 7.72.030(1)(b), which requires proof that "at the time of manufacture, the likelihood that the product would cause the claimant's harm or similar harms, and the seriousness of those harms, rendered the warnings or instructions of the manufacturer inadequate and the manufacturer could have provided the warnings or instructions which the claimant alleges would have been adequate." RCW 7.72.030.  Plaintiff also must prove proximate cause. *Hegre v. Simpson Dura-Vent Co.,* 50 Wash. App. 388, 393, 748 P.2d 1131 (1988).

Under the WPLA, Plaintiff must prove: (1) the likelihood of harm at the time of manufacture; (2) the seriousness of that harm; and (3) that these factors rendered the warnings inadequate when the manufacturer could have provided adequate warnings. RCW 7.72.030. Plaintiff's opposition repeatedly asserts that Mr. Dixon opined the warnings were "inadequate," "misleading," "ambiguous," and "contradictory." These conclusory labels are far from what is required as essential elements under a WPLA failure to warn claim.

FLOYD | PFLUEGER
KEARNS, NEDDERMAN & GRESS P.S.
3101 Western Avenue, Suite 400
Seattle, WA 98121-3017
206-441-4455

*1.* *Mr. Dixon Did Not Analyze Likelihood or Seriousness of Harm Regarding Warnings*

The WPLA requires proof of the "likelihood that the product would cause the claimant's harm or similar harms" at the time of manufacture. *Id.* "Likelihood" means "probability[] that an event would occur" and "contemplates statistical evidence on probability." *Ayers by & through Ayers v. Johnson & Johnson Baby Prods. Co.*, 818 P.2d 1337, 1345 (Wash. banc 1991). In addition, the WPLA requires that the Plaintiff analyze the seriousness of the harm. *Id.*

Mr. Dixon explicitly testified that he performed no such analysis. When asked whether he reviewed "any data specifically addressing injuries—the rate of injuries to individuals hitting carts when they lock because they're going through a shoplifting system," Mr. Dixon responded that he had not, adding: "And it's really irrelevant to my analysis on whether this creates a potential danger." *Id.,* **ECF 115-3** (Dixon Dep.), at 58:6–21.

Mr. Dixon's declaration now attempts to correct this missing analysis by invoking "70 other incidents" at Fred Meyer stores. But Mr. Dixon never calculated what percentage of total cart users these 70 incidents represent, never analyzed exposure rates, and expressly testified that such data was "irrelevant" to his analysis. Further, Mr. Dixon has no idea what specific Gatekeeper system, if any, was the anti-theft system installed at the store. Nor does he know what warning signs were installed, where they were installed, what language was used on those warning signs, or whether the signs were the same as those installed on the subject store's carts.

Without this analysis, 70 incidents across various stores with differing circumstances prove nothing about "likelihood" under the statute. Plaintiff, or Mr. Dixon, cannot present any "statistical evidence on probability" regarding warnings on the various shopping carts involved in these other alleged incidents.

**FLOYD | PFLUEGER**
KEARNS, NEDDERMAN & GRESS P.S.
3101 Western Avenue, Suite 400
Seattle, WA 98121-3017
206-441-4455

### 2. Mr. Dixon Did Not Conduct a Consumer Expectation Analysis for Warnings

The WPLA permits Plaintiff to prove inadequate warnings through either risk-utility balancing or consumer expectation analysis. *Soproni v. Polygon Apartment Partners*, 137 Wash. 2d 319, 971 P.2d 500 (1999); *Ayers by & through Ayers v. Johnson & Johnson Baby Prods. Co.*, 818 P.2d 1337, 1345 (Wash. banc 1991). Mr. Dixon conducted neither.

Mr. Dixon explicitly testified: "I wouldn't say that I conducted a specific consumer expectation analysis." **ECF #115-3** (Dixon Dep.), at 91:14–21. He testified that he reviewed no "consumer research, market research, or literature addressing a consumer's awareness of anti-theft cart systems." **ECF #115-3** (Dixon Dep.), at 25:1-25; 26:1-4. His declaration now asserts that "adequate warnings were not provided to communicate the information necessary to reliably warn a customer," but this conclusion still lacks foundation in any analysis of what an ordinary consumer would expect from a shopping cart anti-theft system.

