**In the Matter Of:**

LAROCQUE vs THE KROGER CO.

3:25-cv-05380-MJP

---

**LEVI DIXON MS**

*May 20, 2026*

---

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

A. My recollection is that it was in a similar location to the photographs that were taken after the incident showing where it was located. So my understanding is it was in a similar location.

Q. When you say the photos taken after the incident, which photos are you referring to?

A. My recollection is the Larocques had taken some photographs that were provided in the discovery material.

Q. Okay. Do you know if the Larocques took it or if plaintiff's counsel took those photos?

A. You know, I would have to look back through the discovery to confirm one way or the other.

Q. Okay. We can move on to the placards on the carts themselves. I think the big issue here is we don't know the specific cart she used. Is that your understanding?

A. That is my understanding, that the specific cart was not pulled aside or documented in some form or fashion.

Q. Okay. So when you were doing your analysis and coming to a conclusion of what the status of a warning placard was at the time of the incident,

what information or sources did you use to determine that?

A. It would be first the testimony of the Larocques. They described that after the incident they were essentially shocked and confused at what was happening, that they inspected the cart and that there was no warning placard.

Q. I'm going to go through some things in your report. Do you have a copy with you? The first report, your initial one.

A. I do have a hard copy so if you see me looking down, if that's all right, that's what I'll be looking at.

Q. All right. I don't want to take up the screen with the report so I'm not going to share unless it's needed.

So in your report you used a two-foot stopping distance from the pedestrian or walker's torso to the handlebar when calculating reaction time. Is that accurate?

A. That's for illustration. That's not to say that each and every shopper or even that the Larocques were walking in that exact manner, but that was just for illustrative purposes.

Q. Okay.

A. But yes.
Q. A general number but not specific to Miss Larocque.
A. That's correct.
Q. Do you know where you got that number from, the two feet?
A. That was just for illustrative purposes that I utilized. If you go to any grocery store you can observe people walking with their arms straight out in front of them. Some people will actually be physically leaning on the cart. Some people rest their forearms on the handlebars. So I just used the two feet for illustrative purposes.
Q. So Miss Larocque testified that she pushed the cart with her arms extended in front of her and that she stood up and down. Do you have any indication as to whether that would be more or less than two feet away from the handlebar?
A. You know, my recollection is that she did describe what you were stating, but then I believe it was also asked if she was potentially leaning forward onto the cart, and she stated that she wasn't sure or didn't recall or didn't know. But having said that, I didn't specifically measure her arms to get an exact distance.

Q. Okay. That would impact reaction time, wouldn't it? If the distance is greater or less than that two feet?
A. It wouldn't necessarily affect the reaction time but it would affect potentially how much time you have to react before striking it.
Q. Kind of the stopping distance before striking the handlebar?
A. It would affect the amount of time that you would have to react to stop before striking the handlebar or potentially striking your shin or knee on the structure underneath the handlebar.
Q. Okay. In your report you noted you used a walking speed of about four feet per second; where did you get that speed from?
A. That's a fairly typical average walking speed for adults. There's a lot of data on that. And one that comes to mind would be from Jerry Eubanks, that's E-U-B-A-N-K-S, publishes walking speed data.
Q. So that's not based on any measurement of Miss Larocque's walking speed?
A. That is correct. I was just, again for illustrative purposes, using an average walking speed of four feet per second.

Q. Are you aware of Mr. Larocque's testimony that they were walking slowly?
A. Yes.
Q. And are you aware that he testified if they were walking faster he, quote, would have been on top of her?
A. Sorry. Can you repeat that again, please.
Q. Mr. Larocque testified that they were walking slowly, if they were walking faster he would have been right on top of her. "Her" being Miss Larocque. Do you recall seeing that testimony?
A. If it was in there I would have seen it. I don't recall that specifically off the top of my head.
Q. Do you recall seeing that Mr. Larocque was walking with a cane?
A. Yes.
Q. Do canes have any impact on walking speeds?
A. They certainly can cause somebody to walk slower.
Q. And then do you have an understanding that Miss Larocque was a few months post knee surgery?
A. I do have that understanding, yes.
Q. Do you have an understanding she was

wearing a brace at the time of the incident?
A. That's my recollection, yes.
Q. Would either of those have an impact on someone's walking speed?
A. I would say it would depend on the person, but there's a possibility of that, yes.
Q. Did you consider those factors when using the illustrative example of four feet per second for walking speed?
A. I certainly considered that testimony. Again, if you look at the safety analysis I did, I was just using round numbers for an average person. It goes without saying that someone walking at an average speed is put at risk of harm for all of the factors I talked about, as is somebody that's walking slower.
Q. Okay. Do you have an opinion whether Miss Larocque was walking at the average speed of four feet per second or slower?
A. You know, I can't say definitively, but if you look at their testimony, they described walking slowly, which would indicate potentially slower than four feet per second.
Q. If someone's walking slower does that mean they have more time to react to a potential hazard?