The consumer expectation test requires proof that "the product was unsafe to an extent beyond that which would be contemplated by the ordinary consumer." *E.g.*, *Anderson v. Weslo, Inc.*, 906 P.2d 336, 340 (Wash. App. 1995). Mr. Dixon offers no evidence establishing baseline consumer expectations. Mr. Dixon presents no surveys, no market research, no industry standards, and no comparison to consumer expectations for similar anti-theft systems. His personal opinion about what warnings "should" contain does not constitute evidence of ordinary consumer expectations.

Similarly, Mr. Dixon testified he did not conduct a risk-utility analysis. The risk-utility test requires balancing the likelihood and seriousness of harm against "the burden on the manufacturer to design a product that would have prevented those harms and the adverse effect

FLOYD | PFLUEGER
KEARNS, NEDDERMAN & GRESS P.S.
3101 Western Avenue, Suite 400
Seattle, WA 98121-3017
206-441-4455

that an alternative design that was practical and feasible would have on the usefulness of the product." RCW 7.72.030; *Ayers by & through Ayers v. Johnson & Johnson Baby Prods. Co.*, 818 P.2d 1337, 1345 (Wash. banc 1991). Mr. Dixon performed no analysis of Gatekeeper's burden to provide different warnings, no cost-benefit analysis, and no evaluation of whether alternative warnings would adversely affect the anti-theft system's usefulness in preventing push out theft.

### 3. Mr. Dixon Did Not Propose Adequate Alternative Warnings

RCW 7.72.030(1)(b) requires proof that "the manufacturer could have provided the warnings or instructions which the claimant alleges would have been adequate." RCW 7.72.030. Plaintiff must identify what "adequate" warnings would look like. Mr. Dixon expressly declined to do so. When asked "do you have any—do you have proposed alternative language that should have been used?" Mr. Dixon responded: "I haven't been asked to recreate the warning system, so no." **ECF #115-3** (Dixon Dep.), at 81:17–22. When asked whether he had "a recommendation or opinion on how those warning signs that are on the glass should have been presented," he again answered: "Again, it's really beyond the scope of my analysis to redesign the warning system. I'm really just doing an analysis of what was in place." *Id.* Mr. Dixon was clear that he is not offering any opinion regarding what Plaintiff would consider "adequate" as a warning under the WPLA.

Mr. Dixon's declaration now states that warnings should inform customers "of the hazard, the consequence, and how to avoid the hazard." But this generic statement of purported warning principles does not satisfy the WPLA statutory requirement. Plaintiff did not identify, and Mr. Dixon explicitly refused to identify any specific warnings Plaintiff alleges would have been adequate, the actual text that should have been present, the placement, or the format of warnings that Gatekeeper should have provided.

FLOYD | PFLUEGER
KEARNS, NEDDERMAN & GRESS P.S.
3101 Western Avenue, Suite 400
Seattle, WA 98121-3017
206-441-4455

Plaintiff cannot prove that Gatekeeper "could have provided" adequate warnings when her own expert refused to specify what those warnings would say or how they would be presented. The statute requires more than criticism of existing warnings; it requires proof of what adequate warnings would have been. RCW 7.72.030. Plaintiff has therefore failed to show an essential element of her failure to warn claim.

### 4. Plaintiff Cannot Establish Proximate Cause that an Alleged Inadequate Warning Caused Plaintiff's Injury

Even if Plaintiff could prove the warnings were inadequate under the WPLA statutory test, which she cannot, she still must prove proximate cause. *Kirkland v. Emhart Glass S.A.*, 805 F. Supp. 2d 1072, 1077 (9th Cir. 2011). Proximate cause comprises two elements: cause in fact and legal causation. *Id*

Mr. Dixon testified he did not conduct proximate cause analysis specifically tied to the warnings. When asked whether he analyzed "whether the warning issue specifically caused the injury," he responded that he "looked at the cart system in its entirety, not the warnings." **ECF #115-3** (Dixon Dep.), at 100: 4–23. His declaration now asserts causation conclusions in attempt to have the Court disregard his explicit testimony. Mr. Dixon's post-deposition assertions cannot overcome his deposition testimony that he did not perform a warning-specific causation analysis. While Plaintiff can point to her orthopedic expert in an effort to show causation, showing that the physical striking of a plaintiff's knee against the cart was the cause of the alleged injury is entirely separate from showing that the alleged *inadequate warnings caused the alleged injury*. Plaintiff has not made any such showing.