A. I agree with that. And again, what you've just said perfectly illustrates that prior incidents are generally unreliable or it's unreliable to rely on them when we know that an injury happened here and yet there's not even an incident report. So it's not surprising that I haven't seen an incident report for any of those to the extent that an injury did occur.

Q. Of the cases that did -- of the incidents that did note an injury, do you know how many of them included or revolved around someone's knee striking the cart?

A. Not a specific number. But I know that a number of them described twisting knees, striking knees, striking shins. In other words, lower limbs striking the cart or being injured.

Q. So one aspect of your opinions is that Miss Larocque's behavior was predictable from a human factors perspective. Is that a fair description of one of your opinions?

A. Yes, sir.

Q. Okay. And she testified that she used the cart solely for balance and mobility. Do you recall that?

MR. WILKE: Object to form.

A. I don't recall her stating that it was solely for balance and stability. I recall that she was shopping for merchandise and she described that she was using it for stability, though.

Q. Okay. Is it predictable for a customer to use a cart for stability and balance versus carrying of goods?

A. I would say, again in the context of this case, those aren't mutually exclusive. You can use it for both. And if you look at the incident reports, there are several that talk about - I believe, one talked about just having back surgery and was in physical therapy. Another one that talked about being in physical therapy. So I would say that it's certainly predictable that someone would use a cart for stability while they're shopping.

Q. Is that based on any data or surveys?

A. I didn't conduct any surveys. It's based on my experiences of shopping as well as my review of the evidence in this case.

Q. Shifting gears a little bit. You were retained by plaintiff's firm in this case. Have you ever worked with Mr. Wilke or his firm on other cases?

intended use of Gatekeeper system is?
A. To reduce the risk of push-outs or people loading up shopping carts and stealing merchandise.
Q. Okay. We've addressed these -- I think we've addressed these, but I want to put a fine point on it. Did you contact any risk utility analysis through your process?
A. I am not familiar with a risk utility analysis so I did not conduct that.
Q. Okay. You're not offering an alternative system engineering design of the system. Right?
A. I am not intending to offer an alternative engineering design, that's correct.
Q. Did you conduct a consumer expectation analysis?
A. I wouldn't say that I conducted a specific consumer expectation analysis but I certainly, from a safety and human factors perspective, analyzed the expectation of shoppers based on our previous experience using shopping carts, things of that nature.
Q. And in performing that analysis did you utilize any data regarding injuries with shopping cart anti-theft systems?
A. Not specifically other than I considered

the evidence in this case which involved a number of other incidents involving the locking wheels from the theft system.

Q. Okay. Earlier when we were talking about the process for replacing warning signs, fair to say you'd agreed that Gatekeeper would not know if a cart is missing a warning sign unless they were notified by the store. Right?

A. Other than if Gatekeeper did an inspection and observed that, I would generally agree with you.

Q. Okay. Did you, at any point in your analysis, look at what the warning language was -- bad question. Strike that.

During your analysis did you look at any warning signs used by competing shopping cart anti-theft companies?

A. Not to my recollection, no.

MR. URBAN: I think that's everything for me, Mr. Dixon. Great to see you. Appreciate your time.

THE WITNESS: Good to see you as well.

CROSS-EXAMINATION

BY MR. BEHAR:

Q. Hi, Mr. Dixon. Samuel Behar here on behalf

several other facilities such as office buildings, restaurants, churches, hotels, hospitals and theaters before narrowing this down?

A. I would need to refer back to the study. I don't dispute that but I don't recall it specifically as I sit here.

Q. Well, I can represent to you that it appears that the study only used 2,283 accident records that they considered as being injuries that occurred in retail stores in 2012. Does that sound correct?

A. Again, I don't have the study in front of me but I'm not disputing that. That's a fairly common methodology to use a sample and then extrapolate out from there. And it's an estimated number of injuries that happened.