Plaintiff cannot establish that different warning language would have changed her behavior on May 6, 2024. She used the cart for "balance" while recovering from knee surgery.

GATEKEEPER SYSTEM, INC.'S REPLY IN SUPPORT OF ITS MOTION
FOR SUMMARY JUDGMENT- 6

3:25-CV-05380-MJP

She did not purchase any merchandise and attempted to exit without going through checkout. Mr. Dixon provides no analysis of how any alternative warning would have caused Ms. LaRocque to act differently under these specific circumstances.

Moreover, Ms. LaRocque testified she shopped at this Fred Meyer store at least once or twice a week for approximately twenty years before the accident, including after the 2017 installation of the PurCheck system. **ECF #115-2** (L. LaRocque Dep.), at 44:17-21. She had extensive familiarity with the store and its operations. The warning signs Gatekeeper provided stated that carts "may stop unexpectedly at exit doors." Even if Ms. LaRocque never saw these specific warnings on the date of the incident, her twenty years of shopping at Fred Meyer, including the several years with the PurCheck system installed, gave her ample opportunity to understand that carts might lock.

5. *Plaintiff's Arguments About Warning Placement and Maintenance Fail*

Under RCW 7.72.030(1)(c), post-manufacture warning duties arise only when "a manufacturer learned or where a reasonably prudent manufacturer should have learned about a danger connected with the product after it was manufactured." Plaintiff presents no evidence that Gatekeeper learned, or should have learned, that warning signs were missing from specific carts. Plaintiff argues that warning signs on the doors were "partially or completely obscured" and that some carts lacked warning placards. These arguments fail. First, there is no evidence the cart Ms. LaRocque used lacked a warning sign or that it was obscured. The only evidence is that Ms. LaRocque did not recall seeing one, but her failure to observe a sign does not prove it was absent.

However, whether there was a warning sign present or not is immaterial insofar as it

FLOYD | PFLUEGER
KEARNS, NEDDERMAN & GRESS P.S.
3101 Western Avenue, Suite 400
Seattle, WA 98121-3017
206-441-4455

concerns Gatekeeper. Gatekeeper's maintenance obligations are governed by its break-fix service relationship with Fred Meyer. Gatekeeper advised Fred Meyer that damaged or missing signs needed to be replaced and maintained a service protocol requiring Fred Meyer to notify Gatekeeper of needed repairs. **ECF #115-1 (**Harter Dep.), at 44:25–45:26 Fred Meyer never contacted Gatekeeper about missing or damaged warning signs on carts at the subject store. Mr. Dixon conceded that responsibility for notifying Gatekeeper about missing cart placards rests with the individual stores, not Gatekeeper. **ECF #115-3** (Dixon Dep.), at 80:5–16; 92:6–8. Without notification from Fred Meyer, Gatekeeper had no basis to know that particular carts needed sign replacement.

Finally, the door signage placement was dictated by Fred Meyer store management to ensure signs would not be "subsequently removed or obscured." **ECF #115-1** (Harter Dep.), at 39:7–9, 20–25; 40:1; 44:6–15. Gatekeeper recommended placement "in the line of sight" focused on exiting customers, but "ultimate placement location is dictated by the store manager." **ECF #115-1** (Harter Dep.), at 39:7–9, 20–25; 40:1; 44:6–15.

### B. Plaintiff Fails to Satisfy the Essential Elements of Her Claim the PurCheck System was Not Reasonably Safe as Designed

Plaintiff's design defect claim fails because she cannot satisfy either the risk-utility test or the consumer expectation test under RCW 7.72.030(1)(a) and (3). *E.g. Anderson v. Weslo, Inc.*, 79 Wash. App. 829, 906 P.2d 336 (1995).