Q. All right. So out of the 2,283 incidents that were reviewed, do you have any knowledge as to how many of them were due to wheel locks?

A. That level of detail, to my understanding, is not provided, so not specifically.

Q. Did you reach out and ask any of the authors of the study? Including I think I saw Aaron Harley in there who I know is local. Did you reach out and try to get any additional information

before citing the Kim paper?
A. No, I didn't feel the need to get that level of detail. This is really just background information that, as I testified to earlier, take this out of my analysis and none of my opinions change
Q. It also mentions, because you do mention: of all contact incidents, the object involves a shopping cart in over 31 percent of incidents. How many of these incidents were caused by shopping carts of the same style that were used at Fred Meyer store?
A. Really same answer, sir; I don't have that level of detail.
Q. Do you have any idea as to how many of them may have been flatbed carts like you'd see at Costco or Home Depot?
A. Not specifically.
Q. How about any large non standard carts such as the real big ones that you get at Costco that aren't flatbed?
A. I don't have specific information about each and every cart that is discussed in the study.
Q. All right. So how many of those 2,000 and so of - the 31 percent of the 2,000 and so that

are put at a serious risk of striking the cart with their torso, lower limbs or the like and/or losing their balance or falling.

How did you come to the conclusion that the specific mechanism of injury in this case is part of this generalized serious risk?

A. Well, if you look at all of the evidence in this case, Miss Larocque's testimony is consistent with the cart abruptly stopping, and then she describes that she then strikes her lower limb on it. Look at the stack of incident reports and you'll see people repeatedly describing slamming into the cart, striking their shin, striking their knees. One kid I believe gets hit in the face. So there's a whole bunch of incident reports describing an abrupt stop and then people striking the cart, which is consistent with what Miss Larocque described occurred.

Q. Did you perform any sort of kinematics analysis to determine how her knee could have possibly made contact with the shopping cart?

A. I did not do so. That's really beyond the scope of my analysis.

Q. You said, middle of page four: The evidence I have reviewed indicates that the

MR. WILKE: Object to form.
A. Unless other evidence comes out. For example, a video showing something completely different than what is all of the evidence indicates, there's nothing that would change my opinion --
Q. Do you think there's any --
A. -- in the defense expert report.
Q. Apologize. Do you think there's any additional testing that's needed from your perspective?
A. Nothing comes to mind for the sake of my opinions.
Q. And are you ready to testify at trial as we are here sitting today?
A. You bet I am.
Q. Okay. Go through my notes real quick. I think I got everything.
I think Skyler asked a little about this but I want to go over a couple quick things. Did you ever interview Miss Larocque?
A. No, sir.
Q. Have you ever seen Miss Larocque?
A. I believe there was maybe a photograph I saw of who I understood to be Miss Larocque but I

haven't seen her in person, for example.
Q. Did you interview any witnesses?
A. No, sir.
Q. Did you interview any of the investigating officials? Anybody from Fred Meyer? Anything like that? Did you ever request that?
A. I did not request that, no.
Q. Have you ever spoken to anybody from Gatekeeper?
A. Not to my knowledge.
Q. When you went to Fred Meyer for your inspection, did Fred Meyer know you were going to be going there?
A. Yes, sir.
Q. Who did you speak to when you were there?
A. Plaintiff's counsel Mr. Wilke was there, Mr. Urban was there, someone from your office was also there, and I believe it was Mr. Wheeler was also there.
Q. Outside of your report of February 25, 2026 and May 7, 2026, are there any opinions that you're prepared to give at trial that are not specifically laid out in either of these two documents?
A. Nothing specific comes to mind as I sit here.

C E R T I F I C A T E.

STATE OF WASHINGTON )
) ss.
COUNTY OF CLARK )

I, Gwen A. Dickson, a Registered Professional Reporter and Washington Certified Court Reporter, certify that the deposition of LEVI DIXON, M.S., occurred at the time and place set forth in the caption hereof; that at said time and place I reported in Stenotype all the testimony adduced and other oral proceedings had in the foregoing matter; that thereafter my notes were reduced to typewriting under my direction and the foregoing transcript, pages 1 through 117, both inclusive, contains a full, true and correct record of all such testimony adduced and oral proceedings had and of the whole thereof.

Witness my hand at Vancouver, Washington, this 30th day of May, 2026.

Gwen Dickson, RPR
WA CCR# 2442