#### 1. *Plaintiff Did Not Conduct Risk-Utility Analysis*

As noted herein, under the risk-utility test, "a product is not reasonably safe as designed, if, at the time of manufacture, the likelihood that the product would cause the claimant's harm or similar harms, and the seriousness of those harms, outweighed the burden on the manufacturer

GATEKEEPER SYSTEM, INC.'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT- 8

3:25-CV-05380-MJP

FLOYD | PFLUEGER
KEARNS, NEDDERMAN & GRESS P.S.
3101 Western Avenue, Suite 400
Seattle, WA 98121-3017
206-441-4455

to design a product that would have prevented those harms and the adverse effect that an alternative design that was practical and feasible would have on the usefulness of the product." RCW 7.72.030. This test "require[s] a balancing test" with specific elements on each side of the scale. *Ayers by & through Ayers v. Johnson & Johnson Baby Prods. Co.*, 818 P.2d 1337, 1345 (Wash. banc 1991). "On one side of the balance … are the likelihood that the product would cause the claimant's harm or similar harms and the seriousness of those harms." *Id.* "On the other side of [the] balance are the burden on the manufacturer to design a product that would have prevented those harms, and the adverse effect that a feasible alternative design would have on the usefulness of the product." *Id.* Likelihood is the "probability[] that an event would occur." *Ayers*, 818 P.2d at 1346. A showing of likelihood thus contemplates statistical evidence on probability. *See, e.g., Paul v. Henri-Line Mach. Tools*, *Inc.*, 938 F. Supp. 2d 691, 699 (E.D. Mich. 2013); *Monahan v. Toro Co.*, 856 F. Supp. 955, 959 (E.D. Pa. 1994).

Further, the risk utility test does not require that a manufacturer's product be the safest it can be. "Most any product can be made more safe." *Branham v. Ford Motor Co.*, 701 S.E.2d 5, 16 (S.C. 2010). But, "a manufacturer is not expected to produce an accident free product, it is not an insurer of the users of its product and it need not adopt every possible safety device." *Baumgardner v. Am. Motors Corp.*, 522 P.2d 829, 832 (Wash. banc 1974).

Mr. Dixon admittedly did not perform this analysis. When asked "Did you conduct any risk utility analysis through your process?" he answered: "I am not familiar with a risk utility analysis so I did not conduct that." **ECF #115-3** (Dixon Dep.), at 91: 5–9. Plaintiff's opposition attempts to sidestep this admission by arguing that the "evidence establishes Gatekeeper's violation" under risk-utility theory. Mr. Dixon's declaration does not cure this deficiency, in part

GATEKEEPER SYSTEM, INC.'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT- 9

3:25-CV-05380-MJP

FLOYD │ PFLUEGER
KEARNS, NEDDERMAN & GRESS P.S.
3101 Western Avenue, Suite 400
Seattle, WA 98121-3017
206-441-4455

because it is based on factually inaccurate information. Mr. Dixon opines that implementing SmartExit "would have prevented harm to customers exiting the stores with empty carts due to empty cart activations, with no or minimal effect on the usefulness of the product."

As a preliminary issue, this isolated statement does not constitute risk-utility analysis. Mr. Dixon still has not analyzed the likelihood of harm at the time of manufacture, has not quantified the seriousness of the harm, and has not weighed these factors against Gatekeeper's burden to implement an alternative design that was not yet commercially available. However, as noted in Gatekeeper's Motion, the SmartExit system was not available on the date of the subject incident.

### 2. The SmartExit System Was Not a Feasible Alternative Design

The WPLA requires that alternative designs be "practical and feasible" at the time of manufacture. RCW 7.72.030(1)(a). Here, it is Plaintiff's burden to show that the SmartExit system was "practical and feasible" at the time of the incident. Plaintiff has not shown any evidence that it was. Mr. Harter, Gatekeeper's representative testified that the SmartExit System, has only been deployed in a limited testing capacity "recently" and that it was not available at the time Kroger contracted with Gatekeeper for the system to be installed at the subject store. **Declaration of Skyler P. Urban in Support of Reply** (Harter Dep.), at 55. SmartExit remains in "trial and proof of concept testing" at "a few select Kroger Stores." **ECF #115-1** (Harter Dep.), at 35:23-24. A design that was not available on the date of the incident cannot be "practical and feasible" for purposes of imposing liability on a manufacturer.

If Plaintiff is attempting to argue, **without support**, that the SmartExit system was available for the subject store on the date of the alleged injury, it is also important to note that Gatekeeper, by definition, did not fail to design a product that could have prevented Plaintiff's

GATEKEEPER SYSTEM, INC.'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT- 10

3:25-CV-05380-MJP

FLOYD | PFLUEGER
KEARNS, NEDDERMAN & GRESS P.S.
3101 Western Avenue, Suite 400
Seattle, WA 98121-3017
206-441-4455

harm, but that the subject store did not chose to opt into or pay for an additional product offered by Gatekeeper.

The risk-utility test in RCW 7.72.030(1)(a) specifically contemplates a defendant failed "to design" a particular product that would have prevented the claimant's harm. Its risk-utility test is not phrased in terms of a manufacturer failing "to require" a particular feature but only failing "to design" one. RCW 7.72.030(1)(a).

When "a customer exercises an option to purchase a product without a safety feature, it is axiomatic that the manufacturer should not be held liable for damages which that safety feature may have prevented." *Austin v. Clark Equip. Co.*, 48 F.3d 833, 837 (4th Cir. 1995). "It makes no practical sense to impose liability on" the manufacturer "for failing to equip" a product "with an optional [safety] device that [the purchaser] knowingly rejected." *Scallan v. Duriron Co., Inc.*, 11 F.3d 1249, 1254 (5th Cir. 1994). Numerous authorities are in accord. *See, e.g., Babin v. Yale Mats. Handling Corp.*, No. 94-1537, 1995 WL 115857, at *3 (4th Cir. 1995); *Curtis*, 649 F.2d at 811; *Anderson v. P.A. Radocy & Sons, Inc.*, 865 F. Supp. 522, 531 (N.D. Ind. 1994); *Butler v. Navistar Int'l Transp. Corp.*, 809 F. Supp. 1202, 1209 (W.D. Va. 1991); *Brewer v. PACCAR, Inc.*, 124 N.E.3d 616, 625 (Ind. 2019); *Loredo v. Solvay Am., Inc.*, 212 P.3d 614, 631 (Wyo. 2009); *Banzhaf*, 28 S.W.3d at 187; *Rotzoll*, 681 N.E.2d at 161; *Morrison v. Kubota Tractor Corp.*, 891 S.W.2d 422, 428 (Mo. App. 1994); *Davis v. Caterpillar Tractor Co.*, 719 P.2d 324, 327 (Colo. App. 1985).

Gatekeeper had not located any Washington authority contradicting the holding in various other jurisdictions listed above, *i.e.*, that the risk-utility test is applicable when, as alleged by Plaintiff (without support) that Gatekeeper designed and offered the subject product, but the

FLOYD | PFLUEGER
KEARNS, NEDDERMAN & GRESS P.S.
3101 Western Avenue, Suite 400
Seattle, WA 98121-3017
206-441-4455

customer simply did not opt to purchase it. Such a holding would be inconsistent with the plain language of RCW 7.72.030(1)(a). It would also be inconsistent with the Washington Supreme Court's recognition that "a manufacturer is not expected to produce an accident free product, it is not an insurer of the users of its product and it need not adopt every possible safety device." *Baumgardner v. Am. Motors Corp.*, 522 P.2d 829, 832 (Wash. banc 1974). Plaintiff is required to show that the PurCheck system was not reasonably safe as designed, not that an alternative product *could* be safer. Plaintiff has failed to conduct a risk-utility analysis, and her design defect claim must be dismissed.

Finally, Plaintiff's reliance on Fred Meyer's tender letter is misplaced. Fred Meyer's allegations against Gatekeeper in a third-party tender do not constitute evidence of Gatekeeper's liability to Plaintiff or what was available to consumers at the time of the incident. The tender letter represents Fred Meyer's attempt to shift its own potential liability, nothing more. Further, the tender letter assertions regarding smart exit technology are factually wrong. As made clear by the evidence in this case, there was no SmartExit system at the store at the time of the incident, and it was not available until recently. A tender letter's assertions are not evidence of a design defect and do not create genuine disputes of fact regarding what designs were feasible in 2024.

   3. *Plaintiff Did Not Conduct Consumer Expectation Analysis Concerning the Alleged Design Defect*

As noted above, the consumer expectation test requires proof that "the product was unsafe to an extent beyond that which would be contemplated by the ordinary consumer." *E.g.*, *Anderson v. Weslo, Inc.*, 906 P.2d 336, 340 (Wash. App. 1995). "Under the 'consumer expectations' test, [a plaintiff] must show that the [product] was more dangerous than the ordinary consumer would expect." *Id.*

FLOYD | PFLUEGER
KEARNS, NEDDERMAN & GRESS P.S.
3101 Western Avenue, Suite 400
Seattle, WA 98121-3017
206-441-4455

Mr. Dixon testified: "I wouldn't say that I conducted a specific consumer expectation analysis." **ECF #115-3** (Dixon Dep.), at 91:14–21. He reviewed no literature or market research addressing consumer awareness of anti-theft cart systems. His declaration now asserts that the system "was unsafe and posed a serious risk of harm to customers," but this conclusion is unaccompanied by any actual analysis of ordinary consumer expectations.

The consumer expectation test focuses on what ordinary consumers reasonably expect from the product. Shopping cart anti-theft systems are widely deployed in retail environments. Ordinary consumers understand that stores employ theft-prevention measures. The warnings Gatekeeper provided, stating that carts "may stop unexpectedly at exit doors," align with what consumers would expect from an anti-theft system.

In *Anderson v. Weslo, Inc*., the court held that a trampoline's design was not unreasonably dangerous where "the risks of trampoline use are obvious and expected by ordinary consumers." *Anderson v. Weslo, Inc.,* 79 Wash. App. 829, 906 P.2d 336 (1995). Similarly here, the risk that an anti-theft cart system might activate when a cart exits without going through checkout is obvious and expected. Consumers understand that anti-theft systems are designed to prevent merchandise theft and may activate in various circumstances. Plaintiff presents no evidence to the contrary.

> 4.  *Plaintiff's "Empty Cart Scenario" Argument Does Not Establish Defect*

Plaintiff argues extensively that Gatekeeper knew "over half of wheel lock activations involved innocent customers with empty carts." Even accepting this unsupported assertion, it does not prove the PurCheck system was defectively designed. The PurCheck system is specifically designed to activate when a cart exits without passing through the checkout area

FLOYD | PFLUEGER
KEARNS, NEDDERMAN & GRESS P.S.
3101 Western Avenue, Suite 400
Seattle, WA 98121-3017
206-441-4455

where it receives electronic authorization. This design serves the system's core anti-theft purpose: preventing "push out" thefts where individuals load carts with merchandise and exit without paying. The fact that some activations involve empty carts does not render the system defective under the WPLA. A product is not defective merely because it can cause harm in some circumstances. *Thongchoom v. Graco,* 117 Wash. App. 299, 304, 71 P.3d 214 (2003).

Plaintiff also presents no evidence that the May 6, 2024 activation log is representative of typical activation patterns, nor any evidence of what percentage of empty cart scenarios result in injuries. The log shows 12 empty cart activations out of 21 total activations on one day. Without evidence of injury rates, total cart usage, or long-term patterns, this single-day snapshot proves nothing about the product's reasonable safety. As noted in Gatekeeper's Motion and herein, the PurCheck system includes warnings specifically addressing the activation at exits. The signs state: "Shopping Carts may stop unexpectedly at exit doors." Customers are warned that carts may stop at exits, precisely what happened with Ms. LaRocque.

### 5. Industry Custom and Standards Support Gatekeeper

RCW 7.72.050(1) provides that "[e]vidence of custom in the product seller's industry, technological feasibility or that the product was or was not, in compliance with nongovernmental standards or with legislative regulatory standards or administrative regulatory standards, whether relating to design, construction or performance of the product or to warnings or instructions as to its use may be considered by the trier of fact." RCW 7.72.050.

The undisputed evidence shows that Gatekeeper's PurCheck system is deployed "in stores across the world" including "the United States, Canada, Europe, the UK, and Australia." This widespread deployment demonstrates industry acceptance of the basic PurCheck design.

GATEKEEPER SYSTEM, INC.'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT- 14

3:25-CV-05380-MJP

FLOYD | PFLUEGER
KEARNS, NEDDERMAN & GRESS P.S.
3101 Western Avenue, Suite 400
Seattle, WA 98121-3017
206-441-4455

Plaintiff presents no evidence that industry standards require empty-cart detection features or that Gatekeeper's design deviates from accepted industry practice.

While compliance with industry standards is not dispositive, it is relevant evidence that the design meets reasonable safety expectations. *Soproni v. Polygon Apartment Partners*, 137 Wash. 2d 319, 971 P.2d 500 (1999). Plaintiff's theory would require this Court to conclude that the thousands of PurCheck systems deployed worldwide are all defectively designed because they lack an optional feature still in trial deployment. The WPLA does not impose such broad liability.

### III.   CONCLUSION

Plaintiff has failed to present evidence creating genuine disputes of material fact and has not presented sufficient evidence to survive summary judgment on her WPLA claims. Plaintiff did not conduct the risk-utility analysis or consumer expectation analysis required by statute. Plaintiff did not propose adequate alternative warnings or analyze the likelihood of harm at the time of manufacture. Plaintiff's expert has expressly testified that he did not perform risk-utility analysis and was unfamiliar with that test. The alternative design Plaintiff identifies, SmartExit, was not even commercially available at the time of the incident.

Summary judgment is appropriate when the nonmoving party fails to produce more than a "scintilla" of evidence on essential elements of her claims. Plaintiff cannot satisfy essential elements of her WPLA claims. For these reasons, Gatekeeper respectfully requests that this Court grant its Motion for Summary Judgment and dismiss all claims asserted against Gatekeeper Systems, Inc. with prejudice.

*I certify that this Reply contains 4180 words in compliance with the Local Rules.*

GATEKEEPER SYSTEM, INC.'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT- 15

3:25-CV-05380-MJP

FLOYD | PFLUEGER
KEARNS, NEDDERMAN & GRESS P.S.
3101 Western Avenue, Suite 400
Seattle, WA 98121-3017
206-441-4455

Dated this 6th day of July, 2026.

FLOYD | PFLUEGER
KEARNS, NEDDERMAN & GRESS, P.S.

By: _____
Francis S. Floyd, WSBA No. 10642
Skyler P. Urban, WSBA No. 58761
3101 Western Ave, Suite 400
Seattle, WA  98121
206-441-4455
ffloyd@nwtrialattorneys.com
surban@nwtrialattorneys.com
*Attorneys for Defendant Gatekeeper Systems, Inc.*

GATEKEEPER SYSTEM, INC.'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT- 16

3:25-CV-05380-MJP

FLOYD | PFLUEGER
KEARNS, NEDDERMAN & GRESS P.S.
3101 Western Avenue, Suite 400
Seattle, WA 98121-3017
206-441-4455

# DECLARATION OF SERVICE

Pursuant to RCW 9A.72.085, I declare under penalty of perjury and the laws of the State of Washington that on the below date, I delivered a true and correct copy of the foregoing via the method indicated below to the following parties:

| Robert C. Wilke<br>Ian M. Leifer<br>Gordon Thomas Honeywell, LLP<br>1201 Pacific Avenue, Ste. 2100<br>Tacoma, WA 98401<br>rwilke@gth-law.com<br>ileifer@gth-law.com | *Counsel for Plaintiff* | ☒ Via Email/E-Service<br>☐ Via U.S. Mail |
|---|---|---|
| John R. Barhoum<br>Sarah Tuthill-Kveton<br>Hanna R. Lukes<br>Samuel ben Behar<br>Chock Barhoum, LLP<br>121 SW Morrison St, Suite 500<br>Portland, OR 97204<br>john.barhoum@chockbarhoum.com<br>sarah@chockbarhoum.com<br>hanna.lukes@chockbarhoum.com<br>sam.behar@chockbarhoum.com | *Counsel for Defendants The Kroger Company and Fred Meyer Stores, Inc.* | ☒ Via Email/E-Service<br>☐ Via U.S. Mail |

DATED this 6th day of July, 2026.

_s/ Sophia E. S. Katinas_
Sophia E. S. Katinas, Legal Assistant

GATEKEEPER SYSTEM, INC.'S REPLY IN SUPPORT OF ITS MOTION
FOR SUMMARY JUDGMENT- 17

3:25-CV-05380-MJP

**FLOYD | PFLUEGER**
KEARNS, NEDDERMAN & GRESS P.S.
3101 Western Avenue, Suite 400
Seattle, WA 98121-3017
206-441-4455